## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DANIEL SUHR,

       Plaintiff,

  v.

DEAN R. DIETRICH, JANE ELLEN BUCHER,
MARGARET WRENN HICKEY, FRANCES
COYER MUNOZ, DEANNE M. KOLL, JOSEPH M.
CARDAMONE III, AND LARRY MARTIN, in their
official capacities as officers of the State Bar of
Wisconsin,

       Defendants.

## VERIFIED COMPLAINT

Plaintiff states his Verified Complaint against Defendants as follows.

## INTRODUCTION

1.    The State Bar of Wisconsin, a creation of the Wisconsin Supreme Court,

administers and promotes a "Diversity Clerkship Program," which has doled out paid

internship slots to almost 600 law students since its inception. Exs. 1:1;[1] 2:2.[2] The program offers a special path to coveted career opportunities at top Wisconsin employers.

2. Not all law students may participate, however. The eligibility requirements and selection and matching processes discriminate between students based on various protected traits, primarily race.

3. The program is unconstitutional. In a video posted on YouTube by the Bar, the Honorable Carl Ashley, a state circuit court judge who has promoted the program on behalf of the Bar, even conceded that it was probably illegal. Ex. 3:9:16.[3] The Fourteenth Amendment to the United States Constitution mandates that educational and employment opportunities "must be made available to all on equal terms" and "shall be the same for the black as for the white . . . ." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 202, 204 (2023) (quoted sources omitted). Affirmative action for student internships is just as unconstitutional as affirmative action for student admissions.

---

[1] https://web.archive.org/web/20231023162126/https://www.wisbar.org/aboutus/forla wstudents/Pages/Diversity-Program.aspx.

Exhibits include several webpages and responses to public records requests. The webpages may be viewed in the appendix or by clicking the permalink in the first footnote referencing the webpage. YouTube videos and certain social media posts cannot be easily permalinked; accordingly, the standard address is provided for such links. Some public record exhibits were sent by the agency with redactions. Plaintiff has additionally redacted law student names and what he believes are student ID numbers.

[2] https://web.archive.org/web/20231003170443/https://www.wisbar.org/NewsPublicat ions/InsideTrack/Pages/Article.aspx?Volume=15&Issue=14&ArticleID=29930.

[3] https://www.youtube.com/watch?v=-k86irV1zWE&t=5s.

4.      The Bar requires its members to fund the unconstitutional program—Plaintiff Daniel Suhr, an accomplished attorney and member, objects. Plaintiff is required to pay the Bar hundreds of dollars each year to maintain his membership. *See* Wis. Sup. Ct. R. (SCR) 10.01(1); SCR 10.03(5). If he does not pay, the Bar will suspend him, and an attorney cannot practice law while suspended. *See* SCR 10.03(6); SCR 20:8.4(f); Ex. 4:2.[4]

5.      Defendants are violating Plaintiff's First Amendment right to free speech under *Keller v. State Bar of California*, in which the United States Supreme Court held that an association like the Bar cannot compel an objecting member to fund activities that are not "germane" to a constitutionally permissible justification for mandatory membership. 496 U.S. 1, 13–14 (1990). The Court identified only two permissible justifications: "regulating the legal profession and improving the quality of legal services." *Id.* at 13. The Bar offers objecting members a so-called *Keller* "dues reduction" instead of abstaining from non-germane activities. Ex. 5:1.[5] The Bar classifies its various activities as either chargeable or non-chargeable to the mandatory portion of dues through an opaque procedure, ultimately determining a reduction amount. *Id.* Plaintiff took a reduction for this fiscal year, but because the

---

[4] https://web.archive.org/web/20231003164903/https://www.wisbar.org/formembers/groups/Pages/State-Bar-Bylaws.aspx#1.

[5] https://web.archive.org/web/20231003173910/https://www.wisbar.org/formembers/membershipandbenefits/Documents/2024%20Keller%20Dues%20Insert.pdf.

Bar incorrectly classified the program as chargeable, he has been forced to fund the program. Ex. 6:1.

6. The program should not exist, but at a minimum, under *Keller*, the Bar should have classified the program as non-chargeable. The Bar, via the program, violates the equal protection rights of law students. *See Students for Fair Admissions*, 600 U.S. at 213. It also advocates for supplanting equal opportunity with equal outcome and violates the free speech rights of students by discriminating against those who will not profess a commitment to this ideology. *See Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). A program that violates the Constitution cannot be germane to a constitutionally permissible justification. Therefore, under *Keller*, the Bar is violating Plaintiff's right to free speech. For similar reasons, the Bar is also violating Plaintiff's First Amendment right to free association by forcing him to be a member of an association engaged in unconstitutional activity. *See Janus v. American Fed. of State Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2467 (2018).

7. The Bar also engages in several other non-germane activities to which Plaintiff objects. *See Boudreaux v. Louisiana State Bar Ass'n*, 86 F.4th 620 (5th Cir. 2023). Like the program, some of these activities include divisive rhetoric. For example, the Bar lambasts police on its website, claiming that "[b]lack Americans suffer from police brutality . . . caused by systemic racism . . . that is ingrained in our

legal system . . . . This is unacceptable. Black Lives Matter." Ex. 7:1[6] Plaintiff does not want to help spread or be associated with this speech.

8.     Additionally, the Bar uses constitutionally inadequate dues-collecting procedures, thereby violating Plaintiff's right to free speech. Among other issues, the Bar is required to provide "potential objectors" with "sufficient information to gauge" whether it has correctly calculated the amount it requires members to pay for chargeable activities. *See Chicago Tchrs. Union, Local No. 1 v. Hudson*, 475 U.S. 292, 306 (1996). The Bar obscures its funding decisions in large, generic categories that inhibit objector's ability to identify non-germane activities. *See Janus,* 138 S. Ct. at 2482.

9.     Plaintiff requests that this Court declare that Defendants have violated Plaintiff's rights to free speech and free association, enjoin Defendants from permitting the Bar to spend money received from Plaintiff's dues on the program and other activities discussed herein, enjoin Defendants from administering or promoting the program in an unconstitutional manner, enjoin Defendants from using constitutionally inadequate dues-collecting procedures, and award Plaintiff damages, costs, attorney fees, and such other relief as this Court may deem appropriate.

## PARTIES

10.     Plaintiff is a constitutional conservative who has dedicated his legal practice to public-interest litigation. He believes in equality under the law for all.

---

[6] https://web.archive.org/web/20231207175523/https://www.wisbar.org/aboutus/diversity/Pages/Racial-Equity.aspx.

Plaintiff has been a member of the Bar and paid it dues yearly since 2008. Plaintiff takes a *Keller* deduction yearly. In fact, in 2009 he called the Bar when his Bar dues form included a typo with $0.00 for the *Keller* option, which prompted the Bar to send him a stuffed cow wearing a Bar t-shirt as a token of appreciation for finding the error. As already noted, Plaintiff took a *Keller* dues reduction for fiscal year 2024. He intends to do so again for the upcoming fiscal year. Plaintiff resides and works in Ozaukee County, Wisconsin.

11.     Defendant Dean R. Dietrich is the President of the Bar; as such, he is the Bar's "chief executive officer" and a member-at-large of the Bar Board of Governors, which "manage[s] and direct[s]" the "affairs" of the Bar. SCR 10.04(2)(a); SCR 10.05(1). Defendant Dietrich resides in Wausau, Wisconsin.

12.     Defendant Jane Ellen Bucher is the President-elect of the Bar; as such, she is an officer of the Bar and a member-at-large of the Bar Board of Governors. SCR 10.04(1), (2)(b). Defendant Bucher resides in Brodhead, Wisconsin.

13.     Defendant Margaret Wrenn Hickey is the Past-president of the Bar; as such, she is an officer of the Bar and a member-at-large of the Bar Board of Governors. SCR 10.04(1), (2)(b). Defendant Hickey resides in Milwaukee, Wisconsin.

14.     Defendant Frances Coyer Munoz is the Secretary of the Bar; as such, she is an officer of the Bar and a member-at-large of the Bar Board of Governors. SCR 10.04(1), (2)(d). Defendant Munoz resides in Milwaukee, Wisconsin.

15.     Defendant Deanne M. Koll is the Treasurer of the Bar; as such, she is an officer of the Bar and a member-at-large of the Bar Board of Governors. SCR 10.04(1), (2)(e). Defendant Koll resides in New Richmond, Wisconsin.

16.     Defendant Joseph M. Cardamone III is the Chairperson of the Bar Board of Governors; as such, he is an officer of the Bar and a member-at-large of the Board. SCR 10.04(1), (2)(c). Defendant Cardamone resides in Kenosha, Wisconsin.

17.     Defendant Martin is the Executive Director of the Bar; as such, he is the "chief executive officer of the administrative staff" of the Bar. SCR 10.11. He is responsible for certifying to the Clerk of the Wisconsin Supreme Court all members who are suspended for the nonpayment of dues. Ex. 4:2. Upon information and belief, Defendant Martin resides in Dane County, Wisconsin.

18.     Each Defendant is sued only in his or her official capacity.

## JURISDICTION AND VENUE

19.     This action arises under the First and Fourteenth Amendments and is brought pursuant to 42 U.S.C. § 1983. Accordingly, this Court has subject matter jurisdiction to hear and decide this action under 28 U.S.C. § 1331.

20.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) & (2) because at least one Defendant resides in this district, all Defendants reside in Wisconsin, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## BACKGROUND

### The diversity internship program discriminates based on protected traits and viewpoint.

21.    The program is the most troubling of the Bar's many non-germane activities—because it is illegal.

22.    In a 1993 newsletter, a Bar leader expressed concern that "[m]ost minority law graduates leave the state, and those who remain in Wisconsin go disproportionately into the public sector or solo practices . . . ." Ex. 8:2.

23.    As the Bar leader explained, that year, the Bar's Committee to Encourage Placement of Minority Lawyers started the program to address this purported disparity. *Id.*

24.    Specifically, the Bar leader said that the program would "address" a racial "imbalance" in "medium or large Wisconsin law firms." *Id.*

25.    The Bar noted in the newsletter that "[e]ight law firms and corporations have joined with the . . . Bar to launch a program placing minority [law] students in private-sector clerkships. . . . The program will help minority . . . students get a first-hand look at private sector practice . . . ." *Id.*

26.    Notably, the Bar did not say in the newsletter that the cause of the purported disparity in hiring was discrimination or bigotry within Wisconsin's legal community.

27.    In fact, before 2023, the Bar never claimed or indicated that it created the program to remedy specific instances of past discrimination.

28.     Instead, the Bar justified the program as an effort to diversify the legal profession, racially and otherwise. Ex. 9:5.[7]

29.     In the fall of 2023, the Bar changed course and now asserts that the program is for law students "with backgrounds that have been historically excluded from the legal field . . . ." Ex. 1:1.

30.     Even still, much of the Bar's literature promoting the program continues to reference the original diversity rationale—as does the name of the program and the name of the Bar entity primarily responsible for executing the program.

31.     According to a brochure for employers distributed by the Bar, currently, "[t]he State Bar's Diversity Inclusion and Oversight Committee oversees the program with the help of . . . Bar staff. Committee members recruit employers and students for the program; a selection committee meets to select students to participate in the program; and a matching committee determines the employer-student clerkship assignment." Ex. 10:1.[8]

32.     A similar brochure for students contains a materially identical description of how the program is administered. Ex. 11:2.[9]

---

[7] https://web.archive.org/web/20231005002341/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.aspx?Volume=9&Issue=15&ArticleID=25774.

[8] https://web.archive.org/web/20231023200301/https://www.wisbar.org/aboutus/forlawstudents/Documents/DCP/2024/2024%20Employer%20Information%20Brochure.pdf.

[9] https://web.archive.org/web/20231023200523/https://www.wisbar.org/aboutus/forlawstudents/Documents/DCP/2024/2024%20Information%20Brochure-final.pdf.

33.     Not all law students are eligible for the program, and the selection and matching processes treat students differently based on protected traits.

34.     The Bar makes clear on its webpage titled "Diversity Clerkship Program," under the heading "Eligibility," that only law students "with backgrounds that have been historically excluded from the legal field . . . may apply." Ex. 1:1.

35.     The application instructions and student brochure similarly state that the program is for law students "with backgrounds that have been historically excluded from the legal field . . . ." Exs. 11:1; 12:1.[10]

36.     The employer brochure, retaining the original diversity rationale, states that law students "with diverse backgrounds . . . may apply." Ex. 9.

37.     In a recent presentation to law students, the Bar explained that a student could demonstrate that he or she had the necessary background by citing an immutable characteristic, such as "race." Ex. 11:6.

38.     By race, the Bar means not white.

39.     In fact, a 2020 program reception was held virtually because of the COVID-19 pandemic, and the Bar posted a recording of the reception on YouTube; 13 law students who participated in the program spoke, and all 13 were from minority racial backgrounds. Ex. 13.[11]

---

[10] https://web.archive.org/web/20231023201159/https://www.wisbar.org/aboutus/forlawstudents/Documents/DCP/2024/DCP%20Application2024_blank.pdf.

[11] https://www.youtube.com/watch?v=KnpM8wj8zs4&t=2981s.

40.     The demographics of these law students is unsurprising: Nearly a decade ago, a report by the Bar's Diversity Task Force acknowledged the program uses "race-based selection criteria" and recommended "[m]onitor[ing] and evaluat[ing]" relevant developments in "case law." Ex. 14:24.[12]

41.     In a video posted on YouTube by the Bar, Judge Ashley, who was involved with the Bar's Diversity Task Force, explained that "there is concern . . . about the legal repercussions for isolating people minorities [sic] at the exclusion of others . . . . We're gonna take a look at the more recent law, but most of us are pretty convinced it's not gotten any less problematic over time." Ex. 3:9:16.

42.     In October 2023, Defendant Martin acknowledged that "[n]o changes . . . [were] deemed necessary"—or implemented—in response to the Task Force's recommendation. Ex. 15:1–3.

43.     Similarly, in December 2022, Defendant Martin said in a report to the Bar Board of Governors that program is "a[n] . . . internship experience for . . . minority law students." Ex. 16:11.[13]

44.     The Bar has long known that many law students apply to the program because they believe that participating employers engage in illegal affirmative action.

---

[12] https://web.archive.org/web/20231004222150/https://www.wisbar.org/formembers/ResearchandReports/Documents/State-Bar-Diversity-Task-Force-Report.pdf.

[13] https://web.archive.org/web/20231003164633/https://www.wisbar.org/aboutus/leadership/Documents/Executive%20Director's%20Report%20%E2%80%93%20December%202022.pdf.

45.     The University of Wisconsin Law School has partnered with the Bar to advertise the program, and the university's webpage advertising the program also states: "**Our commitment to students of color can be seen in our numbers** . . . . We have graduated more than 1,500 students of color . . . . Students of color currently make up more than 20 percent of our student body." Ex. 17:2.[14]

46.     Consistent with this messaging, one law student at the University of Wisconsin Law School reported that she applied to the program because she is "a visible racial minority." Ex. 18:4.[15]

47.     The University of Wisconsin Law School even kept demographic data on law students who applied and were successful, noting in one document, "[f]or the summer of 2023, two of five [b]lack students, one of two Native American students, four of six Asian Pacific Desi American students, and seven of seven Hispanic/Latinx students from Wisconsin Law who applied were accepted into the program." Ex. 18A:2.

48.     The Bar has also long known that employers use the program to engage in illegal affirmative action.

---

[14] https://web.archive.org/web/20231003171929/https://law.wisc.edu/prospective/diversitymain.html.

[15] https://web.archive.org/web/20231003172256/https://captimes.com/news/local/neighborhoods/long-running-program-places-diverse-law-students-in-prestigious-summer-jobs/article_6b90ff28-de45-5e27-a59c-736e6f515167.html.

49.     One participating employer, Dane County Corporation Counsel, asked the Bar to distribute a form to law students that said "women and racial and ethnic minorities are especially encouraged to apply." Ex. 19:2.

50.     Upon information and belief, the Bar distributed the form, which bears the logo of the Bar at the top.

51.     According to public records, a deputy corporation counsel for Dane County wrote in an email that he did not understand why Dane County Corporation Counsel wanted to participate in the program. Ex. 20:2.

52.     An assistant corporation counsel responded, "[o]ur goal is less about finding the perfect fit for us, but more about raising our profile among potential minority candidates." *Id.*

53.     Corporation counsel responded that the assistant was "100% correct . . . ." *Id.* at 1.

54.     In discussing how Dane County Corporation Counsel should rank law students, the assistant referred to one student as "the . . . 20-something white woman . . . ." Ex. 21:1.

55.     The assistant also told a University of Wisconsin Law School employee, "[a] big part of our interest in reaching out is to encourage more minority law students to pursue careers in local government." Ex. 22:1.

56.     The assistant explained that she would market the program by targeting "minority law student groups. . . . I envision this as being an opportunity to develop interest in our externship . . . among students of color." Ex. 23:1.

57.     The assistant specifically mentioned presenting to four minority law student groups at the University of Wisconsin Law School: a black student group, a Latino student group, an Asian student group, and an indigenous student group. Ex. 22:1.

58.     Another employer, in a Bar publication, called the program "a good way for . . . [her law] firm to support minority law students . . . ." Ex. 9:3.

59.     Yet another employer who participated in the program described it as an "opportunity for underrepresented . . . [law] students." Ex. 24:2.[16]

60.     Contrary to the apparent assumption of the Bar and some participating employers, many ineligible law students have faced socioeconomic hardship or otherwise could make a workplace more diverse because of their viewpoints.

61.     Under "Eligibility," the Bar's webpage also states that "[s]uccessful applicants demonstrate a commitment to diversity . . . ." Ex. 1:1.

62.     Brochures similarly state that law students will be selected based on the degree to which they demonstrate a "[c]ommitment to diversifying the legal profession . . . ." Exs. 10:2; 11:2.

63.     Law students who chose to apply must submit a personal statement, and the application instructions describe this statement as "an extremely important factor" that should reflect how a student "[c]ontributed to the diversification of spaces that lack diversity" or "[h]opes to contribute to diversity in the future." Ex. 12:1.

---

[16] https://web.archive.org/web/20231003173315/https://www.hallrender.com/about-us/diversity-overview/diversity-initiatives/.

64.    Using similar language, for 2022 and 2023, many law students wrote in their personal statements about how "spaces" were either diverse or not diverse based on the number of people in those spaces with certain legally protected traits.

65.    For example, one law student stated, "I finally started to find that peace, when a [b]lack friend of mine suggested I seek out spaces for mixed-race people." Ex. 25:2.

66.    Another discussed how he had "formed a critical worldview of what an inclusive space requires," having grown up in "predominantly white spaces . . . ." Ex. 26:2.

67.    Another referred to "spaces with more Hispanic individuals" and "Hispanic dominated spaces . . . ." Ex. 27:2.

68.    Yet another stated that "[h]ad I not gotten a chance to participate in . . . [similar diversity programs], I would not have been able to embrace how much my racial and ethnic backgrounds contributed to the conversation of diversity in every space I entered." Ex. 28:3.

69.    More generally, for 2022 and 2023, several law students submitted personal statements that make exceedingly clear that these students believed their protected traits—including race, national origin, gender identity, and sexual orientation—were relevant considerations.

70.    All of the following remarks appear in personal statements submitted during the 2022 or 2023 application cycle (and each in a different statement):

- "My experiences as a person of color, attention to detail, and enthusiasm for problem solving will make me a thoughtful and passionate addition to the . . . program." Ex. 29:2.

- "I am a young [b]lack man from the South Side of Chicago." Ex. 30:2.

- "I was shocked by how my peers . . . seemed to have already determined my worth because of stereotypes surrounding black men that I visually fit into." Ex. 31:2.

- "Being raised in a wealthy, white community, I quickly settled into my role as the only [b]lack woman in the class, on the team, and in the room." Ex. 32:2.

- "I think people are often shocked when I, a black woman, tell them I am interested in environmental science." Ex. 33:2.

- "My ethnic background, consisting of both Middle Eastern and African American descent has caused many controversies." Ex. 34:2.

- "My dad is black, and my mom is white." Ex. 35:2.

- "I appear Hispanic." Ex. 27:2.

- "As a first-generation Mexican American, I have benefited from the courageous journey that my parents undertook . . . ." Ex. 36:2.

- "I thought little about what my identity as a Half-Mexican individual meant . . . ." Ex. 37:2.

- "As a mixed White and Mexican, bisexual woman in a white, Catholic suburb of Milwaukee, WI, I quickly learned that advocacy often only went so far." Ex. 38:2.

- "Bayanihan made sense to me because I grew up in a household that celebrated my mixed Filipino and Irish heritage . . . ." Ex. 39:2.

- "My grandparents are from the Island of Luzon in the Philippines." Ex. 40:2.

- "As a first-generation immigrant from India, I faced my own set of challenges . . . ." Ex. 41:2.

- "My Sri Lankan mother arrived in the US fleeing a civil war . . . ." Ex. 42:2.

- "I have endured as a Hmong American . . . ." Ex. 43:3.

- "Being [b]iracial has been one of the most influential and amazing forces in my life." Ex. 25:2.

- "I am a proud member of the Oneida Nation Tribe . . . ." Ex. 44:2.

- "I came out as bisexual to my closest circle of friends." Ex. 45:2.

- "I came out as gay when I was 21 years old . . . ." Ex. 46:2.

- "My changing relationship with the word gay is representative of the journey I took to embrace my identity as a gay man." Ex. 47:2.

- "Growing up as a gay teen in rural Wisconsin, I often felt like an outsider." Ex. 48:2.

- "As a queer woman, I have learned that I am allowed to exist in a space that has traditionally not welcomed my presence . . . ." Ex. 49:2.

- "I am a queer, fat woman." Ex. 50:2.

71.    Interview evaluation forms indicate law students were judged based on protected traits.

72.    The forms show that law students were scored from 1 to 4 on each of various criteria, with 4 being the best.

73.    In particular, evaluators were instructed to "[e]valuate the candidate's motivation for/interest in the . . . [p]rogram as shown by his or her personal essay and their responses to questions asked during your interview." Ex. 51:15.

74.    Under this criterion, one law student received a 4, and in the remarks, the evaluator commented on the student's "Hispanic heritage." *Id.*

75. Another received a 4, and the evaluator wrote, "[s]aw weight given to diversity and was impressed as a man of color whose fai h [sic] practice [Sikh] is visible . . . ." Ex. 52:10.

76. Another received a 4, and the evaluator wrote, "[s]he [who was from the Philippines] explained how only 2% of attorneys are Asian and she wanted to help change that." Ex. 53:15.

77. Yet another received a 4, and the evaluator commented on the law student's Native American heritage and gender. Ex. 44:13.

78. The forms also indicate that multiple law students told the evaluator they were applying to the program because the Bar had "vetted" participating employers to ensure they had particular viewpoints. Exs. 37:15 ("[S]he believes that they [the Bar] have thoroughly vetted every employer that participates in this program."); 50:16 ("She understands that the . . . Bar has vetted these employers for a reason and that they are familiar with div[.]").

79. When asked about motivations for applying, law students who gave answers about wanting to work for employers with these views received higher scores than those who said they wanted to perform important legal work in a professional setting.

80. For example, one law student received a 4, and the evaluator wrote: "interested in this program because it is a thoroughly vetted program. She believes that all of the employers will help her grow and support her in all facets of her iden ity [sic]." Ex. 50:16.

81.    Another received a 4, and the evaluator wrote: "Wants to work at a company that actually strives for diversity, not just talks about it." Ex. 35:14.

82.    Another law student, who received all 4s, was asked by the evaluator how he would handle being assigned "to defend against discrimination claims . . . ." Ex. 30:12.

83.    This law student said that he would not "put his personal beliefs completely to the side" but understood "the importance of the attorney-client relationship and the duties he owes to his clients . . . ." *Id.*

84.    The evaluator, clearly impressed, wrote that the law student took "the right approach" and "handled the question well . . . ." *Id.*

85.    In contrast, one law student wrote in her personal statement about how she grew up in Korea and came to the United States at fourteen to learn English as a second language. Ex. 54:2.

86.    This law student also wrote about her "work experience as a legal assistant" and how "women lawyers could be powerful advocates for women." *Id.*

*87.*    This law student told the evaluator that she wanted to gain "practical experience" and "jump[] into real cases." *Id.* at 15.

88.     Based on this law student's personal statement and interview, the evaluator deducted a point, writing "nothing re: diversity." *Id.*

89.    Another law student was docked two points (a very low score compared to her peers) for saying that she "wants to participate in the . . . program 'to be

challenged intellectually' and obtain 'hands on legal experience outside of the class room.' " Ex. 25:16.

90.     These differences in scores are consistent with complaints received by two University of Wisconsin Law School employees about the program's selection and matching processes. Ex. 18A:1.

91.     According to these employees, law students reported feeling "pigeon-hol[ed]" and needing to say they were "interested in social justice because of their diverse identities. Many students who are interested in business, corporate, or other areas of law, are rightly offended by this." *Id.*

*92.*     These employees reported that "[s]tudents of color" were being "asked about their diversity when white students" were not. *Id.*

93.     These employees also reported that law students described the program as "trading in trauma." *Id.*

94.     More specifically, "students of color have expressed that they are being asked different questions than their white counterparts are. For example, being asked, 'what's the hardest thing you've had to overcome?' And then the interviewer showing disappointment when the answer isn't 'bad enough. . . .' " *Id.*

**The diversity internship program is unconstitutional.**

95.     The program discriminates against law students based on unlawful classifications, thereby violating those students' rights secured by the Equal Protection Clause of the Fourteenth Amendment. Plaintiff cannot be compelled to support an unconstitutional program.

96. In particular, the program's eligibility requirements classify law students based on race.

97. The Selection Committee is also scoring some law students higher because of unlawful classifications.

98. Additionally, at least some participating employers are preferencing law students based on protected traits, which the Bar facilitates through its Matching Committee.

99. Accordingly, the program violates the Equal Protection Clause's "twin commands": the program uses race as a "negative" and as a "stereotype." *Students for Fair Admissions*, 600 U.S. at 218.

100. "[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoted source omitted); *see also id.* at 752 (Thomas, J., concurring) ("[A]s a general rule, all race-based government decisionmaking—regardless of context—is unconstitutional.").

101. "[Racial] classifications . . . 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' . . . They threaten to stigmatize individuals by reason of their membership in the racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoted source omitted).

102. Therefore, the Bar must demonstrate that its racial classifications satisfy strict scrutiny. *See Johnson v. California*, 543 U.S. 499, 505 (2005).

103. Accordingly, the Bar must establish that the program's classifications are narrowly tailored to further a compelling governmental interest. *See id.*

104. The Bar originally tried to justify the program in the name of diversity, but a 2023 decision from the United States Supreme Court made clear that diversity is not a compelling interest. *Students for Fair Admissions*, 600 U.S. at 214.

105. The Bar appears to have so recognized, now requiring law students to have "backgrounds that have been historically excluded from the legal field . . . ." Ex. 1:1.

106. To justify the program on a remedial ground, the Bar needed a "strong" evidentiary basis "to conclude that remedial action was *necessary*, '*before* it embark[ed] on an affirmative-action program.' " *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398, 404 (2022) (per curiam) (quoted source omitted). *See generally Reno*, 509 U.S. at 643 ("[E]ven in the pursuit of remedial objectives, an explicit policy of assignment by race may serve to stimulate our society's latent race consciousness, suggesting the utility and propriety of basing decisions on a factor that ideally bears no relationship to an individuals' worth or needs." (quoted source omitted)).

107. Specifically, the Bar needed evidence of past instances of intentional racial discrimination in which the Bar participated. *See Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (holding that to establish a compelling interest, the government must show that it is remedying a specific instance of intentional

discrimination that it had a hand in); *see also Parents Involved*, 551 U.S. at 720, 731–32 (majority).

108. The Bar needed to be able to describe these instances "with some specificity." *See Shaw v. Hunt*, 517 U.S. 899, 909 (1996) (quoted source omitted)).

109. "A generalized assertion of past discrimination in a particular industry or region is not adequate . . . ." *Id.*

110. The Bar has never had evidence of this nature; accordingly, it lacks a compelling interest.

111. Even if the Bar could prove a compelling interest, the program is not narrowly tailored to serve a remedial ground.

112. Among other issues, the program's classifications are "arbitrary," "imprecise," "undefined," "underinclusive," and "overbroad." *Students for Fair Admissions*, 600 U.S. at 216.

113. Additionally, several government agencies currently participate in the program even though Bar leaders in 1993 created the program because minority law school graduates who remained in Wisconsin were going "disproportionality" into the public sector. Ex. 8:2.

114. Even if the program could have been justified on a remedial ground in 1993, narrow tailoring requires a "logical end point." *Students for Fair Admissions*, 600 U.S. at 221.

115. Three decades have passed since the program's inception and no end date is in sight—therefore, the program lacks a logical end point. *See id.* at 213.

116.    The program's other classifications based on protected traits, including sex, are also unconstitutional. *See United States v. Virginia*, 518 U.S. 515, 532–33 (1996).

117.    Even if the program appears technically neutral on its face, its operation, results, and rhetoric make clear that it discriminates behind closed doors, which is just as illegal. *Students for Fair Admissions*, 600 U.S. at 230.

*118.*    In the alternative, even if the program is technically neutral on its face, the program was founded with an intent to discriminate based on race, and that intent continues to shape and govern the program today, as is evident from the program enrollment. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp,* 429 U.S. 252 (1977).

119.    Furthermore, the program discriminates against law students based on viewpoint.

120.    "When the government targets . . . particular views taken by speakers on a subject," the First Amendment is "blatant[ly]" violated. *Rosenberger*, 515 U.S. at 829.

121.    Therefore, the Bar must "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

122.    The Bar penalizes certain law students for their viewpoint (or encourages them to censor themselves) by requiring them to write a personal

statement in which they profess a commitment to diversity, which the Bar defines as largely a matter of protected traits.

123. Law students who believe that people should be judged on their "merit and essential qualities," rather than immutable characteristics, cannot express their true beliefs in a personal statement and hope to gain admission to the program. *See Students for Fair Admissions*, 600 U.S. at 220 (quoted source omitted).

124. Upon information and belief, these law students also could not say that "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial . . . [or] sexual . . . class" and hope to gain admission to the program—despite being correct. *See id.* at 223 (quoted source omitted).

125. Indeed, law students who emphasized that they wanted to work hard and gain practical experience received lower scores than their peers who expressed ideological views consistent with the Bar's.

126. The Bar also matches law students who profess this commitment to diversity with employers that it has vetted.

127. At bottom, the program advocates in favor of "[t]he badge of inequality and stigmatization conferred by . . . discrimination . . . ." *See Moore v. United States Dep't of Argric.*, 993 F.2d 1222, 1224 (5th Cir. 1993).

128. The program is therefore unconstitutional.

**The Bar incorrectly classified the program as chargeable to membership dues.**

129.    For fiscal year 2024, the Bar budgeted nearly $40,000 for the program, and the Bar has used money received from dues to fund it. Exs. 55; 56.

130.    Among other things, the Bar spends this money to finance a program reception each year. Ex. 56:2.

131.    One brochure says these receptions "honor[]" participating employers. Ex. 10:1.

132.    At these receptions, participating employers have received awards from the Bar "[i]n appreciation for extraordinary efforts to champion diversity in the Wisconsin legal profession." Ex. 57:1.[17]

133.    The Bar also promotes the program through various means, including videos on the Bar's YouTube channel, and these efforts are funded using money received from dues. Ex. 56:2; 57.[18]

134.    At least one Bar employee, who is paid using money received from dues, has performed work related to the program. Ex. 56:1.

135.    In calculating the *Keller* dues reduction amount, the Bar incorrectly classified the program as chargeable to membership dues. *Id.* at 2.

---

[17] https://web.archive.org/web/20231003173759/https://www.linkedin.com/posts/wicorrections_doc-received-the-champions-of-diversity-award-activity-6824354703409844224-DExa/?trk=public_profile_like_view.

[18] https://www.youtube.com/watch?v=rPr4iOITMio.

136. Defendant Martin, when asked if the Bar would reconsider how it calculated the *Keller* dues reduction amount, responded that the Bar's "Executive Committee in its most recent *Keller* evaluation . . . once again confirmed the . . . [program] as chargeable to . . . membership dues, consistent with the opinion of . . . the Fifth Circuit. *See, McDonald v. Longley*, 4 F.4th 229, 249 (5th Cir. 2021), *cert. denied* __ U.S. __, 142 S.Ct. 1442 (Apr. 4, 2022) ('The Bar's various diversity initiatives . . . though highly ideologically charged, are germane to the purposes identified in *Keller*.')." *Id.* Notably, the Fifth Circuit opinion on which the Bar relied predates a 2023 decision of the United States Supreme Court, which held that diversity is not a compelling interest. *Students for Fair Admissions*, 600 U.S. at 214. The Fifth Circuit also did not suggest that illegal affirmative action is germane to a constitutionally permissible justification for mandatory membership in an association like the Bar.

**Plaintiff objects to his dues being used to fund the program.**

137. Plaintiff objects to the program, but the Bar is still using money received from his dues to fund the program.

138. Dues for fiscal year 2024 were over $300; however, dues for an attorney who objected to the Bar's "political or ideological activities" were reduced by $15.50—the *Keller* dues reduction. Ex. 5:1.

139. Plaintiff took a *Keller* dues reduction for fiscal year 2024; however, the Bar did not increase the amount of the reduction to account for the program—even though it is a "political or ideological" activity. Exs. 6; 56:2.

140.   Plaintiff objects to the program as a violation of his values and as unconstitutional.

141.   Plaintiff is especially concerned about the reception, at which honors are conferred for advancing the program. He has written before on the importance of maintaining integrity in those chosen for public honors and recognition. *See* Daniel R. Suhr, *Lessons for Law School Deans Regarding* Catholics in Political Life, 8 Geo. J.L. & Pub. Pol'y 395 (2010).

142.   Plaintiff believes—correctly—that he is being forced to support a program that violates the rights of law students, which he considers a breach of the oath he took when he became an attorney. *See* SCR 40.15. He believes that it is the responsibility of lawyers and legal institutions to model and exemplify respect for the Constitution and the rule of law, and that our profession bears a special responsibility to ensure our activities are constitutionally compliant.

143.   If Plaintiff were not required to be a member of the Bar and pay it dues, he would not support the program financially or otherwise.

144.   Plaintiff believes that such activities should not exist, and at a minimum, should be funded through private contributions.

**Plaintiff objects to other non-germane Bar activities.**

145.   Plaintiff also objects to other non-germane Bar activities.

146.   Upon information and belief, some of these other activities are funded using Bar dues.

147.    Even if these other activities were classified as non-chargeable, Plaintiff objects to being forced to associate with the Bar as long as it engages in them.

148.    Several of these other non-germane activities advance the same race-centric worldview as the program.

149.    For example, the Bar has used its resources to attack the character of law enforcement officers and promote the "Black Lives Matter" movement.

150.    As explained on the official website for Black Lives Matter, the movement's goals include "convict[ing] and bann[ing] [former President Donald] Trump from future political office," "[p]ermanently ban[ning] [President] Trump from all digital media platforms," "[e]xpel[ling] Republican members of Congress who attempted to overturn the election and incited a white supremacist attack," and "[d]efund[ing] the police." Ex. 58:1.[19]

151.    The Bar's endorsement of the movement came in the wake of George Floyd's death.

152.    In 2020, a law enforcement officer placed his knee on Floyd's neck; thereafter, Floyd died.

153.    Floyd was black, and the Bar viewed his death as a racial injustice.

---

[19]    https://web.archive.org/web/20231207220410/https://blacklivesmatter.com/blm-demands/.

154. On Twitter (a social media website now known as X), the Bar called Floyd's death "tragic" and linked to an official statement from the then-President of the Bar. Ex. 59:1.[20]

155. As of the filing of this Verified Complaint, the Twitter post is still publicly visible on the Bar's account, and the link to the President's statement is still functional.

156. In the statement, the President claimed that "[t]he plain truth is that there are racial disparities in our legal system and that many Wisconsin residents, particularly those of color, lack access to justice." Ex. 60:1.[21]

157. A few weeks later, the Bar posted on Twitter that "[b]lack Americans suffer from police brutality and crippling fear caused by systemic racism . . . that is ingrained our legal system [sic], law enforcement institutions, and countless other facets of American life. This is unacceptable. Black Lives Matter." Ex. 61.[22]

158. The Twitter post is also still publicly visible on the Bar's account.

159. Around this time, Bar leaders issued a collective official statement, praising the "Black Lives Matter" movement as "historic" and purporting that

---

[20] https://twitter.com/StateBarofWI/status/1267848983315169282.

[21] https://web.archive.org/web/20231213033320/https://www.wisbar.org/NewsPublications/Pages/General-Article.aspx?ArticleID=27782.

[22] https://twitter.com/statebarofwi/status/1273263903795970048.

"[m]any of us cannot fathom the pain that the [b]lack community experiences daily." Ex. 62:2.[23]

160. This statement is still publicly visible on the Bar's website.

161. The Bar leaders further emphasized their race-centric worldview, noting that "[m]any of us don't know the agony of losing a father, a mother, a sister or brother, a son, or daughter to police violence. Many of us don't know what it's like to live in fear for our lives due to the color of our skin." *Id.*

162. Also in 2020, following a police-involved shooting in Kenosha, Wisconsin, as summarized in one Bar publication, "Bar leaders wondered what message might be conveyed by having a [Bar] meeting in . . . [Kenosha]." Ex. 63:4.[24]

163. Rather than have a meeting, the Bar partnered with various groups to "hold an expungement clinic" in Kenosha. *Id.*

164. In one Bar publication, the author laments about how "the legal profession" has "been complicit in perpetuating racial injustice," making it responsible for the "Black Lives Matter movement." Ex. 64:7–8.[25]

---

[23] https://web.archive.org/web/20231213034222/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.aspx?Volume=12&Issue=11&ArticleID=27820.

[24] https://web.archive.org/web/20231213034723/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=95&Issue=6&ArticleID=29154.

[25] https://web.archive.org/web/20231213035123/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=94&Issue=3&ArticleID=28271.

165.    As evidence of this complicity, the author relies on a study that he describes as showing that "[b]lacks" and "[l]atinx" are underrepresented in "the legal technology industry." *Id.* at 8.

166.    The Bar also posted on Twitter a quote from an attorney that read: "Become friends with [b]lack people. Consistently surround yourself with [b]lack people in and out of the office." Ex. 65.[26]

167.    The Bar operates a "Diversity Counsel Program" for attorneys, which promotes the same disconcerting race-centric worldview as the Diversity Clerkship Program. Ex. 66.[27]

168.    At a recent event as a part of the Diversity Counsel Program, one speaker, a state circuit court judge, gave a speech. *Id.* at 4.

169.    This judge complained that while walking to her chambers, she had to "look[] down" a hallway that had "a row of white men that goes from one end to the other." *Id.*

170.    This "row of white men" is a series of portraits of previous judges. *Id.*

171.    Another speaker advised that employers ask themselves: "How many board members of color do we have? How many board members who identify as LGTBQIA+ do we have?" *Id.* at 5.

---

[26] https://twitter.com/StateBarofWI/status/1294665425171644416?s=20.

[27] https://web.archive.org/web/20231213035937/https://www.wisbar.org/NewsPublications/Pages/General-Article.aspx?ArticleID=30151.

172. Another speaker called "the notion of a colorblind constitution, propounded by Justice John Harlan in *Plessy v. Ferguson*, 163 U.S. 537 (1896), . . . a non-sequitur . . . ." *Id.* at 3.

173. The Bar also promoted a "DEI Hackathon Pitch Contest," which was aimed at changing the racial makeup of the "Milwaukee legal community" to make it more "diverse." Ex. 67:2.[28]

174. The Bar has published numerous articles in its magazine, the *Wisconsin Lawyer*, and on its website promoting its race-centric worldview.

175. In one such article, an attorney lamented about how he "practiced estate planning and long-term care planning for close to three decades" but had "not consistently ask[ed] questions about a client's racial or ethnic background." Ex. 68:3.[29]

176. The Bar also publishes other articles in the *Wisconsin Lawyer*, which are not germane to regulating the legal profession or improving the practice of law.

177. Among other things, these articles take stances on controversial issues and give advice about the business of law—rather than its practice.

178. Titles of such articles include "Qualified Immunity: A Dubious Doctrine and a 21st Century Wisconsin Solution," "What Your Firm Should Have in Common

---

[28] https://web.archive.org/web/20231213050219/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.aspx?Volume=15&Issue=21&ArticleID=30110.

[29] https://web.archive.org/web/20231213051326/https://www.wisbar.org/NewsPublications/Pages/General-Article.aspx?ArticleID=29945.

with Sports Illustrated," and "How to Measure Your Digital Marketing & Set Some Goals." Exs. 69;[30] 70;[31] 71.[32]

179. The Bar also promotes "health and wellness" through the "Wisconsin Lawyers Assistance Program" (WisLAP). Ex. 72:1.[33]

180. The Bar's webpage promoting WisLAP encourages attorneys to consider whether they are experiencing "attention-deficit/hyperactivity disorder" and to self-administer a test to determine if they have "depression." *Id.* at 2.

181. The Bar on this webpage recommends "breathe and relax" exercises and "mindful eating." Exs. 73:2;[34] 74:1.[35]

182. The Bar's webpage has a link titled "Lifestyle and Fitness Discounts." Ex. 72:4.

183. This link takes the browser to another Bar webpage that advertises several member benefits unrelated to a healthy lifestyle.

---

[30] https://web.archive.org/web/20231213051629/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=96&Issue=10&ArticleID=30088.

[31] https://web.archive.org/web/20231213051831/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=96&Issue=5&ArticleID=29790.

[32] https://web.archive.org/web/20231213052032/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=96&Issue=10&ArticleID=30096.

[33] https://web.archive.org/web/20231213052351/https://www.wisbar.org/formembers/wislap/pages/health.aspx.

[34] https://web.archive.org/web/20231213052648/https://www.wisbar.org/formembers/wislap/Documents/Meditation.pdf.

[35] https://web.archive.org/web/20231213052923/https://www.wisbar.org/formembers/wislap/Documents/Mindful%20Eating.pdf.

184.    For example, the webpage advertises brands that cannot be fairly characterized as healthy, such as "Cheryl's Cookies," "Simply Chocolate," and "Omaha Steaks." Ex. 75:1–3.[36]

185.    The webpage also advertises for "800Flowers," "Pet Health Insurance," "Auto Rebates," and "Shipping Services." *Id.* at 1–2.

186.    The Bar also promotes several other so-called "benefits of membership," which are not germane to a constitutionally permissible justification for mandatory membership in the Bar.

187.    To name just a few more, the Bar promotes "Home Security Systems," "Auto and Home Insurance," "Life Insurance," various financial services, discounts on Dell computing products, discounts on Verizon products or services, and "Travel and Entertainment Discounts." Exs. 76:1;[37] 77:1–2; [38] 78;[39] 79:1;[40] 80:1;[41] 81:1.[42] *See*

---

[36]    https://web.archive.org/web/20231213053134/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Lifestyle-Discounts.aspx.

[37]    https://web.archive.org/web/20231213053751/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Security.aspx.

[38]    https://web.archive.org/web/20231213054000/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Insurance-Discounts.aspx.

[39]    https://web.archive.org/web/20231213054327/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Financial-Discounts.aspx.

[40]    https://web.archive.org/web/20231213054707/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Computers-and-Technology-Discounts.aspx.

[41]    https://web.archive.org/web/20231213055114/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Office-Discounts.aspx.

[42]    https://web.archive.org/web/20231213055348/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Travel-Discounts.aspx.

*generally Romero v. Colegio de Abogados de Puerto Rico*, 204 F.3d 291, 302–03 (1st Cir. 2000) (explaining the record did not establish that life insurance was germane to a constitutionally permissible justification for mandatory membership in an association like the Bar).

188. The Bar also promotes various "Marketing Resources" to help attorneys advertise their services. Ex. 82:1.[43]

189. For example, the Bar partnered with the Wisconsin Newspaper Association to help attorneys place columns in newspapers as a way for attorneys to "[b]oost" their "brand." Ex. 83.[44]

190. The Bar says that "[i]n 2024 we'll amplify these stories through a new branded campaign on . . . Bar social media channels." Ex. 84:3.[45]

191. The Bar has posted all of the following on social media: "Unhappy at your job? Don't hesitate or overthink. Why and how to take action now to create a career you love," "Save up to 30% on Lenovo laptops, tablets, desktops, and accessories for your home or office @Lenovo," "Looking for the best deal on wireless service? State Bar members can save 22% off monthly access fees and up to 35% off smartphones, tablets, and accessories from Verizon. @Verizon," generic Thanksgiving

---

[43] https://web.archive.org/web/20231213055618/https://marketplace.wisbar.org/Practice-Management/Marketing-Resources.

[44] https://twitter.com/StateBarofWI/status/1733541008988586281.

[45] https://web.archive.org/web/20231213060221/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.aspx?Volume=15&Issue=22&ArticleID=30126.

messages, a generic Happy Halloween post, and a "LoveYourLawyerDay" post. Exs. 85;[46] 86;[47] 87;[48] 88;[49] 89;[50] 90;[51] 91.[52]

192.    The Bar has taken formal stances on controversial legal issues and legislation.

193.    On social media, the Bar liked a post thanking two legislators for sponsoring a bill "strengthening the criminal code . . . ." Ex. 92:2.[53]

194.    The Bar also liked a post thanking legislators for sponsoring a bill that "clarifi[ed] the responsible party for costs incurred by utility relocation delays." *Id.* at 3.

195.    In one publication, under the heading "Your Voice Matters," the Bar explained that its "Advocacy and Access Justice Team" worked on "Expungement Reform" and "Returning 17-year-olds to Juvenile Jurisdiction Courts." Ex. 93:11.[54]

196.    The Bar effectively claims to speak on behalf of all members as if it were a voluntary association—but it is not.

---

[46] https://twitter.com/StateBarofWI/status/1730366992232702145.

[47] https://twitter.com/StateBarofWI/status/1729515590434373759.

[48] https://twitter.com/StateBarofWI/status/1729153294184902745.

[49] https://twitter.com/StateBarofWI/status/1728134921703555173?s=20.

[50] https://twitter.com/StateBarofWI/status/1727440083278499841?s=20.

[51] https://twitter.com/StateBarofWI/status/1719422740929605803.

[52] https://twitter.com/StateBarofWI/status/1720592541920215464.

[53] https://twitter.com/StateBarofWI/likes.

[54] https://web.archive.org/web/20231213063710/https://www.wisbar.org/aboutus/leadership/Documents/ExDReports/Executive%20Director%27s%20Report%20-%202023%20-%20Dec.pdf.

**Plaintiff objects to the Bar's dues collecting procedures.**

197. Plaintiff is also frustrated by the lack of procedures to protect his free speech and free association rights.

198. The Bar's dues collecting procedure are problematic in numerous ways.

199. First, the Bar uses a so-called "opt-out" procedure, by which it assumes that each member wants to fund activities that are not germane to a constitutionally permissible justification for mandatory membership in the Bar unless a member takes affirmative and specific steps to inform the Bar otherwise.

200. These steps must be taken during a specific period each year.

201. Second, although the Bar provides members with a notice of its activities that it has classified as non-chargeable, the notice does not summarize activities that it has deemed chargeable. Ex. 5:2.

202. Below is a screenshot from the fiscal year 2024 notice, which lists the "Cost of Nonchargeable Activities."

| Activity | Cost of Nonchargeable Activity | Portion Funded by Dues |
|---|---|---|
| Board of Governors | $42,214 | $42,214 |
| Legislative Activities | 62,552 | 62,552 |
| Annual Meeting & Conference | 30,612 | 30,612 |
| ABA Delegates | 1,596 | 1,596 |
| ABA Lobby Day | 1,346 | 1,346 |
| Division ABA | 3,703 | 3,703 |
| Government Lawyers Division | 2,852 | 2,852 |
| Non-Resident Lawyers Division | 4,633 | 4,633 |
| WI Lawyer Magazine | 13,738 | 13,738 |
| Legislative Oversight Committee | 5,291 | 5,291 |
| Executive Committee | 758 | 758 |
| Board of Governors Policy Committee | 3,368 | 3,368 |
| InsideTrack | 521 | 521 |
| Grassroots & Rotunda Report | 59,264 | 59,264 |
| Sections | 61,829 | 61,829 |
| Young Lawyers Division | 2,417 | 2,417 |
| Senior Lawyers Division | 7,968 | 7,968 |
| Social Media/WisLaw Now | 0 | 0 |
| Legal Assistance Committee | 0 | 0 |
| **Total Cost of Nonchargeable Activities** | **$304,662** | |
| **Total Dues Devoted to Nonchargeable Activities** | | **$304,662** |

203.   No similar chart is provided in the notice for activities that the Bar classified as chargeable.

204. Effectively, the Bar presumes that members are aware of all activities that the Bar classifies as chargeable and places the onus on members to object to its classification of these activities.

205. Third, the Bar maintains that it is not subject to public records requests. Ex. 56:1.

206. Although the Bar makes some of its records available to members, it declined to provide all of the following about the diversity internship program: "communications with prospective employers," "communications with applicants," "documents that explain or further break down" two line items in a budget document, "invoices, checks, or other documentation showing how" the program's reception was financed, and "invoices, checks, or other documentation showing how" a YouTube video promoting the program was financed. *Id.* at 3–4.

207. Attorneys should not have to work hard to understand how the money they are required to pay is being spent.

### First Claim for Relief: Violation of 42 U.S.C. § 1983
### (Compelled Speech)

208. Plaintiff repeats and realleges the preceding allegations.

209. By carrying out the program and other activities as alleged herein, Defendants act under color of state law.

210. The Bar is an association created by the Wisconsin Supreme Court. SCR 10.01(1).

211.    The Wisconsin Supreme Court has promulgated rules that authorize the Bar to, among other things, charge dues, which the Bar does. *See* SCR 10.03(5).

212.    Acting under color of these and other state laws, Defendants have violated Plaintiff's right to free speech.

213.    Plaintiff did not surrender his free speech rights when he became an attorney. *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002).

214.    To the contrary, an attorney's speech may be entitled to "the strongest protection our Constitution has to offer." *See id.*; *see also Keller*, 496 U.S. at 10–12 (rejecting a government speech argument and explaining "the very specialized character of the . . . the Bar . . . serve[s] to distinguish it from the role of the typical government official or agency."); *cf. Supreme Ct. of N.H. v. Piper*, 470 U.S. 274, 281 (1985) (explaining a minimally component person has a "fundamental right" to "practice law," which is protected by the Privileges and Immunities Clause of Article IV of the Constitution).

215.    Plaintiff's free speech rights include the right to "refrain" from speaking. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

216.    As a corollary, the First Amendment prohibits the Bar from forcing Plaintiff to subsidize activities that are not "germane" to a constitutionally permissible justification for mandatory membership in the Bar. *Keller*, 496 U.S. at 13–14.

217.    To be "germane," an activity must "necessarily or reasonably" serve a justification. *Id.* at 14; *see also United States Dep't of Argic. v. United Foods, Inc.*, 533

U.S. 405, 415 (2001) (instructing lower courts not to render the germaneness requirement from *Keller* "empty of meaning and significance").

218. In *Keller*, the United States Supreme Court identified only two constitutionally permissible justifications for mandatory membership in an association like the Bar: "regulating the legal profession and improving the quality of legal services." 496 U.S. at 13.

219. For example, under *Keller*, "activities connected with disciplining members of the Bar or proposing ethical codes for the profession" are germane. *Id.* at 16.

220. In contrast, the Bar cannot spend money received from dues to lobby for gun control. *Id.*; *see also Pomeroy v. Utah State Bar*, 598 F. Supp. 3d 1250, 1260 (D. Utah 2022) (explaining a Utah attorney plausibly identified articles in the *Utah Bar Journal* that "could be non-germane" because "[i]nvoking the concept of implicit bias, discussing the importance of equity as a distinct concept from equality, and reviewing a book which advocates punishing people who protect an institution where a sexual assault occurred" are "topics" that may "stray from the goals of regulating the legal profession and improving the quality of legal services"); *Romero*, 204 F.3d at 302–03 (explaining the record did not establish that life insurance was germane to a constitutionally permissible justification for mandatory membership in an association like the Bar).

221. Notably, "Plaintiff[] . . . do[es] not bear the burden of proving non-germaneness. Challengers bear only the burden of making their objections known;

the Bar must prove that the expenditures were germane and chargeable." *Popejoy v. New Mexico Bd. of Bar Comm'rs*, 887 F. Supp. 1422, 1432 (D.N.M. 1995) (citing *Hudson*, 475 U.S. at 306).

222.    Accordingly, any doubt is to be resolved in Plaintiff's favor.

223.    The Bar cannot meet its burden.

224.    As a preliminary matter, in Wisconsin, the Bar is not primarily responsible for either regulating the legal profession or improving the quality of legal services. *See generally In re the State Bar of Wis.*, 485 N.W. 2d 225, 231 (1992) (Abrahamson, J., dissenting) ("In 1976, the [Wisconsin Supreme C]ourt explicitly removed these responsibilities from the Bar and placed them under the court's supervision to assure the public that lawyer discipline, bar admission, and regulating competence through continuing legal education would be conducted for the benefit of the public, independent of elected bar officials.").

225.    The Board of Bar Examiners, a separate entity from the Bar, deals with attorney licensing issues, such as administering continuing legal education requirements.

226.    The Office of Lawyer Regulation, also a separate entity, investigates and prosecutes attorney misconduct.

227.    The Bar does not even issue Certificates of Good Standing—the Clerk of the Wisconsin Supreme Court performs that activity.

228. Even assuming that the Bar engages in some activities germane to the constitutionally permissible justifications, the program and other activities discussed herein are not germane.

229. The Bar is forcing Plaintiff to support discrimination by spending his dues to fund the diversity internship program, and discrimination cannot be germane to any constitutionally permissible justification for mandatory membership in the Bar. *See Keller*, 496 U.S. at 13–14.

230. More generally, the Bar's ideologically charged messages, advertisements, and other activities discussed herein are not germane to regulating or improving the legal profession.[55]

231. The Bar is "demeaning" Plaintiff because "free and independent individuals" cannot be "forc[ed] . . . to endorse ideas they find objectionable . . . ." *Janus*, 138 S. Ct. at 2464.

232. Additionally, the Bar must implement procedures that safeguard the rights of its members to free speech. *Keller*, 496 U.S. at 17.

233. The United States Supreme Court has long analogized procedures that an association like the Bar must follow to procedures that unions were required to follow—when unions could compel support. *Id.* at 12.

---

[55] Defendants may rely on *Kingstad v. State Bar of Wisconsin*, 622 F.3d 708, 721 (7th Cir. 2010), in which the court held that a "public image campaign" by the Bar was germane. *Kingstad* is distinguishable. Defendants may also rely on *File v. Martin*, 33 F.4th 385, 388 (7th Cir. 2022); however, *File* was a facial challenge.

234. Years ago, "opt-out . . . schemes," like the Bar's, were declared insufficient in the union context. *Knox v. Services Emps. Int'l Union, Local 1000*, 567 U.S. 298, 312 (2012).

235. "Courts 'do not presume acquiescence in the loss of fundamental rights.' " *Id.* (quoted source omitted).

236. An opt-out scheme "creates a risk" that dues will be used for an activity that is not germane without an objector's knowledge—let alone approval. *Id.*

237. Accordingly, quoting the same decision relied on in *Keller*, the United States Supreme Court held that unions must minimize this risk. *Id.* (quoting *Hudson*, 475 U.S. at 305).

238. The Bar's opt-out scheme does not do so. *See id.* at 317, 321.

239. Worse still, the Bar's notice about *Keller* dues reductions does not give "potential objectors . . . sufficient information to gauge the propriety" of the Bar's dues. *Hudson*, 475 U.S. at 306.

240. The notice does not tell members about "the source of the figure" they are required to pay (the post-*Keller* dues reduction amount)—rather, it tells members about how the *Keller* dues reduction amount was calculated. *Id.*; *see also id.* at 306–07 ("In this case, the original information given to the nonunion employees was inadequate. Instead of identifying the expenditures for collective bargaining and contract administration [i.e., the germane expenses] that had been provided for the benefit of nonmembers as well as members—and for which nonmembers as well as

members may be fairly charged a fee—the Union identified the amount that it admittedly had expended for purposes that did not benefit dissenting members.").

241. The Bar also does not permit members to access records that are reasonably necessary for those members to understand whether activities have been incorrectly classified as chargeable. *See Janus*, 138 S. Ct. at 2482 (indicating members should not have to litigate to gain access to such records).

242. Simply put, the First Amendment "requires that [B]ar members be able to challenge expenditures as non-germane," and the "inability to identify non-germane expenditures" in an easy manner is a standalone injury to Plaintiff's free speech right. *Boundreaux v. Louisiana State Bar Ass'n*, 3 F.4th 748, 760 (5th Cir. 2021); *see also Janus*, 138 S. Ct. at 2482 (explaining that determining whether an activity is properly chargeable should not be "a laborious and difficult task" or require litigation).

243. Plaintiff suffered this injury because the Bar makes understanding its finances far too difficult.

244. In summary, the Bar is violating Plaintiff's right to free speech.

### Second Claim for Relief: Violation of 42 U.S.C. § 1983 (Compelled Association)

245. Plaintiff repeats and realleges the preceding allegations.

246. The First Amendment also protects the freedom of association.

247. "Freedom of association . . . plainly presupposes a freedom not to associate." *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984).

248.    Individuals have a right to "eschew association for expressive purposes . . . ." *Janus*, 138 S. Ct. at 2463.

249.    For as long as the Bar is engaged in activities that are not germane to either regulating the legal profession or improving the quality of legal services, compelled membership is unconstitutional.

250.    The State lacks a compelling interest in forcing attorneys to associate with and pay dues to an association engaged in such activities.

251.    The State especially lacks any interest in forcing attorneys to support an association engaged in unconstitutional activities.

252.    Nineteen states license and regulate attorneys directly without compelling them to join an association like the Bar, and no evidence indicates they have any serious issues with the legal profession. Other states, such as California, require membership in the bar only for regulatory purposes, while membership in the trade-association aspects of the bar is optional.

253.    Defendants have no justification for their continued violation of Plaintiff's right to free association.

### REQUEST FOR RELIEF

For these reasons, Plaintiff requests that this Court:

A.    Enter a judgment declaring that Defendants have violated Plaintiff's free speech and free association rights;

B.    Enjoin Defendants from permitting the Bar to spend money received from his dues on the program and other activities discussed herein;

C. Enjoin Defendants from implementing the program in a manner that violates the rights of law students;

D. Enjoin Defendants from using constitutionally inadequate dues-collecting procedures;

E. Award Plaintiff damages under 42 U.S.C. § 1983, including nominal, compensatory, and punitive damages;

F. Award Plaintiff costs and attorney fees; and

G. Award Plaintiff such other relief as this Court may deem appropriate.

Respectfully submitted December 19th, 2023

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

s/ Skylar Croy
Rick Esenberg (WI Bar No. 1005622)
Daniel P. Lennington (WI Bar No. 1088694)
Skylar Croy (WI Bar No. 1117831)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Dan@will-law.org
Skylar@will-law.org

*Attorneys for Plaintiff*

**VERIFICATION**

1.      I am the plaintiff in this action.

2.      I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint. If called upon to testify, I would competently testify as to the matters relevant to me and my claim.

3.      I have also reviewed all the materials in the attached exhibits and declare that they are true and accurate representations of websites and public records.

4.      I verify under the penalty of perjury under the laws of the United States that the factual statements in this Verified Complaint concerning myself, my activities, and my intentions, are true and correct.

Dated: _____Dec. 19, 2023_____          Signature: _____

Printed Name: _____Daniel R. Suhr_____