The Wayback Machine - https://web.archive.org/web/20231023162126/https://www.wisbar.org/aboutus/forlawstudents/Pages/Diversity-Pr...

 

Lawyer Search   Legal Research   Directories   Careers   Contact Us   *my*StateBar   

About Us          For Members          Marketplace          News & Publications          For Public

Home  >  About Us  >  For Law Students  >  Diversity Program

# Diversity Clerkship Program

ABOUT US

**CLASSIFIEDS / SERVICES**

The State Bar's Diversity Clerkship Program is a 10 week paid summer employment opportunity where first-year Marquette University Law School and University of Wisconsin Law School students with backgrounds that have been historically excluded from the legal field are matched with a wide array of employers from private law firms, corporate legal departments and governmental agencies. Student clerks gain practical legal experience, and participating employers obtain valuable legal support.



*The 2022 Diversity Clerkship Program participants.*

Place a Classified Ad

Career Opportunities

For Sale or Rent

Member Discounts

Professional Services & Experts

Court Reporters

Attorney Referrals

## Eligibility

First-year Marquette University Law School and University of Wisconsin Law School students with backgrounds that have been historically excluded from the legal field who are in good standing may apply. Successful applicants demonstrate a commitment to diversity and a record of academic achievement.

## Student Application Information

| Program Brochure | DOWNLOAD (1.0 MB) |
| Student Application | DOWNLOAD (178 KB) |

## Employer Information

<span style="color:red">Exhibit 1</span>



Program Brochure                                    DOWNLOAD (1.0 MB) 

Employers Fillable Form                             DOWNLOAD (83 KB)



Open All

| Important Dates |
| --- |

| Participating Employers in 2023 |
| --- |

| Meet Past Participants |
| --- |

## Questions? Need Help?

**Contact Jacque Evans**
State Bar of Wisconsin Diversity & Inclusion Specialist
Phone: (608) 250-6083
Email: jevans@wisbar.org

**Diversity Clerkship Program: Building Careers**
The State Bar's Diversity Clerkship Program is a 10-weeks, paid summer employment opportunity where first-year Marquette University Law School and University of Wisconsin Law School students with diverse backgrounds are matched with a wide array of employers from private law firms, corporate legal departments and governmental agencies. Student clerks gain practical legal experience, and participating employers obtain valuable legal support.



Milwaukee Circuit Court Judge Carl Ashley took the
Harvard Implicit Bias Test. "It indicated, I had bias," he
said. So he took the test a second time.





Follow us:

## HELP FOR MEMBERS

Ethics Hotline
WisLAP
Practice411
Mentoring Program

## YOUR MEMBERSHIP

FAQs
Your Benefits
Maintaining Your Membership

## CONNECT WITH US

Customer Service
Social Media
Staff Directory
Find Us

## AUDIENCES

For New Lawyers
For Public
For Law Students
For Paralegals
For Media
For Educators

## DIRECTORIES

Lawyer Search
Court Directory
Circuit Court Rules
Lawyer-to-Lawyer Directory
State Bar Leadership
Professional Services & Experts
Law-Related Organizations and
Agencies

## GET INVOLVED

Advocate
Volunteer
→ Pro Bono
→ Write/Speak
→ Leadership and Committees
→ ABA Delegates
Join LRIS Panel
Sections/Divisions
Committees

## DIVERSITY & INCLUSION

Diversity Clerkship Program
Diversity and Inclusion Oversight
Committee
What We Are Doing

## WORK FOR US

Open Positions
Application Process
Benefits

## CLASSIFIEDS | ADVERTISE

View Classifieds
Place a Classified Ad
Advertise With Us

## WISCONSIN LAW FOUNDATION

Donate
Apply for Grants
Awards and Scholarships
For Fellows

## HELP FOR THE PUBLIC

Lawyer Referral and Information
Service
Common Legal Questions
Resources for the Public

## LEGAL REPORTS AND HISTORY

Legal Reports
→ Reports
→ Resarch & Reports
Legal History

Advertise With Us      Legal      Privacy

©2023 State Bar of Wisconsin. All rights reserved.

Live 1

The Wayback Machine - https://web.archive.org/web/20231003170443/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.asp...

*The State Bar Center is currently experiencing internet issues. Please be aware that our staff are unable to utilize internet services or be reached via email at this time.*



Search the site...

Lawyer Search | Legal Research | Directories | Careers | Contact Us | *my*StateBar

Log in here

About Us          For Members          Marketplace          News & Publications          For Public

Home  >  News & Publications  >  InsideTrack  >  Article



BI-WEEKLY NEWSLETTER OF
THE STATE BAR OF WISCONSIN

AUGUST        VOLUME        NUMBER
2023          15            14

Exhibit 2

AUGUST 02, 2023

# Diversity Clerkship Program Jump-starts Legal Careers

The State Bar's Diversity Clerkship Program offers law students the opportunity to experience what it is like to work as an attorney in the summer after their 1L year – and to expand their legal skills. Join us in congratulating the legal employers and the clerks who participated in this year's program.

SHANNON GREEN

Comments (0)        SHARE THIS:        A A A



*"My experience was really eye-opening, seeing the law in action. I never thought I'd be interested I consumer law and advocacy, but I have grown to love it," said Maninderjit Singh (right) who clerked with Legal Action of Wisconsin. He is pictured here with Angel Kwaterski, an attorney with Legal Action (left). For more photos of the event celebrating clerks and employers in the program, see the* [album on the State Bar of Wisconsin Facebook page](#)*.*

Aug. 2, 2023 – They are future leaders in the legal profession: 25 rising 2L students from the U.W. Law School and Marquette University Law School who spent the summer learning what it's like to work as a lawyer.

Last month, the State Bar of Wisconsin celebrated the clerks and employers who participated in the 2023 Diversity Clerkship Program. The program matches first-year law students of diverse backgrounds with legal offices for a 10-week summer clerkship. The program is competitive – in 2023, the program received 74 applications for the 25 positions.

The clerks and employers celebrated the program and their successes at a reception July 20, held at the State Bar Center in Madison.

This year, 25 employers provided law students with paid summer internships. The program over the past 30 years has helped jump-start the careers of more than 585 law students.

"These students – and their employers – grow in their practice and careers because of this program," said State Bar President Dean Dietrich. "This is the type of program that the State Bar is so proud of – it has a real impact on both the clerks and the employers."

Case 2:23-cv-01697 Filed 12/19/23 Page 6 of 258 Document 1-1

The employers themselves recognize the value of the Diversity Clerkship Program. Stephane Fabus, of Hall Render Killian Heath & Lyman – one of 25 employers participating this year – said the firm finds new associate attorneys via the program, inviting their summer clerks to join them after graduation.

"We believe that this program has great value for not only the participants, but also our firm and the broader Wisconsin legal community," Fubus said.

Here is more about what the clerks and employers say about participating in the program:



*This year, 25 employers provided 1L law students with paid summer internships. The program over the past 30 years has helped jump-start the careers of more than 585 students from U.W. and Marquette University law schools.*

## Law Clerks: This Experience Is Priceless

"I have had the chance to work on assignments that matter, that are enjoyable and across a range of areas in the law. The attorneys that I've worked with really value our insight. It's been an amazing summer." – Emmet Burgos, clerking with Fiserv, Inc.

"I was given the incredible opportunity to support attorneys during a civil jury trial in the United States Eastern District Court of Wisconsin. This experience allowed me to work side-by-side with attorneys, and I felt like my opinion was truly valued." – Noella Campbell, clerking with the ACLU of Wisconsin.

"I had a fantastic introduction to health law – I learned everything about Medicare and Medicaid that I possibly could. The attorneys were so patient and willing to work every step of the way with me, even when I didn't know where I could find things within 42 CFR." – Julia Derzay, clerking with Quartz Health Solutions.



***Shannon Green** is communications writer for the State Bar of Wisconsin, Madison. She can be reached by [email](email) or by phone at (608) 250-6135.*

"At the OLR, I had exceptional supervisors and everyone at the office taking an interest in me as a young professional and as a human being. I'm grateful for the experience." – Nathaniel Douglas, clerking with the Office of Lawyer Regulation.

"Everybody has been so fantastic and willing to speak to me about anything, any question, any concern. They gave me wonderful opportunities and lots of open communication. I didn't think I would enjoy drafting corporate policy until I actually got the chance to do it." – Kendall Elliott, clerking with CUNA Mutual Group.

"My experience was really eye-opening, seeing the law in action. I never thought I'd be interested in consumer law and advocacy, but I have grown to love it." – Maninderjit Singh, Legal Action

"I thought I hated contracts, but at Regal Rexnord all I did were contracts. And I absolutely loved it. Everyone has been honest and funny, and showed me the kind of lawyer I want to be." – Ella Uylaki, clerking with Regal Rexnord Corporation.

"I didn't realize how much other areas of law, life insurance and health law, intersect with personal injury law. I have learned a lot." – Lisa Xiong, clerking with Gingras Thomsen & Wachs.



*"At the OLR, I had exceptional supervisors and everyone at the office taking an interest in me as a young professional and as a human being. I'm grateful for the experience," said Nathaniel Douglas, clerking with the Office of Lawyer Regulation. Pictured here are Francis Sullivan, OLR deputy director of litigation (far left); Nathaniel Douglas (second from left); Julie Spoke, OLR deputy director of intake (second from right); and OLR Director Timothy Samuelson (right).*

## Employers: This Is Worth It

"This is Manitowoc's first year participating in the State Bar Diversity Clerkship Program. We were impressed by the students and were very happy to be matched with Nimmi Arora. She has been a great addition to the team and provided valuable work and insights to the company." – Andy Barragry, The Manitowoc Company

"We are always happy to participate in the Diversity Clerkship Program. The program consistently provides us with high-quality talent – in fact, multiple attorneys at Northwestern Mutual participated in the program as law students, both here and with other employers. Our clerk, Mackenzie Retzlaff, has been a great addition to our summer class, and worked on a variety of complex (and hopefully interesting) assignments." – Andrew McLean, Northwestern Mutual Insurance Company

"The Office of Lawyer Regulation had the pleasure of working with Nate Douglas this past summer. He's

Case 2:23-cv-01697   Filed 12/19/23   Page 8 of 258   Document 1-1

everything we could have hoped for from a 1L clerk: he asked smart questions, was thoughtful in his approach, and proved himself a quick study. The sky's the limit for Nate. I just hope he benefited as much from us as we did from him." – Timothy Samuelson, Office of Lawyer Regulation

"Julia Derzay has been a phenomenal summer law clerk for Quartz. She brings great initiative to her work and is keenly aware of how her work contributes to the business. She has developed resources our team will use for many years to come. Julia will be a terrific attorney. We were lucky to have her with us this summer." – Kristin Degeneffe, Quartz Health Insurance

"Danny Levandoski is a bright and talented law clerk who has been an enormous help on the long-term projects and short-term research assignments we've given him to work on this summer. We are better for having Danny be a part of it, and we are excited for what the future holds for this smart and thoughtful soon-to-be attorney." – Marisa Roubik, Racine City Attorney's Office

"Miguel Gonzalez has tackled a wide variety of assignments with us so far and we look forward to continuing to see his development firsthand. The future is bright for Miguel." – Tyrone St. Junior II, Robert W. Baird & Co.



*"I didn't realize how much other areas of law, life insurance and health law, intersect with personal injury law. I have learned a lot," said Lisa Xiong, clerking with Gingras Thomsen & Wachs. She is pictured here (center) with State Bar President Dean Dietrich (left) and Past President Margaret Hickey (right).*

"Stafford Rosenbaum's Diversity Clerkship Program clerk, Jamie Kanchananakhin, makes our firm a better place, making it easy to celebrate him and his future. We can't wait to see where his career takes him!" –Stafford Rosenbaum, LLP

"During her clerkship, Hailey Lipinski integrated well into our day-to-day rhythm with a positive attitude. Hailey holds the tradition of excellence and professionalism within the State Bar Diversity Clerkship Program." – Glen Mercier II, Wisconsin Department of Corrections

"I have supervised hundreds of law students over the years. Augie Rice is among the top students I've had the pleasure to work with. DOJ was impressed with the quality of the pool of candidates the State Bar selected, and we were thrilled to learn we'd get Augie. The Department of Justice has been a participant in this program for a long time. It's been a great experience." – Sonya Bice, Wisconsin Department of Justice

"We are very fortunate to have Duranya Freeman as a legal intern. She immediately immersed herself in the work and began adding value from day one. Alliant Energy appreciates her work and wishes her well

for the next academic year!" – Zach Ramirez, Alliant Energy

"Julie Kim jumped into various tasks without hesitation and asked very intelligent and thoughtful questions. She brought a positive and collaborative attitude to the team. Julie will have a very bright future in law." – Melissa Fitzgerald, Church Mutual Insurance Company

"Kendall Elliott has proven to be a real asset to our legal team. She has been thrown into insurance and financial services, learning a complex web of legal entities, and brings a great perspective to the conversation that I find so valuable." – Carmen Burnard, CUNA Mutual Group

"We really enjoyed having Ben Kubisiak with us this summer. He asks smart legal questions and spots relevant 'law in action' issues. Ben was self-directed and did the research before asking good questions. That's impressive for a student!" – Amanda Ramaker, Dane County Corporate Counsel

"Our clerk, Connor Cruz, has been an active contributor to Froedtert OGC's many projects and initiatives, working with several team members, our outside counsel, and various departments within Froedtert Health. Our participation in the DCP has been a positive experience, and we appreciate the State Bar's investment to make this a successful program for employers and clerks." – Lisa Gingerich, Froedtert Health Inc.

"Morgan Boyd brought a great energy to our team, is willing to dive into any project we give her, and produces excellent work results. We could not be more pleased to have Morgan on our team and are planning to participate in the Diversity Clerkship Program again next year." – Barbra Klug, Kohler Co.

"Litigation is complicated and involves many moving (and often simultaneous) pieces. Rare for a law student, Mary Berg has demonstrated a real knack for understanding those pieces and for sorting through what matters and what does not. At Law Forward, Mary has unpackaged complicated constitutional law issues and moved important voting rights disputes toward resolution. Mary is brilliant, and we have truly enjoyed her presence in our office!" – Scott Thompson, Law Forward



*"Litigation is complicated and involves many moving (and often simultaneous) pieces. Rare for a law student, Mary Berg has demonstrated a real knack for understanding those pieces and for sorting through what matters and what does not. At Law Forward, Mary has unpackaged complicated constitutional law issues and moved important voting rights disputes toward resolution. Mary is brilliant, and we have truly enjoyed her presence in our office!" said Scott Thompson, Law Forward (right)...pictured here with attorney Elizabeth Piersof Law*

Case 2:23-cv-01697  Filed 12/19/23  Page 10 of 258  Document 1-1

*Forward (left) and clerk Mary Berg (center).*

## Special Thanks to Our 2023 Employers

| | |
|---|---|
| American Civil Liberties Union of Wisconsin* | Madison City Attorney's Office |
| Alliant Energy Corporation | The Manitowoc Company* |
| Church Mutual Insurance Company | Milwaukee City Attorney's Office |
| CUNA Mutual Group | Northwestern Mutual Insurance Company |
| Dane County Corporate Counsel | Office of Lawyer Regulation* |
| Fiserv Inc. | Quartz Health Solutions |
| Froedtert Health Inc. | Racine City Attorney's Office |
| GE Healthcare | Regal Rexnord Corporation |
| Gingras Thomsen & Wachs | Robert W. Baird & Co.* |
| Hall Render Killian Heath & Lyman, PC | Stafford Rosenbaum LLP |
| Kohler Co. | Wisconsin Department of Corrections |
| Law Forward* | Wisconsin Department of Justice |
| Legal Action | |

*Note: * indicates employers participating in the program for the first time this year.*

### Sponsored by the Wisconsin Law Foundation

The Diversity Clerkship Program reception is sponsored by the Wisconsin Law Foundation, the charitable arm of the State Bar of Wisconsin. Find out more about the Foundation's programs by visiting wisbar.org/wlf.

Comments (0)                                             SHARE THIS:

See Link for Exhibit: https://www.youtube.com/
watch?v=-k86irV1zWE&t=5s

Exhibit 3

The Wayback Machine - https://web.archive.org/web/20231003164903/https://www.wisbar.org/formembers/groups/Pages/State-Bar-Bylaws.aspx

*The State Bar Center is currently experiencing internet issues. Please be aware that our staff are unable to utilize internet services or be reached via email at this time.*



Search the site...    Lawyer Search  |  Legal Research    Directories  |  Careers  |  Contact Us  |  myStateBar        Log In here

About Us          For Members          Marketplace          News & Publications          For Public

Home  >  For Members  >  Sections, Divisions, Committees  >  State Bar Bylaws

# State Bar Bylaws

FOR MEMBERS

CLASSIFIEDS / SERVICES

Supreme court rules regulating the State Bar

Place a Classified Ad

Article I: Membership

Career Opportunities

Article II: Officers

For Sale or Rent

Article III: Board of Governors

Member Discounts

Article IV: Standing Committees

Professional Services & Experts

Article V: Finance Committee

Court Reporters

Article VI: Section Organization and Activities

Attorney Referrals

Article VII: Amicus Curiae Briefs

Article VIII: Indemnification of Officers, Employees, and Agents

Article IX: Amendment

State Bar of Wisconsin bylaws

**Amended:** March 24, 1981; April 20, 1982; June 13, 1982; June 10, 1983; October 14, 1983; June 15, 1984; August 26, 1988; January 4, 1990; June 19, 1991; September 13, 1991; June 17, 1992; April 2, 1993, April 19, 1993, June 16, 1993, October 21, 1993, June 22, 1994; January 23, 1996; September 20, 1997; January 25, 2000; April 14, 2000; March 7, 2001; April 10, 2001; January 23, 2002; January 28, 2002; March 24, 2005; November 14, 2007; February 12, 2008; January 1, 2009; May 4, 2010; June 12, 2013; July 1, 2014; April 18, 2015, June 12, 2019; September 8, 2021.

## Article I Membership

***Section 1. Membership Register*** The Association shall maintain a membership register for the enrollment of members of the State Bar, which shall contain as to each member a record showing the member's address, date of registration, class of original membership and each subsequent change of membership status, and such other information as may be required by the Board of Governors from time to time.

Every member shall enroll in the State Bar by filing in the office of the Association the following information concerning the registrant:

   a. Full name.

   b. Residence address.

   c. Office address. Location of principal office.

   d. Date of admission to practice in Wisconsin.

<span style="color:red">Exhibit 4</span>

e. Date of admission to practice in any state or states other than Wisconsin.

f. Date and place of birth; and in the case of a naturalized person, the date and place of naturalization.

ADVERTISE WITH US

g. Particulars regarding any previous suspension or revocation of right to practice law in any state or country.

h. Name of law school and year of graduation.

i. Social security number.

Every change after enrollment in respect of any of the matters above specified shall be promptly reported to the Executive Director. Communications from the Association to any member shall be sent to the latest address furnished by such member. At the time of enrollment of each member admitted to practice after these rules take effect, the Association shall deliver to the new member a copy of the lawyer's oath set forth in sec. 757.29, Wisconsin Statutes.

**Section 2. Membership Dues.** Membership dues shall be paid on the basis of a July 1 through June 30 fiscal year and shall be due and payable to the treasurer on July 1 beginning each such year. Membership dues for the fiscal year in which admission to the State Bar occurs shall be paid by the due date stated on an initial dues statement as follows: (i) for those admitted between July 1 and December 31, full applicable annual dues; (ii) for those admitted between January 1 and April 30, one-half applicable annual dues; (iii) for those admitted between May 1 and June 30, no dues. The Board of Governors may exempt any member serving in the armed forces of the United States at the date of admission or at the beginning of any fiscal year, provided satisfactory proof of exemption is submitted to the Executive Director within 60 days of the date dues otherwise would be payable.  The Board of Governors shall exempt any newly admitted member who qualifies for an exemption under Wis. Stat. 45.44(3) from their initial dues upon certification of eligibility from the Board of Bar Examiners.  For those admitted between May 1 and June 30, the waiver will apply to the first dues owed for the fiscal year following admission.

**Section 3. Penalty for Nonpayment of Dues.** (a) Any member admitted to the State Bar prior to July 1 whose dues are not paid by September 1 shall be notified of his or her delinquency and the consequent penalties by certified mail sent to the member's last known address prior to October. Failure to pay the dues by October 31 shall automatically suspend the delinquent member. The names of all members suspended for the nonpayment of dues shall be certified by the Executive Director to the Clerk of the Supreme Court and to each judge of a court of record in this state, after first mailing a copy of such list to each suspended member 10 days before it is filed with the Supreme Court.

(b) Any member admitted to the State Bar on or after July 1 and whose dues are not paid within 60 days after the due date stated on his or her initial dues statement shall be notified of his or her delinquency and the consequent penalties by certified mail sent to the member's last known address within 90 days after the initial due date. Failure to pay initial dues within 120 days from the initial due date shall automatically suspend the delinquent member, and the Executive Director shall certify such suspension in the manner provided by these bylaws.

(c) Whenever a member so suspended for nonpayment of membership dues makes full payment of the amount owing, and in addition thereto the sum of twenty dollars as a penalty, the member shall be reinstated as a member by the Board of Governors, and the fact of reinstatement shall be certified by the Secretary to the Clerk of the Supreme Court. Provided however in the case of any person whose membership dues shall have been in arrears for a period of three or more consecutive years, no application for reinstatement shall be granted unless ordered by the court. Provided further however, that no person whose membership is suspended for the nonpayment of dues shall be entitled to practice law during the period of such suspension.

**Section 4. Hardship Cases.** The Executive Director, with the approval of the President, may in individual cases waive or refund dues or penalties in any case where to do otherwise would work an injustice or an undue hardship. All such waivers or refunds shall be reported to the Board of Governors.

**Section 5. Dues Reduction Arbitration Procedure.** (a) Demands for arbitration of the dues reduction under SCR 10.03(5)(b) shall be made in writing and shall be delivered to the Executive Director of the State Bar within 30 days of receipt of the member's dues statement. Delivery may be made in person or by first class mail, and mailed demands shall be deemed delivered upon mailing. Demands shall include the name and address of the member or members demanding arbitration, a brief statement of the claim or objection, and the signature of the member or members.

(b) If one or more timely demands for arbitration are delivered, the State Bar shall agree to submit the matter forthwith to arbitration. All timely demands for arbitration shall be consolidated for hearing before the arbitrator appointed, and the provisions of sec. 788, Stats., shall apply as if the parties had entered into a written agreement for arbitration[1]. A member demanding arbitration is required to pay his or her dues by October 31 or 15 days following the arbitrator's decision, whichever is later. Failure to pay dues by such date shall automatically suspend the delinquent member.

(c) Upon receipt of all demands for arbitration, the State Bar shall apply for appointment of an impartial arbitrator to the Chief Judge of the Federal District Court for the Western District of Wisconsin.

(d) Members demanding arbitration shall have access to the financial records upon which the State Bar based the determination of the amount of dues that can be withheld. These records shall be available for inspection and copying during normal business hours. Copying shall be at the member's expense.

(e) The arbitrator shall determine the date, time and location of the arbitration hearing(s) or the briefing schedule, as the case may be, and shall so notify the parties at least 15 days prior to said hearing(s) or the deadline for the filing of the opening brief. The arbitrator will promptly hold hearings in which the parties will be permitted to participate personally or through a representative, unless the parties agree that the matter may be decided on briefs. The State Bar shall bear the burden of proof regarding the accuracy of the determination of the amount of dues that can be withheld. All parties will be given the opportunity to present evidence and to present arguments in support of their positions. The arbitrator shall not be deemed a necessary party in judicial proceedings relating to the arbitration.  The arbitrator shall have no authority to add, subtract, set aside or delete from any Supreme Court Rules, or State Bar bylaw.  Unless otherwise agreed by the parties, the following rules shall apply to the arbitration proceedings:

    i. There will be no transcripts or post-hearing briefs.

    ii. The arbitrator will issue an award stating the reasons for the decision within 30 business days of the closing of the hearing. The opinion will be brief, and based on the evidence and arguments presented.

    iii. The arbitrator will charge a reasonable hourly fee for services, including the hearing, preparation and study time, and shall be reimbursed for all necessary expenses of the arbitration.

    iv. The hearing(s) or the briefing schedule, as the case may be, shall be completed within 60 days of appointment of the arbitrator.

(f) Members first admitted to the State Bar after the date of notification to members shall be given that notification with their initial dues statements. Such members shall be further notified that they may deliver a demand for arbitration within 30 days following receipt of the notification. If arbitration is pending at the date of delivery of a demand for arbitration by a newly admitted member, the newly admitted member's demand shall be consolidated with the pending arbitration. All of the provisions of this section shall otherwise apply to demands for arbitration filed by newly admitted members.

[1] "The arbitrator's decision would not receive preclusive effect in any subsequent section 1983 action." Chicago Teachers Union v. Hudson, 472 U.S. 292, 308 n. 21 (1986).

## Article II Officers

**Section 1. Nominations.** The President-Elect, the Secretary and the Treasurer of the State Bar shall be elected from a list of candidates nominated in the following manner:

(a) The President of the Association with approval of the Board of Governors shall appoint a committee of five members to nominate candidates for said offices to be voted on at the next annual election. The nomination committee shall be approved at the first regularly scheduled Board meeting following the annual convention. The committee shall issue a report naming two or more nominees for the Office of President-Elect, two or more nominees for the Office of Secretary and two or more nominees for the Office of Treasurer. Before making its report, the committee shall solicit from the membership the names of members interested in seeking nomination to any office scheduled for election. The committee shall make its report no later than December 15 in each year.

(b) Other persons may be nominated for any of said offices by petition. Each nominee must provide a petition signed by not less than one hundred active members of the Association. The petition must be filed in the Office of the Executive Director on or before the first business day of February of the year of the election. Before such a petition may be filed, the nominee must consent in a written statement to nomination for the office designated in the petition.

**Section 2. Voting and Canvass of Ballots.** The provisions of Sections 4 to 8 inclusive of Article III of these By-Laws relating to the election of members of the Board of Governors shall be applicable also to the election of officers.

**Section 3. Election of Chairperson of the Board of Governors.** The Board shall elect a Chairperson of the Board of Governors from its members at its last regular meeting each fiscal year. The President-Elect shall appoint a nominating committee from the governors at the second to last regular Board meeting of the fiscal year. The committee shall nominate one or more candidates for this office. Those eligible for nomination and election to this office are: all current Board members, including members whose second terms expire that June, except for the President and President-Elect. While serving as Chairperson of the Board, the Chairperson of the Board shall be a governor at large and no longer a district governor.

**Section 4. Commencement of Term of Office.** The terms of all out-going officers of the Association and the Chairperson of the Board of Governors shall end, and the term of their successors shall commence, on the first day of July.

**Section 5. Vacancies.** A vacancy is created by the death, incapacity, inability to serve, revocation, suspension, or relinquishment of law licensure, or resignation of an officer, or by removal of an office pursuant to section 7.

*a) President.* If the office of President becomes vacant, the President-elect shall succeed to the office of President for the unexpired term of the President and shall serve a one-year term thereafter, if the President-elect was elected as President-elect at the previous annual election.

*(b) President-elect.* A vacancy in the office of President-elect shall be filled by a vote of a majority of the total membership of the Board of Governors. A President-elect so chosen shall succeed to the office of President only if necessary to fill a vacancy as provided for in this section and shall not serve an additional one-year term as President unless elected as such at the next annual election or at an earlier special election as the Board of Governors may require.

*(c) Secretary.* A vacancy in the office of Secretary shall be filled by a vote of a majority of the total membership of the Board of Governors. A Secretary so chosen shall not serve an additional term as Secretary unless elected as such at the next scheduled election for secretary, or at an earlier special election as the Board of Governors may require.

*(d) Treasurer.* A vacancy in the office of Treasurer shall be filled by a vote of a majority of the total membership of the Board of Governors. A Treasurer so chosen shall not serve an additional term as Treasurer unless elected as such at the next scheduled election for treasurer, or at an earlier special election as the Board of Governors may require.

**Section 6. Temporary Vacancy**. If an officer is temporarily unable to perform his or her duties, the Board may appoint a temporary replacement, who shall serve no longer than the remainder of the officer's unexpired term, or until the inability to serve or license status issue is resolved, whichever occurs first.

**Section 7. Removal**. An officer may be removed from office as follows: Revocation, Suspension or Relinquishment of Law License.  If an officer's license to practice law is revoked or relinquished during his or her term, the officer shall immediately be removed from office, without further notice.  If the officer's license to practice law is suspended for a term less than the time remaining on his or her term, the officer's position will be considered temporarily vacant.

## Article III Board of Governors

**Section 1. Qualifications of Electors.** Each member of the Board of Governors shall be elected by the active members of the State Bar eligible to vote in the State Bar District in which such member of the Board of Governors has his or her principal office for the practice of law.

**Section 2. Term.** At the annual election members of the Board of Governors shall be elected in the several State Bar districts by the members entitled to vote in each Bar district where there is a vacancy or vacancies for governor or governors whose terms expire.

**Section 3. Nomination Petitions.** Nominations for the Office of Governor shall be by petition signed in respect of each nominee by not less than ten persons entitled to vote for such candidate. Blank forms for that purpose shall be supplied by the Executive Director of the Association on request. Nomination petitions for candidates to be voted on at the annual election in any year shall be filed in the office of the Executive Director not later than the first business day of March of such year, provided that before the filing of such petition a statement shall be endorsed thereon by the nominee to the effect that the nominee consents to nomination for the office designated in the petition. No nominating petition for governor shall be filed on behalf of any member practicing in the same county in which another member is a governor whose term does not expire at the next annual meeting.

**Section 4. Voting List.** On the third Friday of March in each year the voting list shall close for the election in that year. Every active member of the Association in good standing on that date shall be entitled to vote in the State Bar District in which the member's principal office for the practice of law is located, for officers of the State Bar and for the governor or governors for such district to be elected that year.

**Section 5. Distribution of Ballots.** On or before the second Friday of April in each year the Executive Director or his designee shall prepare and distribute the required ballots to each active member of the State Bar entitled to vote at the annual election. Ballots may be distributed by electronic or regular mail. One form of ballot sent to persons entitled to vote in each State Bar District shall contain the names of the nominees for the several offices of the State Bar to be filled at the annual election. If any such person entitled to vote in such election fails to receive his or her ballots, or if it appears that any such ballot has been lost or destroyed, a new ballot shall be furnished to the person. Twelve noon on the fourth Friday of April in each year shall be the last day and time for voting in such election and no ballots received after that date and time shall be counted.

**Section 6. Voting of Ballots.** No ballot shall be counted unless returned on or before the last day and time for voting, in an envelope marked "Ballot" or in the manner designated by the electronic ballot provider.

**Section 7. Checking and Custody of Ballots.** The Executive Director or his designee shall receive and have custody of the ballots after they are voted until they are canvassed. All such ballots shall be segregated as to State Bar districts from which they are received and shall remain unopened until canvassed..

**Section 8. Canvass of Ballots.** The ballots shall be canvassed by an independent entity. The candidate receiving the highest number of votes for each office shall be declared elected. In case of a tie vote the Executive Committee shall determine the successful candidate by lot drawn by the Committee. The independent entity shall certify the results to the Executive Director, who shall forthwith notify the candidates and announce the results. Upon completion of the canvass, the independent entity shall be allowed to destroy all completed and blank ballots in the posession of the independent entity on or after August 1 unless notified otherwise by the further order of the Board of Governors.

**Section 9. Vacancy.** A vacancy is created by the death, incapacity, inability to serve, revocation, suspension, or relinquishment of law license, or resignation of a governor, or by removal of a governor pursuant to section 10.

*(a) Governor.* Any vacancy in the office of an elected governor shall be filled by the Board for the remainder of the unexpired term. Any member appointed to fill such a vacancy shall be eligible for election to two consecutive full terms as a governor. Any vacancy in the office of an appointed public member shall be filled by the Supreme Court. Any vacancy in the office of a division representative shall be filled in accordance with the bylaws of the division.

*(b) Temporary Vacancy.* If a governor is temporarily unable to perform his or her duties, the Board may appoint a temporary replacement, who shall serve no longer than the remainder of the governor's unexpired term, or until the inability to serve or license status issue is resolved, whichever occurs first. The replacement shall be a member whose principal office, or residence, if the member has no principal office, is in the same district as that of the governor who is being temporarily replaced.

**Section 10. Removal**. A Governor may be removed from office as follows: Revocation, Suspension or Relinquishment of Law License. If a governor's license to practice law is revoked or relinquished during his or her term, he or she shall immediately be removed from the Board, without further notice. if the governor's license to practice law is suspended for a term less than the time remaining on his or her term, the Governor's position will be considered temporarily vacant.

**Section 11. Meetings of Board of Governors.** (a) There shall be a regular meeting of the Board of Governors in each year at the time of the annual meeting of members of the State Bar. There shall be at least three additional regular meetings in each year. The meetings shall be on the dates set by the President and announced no later than thirty days following the President's assumption of office on July 1. Special meetings of the Board of Governors may be held at any time upon call of the President, and shall be called by the President upon written request signed by seven members of the Board.

(b) Notice of the time and place of regular and special meetings of the Board shall be given to each member by the Executive Director by mail or telephone at least five days before the meeting. At any regular meeting of the Board any business may be transacted which is within the power of the Board, whether or not specified in the call or notice of the meeting. At any special meeting of the Board, any business may be transacted which is within the power of the Board if specified in the call or notice of the meeting. Members of the Board may participate and vote by telephone at any special meeting, but not at a regular meeting. Members appearing by telephone at a special meeting shall be deemed present for the purpose of determining a quorum. Action by the Board may be taken by a majority of members present at a meeting at which a quorum is present, except action upon legislative proposals, proposed supreme court rule changes and proposed executive agency rule changes shall require approval by a 60% majority of members present at a meeting at which a quorum is present. At any regular or special meeting, any business placed on a consent agenda that is part of the notice or call will be acted upon without debate. Business listed on the consent agenda may be removed by any one governor within a 72-hour notice to the Secretary of the State Bar.

**Section 12. Members of Judicial Council.** Upon expiration of the term of office of each member of the Judicial Council selected by the Wisconsin Bar Association pursuant to the provisions of sec. 758.13, Wisconsin Statutes, the successor in such office shall be elected

Case 2:23-cv-01697   Filed 12/19/23   Page 18 of 258   Document 1-1

from the active members of the State Bar in the manner provided for the election of officers.

***Section 13. American Bar Association Delegates.*** (a) Upon expiration of the term of office of each State Bar delegate of the House of Delegates of the American Bar Association, the successor shall be elected by the Board of Governors and every vacancy thereafter occurring in such office shall be filled in the manner specified below.

(b) The election of delegates shall be held at the meeting of the Board of Governors held in conjunction with the annual meeting of the State Bar of Wisconsin each year.

(c) Qualification for election as State Bar of Wisconsin delegate to the American Bar Association House of Delegates shall be membership in the State Bar of Wisconsin and the American Bar Association and shall be made by petition of nomination to such office endorsed by at least ten members of the State Bar of Wisconsin Board of Governors, except that a candidate for Young Lawyer delegate who is otherwise qualified under section 6.4 of the American Bar Association Constitution shall be nominated by petition endorsed by at least four members of the Young Lawyers Division Board of Directors. Members of the State Bar of Wisconsin Board of Governors or, in the case of nomination of the Young Lawyer delegate, members of the Young Lawyers Division Board of Directors, may endorse any number of candidate petitions. Petitions for nomination shall be substantially in the form of petition for election to the State Bar of Wisconsin Board of Governors as prescribed in Article III, Section 3 of the State Bar of Wisconsin Bylaws with appropriate changes in order to make the petition germane to this purpose. Petitions for nominations shall be filed in the office of the Executive Director of the State Bar of Wisconsin no later than the 15th day of April in the year the election is to be held.

(d) Notice of election for terms of delegates expiring at the close of the American Bar Association Annual Meeting each year shall be substantially in the form as the notice attached hereto as Exhibit A. Said notice shall be published in February in an official State Bar publication pursuant to SCR10.12.

(e) Commencing with delegates elected at the meeting of the Board of Governors held in conjunction with the 1994 Annual Meeting of the State Bar of Wisconsin, no candidate shall be elected to more than three consecutive terms.

***Exhibit A***

Notice of Election of State Bar of Wisconsin Delegates to the American Bar Association House of Delegates.

An election of two members or in odd numbered years, one member and one member of the Young Lawyers Division, of the State Bar of Wisconsin to the American Bar Association House of Delegates (House) will be held at the meeting of the Board of Governors on the _____ day of ____ 19 ____. Those members interested in representing the State Bar of Wisconsin in such capacity are referred to Article III, Section 11 of the State Bar of Wisconsin Bylaws for qualifications for election and election procedure. Below is a brief description of the American Bar Association House of Delegates as well as the duties of said office.

The House has the ultimate responsibility for establishing Association policy, both as to the administration of the Association and it positions on professional and public issues. The House elects the officers of the Association and members of the Board of Governors upon nomination of the Nominating Committee. The House has sole authority to amend the Association's Bylaws and has authority to amend the Association's Constitution upon concurrence of the Association's Assembly of members. The House authorizes committees and Sections of the Association and has the authority to discontinue them. The House sets the dues for membership upon recommendation of the Board of Governors.

A Delegate is responsible for attending each meeting of the House, participating fully in its proceedings and discharging the responsibilities of the House. The State Bar of Wisconsin reimburses the expenses incurred by its delegates for transportation and lodging for the meeting of the House held at the Annual Meeting of the American Bar Association. The American Bar Association reimburses the expenses, which conform to the American Bar

Case 2:23-cv-01697   Filed 12/19/23   Page 19 of 258   Document 1-1

Association policy, incurred by all delegates for transportation to the Mid-year meeting of the House. The State Bar reimburses its delegates for lodging expenses incurred by its delegates at the Mid-year meeting of the house.

It is the responsibility of each Delegate to keep his or her constituency fully apprised of the actions taken by the House, and, to the extent possible, matters pending before the House; and to assist constituent entities in presenting issues of concern for debate and action by the House.

## Article IV Standing Committees

**Section 1(a). Appointment. Number of Members. Term.** Each of the standing committees other than the Committee on Legal Assistance and the Continuing Legal Education Committee shall consist of 12 members. The Committee on Legal Assistance shall consist of 18 members, 3 of whom are attorneys employed by legal services, legal aid, or legal assistance providers. The Continuing Legal Education Committee shall consist of 13 members, one of whom must be a member of the Government Lawyers Division. The Diversity and Inclusion Oversight Committee shall have at least one member from the Board of Governors.  The members of each such committee shall be appointed by the President for a term of three years, so arranged that the term of office of only one-third of the members shall expire in any year. No person is eligible for appointment to the same committee for more than two consecutive terms. The Government Lawyers Division member of the Continuing Legal Education Committee shall be appointed by the President for a term of one year. The chairperson of each committee shall be designated by the President for a term of one year. In the event of any vacancy in any committee it shall be filled by appointment by the President for the unexpired term. Members of committees shall serve until the appointment of their respective successors. A majority of the members of any committee shall constitute a quorum for the transaction of business. Each committee shall keep a record of its meetings and proceedings and shall submit an annual report to the Board of Governors. The Board of Governors may assign powers or duties to any standing committee in addition to those hereinafter set forth.

**(b) Removal for Nonattendance.** After two consecutive nonexcused absences from meetings of any committee, the chairperson of the committee shall report said absences to the President. The President shall thereupon notify such member of the member's removal from the committee, and appoint a replacement for the balance of the term of office.

**Section 2. Committee on Continuing Legal Education.** This committee shall provide guidance for the State Bar of Wisconsin's continuing legal education program, which is designed to serve the public interest by improving the competence of lawyers. Competence includes knowledge of substantive and procedural law, principles of ethics and professionalism, and techniques of law practice management. The continuing legal education program should be committed to providing a range of high quality educational and practice resources at competitive prices while recognizing that its long term vitality is dependent upon fiscal responsibility.

**Section 3. Committee on Professional Ethics.** This committee shall formulate and recommend standards and methods for the effective enforcement of high standards of ethics and conduct in the practice of law; shall consider the "Rules of Professional Conduct for Attorneys" as adopted by the Wisconsin Supreme Court and the observance thereof, and shall make recommendations for appropriate amendments thereto. The committee shall have authority to express opinions regarding proper professional conduct, upon written request of any member or officer of the State Bar. However, the committee shall not issue opinions as to the propriety of past or present conduct of specific member attorneys unless requested to do so by a grievance committee of the State Bar or by the Board of Governors of the State Bar. Unless waived by the requestor or subject, the identities of all requestors of past and current opinions or advice shall be confidential and information relating thereto shall also remain confidential. Members of the committee or designees who provide ethics advice to member attorneys shall be subject to this requirement of confidentiality.

***Section 4. Committee on Communications.*** This committee shall create, develop and implement effective means and methods of communication between the State Bar, courts, attorneys, clients, all forms of media and the general public. It shall suggest, encourage and foster the activities of local bar associations in communicating more efficiently and effectively in their respective areas. It shall be responsible for the relations of the State Bar to the public and shall report and make recommendations from time to time to the Board of Governors.

***Section 5. Committee on Legal Assistance.*** This committee shall promote the establishment and efficient maintenance of legal aid organizations equipped to provide legal services to those unable to pay for such service; shall study the administration of justice as it affects persons in the low income groups; and shall study and report on methods of making legal service more readily available to persons of moderate means, and shall encourage and assist local bar associations in accomplishing this purpose.

***Section 6. Diversity and Inclusion Oversight Committee.*** This committee shall carry out diversity and inclusion commitment and goals of the State Bar; shall advise, facilitate and monitor efforts of the State Bar with regard to diversity and inclusion goals and strategies; shall recommend metrics to assess and monitor the State Bar's progress in advancing diversity and inclusion; shall maintain records and results on the State Bar's diversity and inclusion initiatives; shall collect and share information on diversity and inclusion projects from other jurisdictions; and shall report directly to the Executive Committee on a continuous basis. The committee shall report at least annually to the Board of Governors.

***Section 7. Special Committees.*** Each special committee shall consist of a number of members determined and appointed by the President or, if the special committee is a committee of the Board of Governors, such number as shall be determined and appointed by the President with the advice and consent of the Board of Governors. Appointments to special committees shall be for a term of one year. No person is eligible for appointment to the same special committee for more than four consecutive years. Creation or abolition of a special committee by the President is subject to review and approval by the Board of Governors. The Chairperson of each special committee, other than a committee of the Board, shall be designated by the President for a term of one year. The Chairperson of each committee of the Board shall be designated by the Board for a term of one year. In the event of any vacancy in any special committee, it shall be filled by appointment by the President or, in the event of a vacancy in a committee of the Board, by the Board for the unexpired term. Members of the special committee shall serve until the appointment of their respective successors. Each special committee shall keep a record of its meetings and proceedings and shall submit an annual report to the Board of Governors. The members of any special committee shall be subject to the removal provisions contained in Section 1(b).

***Section 8. Legislative Oversight Committee.*** (a) Composition. The Legislative Oversight shall be a standing committee composed of nine voting members, selected as follows: The President shall appoint four committee members, including the committee chair, each year; and the Section Leaders Council shall elect one member. Members shall serve for two-year terms. The first year that this Section becomes effective, the current president shall appoint eight members: four to two year terms and four to one year terms. The Executive Director and the State Bar Director of Public Affairs shall serve as ex-officio/nonvoting members. A vacancy shall be filled by the person or body responsible for originally appointing or electing the member whose departure from the committee has created the vacancy. Members of the Legislative Oversight Committee shall represent the State Bar as a whole and do not represent any individual section, division, or constituency. The committee shall recommend action(s) consistent with the overall best interest of the State Bar.

(b) Functions. (1) General. The Legislative Oversight Committee shall review and monitor all public policy positions, as defined in subsection (c), taken or proposed to be taken by the State Bar or its sections and shall assist the State Bar government relations staff in planning, setting priorities, and allocating resources. The Legislative Oversight Committee also shall make recommendations and report to the Executive Committee and/or to the Board regarding State Bar and section public policy positions. The Legislative Oversight Committee shall also resolve all conflicts between sections seeking to take public policy positions pursuant to the

procedures set forth in subsection (b)(4) and is the final arbiter of such disputes. The Legislative Oversight Committee shall be subject to the information requests and reporting requirements set forth in Article IV, Section 1(a).

(2) State Bar Positions. The Legislative Oversight Committee shall generally monitor State Bar government relations staff for compliance with Supreme Court Rules and compliance with the Keller rules on permissible lobbying activity by mandatory bar associations.

(3) Section Positions. The Legislative Oversight Committee shall monitor public policy positions adopted by the sections, the setting of section lobbying fees, and the costs of each section's annual legislative activity. The committee may order a section to cease using State Bar resources or to delay publicly releasing or expressing a public policy position until reasonable notice and/or an opportunity to act is given to the Board of Governors and/or the Executive Committee if: (a) a section position is contrary to, or in conflict with, a State Bar position; (b) a section position is contrary to, or in conflict with, another section's position, or opposed by another section; (c) the proposed communication does not sufficiently and clearly communicate that the position is that of a group of lawyers within the Bar and is not the position of the State Bar; (d) the section has not complied with subsection (c)(3).

(4) Conflict Resolution. Whenever a conflict between two or more sections arises with regard to a public policy position, the following procedure will apply.

(i) The Chair shall first request the sections to meet informally to discuss the issues and try to work out an amicable resolution.

(ii) If informal discussions under (i) are unsuccessful, the Chair in his or her judgment may appoint a mediator to help the sections reach a solution;

(iii) If mediation is unsuccessful, or if in the Chair's judgment the conflict is intractable such that mediation would not be worthwhile, the Chair shall appoint a subcommittee of three members of the Committee, including a subcommittee chair, to review materials and hold a hearing on the matter. The subcommittee shall set deadlines for the submittal of materials from each section based upon the time frames involved in the issue and then shall hold a hearing, unless time does not permit for a hearing. Minutes shall be kept of any hearing. The subcommittee shall then issue a written decision governing which section, if any, may take the requested public policy position or such other guidelines and procedures for the sections to take positions on the issue in question.

(iv) The non-prevailing section in (iii) above may appeal the subcommittee's decision to the full Committee. The full Committee shall not review the matter de novo, but rather will review the materials previously submitted, the minutes from any hearing, and the decision of the subcommittee. The full Committee shall then vote on whether the subcommittee fairly applied State Bar Rules, By-laws, and procedures in reaching its decision. The decision of the full Committee is final and non-appealable.

(v) The Chair and/or the Committee may from time to time create further policies and procedures for conflict resolution that are not in conflict with, and do not supersede, above subsections (i) – (iv), for the more efficient resolution of conflicts. Notice of such policies and procedures shall be given to all sections and the Board of Governors in a timely fashion.

(5) Meetings; voting. The Legislative Oversight Committee shall meet at the call of the chair or at the call of the President. Meetings may be held on reasonable notice. Action on any matter requires approval by the affirmative vote of a majority of the committee's members. When necessary, late voting by members unable to attend or participate in the meeting will be counted.

(c) Public Policy Positions. (1) Definition. Public policy positions are statements, comments, and/or expressions of opinion concerning changes or proposed changes to, proposed or existing, laws, rules, or actions of the legislative, executive, and judicial branches of government and other positions of public advocacy.

(2) Public Policy Positions of the State Bar. Public policy positions of the State Bar as a whole shall be governed by procedures as adopted by the Board of Governors, including the 60 percent requirement set forth in Article III, Section 11(b). The vote on whether to approve the taking of a public policy position shall be by roll call. Divisions and committees may not take public policy positions on behalf of themselves or the State Bar except as authorized by the Board of Governors.

(3) Public Policy Positions of Sections.

   (i) Criteria. No section or State Bar member on behalf of a section may express a position on a matter involving an issue of public policy unless the following conditions are met: (a) the matter is one on which the section's views would have particular relevance; (b) the position is adopted in accordance with section bylaws; (c) the position is expressly stated to be taken only on behalf of the section; (d) the section public policy position is adopted in accordance with procedures for public policy positions adopted by the Board of Governors; (e) the position is not contrary to an expressed State Bar position; (f) the section sends a summary of the public policy to the Legislative Oversight Committee; and (g) no section shall undertake any act which constitutes lobbying without the knowledge and consent of the State Bar's Director of Public Affairs or a designate. Review of section public policy positions shall be conducted pursuant to subsection (b)(3).

   (ii) Bylaws. No section shall lobby unless its bylaws meet the requirements as set forth by the Board of Governors.

## Article V Finance Committee

**Section 1. Composition.** There shall be a continuing Special Committee on Finance composed of the President, President-Elect, immediate Past-President, Treasurer, Chairperson of the Continuing Legal Education Committee or his or her designee, and four members who shall be appointed by the President and shall be experienced with the governing of the Bar and with financial management. The President shall appoint the chairperson.

**Section 2. Functions.** The Committee on Finance shall review the annual budget proposed by the Executive Director and make recommendations to the Board of Governors thereon, and shall maintain continuing budget and expenditure scrutiny during the year. The committee shall also deal with other financial aspects of the Association's operation, including review of financial statements and recommendations thereon, pension administration, investment and other asset management, and long-range financial planning; shall serve as a resource on financial policies and procedures for proposed actions of the Board of Governors and the Executive Committee; and shall perform such other functions and duties as are assigned by the Board of Governors, the Executive Committee or the President.

## Article VI Section Organization and Activities

**Section 1. Establishment, Consolidation and Discontinuance of Sections.** Upon approval of an application for the establishment of a new section, the Board of Governors, by a vote of a majority of its members may establish such a section dedicated to a field of law not committed to any other section or committee of the Association. Every application to the Board of Governors for the establishment of a section shall set forth:

   a. The field of law to which the proposed section is to be dedicated, which shall be within the purposes of the State Bar and outside the field of law committed to any existing section or committee of the Association.

   b. A statement of the need for the proposed section.

   c. The proposed by-laws for the government of such section.

   d. The names of the several committees, if any, of the proposed section.

   e. A list of members of the Association who have signified their intention of applying for membership in the proposed section.

**Case 2:23-cv-01697   Filed 12/19/23   Page 23 of 258   Document 1-1**

An application for the consolidation of existing sections shall set forth the information required in the case of an application for establishing a section. Such an application may be granted by the Board of Governors in its discretion, by vote of a majority of the members of the Board of Governors, but only after notice by mail to the members of such section.

A section may be discontinued by vote of a majority of the members of the Board of Governors but only after notice by mail to the members of such section.

**Section 2. Membership of Sections.** Any member of the State Bar shall be entitled at the member's election to enroll in any section.

**Section 3. Section Officers and Council.** Each section shall have a chairperson and council and such other officers as the section by-laws may provide. The council of a section shall consist of the officers ex officio and such other members as may be provided in the by-laws. No change in the by-laws of any section shall be effective until approved by the Board of Governors.

**Section 4. Section Dues.** The members of any section may be required to pay section dues in such amount and for such purposes as the section, with the approval of the Board of Governors, may from time to time determine.

**Section 5. Section Meetings.** The officers and directors of each section shall arrange for meetings of the section in conjunction with the annual meeting of the State Bar. Special meetings may be held at such times and places as the section boards and officers may determine.

**Section 6. Reports.** Each section shall submit to the Board of Governors prior to the annual meeting of the Association in each year a report of the activities of the section.

**Section 7. Expenses.** Expenditures out of the dues of sections shall be made only by direction of the council of the section; and the treasurer of the State Bar shall pay out of such dues only such amounts as the chairperson of the section shall certify to have been so authorized.

## Article VII Amicus Curiae Briefs

Briefs *amicus curiae* may be authorized and filed in the name of the State Bar of Wisconsin or one of its sections or divisions pursuant to the following guidelines, policies and procedures:

**Section 1. State Bar of Wisconsin Briefs.**

*(a) Authorization.* The Board of Governors may authorize the preparation and filing of a State Bar of Wisconsin brief *amicus curiae* by an affirmative vote of at least two-thirds of those members present and voting

*(b) Appropriate Cases.* Briefs *amicus curiae* may be authorized only when consistent with the purposes of the State Bar, as expressed in SCR 10.02(2).

*(c) Preparation and Filing of Briefs.*

1. A brief *amicus curiae* may be filed only after review and approval by the President of the State Bar who, in consultation with others as may be necessary and appropriate, shall insure that the brief is of high professional quality and an accurate representation of State Bar policy.

2. In addition to the person or persons actually preparing the brief, the President of the State Bar shall also appear as counsel on the brief.

3. The State Bar shall pay for the costs of printing and filing an *amicus curiae* brief but will pay no legal fees for preparation or review of such brief.

*(d) Role of Individual Members, Committees, Divisions and Sections.*

1. Whenever practicable, appropriate State Bar committees, divisions and sections shall be consulted prior to authorization of an *amicus curiae* brief.

Case 2:23-cv-01697   Filed 12/19/23   Page 24 of 258   Document 1-1

2. Individual members, committees, divisions and sections may recommend that a brief *amicus curiae* be filed in the name of the State Bar of Wisconsin, which recommendation shall include:

   1. A full statement of the facts of the controversy and the status of the litigation;

   2. A statement of the principles of law to be supported with a full explanation of the applicant's reasons for believing that the case is an appropriate one for State Bar involvement;

   3. A statement advising when the recommendation was authorized and a description of any dissenting views when presented by a committee, division or section;

   4. A full disclosure of any personal or professional interest in the matter of any proponent of the recommendation, or of any individual member of the section or division directors or officers or committee members which authorized the submission of the recommendation;

   5. The name of the person or persons who are proposed to prepare the brief *amicus curiae*;

   6. The names of all interested parties to whom a copy of the recommendation has been furnished prior to submission to the Board of Governors or Executive Committee.

*(e) Involvement by State Bar Membership.*

1. Whenever practicable, before the Board of Governors or Executive Committee votes on whether to authorize the filing of an amicus curiae brief, notice of the proposed action, inviting comment and recommendations from State Bar members, shall be published pursuant to SCR 10.12 or distributed by a method designed to reach State Bar members as quickly as possible.

2. All comments and recommendations from the membership timely received under (e)(1) shall be considered by the Board of Governors or Executive Committee prior to taking the proposed action.

**Section 2. Section and Division Briefs.**

*(a) Authorization.* No *amicus curiae* brief shall be filed by any committee, section or division of the State Bar of Wisconsin without the authorization provided herein.

1. Upon receipt of any request to file an *amicus curiae* brief from any person, lawyer, committee, section or division of the State Bar, the President or designee shall, as soon as practical, telephonically or electronically communicate such request to counsel for the opposing party in the court below and to any other committee, section or division of the State Bar that reasonably would be expected to have an interest in the issues of the case and invite any timely comment to such request.

2. If a request originates from a court, whether it goes first to a committee, section or division or directly to the Board of Governors, the foregoing paragraph shall not apply.

3. Authorization for the preparation and filing of a brief *amicus curiae* by a committee, section or division shall be by an affirmative vote of at least two-thirds of the members of the Board of Governors present and voting at an official meeting of the Board of Governors.

4. In the event the President of the State Bar of Wisconsin determines it is not feasible or practical for the Board of Governors to meet and act upon a requested authorization to file a brief *amicus curiae*, then Paragraph 3 shall not apply. In such case the President shall electronically communicate the request for such brief and any comments to all members of the Board of Governors, which communication shall be for informational and comment purposes only. The President shall then contact and convene, either in person or through telephonic or electronic communication, a meeting of the Executive Committee of the State Bar of Wisconsin. The committee shall then, where deemed appropriate by the President, assume the responsibilities of the Board of Governors as to the authorization of the preparation and filing of an *amicus curiae* brief by affirmative vote of at least two-thirds of the members of the Executive Committee then participating and voting, provided that those Executive Committee members participating and voting constitute at least a majority of the Executive Committee.

5. If for any reason the President of the State Bar of Wisconsin is unable to assume the duties provided for above, the President-elect shall be authorized to act in the capacity of the President of the State Bar of Wisconsin for the limited purpose of determining whether or not it is feasible and practical to require an authorization of the total Board of Governors, or whether the situation demands immediate action and therefore the convening of the Executive Committee for the purpose of considering the *amicus curiae* brief request.

6. The President has the discretion to refuse to consider a request to file an *amicus curiae* brief in the event it is not submitted in a timely manner.

*(b) Appropriate Cases.* Briefs *amicus curiae* may be authorized only when consistent with the purposes of the State Bar, as expressed in SCR 10.02(2) and the purposes of the section or division as expressed in the section bylaws.

*(c) Preparation and Filing of Briefs.*

1. A brief *amicus curiae* may be filed only after review and approval by the chairperson of the section or president of the division who, in consultation with others as may be necessary and appropriate, shall insure that the brief is of high professional quality and an accurate representation of section or division policy and in accordance with the authorization of the Board of Governors.

2. In addition to the person or persons actually preparing the brief, the chairperson of the section or president of the division shall also appear as counsel on the brief.

3. The section or division may pay for the costs of printing and filing an *amicus curiae* brief but may not pay legal fees for preparation or review of such brief.

4. The brief must include a statement that it is filed only by the section or division, not the Board of Governors or any other State Bar entity.

*(d) Role of Individual Members, Committees, Divisions and Sections.*

1. Whenever practicable, appropriate State Bar committees, and other divisions and sections shall be consulted prior to requesting authorization of an *amicus curiae* brief by the Board of Governors.

2. A section or division request for authorization to file an *amicus curiae* brief shall include:

   1. A full statement of the facts of the controversy and the status of the litigation;

   2. A statement of the principles of law to be supported with a full explanation of the reasons for believing that the case is an appropriate one for section or division involvement;

   3. A statement advising when and by what vote it was decided to request authorization to file an *amicus* brief and a description of any dissenting views;

   4. A full disclosure of any personal or professional interest in the matter of any individual member or officer or director of the section or division;

   5. The name of the person or persons who are proposed to prepare the brief *amicus curiae*;

   6. The names of all interested parties to whom a copy of the request for authorization has been furnished prior to submission to the Board of Governors or Executive Committee.

*(e) Involvement by State Bar Membership.*

1. Whenever practicable, before the Board of Governors or Executive Committee votes on whether to authorize the filing of an amicus curiae brief, notice of the proposed action, inviting comment and recommendations from State Bar members, shall be published pursuant to SCR 10.12 or distributed by a method designed to reach State Bar members as quickly as possible.

2. All comments and recommendations from the membership timely received under (e)(1)1 shall be considered by the Board of Governors or Executive Committee prior to taking the proposed action.

**Case 2:23-cv-01697   Filed 12/19/23   Page 26 of 258   Document 1-1**

## Article VIII Indemnification of Officers, Employees, and Agents

**Section 1. Power.** The State Bar of Wisconsin (herein State Bar) shall indemnify any person who was or is a party or threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether with or without merit (other than an action, suit or proceeding by or in the right of the State Bar) by reason of the fact that he or she is or was a member of the Board of Governors of the State Bar or its Executive Committee, an officer or employee of the State Bar, or an agent of the State Bar acting on its behalf as a committee, division, or section member or as an appointee of an officer or the Executive Director of the State Bar (all of the above herein designated as "State Bar Persons"), against expenses, including attorney's fees, judgments, fines and amounts paid in settlement, actually and reasonably incurred by the person in connection with such action, suit or proceeding if he or she breached or failed to perform any duty resulting solely from his or her status as a State Bar Person unless the breach or failure to perform constitutes any of the following:

    a. A willful failure to deal fairly with the State Bar or its members in connection with a matter in which the State Bar Person has a material conflict of interest.

    b. A violation of criminal law, unless the State Bar Person had reasonable cause to believe his or her conduct was lawful or no reasonable cause to believe his or her conduct was unlawful.

    c. A transaction from which the State Bar Person derived an improper personal profit.

    d. Willful misconduct.

**Section 2. Effect of Termination.** The termination of any action, suit or proceeding referred to in Section (1) by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not of itself create a presumption that indemnification of the State Bar Person is not required under this section.

**Section 3. Success on Merits.** To the extent that a State Bar Person has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in section (1), or in defense of any claim, issue or matter therein, he shall be indemnified against expenses, including attorney's fees, actually and reasonably incurred by the person in connection therewith.

**Section 4. Denial of Indemnification.** Any indemnification under section (1) shall be made by the State Bar unless there is a determination that indemnification of the State Bar Person is improper in the circumstances because he or she has breached or failed to perform a duty in a manner described in Section (1)(a) to (d). Such determination shall be made by one of the following subject to review by the court which conducted the action, suit or proceeding or by another court of competent jurisdiction:

    a. By the Executive Committee of the Board of Governors of the State Bar by a majority vote of a quorum consisting of members who were not parties to such action, suit or proceedings; or

    b. By the Board of Governors of the State Bar by a majority vote of a quorum consisting of members who were not parties to such action, suit or proceeding.

**Section 5. Advance Payment.** Expenses including attorney's fees, incurred in defending a civil or criminal action, suit or proceeding may be paid by the State Bar in advance of the final disposition of such action, suit or proceedings upon receipt of an undertaking by or on behalf of the State Bar Person to repay such amount if it is ultimately determined that he or she is not entitled to be indemnified by the State Bar as provided in this Article.

**Section 6. Insurance.** The State Bar shall have power to purchase and maintain insurance on behalf of any State Bar Person against any liability asserted against the person and incurred by him or her in any capacity as a State Bar Person whether or not the State Bar would have to indemnify against such liability under this Article. Where there is insurance coverage the State Bar will not indemnify against attorney's fees paid by the State Bar Person except where such person has reasonably retained counsel because a claim exceeds the insurance coverage.

Case 2:23-cv-01697   Filed 12/19/23   Page 27 of 258   Document 1-1

## Article IX Amendment

The provisions of these By-Laws shall be subject to amendment or abrogation by (i) resolution adopted by vote of two-thirds of the members of the Board of Governors, or (ii) action of the members of the Association expressed through the referendum procedure defined in SCR 10.08. When any change in the By-Laws has been made, the Executive Director shall publish notice thereof, including a copy of the amendatory resolution, in an official publication of the State Bar pursuant to SCR 10.12, and he or she shall file a certified copy thereof with the Clerk of the Supreme Court. A petition for review of any such change in the By-Laws will be entertained by the Court if signed by twenty-five or more active members of the Association and filed with the Clerk of the Court within sixty days after publication of notice of such change. Hearing upon such a petition will be pursuant to notice in such manner as the Court may direct.

**Amended:** March 24, 1981; April 20, 1982; June 13, 1982; June 10, 1983; October 14, 1983; June 15, 1984; August 26, 1988; January 4, 1990; June 19, 1991; September 13, 1991; June 17, 1992; April 2, 1993, April 19, 1993, June 16, 1993, October 21, 1993, June 22, 1994; January 23, 1996; September 20, 1997; January 25, 2000; April 14, 2000; March 7, 2001; April 10, 2001; January 23, 2002; January 28, 2002;  March 24, 2005; November 14, 2007; February 12, 2008; January 1, 2009; May 4, 2010; June 12, 2013; July 1, 2014, April 18, 2015, June 12, 2019.



Follow us:

| HELP FOR MEMBERS | YOUR MEMBERSHIP | CONNECT WITH US |
| --- | --- | --- |
| Ethics Hotline | FAQs | Customer Service |
| WisLAP | Your Benefits | Social Media |
| Practice411 | Maintaining Your Membership | Staff Directory |
| Mentoring Program | | Find Us |

| AUDIENCES | DIRECTORIES | GET INVOLVED |
| --- | --- | --- |
| For New Lawyers | Lawyer Search | Advocate |
| For Public | Court Directory | Volunteer |
| For Law Students | Circuit Court Rules | → Pro Bono |
| For Paralegals | Lawyer-to-Lawyer Directory | → Write/Speak |
| For Media | State Bar Leadership | → Leadership and Committees |
| For Educators | Professional Services & Experts | → ABA Delegates |
| | Law-Related Organizations and Agencies | Join LRIS Panel |
| | | Sections/Divisions |
| | | Committees |

| DIVERSITY & INCLUSION | WORK FOR US | CLASSIFIEDS \| ADVERTISE |
| --- | --- | --- |
| Diversity Clerkship Program | Open Positions | View Classifieds |
| Diversity and Inclusion Oversight Committee | Application Process | Place a Classified Ad |
| What We Are Doing | Benefits | Advertise With Us |

| WISCONSIN LAW FOUNDATION | HELP FOR THE PUBLIC | LEGAL REPORTS AND HISTORY |
| --- | --- | --- |
| Donate | Lawyer Referral and Information Service | Legal Reports |
| Apply for Grants | Common Legal Questions | → Reports |
| Awards and Scholarships | Resources for the Public | → Research & Reports |
| For Fellows | | Legal History |

Case 2:23-cv-01697   Filed 12/19/23   Page 28 of 258   Document 1-1

Advertise With Us      Legal      Privacy

©2023 State Bar of Wisconsin. All rights reserved.

Live 1

Case 2:23-cv-01697   Filed 12/19/23   Page 29 of 258   Document 1-1

# NOTICE CONCERNING STATE BAR DUES REDUCTION AND ARBITRATION PROCESS

## §1.0    Overview

In *Keller v. State Bar of California*, the United States Supreme Court held that a mandatory bar may not fund political or ideological activities with the underlying dues unless those activities are germane to regulating the legal profession or improving the quality of legal services. The *Keller* Court further held that a mandatory bar could satisfy its constitutional obligation to ensure that such activities were funded only with voluntary payments by adopting a procedure that would allow dissenting members to deduct the pro rata amount spent on those activities from their mandatory dues payment, and providing a mechanism to challenge the calculation of the reduction that that I find previously approved for mandatory union dues in *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986).

Following *Keller*, the Wisconsin Supreme Court adopted the procedures set forth in SCR 10.03(5)(b) and State Bar bylaw Article I, Section 5 when it recognized *Keller*. That procedure was upheld in the face of a constitutional challenge in *Thiel v. State Bar of Wisconsin*, and has governed the State Bar's procedures for calculating the annual dues reduction since then. However, in *Kingstad v. State Bar of Wisconsin*, decided in September 2010, the Seventh Circuit held that case law subsequent to *Thiel* required that all activities of the bar, not only political or ideological activities, must be germane to the purposes identified in *Keller* in order to be funded with mandatory dues. Activities that are not germane to these two purposes are considered to be "nonchargeable." The State Bar may use compulsory dues of all members for all other activities, provided the activities are within the purposes of the State Bar as set forth in SCR 10.02(2). These activities are considered to be "chargeable."

The method used to calculate the amount of the dues reduction is based on the method approved after a *Thiel*-amount may use the fact the cost, the U.S. Supreme Court indicated that a labor amount may use the year for which the most recent audit report is available as the base line period for determining chargeable and nonchargeable activities and calculating the cost of the nonchargeable activities.

To calculate this year's dues reduction, the State Bar's Executive Committee used this historical approach and reviewed activities for the fiscal year ending June 30, 2022 (FY22), the most recent fiscal year for which there is an audit report. (A copy of the audit report can be found at wsbar.org/keller.)

The committee scrutinized all State Bar activities during FY22 to identify nonchargeable activities. For each activity found to be nonchargeable, the State Bar calculated the cost of the activity— including all applicable overhead and administrative costs—and the amount of dues expended on the activity. That process resulted in the determination that $304,621 of dues was expended on nonchargeable activities during FY22.

## §2.0    Dues Reduction for FY24

Each State Bar member's FY24 pro rata portion of the dues devoted to nonchargeable activities was calculated by a process that involved translating the nonchargeable activities cost for FY24 (before reduction) into the equivalent number of full dues payments. The State Bar estimates that there will be 25,761 State Bar members in FY24 paying various levels of dues that translate into 20,021 full dues payment equivalents. Dividing $304,621, the total dues devoted to nonchargeable activities in FY23 by 20,021 (the number of full dues payment equivalents) results in a pro rata reduction of $15.22 for members paying full dues.

Although this calculation results in an available dues reduction of $15.22 for members paying full dues, the Board of Governors voted to set the available dues reduction at $15.50 for members for the fiscal year beginning July 1, 2023 (FY24). [Active members admitted to practice on or before April 30, 2021, voting judicial members, and Supreme Court justices can withhold $15.50; active members admitted to practice for 3 years or less in this case, after April 30, 2021, senior active and inactive members can withhold $7.75; nonvoting judicial members can withhold $10.33] The purpose of setting the dues reduction at the higher amount of $15.50 is to give those who take the dues reduction the benefit of any error that may have been made in the calculation and make it unnecessary for members to request arbitration for small amounts.

## §3.0    Detailed Calculation of the Dues Reduction

### §3.1    Cost and Dues Expended on FY22 Nonchargeable Activities

As noted earlier, to calculate the cost of and dues expended on chargeable and nonchargeable activities, the State Bar used the year for which the most recent audit report exists—that is, FY22. The State Bar reviewed all FY22 activities to identify those activities not germane to the regulation of the legal profession or improving the quality of legal services.

If an activity was determined to be nonchargeable, its cost was calculated. The cost included all staff time and facilities, governance and administrative expenses allocated in accordance with established State Bar accounting practices. Any revenue generated by the activity, such as *Inside Track* advertising, or other income earmarked for the activity were deducted from the total cost before the amount of dues devoted to the activity was calculated. In addition, surplus revenue over expense from other State Bar activities and unallocated revenue were assigned to the activity on a pro rata basis with dues revenue. Using this methodology, the total cost of and amount of dues devoted to nonchargeable activities in FY22 is calculated as follows:

| Activity | Cost of Nonchargeable Activity | Portion Funded by Dues |
|---|---|---|
| Board of Governors | 542,114 | 542,114 |
| Legislative Activities | 62,552 | 62,552 |
| Annual Meeting & Conference | 30,612 | 30,612 |
| ABA Delegates | 1,596 | 1,596 |
| ABA Lobby Day | 1,346 | 1,346 |
| Division ABA | 3,703 | 3,703 |
| Government Lawyers Division | 2,852 | 2,852 |
| Non-Resident Lawyers Division | 4,633 | 4,633 |
| WI Lawyer Magazine | 13,738 | 13,738 |
| Legislative Oversight Committee | 5,291 | 5,291 |
| Executive Committee | 758 | 758 |
| Board of Governors Policy Committee | 3,368 | 3,368 |
| InsideTrack | 521 | 521 |
| Grassroots & Materials Report | 59,264 | 59,264 |
| Sections | 61,629 | 61,629 |
| Young Lawyers Division | 2,417 | 2,417 |
| Senior Lawyers Division | 7,968 | 7,968 |
| Social Media/WisLaw Now | 0 | 0 |
| Legal Assistance Committee | 0 | 0 |
| **Total Cost of Nonchargeable Activities** | **$304,662** | **$304,662** |

# Exhibit 5

Continued on back

A brief description of these FY22 nonchargeable activities follows.

**ABA.** All of the expenses related to the State Bar Delegates attending the ABA House of Delegates at the ABA annual or midwinter convention and all of the expenses related to ABA Lobby Day.

**Government Relations Activities.** While not all lobbying activities are non-chargeable under a Keller analysis, the State Bar of Wisconsin Board of Governors has conservatively approved at its February 9, 2018 meeting a policy in an effort to ensure it is protecting the First amendment rights of its members including those who take the annual Keller dues reduction. As a result, "in its policy the Board of Governors has included in an annual calculation of expenditures deemed non-chargeable to mandatory dues those expenditures that relate to activities which constitute direct lobbying on policy matters before the Wisconsin State Legislature or the United States Congress. The State Bar of Wisconsin Board of Governors adopts as policy and directs the Executive Committee to include with the annual dues reduction under SCR 10.03(5)(b), in addition to other expenses deemed non-chargeable, the amount of expenditures related to State Bar lobbying of public policy matters under the Federal positions and SBW position codes used by the State Bar timekeeping system, regardless of whether they would otherwise qualify as chargeable under a Wisconsin Keller dues analysis."

During FY22, work on the following legislative topics/issues are thus included as non-chargeable activities:

**State Bar of Wisconsin:**
• All direct lobbying activities
• All direct grassroots activities
• Rotunda Report newsletter
• Liaison to the Wisconsin Uniform Laws Commission
• Preparation of the Public Affairs Policy Book

**FEDERAL ISSUES:**
Violence Against Federal Judges
Reduction of Student Debt

**STATE ISSUES:**
Expungement of Criminal Records
Juvenile Shackling During Courtroom Proceedings
Juvenile Court Jurisdiction (Second Chance/17-year-olds)
Raise the Age
Student Loan Relief/Law School Debt
The Use of Cash Bail and Pretrial Reform
Broadband Expansion to Underserved Communities
Progression of Publicly Employed Attorneys
Racial Disparities/Law Enforcement Reform
State Public Defenders Office Reimbursement to Private Bar
State Civil Legal Services Funding
Court Funding (SBW)

**Business Law:**
Business Entity Acts

**Children & the Law:**
Standardized Guardianship
Juvenile Shackling During Courtroom Proceedings
Prosecuting a person under the age of 18 with committing an act of prostitution. (Saif Harbor)

Adoption Reform
Uniform Law Commission Parentage Act
Adequate Access to Birth Records
Foster Parent Bill of Rights
Drug Effected Child
Duty to Participate in Termination of Parental Rights Cases
Termination of Parental Rights for Incarcerated Persons

**Civil Rights and Liberties:**
Election Law – Violations of Election Law and Changes to Venue Requirements for Trials

**Contractors & Public Contracts:**
Revisions to Lien Laws – Clearing Dormant Liens

**Criminal Law:**
Retail Theft – Mandatory Minimum Sentencing for Retail Thefts

**Elder Law:**
Elder Abuse including in Financial Transactions

**Family Law:**
Reduce Waiting Period Following Divorce
Granting Court Commissioner Authority to Finalize Legal Separation
Non-Parent GAL Visitation
Treatment of Stipulation/Orders Before Final Judgment
Placement of Children
Judicial Notice of Court Records in DV Cases
Uniform De Novo Review of Circuit Court Commissioner Decisions
Record Exchange of Financial Information under Ch.767
Child Support Guidelines

**Real Property & Public:**
Remote Notary/RULONA
Payment on Death Accounts
Responsibility for Private Road Maintenance
40 Year Easements
Uniform Trust Code

**Annual Meeting & Conference.** Expenses in connection with Thursday's luncheon plenary speaker, Megan Phelps-Roper and her presentation entitled "Bridging Ideological Divides: Dialogue That Overcomes Hate, Makes Connections, and Changes Minds" (an educational program to share ways we can learn to successfully engage those with opposing viewpoints and beliefs) and Friday's session 7, "A Conversation with Laura Coates, CNN Anchor and Senior Legal Analyst"

**Board of Governors.** The board's discussion on the Racial Justice Task Force recommendations and the Greater Wisconsin Initiative Working group recommendations, updates and reports on ABA activities, ABA House of Delegates, ABA Lobby Days, reports from State Bar Presidents regarding legislative advocacy meetings they attended and opening remarks from former Governor Tommy Thompson.

**Government Lawyers Division.** Expenses in connection with legislative session updates.

**Non-Resident Lawyers Division.** Expenses in connection with a State Bar presidential candidate presentation which included discussion of the Wisconsin legislature.

**Young Lawyers Division.** Expenses in connection with reports of ABA activities.

**Senior Lawyers Division.** Expenses in connection with the visiting aging lawyers program and BOG legislative positions.

**Section Lobbying and Administrative services.** Expenses over and above the fees collected related to lobbying and administrative services provided by the State Bar of Wisconsin to the 24 sections.

**Inside Track.** Expenses in connection with the following articles:
• December 2021 article titled "Judges, Defense Lawyers Join State Bar in Supporting Juvenile Shackling Petition"

**Legislative Oversight Committee.** All expenses related to the committee were treated as non-chargeable as the committee provides oversight to the legislative activities of the Bar and Sections.

**Board of Governors Policy Committee.** All committee meeting time and expenses.

**Wisconsin Lawyer Magazine.** Pages devoted to the following articles:
• "Human Rights & US Foreign Policy: A Tough Approach to Trade Issues" by Nyesome Fordem
• "It's My Constitutional Right" by Jessica A Lebau
• "Expungement Clinics: Removing Barriers" by Michael Semp/Hyock Yang
• "Connect with Legislators: Lawyers are Constituents Too" by Cheryl Daniels
• "What Processing Pardon Applications Taught Me" by Felicia L Owen

• "Becoming Comfortable with Discomfort" by TR Edwards
• "Nudges, Algorithms, and Human Choice: What Does the Future Hold?" by James Casey
• "Lawyers are Democracy's First Line of Defense" by Larry J Martin
• "A Question of Balance? Law, Technology, and Democracy" by James Casey
• "Creating a More Diverse and Equitable Legal System" by Jill Kastner, Starlyn Tournfort Miller & Alex Lodge
• "State Bar Lobbying Program Finishes Successful 2021-22 Legislative Session" by Cale Battles, Lynne Davis & Devin Martin
• Every page in the magazine that included an ad to engage in the State Bar Advocacy Network

**Executive Committee.** The committee's discussions on the Racial Justice Task Force recommendations and the Greater Wisconsin Initiative Working group recommendations, grassroots outreach efforts, the ABA House of Delegates, and other legislative priorities.

**§4.0 Deadline for Arbitration Requests**
Any member who wishes to call for arbitration of the amount of the dues reduction permitted for FY24 should deliver a request in writing to the Executive Director of the State Bar within 30 days of receipt of this statement. For details of the arbitration process, see SCR 10.03(5)(b) and Article I, Section 5 of the State Bar Bylaws, which are available on wisbar.org and wicourts.gov.

---

**Payments are due no later than July 1, 2023.**
**Payments received after July 1, 2023 may be subject to late fees.**



S T A T E   B A R
O F   W I S C O N S I N

P.O. Box 7158 • Madison, WI 53707-7158
(608) 257-3838 • (800) 728-7788

2

---------- Forwarded message ---------
From: **State Bar of Wisconsin Customer Service** <noreply@wisbar.org>
Date: Thu, Jul 6, 2023 at 10:59 AM
Subject: Online Payment Confirmation – Supreme Court Assessments and State Bar Dues
To: <danielsuhr@gmail.com>

Dear Atty. Daniel Robert Suhr,

Thank you for completing your Supreme Court Assessments and State Bar Dues Statement online. Your payment has been processed and your record has been updated. You can expect to receive your new State Bar of Wisconsin membership card and written receipt in the next two weeks.If you have any questions, please call State Bar Customer Service at (800) 728-7788 for assistance.

## Payment Summary

**Supreme Court Assessments**

| | |
|---|---|
| Office of Lawyer Regulation: | $150.00 |
| Board of Bar Examiners: | $11.00 |
| Fund for Client Protection: | $50.00 |
| Public Interest Legal Srvcs: | $25.00 |

**State Bar Membership Dues**

| | |
|---|---|
| Annual Membership Dues: | $287.00 |

**Optional Fees**

| | |
|---|---|
| Sections and Divisions: | $0.00 |
| • (No Sections selected) | |
| | |
| Wisconsin Law Foundation: | $0.00 |
| Keller Dues Reduction: | $-15.50 |

**Totals**

| | |
|---|---|
| Amount Paid Today: | $507.50 |

**ID:** 1056658
**Date Paid:** Thursday, July 6, 2023 10:59 AM
**Paid with Card:** 3190

Exhibit 6

**<u>Trust Account Certificate Signature</u>**
**Signature:** DANIEL R SUHR
**Date Signed:** Tuesday, May 9, 2023 1:26 PM

Sincerely,
State Bar of Wisconsin Customer Service.

The Wayback Machine - https://web.archive.org/web/20231207175523/https://www.wisbar.org/aboutus/diversity/Pages/Racial-Equity.aspx

 STATE BAR OF WISCONSIN

Log In here        

Search the site



What You Can Do


How to Help the Public


## What We Believe

We must insist on real change. And, we need your help.

Black Americans suffer from police brutality and crippling fear caused by systemic racism and implicit bias that is ingrained in our legal system, law enforcement institutions, and countless other facets of American life.

This is unacceptable. Black Lives Matter. We have a responsibility to act.

Read the full statement from State Bar Leadership

### What We're Doing

**Stepping Up**
While issues of race in the justice system are at the forefront of many State Bar of Wisconsin efforts, we know we must do more.

The State Bar's Racial Justice Leadership Group, appointed in June 2020, is working to combat racial injustice and disparities, advance equal justice, and promote diversity and inclusion by:

- advancing a proposal that requires Wisconsin lawyers receive elimination of bias/diversity and inclusion training;
- focusing on greater diversity and inclusion within the State Bar, collaborating with affinity bar groups, the law schools, and other stakeholders to promote greater diversity of law students, faculty, and presenters, a well as racial justice education and anti-racism training at the law schools; and
- reviewing existing and suggested legislation related to race equity and justice for the next legislative session.

**Addressing Disparities by Advancing Policy Priorities**
The State Bar has been working to address disparities throughout Wisconsin's justice system, including issues related to expungement, bail reform, juvenile justice, civil legal aid funding, exoneree compensation, and adequate investment in the justice system. See our policy priorities and help take action.

<span style="color:red">Exhibit 7</span>

<span style="color:blue">Case 2:23-cv-01697   Filed 12/19/23   Page 34 of 258   Document 1-1</span>

**Building Awareness of Mass & Disparate Incarceration in Wisconsin**

When Wisconsin rose to the top in the nation for the highest incarceration rates of African-Americans, the State Bar convened a symposium of community leaders. The result was an education program and advocacy focus on how Wisconsin might change this course. Read more.

**Redoubling Our Commitment to Diversity & Inclusion**

The State Bar is deliberate and intentional in its efforts to bring diverse voices to the table to influence conversations and policy decisions. It is a focus of the State Bar's guiding principles and strategic priorities. But, there's more to do.

An Action Plan ensures our accountability in creating a culture that attracts and engages diverse leaders and staff in all aspects of the organization's work. In addition, an oversight committee, along with committed leadership and staff, work together to advance diversity and inclusion.

## Share Your Ideas

We welcome your ideas on how the State Bar can combat racial injustice! Contact Mike Wiltse, Public Relations Specialist, at mwiltse@wisbar.org.*

ABOUT US

CLASSIFIEDS / SERVICES

Place a Classified Ad

Career Opportunities

For Sale or Rent

Member Discounts

Professional Services & Experts

Court Reporters

Attorney Referrals

**ADVERTISE WITH US**



Follow us:

## HELP FOR MEMBERS

Ethics Hotline
WisLAP
Practice411
Mentoring Program

## YOUR MEMBERSHIP

FAQs
Your Benefits
Maintaining Your Membership

## CONNECT WITH US

Customer Service
Social Media
Staff Directory
Find Us

## AUDIENCES

For New Lawyers
For Public
For Law Students
For Paralegals
For Media
For Educators

## DIRECTORIES

Lawyer Search
Court Directory
Circuit Court Rules
Lawyer-to-Lawyer Directory
State Bar Leadership
Professional Services & Experts
Law-Related Organizations and Agencies

## GET INVOLVED

Advocate
Volunteer
→ Pro Bono
→ Write/Speak
→ Leadership and Committees
→ ABA Delegates
Join LRIS Panel
Sections/Divisions
Committees

Case 2:23-cv-01697   Filed 12/19/23   Page 36 of 258   Document 1-1

## DIVERSITY & INCLUSION

Diversity Clerkship Program

Diversity and Inclusion Oversight Committee

What We Are Doing

## CLASSIFIEDS | ADVERTISE

View Classifieds

Place a Classified Ad

Advertise With Us

## WISCONSIN LAW FOUNDATION

Donate

Apply for Grants

Awards and Scholarships

For Fellows

## LEGAL REPORTS AND HISTORY

Legal Reports

→ Reports

→ Resarch & Reports

Legal History

## WORK FOR US

Open Positions

Application Process

Benefits

## HELP FOR THE PUBLIC

Lawyer Referral and Information Service

Common Legal Questions

Resources for the Public

Advertise With Us      Legal      Privacy

©2023 State Bar of Wisconsin. All rights reserved.

Live 2

Case 2:23-cv-01697   Filed 12/19/23   Page 37 of 258   Document 1-1



# Newsletter

Wisconsin State

_Law Library_

1993

*of the*
*State Bar*
*of Wisconsin*

Volume 13
Issue 6
June 1993

*Juvenile Justice Forums*

## No easy answers on juvenile justice issues

A diverse group of professionals debated how to improve the state's juvenile justice system, at two recent State Bar forums in Milwaukee and Madison. The judges, teachers, social workers, reporters, legislators, lawyers and other professionals who attended the daylong Juvenile Justice Forums offered many different theories on the causes and solutions for the rising tide of juvenile crime.

Despite the lack of easy answers, there was a broad consensus on one point: meaningful change requires a holistic, interdisciplinary approach.

A "brain trust" to facilitate this approach was proposed by Dane County Judge Moria Krueger, the luncheon keynote speaker at the April 24 forum in Madison. Krueger suggested such a group could start by establishing mutually agreed-upon criteria to measure the success of social service, corrections and other programs serving juveniles.

The brain trust also could reduce the adversarial relationships brought about by funding competition and encourage those representing a broad spectrum of interests to solve problems together, Krueger said.

Federal legislation to control the manufacture of four-inch handguns was advocated by Attorney General James Doyle, the morning keynote speaker at the Madison session. Doyle noted that these guns are the weapons most often used in crimes, and help turn what once would have been school-yard fistfights into homicides.

However, reducing child abuse and neglect should be our highest priority, Doyle said, noting "the victim will likely

## Northernmost lawyer to head State Bar

The state's northernmost solo practitioner – Gary E. Sherman of Port Wing (population 434) – has won this year's contest for State Bar president-elect. Milwaukee attorney Pamela Barker, the current president-elect, will succeed Tom Sleik as president on July 1.

In other election results, the post of treasurer goes to Mary Lynne Donohue of Sheboygan, and the Judicial Council opening goes to James A. Drill of New Richmond. The winning governor candidates are: District 1 – Harry F. Worth Jr.; District 2 – Daniel Chudnow, Dennis R. Cimpl, James E. Collis, Jean W. DiMotto, Joan F. Kessler, Daniel A. Noonan and David A. Saichek; District 3 – Paul G. Swanson; District 5 – William D. Dyke; District 7 – Maurice G. Rice Jr.; District 9 – John C. Albert, Milo G. Flaten Jr. and Harvey L. Wendel; District 11 – Joseph C. Crawford; District 13 – James G. Pouros; and District 15 – Robert R. Goepel.

For the Government Lawyers Division, the winners are: president-elect – Sherwood K. Zink of Madison; secretary – Linda U. Burke of Milwaukee; treasurer – Timothy J. Kelley of Green Bay; and Board of Directors – Eunice Gibson of Madison, Susan M. Knepel of Germantown and V. Russell Whitesel of Madison.

For the Nonresident Lawyers Division, the winners are: secretary – Michael D. Downing of Glenview, Ill.; treasurer – Robert E. Browne of Chicago; Board of Governors western U.S. representative – Robert W. Hansen of Denver; and Board of Directors – William Grant Callow II of Anchorage, Ala., Mary Chris Misurek of Burnsville, Minn., Michael J. Remington of Arlington, Va., Robert Tad Seder of Seattle, and John J. Tyson of Orlando, Fla.

The winning candidate for Young Lawyers Division president-elect is Paul G. Bonneson of Brookfield.

become the perpetrator." Doyle recently asked the Legislature to appropriate some of the funds now targeted for building new prisons and invest them in the juvenile system.

U.S. Senator Herb Kohl, the keynote speaker at the May 1 forum in Milwaukee, said he was sponsoring legislation making it a federal crime for a minor to purchase or possess a handgun, or for an adult to sell a gun to a minor. Kohl cited a 79 percent increase over the last decade in the number of minors committing murder with handguns. Kohl also discussed the Juvenile Justice Act he authored last year and other innovative programs he has worked on as chair of the Senate's Juvenile Justice Subcommittee. He then spent an hour taking audience questions and comments.

Kohl cited the Weed and Seed Program as one of the innovative ways the federal government can help with juve-

nile justice issues. Weed and Seed now is a pilot program in 16 cities, including Madison.

The Madison Weed and Seed Program is coordinated by Enis Ragland, who participated in one of the Juvenile Justice Forums. Working through the Madison Mayor's Office, Ragland co-operates with police, neighborhood associations, social services and school personnel to discourage drugs and gangs and improve the economic health of two low-income neighborhoods.

Ragland noted that Milwaukee may receive funding to start its own program, if Weed and Seed is continued. Because U.S. Attorney General Janet Reno served on Miami's Weed and Seed Committee, Ragland expects she will support continued funding.

In addition to keynote addresses, the forums included panel discussions on *(continued on page 5)*



Photos: Nancy Repyak



**'What are our rights?'**
*Attorneys David McFarlane (in photo at right), Cynthia Schally, Marilyn Townsend and Joanne Whiting and the Bar's Law-Related Education Coordinator Dee Runaas (in top photo, at left) went to Madison's Van Hise Middle School in April. They met with seventh- and eighth-graders to discuss the Bill of Rights' implications for freedom of speech, hate crimes and gangs. The Bar brings lawyers and law-related publications to schools statewide, to help kids understand our legal system. To volunteer, please call Runaas at the State Bar.*

## High court grants Bar's dues reduction petition

The Wisconsin Supreme Court has amended the rules on the Bar's dues reduction and arbitration procedures.

The court amended Supreme Court Rule 10.03(5)(b) to clarify which activities the State Bar may fund with mandatory dues and which activities must be covered by a dues reduction available to dissenting members.

The State Bar petitioned for the changes in December, after a dues arbitrator interpreted the rule to mean that compulsory dues could not be used for law-related education or projects such as the Mentor Council.

"The rule has been misunderstood as somehow not the same as [the U.S. Supreme Court's decision in] *Keller*," testified State Bar President Tom Sleik at the court's March hearing.

"We don't think the Wisconsin Supreme Court or *Keller* intended challenges to activities that were clearly not political or ideological in nature," Past President Daniel Hildebrand testified.

The rule also was amended to require those requesting dues reduction arbitration to give seven days' notice of which activities they object to and why.

The order will appear in the June *Wisconsin Lawyer*.

# Employers, students lined up for new minority clerk program

Eight law firms and corporations have joined with the State Bar to launch a program placing minority students in private-sector clerkships.

"Most minority law graduates leave the state, and those who remain in Wisconsin go disproportionately into the public sector or solo practices," says Madison attorney Earl H. Munson Jr., whose Committee to Encourage Placement of Minority Lawyers developed the program. "Of the more than 100 recent minority graduates from the U.W. Law School, only three went to work for medium or large Wisconsin law firms. This program can help address that imbalance."

The program will help minority law students get a first-hand look at private sector practice, and will give large law firms and corporate legal departments a chance to experience more diversity. Participating employers will pay the students the normal salary for first-year summer clerks and will provide men-tors, frequent performance feedback, and exit interviews.

Ten first-year minority law students

**'Thank you'**
The State Bar of Wisconsin and the Committee to Encourage Placement of Minority Lawyers wish to thank these organizations for participating in the 1993 Minority Clerkship Program:
Boardman, Suhr, Curry & Field, *Madison*
Foley & Lardner, *Madison and Milwaukee*
Godfrey & Kahn, *Milwaukee*
LaFollette & Sinykin, *Madison*
Michael, Best & Friedrich, *Milwaukee*
Northwestern Mutual Life Insurance Company, *Milwaukee*
Quarles & Brady, *Milwaukee*
Wausau Insurance, *Milwaukee and Wausau*

– seven from the U.W. and three from Marquette University – were selected for the program. Committees at each school selected these students from among 35 applicants, based on personal statements and interviews.

The selection committee for the U.W. was chaired by U.W. Legal Writing Program Director Aviva Meridian Kaiser, and included Madison attorneys Michelle A. Behnke and William M. Conley, U.W. Law School Assistant Dean Steve Rocha, and U.W. Law Professor William Whitford. The selection committee for Marquette was chaired by Law Professor John J. Kircher and included Milwaukee attorneys Thomas R. Cannon and Jorge A. Gomez and Law Professors Edward A. Fallone and Kathleen H. McManus.

The Committee to Encourage Placement of Minority Lawyers was created last spring by Past President Daniel Hildebrand. The program was approved by the Board of Governors in December.

## 'We're sorry...'
## Citation, ADA guides have sold out (but more are on the way)

If you were one of many members who recently ordered the *Guide to Wisconsin Citation* or *Americans with Disabilities Act: A Guide for Wisconsin Employers* and had to wait a while before receiving your copies, please forgive the delay.

Due to an extraordinary demand, both booklets sold out a month after publication. But both guides have been reprinted and are available again.

The *Wisconsin Guide to Citation* is designed for attorneys, law clerks, paralegals and legal secretaries – anyone who uses or types citations. Based on *The Bluebook*, the guide focuses on Wisconsin citations and gives examples of how to cite the most common primary and secondary authorities in briefs and memoranda.

Single copies of the *Guide to Citation* are $4 ($6 for nonmembers), plus tax and shipping.

The *Americans with Disabilities Act* guide can help both lawyers and their clients understand the requirements of this far-reaching federal law. This 70-page booklet is an easy way to become familiar with the ADA's requirements, to help achieve the ADA's goals and avoid liability for failing to reasonably accommodate employees and customers with disabilities.

The ADA guide is $20 for single copies, plus tax and shipping, with significant discounts on volume purchases. (For example, it is $15 per booklet for two to 24 copies and $10 per booklet for 25 copies or more, making it easily affordable to give to clients.)

For information or to order, please call Chris Boman at the State Bar.

### ☎ Calling the State Bar?
**(608) 257-3838 (local calls)**
**(800) 362-8096 (in Wisconsin)**
**(800) 728-7788 (nationwide)**

## Rick Rodgers' WordPerfect seminar is back by popular demand

"How to Become Expert with WordPerfect® in Your Law Practice," presented by Richard T. (Rick) Rodgers, will return to Wisconsin in July, in response to many member requests and glowing praise of his previous State Bar seminars.

The daylong seminar shows participants how to use WordPerfect to go beyond glorified typing, using the software to boost productivity officewide and even minimize malpractice exposure. The course is designed specifically for lawyers and law office staff, covering such issues as automated document production and officewide scheduling. Attendees receive more than 500 pages of instructional materials and Rodgers' Generic Law Practice System add-on software for automated legal document production.

Because the material presented has far-reaching implications for law office management, lawyers are encouraged to attend with their paralegals, legal secretaries or other key staff.

As a lawyer himself, Rodgers is keenly aware of the technology needs of today's law practices. He is a law professor at North Carolina's Campbell University, a contributing editor for *The Lawyer's PC* and a law office systems design consultant. He formerly practiced with the firm of Rodgers, Cabler & Henson in Highlands, N.C.

"How to Become Expert with WordPerfect" will be offered July 21 in Appleton, July 22 in Milwaukee and July 23 in Madison. Because this material is best absorbed in a live seminar, no video replays will be offered.

Tuition is $99 for members and nonmembers alike (including law office support staff). Up to 7 Wisconsin CLE credits will be available; Minnesota CLE credit also will be applied for.

When this seminar was offered previously, places were snapped up quickly. To avoid disappointment, please reserve your place early. For information or to register, please call Chris Boman at the State Bar.

## Convention programs offer ethics CLE credit

Four sessions at this month's Annual Convention in Oshkosh have been tentatively approved for the new ethics CLE credit.

The approved sessions are:

• "Current Topics in Professional Responsibility in Wisconsin and the Nation," by University of Texas Law School Fellow Charles Silver and Professor John S. Dzienkowski, offered by the Nonresident Lawyers Division on Saturday, June 19, 9 a.m. to 12:15 p.m.

• "The Ethics of Being a Corporate Counsel: 'Who is the Client?' and How Conflicts Can Arise," by Madison attorney Cynthia Schally and offered by the Corporate Counsel Committee on Thursday, June 17, 1:45 to 5 p.m.;

• "Ethics of Client Interviews," by Milwaukee attorney James Caragher, offered by the Intellectual Property Section on Friday, June 18, 4 to 5 p.m.; and

• "Ethics in Practice Before the U.S. Patent and Trademark Office," presented by Cameron Weiffenbach of the U.S. Patent Office in Arlington, Va., offered by the Intellectual Property Section on Friday, June 18, 1:45 to 3 p.m.

Under a Supreme Court Rule adopted in December, Wisconsin-licensed lawyers must earn three of the 30 mandatory continuing legal education hours on the subject of ethics and professional responsibility. Lawyers can earn these ethics hours either by attending standalone ethics courses or substantive law programs with components that have been approved for ethics credit by the Board of Bar Examiners.

### Is stress taking too high a toll on your practice?
Call the Committee on Assistance for Lawyers Helpline
**800-543-2625**
If stress is impairing your personal and professional functioning – or if you are a relative, friend or colleague of a lawyer facing these challenges – COAL wants to help. The COAL Helpline operator can connect you to a trained volunteer lawyer, 6 a.m. to midnight, daily.

All calls are confidential and can be kept anonymous.

# Financial Management for Small Firm and Solo Practitioners

**Live in Milwaukee Only: July 16, 1993 ❖ Video all Locations: August 12, 1993**

In the State Bar's recent series of focus group discussions with attorneys from many small firms in Wisconsin and also many solo practitioners, one of the issues most frequently raised by participants was a desire for assistance in managing the business side of practicing law.

Here's the help you need. The faculty offers expertise in accounting, trust account management, and employee benefits. Two representatives from the nationally respected practice management consulting firm of Altman Weil Pensa will also be joining this seminar. They understand your problems with budgeting, cash flow, billing, collections, the cost of having a staff, and other areas. And they have highly practical, extremely effective solutions to share with you.

To give you a head start on more effective money management, we're offering this seminar at a reduced price of $99. But you'll realize far more significant savings, day after day, as you use the information you'll learn from this program.

## Topics to be covered

- ◆ Economics of Law Practice and Trends in the Profession
- ◆ Financial Controls and Setting Up General Accounting Systems
- ◆ How to Manage Cash Flow, Budgeting, and Forecasting
- ◆ Retainers, Billing, Collections, and Billing Alternatives
  - ◆ Retainer and billing arrangements
  - ◆ Alternatives to hourly billing
  - ◆ Billing follow-up and collection
- ◆ Trust Account Management and Procedures
- ◆ Capitalization, Lines of Credit, Valuation, and Transfer of a Law Practice
- ◆ Health Care, Retirement Plans, and Other Fringe Benefits
- ◆ Employment Issues in Today's Law Firm

## Faculty

**Gary L. Bakke**
Bakke & Norman, S.C.
New Richmond

**James D. Cotterman**
Altman Weil Pensa
Newtown Square, PA

**Carole V. Hahm**
Carole Hahm & Co, Inc.
Milwaukee

**Noel W. Iverson**
Stan Mintz Associates Inc.
Madison

**Ronald E. Roberts, CPA**
Roberts, Ritschke & McNeely, Ltd.
Neenah

**Alan R. Olson**
Altman Weil Pensa
Racine

**Lowell E. Sweet**
Sweet, Leece & Phillips, S.C.
Elkhorn

## Credits/Tuition

**CLE Credits . ...................... up to 8.0 credits**
(We have applied for Minnesota CLE credit.)

**Tuition ...................................... $99**



For more information or to register by MasterCard or VISA, call CLE seminars
**800/728-7788 or 608/257-3838, ext. 118**

## Convention 'Computer Corner' to highlight computerized research

If you're looking for ways computer technology can help you in your practice, you'll want to stop by the Computer Corner during the Annual Convention in Oshkosh June 17 to 19.

This year's Computer Corner will focus on computerized legal research. Revisor of Statutes Bruce Munson will demonstrate the Wisconsin Statutes on CD-ROM, a version that is faster to use and available in more frequent updates than the print version.

State Law Librarian Marcia Koslov and Public Services Librarian Jane Colwin will discuss and demonstrate online research resources, including:

• commercial services such as Lexis®/Nexis® and Westlaw®;
• the Wisconsin State Online Law Library catalog; and
• the Supreme Court/Court of Appeals Bulletin Board.

Also on hand to answer computer questions will be Technology Resource Committee members and the Bar's Computer Services Director Art Saffran.

The Computer Corner will be in the lobby of the Hilton Convention Center, 8 a.m. to 5 p.m. on Thursday and Friday, and 8 a.m. to noon on Saturday.

## Small firms get free Lexis search offer

Small firms that have held back from computerized research are being tempted by an offer of a free Lexis® search by State Law Library staff.

Coupons for the searches went out to firms with up to 10 attorneys last month, with a letter describing a new flat-rate Lexis option called MVP. The coupons can be used at the Computer Corner during the upcoming Annual Convention (see article above) or by calling the State Law Library by June 30. The free searches give firms the chance to experience firsthand the speed and broad reach of online research.

The MVP option makes Lexis very affordable for small firms, especially for those with up to three lawyers. The flat rate means MVP subscribers can do as much research as they need, without worrying about the cost.

MVP comes in several versions, but all feature a set monthly rate for unlimited access and printing for specified materials. For unlimited searching and printing of Wisconsin materials, firms of up to three lawyers pay only $180 a month. Or for $210 a month, a three-lawyer firm can get unlimited use of Wisconsin and Seventh Circuit materials. Additional state libraries can be included for $180 each per month.

For each version of MVP, firms with more than three attorneys pay an additional fee per attorney. Solo practitioners can avoid paying the three-lawyer rate by joining with other solo lawyers or with a firm in the Share Option.

Those who sign on to MVP by June 30 will get free introductory training and Lexis communication software.

MVP is made available by the Computerized Legal Research Service (CLRS), which is a joint project of the State Bar and the State Law Library. For more information about MVP and CLRS, please call Kris Wenzel at the State Bar.

*'What's the going hourly rate?'*
## Economics of practice survey underway

Are you one of the many lawyers who have called the State Bar seeking information on the economics of practice?

"Every day members ask us for information about hourly rates, overhead costs, technology use, and billing methods – but we have little information to give them," says State Bar President Tom Sleik. "Members are telling us that gathering this information must be a priority."

To gather this information, the State Bar now is surveying 1,200 members who practice in Wisconsin. If you are among those contacted, please take the time to answer the survey. Your answers – which will be anonymous – will be of help to all the state's lawyers.

The survey results will be summarized in the October *Wisconsin Lawyer*. Full survey results will be available to State Bar members at a nominal charge.

## No easy answers

*(from page 1)*
such topics as waivers into adult court, publicity about juvenile cases, victim-witness rights, accessibility of school records, and punishment of juveniles.

Panelists and audience members offered many suggestions, including that Wisconsin should:

• place an equal or higher priority on the juvenile system as compared to the adult system, and stop making the juvenile system an afterthought;
• focus more resources on intervention, rather than directing the majority of resources to corrections;
• allocate resources so that immediate consequences and treatment can be ordered for first-time juvenile offenses;
• improve communication and cooperation among professionals and others who work with juveniles and their families;
• provide resources to support collaboration among police, schools, neighborhood groups, courts, social services and others to improve the safety of homes, communities and schools;
• fund community programs that offer alternatives to gangs and meet juveniles' needs for security and affiliation;
• support programs to reduce child abuse and neglect;
• measure program success with criteria that are established by a broad group of professionals who work with juveniles and their families, and redirect funding away from programs that are not working and toward successful programs and program development;
• re-examine the Children's Code to ensure it allows juvenile justice professionals to prescribe the most effective treatment and punishment for offenders;
• set and apply rules for school and community programs so that fairness and consistency prevail across districts and systems; and
• consider allowing greater public and media access to juvenile courts and programs, to further public knowledge about the system.

The Juvenile Justice Forums were coordinated by the State Bar's Media-Law Relations Committee, chaired by Madison attorney Steve Ritt. The committee will summarize the participants' suggestions in a report to be distributed to legislators and the media.

More Juvenile Justice Forums are planned for March of 1994.

Case 2:23-cv-01697   Filed 12/19/23   Page 42 of 258   Document 1-1

# The *Newest* State Bar Books

**Currently, the State Bar offers nearly 40 books on Wisconsin law.
Three publications you ought to know about are highlighted below.**

## Wisconsin Guide to Citation



The State Bar has developed a practical easy-to-use guide to legal citations: *Wisconsin Guide to Citation.*

The *Guide* is designed for attorneys, law clerks, paralegals and legal secretaries – anyone who uses or types citations.

Based on the *Harvard Citator,* the new guide focuses on Wisconsin citations and provides examples of how to cite the most common primary and secondary authorities in briefs and memoranda. It also shows how to cite services and electronic databases.

The guide, is reproduced in an 8-1/2-by-11-inch bound format. Single copies are available for $4 ($6 for nonmembers) plus tax and shipping charges)



STATE BAR
OF WISCONSIN

## Americans with Disabilities Act: A Practical Guide for Wisconsin Employers



This new 90-page booklet is designed to help you and your clients understand the requirements of the new Americans with Disabilities Act. Practical and easy to understand, the booklet will give you a concise overview of the ADA, including coverage under the act, reasonable accommodations, design and construction requirements, prohibited employment practices and service activities, and enforcement procedures. You'll find numerous practical examples that help explain the ADA's provisions, as well as comparative notes on related Wisconsin laws.

The booklet is $20 for single copies, $15 for 2-24 copies, and $10 for 25 or more copies, plus tax and shipping. Space is provided on the back cover for your firm's name.

## Wisconsin Business Corporation Law



This new reference work provides section-by-section coverage of Wisconsin's revised business law. Of particular value are the annotations provided for the individual sections of the revised law. In practical and easy-to-understand terms, they discuss the meaning and purpose of the section. They also offer insights into the intent behind the special provisions included in the Wisconsin law.

Written by Attorney Christopher S. Berry, Professor Kenneth B. Davis, Jr., Dean Frank C. DeGuire, and Attorney Clay R. Williams, *Wisconsin Business Corporation Law* works together with *Organizing a Wisconsin Business Corporation* to provide you with the information you need to deal with Wisconsin business law.

**State Bar member price $125/
nonmember price $165**

---

## Order Form

Wisconsin Guide to Citation .................. $4/$6

**Americans with Disabilities Act:
A Practical Guide for Wisconsin
Employers** ............................... 1 copy – $20 each
........................... 2-24 copies – $15 each
........................... 25+ copies – $10 each
**Wisconsin Business
Corporation Law** .................................. $125/165

          **Total amount** _____

    **Shipping and handling\*** _____

| *Shipping & Handling* | |
|---|---|
| $0-$99 .................$3.00 | |
| $100 & over .......$6.00 | |

          **Subtotal** _____

**5% WI sales tax** _____
(In Dane Co. add 5.5%)

            **Total** _____

☐ Do NOT enter my subscription for future editions.

State Bar Attorney Number _____

Organization _____

Name (if desired) _____

Street Address _____

City/State/Zip _____

**Payment:** ☐ Check ☐ Visa ☐ MasterCard
Payable to State Bar CLE Books

Credit Card No. _____ Exp. date _____

Authorized Signature _____

**Mail to:** State Bar of Wisconsin
CLE Books
P.O. Box 7158
Madison, WI 53707-7158

© State Bar of Wisconsin.
Prices subject to change
without notice.

Order code: B336

---

State Bar of Wisconsin CLE Books uses the LEXIS ® legal research service of MEAD DATA CENTRAL, Inc., in preparing its books and supplements.

# New videos boost staff skills in client service, civil litigation

Is your law firm's staff delivering the best possible client service? If you have support staff who are new to litigation, do they understand the legal system and civil litigation process? Two new State Bar Law Office Videotapes – "Delivering Exceptional Client Service" and "Civil Litigation for Support Staff" – offer an easy way to train your staff in these key areas.

"Poor service" is the top reason clients give for switching law firms, as the new "Delivering Exceptional Client Service" video explains. Competent legal work may be the most important aspect of client service, but support staff also have a major impact on how clients view your firm's performance.

This 15-minute video shows what legal secretaries, paralegals and receptionists can do to improve client service. It emphasizes ways that lawyers and nonlawyer staff can work together to achieve service that stands out in today's competitive market. Following the video's simple guidelines can pay off in many ways: more repeat business, more client referrals, fewer malpractice claims, and even more job satisfaction for your support staff.

The other new video, "Civil Litigation for Support Staff," is a 27-minute video that explains both the civil litigation process and the role played by law office support staff.

The video follows a civil case involving a car-bicycle accident from the initial client interview through discovery, trial and appeal. As the case proceeds, the video explains the federal and state court systems, defines legal terms and illustrates support staff responsibilities.

"Delivering Exceptional Client Service" and "Civil Litigation for Support Staff" are available from the State Bar for $129 each, plus tax and shipping.

## Ethics video is a best-seller

"Legal Ethics for Support Staff" is becoming one of the most popular titles in the Law Office Videotapes series.

Using vignettes, the video covers how to maintain confidentiality, check for conflicts of interest, handle trust accounts, refrain from giving legal advice, and facilitate clear, prompt communication with clients.

The 22-minute video "dramatizes the kinds of ethical issues that frequently cause lawyers grief and offers inexpensive, practical suggestions that don't insult the intelligence of the viewer," said a recent review in the *Law Firm Profit Report* (Newsletter Services).

The review ends with a telling quote on the importance of staff training: "It's a common complaint: 'You train good people and they leave,' " says Los Angeles CPA and management consultant Harvey Goldstein. "But how many of you want to have bad people who stay?"

"Legal Ethics for Support Staff" is $129 plus tax and shipping. To order, please call Chris Boman at the State Bar.

# Join with LRIS to build your practice, serve public

Would you like to build your practice with referrals in the areas of law you want to practice – and offer a valuable service to consumers who don't know where else to turn?

If so, the Lawyer Referral and Information Service (LRIS) invites you to become an LRIS panel attorney. As a panel attorney, you will receive prescreened referrals in your geographic and practice areas. Some of these referrals lead to lucrative cases or long-term clients, others to simple consultations, but all those referred need your help.

The LRIS advertises its toll-free number in every yellow pages directory and courthouse in the state, drawing some 30,000 calls a year. LRIS callers speak with legal assistants, who may refer them to panel attorneys, community agencies or other resources, as appropriate. Those with simple questions may get a call-back from a lawyer volunteer on the LRIS Hotline. Only consumers who need and can pay for legal services – about 25 percent of LRIS' callers – are referred to panel attorneys.

A consumer referred to a panelist contacts that attorney for a half-hour consultation for a charge of up to $20, to discuss the matter and what fees will be involved if the lawyer handles it.

To register for the panel, simply complete and return an LRIS registration form (forms recently were mailed to all members). The form includes a check-off list of 171 practice areas, for you to indicate the types of cases you want to handle. New additions to this list include the Americans with Disabilities Act and the Family and Medical Leave Act.

In order to help LRIS match clients with special concerns, the form also lets the panel registrant indicate if he or she: has additional professional degrees or licenses; speaks languages in addition to English; offers special hours or fee arrangements; or is interested in working with clients who are developmentally disabled, elderly, hearing-impaired or HIV-positive.

To help support LRIS, panelists pay a registration fee of $60 per year ($45 for new lawyers and no charge for those admitted in 1993) and 10 percent of collected legal fees over $200.

For information or an additional LRIS registration form, please call Shell Goar or Cindy Walker at the State Bar.

## LRIS celebrates its 15th birthday

This summer the LRIS begins its 15th year bridging the gap between attorneys and consumers looking for help with legal problems.

The LRIS began its work in 1978, as a project of the State Bar's Lawyer Referral Committee, which was then chaired by Reedsburg attorney Myron E. LaRowe. The committee had been created by former State Bar President Rodney O. Kittelsen in 1976, as part of the State Bar's efforts to make legal services more readily available to Wisconsin consumers.

When the LRIS started off in 1978 it made only about three referrals to attorneys a day.

Now LRIS makes about 30 referrals to panel attorneys each day – plus countless referrals to legal aid, community agencies and other resources. LRIS also coordinates a free call-back hotline, in which volunteer lawyers answer basic legal questions for consumers who may not need a full consultation.

By helping some 30,000 callers each year, LRIS offers a vital public service that builds goodwill for the legal profession.

# Foundation presents lawyer's painting to supreme court

The Wisconsin Law Foundation (WLF) last month presented an original watercolor by attorney-artist William D. Dyke to the Wisconsin Supreme Court.

Entitled "Belmont 1836: A Place of Beginnings," the historically accurate painting depicts the two buildings where the Wisconsin Territory's government and judicial system were launched. The right-hand building in the painting is the Council House, used for the territory's first legislative and court deliberations. The left-hand building was intended to be used as a courthouse but instead became the home of the state's first chief justice, Charles Dunn.

Dyke is a Mineral Point sole practitioner (and former Madison mayor) who is active in both the State Bar and WLF. He had previously donated the painting to WLF so it could offer limited-edition color prints to those who give $100 or more to support law-related education and public service. (If you would like to



*Attorney Bill Dyke with his painting of the birthplace of Wisconsin's government and judicial system.*

help WLF fund such projects, please contact Chris Boman at the State Bar.)

When accepting the original painting on behalf of the court, Chief Justice Nathan S. Heffernan commented on its historical context. The buildings de-

picted in Dyke's painting were erected by a land speculator who convinced the Wisconsin Territory's first governor to choose Belmont as the capitol, he said. The choice of Belmont proved unpopular due to the lack of amenities in the town, Heffernan explained, citing a newspaper article that complained, "Empty stomachs may make for clear heads but not good laws. God deliver us from hungry legislators."

Burlington was the second choice as capitol, but there the Capitol building burned down. Finally James Doty succeeded in having the capitol moved to Madison, "a swampy area largely owned by him on the banks of the Yahara River ... where we have all lived happily ever after," Heffernan said.

Heffernan said Dyke's painting would join the court's collection of art and historical mementos, including a gavel made of wood from the Belmont courthouse depicted in the painting.

Nonprofit Organization
U.S. POSTAGE PAID
Madison, WI
Permit No. 515

STATE BAR OF WISCONSIN
P.O. Box 7158, Madison, WI 53707-7158



102071 53707
JEAN'S WOCK
USFAB LAW LIBRARY
SPO BOX 78 SH
MADISON,

## Newsletter

### Inside:

- The Wisconsin Supreme Court grants a State Bar petition to change the Bar's dues reduction and arbitration procedures – page 2.

- Minority law students get a taste of private-sector practice this summer, as part of a new State Bar program – page 2.

- The popular seminar "How to Become Expert with WordPerfect® in Your Law Practice" returns in July – page 3.

- Two new State Bar videos polish your staff's client service and civil litigation skills – page 7.

- Will LRIS begin its 15th year with you on board? – page 7.

This newsletter is published monthly by the Periodicals and Consumer Publications Department, State Bar of Wisconsin, P.O. Box 7158, Madison, WI 53707-7158. If you have information for the newsletter, please send it in before the first of the month preceding the month in which you wish it to appear. (For example, information received by Feb. 1 can be covered in the March newsletter, if space allows.) If you have a suggestion or question about the State Bar newsletter, please contact Joyce Hastings or Roxanna Nakamura at the State Bar Center.

Please direct inquiries about CLE seminars and publications to the CLE Seminars or CLE Books departments. For general questions, please call Chris Boman. To reach anyone at the State Bar, call (608) 257-3838, (800) 362-8096 (statewide) or (800) 728-7788 (nationwide). Our fax line is (608) 257-5502.

© State Bar of Wisconsin, 1993

The Wayback Machine - https://web.archive.org/web/20231003173207/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.asp...

 STATE BAR OF WISCONSIN    Search the site...

Lawyer Search | Legal Research | Directories | Careers | Contact Us | myStateBar    Log In here 

About Us          For Members          Marketplace          News & Publications          For Public

  Home  >  News & Publications  >  InsideTrack  >  Article

# InsideTrack

BI-WEEKLY NEWSLETTER OF
THE STATE BAR OF WISCONSIN

| AUGUST | VOLUME | NUMBER |
|--------|--------|--------|
| 2017 | 9 | 15 |

Exhibit 9

AUGUST 02, 2017

# A Reason for Optimism: 453 Careers Boosted by Diversity Clerkship Program

The State Bar of Wisconsin Diversity Program matches first-year law students with employers to help students build legal practice skills. Now in its 25th year, the program has placed 453 law students with 74 law firms, corporations, and government offices.

SHANNON GREEN

Comments (0)                                                SHARE THIS:                    A Ā A









Case 2:23-cv-01697   Filed 12/15/23   Page 47 of 258   Document 1-1





*The State Bar celebrated 25 years of the Diversity Clerkship Program with a reception for participating employers and law student clerks. Visit our Facebook page for more photos of this event, or click here.*

Aug. 2, 2017 – Boardman & Clark LLP in Madison has long made a point of hiring first-year law students as clerks in the summer.

It's a very successful strategy for attracting good young attorneys to the firm, says Anita Gallucci, a partner and chair of the firm's recruiting committee.

Gallucci was a young associate in 1993 and in charge of the firm's clerk program when she heard of a new State Bar of Wisconsin program that placed law students of minority and diverse backgrounds in clerkships for their 1L summer.

"The partners thought it would be a good way for the firm to support minority law students, as well as to help diversify the workplace here," she said.

Celebrating its 25th year, the State Bar's Diversity Clerkship Program is a limited-term, summer employment experience that gives first-year law students with diverse backgrounds the opportunity to build legal practice skills and knowledge. Participating employers provide a paid, 10-week summer clerkship opportunity for a first-year law student with a diverse background.

The program, launched in the summer of 1993, was the work of the Committee to Encourage Placement of Minority Lawyers, formed in 1992 by then-State Bar President Daniel Hildebrand. The first summer, 10 clerks were placed with eight employers, including Boardman, Suhr, Curry, & Field – as the firm was known then. The list of employers also includes Northwestern Mutual Life Insurance in Milwaukee – which also has participated in the program since its inception.



*Boardman & Clark this year celebrates 25 years'
participation in the Diversity Clerkship Program.
Pictured: Law clerk Victoria Crosby, second from left, with
Boardman & Clark lawyers, from left: Jennifer Mirus,
Ashley Rouse, and Anita Gallucci.*

*Visit the State Bar's Facebook page for more photos of this
event, or click here.*

## A Quarter Century

After a quarter century, Boardman & Clark remains active in the program.

"We maintain a commitment to the program not only because it supports diverse law students and benefits our firm, but also because we are committed to supporting the State Bar and improving the practice of law within Wisconsin," Gallucci said.

"As long as there is a program, we'll participate," she said.

The attorneys at Boardman & Clark highly value the Diversity Clerkship Program. "We see really great candidates. I believe the quality of the candidates over the years has only increased," she said. "That has also been a strong incentive to stay in the program."

In fact, the firm has helped the program to grow – with the participation of the Madison City Attorney's Office. The city attorney, Michael May, worked as a partner at Boardman, Suhr, Curry, & Field for many years. "It was because of his experience here that he encouraged the city to participate in the program," Gallucci said.



*"I cannot wait to see how the skills and knowledge I've
learned transfer to the classroom and beyond." – Yamilett
Lopez, clerk with Northwestern Mutual*

*Pictured: Law clerk Yamilett Lopez with Wesley Warren of
Northwestern Mutual Life Insurance Company. Visit the
State Bar's Facebook page for more photos of this event, or
click here.*

## The Program: 453 Students, 74 Employers

The Diversity Clerkship Program is still needed, according to Michelle Behnke, former State Bar president who was involved in the committees that organized and operated the program in the 1990s. The program is now operated by the State Bar's Diversity and Inclusion Oversight Committee.

Over the past 25 years, the program has placed 453 law students with 74 law firms, corporations, and government offices.

*__Shannon Green__ is communications writer for the State Bar of Wisconsin, Madison. She can be reached by email or by phone at (608) 250-6135.*

Programs like the State Bar's began at a time when bar leaders nationwide recognized that lawyers of diverse backgrounds were struggling to work in practice areas outside of government agencies, said Behnke, who spoke recently at a reception for the 2017 law clerks and their employers.

In Wisconsin, lawyers involved in State Bar leadership like Michael Gonring and Earl Munson Jr. laid the groundwork for the program and got it running, recognizing at the time that Wisconsin's legal profession was not very diverse.

Munson noted in 1993 that only three of 100 minority law graduates went to work for medium and large firms. "Most minority law graduates leave the state, and those who remain in Wisconsin go disproportionately into the public sector or solo practices," he said in the June 1993 *Newsletter of the State Bar of Wisconsin*.

They looked to the model set by the American Bar Association.

"The goal of the program was simple – place a diverse group of first-year law students in summer internships with private law firms for a summer clerkship experience," Behnke said. "The law students would be exposed to private practice and a variety of practice areas. The law firms would gain legal support and could participate in the program as a tool to address their own diversity goals."



*"This was a great experience. I've been exposed to a variety of legal fields and worked on a range of projects with different attorneys." – Sydnie Parker, clerk with Great Lakes Higher Education Corp.*

*Pictured: From left, law student Sydnie Parker and Aisha Smith of the Great Lakes Higher Education Corp, who participated as a student in the program in 2011. Visit the*

Case 2:23-cv-01697   Filed 12/19/23   Page 50 of 258   Document 1-1

*State Bar's Facebook page for more photos of this event, or click here.*

## Addressing Racial and Ethnic Barriers

Recent studies show only small improvements in diversifying the profession since then, Behnke noted, with the ABA reporting in 2013 that African-American and Hispanic lawyers comprise only 8.4 percent of the legal profession, while comprising 25 percent of the U.S. workforce.

"There is still reason to be optimistic," Behnke said. State bars, the ABA, and other associations across the country, along with many corporations, are committed to boosting diversity in the workforce.

She fully expects the program to celebrate its 50th year. By 2042, she said, the U.S. will be a "majority minority" country, with no one race or ethnicity in the majority. These demographic changes make the need for such programs more urgent, says Behnke.

"We must never stop trying to include those that are on the outside or not fully included in the legal profession," she said.



*"I've had the opportunity to see what it is like not only to be a lawyer, but a business person as well." – Torrean Edwards, clerk with GE Healthcare*

*Pictured: Heidi Ratzlaff of GE Healthcare with law clerk Torrean Edwards. Visit the State Bar's Facebook page for more photos of this event, or click here.*

## Plans and Takeaways

Meanwhile, the 2017 clerks are using the experience to better plan their future careers – for some, in areas that they never thought to explore, and for others, the experience reinforced their interest in an area of law.

"My Diversity Clerkship Program experience was phenomenal!" This is the response from law student Chue Xiong, one of 16 law students matched with employers as summer law clerks through the State Bar of Wisconsin Diversity Clerkship Program. Xiong was matched this summer with American Family Insurance.

Ricardo Tapia participated in every facet of litigation, including pretrial negotiations and first-hand work on a jury trial as a law clerk for Society Insurance. Kierre Elvington clerked with Church Mutual

Insurance Co., which gave him a glimpse into corporate, litigation, and regulatory practice areas.

A real benefit, Elvington said, was "working alongside a legal team with decades of practical legal experience and sound business acumen – something you cannot replicate in a classroom setting."

Hannah Demsien, who worked with Madison City Attorney Michael May, said her experience has confirmed her interest to work in government law. She was surprised to learn the degree to which municipal law affects people's everyday lives. "I've learned a lot about how municipal law interacts with state and federal law and about how to research municipal law."

Visit the State Bar's Facebook page for more photos of this event, or click here.

---

## Employers Needed for 2018 Summer Diversity Clerkship Program

Employers – law firms, corporate legal departments, and government agencies – are needed for the 2018 Diversity Clerkship Program.

The State Bar's Diversity Clerkship Program is a limited-term, summer employment experience that gives first-year law students with diverse backgrounds the opportunity to build legal practice skills and knowledge. Participating employers provide a paid, 10-week summer clerkship opportunity for a first-year law student with a diverse background.

Employers can enroll through Jan. 12, 2018. Learn more about the program, or contact Megan Zurbriggen at (800) 444-9404, ext. 6181.

---

Comments (0)                                                                    SHARE THIS:

# Diversity Clerkship Program



## About the Program

The State Bar's Diversity Clerkship Program is a limited-term, summer employment opportunity that gives first-year Marquette University Law School and University of Wisconsin Law School students with diverse backgrounds the opportunity to build legal practice skills and knowledge. Student clerks gain practical legal experience, and participating employers obtain valuable legal support.

### Program Goals

- Provide legal employers with access to first-year law students with diverse backgrounds from Wisconsin law schools
- Enhance law student academic education with practical legal work experience
- Expose law students to varied legal employment opportunities
- Provide full-time, limited-term summer clerkship experiences with premier legal organizations

### Student Eligibility

First-year Marquette University Law School and University of Wisconsin Law School students with diverse backgrounds who are in good standing may apply. Successful applicants demonstrate a commitment to diversity and a record of academic achievement.

### Employer Eligibility

Although our employer roster changes from year to year, we look for a broad representation of employers that reflect the real-world legal environment, including traditional law firms, government agencies, and in-house counsel.

We primarily recruit employers from Wisconsin, and a majority of our employers are located in Madison and Milwaukee. We have occasionally had a few employers located in small to medium, sized Wisconsin cities or out of state.

Employers provide the same salary, work experience, and social opportunities to our clerkship students as they provide to any of their other summer associates.

All labor and employment laws relating to hiring a student through the program must be followed. Many employers provide an in-house mentor for their student clerk. The program requires employers to provide students with periodic evaluations during the summer and an exit interview at the end of the clerkship term of service.

Our roster of employers changes from year to year. A finalized list of employers is not available until early February 2022.

### Continued Employment

Participating employers commit to hiring a student for a limited period of time during the summer. Outside of the program, employers and students are free to negotiate continuing employment.

### State Bar Sponsorship

The Diversity Clerkship Program is an initiative of the State Bar of Wisconsin. The State Bar's Diversity Inclusion and Oversight Committee oversees the program with the help of State Bar staff. Committee members recruit employers and students for the program; a selection committee meets to select students to participate in the program; and a matching committee determines the employer-student clerkship assignments.

For more information about the program, please contact Jacque Evans, State Bar of Wisconsin, 608-250-6083 / jevans@wisbar.org.

### Diversity Clerkship Recognition Reception

Each year, the State Bar's Diversity Inclusion and Oversight Committee plans a recognition reception honoring past and present Diversity Clerkship employers and law clerks. The reception is typically held in July. All employers and students are encouraged to come to this evening of celebration.

**APPLICATION DEADLINE: JANUARY 14, 2022**



**S T A T E   B A R   OF   W I S C O N S I N**
*Your Practice. Our Purpose.®*

Exhibit 10

E



# Student Selection Process

Interested first year law students meeting the eligibility requirements apply to the program at the beginning of their second semester. Candidates submit a written application, resume, legal writing sample, and personal statement demonstrating their commitment to diversity.

A selection committee of practicing attorneys reviews the application materials and conducts interviews before making final selections.

The selection committee considers the following criteria when choosing participants:

- Commitment to diversity
- Probability of success, as measured by maturity, judgment, motivation, and ability to relate to others
- Academic achievement in law school and prior to law school
- Proficiency in English - oral and written
- Ability in legal research and writing
- Previous work experience and volunteer activities
- Interview evaluations by selection committee

Once selected, all students are interviewed by all participating employers. Both students and employers rank their assignment preferences based on the interviews. The selection committee then makes student-employer assignments.

*"At Bell, Moore and Richter, I have had the opportunity to do extensive legal research and writing to assist attorneys with legal questions and fact development. Thus far, I have delved into several areas of the law including personal injury, family law, labor and employment, medical malpractice, insurance law, and trusts and estates. I have observed BMR's attorneys in action at a major trial, a deposition, multiple hearings, and a small claims case. I am thankful to the attorneys and legal staff at BMR for providing me with the opportunity to explore what the legal profession has to offer."*
—Amakie Amattey, Bell, Moore & Richter, S.C. Clerk

*"It was a privilege working with incredibly talented attorneys whom individually have a depth of knowledge, and collectively have the breadth of knowledge required to master the nuances of healthcare law. My supervising attorney advocated for my success by exposing me to new areas of practice, providing training, and offering guidance on navigating the practice of law. Participating in the State Bar of Wisconsin's Diversity Clerkship from the information session, to the two days of interviews, to working at Hall Render, Killian, Heath & Lyman, PC has reinforced my commitment to building my legal career in Wisconsin and supporting the program in the future."*
—Jenny Kumosz, Hall, Render, Killian, Heath & Lyman PC Clerk

*"My summer experience at David Werwie & Associates has been incredibly rewarding. The quality and multitude of work I've been exposed to has taken me out of the relatively monotonous world of case law and on to the ground level, into the trenches, to see how the sausage actually gets made. From drafting legal memoranda on a variety of intriguing legal issues, to motions to dismiss, motions in limine, and motions for summary judgment, or to attending depositions, Rule 16 pre-trial conferences, mediations, or arbitrations, I have really learned a tremendous amount this summer."* —Christian Vu, David Werwie & Associates Clerk

*"I have felt like a valued member of the Alliant Energy team since my very first day. The diversity of projects I've been assigned and the groups of people I have gotten to work with have really helped me determine what kind of attorney I want to be. The whole legal department is wonderful, especially my supervisor, and I am blessed to have been given the opportunity to work with such an amazing group of people."* —Brittani Miller, Alliant Energy Clerk

*"It's an awesome experience to work in a corporate environment as I'm able to not only apply what I've learned in class, but also understand the law from a different perspective - to see what the business's legal needs are and what is the priority."* —Liuzhuoyi Liu, GE Healthcare Clerk

*"The Diversity Clerkship Program has been crucial in my law school and career planning process. Working with the great people at Fiserv has been a perfect fit and my experience so far has provided me with beneficial legal experience and networking opportunities."* —Richard Esparza, Fiserv Inc. Clerk

E

# Diversity Clerkship Program



## What Employers Want to Know

### Why should my organization participate?

Reap the benefits of a more diverse workforce and gain access to the best up-and-coming legal talent in the state. Students who make it through the rigorous selection process are committed to working hard and learning quickly during their clerkships.

The number of students selected for the program each year must match the number of participating employers. The more employers who take part in this valuable program, the more students get the opportunity to participate!

### How are employers recruited for the program?

Participation is completely voluntary. Members of the State Bar of Wisconsin Diversity Inclusion and Oversight Committee help to recruit employers. Interested employers can contact Jacque Evans, State Bar of Wisconsin, 608-250-6083 / jevans@wisbar.org.

### What is the employer's commitment?

Program employers commit to accepting any assigned student, even if the student is not among their top preferences. Employers hire the assigned student
for a limited term and agree to provide the student with the same salary, work experience, and social opportunities as provided to their previous student clerks. Employers agree to comply with all labor and employment laws relating to hiring a student through our program. Employers provide mentoring to the clerk and also provide the student with periodic evaluations and an end-of-term exit interview. There is no obligation to offer continuing employment beyond the program dates.

### Will we be matched with one of our top student choices?

Employer and student preferences are just one of many factors considered during the assignment process. We make every attempt to maximize employers and student preferences; however, there is no guarantee that students or employers will be granted their top preference.

## 2021 Employers

- Alliant Energy
- Bell Moore & Richter SC
- Boardman & Clark
- CapSpecialty
- Dean Health Plan
- Dewitt, LLP
- Fiserv Inc.
- GE Healthcare
- Gingras, Thomsen & Wachs - Madison and Milwaukee offices
- Hall Render Killian Heath & Lyman, PC
- Hawks Quindel
- Kowalski Family Law
- The Law Office of Odalo J. Ohiku
- Legal Action of Wisconsin
- Madison City Attorney's Office
- Milwaukee City Attorney's Office
- Molson Coors
- Northwestern Mutual
- Rathje Woodward
- Regal Beloit Corporation
- Stafford and Rosenbaum
- Wisconsin Department of Corrections
- Wisconsin Department of Justice
- Wisconsin Department Safety and Professional Services - Division of Legal Services
- Zendesk

All students chosen to participate in the Diversity Clerkship Program have met the program's criteria and have the potential for success.

### Can we contact previous employer participants?

Absolutely! Just contact us for employer names and telephone numbers.

For more information or to apply, visit www.wisbar.org/dcp

# Diversity Clerkship Program



## About the Program

The State Bar's Diversity Clerkship Program is a limited-term, summer paid employment opportunity that affords first-year Marquette University Law School and University of Wisconsin Law School students who come from backgrounds that have been historically excluded from the legal field the opportunity to build legal practice skills and knowledge. It is an employer-student assignment program where students are assigned to private law firms, corporate legal departments and governmental agencies. Student clerks gain practical legal experience, and participating employers obtain valuable legal support.

### Eligibility

First-year Marquette University Law School and University of Wisconsin Law School students who come from backgrounds that have been historically excluded from the legal field who are in good standing may apply. Successful applicants demonstrate a commitment to diversity and a record of academic achievement.

### Program Goals

- Provide legal employers with access to first-year law students who come from backgrounds that have been historically excluded from the legal field from Wisconsin law schools

- Enhance law student academic education with practical, real-business legal work experience

- Expose law students to varied legal employment opportunities

- Provide full-time, limited-term summer clerkship experiences with premier legal organizations

- Provide a program-wide networking opportunity for students and employers to connect

### Employment

Our employer roster changes from year to year. We primarily recruit employers from Wisconsin, and a majority of our employers are located in Madison and Milwaukee. We occasionally have employers located in small to medium-sized Wisconsin cities or out of state.

As a first-year law student, your exposure to legal practice is very limited. A clerkship experience enables you to build your general practice skills and expand your legal knowledge and experience base. Our employers represent a wide spectrum of legal employment options – law firm, governmental agency, and in-house counsel. We recruit a broad representation of employers that reflect the real-world legal environment.

A successful and satisfying clerkship experience requires an open mind and a great deal of flexibility on your part. You need to be absolutely committed to accepting a clerkship assignment with any of our employers—despite locale and legal focus. While there is no guarantee that students or employers will be granted their top preference, we make every attempt to maximize employer and student preferences. We have found that most law students who enter a clerkship with preconceived doubts about a particular area of practice or employer come away feeling pleasantly surprised about their experience.

Should you be fortunate to receive an employer assignment and accept it, we ask that you follow your commitment through with enthusiasm and vigor. Backing out of an assignment after accepting it causes disruption within the program and may deprive another interested law student who sought the same opportunity. We want to maintain good relations with participating employers who have graciously offered to fund a summer job opportunity.

Our employers commit only to hiring a student for a limited period of time during the summer. Outside of the program, however, employers and students are free to negotiate continuing employment.

*Continued*



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.*®

Exhibit 11

**State Bar Sponsorship**

The Diversity Clerkship Program is an initiative of the State Bar of Wisconsin. The State Bar's Diversity Inclusion and Oversight Committee oversees the program with the help of State Bar staff. Members of this committee assist in the recruitment of employers and students and work with the program's selection committee.

A matching committee also determines the employer-student assignments and conducts on-going program evaluations

For more information about the program, please contact Jacque Evans M.Ed., State Bar of Wisconsin (608) 250-6083 / jevans@wisbar.org or Atty. John Wesley Warren, johnwesleywarren@northwesternmutual.com

# Student Selection Process

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Interested first year law students meeting the eligibility requirements apply to the program at the beginning of the second semester. Clerkship materials and applications are available at www.wisbar.org/dcp. The application includes a personal statement section that allows each applicant an opportunity to demonstrate their commitment to diversifying the legal field.

After the application and interview process, students are assigned an employer. During the summer, students are placed in a real-world business setting performing legal research, legal writing, and other legal skills learned during the first year of law school course work.

The selection committee, composed of practicing attorneys, considers the following criteria when evaluating qualifications and selecting participants:

- Commitment to diversifying the legal field
- Probability of success, as measured by maturity, judgment, motivation, and ability to relate to others
- Academic achievement in law school and prior to law school
- Proficiency in English - oral and written
- Ability in legal research and writing
- Interview evaluations commissioned by selection committee

## Program Timeline

• January 11, 2024 - Law Student Application Deadline

• January 17, 2024 - 1st Round of Interviews with UW Law School

• January 18, 2024 - 1st Round of Interviews with Marquette Law School

• Week of February 5, 2024 - Students are notified of selection /commitment to program

• Week of February 26, 2024 - Employer interviews for Milwaukee based employers

• March 18, 2024 - Students and Employers are notified of matches

• May 16, 2024* - Workshop "Working in the Legal Field"

• July 18, 2024 - Diversity Clerkship Program Reception

 * Subject to change

# Diversity Clerkship Program



# What Students Want to Know

## How can I apply?

Eligible students must complete an official Diversity Clerkship Program Application Form with requested documentation along with a personal statement. Please see the Personal Statement Guidelines for more information. Applications are submitted through Symplicity. Application materials can be obtained through the career services office of Marquette and UW Law Schools or at www.wisbar.org/dcp.

## What are the basic requirements of a clerkship?

Understanding an employer's expectation is very important. At a minimum, you are expected to fulfill the full term of your clerkship. Subject to the employer's needs, you can expect your clerkship commitment to be around 10 weeks. Some employers may have longer clerkships while others may have shorter clerkships.

To avoid any problems, we request that you do not make any summer vacation plans until after you learn your employer's work expectations. Summer clerkships are intense and time-consuming. By necessity, your full-time focus and attention is on taking advantage of the summer's learning and working experience at your assigned organization.

## Diversity Clerkship Recognition Reception

Each year, the State Bar's Diversity Inclusion and Oversight Committee plans a recognition reception honoring past and present Diversity Clerkship employers and law clerks. This year's reception will be held on July 20, 2023. All employers and students are encouraged to come to this evening of celebration.

## How many positions are available?

The number of positions vary from year to year and depend on the extent of employer participation. Historically, the program has paired an average of 20-25 law students with employers per year.

## 2023 Employers

- ACLU of Wisconsin
- Alliant Energy
- Church Mutual Insurance Company, S.I.
- CUNA Mutual Group
- Dane County Corporation Counsel
- Fiserv
- Froedtert Health Inc.
- GE Healthcare
- Gingras Thomsen & Wachs
- Hall, Render, Killian, Heath & Lyman, P.C.
- Kohler Co.
- Law Forward
- Legal Action of Wisconsin, Inc.
- Madison City Attorney's Office
- The Manitowoc Company
- Milwaukee City Attorney's Office
- The Northwestern Mutual Life Insurance Company
- Office of Lawyer Regulation
- Quartz Health Solutions, Inc.
- Racine City Attorney's Office
- Regal Rexnord Corporation
- Robert W. Baird & Co
- Stafford and Rosenbaum LLP
- Wisconsin Department of Corrections
- Wisconsin Department of Justice

## When do I have to commit to the program?

Once notified that you have been selected, you will be given a short time to decide whether or not to accept our invitation. A firm commitment to the program is essential at this time to preserve the integrity of the program. If selected to participate in the program, students are required to execute Authorization for Release of Information documents.

## How are students and employers assigned?

Our employer roster parallels the varied employment opportunities available in the real world. Selected students who commit to accepting an employer assignment participate in a final interview session where each student interviews with each employer. After this final interview session, both employers and students rank their assignment preferences from first to last.

## Will my assignment be with one of my top employer assignment preferences?

We make every attempt to maximize employer and student preferences, however, there is no guarantee that students or employers will be granted their top preference. We have found that most law students who enter a clerkship with preconceived doubts about a particular area of practice or employer come away feeling pleasantly surprised about their experience. It is important to remember that all of the program's participating employers are fully committed to providing you with an excellent educational summer experience – with challenging and rewarding work that will build your practice skills and knowledge.

## How do students learn about employers?

Once selected to participate, we supply students with information about our committed employers. In addition, students are strongly encouraged to do their own independent research.

## Why do employers want to participate?

The State Bar of Wisconsin commits to helping legal organizations gain greater access to law students who come from backgrounds that have been historically excluded from the legal field. Employers are eager to introduce first-year law students to their organizations. The clerkships encourage diversity within the workforce and the legal profession.

## Are students in the program all paid the same salary?

Each employer sets its own salary. Our roster of employers reflects the current legal employment market.

## Can I expect future employment?

Our program is a limited, summer employment opportunity. Our employers commit only to hiring a student for a limited period of time during the summer.

Outside of the program, employers and students are free to negotiate continuing employment.

# Personal Statement Guidelines

In addition to submitting an official Diversity Clerkship Program Application Form, each applicant must also submit a personal statement. An applicant's personal statement provides the program's screening committee with insight into an applicant's commitment to diversifying the legal field.

The personal statement is an extremely important factor in the selection process and should reflect how an applicant has:
- Contributed to the diversification of spaced that lack diversity
- Hopes to contribute to diversity in the future

When preparing your personal statement (500 words), consider responding to the following questions:

- How are you or how is your life story reflected in the legal field?
- What are unusual obstacles or hardships (for example, economic, familial or physical) in your life?
- How has your commitment to diversity influenced your decision to attend law school, and how do you think this commitment may influence your career as an attorney?
- Is diversity important in the legal field? Why?

For more information or to apply, visit www.wisbar.org/dcp



# Diversity Clerkship Program

Presented by: State Bar of Wisconsin

1

Exhibit 11A



# Welcome and Introductions



Judge Kori Ashley



Attorney John Wesley Warren

2



# Program Overview

The Diversity Clerkship Program is a limited-term, paid summer employment opportunity for 1L law students from Wisconsin law schools. Employment typically lasts 10 weeks, starting after the end of the spring semester. It is an employer-student matching program that helps students gain practical legal experience.

3

 



# Program Goals

- Provide legal employers with access to 1st year law students with diverse backgrounds from WI law schools

- Enhance law student academic education with practical, real-business legal work experience

- Expose law students to varied legal employment opportunities

- Provide full-time, limited-term paid summer clerkship experiences with premier legal organizations; and

- Provide a program-wide networking opportunity for students and employers to connect

4



# Eligibility

- First year law students with diverse backgrounds from MU and UW, in good standing

5



# What does Diversity mean?
## State Bar of Wisconsin Diversity Statement

The term "diversity" has a dynamic meaning that evolves as the demographics in the state change. It is an inclusive concept that encompasses, among other things, race, ethnicity, national origin, religion, gender, gender identity, age, sexual orientation and disability. Inclusion helps to create a culture that embraces people from the widest range of talent and experience and promotes understanding and respect for all people and different points of view in the legal profession.

6

# Employers

❑ Employers represent a wide variety of employment settings. Private law firms, city and county government, corporate legal departments and non-profit etc. We recruit employers in Wisconsin, mostly from Madison and Milwaukee. However, there are some employers from smaller cities and rarely outside of Wisconsin

❑ Employers handle legal matters in diverse areas such as Health Law, Criminal, Family, Business, etc.

7



DCP Employers in 2022

- Alliant Energy
- Bell Moore & Richter SC
- Cade Law Group LLC
- Church Mutual Insurance Company
- Dane County Corporate Counsel
- Fiserv Inc.
- GE Healthcare
- Hall Render Killian Heath & Lyman, PC
- Hawks Quindel – Madison
- Johnson Teigen Attorneys at Law
- Kohler Co.
- Legal Action
- Madison City Attorney's Office

- Meissner Tierney
- Milwaukee City Attorney's Office
- Molson Coors
- Northwestern Mutual Life Insurance Co.
- Ohiku Law Office
- Ogden Glazer & Schaefer
- Quartz Health Solutions
- Racine City Attorney's Office
- Regal Rexnord Corporation
- Stafford and Rosenbaum
- Wisconsin Department of Corrections
- Wisconsin Department of Justice
- Zendesk

9



STATE BAR OF WISCONSIN

# DIVERSITY CLERKSHIP PROGRAM

# Experiences from Past DCP Clerks

10

 

STATE BAR OF WISCONSIN
**DIVERSITY**
**CLERKSHIP**
**PROGRAM**

# How does one apply to the DCP?

☐ Application forms are available on the DCP webpage, or through your Career Services Department

 Due Thursday, January 12, 2023 , by 4:00 p.m.

 All submissions are electronic through Symplicity.

11



# What is required with the application?

- Application form – sent in virtual materials. If your information is on your Legal Resume, just need to write your name and sign the application form

- Personal Statement – Diversity statement. How you have been affected by diversity, contributed to diversity, and/or hopes to contribute to diversity in the future

- Resume – Work with the Career Services department to finalize your resume. Check your spelling.

- Legal Writing Sample – Focus of the writing sample should be your legal analysis skills. Limit facts to 2 pages, and limit writing sample to no more than 10 pages.

- GPA – Law schools will provide us with your 1st semester transcripts

12





# First-Round Interviews

- After the application deadline has passed, all applicants must participate in the first round interviews. These will be done virtually with volunteer attorneys
  - UW: January 18, 2023 - 5:30 to 8:00 p.m.
  - MU: January 19, 2023 - 5:30 to 8:00 p.m.

- Interviewers will have your applications. They will assess your communication skills, interview characteristics, and motivation for participating in the program. Each interviewer will also provide you with feedback.
  - Good idea to work with your Career Services department for interview prep. Sign up for these interviews will be done through Career Services Department as well

13



# Selection Process

- ☐ The benefit of applying to the program. Regardless of whether or not you'll be selected as part of the program you'll come away with the experience of having gone through live interviews from a legal employer.

- ☐ After the 1st round interviews, all application materials and the interview feedback is provided to the Selection Committee that reviews all application materials. They determine which students will be invited to the next round of employer interviews

- ☐ Notification is sent out during the second half of February whether you are Approved or an Alternate. For those Approved, you will have a short time to commit to the program

14

 



# Employer Interviews

☐ All applicants who are chosen to continue during the selection process must participate in the employer interviews.

☐ Tuesday, February 21st

☐ Interviewers will have your application packets and evaluations from the first-round interviews. Each employer will be assessing your interview according to their own criteria.

☐ Employers and students will complete preference forms to rank their choices. These forms are given to the Matching Committee.



15

Case 2:23-cv-01697   Filed 12/19/23   Page 74 of 258   Document 1-1



# Matching Process

☐ The Matching committee does their best to maximize both employer and student preferences

❖ Once you commit to the program it is up to the employers to contact students and work out the details of the employment

16

 



# Other events

- ☐ Workshop on soft-skills & entering your legal career
  - ☐ May 10, 2023 at 5:30 to 7:00 p.m.
- ☐ Reception July 20, 2023
  - ☐ Event to celebrate all employers and students
  - ☐ Expect all participants of the program to be present for this event

17



# Closing Thoughts

☐ If you are on the fence about applying, please reach out to the Career Services Department or talk it over with the alumni of the program. Whether you decide to stay in the program, it is worthwhile to at least apply. You will gain valuable experience just going through the 1st round of interviews so there is no reason not to apply.

• Before we conclude, I will ask each of our panelists to give their final piece of advice regarding DCP

18

Case 2:23-cv-01697   Filed 12/19/23   Page 77 of 258   Document 1-1



Questions from Attendees

STATE BAR OF WISCONSIN
DIVERSITY
CLERKSHIP
PROGRAM

19



Thank you for attending!

STATE BAR OF WISCONSIN
DIVERSITY
CLERKSHIP
PROGRAM

20



STATE BAR OF WISCONSIN
# DIVERSITY CLERKSHIP PROGRAM

## Application Instructions

The State Bar's Diversity Clerkship Program is a limited-term, summer employment opportunity that affords first-year Marquette University Law School and University of Wisconsin Law School students who come from backgrounds that have been historically excluded from the legal field the opportunity to build legal practice skills and knowledge. It is an employer-student program where students are assigned to private law firms, corporate legal departments and governmental agencies. Student clerks gain practical legal experience and participating employers obtain valuable legal support.

**Eligibility**
First-year Marquette University Law School and University of Wisconsin Law School students who come from backgrounds that have been historically excluded from the legal field who are in good standing may apply. Successful applicants demonstrate a commitment to diversity and a record of academic achievement. Prospective employers may request your first semester law school grade transcript during the interview process.

**Application**
To apply, please submit the following via your law school's Simplicity website:

* The State Bar of Wisconsin Diversity Clerkship Program application form
* Personal statement
* Resume
* A legal writing sample

**Applications must be received no later than 4:00 p.m. Friday, January 14, 2022.**

**Personal Statement**
The personal statement is an extremely important factor in the selection process and should reflect how an applicant has:

* Contributed to the diversification of spaces that lack diversity, and/or
* Hopes to contribute to diversity in the future.

When preparing your personal statement (500 words), consider responding to the following questions:

* What is unique, special, distinctive and/or impressive about you or your life story?
* How are you or how is your life story reflected in the legal field?
* How has your commitment to diversity influenced your decision to attend law school, and how do you think this commitment may influence your career as an attorney?
* Is diversity important to the legal field? Why?

**Legal Writing Sample**
The legal writing sample should primarily show an applicant's legal analysis skills. Therefore, limit the statement of facts to 2 pages, and limit the entire legal writing sample to no more than 10 pages.

STATE BAR OF WISCONSIN
Your Practice. Our Purpose.®

Exhibit 12



STATE BAR OF WISCONSIN
DIVERSITY CLERKSHIP PROGRAM

# Application Form

If you have any questions about this process, please contact the following:

**Paul Katzman**
Dean
Marquette University Law School
Eckstein Hall, Suite 240
Paul.katzman@marquette.edu

**Emily Kite**
Associate Dean for Career &
Professional Development
University of Wisconsin Law School
975 Bascom Hall, Room 3221
emily.kite@wisc.edu

**Jacque Evans**
Diversity & Inclusion Specialist State
Bar of Wisconsin
5302 Eastpark Blvd., Madison, WI
(608) 250-6083 / jevans@wisbar.org

## Biographical Information
## Note: Provide information below if it is not included in your resume

First Name: _____ Last Name: _____

Law School: _____

Interested Area of the Law (if known): _____

Current mailing address: _____

Telephone: _____ Email: _____

Permanent mailing address (if different than above): _____

## Undergraduate Degree
College/University: _____

GPA: _____

Concentration/Major(s): _____

Type(s) of Degree Received: _____

## Graduate Degree (If Applicable)
College/University: _____

GPA: _____

Concentration/Major(s): _____

Type(s) of Degree Received: _____



## Commitment to Diversity Clerkship Program

If you are selected and agree to participate in the State Bar of Wisconsin's Diversity Clerkship Program, you have made a firm commitment to:

1) Accept any assigned clerkship. Although there is no guarantee that you will be assigned your top preferences, the Selection Committee will try its best to maximize employer and student preferences.
2) Work for your assigned employer in accordance with your assigned employer's rules and clerk needs. Subject to the employer's needs, you can expect your clerkship commitment to be 10 weeks—unless the employer agrees to a shorter/longer period of time.
3) Attend the Diversity Clerkship Summer Reception.

Diversity Clerkship Program staff may become aware of other clerkship opportunities outside of the Program. In the event you are not selected to participate in the 2024 Diversity Clerkship Program, do you grant permission for program staff to forward your application materials to these organizations?

☐ Yes    ☐ No

Your signature signifies that you are eligible for the State Bar of Wisconsin's Diversity Clerkship Program. By signing this application form, you authorize the Selection Committee to obtain your law school records and grades. If selected to participate in the program, you are required to execute Authorization for Release of Information documents.

Signature: _____     Date: _____

(Typed signature acceptable)

STATE BAR OF WISCONSIN
*Your Practice. Your Purpose.*

Case 2:23-cv-01697   Filed 12/19/23   Page 82 of 258   Document 1-1

See Link for Exhibit: https://www.youtube.com/watch?v=KnpM8wj8zs4&t=2981s

Exhibit 13

State Bar of Wisconsin

# Diversity Task Force Report & Recommendations to the State Bar of Wisconsin Board of Governors

Diversity Task Force
June 2014

Exhibit 14

2

# TABLE OF CONTENTS

**Introduction** ..................................................................................................5

**Diversity Task Force Roster** ...........................................................................7

**Executive Summary** .........................................................................................9

**Diversity Task Force Report** ........................................................................15

   History ..........................................................................................................15

   Methodology ................................................................................................17

   Diversity and Inclusion Recommendations .................................................21

      I.     Adopt Definition of Diversity and Commit to Promoting Diversity..............21

      II.    Promote and Further Diversity and Inclusion within the State Bar ..............21

      III.   Promote and Further Diversity and Inclusion in the Law Schools ...............23

      IV.   Promote and Further Diversity and Inclusion in the Wisconsin Legal Profession as a Whole ........................................................................25

**Conclusion** ....................................................................................................27

Case 2:23-cv-01697   Filed 12/19/23   Page 86 of 258   Document 1-1



# INTRODUCTION

**From the Chair**

I am pleased to present this report on behalf of the State Bar Diversity Task Force. Established in 2012, the Task Force's mandate was to determine the State Bar's role in promoting and furthering diversity and inclusion in the Wisconsin legal profession.

I would like to recognize and thank the outstanding commitment of the State Bar Diversity Task Force members for the many hours and days of meetings, listening sessions, and drafting of documents. They did so despite very busy professional and personal obligations. A special thanks to Sonabai Kanhai, State Bar Program Coordinator, who did an amazing job staffing our task force. The State Bar Diversity Task Force is submitting our recommendations to Bar Leadership with great expectations that they will be the foundation for a renewed and focused effort to promote diversity and inclusion throughout the legal profession in Wisconsin.

We have reviewed efforts by many other states and the ABA, as they too, endeavored to address the issue of diversity and inclusion, but it was the many listening sessions that provided the task force with heartfelt and tangible insight into what diversity and inclusion, or the lack thereof, means to lawyers, judges, law faculty and law students. We hope that the majority of bar members will readily conclude and agree that a diverse bar encompassing, among other things, diversity of race, ethnicity, national origin, religion, gender, age, sexual orientation and disability helps to create a culture that embraces people from the widest range of talent and experiences and promotes understanding and respect for all people and different points of view in the legal profession. If this is true, and we believe it is, then we, not surprisingly, have much work to do.

The good news is the State Bar Leadership has recognized the need to do more to address diversity and inclusion by appointing our Task Force. We would like to recognize President Patrick J. Fiedler, President-Elect Robert R. Gagan, Past-President Kevin G. Klein, and State Bar Executive Director George Brown for their leadership and support of our efforts. Although the Task Force has been working for more than a year to formulate our recommendations, the real work lies ahead. A primary emphasis underlying all our recommendations, which will be detailed in the report, is incorporating diversity and inclusion in all aspects of State Bar activities and strategies. During our

work as a Task Force, we noted opportunities to support diversity and inclusion that were missed, not because of any intentional decision, but simply something not considered. The culture needs to be changed, that is, we as a Bar should always at least ask the question, how can this action or process support diversity and inclusion or how might it exacerbate the lack of diversity?

There was and is skepticism about what the Bar can or is willing to do about diversity and inclusion. I am convinced that there is a clear understanding of the compelling importance of promoting diversity and inclusion as a fundamental obligation of the Bar. The Bar has the ability to seize the opportunity to comprehensively support diversity and inclusion by adopting the following recommendations. I believe we, as a Bar, are up to the challenge.

I extend our heartfelt thanks and appreciation to the local bar leaders, Marquette Law School Dean, Joseph Kearney, University of Wisconsin - Madison Law School Dean, Margaret Raymond and to everyone who contributed to our work and recommendations, especially to all of the groups who participated in our listening sessions.

It has been my distinct honor and privilege to serve as the chair of the State Bar Diversity Task Force.

_____

Carl Ashley
Circuit Court Judge
Chair of the State Bar of Wisconsin Diversity Task Force

# DIVERSITY TASK FORCE ROSTER 2014

*Hon. Carl Ashley*
**Chairperson**
Milwaukee County Circuit Court
901 N 9th St # 503
Milwaukee, WI 53233-1425
Work Phone: (414) 278-5318
Fax: (414) 223-1264
Email: carl.ashley@wicourts.gov

*Atty. Michelle A. Behnke*
**Member**
Michelle Behnke & Associates
222 N Midvale Blvd Ste 17
Madison, WI 53705-5004
Work Phone: (608) 233-9024
Fax: (608) 233-9029
Email: michelle_behnke@sbcglobal.net

*Atty. Andrew J. Chevrez*
**Member**
PO Box 270720
Milwaukee, WI 53227-7215
Work Phone: (414) 604-1604
Email: achevrez@execpc.com

*Atty. Kathleen Chung*
**Member**
Wisconsin Department of Transportation Office of General
Counsel
PO Box 7910
Madison, WI 53707-7910
Work Phone: (608) 266-8752
Fax: (608) 267-6734
Email: kathleen.chung@dot.wi.gov

*Atty. Bruce J. Lindl*
**Member**
W156S7471 Martin Ct
Muskego, WI 53150-8395
Work Phone: (262) 409-0174
Email: brucelindl@gmail.com

*Atty. Vada Lindsey*
**Member**
Marquette University Law School
PO Box 1881
Milwaukee, WI 53201-1881
Work Phone: (414) 288-5366
Fax: (414) 288-6403
Email: vada.lindsey@marquette.edu

*Atty. Maureen A. McGinnity*
**Member**
Foley & Lardner LLP
777 E Wisconsin Ave
Milwaukee, WI 53202-5306
Work Phone: (414) 297-5510
Fax: (414) 297-4900
Email: mmcginnity@foley.com

*Atty. Cory L. Nettles*
**Member**
Quarles & Brady LLP
411 E Wisconsin Ave Ste 2350
Milwaukee, WI 53202-4426
Work Phone: (414) 277-5000
Fax: (414) 271-3552
Email: cory.nettles@quarles.com

*Atty. Carlos A. Ortiz*
**Member**
Partner
Hinshaw & Culbertson LLP
222 N la Salle St Ste 300
Chicago, IL 60601-1013
Work Phone: (312) 704-3198
Fax: (312) 704-3001
Email: cortiz@hinshawlaw.com

*Atty. Rebecca L. Smith*
**Member**
University of Wisconsin Law School
975 Bascom Mall # 4314C Madison, WI 53706-
1399
Work Phone: (608) 262-2240
Fax: (608) 262-5485
Email: rebeccasmith@wisc.edu

*Atty. Jo A. Swamp*
**Member**
Forest County Potawatomi Community
313 N 13th St
Milwaukee, WI 53233-2244
Work Phone: (414) 847-7750
Fax: (414) 847-7721
Email: Jo.Swamp@fcpotawatomi-nsn.gov

*Atty. Gregory Maurice Wesley*
**Member**
Gonzalez Saggio & Harlan LLP
111 E Wisconsin Ave Ste 1000
Milwaukee, WI 53202-4806
Work Phone: (414) 277-8532 x1114
Fax: (414) 277-8521
Email: greg_wesley@gshllp.com

*Atty. Starlyn Rose Tourtillott*
**Member**
Staff Attorney
Stockbridge-Munsee Community Legal Department
PO Box 70
Bowler, WI 54416-0070
Work Phone: (715) 793-4392
Fax: (715) 793-4856
Email: starlyn.tourtillott@mohican-nsn.gov

*Ms. Sonabai Kanhai*
**Staff Liaison**
State Bar of Wisconsin
5302 Eastpark Blvd
Madison, WI 53718-2101
Work Phone: (608) 250-6181
Fax: (608) 257-5502
Email: skanhai@wisbar.org



STATE BAR
OF WISCONSIN

# EXECUTIVE SUMMARY

The State Bar of Wisconsin, consistent with state bar associations around the country and the American Bar Association, was concerned about the issue of diversity and inclusion within the legal profession. The Wisconsin Bar Leadership committed to a formal effort to reevaluate how the Bar could better promote diversity and inclusion. In December 2012, President-Elect Patrick J. Fiedler directed the creation of the Diversity Task Force with the following charge:

### Diversity Task Force Charge

"The charge of the Diversity Task Force is to determine the role of the State Bar in promoting and furthering diversity within the law schools, the profession and the State Bar by identifying an approach to diversity that will serve the Wisconsin legal profession. This includes creating the State Bar's definition of "diversity", a future committee structure, organization-wide diversity initiatives as well as the future of the Diversity Clerkship Program and diversity based CLE programs. In addition, the Task Force will develop an action plan for the implementation of identified changes to create leadership opportunities for diverse lawyers with Wisconsin and the legal profession and articulate how diversity should inform, shape and influence the work of the State Bar across the organization."

The Diversity Task Force included 13 members and a State Bar staff member who have a record of demonstrated knowledge and commitment toward diversity and inclusion. We reviewed efforts from other State Bars and the American Bar Association. The Task Force engaged in 15 listening sessions with a variety of groups who represent stakeholders in the Wisconsin legal profession. We examined the State Bar's past history in addressing diversity and inclusion and assessed the viability of existing programming. We invite you to read the complete account of the Task Force's methodology and history of the State Bar in addressing diversity and inclusion found on page 15 and 17 respectively of this report.

The Task Force recommends and supports a comprehensive plan for the State Bar to actualize systemic changes to increase and support diversity and inclusion. This starts with a definition of diversity and the structure to implement our other recommendations, with State Bar leadership taking an active role in monitoring and supporting the effort. We are also recommending that "diversity and inclusion" be incorporated into the mission and vision statement of the State Bar. In order to signal a real change in the culture of our legal community, the Bar needs to make a clear and significant commitment, and there is no greater indication for this than to embed in our mission and vision statement the support for diversity and inclusion.

The full list of recommendations begins on page 21 of this report. You will find that they are fairly detailed because we felt it was important to give those involved in the implementation process the advantage of what we learned from our work. The executive summary highlights some of the major recommendations and provides an overview of our overall recommendations.

## Summary of recommendations of the Diversity Task Force

1. **The Task Force recommends that the Bar adopt the following definition of diversity:**

   *The term "diversity" has a dynamic meaning that evolves as the demographics in the state change. It is an inclusive concept that encompasses, among other things, race, ethnicity, national origin, religion, gender, gender identity, age, sexual orientation and disability. Inclusion helps to create a culture that embraces people from the widest range of talent and experience and promotes understanding and respect for all people and different points of view in the legal profession.*

During our review of definitions from other jurisdictions, we found two approaches: a broad and flexible definition or a more limited definition that covered a distinct list of groups or categories. Those who sought to limit the definition, in fairness to their rationale, did so because they were concerned that efforts/resources to address diversity and inclusion might be diluted to the point that those most in need would not receive the proper attention. Although we likewise heard the same concerns in our listening sessions, we concluded the better option was to choose the broader definition. It would have been difficult, if not impossible, for us to exclude any group from our definition since the concept is necessarily inclusive and ever-changing. However, we further recommend that the Bar "[t]ailor specific programs to the diverse, under-represented populations who need those particular

resources" in order to target efforts because not all groups identified in the definitions have the same issues or needs.

2. **The Task Force recommends that the Bar appoint a new Diversity and Inclusion Oversight Committee:**

*Appoint a Diversity and Inclusion Oversight Committee as a Standing Committee to succeed the Diversity Task Force. The Diversity and Inclusion Oversight Committee would serve as the State Bar's diversity "think tank" to carry out diversity and inclusion commitment and goals. The committee would report directly to the State Bar Board of Governors Executive Committee. The Executive Committee would maintain diversity and inclusion as a continuous item on its agenda.*

The oversight committee is central to the success of the Bar's commitment to diversity and inclusion. The new oversight committee will not be the sole entity charged with actually effectuating or incorporating diversity efforts into the Bar's work, but rather it will assist, coordinate and facilitate these efforts within all of the entities of the Bar. The committee will be responsible for institutionalizing and implementing the Bar's ultimate action plan with regard to diversity and inclusion. Elevation to standing committee status will ensure continuity of the Bar's mission. Providing the ability of the committee to report directly to the Executive Committee is intended to remove any obstacles that might hinder access and communication between the committee and Bar leadership. Maintaining diversity and inclusion as a continuous item on the Executive Committee's agenda will allow the Bar leadership to perform ongoing assessment of the committee's work and to provide contemporaneous feedback about diversity and inclusion activities, while also giving notice to staff and the Bar membership about the crucial importance of these efforts. A more complete list of the suggested responsibilities of the committee is located on page 21 of this report.

3. **The Task Force recommends retention of the Diversity Outreach Committee, but renamed, the Law Student Outreach Subcommittee as a subcommittee of the Diversity and Inclusion Oversight Committee:**

*Charge Law Student Outreach Subcommittee with responsibility for playing leadership role in forming and marketing collaboration among law schools, the State Bar, and employers to encourage and support diversity and inclusion.*

The Law Student Outreach Committee will revitalize the Diversity Clerkship Program and consider new initiatives such as mentoring programs, pipeline programs, and shadowing programs. The committee will continue its great collaboration with both Marquette and University of Wisconsin Law Schools. The Task Force discussed a number of potential programs that were suggested at our listening sessions, discovered through our outreach efforts or from Task Force members. The committee will need to sort through what is feasible subject to the guidance of the Diversity and Inclusion Oversight Committee and Bar leadership.

4. **The Task Force recommends that the Bar establish, update and publish reliable data:**

> *The State Bar should establish, update and publish reliable census data regarding the diversity of State Bar members.*

We found no legitimate effort on the part of any State Bar to address diversity and inclusion without some objective evaluation. The Bar should establish a baseline of information with pertinent data points that will enable an objective evaluation of what programs/initiatives are needed, who the target groups should be, and a method to determine and track whether progress has been made over time. We realize that it will be challenging to objectively evaluate these efforts, but we strongly feel that it necessary to do so.

5. **The Task Force recommends that the State Bar model diversity and inclusion:**

> *The Bar should model diversity and inclusion within the State Bar leadership, Executive Committee, Board of Governors, Committee leaders, Division boards, Section leaders, State Bar management and staff.*

The Bar should set the tone from top to bottom that it underlines values diversity and inclusion. The Bar must lead not only by promoting the need for increased diversity and inclusion within the legal profession, but also by serving as a model of diversity and inclusion as it pertains to its own organizational structure and staff.

6. **The Task Force recommends that the State Bar take a leadership role in promoting and furthering diversity and inclusion in all facets of the Wisconsin legal profession:**

> *The State Bar should support and promote increased diversity and inclusion in the Wisconsin legal profession as it impacts lawyers, firms, employers, students, faculty, and the judiciary.*

As a mandatory bar representing lawyers who practice in Wisconsin, the State Bar of Wisconsin is in a unique position to advance the cause of diversity and inclusion in the Wisconsin legal profession. Diversity and inclusion is already part of the Bar's strategic plan. The Diversity Task Force strongly supports adoption of these recommendations so that the State Bar of Wisconsin can set a course demonstrating the commitment to create a culture that truly embraces people from the widest range of talent and experience and promotes understanding and respect for all people and different points of view in the legal profession in Wisconsin.



**[Page intentionally left blank]**



Case 2:23-cv-01697   Filed 12/19/23   Page 97 of 258   Document 1-1

# DIVERSITY TASK FORCE REPORT

**State Bar of Wisconsin's History with Diversity and Inclusion**

The issue of diversity and inclusion, or the lack thereof, in Wisconsin's legal profession did not receive much attention by the State Bar of Wisconsin until the mid-90's. In 1993 the Minority Placement Committee was formed to create summer clerkship opportunities for minority law students. In 1994, through the efforts of the Greater Madison African American Lawyers, Wisconsin Association of Minority Attorneys and then incoming State Bar President Pamela Barker, the State Bar established the Diversity Outreach Committee and made the previously existing Minority Placement Committee a subcommittee of the Diversity Outreach Committee. The Diversity Outreach Committee as it currently operates, was formed in 2007 when three already established State Bar Committees, the Gender Equity Committee (formed in the late 90's and referred to as the Special Committee on the Participation of Women in the Bar until mid-2002), Minority Clerkship Committee (formerly the Minority Placement Committee) and Diversity Outreach Committee, were combined to make the Diversity Outreach Committee. This new committee focused on the wider diversity needs of the State Bar, its members, members' clients and the state in general. The Diversity Outreach Committee concentrated its work in three areas:

1) **Diversity Clerkship Program** – a program designed to match 1L's from Wisconsin's two law schools with paid clerkships from participating employers. The purpose of the program is to facilitate a rich learning experience for participating students and employers. The program has provided first-hand experience in private law firms, corporate legal departments, and governmental agencies. There is also an interviewing/networking skills program that the planning subcommittee and staff arrange at both law schools as part of this program for practicing attorneys to educate students on how to interview and network in a legal environment.

   The clerkship selection process begins in the fall by securing employers to participate in the upcoming summer program. The student application process includes two selection rounds. At the end of the selection process, each participating employer has interviewed all student

finalists and both students and employers submit their matching preferences and a selection is then made. Clerks work through the summer and there is a networking event for clerks, employers and committee members at the end of the summer.

2) **Diversity Counsel Program** – creation and coordination of a State Bar CLE program devoted to legal diversity issues/considerations. The program raises awareness of the contributions of diverse attorneys as well as engages and educates attorneys about diversity issues. The program takes place in the fall and provides opportunities for attorneys to receive quality, low cost CLE diversity programming. This is a self-supporting program, bringing in sponsors to cover the cost of the program, with excess sponsorship/registration funds received going to the Diversity Designated Fund administered by the Wisconsin Law Foundation to be used in future Counsel Program events and diversity education.

3) **Diversity Statement** – a subcommittee of the Diversity Outreach Committee worked on a diversity statement and guidelines for its use. In June 2012 the State Bar Board of Governors adopted the statement in the form of a resolution declaring its commitment to diversity in the legal profession. Also accompanying the diversity statement to the Board of Governors was the committee's request that the Board of Governors appoint a Diversity Task Force to conduct ongoing studies on diversity. The Committee suggested these areas of focus: why a large percentage of minority law graduates in Wisconsin leave the state after graduation, what percentage of those remaining get jobs and work in the legal profession, how many remain employed in the legal profession in Wisconsin after 5 years, how to foster communication on diversity programming and efforts between different State Bar entities and specialty bars in Wisconsin's legal community, and study whether a mandatory diversity CLE credit is appropriate for Wisconsin.

In December 2012 then President-Elect Patrick J. Fiedler called for the creation of the Diversity Task Force with the following charge:

**Diversity Task Force Charge**

"The charge of the Diversity Task Force is to determine the role of the State Bar in promoting and furthering diversity within the law schools, the profession and the State Bar by identifying an approach to diversity that will serve the Wisconsin legal profession. This includes creating the State Bar's definition of "diversity", a future committee structure, organization-wide diversity initiatives as well as the future of the Diversity Clerkship Program and diversity based CLE programs. In addition, the Task Force will develop an action plan for the implementation of identified changes to create leadership opportunities for diverse lawyers with Wisconsin and the legal profession and articulate how diversity should inform, shape and influence the work of the State Bar across the organization."

## Methodology of the Diversity Task Force

In spring of 2013 the members of the Diversity Task Force were appointed and began their work with a focus on the Charge. The Task Force conducted a total of seven (7) in-person meetings. In addition, several subcommittees were created and there were numerous meetings held via teleconference. We felt strongly that it was important to gather the perspectives of a wide variety of groups within the Wisconsin legal community regarding diversity and inclusion. As such, the Task Force engaged in 15 listening sessions with the following groups: Wisconsin Hispanic Lawyers Association (WHLA), Legal Association for Women (LAW), Wisconsin Association of African American Lawyers (WAAL), Indian Law Section, Marquette University Law School Faculty and Students, Wisconsin Chapter of the Association for Corporate Counsel (WISACCA), State Bar Section Leaders Council, UW Law School Faculty and Students, Association for Women Lawyers (AWL), State Bar Government Lawyers Division, State Bar Young Lawyers Division, State Bar Executive Committee, Wisconsin Asian Bar Association (WABA), and representatives from the disabled lawyers community and the LGBTQ lawyers community. The listening sessions proved to be invaluable and insightful.

Some of the following common themes were expressed throughout the listening sessions:

1. Diversity should be broadly defined;
2. Leadership on diversity and inclusion should originate from the top of the State Bar;
3. In terms of programming, greater mentorship and internship opportunities, and raising awareness and education on diversity and inclusion were cited as examples that the State Bar should strive to improve upon;
4. Improved diversity in the judiciary is needed; and
5. The State Bar should work to facilitate better communication and networking among the various stakeholders.

In addition, the Task Force examined the reports and recommendations issued by other states, including neighboring states. We also reviewed the efforts of the American Bar Association in this regard. Many state bars have adopted a policy and action plan regarding diversity and inclusion. The recommendations contained within this report represent, in our opinion, the best course of action going forward for the State Bar of Wisconsin given its current organizational structure, our assessment of existing programming, and available resource levels while also taking into account issues that are unique to the legal landscape in Wisconsin.

During the course of the year, the Task Force was proactively involved in efforts that we felt would help lay the groundwork for implementation of the report and recommendations. First, the Task Force sought and obtained approval from the State Bar leadership and the Board of Governors for an amendment to the Bar's strategic plan to include diversity and inclusion as one of its goals that would codify the Board of Governor's June 2012 commitment to diversity. Second, the Task Force requested and obtained approval that a section in the bar annual dues statement be inserted to solicit voluntary reporting of demographic information as a first step of establishing a baseline for diversity levels in the Wisconsin bar. Third, the Task Force partnered with the State Bar Communications Committee in the Nominate a Legal Innovator Program. This initiative solicits submissions regarding innovative practices in a variety of subjects (for example, use of technology, new marketing strategies) that have been successful in creating value or an advantage to consumers of legal services. The Communications Committee was gracious in allowing diversity to be included as

Case 2:23-cv-01697   Filed 12/19/23   Page 101 of 258   Document 1-1

an additional component. It is our hope that we can identify and recognize best practices in the area of diversity that can serve as examples of best practices for others. Finally, the Task Force facilitated the creation of a video to market Wisconsin to diverse candidates that was screened at the National Black Law Student Association convention in Milwaukee.

In the report entitled *"Diversity in the Legal Profession: The Next Steps"*[1], the American Bar Association adequately summarizes why diversity in the legal profession is beneficial to the justice system:

- Our political system requires broad participation by all its citizens. When attorneys and judges come from diverse backgrounds, people have greater trust in the government and judicial system.

- Global customers, suppliers, and competitors are composed of workforces from diverse backgrounds and clients expect their lawyers to be culturally and linguistically proficient.

- Individuals with law degrees often possess the skill sets necessary to become leaders in their communities. Access to a legal education must therefore be broadly inclusive.

- The demographics of the legal profession should represent the demographics of our nation's population as a whole.

The Task Force unanimously believes that the State Bar of Wisconsin should take a greater leadership role in improving diversity and inclusion in Wisconsin's legal profession. We have provided a roadmap for how to achieve this. However, in our view, success depends upon the commitment by State Bar leadership to make diversity an important priority in action and words. From now on, diversity and inclusion should be a permanent part of the discussion in everything the Bar does.

---

[1] p. 25 Diversity in the Legal Profession: The Next Steps, American Bar Association, April 2010

**[Page intentionally left blank]**



Case 2:23-cv-01697   Filed 12/19/23   Page 103 of 258   Document 1-1

# DIVERSITY AND INCLUSION RECOMMENDATIONS

I. **Adopt Definition of "Diversity" and Commit to Promoting Diversity**

   A. Incorporate commitment to diversity and inclusion in the mission and vision statement of the State Bar's strategic plan, with goals to include:

      1. Increase representation and participation of diverse Wisconsin lawyers in all aspects of the work of the State Bar, including leadership and staff;

      2. Collaborate with Wisconsin law schools to increase and support diversity and inclusion in legal education;

      3. Collaborate with the Wisconsin Supreme Court to increase diversity, and support and foster a culture of inclusion, in the Wisconsin judiciary and the practicing bar; and

      4. Promote diversity and inclusion in the legal community and the justice system.

   B. Adopt broad, inclusive definition:

      "The term 'diversity' has a dynamic meaning that evolves as the demographics in the state change. It is an inclusive concept that encompasses, among other things, race, ethnicity, national origin, religion, gender, gender identity, age, sexual orientation and disability. Inclusion helps to create a culture that embraces people from the widest range of talent and experience and promotes understanding and respect for all people and different points of view in the legal profession."

   C. Tailor specific programs to the diverse, under-represented populations who need those particular resources

   D. State Bar leadership should seize opportunities to emphasize the importance of diversity in all aspects of the legal profession and share successes

II. **Promote and Further Diversity and Inclusion within the State Bar**

   A. Appoint new **Diversity and Inclusion Oversight Committee** as a Standing Committee to succeed Diversity Task Force. The Diversity and Inclusion Oversight Committee would serve as the State Bar's diversity "think tank" to carry out diversity and inclusion commitment and goals. The committee would report directly to the **Board of Governors Executive Committee**. The Executive Committee would maintain diversity and inclusion as a continuous item on its agenda.

      1. Committee duties:

         a. Advise, facilitate and monitor the efforts of State Bar staff and other Bar partners (Board of Governors, committees, divisions, sections, etc.) with regard to diversity and inclusion goals and strategies;

      b. Collect information on other state bars' diversity and inclusion programs and projects, brainstorm new initiatives, and share with appropriate Bar partners;

      c. Serve as resource to assist President/Board of Governors in identifying, developing and implementing effective diversity and inclusion initiatives;

      d. Recommend metrics to assess the Bar's progress in advancing diversity and inclusion; monitor progress and surface concerns to Board of Governors;

      e. Report at least annually to the Board of Governors on the progress of diversity initiatives;

      f. Maintain records on the Bar's diversity and inclusion initiatives and results.

2. Committee composition

      a. Committee comprised of 9 members, each appointed to a three-year term with staggered terms so one-third of the committee terms expire each year;

            i. Committee members should have interest in supporting and advancing diversity and inclusion efforts;

            ii. Two (2) Board of Governors members serve;

            iii. Committee should reflect diversity and include some members with experience with State Bar policy and governance;

            iv. Committee should include lawyers, judges, law school faculty, and law student representatives.

B. Retain Diversity Outreach Committee and rename it **Law Student Outreach Subcommittee** as a subcommittee of Diversity and Inclusion Oversight Committee (see Section III for responsibilities).

C. State Bar should establish, update and publish reliable census data regarding the diversity of State Bar members.

1. Obtain baseline demographic information in the year 2014 by requesting Demographic Data on dues renewal statement for ethnicity, gender, sexual orientation, and disability and update periodically;

2. Collect diversity information from new State Bar members as they join;

3. Collect information on retention of diverse new UW and MU law school graduates;

4. Publish and regularly update diversity information in:

      a. State Bar Annual Report

  b. President/Executive Director Report to Board of Governors at least annually.

  c. Separate Report on the diversity of members of the judiciary

 5. Monitor and report on relevant comparisons [*e.g.* Wisconsin general demographics, other state bars, other state judiciaries]

D. Model diversity and inclusion within State Bar leadership including the Executive Committee, Board of Governors, Committee leaders, Division boards, and Section leaders

 1. Establish in 2014, update, and publish reliable census data regarding the diversity of State Bar leadership;

 2. Develop and implement outreach strategies for all levels of leadership, including continuation of the Leadership Summit;

 3. Formally incorporate diversity and inclusion expectations in appointment processes and report results to Board of Governors and membership;

 4. Regularly share best practices for grooming/recruiting diverse leaders;

 5. Codify the "Building Bridges Liaison" program into State Bar by-laws and continue inviting affinity groups to appoint non-voting representatives to the Board of Governors.

E. Model diversity and inclusion within State Bar staffing.

 1. Beginning in 2014, update and publish reliable census data regarding the diversity of State Bar staff members;

 2. Include and evaluate staff diversity as performance objective for Executive Director and departmental managers.

F. Facilitate formation of statewide LGBTQ and disabled lawyers affinity groups.

G. Charge State Bar staff with ensuring that the State Bar's communications and initiatives include a diversity component.

H. Charge State Bar staff with ensuring that State Bar sponsored CLE programs, presentations and publications feature diverse presenters and authors.

### III. Promote and Further Diversity and Inclusion in the Law Schools

A. Charge **Law Student Outreach Subcommittee** with responsibility for playing leadership role in forming and marketing collaboration among law schools, State Bar, and employers to encourage and support diversity and inclusion, including:

 1. Revitalize **Diversity Clerkship Program**

a. Monitor and evaluate case law on race-based selection criteria for paid summer clerkships;
b. Establish a minimum grade point requirement for first semester;
c. Implement aggressive marketing campaign to recruit employers and qualified applicants;
d. Explore increasing clerkships through alternative funding;
e. Explore providing CLE credit for lawyers who provide a certain number of hours of clerk supervision and mentoring;
f. Increase recognition of participating employers;
g. Expand social component for participating clerks and employers beyond current end-of-summer socials, to include a blog and in-person gatherings to introduce participants, facilitate networking, and share diversity best practices;
h. Consider asking each employer to offer a two-hour tour for all program participants so all clerks have opportunity to tour all participating employers;
i. Invite all clerks to attend selected state and local bar activities during the summer, as well as gatherings of the judiciary.

2. Facilitate better communication/collaboration to develop/expand programs such as:
   a. Pre-Law School
      i. Pipeline programs (exposing underrepresented middle school, high school or undergraduate students to the pre-admission process, law professors, review of cases and participation in mock trial events);
      ii. Pre-law study programs;
      iii. LSAT preparation;
      iv. School application preparation.
   b. Law Students
      i. Formal mentoring programs for 1L and 2L students, the specifics of which should be designed with direct student input;
      ii. Shadowing programs (learning about law practice by observing practitioners in a variety of settings);
      iii. Short internships;
      iv. Rotations through different legal settings;
      v. Career counseling (e.g. what classes to take/trajectory if career objectives are identified);
      vi. Tutoring;
      vii. Opportunities for/benefits of practicing law in Wisconsin (including rural initiatives);
      viii. Interviewing/job hunting skills;

Case 2:23-cv-01697   Filed 12/19/23   Page 107 of 258   Document 1-1

         ix.     Provide networking/social opportunities.
    c.  New Graduates
         i.     Transition to work expectations;
         ii.    Resources;
         iii.   Networking opportunities.

B.  Develop tools that could be used to market Wisconsin to diverse candidates and make available to law schools and employers.

C.  Promote State Bar membership for law students at UW and MU, and for other law students with Wisconsin ties.

D.  Recruit employers to sign onto diversity pledge, post on wisbar.org.

E.  Engage State Bar members and other community volunteers in recruiting diverse law school faculty.

F.  Provide opportunities to acquaint diverse out-of-state law students with opportunities throughout the state.

**IV.    Promote and Further Diversity in the Wisconsin Legal Profession as a Whole**

A.  Encourage the Wisconsin Supreme Court to commit to promoting diversity and inclusion in Wisconsin's court system;

B.  Explore ways to remove barriers in the election and appointment of diverse judges, commissioners, and court staff;

C.  Consider asking the Wisconsin Supreme Court to add requirement for diversity credits;

D.  Collaborate with Challenges Facing New Lawyers Committee to research other states' loan repayment assistance programs and explore viability of Wisconsin offering similar program;

E.  Solicit and recognize/reward diversity and inclusion best practice ideas from lawyers, judges, employers, law schools and law students.
      1.  Collaborate with State Bar Communications Committee "Innovations" subcommittee; include diversity as Innovations topic, solicit nominations in April 2014 with selections published in fall 2014;
      2.  Publish periodic *Wisconsin Lawyer* articles on diversity;

3. Sponsor biennial diversity best practices summit and/or include diversity programs at State Bar conventions;
4. Provide blog or chat room for individuals to share questions and recommendations/opportunities on topics such as retention strategies, family friendly policies, outreach to women lawyers returning to work, *etc.*)

F. Create diversity web page on public portion of wisbar.org that includes:
   1. Contact information for lawyers with expertise in representing underserved populations;
   2. Contact information for multi-lingual lawyers;
   3. Contact information for attorneys willing to mentor/be a resource for diverse attorneys, law students and pre-law students;
   4. Contact information for diverse bar associations in Wisconsin;
   5. Blog or chat room to facilitate networking among diverse attorneys.

G. Offer orientation/welcome program for diverse lateral attorneys moving to Wisconsin.

H. Produce training program(s) on understanding differences/capitalizing on diversity as asset, for use by local bar associations and other groups.

I. Encourage local bar associations to access State Bar local bar grants to support diversity programs, including "road trips" to promote rural practices.

J. Play leadership role in identifying and facilitating networking opportunities for diverse lawyers and law students with other diverse professionals (*e.g.* Black MBA's).

K. Identify worthy projects that might qualify for Wisconsin Law Foundation funding.

Case 2:23-cv-01697   Filed 12/19/23   Page 109 of 258   Document 1-1

# CONCLUSION

The State Bar of Wisconsin has taken the important first step of committing to furthering and promoting increased diversity and inclusion in the Wisconsin legal profession by appointing the Diversity Task Force to study this issue and submit recommendations. The work performed by the Task Force has opened dialogue amongst the various stakeholders and has sparked optimism that the State Bar is committed to lead on this important issue.

For your consideration, the Diversity Task Force respectfully submits this report with actionable recommendations for immediate and long term implementation. It is our hope that the State Bar will adopt the Task Force's recommendations and embark on a new course of action that will increase diversity and inclusion in the Wisconsin legal profession. Success will require support and commitment from the State Bar leadership to make diversity and inclusion a priority both in word and action.

Diversity and inclusion should become an important focus of the State Bar. The legal profession is enriched and better equipped by a community of diverse lawyers who possess a wide range of talents and perspectives. Greater diversity and inclusion engenders more public confidence and trust that our legal system is fair and reflective of the public that it serves.

| | |
|---|---|
| **Subject:** | RE: Request for Information & Records Concerning the Diversity Clerkship Program |
| **Date:** | Tuesday, October 17, 2023 at 12:39:05 PM Central Daylight Time |
| **From:** | Larry Martin |
| **To:** | Skylar Croy |
| **CC:** | amunoz@brookdale.com |
| **Attachments:** | image001.png |

Dear Atty. Croy,

Thank you for your follow-up inquiry regarding the State Bar of Wisconsin's Diversity Clerkship Program.

The State Bar clerkship program eligibility requirements include a background that has been "historically excluded from the legal field" and in good standing with their respective law schools. Applicants should demonstrate a commitment to "diversity" and have a record of academic achievement.

The definition of diversity, adopted in September 2014 by the Board of Governors as a result of the task force report you mentioned, provides for a very "broad and flexible" consideration of diverse backgrounds.

*"The term 'diversity' has a dynamic meaning that evolves as the demographics in the state change. It is an inclusive concept that encompasses, among other things, race, ethnicity, national origin, religion, gender, gender identity, age, sexual orientation, and disability. Inclusion helps to create a culture that embraces people from the widest range of talent and experience and promotes understanding and respect for all people and different points of view in the legal profession."*

However, the clerkship program had already adopted a broader definition of diversity several years prior to adoption by the Board of Governors. In 2008, the clerkship program moved from a "Minority Clerkship Program" to a "Diversity Clerkship Program," reflecting the program's commitment to a broader definition of diverse backgrounds.

As was provided previously, the application for students to participate in the program does not ask, nor does the State Bar require an identification of how the student qualifies for the program other than to state that it is organized for those that "have been historically excluded from the legal field." While an applicant's race may be important to his/her own consideration for applying, so could economic situation, family dynamics (such as first to go to law school or single parent household), residence in a legally underserved county, or disability.

The State Bar's role and goal is to provide those self-selected diverse applicants with the opportunity to meet clerkship employers. It does not "qualify" individual applicants for participation.

Finally, the task force report does include a recommendation to monitor legal changes. However, the program had already moved toward the broader definition over a decade ago. No additional

changes have been deemed necessary.

Thanks again for reaching out.  I hope this answers your additional questions.

*Larry*

Larry J. Martin
Executive Director
State Bar of Wisconsin
www.wisbar.org
(608) 257-3838

Support the Wisconsin Law Foundation.
Secure Online Donations here

Follow the State Bar on Facebook and Twitter.

**Your Practice. Our Purpose.**®

*This email message, including any files attached to it, is confidential and it is intended solely for the individual or entity to which it is addressed. If you have received this message in error, please do not read it, notify the sender by return email mail that you have received it, and delete all copies of this message from your email system.*

**From:** Skylar Croy <skylar@will-law.org>
**Sent:** Wednesday, October 4, 2023 6:34 PM
**To:** Larry Martin <lmartin@wisbar.org>
**Cc:** amunoz@brookdale.com
**Subject:** Re: Request for Information & Records Concerning the Diversity Clerkship Program

Dear Director Martin,

I don't think I thanked you for this response, so please let me start by doing that. Although I am disappointed that the Bar is not willing to turn over certain records, I do appreciate that you responded in a timely manner.

I have some follow up questions.

About a decade ago, Judge Ashley stated the following in a YouTube video about the Diversity Clerkship Program, which is posted on the Bar's website: "there is concern . . . about the legal repercussions for isolating people minorities [sic] at the exclusion of others . . . . We're gonna take a look at the more recent law, but most of us are pretty convinced it's not gotten any less problematic over time."

https://www.youtube.com/watch?v=-k86irV1zWE&t=5s

The Diversity Task Force Report from that time recommended that the Bar monitor "case law" on "race-based selection criteria."

**As far as I can tell, the Bar didn't change anything in response to Judge Ashley's concern or recent case law. Am I wrong on that? If the Bar has documents it is willing to provide that demonstrate race is no longer considered in the selection process, I would very much like to see them as soon as possible.**

**Assuming race is still considered, is the Bar willing to explain what races qualify a person as having a "diverse background"?**

Best wishes,

**Skylar Croy** I Associate Counsel
Wisconsin Institute for Law & Liberty, Inc.
330 E. Kilbourn Ave., Suite 725 I Milwaukee, WI 53202
(920) 422-1861 I Cell



CONFIDENTIALITY NOTICE: The information contained in this e-mail and attached document(s) may contain confidential information that is intended only for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or taking of any action in reliance upon the information is prohibited. If you have received this e-mail in error, please immediately notify the sender and delete it from your system.

**From:** Larry Martin <lmartin@wisbar.org>
**Date:** Thursday, September 14, 2023 at 9:26 AM
**To:** Skylar Croy <skylar@will-law.org>
**Cc:** amunoz@brookdale.com <amunoz@brookdale.com>
**Subject:** RE: Request for Information & Records Concerning the Diversity Clerkship Program

Dear Attorney Croy,

I write in response to your letter dated September 5, 2023, in which you request certain documents and other information regarding the State Bar's Diversity Clerkship Program pursuant to the State Bar's Access to Records Policy and Wisconsin's Public Records Law. First, as you may know, the Public Records Law is not applicable to the State Bar of Wisconsin. Entities created by the Wisconsin Supreme Court are not state agencies for purposes of that

statute. *See State ex rel. Lynch v. Dancey*, 71 Wis. 2d 287, 291–98, 238 N.W.2d 81, 83–87 (1976); *see also* the Attorney General's Open Meetings Compliance Guide (beginning on Page 7; footnotes omitted):

> **Bodies Created by the Wisconsin Supreme Court**
> The Wisconsin Supreme Court has held that bodies created by the Court, pursuant to its superintending control over the administration of justice, are not governed by the open meetings law. Thus, generally speaking, the open meetings law does not apply to the Court or bodies created by the Court. In the *Lynch* case, for example, the Court held that the former open meetings law, Wis. Stat. § 66.77(1) (1973), did not apply to the Wisconsin Judicial Commission, which is responsible for handling misconduct complaints against judges. Similarly, the Attorney General has indicated that the open meetings law does not apply to: the Board of Attorneys Professional Responsibility; the Board of Bar Examiners; or the monthly judicial administration meetings of circuit court judges, conducted under the authority of the Court's superintending power over the judiciary.

Notwithstanding the inapplicability of the Public Records Law, the State Bar's Access to Records Policy does, as you note, voluntarily establish a general policy of transparency with respect to member requests for information. That policy is not, however, without exception and, as noted below, certain of the materials requested are excepted from the general policy of availability to members.

Responding to the specific questions and requests set forth in your letter:

**Questions**
- Has any employee of the Bar, who is paid using membership dues, performed work related to the Diversity Clerkship Program?

  > Yes, but note that membership dues are less than half of the State Bar's annual revenues.

  If the answer is no, how is Ms. Evans being paid?

  > N/A

- What were the two-line items mentioned above [in the FY2024 Budget under "Staff Adjustments"] referring to if not the Diversity Clerkship Program? Were membership dues used to pay for these items?

  > These line items reference the Diversity Clerkship Program (DCP). The DCP has its own annual budget submitted and approved by the State Bar Board of Governors as part of the budget development, review, and approval process. A copy of the Fiscal Year 2024 budget for DCP is attached. As one of the State Bar's subsidized programs (in which expenses exceed direct revenues of the program), revenue sources inclusive of membership dues and others are used to fund this program.

- Were membership dues used to pay for the YouTube video? If not, how was it funded? Are any advertisements for the Diversity Clerkship Program funded using membership dues?

  > See answer to previous question.

- Were any employees of the Bar at the law school events?

  > Yes. Note: When employees attend law school events, their time is allocated

based upon the function they are serving while attending the event, which may include DCP.

- Do you know if any of the governmental agencies noted above paid the clerks? Did these clerks receive scholarships, grants, or other funding from either the Bar or their respective schools?
> We can only speak to the State Bar with certainty.  No scholarships/grants were provided from the State Bar to the DCP clerks for their work experience as part of this program.  As to the participating employers, as noted in the materials you have reviewed online, the program contemplates payment to the clerks, with the details of those arrangements negotiated between the individual employer and employee.

- Were membership dues used to pay for the Diversity Clerkship Reception?
> See answer above re: funding for the DCP generally.

- How did the Executive Committee account for the Diversity Clerkship Program in calculating the upcoming *Keller* dues reduction? If the Executive Committee did not account for this program, is it open to reconsidering its calculation?
> The Executive Committee in its most recent *Keller* evaluation (August 25, 2023) once again confirmed the DCP as chargeable to State Bar membership dues, consistent with the opinion of the U.S. Court of Appeals for the Fifth Circuit. *See, McDonald v. Longley*, 4 F.4th 229, 249 (5th Cir. 2021), *cert. denied* ___ U.S. ___, 142 S.Ct. 1442 (Apr. 4, 2022) ("The Bar's various diversity initiatives through OMA, though highly ideologically charged, are germane to the purposes identified in *Keller.")* .

**Requests**
- Any communications from Ms. Evans or any other employee or officer of the Bar concerning the Diversity Clerkship Program created or sent in the past year, including:
  - Any communications with prospective employers; and
  - Any communications with applicants.
> These records are not available to members, as set forth in the Access to Records Policy, Exceptions, Paragraph 6.
- Any documents that explain or further break down the two-line items mentioned above;
> These records are not available to members, as set forth in the Access to Records Policy, Exceptions, Paragraphs 2, 6.
- Any invoices, checks, or other documentation showing how the YouTube video was financed.
> These records are not available to members, as set forth in the Access to Records Policy, Exceptions, Paragraphs 2, 6.
- Any agendas or other documentation discussing what happened at the law school events.
> There are no agendas.  A copy of the PowerPoint presentation used is attached.

- Any invoices, checks, or other documentation showing how the Diversity Clerkship Reception was financed.
> These records are not available to members, as set forth in the Access to Records Policy, Exceptions, Paragraphs 2, 6.

- Any documents showing how the *Keller* dues reduction is calculated.

      A full explanation is provided in the annual dues notice. The 2024 "Keller Dues Insert" can be found here:
https://www.wisbar.org/formembers/membershipandbenefits/Documents/2024%20Keller%20Dues%20Insert.pdf.

Thanks for your inquiry.

*Larry*

Larry J. Martin
Executive Director
State Bar of Wisconsin
www.wisbar.org
(608) 257-3838

Support the Wisconsin Law Foundation.
Secure Online Donations here

Follow the State Bar on Facebook and Twitter.

***Your Practice. Our Purpose.*®**

*This email message, including any files attached to it, is confidential and it is intended solely for the individual or entity to which it is addressed. If you have received this message in error, please do not read it, notify the sender by return email mail that you have received it, and delete all copies of this message from your email system.*

---

**From:** Skylar Croy <skylar@will-law.org>
**Sent:** Tuesday, September 5, 2023 10:03 AM
**To:** Larry Martin <lmartin@wisbar.org>
**Cc:** amunoz@brookdale.com
**Subject:** Request for Information & Records Concerning the Diversity Clerkship Program

Dear Executive Director Larry Martin:

Please see the attached letter. Also please confirm receipt of this request for information under the Bar's *Access to Records Policy* and request for records under Wisconsin's Public Records Laws.

Best Wishes,

**Skylar Croy** | Associate Counsel
Wisconsin Institute for Law & Liberty, Inc.
330 E. Kilbourn Ave., Suite 725 | Milwaukee, WI 53202
(920) 422-1861 | Cell



CONFIDENTIALITY NOTICE: The information contained in this e-mail and attached document(s) may contain confidential information that is intended only for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or taking of any action in reliance upon the information is prohibited. If you have received this e-mail in error, please immediately notify the sender and delete it from your system.

December 2022

# The Bar Report

**Executive Director's Report to the Board of Governors**


**STATE BAR OF WISCONSIN**

► **Coming Up: The Forensic Justice Institute, p6**

► **Close Races Top Midterm Elections, p12**

► **Volunteer! Pro Bono Portal Offers 78 Opportunities, p14**

► **Young Lawyers Receive Scholarships for Representing the Underserved, p17**

► **How Is Your Health Insurance Plan Performing?  p19**



**State Bar Hosts AG Debate, P. 16**

Exhibit 16

*We support our members in a dynamic and diverse society in delivering valued professional services, promoting access to justice and pursuing professional satisfaction.*



## Table of Contents

### ▶ INSIDE THE BAR

-From the Executive Director's Desk, p3
-Larry Martin's Wisconsin Lawyer Column's, p4
-Upcoming Events, p5

### ▶ EDUCATE

-Check Out Books Unbound Today! p6
-Coming Up: Forensic Justice Institute, p6
-It's a Wrap! WSSFC Offers Two Tracks to Earn CLEs, p6
-Veteran Litigators Teach Courtroom Strategy at ABOTA Institute, p7
-Providing Ethics Guidance, p7
-Members Receive Best Practice Tips on Law Firm Accounting & More, p7
-Prioritizing the Well Being of Lawyers, p8
-Section Reports, p9-10
-Division Reports, p10
-Committee Reports, p10-11
-Continuing Our Work on Diversity & Inclusion, p11
-Diversity Clerkship Program Generates Strong Interest Among Students, p11

### ▶ ADVOCATE

-Close Races Top Midterm Elections, p12
-GOP Adds to Majorities in Senate, Assembly, p12
-Lawyer Legislators Continue to Decline, p12
-Advocating for the Justice System, p13
-Connecting Lawmakers with Lawyers, p13

### ▶ FACILITATE

-Pro Bono Portal Offers 78 Volunteer Opportunities, p14
-Top Questions Posed to Free Legal Answers, p14
-31 Small Businesses Receive Free Legal Help, p14
-Check Out Pro Bono Highlights, p14
-Promoting Access to Justice Resources to Wisconsin Librarians, p15
-State Bar Promotes National Pro Bono Week, p15
-Helping Resolve Lawyer-Client Disputes, p15
-Want More Business? Learn About LRIS on December 8, p15
-Media Coverage Gains Steam with WNA Partnership, AG Debate, p15
-Young Lawyers Receive WLF Scholarships, p16
-Remember the WLF in Year-end Giving, p17
-Diversity Clerkship Alumni Participate in WSSFC, p18
-G. Lane Ware Leadership Academy, p18

### ▶ INNOVATE

-Nominations For Leadership Summit Due December 16, p19
-How is Your Health Insurance Plan Performing, p19
-Marketing, Personal Fitness Plans Top List of New Benefits, p20
-Training the Next Generation of Legal Leaders, p20

### ▶ SOCIAL MEDIA

-A Look at the Top Content, p21-25

Case 2:23-cv-01697   Filed 12/19/23   Page 119 of 258   Document 1-1



*From the desk of ...*

# Larry J. Martin, Executive Director



One of my colleagues often uses the word "catawampus." It is an apt word to describe the times we've been living in. But in the last several months, dare I say, things are feeling normal again.

At the State Bar of Wisconsin, we have returned to in-person gatherings and meetings, allowing us to directly interact again with each other. Associations associate. We are in the people business, and reconnecting in person is something I greatly welcome.

However, moving forward, we have learned that there can be more flexibility and choice in how we meet and where we work. Virtual and remote work options allow us to save both time and money, as well as provide greater efficiency in how we organize our days. Regardless, we remain focused on how we can best serve you, our members.

When I am not on the road, I like to be in the office. It's a chance to see my colleagues and members. Having my home as my office for nearly two years just wasn't for me. I need closure each day, and I found that hard to do when working at home.

As we approach the end of the year, I have encouraged my State Bar colleagues to try and take some time off. For us, as I know for many of you, there no longer seem to be slow periods in the rhythm of the year. However, the second half of December still offers that rare time when there are fewer meetings, hopefully fewer emails, and a chance to take a collective breather as many of us take time to celebrate the holidays. I find it a time to reconnect with life beyond my work and the office, to spend time with family and friends and hopefully enjoy a little down time.

Before I head out, I will throw a party for my colleagues. It's something I do each year to personally express my profound gratitude for all they do.

Then I will go home, play some Ella and Bing, pour myself an eggnog and settle in. It will be a time to step back, celebrate the season, and reconnect with those I hold most dear. There will be plenty of work waiting for me in the new year.

However you mark this time of year, best wishes and good health to you and your loved ones. Thanks for taking time to read my report. Please continue to stay well and, as always, ever forward!

*Larry*

Case 2:23-cv-01697   Filed 12/19/23   Page 120 of 258   Document 1-1

# Wisconsin Lawyer Columns

In case you missed my recent columns in the *Wisconsin Lawyer™* magazine:

- **Getting Out of Town:** State Bar of Wisconsin staff and leaders are helping members, no matter where they live (October 2022)

- **Stepping Up for Democracy and the Rule of Law:** Lawyers, let the State Bar of Wisconsin know how the organization and the profession can best promote and ensure the survival of democracy, in the United States and worldwide. (November 2022)

Case 2:23-cv-01697   Filed 12/19/23   Page 121 of 258   Document 1-1



*Upcoming Events*

## Mark Your Calendar

- **Upcoming Board of Governors' Meetings**

  - February 24, 2023:  State Bar Center, Madison
  - April 14, 2023: State Bar Center, Madison
  - June 14, 2023: The Pfister Hotel, Milwaukee
  - September 21-22, 2023: Blue Harbor, Sheboygan

## ▶ In-person CLE Seminars and Webinars

- **Annual Constitutional Law Symposium 2022**
  December 8, State Bar Center, Madison

- **Effective Legal Writing 2022**
  December 9, State Bar Center, Madison

- **Family Law Ethics: Social Media, Prenuptial Agreements, and Acting as GAL 2022**
  December 14, State Bar Center, Madison

- **Forensic Justice Institute  2023**
  Jan 19-20, Webcast Seminar

- **Step-by-Step Estate Planning I 2023**
  January 25, State Bar Center

- **Step-by-Step Estate Planning II 2023**
  February 8, State Bar Center

For all in-person CLE seminars and conferences, visit MarketPlace.

Case 2:23-cv-01697   Filed 12/19/23   Page 122 of 258   Document 1-1


### Check Out Books UnBound Today!

Books UnBound™, our subscription-based online library of PINNACLE® books, went live on September 16. Check out a sample chapter from each book for free. If you have questions or would like a demo, please contact Publications Manager Carol Chapman.

### Coming Up: Forensic Justice Institute

The **2nd annual Forensic Justice Institute** will be held virtually on January 19-20. Advances in technologies and testing have created an explosion of new resources for investigators, prosecutors, and defense
counsel. Topics include:

- Firearm identification
- Big data and surveillance
- The role of the medical examiner
- Forensic toxicology
- Eyewitness accounts

Register on Wisbar Marketplace.

### It's a Wrap! WSSFC Offers Two Tracks to Earn CLEs, Network

The Wisconsin Solo & Small Firm Conference (WSSFC), held October 27, 28, and 29 at the Kalahari Resort in the Wisconsin Dells, featured information on substantive law, practice management, technology, quality of life, and ethics.

The virtual portion of the conference, held November 14-16, offered the same 16 ½ credits comprising of a variety of CLE, EPR, LAU and LPM credit types from six plenaries and 32 breakout session options.

Read more about the conference experience in InsideTrack.

Case 2:23-cv-01697   Filed 12/19/23   Page 123 of 258   Document 1-1

## 🔶 Veteran Litigators Teach Courtroom Strategy at ABOTA Institute

Members attending the 32nd Annual Institute of Trial Practice (ABOTA) on Nov. 10 received a front row seat to every step at trial. They heard from veteran litigators regarding their strategies and rational from opening to closing statements. Attendees observed how a judge would manage the proceeding and received perspectives from the bench. They also listened in on a jury deliberation.

## 🔶 Providing Ethics Guidance

The Ethics Program provides guidance regarding Wisconsin's Rules of Professional Conduct for Attorneys. Ethics counsel delivered 15 presentations from September 14 to November 4, with five through PINNACLE. A sampling includes:

- "When Must You Tell The Truth? (Walworth County Bar Association)
- "Who is Your Client When You Are a Public Servant and Your Work is Deemed Political? (Wisconsin Association of County Corporation Counsels)
- "Recent Ethics Opinions" (Dane County Criminal Defense Attorneys)
- "The OLR Process" (Academy of Matrimonial Lawyers)

Ethics Counsel wrote two articles for InsideTrack:

- "Who is the Client in Entity Formation?"
- "Side Switching: Conflicts when a Defense Lawyer Runs for District Attorney"

Questions? Contact Ethics Counsel Aviva Kaiser or Tim Pierce, or call the Ethics Hotline at (800) 254-9154.

## 🔶 Members Receive Best Practice Tips on Law Firm Accounting & More

State Bar Practice411™ Law Practice Assistance Manager Christopher Shattuck met with members for roundtable law practice management discussions in September and October to discuss best practices for law firm financial accounting, legal analytics, ethically avoiding common grievances, and practical tips for automating the client intake process.

Below is a sampling of the presentations given by Practice411:



- "Hardware & Software Encryption Strategies for Protecting Your Law Firm 2022"
- "Law Firm Software for Maximizing Efficiencies in Your Firm 2022"
- "Law Firm Succession Planning 2022"
- "Digital Intelligence"
- "Technology for Lawyers: Leaving the Safety Net"

Case 2:23-cv-01697   Filed 12/19/23   Page 124 of 258   Document 1-1

**About Practice411**: The State Bar's Law Office Management Assistance Program Practice411 helps lawyers improve their efficiency and effectiveness in the delivery of legal services and in implementing systems and controls to reduce risk and improve client relations. It helps lawyers manage the business aspects of their practices. Questions? Contact Christopher Shattuck, Law Practice Assistance Manager.

 **Prioritizing the Well-Being of Lawyers**

WisLAP staff participated in 41 well-being consults with lawyers from September to November and gave eight presentations in 11 cities. Since June 2022, WisLAP has participated in 85 consults and gave 15 presentations.



WisLAP conducted their annual Volunteer Training for 44 people on Nov. 10-11. Topics included mindfulness meditation, motivational interviewing, self-care, implicit bias, mental health and substance use disorders, shame and stigma, and the tenets of positive psychology.

**About WisLAP:** The program offers confidential wellbeing support to lawyers, judges, and law students. WisLAP aims to promote attorney wellbeing by developing a culture within the Wisconsin legal community that destigmatizes mental illness and substance use disorders and fosters work-life balance. Questions? Contact Julia Persike, PsyD, CSAC, WisLAP Manager or Amber Gilles, WisLAP Member Coordinator.

Case 2:23-cv-01697   Filed 12/19/23   Page 125 of 258   Document 1-1



# *We're Working Together for the Common Good*

*State Bar groups consist of Sections, Committees and Divisions. Together these groups provide a wide range of opportunities for professional development while also helping to improve the administration of justice and the practice of law in Wisconsin.*

## Section Reports

The **Administrative and Local Government Law Section** held a CLE in conjunction with PINNACLE, "COVID Relief Legislation & Issues in Administrative Law 2022" on Sept. 19. The program focused on The American Rescue Plan Act of 2021. Section members received a $100 discount for both in person and webcast replays.

The **Bankruptcy, Insolvency & Creditors' Rights Section** held their Annual Bankruptcy Update on Nov. 2 in Milwaukee and Nov. 3 in Madison. This is an opportunity for section members to hear directly from U.S. Bankruptcy Court judges from the Eastern and Western Districts of Wisconsin and get up to speed on the latest trends and developments in bankruptcy practice.

The **Construction and Public Contract Law Section** organized a volunteer event with Revitalize Milwaukee on Oct. 29. Volunteers built a fence for a retired veteran in the Milwaukee area. Members volunteered their time and the board approved a generous financial donation toward the project.

The **Elder Law and Special Needs Section** held a free training, "Going Beyond Diversity to Meaningful Inclusion," on Nov. 2. It was presented by Atty. Jennifer L. Johnson, Director of Diversity & Inclusion at Legal Action of Wisconsin, Inc. The training allowed members to take an introspective look at the section's D&I practices when planning a CLE and recruiting members, challenged members to explore status quo bias, and posed critical questions about the progress in the section's D&I action plan submitted in June 2022. Twenty-seven people attended the event.

The **Family Law Section** co-produced the "Advanced Skills and Techniques for Family Law Practice" with PINNACLE on Oct. 11 and provided three scholarships to members. Participants gained insight into how alcohol and drug assessment evaluations are used in family cases, examined COVID impacts on family law, and recommended security measures for attorneys.

The **Intellectual Property and Technology Law Section** hosted a networking event with each of the law schools on Nov. 10. More than 50 law students and IP attorneys attended each event.

The **International Practice Section** is increasing their Law School Outreach by planning networking events and alternating each month between Madison and Milwaukee. They invite all law students and international practitioners to attend.

Case 2:23-cv-01697   Filed 12/19/23   Page 126 of 258   Document 1-1

**Labor & Employment Law Section** resumed their luncheon series by hosting "Diamond Assets LLC: The Latest from the Restrictive Covenant Front" on Oct. 26. On Nov. 21, a panel discussed "The Law Surrounding Employees with Mental Health Conditions" and explored the unique legal issues employees and employers are experiencing since COVID-19.

The **Real Property, Probate and Trust Section** is producing six CLE's and has offered $50 discounts for the section members who attend. The CLE's include: "Annual Estate Planning Update," "Annual Real Estate Update," "Step by Step Estate Planning I," "Step by Step Estate Planning II," and "The Annual Commercial Real Estate Update."

The **Solo Small Firm and General Practice Section** played a huge role in the planning success of the 2022 Wisconsin Solo Small Firm Conference. The section financially sponsored the event, presented the John Lederer Service Award, presented annually, and provided two scholarships for members to attend the conference.

## Division Reports

The **Nonresident Lawyers Division** held their Annual Fall Meeting in Washington D.C. on Oct. 13-14. The division hosted a CLE program free to local members of the DC Chapter of the Nonresident Lawyers Division. Speakers included Sean Marotta, Dean Dietrich, and Kamilah House. Topics included "Updates on Cases from October Term of the U.S. Supreme Court" and "Civility in the Legal Profession." The division is planning to host more chapter events across the country during the upcoming year.

The **Young Lawyers Division** hosted a CLE program and networking event for division members in La Crosse on Nov. 11. "You're a lawyer! Now What?" included a panel discussion on attracting and retaining clients while expanding your presence through leadership and community engagement. A networking reception co-sponsored by WILMIC followed the program.

The **Senior Lawyers Division** (SLD) held a successful live program in Milwaukee on Oct.20, with over 75 attendees at the Italian Community Center. Repeats of this program will be held in Madison on March 16, 2023, and in Green Bay on May 18, 2023. The SLD has a series of webcasts in production with PINNACLE, including programs on the handling of files, lawyer wellness, technology, and encryption. Past seminars are available to division members in a free library of virtual content with topics of interest to senior lawyers.

## Committee Reports

The **Anti-Sexual Harassment Oversight Committee** created a website of resources that includes a basic model policy for legal employers addressing the issue of sexual harassment in the workplace. This model policy is intended as a starting point to encourage adoption of policies by employers. In addition, the committee will add a minimum of two anti-sexual harassment sessions into their annual rotation of CLE sessions with the assistance of PINNACLE. The committee formed to oversee the recommendations of the **Sexual Harassment and the Legal Profession Report**, which was approved by the Board of Governors.

Case 2:23-cv-01697   Filed 12/19/23   Page 127 of 258   Document 1-1

## 🔶 Continuing Our Work on Diversity and Inclusion

The Diversity Inclusion Oversight Committee (DIOC) continues to build working relationships with Affinity Bar leaders from the Wisconsin Asian Bar Association, LGBT Bar Association of Wisconsin, Legal Association for Women, Wisconsin Hispanic Lawyers Association, and Wisconsin Association of African-American Lawyers. The groups have been updated on FY23 DIOC goals. Some goals include:

- Creating more meaningful touches with the law students and giving them practical mentorship
- Adding Diversity and Inclusion courses to the Judicial College program
- Building on the success of the Diversity Clerkship Program
- Rebuilding the Diversity Counsel Program

## 🔶 Diversity Clerkship Program Generates Strong Interest Among Law Students

Eighty-six students from Marquette and U.W. law schools attended informational sessions in October to learn more about the 2023 Diversity Clerkship Program, a 10-week summer internship experience for first-year minority law students. The program continues to be refined to better accommodate employers and students during the interview process. If you are interested in providing an internship, email Jacque Evans, Diversity and Inclusion Specialist.

The State Bar is committed to exposing law students to the benefits, services and experiences the State Bar offers to members so they will choose to practice law in Wisconsin and become active in the State Bar when they graduate. State Bar staff attended the Aug. 19 and Sept. 1 orientations at U.W. Law School.

State Bar staff are also working with U.W.-Stevens Point to establish opportunities for potential law students in rural areas.

Case 2:23-cv-01697   Filed 12/19/23   Page 128 of 258   Document 1-1



**Advocate**

## *We're Advocating for Justice, Clients, the Legal System and Profession*

### ▶ Close Races Top Mid-Term Elections

True to form, Wisconsin continued its tradition of extremely close statewide elections, but incumbency continued to demonstrate its power.

The two Democratic incumbents, Gov. Tony Evers and Attorney General Josh Kaul, both won their respective races against Republican businessman Tim Michels and Fond du Lac County District Attorney Eric Toney. On the Republican side, incumbent U.S. Senator Ron Johnson won his statewide election against Democrat Lt. Gov. Mandela Barnes.

In the other two statewide races, margins were especially close with one race still too close to call. Republican attorney John Leiber beat his Democratic challenger, Fitchburg Mayor Aaron Richardson, in the campaign for State Treasurer. In the Secretary of State race, Democratic incumbent Doug La Follette currently leads State Representative Amy Loudenbeck by just over 1,300 with votes still outstanding. The race could potentially go to recount once the results are certified over the next few days.

### ▶ GOP Adds to Majorities in Senate, Assembly

As expected, both the Republican-led Senate and Assembly added to their growing majorities in both houses. Favorable open seats and newly drawn district lines from the decennial redistricting process allowed the Senate GOP to add one new seat and three additional Republican seats in the Assembly. With the one additional seat, the Senate now holds a supermajority for the 2023-24 session with 22 Republicans and 11 Democrats. The supermajority in the Senate could be used to override any veto made by Gov. Evers. In the Assembly, the three additional GOP victories fell short of the necessary numbers to reach the supermajority threshold. Assembly Republicans will still hold a sizeable 64 to 35 member advantage.

### ▶ Lawyer Legislators Continue to Decline

The 2022 election had a near-record 31 legislators opting either not to run for re-election or to run for a different elective office. Along with having almost one-fourth of the legislative body being completely new, there will also be a decline of lawmakers that are attorneys. Ten of the 132 legislators have a background as attorneys.

There are seven attorneys serving over the next two years in the Assembly (six Democrats and one Republican):

Case 2:23-cv-01697   Filed 12/19/23   Page 129 of 258   Document 1-1

- Ron Tusler (R-Harrison)
- Marisabel Cabrera (D-Milwaukee)
- Steve Doyle (D-Onalaska)
- Evan Goyke (D-Milwaukee)
- Jimmy Anderson (D-Fitchburg)
- Daniel Riemer (D-Milwaukee)
- Tip McGuire (D-Kenosha)

Meanwhile, three attorneys will serve in the upper chamber beginning in January (one Republican and two Democrats): Eric Wimberger (R-Green Bay); Lena Taylor (D-Milwaukee); and Kelda Roys (D-Madison)

Inauguration Day for the 2023-24 legislative session is January 3, 2023.

## Advocating for the Justice System

The criminal justice system is facing unprecedented challenges with backlogs of cases and staffing issues during a tight labor market. Increased financial support from the legislature will go a long way to addressing these challenges. The first several months of the new legislative session will be focused on crafting a new biennial budget. As reported in *Rotunda Report*, a major priority for the State Bar Advocacy team is building support for increased funding for District Attorney's offices and the State Public Defender's office, including an increase in the private bar rate. We also support the Judicial Council's request for returned funding for staff and services so that they can continue their important advisory role in the judicial system.

## Connecting Lawmakers with Lawyers

The 2023-2024 legislative session will have only 10 members of the legislature who are attorneys and will feature a bumper crop of legislative freshmen. It will continue to be vital for members of the legal profession to engage with their lawmakers as constituents. To this end, the State Bar's Government Relations and Grassroots team is working to continue to educate and engage our members around the legislative process.

Resources available to members include our bi-weekly newsletter, Rotunda Report, our Advocacy Network Action Center, and our Twitter account @SBWRotundaRpt. The most important resource, our staff, includes Lisa Roys, Cale Battles, Lynne Davis, and Devin Martin. They will answer any questions you may have about advocacy and will actively come to you.

The State Bar organizes legislative meetings around the state to bring our members together with their lawmakers to talk about issues important to the legal profession. We offer educational programs on the ins and outs of the legislative process and how attorneys can engage in the process. Educational meetings may feature one credit of CLE.

If you would like to have a meeting with the Government Relations and Grassroots team and your local bar, law firm, or a group of legal colleagues, reach out to Grassroots Coordinator Devin Martin.

Case 2:23-cv-01697   Filed 12/19/23   Page 130 of 258   Document 1-1

*The State Bar promotes access to justice and professional satisfaction for it's members. One way to accomplish this is through pro bono work and public education on the rule of law.*

### ▶ Pro Bono Portal Offers 78 Volunteer Opportunities

The State Bar Pro Bono Portal is currently advertising 78 volunteer opportunities. Since its inception in November 2020, 438 opportunities have been posted to the site.

### ▶ Top Questions Posed to Free Legal Answers

The most common legal questions posed to volunteers in the Wisconsin Free Legal Answers program, a project of the Access to Justice Commission,  involve family law (34%); housing (18%); debts (10%), employment (6%); real estate (4%); and probate (4%).



**6 Month Trend of New Questions**

Volunteers have answered 657 questions from 631 clients around the state in FY2023.

From May to September 2022, Free Legal Answers averaged 173 questions per month with the majority coming from Milwaukee and Dane counties.

### ▶ 31 Small Businesses Receive Free Legal Help

The Business Law Section has expanded the number of appointments available in their free legal assistance effort for small businesses that have non-litigation issues. In September and October, volunteer lawyers and law students served 31 small business clients.

### ▶ Check Out *Pro Bono Highlights*

The State Bar's monthly *Pro Bono Highlights* email newsletter is distributed to all members. It provides an update on statewide pro bono efforts, resources, and opportunities for volunteers in Wisconsin. The November issue highlights the National Pro Bono Week celebration efforts in Wisconsin, a volunteer attorney, and a new pro bono opportunity.

Case 2:23-cv-01697   Filed 12/19/23   Page 131 of 258   Document 1-1

### ➤ Promoting Access to Justice Resources to Wisconsin Librarians

Wisconsin libraries are a frequent first stop for individuals with legal challenges. In fact, 78 percent of library patrons ask for help finding a legal resource.



State Bar Pro Bono Program Manager Jeff Brown joined representatives with the State Library and the UW Law School Library to present "Access to Justice and the Public Library" at a recent meeting of the Wisconsin Library Association in Lake Geneva. The presentation focused on resources librarians can use to refer to patrons, including specific PINNACLE publications and the Lawyer Referral and Information Service (LRIS).

### ➤ State Bar Highlights National Pro Bono Week

National Pro Bono Week is celebrated the last week in October. The State Bar joined with other bar associations and legal services organizations in a variety of efforts to promote the week, including a social media campaign.

### ➤ Helping Resolve Lawyer-Client Disputes

The State Bar's confidential Fee Arbitration Program has 42 open cases – down four since June 2022. The program processes about 67 cases annually. Arbitration hearings continue around the state.

### ➤ Want More Business? Learn About LRIS on December 8

Members interested in joining the Lawyer Referral & Information Service (LRIS) are invited to a webinar on Dec. 8 from noon to 1 p.m. Speakers include LRIS Committee Chair Steve Krueger, and LRIS panel members David Lang and Alexis Garuz.

LRIS connects lawyers with prescreened clients based on legal issue, geographic location, and ability to pay. The service averages 600 calls weekly (29,259 calls in FY22) and offers two Spanish-speaking specialists.

Space is limited. Information: Katie Wilcox, Public Education Program Manager.

### ➤ Media Coverage Gains Steam with WNA Partnership, AG Debate

"Know Your Legal Rights" newspaper stories written by LRIS attorneys appeared in 44 Wisconsin Newspapers in September and October, bringing the total to 152 stories since the partnership formed with the Wisconsin Newspaper Association (WNA) in April 2022.

Case 2:23-cv-01697   Filed 12/19/23   Page 132 of 258   Document 1-1

A sampling of the articles include:

- **Door County Pulse: "Can you afford to drink and drive?"**
  (Atty. Kyle Borkenhagen)
- **The (Rice Lake) Chronotype: "Why parents need a will to establish legal guardianship"**
  (Attys. Ralph E. Johnson and Josiah R. Stein)
- **Sun Prairie Star: "No money down: How contingency fees work in personal injury cases"**
  (Atty. Robert Kasieta)
- **Wausau Pilot & Review: "How to file an action in small claims court?"**
  (Atty. Angela Knight)

Members of the media contacted the State Bar's media outreach program for legal experts on late-breaking stories, including:

- **WKOW (Madison): "Attorneys on the likelihood of an appeal by Darrell Brooks"**
  (Referral to Attorney Sarah Schmeiser)
- **Wisconsin State Journal: "Non-consensual posting of UW volleyball locker room images could be a felony under state law"** (Referral to Atty. Awais Khaleel)

Additionally, the Attorney General debate at the State Bar Center generated considerable statewide attention, with in-person coverage from WISC-TV (Madison), WTMJ (Milwaukee), WisPolitics.Com, WisEye, Associated Press, Wisconsin State Journal, Wisconsin Public Radio, Milwaukee Journal Sentinel, and WUWM-Milwaukee's Public Radio.



**ABOUT STATE BAR MEDIA OUTREACH:** The State Bar's media outreach provides information, corrects inaccurate reporting, connects the media with lawyers as experts, and serves as a trusted source for journalists while highlighting the critical role and expertise lawyers play in society. Questions? Contact Mike Wiltse, Public Relations Specialist.

Case 2:23-cv-01697   Filed 12/19/23   Page 133 of 258   Document 1-1

*Promoting Public Understanding of the Law: Wisconsin Law Foundation*

## Young Lawyers Receive Scholarships for Representing the Underserved

The Wisconsin Law Foundation granted **Belle Case La Follette Awards** in the amount of $2,500 each to three recent law school graduates. The awards recognize recent law school graduates who are State Bar members that practice law in Wisconsin and represent underserved populations. This year's recipients are:

**Atty. Tatiana Shirasaki**, University of Wisconsin, 2018, Public Defender, Dodge County. Tatiana mentors students; volunteers for the Wisconsin State Bar Mock Trial program and WisLap; is a member of the Mayville School Board; supports the U.W. Law Clinics by being the Co-Vice-President of the Economic Justice Institute Inc.; and is involved in Rotary as a District Grant Committee Member.

**Atty. Cassidy Sandoval Baker,** Marquette 2018, Centro Legal, Milwaukee. Instead of using the award herself, Cassidy plans to use it to cover the costs of pro bono representation for two or three family law cases from beginning to end.

**Atty. Kristina Mendez,** Creighton, 2021, Mendez Law LLC, De Pere. Kristina practices in the areas of immigration, family, juvenile, civil, criminal, and business law. She serves low-income Spanish-speaking individuals in Green Bay, Appleton, Sheboygan, Fond du Lac, Wautoma, and the surrounding rural areas. She saw a very high demand for representation in the Latino communities south of Green Bay, so she opened a second office in Appleton to provide services in the southern and western areas of the Fox Valley.

## Remember the Wisconsin Law Foundation in Year-end Giving

These are uncertain and concerning social and economic times. Civic understanding, the role of our courts and the rule of law are in decline; a generation of leaders in the legal profession and in our communities are retiring; and large parts of our state increasingly struggle accessing justice.

This is where your Law Foundation is stepping in. The Foundation is working hard to expand grants to young lawyers who choose to work with underserved populations; engaging high school students on the rule of law and civics through Mock Trial; and developing a new generation of lawyers' leadership skills in service to both the profession and our communities; all while promoting innovative programs that strengthen our justice system.

Our efforts are ambitious, but we cannot do it without your continued support. Your ongoing dedication to our work is critical if we are to continue to address and expand our reach in support to these worthy projects and programs across the state.

**I urge you to join me in personally supporting the critical work of the Wisconsin Law Foundation by making an end-of-the-year contribution today.**

Your support now will also allow us to meet the growing demand to supportWisconsin's High School Mock Trial program; new diversity initiatives; scholarships that help new lawyers reduce debt and establish practices in underserved areas; and programming focused on developing the next

Case 2:23-cv-01697   Filed 12/19/23   Page 134 of 258   Document 1-1

generation of legal leaders. Make donations online at wisbar.org/wlfdonate or send a check to the Wisconsin Law Foundation, 5302 Eastpark Blvd., Madison, WI 53718.

## Diversity Clerkship Alumni Participate in WSSFC

Thanks to scholarships from the Law Foundation's **Fund to Promote Diversity**, two young attorneys who participated in the State Bar's Diversity Clerkship Program when they were in law school, attended this year's Wisconsin Solo & Small Firm Conference (WSSFC).

## G. Lane Ware Leadership Academy

The Law Foundation provided a $4,113 grant to the State Bar's **G. Lane Ware Leadership Academy,** a multi-session training program designed to enhance leadership skills, inspire leadership involvement, build professional networks, and foster the professional development of a diverse group of lawyers. The Leadership Academy helps to improve the leadership skills of lawyers who are interested in becoming leaders in their community, in their places of employment or in the legal profession whether at the local level or within the State Bar.

The first session of the 2022-23 Leadership Academy took place in-person at the State Bar Center on Nov. 4 & 5, 2022. This year's class is made up of 16 lawyers from every corner of the state.

### Nominations For Leadership Summit Due December 16

Help the State Bar identify the next generation of State Bar volunteers by nominating a new lawyer to attend the Leadership Development Summit in April 2023.



The Summit is designed to teach new lawyers the benefits and connection between State Bar engagement and professional growth, as well as understand how to balance family, professional and volunteer responsibilities.

We encourage you to nominate diverse professional colleagues. Nominations are due by December 16. Questions? Contact Beth Drake.

### How Is Your Health Insurance Plan Performing?

Law firms may see an increase in health care coverage costs in 2023. The Kaiser Family Foundation recently released their ACA exchange policy premium rate analysis predicting 2023 health care coverage rate increases for employers ranging anywhere from 5-14%.

Be sure to take some time now to examine how your current plan is performing. Have costs increased? Has the claims experience been positive? If the changes haven't worked in your favor, check out the State Bar Group Health Plan for law firms to see if it offers you any cost-savings.

Paperwork must be submitted by December 15, 2022 for coverage to be effective January 1, 2023. However, law firms may enroll in this group health plan at *any time* throughout the year, not just during open-enrollment time in November.

To qualify, law firms need to employ at least two non-family members who work 26 hours or more per week (i.e. lawyer and one other employee), and coverage must be offered to all, but may be declined. Under current federal and state association health plan law, the State Bar's plan cannot provide coverage to individual attorneys either working as solo practitioners without at least one non-family employee.

Case 2:23-cv-01697   Filed 12/19/23   Page 136 of 258   Document 1-1

Information and video resources available to learn more about the plan:

- Health Checkup:  State Bar's Group Health Plan for Law Firms May Be a Solution for Your Firm
- Association Health Plan for Law Firms: Deeper Dive into Value Added Services
- Town Hall Meeting Q-&-A

To request your quote, please Professional Insurance Program representatives Christine Nadolski, 414-755-4172, or Wendy C. Block, 414-755-4185.

## 👉 Marketing & Personal Fitness Programs Top List of New Benefits

Check out these new benefits made available to State Bar members:

- Gavel Marketing: Offering discounted cutting-edge video production services, media buying, graphic design, market strategy and social media management.

- Transformation Center:  LIVE virtual or in-person fitness program at exclusive discounted rates. Whether you live in Madison or anywhere in the state, this program brings 45 minute live workouts to you wherever you might be.

Explore all your member benefits. Questions? Contact Annette Ashley.

Case 2:23-cv-01697   Filed 12/19/23   Page 137 of 258   Document 1-1

# Social Media: A Look at Top Content

Increasingly, our members engage with the State Bar and each other through our social media channels. Join the conversation; connect with us on Facebook, Twitter (@statebarofwi), LinkedIn, and Instagram (@statebarofwi). Here are some recent metrics and examples that demonstrate how social media plays a role in advancing our mission.

## Facebook

*Posts and metrics from Sept. 4 – Nov. 17, 2022 (compared to period prior)*









Case 2:23-cv-01697   Filed 12/19/23   Page 138 of 258   Document 1-1

# Twitter

*Posts and metrics from Sept. 4 – Nov. 17, 2022  (compared to period prior)*



| Followers | Engagement | Brand awareness |
|---|---|---|
| **5.7K** | **406** | **153** |
| ☉ - | ☉ 19.1% | ☉ 3.4% |
|  | See section | See section |

---

**State Bar of Wisconsin**
@StateBarofWI

Understanding Wisconsin's election laws with Madison City Attorney Mike Haas. youtube.com/watch?v=FQXHmk...

#wisconsinlawyer #wisconsinlaw #electionlaw



youtube.com
Election Law Updates With City Attorney Mike Haas
Madison City Attorney Mike Haas has been busy this year advising city officials on changes in election law by recent ...

4:57 PM · Oct 6, 2022 · Twitter Web App

---

**State Bar of Wisconsin**
@StateBarofWI

Loads of great tips here from @MyCaseInc. What's the #1 thing you do to stay organized?

H/t @LexBlog
#wisconsinlawyer #wisconsinlaw #wisbar




lexblog.com
Improving Lawyer Organization: Best Practices
Organization is a lawyer's best friend. A tidy virtual and physical work environment enables you to work efficiently. Well-managed time results in ...

8:19 AM · Nov 4, 2022 · Agorapulse app

---

**State Bar of Wisconsin**
@StateBarofWI

What better way to kick off National Pro Bono Week than by recognizing Maggie Niebler-Brown, our 2022 Pro Bono Attorney of the Year! 🏆🏆

#wisconsinlawyer #wisconsinlaw #wisbar #probono #probonoweek #celebrateprobono



---

**State Bar of Wisconsin**
@StateBarofWI

It is important that employers ensure workplaces are inclusive of neurodiverse and ability diverse employees. Here are some best practices.

✏️ By Catarina Colón, @HuschBlackwell
#wisconsinlawyer #wisconsinlaw



wisbar.org
Creating Inclusive Workplaces for Neurodivergent and Employees with Disabiliti...
It is important that employers ensure workplaces are inclusive of neurodiverse and ability diverse employees. Catarina Colón offers tips on best practices to ...

# LinkedIn

*Posts and metrics from Sept. 4 – Nov. 17, 2022  (compared to period prior)*

 Followers

## 5.5K

○ 3.7%

 Engagement

## 9.7K

○ 11.1%     See section

 Impressions

## 116K

○ -19%     See section



**State Bar of Wisconsin** ✕
5,543 followers
1mo · 🌐

"During this Hispanic Heritage Month, I want to remind my Latine colleagues and peers that we are deserving of our accomplishments and that we are valuable. There will be times when fear and imposter syndrome might overwhelm you and cause you to close doors on yourself. Even now, there are moments when I doubt my skills and abilities, and when I fear that I will not live up to the expectations of my colleagues.

But when such feelings start to resurface, we must remind ourselves that our place in the legal field serves a much broader purpose. Becoming an attorney means that we are fulfilling our parents' dreams by taking advantage of an education and a life that they could only dream of and that the many heartbreaking sacrifices that we and our families made were worthwhile. It means that Spanish speakers will have access to legal support that previously was not obtainable for them. Finally, it means that we may serve as mentors and guides, which many of us lacked, for

---

**State Bar of Wisconsin**  ...
5,543 followers
2mo · 🌐

Congratulations! Welcome to these new lawyers, including those who passed the Wisconsin Bar Exam in July 2022. Some are just beginning their careers in law, and others are finding new opportunities in Wisconsin. Read more https://lnkd.in/g7ha9TTQ.

👏If you attended the ceremony, please like and share these photos!

🎉New lawyers: As you begin your career, we hope you'll continue engaging with your State Bar of Wisconsin. We have a ton of resources available for young lawyers. Info at https://lnkd.in/gPBCir7F. Best wishes!

📷More photos from each admissions group on our Facebook page.

#wisconsinlawyer #wisconsinlaw #wisbar

 

---

**State Bar of Wisconsin**  ...
5,543 followers
1mo · 🌐

The suicide by the beauty queen, attorney, and TV star is a reminder that "the way that someone appears in public or in their professional life doesn't reflect the whole of their functioning."

🆘If you or someone you know is struggling, the Wisconsin Lawyers Assistance Program is here for you. Contact us for a free, confidential consultation: (800) 543-2625. Learn more at www.wisbar.org/wislap.

📞We can all help prevent suicide. Call or text 988 to reach the suicide & crisis lifeline for free, confidential support any time, any day.

#wisconsinlawyer #wisconsinlaw #wisbar #lawyerwellbeing



The Dazzling Life and Shocking Death of Cheslie Kryst
nytimes.com · 8 min read

Case 2:23-cv-01697   Filed 12/19/23   Page 140 of 258   Document 1-1

# Instagram

Posts and metrics from Sept. 4 – Nov. 17, 2022  (compared to period prior)



Case 2:23-cv-01697   Filed 12/19/23   Page 141 of 258   Document 1-1

# Larry is on Twitter!

*Larry Martin is actively engaging with members and thought-leaders on Twitter (@LarryJMartinED). Connect with him! A selection of his recent tweets are below.*

 **Larry J. Martin** @LarryJMartinED · Nov 8
Ending our @StateBarofWI Northern tour in Merrill with members of the Lincoln Co. Bar Association. We continue to hear of both the great career and life style opportunities practicing in WI's rural communities. Thanks to all our members who joined us along the way!



 **Larry J. Martin** @LarryJMartinED · Oct 3
Wisconsin's legal community mourns the loss of a great lawyer, but even greater friend. Mike May epitomized the best of the legal profession & will be deeply missed. @StateBarofWI @BoardmanClark @CityofMadison @Practice411 @mulaw @WisconsinLaw @SBWRotundaRpt



 **Larry J. Martin** @LarryJMartinED · Sep 30
Proud to count Felicia as a leader @StateBarofWI !

 **Odalo J. Ohiku** @OdaloJOhiku · Sep 28
Ohiku Law Office's newest attorney Felicia Owen writes about structural racism in Wisconsin law & the detriment of a felony conviction. It is her passion as an attorney to help break down the barriers in Wisconsin that hold communities of color back. #lawyer #racism #Wisconsin



 **Larry J. Martin** @LarryJMartinED · Oct 14
Out in Arlington VA for meetings & programming with @StateBarofWI Non Resident Lawyers Board. A great group of Bar leaders! @erikguenther @marghick_hickey @eskelchen @AttyWiseman



 **Larry J. Martin** @LarryJMartinED · Oct 28
Great AG debate last night @StateBarofWI Thanks to our partners @WISCTV_News3 & @wispolitics and to the candidates!

**State Bar of Wisconsin** @StateBarofWI · Oct 27
The State Bar of Wisconsin hosted the live debate between Wisconsin Attorney General election candidates Josh Kaul and Eric Toney Oct. 27 at the State Bar Center, partnering with WisPolitics and Wisc-TV. Watch now, youtube.com/watch?v=wEre19...

Case 2:23-cv-01697   Filed 12/19/23   Page 142 of 258   Document 1-1

**Law School**

University of Wisconsin–Madison (https://web.archive.org/web/20231003171929/https://law.wisc.edu/)

# A Tradition of Diversity, Inclusion and Equity

At the University of Wisconsin Law School, we don't just talk about diversity – we do all we can to create a more diverse and inclusive community dedicated to the pursuit of equal justice under law. We believe law schools have a responsibility to create a learning environment where every student feels safe, valued, respected and heard; and we recognize our unique role in working to end systemic inequalities.

These ideals have long been reflected in our actions. We recruit students from all over the country and from all backgrounds. We look for variety among our admitted students because we believe it makes for a robust and exciting learning environment. We look for students with different life experiences, socio–economic backgrounds, professional experiences and professional goals. We want all kinds of students who can represent a variety of viewpoints. And we strive to make sure that everyone who's a part of the Law School feels that they belong here.

We have a top–notch faculty (/web/20231003171929/https://law.wisc.edu/faculty/index.html), an award–winning facility (https://web.archive.org/web/20231003171929/https://map.wisc.edu/s/dkb67z4), and an impressive curriculum (curriculum.htm), and like other first–tier law schools we offer superb academic and career opportunities. But we are also different from many other law schools because we have a strong history of recruiting, supporting and graduating students of color. We have graduated over 1,500 lawyers of color, and we're committed to our tradition of diversity.

Diversity, equity and inclusion are at the heart of all we do. Let us share some of the ways in which we bring these core values to life.

## For us, advancing equal opportunity and access is not new

Diversity and equal access to legal education have a long tradition at the University of Wisconsin Law School. The first African–American student was admitted in 1875; the first woman graduated in 1885. The Law School's Legal Education Opportunities (LEO) Program (https://web.archive.org/web/20231003171929/http://www.law.wisc.edu/leo/) have long been national models for recruiting students from historically under–represented communities and supporting their success throughout their three years in law school.

Since 1973, the Law School through its Hastie Fellowship Program (https://web.archive.org/web/20231003171929/https://law.wisc.edu/grad/fellow_hastie.htm) has been a leader in guiding and increasing opportunities for lawyers of color to become law professors. Graduates of the program have gone on to prominence as legal educators at law schools around the country, including our own.

We are proud of this tradition, but we're not resting on our laurels. We're looking to the future by welcoming highly qualified candidates like you into our community, ensuring that you thrive in law school, and preparing you for a rewarding legal career.

## Our commitment to students of color can be seen in our numbers

UW Law School has made significant contributions toward diversifying the legal profession nationally. We have graduated more than 1,500 students of color, a proud group of prominent alumni who are increasingly active in their service to the Law School and its students. Access is something we take very seriously which includes first generation students and students who come from challenging socioeconomic backgrounds.

Students of color currently make up more than 20 percent of our student body. As a national law school, we recruit students from across the country and our current students represent more than 30 states. The faculty also reflects diversity in race, sexual orientation, gender identity, religion, beliefs, ideas, and national origin. We have a national reputation for valuing diversity, equity and inclusion, and we are committed to maintaining it.

## Our financial commitment reflects our priorities

Compared to our peer schools, the outstanding education we offer at UW Law School is affordable. Our tuition is lower than our peer schools, and the cost of living in Madison is reasonable as well.

But beyond these financial advantages, we also have made a financial commitment to positioning diverse students to go on to successful legal careers without the burden of excessive debt. We recruit top students and minimize the financial burdens of a legal education through scholarships, and our average debt is well below the national law school average and consistently the lowest among Big Ten schools. We assist students who show financial need, and we offer scholarships to attract students who bring academic and other strengths to the Law School. The LEO Enrichment Fund, an annual campaign among our alumni of color, is just one sources of financial support for our diverse students.

**Exhibit 17**

## A community of support

Our students of color have a supportive community at the Law School. Specific diversity-focused student organizations actively provide personal, academic and career support for their members. In addition, the Legal Education Opportunity (LEO) Program, a student-organized umbrella organization that collectively represents, supports, and helps all students of color, offers a warm and welcoming environment for students.

The UW Law School faculty and administration also are actively involved with our students of color, and they are dedicated to their success. Our diverse faculty members reflect shared experiences with law students of color, and along with their colleagues, are there with support and encouragement.

## LEO Program

The Legal Education Opportunities (LEO) Program (https://web.archive.org/web/20231003171929/http://www.law.wisc.edu/leo/) is designed to bring the UW Law School's students of color and their supporters together as a single community. LEO provides a strong academic and social support network, helps students of color get the legal skills they need, promotes diversity, and recruits students from groups that have been historically disadvantaged. LEO serves as a communication mechanism, influences policy decisions important to students of color, and sponsors an orientation for all first-year students. Each spring, LEO organizes an impressive banquet bringing together LEO alumni and celebrating the successes of our students of color.

In addition to LEO, there are five specific constituent law student associations representing Black, Asian American, Latinx, Middle Eastern and Indigenous law students. They are active, vital organizations. Each group provides academic, social and cultural support for its own members and assists in recruiting and retaining students. Each also encourages student involvement and leadership and provides networking and career opportunities.

Beyond the support systems available through the LEO Program, there are additional unique programs that serve our students of color and the broader Law School community These programs and events heighten awareness around diversity, provide educational and practical training and celebrate the deep commitment the school and these groups have towards diversifying the practice of law.

**The Diversity Clerkship Program**, a Wisconsin State Bar sponsored program (https://web.archive.org/web/20231003171929/http://www.wisbar.org/aboutus/forlawstudents/pages/diversity-program.aspx), offers an opportunity for first-year students from historically underrepresented groups to have summer employment in high-quality legal settings. The clerkship program places students in private firms, corporate legal departments, and government agencies. The experience, feedback and real-world setting give students a way to explore their career choices and expand their options.

## Law-in-action approach

Top students are drawn to the UW Law School because of its tradition of excellence, but it is the law-in-action (https://web.archive.org/web/20231003171929/http://law.wisc.edu/law-in-action/index.html) philosophy and interdisciplinary opportunities that make Wisconsin one of the most intellectually exciting law schools in the country. The UW Law School's law-in-action tradition differentiates it from other law schools. The UW Law School pioneered the belief that law must be studied in action as it relates to society and not in isolation.

The Law School focuses on helping its students understand how law both affects and is affected by every other institutional force in society. The Law School does this in its classrooms, in its many clinical programs, and in its numerous collaborations among departments and colleges at one of the world's leading universities.

## Our vision for the future

We are devoted to diversity, inclusion and equity in everything we do. We will continue to ensure they remain key components of our future as we assess our institutional needs and resources and update our strategic plan. We know there is more work to be done, and we stand ready for that mission.

Diversity, equity, and inclusion are essential components of excellence in legal education. They create a broadening, more stimulating, and thought-provoking environment for everyone; enhance our students' ability to see problems from different perspectives; teach students how to represent clients who are different from them; and prepare students to succeed in the increasingly diverse world in which they will practice.

At UW Law, we are committed to continuing and improving on our tradition of recruiting talented students of color and providing academic support to ensure success during and after law school. We'll continue to prioritize recruiting and retaining a diverse faculty and staff, while seeking to mobilize our community to confront systemic inequality and advance racial justice.

For more information about our diversity programs, contact us at admissions@law.wisc.edu (https://web.archive.org/web/20231003171929/mailto:admissions@law.wisc.edu)

🔒 (https://web.archive.org/web/20231003171929/http://dev.law.wisc.edu/lawcms/edit.php?iPageID=2522&iRevID=)

The Wayback Machine – https://web.archive.org/web/20231003172256/https://captimes.com/news/local/neighborh…

https://captimes.com/news/local/neighborhoods/long-running-program-places-diverse-law-students-in-prestigious-summer-jobs/article_6b90ff28-de45-5e27-a59c-736e6f515167.html

# Long-running program places diverse law students in prestigious summer jobs

**By Natalie Yahr**

Jul 22, 2019



*Thirteen of the 19 2019 Diversity Clerkship participants pose for a group photo at a celebration of their accomplishments held at the State Bar of Wisconsin.*

NATALIE YAHR

Exhibit 18

Case 2:23-cv-01697 · Filed 12/19/23 · Page 145 of 258 · Document 1-1

When Brittani Miller enrolled at the University of Wisconsin Law School, she was arguably a step ahead of other future lawyers. As a paralegal in the U.S. Air Force, she worked closely with lawyers for four years, and she'd begun to do work beyond the usual paralegal tasks.

But for students of color, entering the underlined disproportionately white legal profession can be daunting no matter how much experience they have.

"When you look at walls of people and their pictures and nobody looks like you, it's intimidating," said Miller, who is African American and recently completed her first year of law school.

As of 2017, only 5% of active attorneys identified as black, 5% as Hispanic or Latino, 2% as Asian and 1% as Native American, according to the American Bar Association's National Lawyer Population Survey.

Enter the State Bar of Wisconsin's Diversity Clerkship, which offers students the chance to follow their first year of law school with paid summer positions at private law firms, corporate legal departments and governmental agencies. The students are selected through a competitive process and then matched with employers with whom they work for 10 weeks. Their responsibilities can range from attending client meetings to reviewing and revising contracts. Since the program began in 1992, nearly 500 students have participated.

Case 2:23-cv-01697   Filed 12/19/23   Page 146 of 258   Document 1-1

The current cohort consists of 19 students of varied ethnicities, race, sexual orientation and socioeconomic backgrounds, said Bryant Park, diversity and inclusion outreach coordinator for the State Bar at a gathering last week to celebrate the 2019 clerks.

Miller, who was placed at Alliant Energy Corporation, said it's rare for first-year students to have the chance to clerk.

"Being able to get into some of the firms and corporations as a brand new… law student is really awesome," she said, and it lets her see what kind of work she might like to do in the future.

But the positions offer more than work experience. It's a chance to see "that you can be helpful, you are absolutely wanted in these careers, and here are all the people who don't look like you but they're going to help you get there," Miller said, noting the support she's found on the job. "They might not look like you, but they're definitely behind you 100%."

As clerks, the students take on challenges they haven't encountered in the classroom. On her second day on the job, UW Law student Lo Nelson, who clerks for health care insurance company Quartz Health Solutions, Inc., was told to check for compliance between a Quartz document and a document of one of the company's vendors.

"I was like, 'OK, yeah. Yeah, definitely,'" Nelson said, though she had done nothing quite like that in her law school contracts course. "I was reading HIPAA for the next three to four days and understanding what the federal regulations required," Nelson

Case 2:23-cv-01697   Filed 12/19/23   Page 147 of 258   Document 1-1

said, and she found and helped correct a discrepancy. The task was daunting,"but that's what I'm there to do, and now I can say that I can read regulations," she said.

Nelson, who is African American, said she applied to the Diversity Clerkship program because she's "a visible racial minority."

"I wanted to be in a program that would be accepting of that and wouldn't be shocked and would be willing to create a culturally competent environment so that I can be successful with my legal career," Nelson said.

Some of this year's clerks grew up in rural areas "where lawyers are sorely needed," according to the State Bar. One of them is Forrest Gauthier, a member of the Menominee Indian Tribe of Wisconsin who grew up on the tribe's reservation. A first-generation college student, Gauthier said he hadn't planned to continue his education beyond college.

He changed his mind about a year after his graduation as he recognized how policies like the Termination Act of 1953, which disbanded Native American tribes and allowed their land to be sold, had affected his community. Before Termination, Gauthier said, his tribe was one of the wealthiest in the nation. "It devastated my tribe from all aspects across the board, from health to the economy to culture," Gauthier said. "We have never recovered."

"That kind of was always in the back of my mind (but) I didn't really realize it until later on in life," Gauthier said. "I don't want something like that to happen again to my community or other communities like mine."

He had done other work, like obesity prevention, before returning to law school.

"It was going places, but it wasn't the kind of change I wanted," Gauthier said. "The best way that I thought I could help remedy those issues was by going into law and looking at it from a law perspective."

Now, having completed his first year at UW-Madison Law, Gauthier clerks at Boardman & Clark LLP. He said he didn't know what to expect in the role but has found the environment welcoming. "They were very supportive and very open-door," he said, adding that many lawyers came to introduce themselves to him to "to ease (him) into the firm." As a clerk, he's been writing memos and shadowing lawyers' meetings, and he may later learn to do mediations.

Other clerks came from other countries to study law in Wisconsin. UW law student Rongyi Lin, who lived in China until last year, hopes to become a business lawyer for an American firm, whether in the U.S. or in Asia. He now clerks at the Milwaukee City Attorney's Office, where he conducts legal research, observes hearings and drafts documents. He's been happy in his post, where he says staff are willing to help him and keep him busy.

It's Lin's first internship in the U.S., which he applied for after hearing recommendations from others in an association for Asian students. "Each of them told me it's a great experience, so I have no reason to give up this opportunity," Lin said.

It's not just the students who benefit. Christopher Hughes, a managing partner at Madison-based law firm Stafford Rosenbaum LLP, said the program consistently provides high-caliber employees.

"Every year I'm blown away by how good they are," Hughes said. "I wouldn't want to be a law student competing with the group that comes through this program by any means."

At Thursday's event, the State Bar recognized Stafford for having participated as a Diversity Clerkship employer for 20 years. Hughes said the clerkship plays a key role in Stafford's diversity and inclusion efforts, "but I think there's really a lot more we need to do."

One step, he said, is building cultural competency among the firm's current staff. The firm now requires its lawyers to complete at least one credit of diversity and inclusion continuing education each year. Additionally, to reduce barriers to participation, the firm now offers some of those trainings in-house and allows lawyers to list up to 20 hours of diversity and inclusion work, whether in training or at other events, as billable hours.

As far as actually diversifying the staff, he said, "I think our strategy is really long-term."

"We have to start making inroads and getting to know people as law students and hopefully they'll get to know us through the clerkship program or otherwise," Hughes said. "And then ultimately, if they like who we are, they'll want to join us as

Case 2:23-cv-01697    Filed 12/19/23    Page 150 of 258    Document 1-1

attorneys."

---

Case 2:23-cv-01697 · Filed 12/19/23 · Page 151 of 258 · Document 1-1

To:     Dean Tokaji
From:   Emily Kite and Michael States
Date:   October 3, 2023
Re:     Diversity Clerkship Program

There have been complaints from University of Wisconsin Law faculty and students regarding the State Bar of Wisconsin Diversity Clerkship Program (DCP).  Complaints mainly have been about the application and selection process, and those who are ultimately selected to participate in the program.

**Application process**:

Both the application form and the interview process are problematic for our students of color who participate in the process.  The personal statement that is a required part of the application states that, "the personal statement is an extremely important factor in the selection process and should reflect how an applicant has:

- Been affected by diversity
- Contributed to diversity, and/or
- Hopes to contribute to diversity in the future."

The first bullet point and the subsequent interviews that students participate in often lead them to feel as if they must share more to be competitive.  They have described this as "trading in trauma."  If the DCP had better messaging about what they would like to see in the personal statement, students would feel less exposed when writing the statement.

**Interview process**:

The interviewers don't seem to have uniform level of skill or preparation at both the screening and employer interview stages. A common complaint is that students of color have expressed that they are being asked different questions than their white counterparts are. For example, being asked, "what's the hardest thing you've had to overcome?" And then the interviewer showing disappointment when the answer isn't "bad enough. Students of color have reported being asked about their diversity when white students have not."  It would make sense that all the students be asked the same questions in their interviews to compare them more fairly.  A possible solution might be to create a list of questions that every student would be asked.

Other interviewing concerns:

- A student was asked intrusive questions about the interplay between disability and students' ability to be a zealous advocate for their client.

- Pigeon-holing students as being interested in social justice because of their diverse identities. Many students who are interested in business, corporate, or other areas of law, are rightly offended by this.

**Commitment stage**:

<span style="color:red">Exhibit 18A</span>

Students dislike the requirement to commit to the program before the employer interview stage and before they know where they will be placed. Students also complained about the quick turnaround between offers and the decision deadline. We have heard that some employers are also dissatisfied with the matching process.

- Emily spoke to a colleague at Minnesota Law. The colleague said that there are two Twin Cities diversity programs for 1Ls. The Hennepin County program is essentially the same as DCP, open only to the Minnesota Law Schools. The Twin Cities Diversity in Practice Program, on the other hand, acts as pipeline for applications, but students apply for specific firms and meet those firms' application specifications. There is an overall deadline, but firms can interview and hire on a rolling basis. It seems as most law firms in the Twin Cities are opting for the TCDIP program – it has much more robust participation.

- Michael spoke to colleagues at Moritz College of Law, the Columbus DCP is different in that it is restricted to racial and ethnic minorities.  They are reviewing the language of that program because some firms are stating they will have to leave if they don't.  However, the larger firms left the DCP long ago because of being dissatisfied with the matching process.

**Timeline of DCP**

This year the applications will open on October 24th. Info session is on October 25th here at the Law School.

The deadline for the applications is January 11th.

Mid- to late-January, all students who applied typically have a screening interview. Based on the screening interview and applications, finalists are selected – the same number of finalists as there are spots available in the DCP. Students must accept a position with the Program before proceeding with employer interviews. This year students were given a <u>very</u> short window in which to accept their offer.

All students who accept an offer proceed to employer interviews and following the interviews there is a matching process.

**Demographic data**

For the summer of 2023, two of five Black students, one of two Native American students, four of six Asian Pacific Desi American students, and seven of seven Hispanic/Latinx students from Wisconsin Law who applied were accepted into the program.  These ratios were determined from the list of students who applied through Symplicity for DCP and the students that the bar informed us were chosen to participate in DCP. Neither of these lists included race or ethnicity, I researched that on my own.

There are other complaints, but these are the ones that come up most often.  If you need any additional information, please let us know.

2



## STATE BAR OF WISCONSIN
*Your Practice. Our Purpose.*®

# Employer Description Form
◄ ◄ ◄ ◄ ◄ ◄ ◄ ◄ for the ► ► ► ► ► ► ► ► ►

### 2022 Diversity Clerkship Program

> *Please complete the following information about
> your firm, corporation or government agency.
> We will distribute the completed forms to the student
> applicants.*
> **Please return by Friday, February 4, 2022.**

NAME OF EMPLOYER:    Dane County Corporation Counsel

ADDRESS:    210 Martin Luther King Jr. Blvd., Room 419, Madison WI 53703

PHONE NO.:    608-266-4355

FAX NO.:    608-267-2504

WEBSITE:    https://corpcnsl.countyofdane.com/

OTHER OFFICES:    None

HIRING ATTORNEY:    Eve Dorman

RECRUITING CONTACT:    Eve Dorman

**BRIEF DESCRIPTION OF FIRM, CORPORATION, OR GOVERNMENT AGENCY:** The Dane County
Corporation Counsel, with a number of deputies and assistants, represents the legal interests and
provides advice and counsel to all county agencies, elected officials, and county board
supervisors.

**PRIMARY AREAS OF PRACTICE:** Child welfare; child support; mental commitments; employee
relations; zoning, planning and land use, ordinance enforcement;

**NARRATIVE – COMMITMENT TO EQUITY & INCLUSION:** As an employer, we strive to provide a
work environment where diversity and differing opinions are valued, creativity is encouraged,

<span style="color:red">**Exhibit 19**</span>

continuous learning and improvement are fostered, teamwork and open/honest communication are encouraged, and meeting customer needs through quality service is a shared goal. All employees must be able to demonstrate multicultural competence – the awareness, knowledge, and skills needed to work with others who are culturally different from self in meaningful, relevant, and productive ways. Applicants from traditionally underrepresented populations including women and racial and ethnic minorities are especially encouraged to apply.

**TRAINING:** There is not currently a formal training process for Summer Clerks, due to the immediate nature of the work. We anticipate that students will be asked to shadow attorneys to substantive meetings, court hearings and administrative proceedings. Students may be asked to research and write a short memo regarding a discrete legal issue or topic, prepare pleadings, review/summarize case information and other tasks as assigned. Students will be encouraged to ask questions and submit any written work for review and critique.

**PRO BONO / COMMUNITY INVOLVEMENT:** The office does not engage in pro bono work as part of its mission, but is fully dedicated to its mission of providing guidance and support to the agencies providing services to the Dane County community.

**CLERKSHIP DESCRIPTION:** The successful candidate will have the opportunity to work in each division of the Office of Corporation Counsel. They are the Permanency Planning Division, the Child Support Agency and the General Civil Unit Division. In Permanency Planning, the candidate will shadow attorneys in court proceedings, participate in discussions of litigation strategy, and assist in trial preparation. In the Child Support agency, the candidate will experience how a child support case gets from referral to disposition by participating in Dane County Child Support Agency's walk-a-mile with child support case workers, legal support staff, and attorneys. In the General Civil Unit, the candidate will assist with drafting legal opinions, conduct legal research and participate in various legal proceedings.

**DESCRIBE YOUR CLERKSHIP WORK ASSIGNMENT PROCESS:** Work will be assigned with two objectives in mind: maximizing the student's exposure to a broad range of issues and addressing real time needs within the office. Assignments will be made ad hoc by attorneys within the division to which the student is currently assigned. Concerns with workload or prioritizing tasks will be resolved by Eve Dorman.

**SUCCESSFUL CANDIDATE QUALITIES FOR YOUR ORGANIZATION:** We are looking for candidates who are or may be interested in public service and local government work; who have excellent oral and written communication skills, who can take initiative to identify issues and ask questions as needed.

**SUMMER CLERKSHIP SALARY AND BENEFITS:** $18.50/hour, unpaid time off as arranged with the office.

**WILL THE CLERKSHIP STUDENT BE CONSIDERED FOR AN OFFER TO RETURN FOR A SECOND YEAR CLERKSHIP?** Students may be referred to the UW Law School Government & Legislative Clinic for 2L or 3L externships for credits

**ANY ADDITIONAL INFORMATION YOU WOULD LIKE TO PROVIDE TO CLERKSHIP STUDENTS:**

**WEBLINK TO YOUR EMPLOYEE RECRUITING MATERIALS:**

**Pierson, Melinda**

| | |
|---|---|
| **From:** | Gault, David |
| **Sent:** | Thursday, September 14, 2023 3:40 PM |
| **To:** | Pierson, Melinda |
| **Subject:** | FW: 2023 Diversity Clerkship Program Interview Information |

David R. Gault
Deputy Corporation Counsel
Dane County Corporation Counsel Office
Room 419, City-County Building
210 Martin Luther King, Jr. Blvd.
Madison, WI 53703
(608) 266-4355 Office
(608) 219-1055 Cell

*NOTICE: CONFIDENTIAL LEGAL COMMUNICATION:* The contents of this communication may be subject to the attorney-client privilege and should not be released under an open records request or otherwise without first consulting with legal counsel.

**From:** Pabellon, Carlos <Pabellon@countyofdane.com>
**Sent:** Thursday, February 16, 2023 12:21 PM
**To:** Dorman, Eve <Dorman@countyofdane.com>; Gault, David <Gault@countyofdane.com>
**Cc:** Yang, Vue <Yang.Vue@countyofdane.com>; Pierson, Melinda <pierson.melinda@countyofdane.com>
**Subject:** RE: 2023 Diversity Clerkship Program Interview Information

Eve's a 100% correct on this… we really can't expect much from these students other than their earnestness to get a job in a government agency in Madison for the Summer.

Personally, I just asked our one standard question and then I had them ask me any questions. If the 15 minutes were more than enough, I usually said my thanks and moved on.

To the extent we ask any additional questions, we just to make sure everyone is asking the same ones if they will be used in our evaluation.

**From:** Dorman, Eve <Dorman@countyofdane.com>
**Sent:** Thursday, February 16, 2023 12:11 PM
**To:** Gault, David <Gault@countyofdane.com>
**Cc:** Yang, Vue <Yang.Vue@countyofdane.com>; Pabellon, Carlos <Pabellon@countyofdane.com>; Pierson, Melinda <pierson.melinda@countyofdane.com>
**Subject:** RE: 2023 Diversity Clerkship Program Interview Information

What I believe we are hoping for out of this is to use it as a chance to have more minority candidates be aware of the opportunities that exist in local government/Dane County so we have more hope of drawing a diverse candidate pool when we recruit for future openings.

We don't really expect to get a ton of work product out of any of these students. They are 1Ls (although the resumes I've looked at always impress me) Last year we set the opportunity up as a review of the various areas we practice in. 2-3 weeks with civil (mostly Carlos) 2-3 weeks with Perm Planning, and 1-2 weeks in Ch Supp, though I think that was broken up into various days and half days. That way they got a dabble in everything we do, see how lawyers directly impact the lives of citizens and why that is important.

So I think their goals could be important, but many of them don't entirely know their goals yet. And our goal is less about finding the perfect fit for us, but more about raising our profile among potential minority candidates.

Let me know if I've missed the boat here....

**From:** Gault, David <Gault@countyofdane.com>
**Sent:** Thursday, February 16, 2023 11:58 AM
**To:** Dorman, Eve <Dorman@countyofdane.com>
**Cc:** Yang, Vue <Yang.Vue@countyofdane.com>; Pabellon, Carlos <Pabellon@countyofdane.com>; Pierson, Melinda <pierson.melinda@countyofdane.com>
**Subject:** Re: 2023 Diversity Clerkship Program Interview Information

Perhaps I'm missing the goal on this

David R. Gault
Deputy Corporation Counsel
(608) 261-9703 office
(608)219-1055 cell

Sent from my iPhone

On Feb 16, 2023, at 11:56 AM, Dorman, Eve <Dorman@countyofdane.com> wrote:

Not really – those are kind of hand selected for me by the program.

I usually start off by asking them what they know about us or what questions they have about our work. Since most people seem to barely know we exist. And some people think we do business law. Though not so many anymore.

**From:** Yang, Vue <Yang.Vue@countyofdane.com>
**Sent:** Thursday, February 16, 2023 11:54 AM
**To:** Dorman, Eve <Dorman@countyofdane.com>; Pabellon, Carlos <Pabellon@countyofdane.com>; Gault, David <Gault@countyofdane.com>; Pierson, Melinda <pierson.melinda@countyofdane.com>
**Subject:** RE: 2023 Diversity Clerkship Program Interview Information

For me, there were some students that did take took the whole 15 mins to answer the question and others that had time left over. I would not be opposed to maybe having a second question on hand. Were there questions you used for students you got from the government internship?

**Ms. Vue Yang**
Legal Director
Dane County Child Support Agency

2

**Pierson, Melinda**

| | |
|---|---|
| **From:** | Pabellon, Carlos |
| **Sent:** | Wednesday, February 23, 2022 8:20 AM |
| **To:** | Yang, Vue; Dorman, Eve; Pierson, Melinda |
| **Subject:** | RE: Next Steps - Diversity Clerkship |

Good question... I checked and it says 2.24, but I thought I saw a later date. I will double check.

**From:** Yang, Vue <Yang.Vue@countyofdane.com>
**Sent:** Wednesday, February 23, 2022 8:19 AM
**To:** Pabellon, Carlos <Pabellon@countyofdane.com>; Dorman, Eve <Dorman@countyofdane.com>; Pierson, Melinda <pierson.melinda@countyofdane.com>
**Subject:** RE: Next Steps - Diversity Clerkship

Do we have a deadline to submit our rankings?

Ms. Vue Yang
Legal Director
Dane County Child Support Agency
210 Martin Luther King, Jr. Blvd
Madison, WI 53703
608-266-4031

**From:** Pabellon, Carlos <Pabellon@countyofdane.com>
**Sent:** Wednesday, February 23, 2022 8:02 AM
**To:** Dorman, Eve <Dorman@countyofdane.com>; Yang, Vue <Yang.Vue@countyofdane.com>; Pierson, Melinda <pierson.melinda@countyofdane.com>
**Subject:** RE: Next Steps - Diversity Clerkship

That's fine. We're set to meet on Monday and can discuss it then.

**From:** Dorman, Eve <Dorman@countyofdane.com>
**Sent:** Wednesday, February 23, 2022 8:01 AM
**To:** Yang, Vue <Yang.Vue@countyofdane.com>; Pierson, Melinda <pierson.melinda@countyofdane.com>; Pabellon, Carlos <Pabellon@countyofdane.com>
**Subject:** RE: Next Steps - Diversity Clerkship

I think I would like to chat at least briefly about these guys, just to think through some things i.e. my top guy is probably going to be wanted by a lot of people, my 4s were good too but maybe didn't interview quite as well. And one of my people I really liked is the same 20-something white woman that I always like.

Eve M. Dorman (she/her/hers)
Legal Director for Permanency Planning
Room 419 City County Building
210 Martin Luther King Jr. Blvd.
Madison, WI 53703
608-266-9005
608-267-2504 (fax)

<span style="color:red">Exhibit 21</span>

1

**To:** Dorman, Eve <Dorman@countyofdane.com>
**Subject:** RE: UW Law - Corp Counsel Presentation

Hi Eve,

Thank you for your quick response.

I will certainly reach out to the LEO groups and SLOG to see if they are interested in connecting with you for a potential event this fall semester. Please note that I know many student orgs are in the process of voting and transitioning to their new board so their response may not be prompt. However, I will keep you updated as they become available.

Wonderful to hear that you were successful placing students through clinics and through the Public Interest Interview Program. We will continue to keep you on your invitation list for the 2022 WI Public Interest Interview Program once dates are finalized.

Hope to get back to you soon once I hear a response from the LEO groups and SLOG.

Enjoy the rest of your week!

*Bryant Park*

Bryant Park, J.D.
(He/him/his)
Employer Relations and Diversity Initiatives Coordinator
University of Wisconsin Law School
bryant.park@wisc.edu
608.890.3427



**From:** Dorman, Eve <Dorman@countyofdane.com>
**Sent:** Tuesday, September 21, 2021 7:50 PM
**To:** Bryant Park <bryant.park@wisc.edu>
**Subject:** RE: UW Law - Corp Counsel Presentation

Hi Bryant,

Thank you for this information! A big part of our interest in reaching out is to encourage more minority law students to pursue careers in local government law. I think offering the opportunity to the BLSA, LLSA, ALSA and ILSA as well as SLOG would be great! If any of them are interested, you can have them reach out to me directly so we can set something up. I would also take you up on the offer to market any such events through your various avenues.

I had not known about the mentoring opportunity, but very few of our attorneys are actually UW

<span style="color:red">Exhibit 22</span>

Law grads….

I have already participated in the Public Interest Law interviews and have gotten connected with several good candidates. I also have a relationship with Erin McBride and we serve as one of her placement options for students in the Government and Legislative Clinic. That has also been very successful.

Let me know if you can reach out to the organizations I noted above or if I can offer any further information as you do.

Thanks again, I look forward to working with you!

Eve

Eve M. Dorman (she/her/hers)
Legal Director for Permanency Planning
Room 419 City County Building
210 Martin Luther King Jr. Blvd.
Madison, WI 53703
608-266-9005
608-267-2504 (fax)
NOTICE: CONFIDENTIAL LEGAL ADVICE. This message is intended only for the person to whom it is addressed and may contain legally privileged or confidential information. If you are not the intended recipient, you may not use, read, copy, distribute or disclose this message or its attachments. If you have received this message in error, please notify us and delete all copies of the message and attachments immediately. Notification to DCDHS recipients: This communication should NOT be released under an open records request or otherwise without first consulting with legal counsel. This communication is NOT part of the Dane County Department of Human Services file.

**From:** Bryant Park <bryant.park@wisc.edu>
**Sent:** Tuesday, September 21, 2021 9:54 AM
**To:** Dorman, Eve <Dorman@countyofdane.com>
**Subject:** UW Law - Corp Counsel Presentation

CAUTION: External Email - Beware of unknown links and attachments. Contact Helpdesk at 266-4440 if unsure

Good morning Eve,

I am the Employer Relations & Diversity Initiatives Coordinator at UW Law.
Thank you for reaching out to us about organizing a presentation to UW law students regarding working and interning with the Dane County Corporation Counsel during this fall semester. There are a couple ways to proceed with this presentation.
First, we can certainly coordinate with you to setup your presentation and market it to UW law students through our weekly general and diversity newsletters, and share it with our

| | |
|---|---|
| **From:** | Dorman, Eve |
| **To:** | Pabellon, Carlos |
| **Cc:** | Pierson, Melinda |
| **Subject:** | FW: UW Law - Corp Counsel Presentation URGENT |
| **Date:** | Friday, October 15, 2021 2:05:33 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image004.png |

Hey there,

This is where I am on my attempt to do presentation for the special interest law student groups on campus. They can have me come in over the noon hour next month 11/2 or 11/17. It will be marketed for everyone with special outreach to the minority law student groups. With what we have talked about in M-Team, I envision this as being an opportunity to develop interest in our externship in Perm Planning among more students of color. The Diversity Clerkship is the shorter summer session.

The question for you is – is there any way we could fund providing lunch other than out of my own pocket? Not a deal-breaker, just asking.

Thanks,
Eve

Eve M. Dorman (she/her/hers)
Legal Director for Permanency Planning
Room 419 City County Building
210 Martin Luther King Jr. Blvd.
Madison, WI 53703
608-266-9005
608-267-2504 (fax)
NOTICE: CONFIDENTIAL LEGAL ADVICE. This message is intended only for the person to whom it is addressed and may contain legally privileged or confidential information. If you are not the intended recipient, you may not use, read, copy, distribute or disclose this message or its attachments. If you have received this message in error, please notify us and delete all copies of the message and attachments immediately. Notification to DCDHS recipients: This communication should NOT be released under an open records request or otherwise without first consulting with legal counsel. This communication is NOT part of the Dane County Department of Human Services file.

**From:** Bryant Park <bryant.park@wisc.edu>
**Sent:** Thursday, October 14, 2021 4:07 PM
**To:** Dorman, Eve <Dorman@countyofdane.com>
**Subject:** RE: UW Law - Corp Counsel Presentation

Hi Eve,

Hope you are having a nice week.

<span style="color:red">**Exhibit 23**</span>

The Wayback Machine - https://web.archive.org/web/20231003173315/https://www.hallrender.com/about-us/di...



MENU

# Diversity, Equity & Inclusion Initiatives

> "Beyond supporting Diversity, Equity, and Inclusion within our Firm, we pride ourselves in working with organizations that are similarly committed to DEI. We believe that diversity in experience, background and perspective strengthens our company and, even more so, the health care industry in which we serve."
> — Gregg Wallander, President and CEO

## MANSFIELD RULE CERTIFICATION

Mansfield Rule is a program that measures whether underrepresented attorneys (i.e., women, racial and ethnic minorities, LGBTQ+ attorneys and attorneys with disabilities) have been considered for leadership opportunities, promotions, lateral positions and career-enhancing work opportunities within the firm. The goal is to increase and sustain diversity in law firms through a science-driven method that embeds accountability, transparency and knowledge-sharing within our talent and business development practices.

Our firm initially learned about Mansfield Rule through a client partnership, and we appreciate their leadership in moving us all forward and the many other organizations that embrace DEI progress. We have more work to do here, and we look forward to our continued collaboration with our health care partners.



## INTERNAL DIVERSITY EFFORTS

- Diversity, Equity & Inclusion Committee

Exhibit 24

• Monthly education and awareness communications

• Regular DEI-related activities, events and celebrations

## RECRUITMENT AND PARTNERSHIPS

We are committed to recruiting and developing a pipeline of a diverse group of attorneys interested in practicing health law by participating in programs such as:

• **State Bar of Wisconsin Diversity Clerkship Program**

Hall Render participates in the Wisconsin Diversity Clerkship Program, a 10-week paid summer employment opportunity for underrepresented first-year Marquette University Law School and University of Wisconsin Law School students. Selected students are matched with an array of employers, from private law firms to corporate legal departments and governmental agencies. Participating students gain practical legal experience, and the participating employers obtain valuable legal support.

• **Colorado Pledge to Diversity**

Hall Render participates in the Colorado Pledge to Diversity ("CPTD"), which focuses on building a pipeline of underrepresented, entry-level candidates to Colorado law firms and other organizations' legal departments. The CPTD's 1L Pledge Program also connects participating employers with underrepresented law students in the students' first summer. Additionally, the program exposes underrepresented students to real legal work and business culture, helping them develop professional skills, confidence and resume credentials while establishing professional contacts.

• **Indianapolis Bar Association Diversity Job Fair**

• **Cook County Bar Association Diversity Job Fair**

We support a variety of local and national organizations that promote diversity in the legal community, such as:

• **National Bar Association**

• **Marion County Bar Association**

• **Providence Cristo Rey Work Study Program**

• **Charting Your Own Course**

## HALL RENDER RECRUITMENT AND PARTNERSHIPS

• **Law School Affinity Outreach Program**

Case 2:23-cv-01697    Filed 12/15/23    Page 164 of 258    Document 1-1

Hall Render has created a law school affinity outreach program in which our attorneys partner with affinity groups at various law schools across the country to host one-hour sessions informing Law School Affinity Groups about the field of health law, diversity in health care and legal industries and opportunities and pathways for underrepresented attorneys. Each session includes a roundtable discussion during which attendees can learn more about our attorneys' professional experiences and personal journeys within health law.

## WOMEN'S INITIATIVES

- **Corporate Counsel Women of Color Conference**

  Hall Render is a proud sponsor of the Corporate Counsel Women of Color Conference (CCWC), a conference designed to provide a support network to women attorneys of color and to facilitate networking nationally and abroad, while promoting career advancement and all aspects of global diversity in the legal profession and workplace.

- **Executive Women in Healthcare**

  Hall Render is a committed sponsor of Executive Women in Healthcare (EWHC), of which several of our attorneys are members. EWHC promotes the professional development of women leaders within the health care industry in Central Indiana.

## FAMILY-FOCUSED WORK POLICIES

Hall Render has family-focused work policies including flexible work schedules and paid parental benefits.

**Sign up to receive Hall Render alerts on topics related to health care law.**

EMAIL

CONTINUE

**Connect With Us**



Case 2:23-cv-01697 · Filed 12/19/23 · Page 165 of 258 · Document 1-1

LEGAL NOTICES & PRIVACY POLICY

© 2002-2023. Hall, Render, Killian, Heath & Lyman, P.C. All Rights Reserved.

Case 2:23-cv-01697 - Filed 12/19/23 - Page 166 of 258 - Document 1-1


@wisc.edu

## EDUCATION

**University of Wisconsin Law School**                                      Madison, WI
*Juris Doctor Candidate*                                                        May 2024
          Activities:          Women's Law Student Association, UW Law Run Club

**University of Wisconsin-Madison**                                         Madison, WI
*Bachelor of Arts in Political Science and Spanish*                            May 2016
          GPA:               3.71 (Top 20%)
          Activities:          Intern for Latino Academy, AmeriCorps Volunteer

## EXPERIENCE

**United States Peace Corps**                                          Dominican Republic
*Education Volunteer*                                          August 2019 – March 2020
- Developed 2-year strategic plan in collaboration with local leaders to address community needs.
- Designed individual literacy plans for 16 students and conducted weekly tutoring sessions.
- Revamped Kindergarten classroom curriculum by implementing positive behavior management.
- Engaged community through 55 family home visits and by organizing women's baseball team.

**University Language Center**                                          Edina, Minnesota
*Interpreting Services Coordinator and Spanish Instructor*        October 2018 – August 2019
- Coordinated medical, business, and social service interpreting assignments for 50+ languages.
- Recruited interpreters for hire, executed interviews, and negotiated interpreter payment rate.
- Taught Spanish as a foreign language to 47 elementary students, all achieving basic competency.

**Global Leadership Adventures**                                            Costa Rica
*Regional Travel Coordinator and Enrollment Advisor*          October 2016 – August 2018
- Oversaw all aspects of travel preparation for 500+ students on international programs.
- Operated 24-hour crisis hotline, problem-solving summer program issues across 13 countries.
- Achieved customer satisfaction rate of 95% on a customer service survey.
- Co-led cross-cultural and leadership program for 30 high school students in Guatemala and Cuba.

**Tammy Baldwin for Senate**                                        Madison, Wisconsin
*Intern*                                                     January 2014 – August 2014
- Conducted donor research, executed fundraising calls, and processed campaign contributions.
- Assisted Senator Baldwin at campaign events by collecting contact information of constituents.

## ADDITIONAL INFORMATION

          Languages:          Proficient in Spanish
          Other Employment:   Art n Soul Jewelry Store, Manager (September 2011 – August 2021)
          Community:          Founded social justice book club and alumni racial equity group (2020)
          Interests:          Avid runner and traveler in the Latin American region

Exhibit 25

35

████████████

Diversity Statement

Being Biracial has been one of the most influential and amazing forces in my life. While I have this perspective now, I wish I could reach out to childhood me and give her a hug. She was confused, and the world didn't help. "What are you?" "You can only check one box." "Why is your hair straight?" "How come you talk that way?" "I don't believe you." These questions and statements tugged at my sense of identity and belonging growing up. The lack of representation didn't help either. In the early 2000's in Minnesota, there weren't any other interracial couples in my neighborhood. None of the celebrities I saw on TV or characters I read about in books were like me. I knew I was half-Black and half-White, but I didn't feel like I fit in either group. I struggled to feel at peace with myself when people questioned or were overly curious about my identity.

In 2019, I finally started to find that peace, when a Black friend of mine suggested I seek out spaces for mixed-race people. At the time, it felt like a rejection; however, now I am incredibly grateful to her for seeing me. I began connecting with other people of similar backgrounds and experiences, and I shared my own story and received overwhelming support. As I began to embrace my Biracial identity more, I also began to more deeply understand the privileges that came from that identity. Proximity to whiteness provided me with safety, acceptance, and access that my monoracial Black family members and friend didn't have. I desired to use this privilege and proximity in a positive way. In 2020, I created a community book club in my conservative, predominantly White town that focused on having open conversations about privilege and race. In the same year, I also connected with other alumni of color from my high school, and we created a group focused on healing and racial equity.

This life-long journey of discovery and reconciliation of identity ultimately led me to pursue a career in law. As a lawyer, I will have the opportunity to continue the work of my

███████████

Diversity Statement

ancestors and fight for Black liberation, as well as work to repair the harm wrought by White supremacy. I am passionate about using my education to address mass incarceration, free the wrongfully convicted, and end the death penalty. I want to see more empathy and humanity in the legal system. I believe in second chances and forgiveness. To achieve racial justice, we need passionate and zealous advocates. I would like to be one of those advocates.

███████████ 37

3

███████████

# M E M O R A N D U M

**TO:** Wilhelm Reinhardt

**FROM:** ████████

**DATE:** November 24, 2021

**RE:** Possible Sex Discrimination Case for Fareeha Amari

### QUESTION PRESENTED

Under Title VII, does a plaintiff have a hostile environment sexual harassment claim when her coworker verbally harasses her twenty-two times, humiliates her, and touches her without consent over a span of six months and her employer knows about the harassment but does not take timely corrective action?

### BRIEF ANSWER

Yes, our client can likely bring a successful hostile environment sexual harassment claim. A plaintiff has a hostile environment claim when she can prove her coworker's harassment created a hostile working environment and that her employer is liable because they knew about the harassment and did not take timely corrective action.

### STATEMENT OF FACTS

Our client, Fareeha "Pharah" Amari is a thirty-one-year old, female video game designer that currently works at Snowstorm Entertainment, one of world's biggest and most successful video game companies. Snowstorm is also known for having a pervasive misogynistic culture. This past year, Pharah's coworker, Jack Morrison, sexually harassed her for six months.

1

███████████

Pharah began working at Snowstorm on January 4, 2021 after Snowstorm hired her as a senior game designer. During her first week, she met Morrison, a fellow senior game designer that had worked at Snowstorm for eleven years. In their first interaction, Pharah noticed Morrison dropping his gaze to Pharah's breasts. He also asked her why a pretty girl like her would want to work around a bunch of "neckbeards" like himself. In a desire to make a good first impression, Pharah laughed along with the other game designers at his comment.

On January 8, the game design department hosted a happy hour to celebrate Pharah joining the team. During the happy hour, Morrison told Pharah how pretty she looked and commented that she "really filled out" her blouse. He also placed his hand on Pharah's knee several times as they talked. Pharah removed his hand each time. Later, Morrison started to rub Pharah's lower thigh with his thumb. Pharah told him to stop and then exited the situation.

Morrison did not bother Pharah again until Snowstorm's annual StormCon convention in February. On February 22, at one of the convention's parties for game designers, a drunk Morrison approached Pharah when she was alone and told her that her "behind looked great in that tight little skirt." He then put his hand on her thigh and leaned in to try and kiss her. Pharah stopped him by putting her hand on his mouth, saying "stop," and walking away. The next day, Pharah spoke with Morrison and asked him again to stop making advances. Morrison agreed.

While Morrison stopped making advances, he began to make sexist comments to Pharah on a regular basis through the rest of February and all of April. Pharah remembers six incidents of this behavior. On one occasion, he yelled at her to "stay in that perfect position, baby" as she bent over to look as a co-worker's screen. He then threw a pencil on the ground for her to pick up while he grabbed his crotch and grunted like an ape. Pharah felt humiliated by his conduct and as a result, struggled to concentrate on a regular basis.

2

███████████

On May 1, Pharah reported Morrison's behavior to Human Resources (HR) associate, Elizabeth Ashe. Ashe did nothing. She told Pharah that she was being too nice and that she should "dish it out" if she wanted Morrison to stop. Morrison continued to harass Pharah, making six comments throughout the month of May. He told her several times that "girls don't belong in game design, and he also told her that she was "frigid" and "needed to get laid." On June 1, Pharah met with Ashe again to report Morrison's harassment. Ashe told Pharah to "suck it up," and didn't do anything. Morrison verbally harassed Pharah six more times in the month of June. On one occasion, he pinched the side of her stomach and told her she should work out more because she was getting chubby. This incident disturbed Pharah enough that she took the rest of that day off.

After receiving no remedy from her office's HR department, on July 1, Pharah met with Baptiste Augustin, Snowstorm's vice president of global human resources. Augustin acted immediately and spoke with Morrison about his conduct. After this meeting, Morrison's harassment stopped. Nevertheless, Pharah's first six months at Snowstorm were miserable. She would like our help in taking legal action against Snowstorm for Morrison's harassment.

## DISCUSSION

Pharah likely has a claim against Snowstorm for sex discrimination under Title VII of the Civil Rights Act of 1964. Title VII prohibits employers from discriminating against their employees because of their sex. Civil Rights Act of 1964, 42 U.S.C § 2000e-2(a)(1). One way employees have a sex discrimination claim under Title VII is by demonstrating that the sexual harassment they experienced during employment created a hostile working environment. Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 (1986). In order to establish a prima facie case of hostile environment sexual harassment, a plaintiff must show that: 1) they were subject to unwelcome

3

██████████████

harassment; 2) the harassment was based on their gender; 3) the harassment created a hostile working environment; 4) and their employer is liable. <u>Valentine v. City of Chicago</u>, 452 F.3d 670, 677 (7th Cir. 2006).

The first and second elements will not be in dispute in Pharah's case. First, there is no question that Morrison's harassment of Pharah was unwelcome because she told him to stop his behavior multiple times and reported his conduct to her employer. Second, Morrison's harassment was clearly based on Pharah's gender. Not only did he make sexual comments and touch her because he was attracted to her as a woman, but he also explicitly referenced her gender when making disparaging comments to her. Since the first two elements of the hostile environment claim are established, this memorandum will concentrate on the third element of hostile environment and the fourth element of employer liability.

**I. Morrison's harassment created a subjectively and objectively hostile working environment.**

A plaintiff can demonstrate she suffers from a hostile work environment when her assailant's harassment creates a work environment that's subjectively and objectively hostile. <u>Kuntzman v. Wal-Mart</u>, 673 F. Supp. 2d 690, 705 (D. Ind. 2009). A work environment is subjectively hostile when the plaintiff sees their work environment as hostile. <u>Id.</u> at 709. A work environment is objectively hostile when a reasonable person would find the environment hostile. <u>Id.</u> at 705. In determining if the objective standard is met, courts will consider factors, such as the frequency of the harassing behavior, its severity, whether it was humiliating or a mere offensive utterance, and whether it interfered with the employee's work performance. <u>Id.</u> Despite these guiding factors, courts acknowledge that the line between a hostile work environment and

4

████████████

one that's merely unpleasant is not always easy to draw. Id. at 706. Accordingly, courts consider the totality of the circumstances when determining if an environment is objectively hostile. Id.

Pharah will have no problem demonstrating that her work environment was subjectively hostile. Because Pharah told Morrison to stop and reported his conduct to HR three times, the Court will rule that she saw her environment as hostile. Accordingly, this section will focus on if Pharah can prove that Morrison's harassment created an objectively hostile environment.

Frequent and severe verbal harassment alone can create a work environment that is objectively hostile. Boumehdi v. Plastag Holdings, LLC, 489 F.3d 781, 788 (7th Cir. 2007). In Boumehdi, the assailant, the plaintiff's supervisor in the press department, verbally harassed her eighteen times in the span of ten months. Id. at 786. The plaintiff's assailant often singled her out for her gender by making sexist comments. Id. For instance, he told her that women didn't belong in the pressroom and that cleaning the pressroom was her job because she was a woman. Id. Additionally, the assailant's comments were humiliating, as he once told the plaintiff as she bent over "to remain in that position and that it was perfect." Id. Because the assailant's comments were frequent, severe, and humiliating, the Court held that the assailant's harassment had created an objectively hostile environment. Id. at 789.

Teasing comments, secondhand harassment, and mild, isolated incidents of unwanted touching are not severe enough to create an objectively hostile work environment. Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998). In Adusumilli, the assailants, three male police officers, teased and innocently touched the plaintiff when she worked as an administrative assistant at the department. Id. at 357. For instance, they told the plaintiff not to wave at police cars because people would think she is a prostitute. Id. They also joked to the plaintiff about how she should eat a banana, telling her to wash it first and that she should break it in the middle

5

███████████

instead of eating it whole. Id. Furthermore, the plaintiff once overheard one of the assailants ask another female coworker if she wore a low-neck top the night prior. Id. Because the assailant's comments amounted to simple teasing or were secondhand harassment, the Court concluded their verbal comments were not severe. Id. at 361. The Court also held that, in light of the other circumstances, the assailant's staring and four instances of unwanted touching were mild, isolated instances and therefore not severe. Id. For instance, the assailants stared at the plaintiff's breasts and tried making eye contact with her on three occasions. Id. at 357. They also poked at her fingers twice, briefly touched her arm once, and poked at her buttocks once. Id. Because the assailant's comments and touching were not severe, the Court held that that their conduct had not created an objectively hostile environment. Id. at 361.

Pharah can prove that Morrison's harassment created an objectively hostile work environment because his verbal harassment was frequent, humiliating, and severe like the harassment in Boumehdi. She also can bring an even stronger case for an objectively hostile environment because Morrison touched her without consent and his harassment interfered with her work environment unlike the harassment in Boumehdi.

First, Morrison's harassment was frequent. Like the assailant in Boumehdi that verbally harassed the plaintiff eighteen times in the span of ten months, Morrison verbally harassed Pharah twenty-two times in the span of six months. Second, Morrison's harassment was humiliating. Just as the assailant in Boumehdi told the plaintiff to "stay in that perfect position" when she bent over, Morrison told Pharah to "stay in that perfect position" when Pharah bent over. Additionally, on another occasion, Morrison humiliated Pharah by pinching the side of her stomach and telling her she needed to lose weight. Third, Morrison's harassment was severe. Like the assailant in Boumehdi that said sexist comments on a regular basis, like "women don't

6

███████████

belong in the pressroom," Morrison also said sexist comments on a regular basis, like "girls don't belong in game design." Fourth, in Boumehdi, the assailant never touched the plaintiff. In contrast, Morrison touched Pharah without consent four times and even tried to kiss her. Fifth, in Boumehdi, the assailant's harassment did not interfere with the plaintiff's work performance. Conversely, Morrison's harassment made it difficult for Pharah to concentrate on a regular basis. Because Morrison's verbal harassment parallels the verbal harassment in Boumehdi in that it was equally severe, the Court will see Pharah's work environment as objectively hostile. Additionally, the Court is likely to see Pharah's case for objective environment as even stronger than the plaintiff's case in Boumehdi because Morrison's harassment was more frequent, more humiliating, interfered with Pharah's work performance, and there was unwanted touching.

In contrast, the Court is likely to distinguish Pharah's case from Adusumilli because the verbal harassment and touching were more severe in Pharah's case. First, while the assailants in Adusumilli teased the plaintiff about waving at cop cars and eating bananas on a few occasions, Morrison disparaged Pharah constantly, telling her once that she was "frigid" and that she needed to "get laid." Second, in Adusumilli, the assailants made sexual comments not directed at the plaintiff, once asking a different female coworker if she wore a lowcut top the night prior. In contrast, Morrison's sexual comments were all explicitly directed at Pharah, as he told her that she "really filled out" her blouse and that her "behind looked great in that tight little skirt." Fourth, although both cases included four instances of unwanted touching, the touching in Adusumilli was not severe. For instance, in Adusumilli, the assailants placed a hand on the plaintiff's arm, poked at her fingers, and poked at her buttocks. In contrast, Morrison caressed Pharah's lower thigh, kept placing his hand on Pharah's knee after she told him to stop, and tried to kiss her. Furthermore, because the touching and staring in Pharah's case occurred alongside

7

████████████

pervasive verbal harassment unlike the instances of staring and touching in <u>Adusumilli</u>, the Court will not see them as isolated incidents like they did in <u>Adusumilli</u>. Because Morrison's conduct was more severe than the assailant's in <u>Adusumilli</u>, the Court is likely to distinguish Pharah's case from <u>Adusumilli</u> and hold that Morrison's harassment created a hostile work environment.

**II. Snowstorm is liable for Morrison's harassment because they knew about the harassment and did not respond with timely corrective action.**

When the assailant is a co-worker of the plaintiff, an employer is liable when the employer knows or should know about the harassment and doesn't take timely corrective action to remedy the harassment. <u>Parkins v. Civil Constructors of Illinois, Inc</u>, 163 F.3d 1027, 1035 (7th Cir. 1998). Action is corrective when the employer takes reasonable steps to investigate and rectify the harassment. <u>Id.</u> Action is not corrective when the employer's action is unlikely to prevent continued harassment. <u>Id.</u>

An employer is liable for coworker harassment when they know about the harassment and fail to respond with timely corrective action. <u>Loughman v. Malnati Organization Inc.</u>, 395 F.3d 404, 407 (7th Cir. 2005). In <u>Loughman</u>, the plaintiff's employer, a pizzeria, was liable for harassment by the plaintiff's coworker because the employer waited one year to respond with corrective action. <u>Id.</u> When the assailant in <u>Loughman</u> physically assaulted the plaintiff in a walk-in cooler, the plaintiff discussed the incident with both of her supervisors right away. <u>Id.</u> The supervisors did not reprimand or discipline the assailant. <u>Id.</u> at 406. One of the supervisors told the plaintiff she was too nice and that she should "be a bitch" if she wanted the harassment to stop. <u>Id.</u> After this incident, the assailant continued to verbally harass the plaintiff. <u>Id.</u> A year after the physical assault in the walk-in cooler, the pizzeria's district manager began investigating the harassment and fired the assailant. <u>Id.</u> Even though the plaintiff's employer

8

███████████

eventually responded with corrective action, the Court held the employer was still liable because they responded too late. Id. at 407.

An employer is not liable for a coworker's sexual harassment when they respond with immediate corrective action. Fuller v. Caterpillar Inc., 124 F. Supp. 2d 610, 616 (D. Ill. 2000). In Fuller, the plaintiff's employer, a tractor factory, was not liable for the harassment perpetrated by two of her fellow factory workers because her employer responded with timely corrective action. Id. On the same day the plaintiff's employer learned of the harassment, the plaintiff's manager investigated her allegations. Id. at 612. While the plaintiff would not disclose the names of her assailants, her employer took reasonable steps to rectify the harassment. Id. For instance, the plaintiff's floor supervisor moved her workspace, so he could better monitor any harassment, and the company's union representatives reminded factory workers of the company's sexual harassment policy and told workers to leave the plaintiff alone. Id. at 613. Because the employer in Fuller took timely corrective action when they learned of the harassment, the Court held they were not liable for the sexual harassment perpetrated by the plaintiff's coworker. Id. at 616.

Snowstorm is likely liable for Morrison's harassment of Pharah because they knew about it and waited too long to respond with corrective action. First, like the employer in Loughman, Snowstorm knew about Pharah's harassment early on because she reported it to HR. Second, like the employer in Loughman, Snowstorm's HR did not reprimand or discipline Morrison. Instead, like the manager in Loughman that told the plaintiff that she was being too nice and that she should "be a bitch" to stop the harassment, HR told Pharah she was being too nice and that she should "dish it out" to stop the harassment. Third, just as the plaintiff in Loughman experienced continued harassment because her employer did not respond in a timely manner, Pharah also experienced continued harassment because HR did not respond in a timely manner. Lastly, just

9

███████████

as the employer in <u>Loughman</u> waited a year to take corrective action and fire the plaintiff's assailant, Snowstorm waited two months to take corrective action and reprimand Morrison. Because the Court in <u>Loughman</u> held that the employer was still liable even though they eventually responded with corrective action, the Court is likely to rule similarly for Pharah and hold Snowstorm liable.

In contrast, the Court is likely to distinguish Snowstorm's response to Pharah's harassment from the employer's response in <u>Fuller</u> and rule differently. First, in <u>Fuller,</u> the employer responded to the harassment allegations immediately because they responded the same day they learned of the harassment. Conversely, Snowstorm's HR did not respond promptly because they ignored both of Pharah's complaints. Second, unlike the manager in <u>Fuller</u> that investigated, Snowstorm's HR did not investigate. Third, despite not knowing the identity of the plaintiff's assailants, the employer in <u>Fuller</u> still took corrective action by moving the plaintiff's workspace and reminding workers of the sexual harassment policy. In contrast, Snowstorm's HR knew Morrison was Pharah's assailant, but took no action and told Pharah to "just suck it up." Since Snowstorm did not respond with timely and corrective action to Pharah's allegations, the Court will likely distinguish Snowstorm's case from <u>Fuller</u> and consider Snowstorm liable.

**CONCLUSION**

Pharah has a hostile environment sexual harassment claim under Title VII because she can demonstrate that Morrison's conduct was unwelcome, based on her gender, created a subjectively and objectively hostile environment, and that her employer is liable.

10



**Course History Report for** ████████████

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during his/her current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

**Fall 2021**



Report Generated on 01/18/2022

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2022 Diversity Clerkship Program

▲▲▲▲▲▲▲▲▲ ▶▶▶▶▶▶

### Interview Evaluation Fillable Form

---

### <u>Interviewer Recommendation:</u>

☐ **Outstanding Candidate**

☒ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, <u>jevans@wisbar.org</u> no later than January 24.**

**Student Name:**  ███████████

**Law School:**  ☒ UW    ☐ MULS

**Interviewer:**  <u>Tim Lindl</u>

### A.  <u>General Qualifications</u>

*1.  Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

**Check a Score:**  *Lowest* ↓  ☐ 1    ☐ 2    X 3    ☐ 4    ↑ *Highest*

**Interviewer Comments:**
████ writes well, and tells a good story, which are the skills I focus on the most in my practice.  She spent some time in the Peace Corps (curtailed to six months due to COVID) and has substantial international experience.  She worked on and off for the same employer for 10 years (since high school), showing she is dependable and someone you would want to work with.  She earned good grades during her first semester.

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

**Check a Score:**  *Lowest* ↓  ☐ 1    ☐ 2    ☐ 3    X 4    ↑ *Highest*

**Interviewer Comments:**
As noted above, ████ writes well.  In person, she is warm, friendly and a pleasure to speak with.  She tells a good story, which is what matters in communicating.  She can be a little long-winded.

**B. Interview Characteristics:**

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:  *Lowest* ↓  ☐ 1  ☐ 2  X 3  ☐ 4  ↑ *Highest*

Interviewer Comments:

██████ exhibits substantial confidence, a professional demeanor, strong interpersonal skills, energy, enthusiasm and responsiveness.

**C. Motivation for Participation in the Diversity Clerkship Program:**

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* **What is your motivation for participating in the Diversity Clerkship Program?**

Check a Score:  *Lowest* ↓  ☐ 1  X 2  ☐ 3  ☐ 4  ↑ *Highest*

Interviewer Comments:

██████ wants to participate in the diversity clerkship program "to be challenged intellectually" and obtain "hands on legal experience outside of the class room."

**D. Interviewer's Perspective:**

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* **If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?**

Interviewer Comments:

██████ is from one of the more conservative parts of the Minneapolis area.  In the wake of George Floyd's death in May 2020, she was bothered by the fact it seemed like nothing had happened in her town.  As the only family of color in her neighborhood, she searched for someone that was feeling what she was feeling.  She spoke with her mom, created flyers, held biweekly meetings, and sent out the readings.  The group that came was small (6-8 people), but she was clearly proud to be starting conversations about privilege and race.

**E. Student Feedback:**

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

It was a real pleasure speaking with ██████, and I really appreciated her sending me a thank you note.  With regard to interviewing skills, my suggestion to her is to shorten each anecdote and story as she can be a little long-winded in her answers.  In addition, those stories should be angled towards demonstrating a specific skill she has, *e.g.*, being good in a crisis, solving a problem, standing up for others.



@wisc.edu |

## Education

**University of Wisconsin Law School, J.D.**                                    **May 2025**
> *Activities*: 1L Student Bar Association Rep.; Asian Pacific Islander Desi American Law Students
> Association Social Chair; First-Gen Lawyers; Public Interest Law Foundation - JMA Sponsorship Chair;
> *Pro Bono*: Veterans Law Center (Dane County Bar Association Clinic)

**Sacramento State University, Graduate Certificate** Applied Policy & Government        **May 2021**

**Colorado College, B.A.** Political Science & English Literature              **May 2018**
> *Athletics*: Track & Field Captain, 7x All Conference, 4x Academic Honor Roll, 2 school records
> *Activities*: Justice Corps Self-Help Center Intern, El Paso County Courthouse; Track Clinic Coach
> *Study Abroad:* University College London, Fall 2016

## Professional Experience

**Superior Court of California, County of Butte, Oroville/Chico, CA**
**Court Services Analyst I** *(hired on post-fellowship in August 2021)*              **Aug. 2021 – July 2022**
- Implemented new legislation operationally to ensure court compliance. Provided civil and criminal departments and judges with regular updates on new laws and the California Rules of the Court.
- Configured case management system, including fee codes and mappings to generate state reporting.

**Judicial Fellow (California Capitol Fellows Program)**              **Oct. 2020 – Aug. 2021**
*Selected as one of nine fellows. Program included certificate through CSU-Sacramento's graduate school.*
- Created statewide training course for self-help center staff, now live across California.
- Wrote language for grants which resulted in a combined $150K+ to improve court operations.
- Worked with Glenn Superior Court CEO, DA and law enforcement to design new warrants process.
- Deployed language access kiosk to facilitate court usage by Spanish speakers.

**Colorado Center on Law & Policy, Denver, CO**
**Grants Coordinator** *(Promoted in September 2019)*                      **Sept. 2019 – Sept. 2020**
- Director of 2019 Women's Legislative Breakfast (250 ticketed attendees).
- Coordinated $1.6M, 86% grant-funded budget. Wrote grants upwards of 40+ pages for 25+ funders.
- Secured $400K for CCLP's new litigation program, used to hire managing attorney.

**Policy Associate** *(Promoted in June 2019)*                          **June 2019 – Aug. 2019**
- Lead community engagement efforts and aided in Executive Director Leadership transition.

**Policy & Communications Fellow (Public Interest Fellowship Program)**          **May 2018 – May 2019**
- Drafted legislative declaration for the Eviction Legal Defense Fund (SB19-180)
- Coordinated presentation of 2018 Self Sufficiency Standard Report with the Women's Foundation of Colorado – 36 customized events in rural, metro, and suburban communities.
- Lobbied for 13 successful bills in 2019 session on tenant, health, family, and worker protections.

**Colorado College Admissions, Sr. Communications Ambassador, Colorado Springs, CO** July 2017 – May 2018

**Nat'l Conference of State Legislatures, Public Interest Fellowship Program Fellow, Denver, CO** Summer 2016
- Co-authored LegisBrief with energy analyst on electricity usage in Colorado's marijuana industry

**Palestine Festival of Literature, Book Sales Staff Member – Palestine**              **Spring 2016**

**South Asian Journalism Association, Researcher, Northern Province, Sri Lanka**          **Summer 2015**
- Awarded research grant for project on former LTTE militants & post-war rehabilitation efforts.

Exhibit 26

███████████ – Personal Statement

My life has been defined by duality, adaptability, and a drive to reconcile opposing views. My Sri Lankan mother arrived in the US fleeing a civil war; my father is from Connecticut. Throughout my life, I have had to reconcile two identities which were in many ways incompatible, but which together formed a critical worldview of what an inclusive space requires. My identity combined with my experiences living, studying and working across the United States and internationally make me an excellent fit for this clerkship.

Growing up in predominantly white spaces, I witnessed regular racism against my mother. Law enforcement, shopkeepers, and neighbors in our suburban Philadelphia neighborhood targeted her based on skin color. As a result, I became both acutely aware of the harm that a lack of diversity can cause, and firmly committed to breaking down systems that continue to further discrimination.

This mindset was also informed by the fact that I spent my earliest years in Sri Lanka. Until 2008, the island was enmeshed in a civil war, spurred by aftereffects of colonialism. Bus bombings and gunshots were frequent in my family's city of Colombo. At the war's conclusion, I completed a research project on the Sinhalese government's compassionate rehabilitation of ex-Liberation Tigers of Tamil Eelam (LTTE) militants. This showed me the power of restorative justice, and continues to inform my legal approach.

Today, I walk into exclusionary spaces conscious of their impact on people of color, the systems that have created them, and most importantly, a drive to challenge them. Prior to law school, I advocated for basic needs policies at the Colorado legislature. While building coalitions, I focused on affordability, translation services, childcare, and transportation. Later, at a trial court in California, I created a curriculum for self-help center staff that is now available for every California trial court. The course covered race equity, LGBTQ+ issues, language access, and disability equity, so that staff could holistically understand their clients.

At UW, I have stayed connected to my identity as the social chair for the Asian, Pacific Islander & Desi American Law Students Association (APIDALSA). I am also a member of First-Generation Lawyers. I have received incredible guidance in both organizations, and am eager to mentor future students like myself.

Spending time in Sri Lanka and working alongside communities in poverty caused me to adopt a slogan I first heard in the disability rights community: "Nothing about us without us." This reminds me that anyone affected by those in power must have a seat and microphone at the decision-making table. How I learn, live, and communicate is informed by my work with American communities in poverty and my connection to Sri Lanka, a country very much affected by countries like the United States.

My experiences have taught me when to listen, when to advocate, and when to walk alongside. I am dedicated to keeping these values at the forefront of my legal career, and would be honored to learn from attorneys with similar values this summer.

**Writing Sample Cover Sheet**

███████████

**Content:** The following is an excerpt from a legal memorandum, submitted during the fall semester of 2022 as the final assignment for Legal Research & Writing I. This work is fully my own and does not include edits from outside sources, including professors and peers.

**Task:** Assess the merits of a potential Lanham Act false advertising claim. Client is The Northern Company, a Wyoming-based outdoor gear company. Northern has already brought a lawsuit against an industry competitor, Bridger Gear, and its advertising firm, IKEAZI. Northern now seeks information on whether it can bring a similar claim against three social media "influencers" who were responsible for spreading the advertisements via social media posts. Students were provided with depositions from the influencers and the original Lanham Act complaint against the industry competitor and advertising firm.

**Limitations:** 3,200-word limit. Professor directed students to focus on the Lanham Act claim, not legal procedural issues or potential defenses. The following sample has been edited to conform to the 10-page limit.

███████████

## QUESTION PRESENTED

Under the Lanham Act, can The Northern Company bring a successful claim in the 10th Circuit against three influencers who made disparaging, false statements on social media about The Northern Company?

## BRIEF ANSWER

No. The influencers did make false and misleading statements, in commerce, with the intent of influencing consumers to purchase products from a competing company. However, Northern's standing to bring a Lanham Act claim against them rests on shaky ground; the influencers are not Northern's direct competitor, and their statements may not be the proximate cause of Northern's commercial injury. Further, no court has ever recognized a Lanham Act claim against an influencer; rather, these claims are always brought against companies who pay influencers to advertise. Other agencies are better suited to manage the influencers' actions.

## STATEMENT OF FACTS

Plaintiff is the Northern Company, a Wyoming-based outdoor recreation and gear corporation. Northern creates "high-quality" products for elite athletes, and is firmly committed to being sustainable and environmentally friendly in the production of its goods. Northern alleges that recently, it has fallen victim to false advertising. A competing company, Bridger Gear, paid advertising firm IZEAKI, who in turn scripted posts that included false statements about Northern and paid three influencers to disseminate them. The captions and posts were nearly fully scripted by IZEAKI and Bridger. The influencers, who travel and work as professional athletes, collectively have a following of nearly four million. Each post made at least one disparaging statement against Northern's products, while lauding Bridger as an alternative. Northern has already brought a Lanham Act claim against Bridger and IZEAKI, and is now

1

considering a second claim against the influencers: climber Alecia Diguill, fly fisher Anne Daprah, and retired Olympic skier Cory Jones Miller.

The influencers' posts criticized both the quality of the materials used in Northern's products, and the environmental sustainability of Northern as a company. Diguill, in a photo of herself in a Northern shirt, stated that she will no longer purchase clothes "not made from organic materials." Daprah shared an image of herself in Northern gear, captioned "just heard that some gear is made with harmful chemicals and dyes that pollute our waterways […] make sure you source your gear from companies that care about our environment," with hashtags such as "#CorporateSelloutIsTheWorst." Miller posted a torn Northern backpack, questioned its durability, and stated that he was looking for "real, quality" gear. He also posted a fully staged photo of himself falling on a ski run while wearing Northern products.

The influencers also encouraged followers to consider Bridger products based on Bridger's supposedly high-quality, sustainably sourced gear: Diguill and Miller referenced Bridger's website; Daprah praised Bridger's environmentally friendly textile sourcing; Miller commended Bridger for its "durable goods for the socially-conscious consumer." In Miller's staged photo, he stated that he would be sticking to Bridger products in the future.

The influencers, though doubtful of the accuracy of the posts, did not verify the claims made within them before posting. No post included a disclosure of the fact that it was a paid post. The influencers did not actively wish to harm Northern, rather, IZEAKI's five-figure payouts were very attractive and served to support their lifestyles. Diguill even expressed regret, stating she "didn't feel good" about her post, and Daprah said that she saw Northern as a family company and did not want to disparage its brand.

2

Northern has claimed that due to the false advertising, it has suffered "irreparable" harm, citing lower sales, slippage in rank as the top ranked adventure gear provider, and reputational damage. Northern now seeks information on whether it can bring a Lanham Act claim against Diguill, Daprah, and Miller.

**DISCUSSION**

The Lanham Act is a federal policy that was enacted to prevent unfair commercial competition that arises from false advertising. 15 U.S.C.A. § 1125(a)(1). To bring a successful claim, a plaintiff must show that (1) in commerce, a defendant (2) made a false or misleading statement about plaintiff's product which (3) likely confused consumers as to the nature of plaintiff's product, and that (4) a commercial injury resulted. *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir.1999). In the 10th Circuit, the statements must also be commercial speech, made for the purpose of influencing consumers to buy defendant's products, and disseminated sufficiently to the relevant purchasing public. *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1270 (10th Cir. 2000). Speech is commercial if it references two commercial entities and expresses a preference. *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 638 (1985).

Until recently, a Lanham Act defendant also had to be a direct competitor of the plaintiff, but this test has since been overruled. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 124-25 (2014). However, the 10th Circuit has been reluctant to dispose of the direct competitor element in subsequent cases. *Strauss v. Angie's List, Inc.*, 951 F.3d 1263, 1268-69 (10th Cir. 2020) (post-*Lexmark* case in which court required plaintiff to be a direct competitor).

It is indisputable that in this case, the influencers made their statements in commerce, for the purpose of influencing consumers to buy Bridger's products, and that their statements were

3

commercial speech. The influencers were paid to make the statements, indicated that they would be buying Bridger products in the future, and directed viewers to Bridger's website. The influencers also expressed a preference for Bridger over Northern. However, determining whether the influencers meet our Circuit's inconsistent test regarding standing, assessing the falsity of their statements, and evaluating whether they proximately caused Northern's commercial injury to the level needed for Lanham Act liability requires a closer examination.

    **I.**    **Influencers are not Northern's direct competitors; therefore, this claim risks dismissal**

       The influencers are not direct competitors of Northern, and a claim against them may face dismissal in our jurisdiction. The 10th Circuit has long required that a defendant be plaintiff's direct competitor. *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 873 (10th Cir. 1995) (citations omitted). However, the Supreme Court seemingly did away with the direct competitor requirement when it resolved a national circuit split on the issue of Lanham Act standing. *Lexmark Int'l Inc.*, 572 U.S. at 136. *Lexmark* established a new test which focused on injury, stating that the plaintiff must allege a commercial injury to its reputation or sales (*Id.* at 132); and demonstrate that the injury was proximately caused by defendant's false statements. *Id.* at 133.

       Nevertheless, the 10th Circuit has applied *Lexmark* inconsistently. In *Strauss v. Angie's List*, the 10th Circuit expressly declined to dispose of the direct-competitor requirement. *Strauss*, 951 F.3d at 1267 (citations omitted). However, in other cases since *Strauss*, the 10th Circuit has applied *Lexmark*. *Atlas Biologicals, Inc. v. Kutrubes*, No. 19-1404, 2022 WL 2840484, at *4 (10th Cir. July 21, 2022); *Choq, LLC v. Holistic Healing, LLC*, No. 20-CV-00404, 2020 WL 8175553, at *1 (D. Wyo. July 28, 2020) (post-*Strauss* cases which applied only *Lexmark's* test).

       Although this irregularity makes it difficult to determine what may be the actual "standing," test, the court since *Strauss v. Angie's List* continues to reference the fact that a

4

plaintiff is typically a direct competitor, even if it ultimately applies *Lexmark*, suggesting that being a competitor is still an important factor. *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th 1250, 1265 (10th Cir. 2022); *Am. Soc'y of Home Inspectors, Inc. v. Int'l Ass'n of Certified Home Inspectors*, 36 F.4th 1238, 1241 (10th Cir. 2022) (both cases applied competitor element). The Supreme Court even recognized shortly after *Lexmark* that competitors are the proper actors to bring a Lanham Act claim, since they are the actors that can suffer a commercial injury. *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014).

 In this case, defendants are not Northern's direct competitors. Although they use outdoor gear to succeed in their sport, the influencers' direct competitors are other athletes or other influencers competing for contracts. None of the influencers produce gear of their own. Though *Lexmark* has been applied variably, both the 10th Circuit and the Supreme Court recognize that Lanham Act claims are *overall* better suited to direct competitors; therefore, the competitor factor remains an important component, even if it is not the keystone. If the court chooses to focus on the 10th Circuit's direct-competitor factor, it may immediately dismiss this claim.

 **II.** **Influencers' statements are false, and likely confused consumers as to the nature of Northern's products**

 If the court finds that the direct-competitor test does *not* preclude our case, it will then assess whether the influencers' statements were false, and whether they misled or confused consumers. The court will find that the influencers' statements were unequivocally false, and that they confused consumers regarding the nature of Northern's products. False statements can either be literally false, or literally true but misleading. *Bimbo Bakeries USA, Inc.*, 39 F.4th at 1266. Actionable statements must be clear, affirmative, and identifiable, rather than amorphous. *Id.* at 1269. Grand statements of opinion that sellers use to sell products are "puffery," and do not qualify, as no reasonable person would rely upon them. *Alpine Bank v. Hubbell*, 555 F.3d 1097,

1106-07 (10th Cir. 2009). Superlative statements are usually puffery. *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 787 (10th Cir. 2016) (the phrases "best possible" care, and "excellent care of the highest quality" were deemed puffery).

Statements must also be likely to mislead or confuse consumers concerning the nature of a product. The confusion may be about the nature of a company's goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1)(B). Since companies often market products based on both utility and the values the products promote, values are included under the definition of "commercial activities." *Proctor & Gamble Co.*, 222 F.3d at 1272. In *Proctor & Gamble, Co.*, defendant used a voicemail distribution system to allege that Proctor & Gamble's CEO donated a significant portion of the company's profits to the church of Satan. *Id.* The court found that attacking the morality of Proctor & Gamble's values misrepresented their "commercial activities" and therefore met the "likely to mislead and confuse" element. *Id.* at 1270.

The statements made by the influencers were literally false. Diguill's statement that Northern's shirt was "not made from organic materials," and Daprah's statement that her Northern gear was made with "harmful chemicals and dyes," was literally false. Unlike in *Intermountain Stroke Ctr.*, where the statements were superlative and grandiose, the influencers' statements were specific and clear. Miller, in an egregious example of literal falsity, admitted that he fully staged the photo that faulted Northern products for his fall. It could be true that Northern's gear is not quite as sustainable or as high of quality that Northern purports it to be. However, this does not change the level of literal falsity in Miller's post, and would only shift Diguill and Daprah's statements into the second category: literally true, but misleading.

The posts were also likely to mislead or confuse customers as to the nature of the values, and therefore commercial activities, of Northern. At the heart of the influencers' statements was

6

the idea that Northern was an environmentally harmful company. In *Proctor & Gamble, Co.*, the statements connecting Proctor & Gamble to Satan made customers question the potential immoral values of the company. Similarly, in our case, the statements alleging that Northern made their gear from harmful chemicals and inorganic materials stand at odds with Northern's values of conservation and sustainability. The court will therefore find that the statements likely confused or misled consumers as to whether Northern is a sustainable company.

> **III.** **Influencers' representations were not clearly the proximate cause of Northern's commercial injury; this, combined with lack of legal precedent against influencers, indicate that a Lanham Act claim is not the best approach**

It is debatable whether the influencers were the proximate cause of Northern's commercial injury. To meet this *Lexmark*-established test, a plaintiff must show that defendant's false statements caused consumers to withhold trade from the plaintiff. *Lexmark Int'l, Inc.*, 572 U.S. at 133. Due to this murkiness and the lack of legal precedent against influencers in general, Northern should turn to other administrative options regarding the influencers.

> **a.** **The proximate causal connection between influencers' statements and Northern's commercial injury is weak at best**

It is unclear whether the influencers' statements were the proximate cause of Northern's commercial injury. A commercial injury is one that harms sales or reputation. *Id.* at 140. In the 10th Circuit, statements must also be disseminated to the "relevant purchasing public," or consumers who are interested either in plaintiff's industry or in purchasing a plaintiff's product. *Wilson v. AdvisorLaw LLC*, 780 F. App'x 649, 653 (10th Cir. 2019). The percentage of potential customers that a defendant must reach is ambiguous. *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, 275 F.3d 996, 1003 (10th Cir. 2002) (court deemed that two out of 150 potential customers were too few but did not suggest what would constitute an ideal number).

An increase in defendant's sales is not sufficient to prove a proximately caused commercial injury; rather, plaintiff must allege harm to its *own* sales or reputation. *Am. Soc'y of Home Inspectors, Inc. v. Int'l Ass'n of Certified Home Inspectors*, 36 F.4th 1238, 1242 (10th Cir. 2022). In *Am. Soc'y of Home Inspectors Inc.*, plaintiff alleged that defendant's misleading tagline harmed its own membership levels, since defendant's membership doubled after adding the tagline. *Id.* at 1243. The court ruled, however, that because the plaintiff did not allege an injury to *its* sales or reputation, plaintiff's claim failed the proximate cause test. *Id.* In addition to specific allegations, consumer reaction surveys can also help establish commercial injury by revealing consumer beliefs. *Cottrell, Ltd.*, 191 F.3d at 1252.

The social media influencer's role in advertising is relatively recent, which could make proximate cause difficult to determine. *Ariix, LLC. v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021). Influencers, unlike traditional advertisers, maintain an elevated level of trust with their followers and are thus key actors in social media's ability to influence commerce; studies have shown that 74% of consumers rely on social media content when making purchasing decisions. *False Influencing*, 109 Geo. L.J. 81, 97–98 (2020). "Nano-influencers," or those who have a niche, specialized following within an industry, hold an even higher level of audience trust and therefore substantial advertising power. *Id*. at 90-91.

In this case, Northern's commercial injury is an alleged drop in rank, reputation, and sales. Focusing the injury on their company rather than on Bridger's gain means Northern does not risk dismissal for the reason that the plaintiff in *Am. Soc'y of Home Inspectors, Inc.* did when it focused on a boost in defendant's sales without citing a harm to itself. However, it is still not clear whether the influencers' statements were the proximate cause of Northern's injury. Northern has not put forth any evidence, such as consumer surveys, that the influencers'

8

statements were the proximate cause. In total, the influencers made only six posts. Followers could easily have scrolled past the posts or missed Northern's logo on the influencer's clothing. The court may even rule, as in *Sports Unlimited, Inc.*, that the number of posts was too few to qualify as reaching the relevant purchasing public.

A court could, however, find that the influencers, who are "nano-influencers," with a small but loyal following within a particular athletic industry, had a powerful effect on consumers who then withheld trade from Northern. Social media enables consumers to distribute information beyond the influencers' four million collective followers through sharing tools. However, it is vital to remember that the influencers are two levels removed from the primary and secondary origin points of the false advertising campaign: Bridger and IZEAKI. The fact that these posts may have circulated beyond the influencers' following only further dilutes an already diluted degree of causation.

   b.  **Lack of Lanham Act precedent against influencers inhibit this claim; administrative avenues provide a better option**

The lack of legal precedent that any court has established against an influencer does not bode well for this claim. Administrative avenues, such as the FTC, provide an alternative to civil suit. The FTC requires influencers to conspicuously disclose paid partnerships with brands on their posts. 16 C.F.R. § 255.5 (2022). The FTC also requires that any type of endorsement must reflect an endorser's honest opinions. 16 C.F.R. § 255.1a (2022).

Some courts outside our jurisdiction have considered whether an influencer's disclosure omission can be construed as an actionable Lanham Act statement; however, these claims were brought against the company that paid the influencer, *not* the influencer themselves. *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 640 (S.D.N.Y. 2018) (influencer's lack of disclosure did not qualify as actionable under Lanham Act, company was named

9

defendant); *EIS, Inc. v. WOW Tech Int'l GmbH*, No. CV 19-1227-LPS, 2020 WL 7027528, at *4 (D. Del. Nov. 30, 2020) (first federal case that recognized influencer's disclosure failure was actionable; but company was still the named defendant).

*[Section on National Advertising Division/Better Business Bureau omitted here for length]*

Since companies, rather than influencers, are always the named defendants in Lanham Act suits, Northern's current claim against IZEAKI and Bridger is the better civil action. However, Northern can still pursue an administrative action against the influencers. Each influencer failed to disclose their financial connection with Bridger or IZEAKI. Their opinions also did not reflect their honest opinions: Diguill felt uncomfortable about her post; Daprah saw Northern as a family company but nonetheless insinuated they were a corporate sellout. No influencer attempted to confirm the truthfulness of the scripted posts before posting them. These are clearly FTC violations. Pursuing an FTC complaint, or an arbitration claim with the NAD is a more tested, effective approach against the influencers' actions.

## CONCLUSION

Although the influencers' posts were false and confused consumers as to the nature of Northern's products, the uncertain degree of causation between their statements and Northern's commercial injury, and the lack of legal precedent against influencers does not forecast a successful Lanham Act claim against them. This is particularly relevant in the 10th Circuit, where the court still strongly suggests that a defendant should be plaintiff's direct competitor, and the influencers are not. Northern can instead file an FTC or NAD complaint against the influencers, and should focus efforts on its current Lanham Act claim against IZEAKI and Bridger. Bridger is Northern's direct competitor who, with IZEAKI, originally spearheaded the false advertising campaign. Together, these actors are the ones truly liable for Northern's commercial injury.

10



# Course History Report for █████████████

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

## Fall 2022



| Course # | Title | Instructor | Credits Grade |
|---|---|---|---|

## Spring 2023 - All Courses In Progress



| Course # | Title | Instructor | Credits Grade |
|---|---|---|---|

Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂

## Interview Evaluation Fillable Form

---

## <u>Interviewer Recommendation:</u>

■ **Outstanding Candidate**

☐ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ███████████

**Law School:** ■ **UW** ☐ **MULS**

**Interviewer:** <u>Sir Williams</u>

### A. <u>General Qualifications</u>

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ■ 4 *↑ Highest*
Interviewer Comments:

█████ experience working in legal and policy settings has prepared her well for legal employment.

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ■ 4 *↑ Highest*
Interviewer Comments:

█████ communicates exceptionally well orally and in writing. Her writing sample brief was well organized.

### B. <u>Interview Characteristics:</u>

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

**Check a Score:** *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

████ is confident, poised, professional, and mature. She interviewed well, responded to all questions, and seems particularly adaptable and adept at building community.

**C. Motivation for Participation in the Diversity Clerkship Program:**

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* *What is your motivation for participating in the Diversity Clerkship Program?*

**Check a Score:** *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

Appreciates the cohort model for supporting diverse candidates, the array of available program opportunities

**D. Interviewer's Perspective:**

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

**Interviewer Comments:**

She would focus on what that organization has to offer and her desire to be part of a tight knit community.

**E. Student Feedback:**

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

**Interviewer Comments:**

Feedback provided directly to the student at the conclusion of the interview.

█████████████████████████ *████@wisc.edu

## Education

| | |
|---|---|
| **University of Wisconsin Law School** | Madison, WI |
| *Juris Doctor Candidate* | May 2025 |

    **Activities**:     La Alianza
                          Wisconsin International Law Society

| | |
|---|---|
| **University of Wisconsin-Madison** | Madison, WI |
| *Bachelor of Arts in International Studies and Applied Economics* | December 2021 |

    **GPA:**     3.76
    **Activities:**     College Democrats of UW-Madison, *Financial Director*
                          Spanish Club
    **Study Abroad:**     Universidad Complutense de Madrid

## Experience

| | |
|---|---|
| **State Bank Financial** | La Crosse, WI |
| *Universal Banker* | February 2022-August 2022 |

- Opened, closed, and maintained deposit and savings accounts for customers
- Assisted customers in applying for credit cards
- Acted as the first point of contact for any customer problems

| | |
|---|---|
| **Wisconsin State Legislature** | Madison, WI |
| *Intern* | June 2021-August 2021 |

- Researched and analyzed policies from across the country to determine the legislative priorities of State Representative Doyle
- Collaborated with various state agencies to develop bills and coordinate constituency outreach
- the website, responding to constituents, and taking notes at legislative sessions.

| | |
|---|---|
| **Rise Free** | Madison, WI |
| *Student Fellow* | September 2020-May 2021 |

- Built a coalition of students at UW-Madison to fight for affordable tuition rates
- Communicated with local and state politicians to ensure college affordability will be addressed in their legislation
- Worked with underrepresented student groups to promote and establish equitable access to student's basic needs across universities in Wisconsin.

| | |
|---|---|
| **Fulbright Chile** | Madison, WI |
| *Intern* | June 2020-August 2020 |

- Translated Chilean applications to Fulbright into English from Spanish
- Edited personal and professional letters in both Spanish and English to augment applicants' chances of being selected for their desired doctoral program

## Additional Information

    **Community:**     VITA Program 2023, Uvaldo Herrera National Moot Court Competition
    **Interests:**     Avid traveler, sports fanatic, and lifelong learner

<span style="color:red; font-size:2em;">Exhibit 27</span>

█████████

██████████████

████████████████████████████████████@wisc.edu

Growing up, I always knew I was unique compared to my classmates for our area: While most of my peers' families traced back generations in the same area, my family had no roots in my hometown. Instead, I am a third- generation immigrant from Ecuador. I was the embodiment of Hispanic culture to my classmates growing up; I have a Hispanic last name, most of my family is from outside the country, and I appear Hispanic. As such, I often served as the sole cultural authority for any of my classmate's questions on Hispanic countries, cultures, and people. As a result, I defined myself according to these differences, as the Hispanic kid in class. While I was proud of my family's diversity there was also a sense of isolation that accompanied me as one of the only Hispanic students in my hometown. There were not huge cultural gaps in the day-to-day life between me and my classmates but simply a feeling of always being different.

My occasional feelings of isolation did not disappear as I entered spaces with more Hispanic individuals, rather they heightened in different ways. Anytime I was in Hispanic dominated places I felt as if I was an interloper; that I was not sufficiently Hispanic. I went to the first meeting of the Hispanic student organization my freshman year at UW-Madison and immediately felt out of place. My family did not speak Spanish in our home, nor did we have any traditions that I had associated with Hispanic culture. I thought that my grandfather had seemingly left behind Ecuadorian and Hispanic culture when he came to the U.S., and we lost any ties to a larger culture because of his immigration. While most of my Hispanic peers in college had experiences that I had associated with Hispanic culture, I had none. I believed my only link to my Hispanic heritage were the times I visited my family in Ecuador. As such, I struggled with defining my identity and whether it was appropriate for me to consider myself as Hispanic.

My challenges in defining my identity arose to a culmination while I studied abroad in Spain in college. Two of my peers were Hispanic and as we became closer, a common thread between us was identified. My two classmates and I all felt a tension between being the model for Hispanic culture in some spaces yet when we were in Hispanic dominated spaces, we felt that we were never Hispanic enough. We all had differences when it came to our families and our customs, but we shared a sense of uncomfortability in our identity. Hearing from my peers that experienced the same issue allowed me to resolve how I choose to identify myself. There is no uniform experience for Hispanic individuals; rather it is a collection of traditions, customs, and experiences. My preconceptions about what it meant to be Hispanic were wrong and I was free to choose to define my experience and relation to my culture.

I realized that the conflict in identity that I had was a common experience for many other diverse students as I began at the University of Wisconsin Law School. While I feel confident in my identity now as a Hispanic law student, there are many of my diverse peers who are undergoing similar problems that I have undergone. I am now a member of the Hispanic student organization on campus, La Alianza, and have helped a classmate, who experienced similar problems as me, to join the organization. I plan to use my experiences to help other diverse law students resolve similar identity problems. That is how I will contribute to diversity in the legal field, by using my experiences to ensure that people feel a part of their culture and that they belong despite whatever lack of cultural experiences my peers may believe they have.

████████████

2

**Memorandum**

To: Andrew Turner

From: ▮

Date: November 22, 2022

RE: Violation of the Wisconsin Electronic Surveillance Control Law by the Madison Police Department

**Question Presented:**

Under the Wisconsin Electronic Surveillance Control Law, Wis. § 968.31 (a), which prohibits an individual, among other things, from intentionally intercepting an oral communication, does a police department violate the WESCL by using intentionally visible security cameras in a crowded public park to record a conversation between two ex-Mennonites from Bolivia suspected of illegally trafficking endangered animals, plants, and related products illegally taken from Bolivia, and then using a lip reader to ascertain what was said between the two ex-Mennonites from Bolivia.

**Brief Answer:**

No, a police department does not violate the WESCL by using intentionally visible security cameras in a public park to record a conversation between two criminal suspects, and then using a lip reading interpreter to ascertain what was said between the two criminal suspects. An individual violates the WESCL by, among other things, (1) intentionally (2) intercepting (3) an oral communication. The WESCL does not define intentionally but it provides a criminal penalty for any individual who violates the WESCL so the criminal definition of intent should be used. The WESCL defines interception, among other things, as the aural or other acquisition of oral communication through the use of any electronic device. An acquisition is only an intercept if

the acquisition is contemporaneous with the communication and is not in storage. The WESCL defines oral communication as any oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying the expectation. Courts interpret the definition of oral communication to require an individual to have an actual subjective expectation of privacy and a subjective expectation of privacy that society is willing to recognize as reasonable. The MPD did not violate the WESCL as the MPD did not act intentionally in acquiring the contents of the conversation between Heller and Bellows. The MPD's acquisition of the conversation between Heller and Bellows was not an interception because the acquisition was not contemporaneous with the conversation between Heller and Bellows and was in storage. Even if MPD did intentionally intercept the conversation between Heller and Bellows, the MPD did not violate the WESCL because the conversation between Heller and Bellows was not oral communication.

**Facts:**

On September 5, 2022, an MPD operator received a call on the "crime tip hotline" which was forwarded to a Sgt. Musah, in the MPD. The caller indicated that there was criminal activity occuring in the community. She had personal knowledge of illegal trafficking of endangered animals, ancient artifacts, plants, and related products carried out by Jackson Heller and Mr. Bellows, two ex-Mennonites from Bolivia. She stated that Heller and Bellows met in Twining Park frequently to discuss the smuggling operation.

Due to departmental work overload, the MPD was unable to dispatch anyone to the park for reconnaissance until Mid-October, and at that point Sgt. Musah stated in a memo that reconnaissance of the park was likely to be unsuccessful. However, Sgt. Musah remembered that the park had several security cameras installed. Sgt. Musah was unsure if the cameras would

capture activity as the cameras are intentionally visible to the naked eye because their presence acts as a partial deterrent to criminal behavior and general delinquency. The MPD reviewed the recordings with the help of Wisconsin State University interns and identified a meeting between Heller and Bellows at Twining park on Sunday, September 25. The suspects talked for approximately 45 minutes in the center of the park's lawn area. The park was very crowded as it was a Sunday, and one of the last weekends of warm weather. There was a contant flow of people in and around the immediate vicinity of the suspects. While the video seemed to corroborate some of the informer's accusations, Sgt. Musah stated there was not enough suspicious information to warrant immediate action.

Sgt. Musah then took the video to the MPD's technical service department to see if they could enhance the video to recover sound information, but since the video originally had no sound there was nothing they could do. One of the tech service specialists noted that their faces were almost always plainly visible and he recommended hiring someone adept at lip reading. The MPD hired an expert lip reader, but the suspects did not speak English, Spanish, or French, so the expert lip reader recommended contacting a linguistic department to ascertain the language. The MPD contacted the linguistics department at Wisconsin State University. One of the linguists in the department informed the MPD that based on the background of Heller and Bellow's ethnic background they were likely speaking in Plautdietsch, an old German dialect. She recommended that MPD contact a colleague at Arkansas A&M University, Dr. Knight, who was an expert on dialects spoken by Mennonite religious communities. Dr. Knight agreed to work with the MPD. She transcribed the conversation to a high degree of accuracy and noticed that Heller and Bellows used sign language twice. Their signing was visible and happened exclusively when adults were within about 10 feet of them for more than about 10 seconds. They

did not use sign language when children were present or when adults wandered by. Once they had more information, the MPD passed the information and case to federal authorities. Heller somehow caught wind of the recordings and threatened legal action against the MPD.

**Discussion Section:**

No, a police department did not violate the WESCL by using a security camera in a public park to ascertain information in a conversation between two criminal suspects. An individual violates the WESCL if they, among other things, (1) intentionally (2) intercepts (3) an oral communication. The MPD did not violate the WESCL because the MPD did not act intentionally to acquire the conversation between Heller and Bellows. Nor did the MPD intercept the conversation between Heller and Bellows. Even if the MPD intentionally intercepted the conversation between Heller and Bellows, the conversation between Heller and Bellows was not oral communication.

**A. The MPD did not act intentionally to acquire the conversation between Heller and Bellows**

The MPD did not act intentionally as the MPD did not have the purpose to record Heller and Bellows conversation in installing the cameras nor was the MPD practically certain to acquire Heller and Bellows' conversation. The WESCL does not define intent, but it includes that an individual who violates the WESCL is guilty of a Class H felony. The criminal definition of intent should be applied because the WESCL includes a criminal penalty for any individual who violates the statute. The criminal definition of intent states that an actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result. Wis Stat. § 939.23 (3)(2021-2022). Thus, an individual violates the WESCL if they have a purpose to intercept an oral communication or is aware that their conduct would be practically certain to intercept an oral communication. MPD did not intentionally intercept the

conversation between Heller and Bellows because the MPD's behavior was neither purposeful in intercepting the communication between Heller and Bellows nor was it practically certain to capture the conversation. Sgt. Musah stated in his memo that the security cameras were installed in Twining Park as a partial deterrent to criminal behavior and general delinquency. The MPD's installment of the cameras was not for the purpose of capturing the conversation between Heller and Bellows. Sgt. Musah also stated that he was unsure whether the cameras would have captured anything so the MPD was not aware that their conduct in installing the security cameras would cause the conversation between Heller and Bellows to be captured. The MPD did not act intentionally because the purpose of the security cameras was not to acquire the conversation between Heller and Bellows nor was the MPD aware that their conduct would be practically certain to capture the conversation between Heller and Bellows.

**B. The MPD did not intercept the conversation between Heller and Bellows:**

The MPD's acquisition of the conversation between Heller and Bellows was not an interception that violated the WESCL because the acquisition was of stored communications and was not contemporaneous with the conversation between Heller and Bellows. An interception under the WESCL means (1) the aural or other acquisition of (2) the contents of any wire, electronic, or oral communication (3) through the use of any electronic, mechanical or other device. Wis. § 968.27 (9)(2021-2022) Because the WESCL is ambiguous, extrinsic sources are consulted, including the legislative history of the WESCL. *State v Duchow* WI 2008 57,¶ 6, 310 Wis.2d 1749 N.W.2d 913. The legislative history of the WESCL indicates that the law represents Wisconsin's implementation of the Federal Wiretap Act. *Duchow* 2008 57, ¶ 6. Federal courts that interpreted an interception under the Federal Wiretap Act are used to interpret the WESCL *State v. Gilmore,* 201 Wis.2d 820, 830, 549 N.W.2d 401 (1996). While there is not case law in Wisconsin that states when an interception occurs, federal courts interpret the Wiretap Act to

mean that an interception only occurs when the redirected contents are first heard. *U.S. v Rodriguez*. 968 F.2d 130 (2d. Cir. 1992). Wisconsin courts are silent on when an acquisition becomes an intercept, but federal courts interpreting the Federal Wiretap Act state that acquisition occurs contemporaneously with communication. *Luis v Zang*. 833 F.App'x 619 (6d Cir., 2016). An acquisition then is not an interception if it is acquired in storage. *Konop v Hawaiian Airlines, Inc.* 302 F.App'x 868 ¶ 27 (9d Cir., 2002). For example, a federal case interpreting the Federal Wiretap Act held that a system containing private electronic mail that had been sent to (stored on) the bulletin board, but not read by the intended recipients was not an unlawful intercept. *Steve Jackson Games, Inc. v Secret Service*. 36 F.2d 457 (5d Cir., 1994). The court held the acquisition was stored communications and did not constitute an interception as the procedural and substantive requirements to ascertain stored communications are quite different from the requirements authorized to intercept communications. *Steve Jackson Games, Inc.* (5d Cir., 1994). For an individual to violate the WESCL, an individual must also acquire the contents of an oral communication. Contents, when used with respect to oral communication includes any information concerning the substance, purport, or meaning of that communication. Wis. § 968.27 (3)(2021-2022). MPD did not intercept the conversation between Heller and Bellows because the acquisition was in storage and therefore not contemporaneous with the conversation between Heller and Bellow. There are three times where there is a potential interception. First, the recording of Heller and Bellows' conversation in Twining park by the security cameras on September 26. Second, when Wisconsin State University interns reviewed the recordings with the MPD. Third, when Dr. Knight translated the conversation between Heller and Bellows. The recording of Heller and Bellows conversation on September 26 by the security cameras placed in Twining Park is not an interception because an interception only occurs when

the redirected contents are first heard, and the MPD had not yet reviewed the recording. The review of recordings conducted by Wisconsin State University interns and the MPD was a potential interception because the video contained some information concerning the purpose of the conversation between Heller and Bellows. In Sgt. Musah's memo, he stated that the video seemed to corroborate some of the initial informant's accusations of illegal trafficking conducted by Heller and Bellows. Dr. Knight's translation of the conversation between Heller and Bellows also is a potential interception as there was an acquisition of the contents of the communication between Heller and Bellows. However, there was not an interception that violated the WESCL in either the review conducted by the Wisconsin State University interns or Dr. Knight's translation because there was no contemporaneous acquisition of the communication. Similarly to a case where email had been stored but not yet read by the recipients, the security video of the conversation between Heller and Bellows was stored onto MPD's 30 day security camera recordings, and then read at a later point by the Wisconsin State University interns and Dr. Knight. The acquisition of the conversation between Heller and Bellows, both by the Wisconsin State University interns and by Dr. Knight was an acquisition that occurred in storage. Because the acquisition of the conversation between Heller and Bellows occurred in storage there was no interception that violated the WESCL. The acquisition of the conversation between Heller and Bellows was not an intercept because the acquisition was of stored communications and was not contemporaneous with the conversation between Heller and Bellows.

   **C. The conversation between Heller and Bellows is not oral communication**

The conversation between Heller and Bellows was not oral communication because they did not have a subjective expectation of privacy nor an expectation of privacy society would recognize as reasonable. Oral communication means (1) any oral communication uttered by (2) a person

exhibiting an expectation that the communication is not subject to interception under circumstances justifying the expectation Wis. § 968.27 (4)(2021-2022). Statutory language is given its common, ordinary, and accepted meaning. *State ex rel. Kalal v Circuit Court for Dane County.* WI 2004 58, ¶45, 271 Wis.2d 633 681 N.W.2d 110. The meaning of "utter" is given its common definition; to say something or make a noise with a voice. Therefore, for an individual to violate the WESCL an individual must say something or make a noise with a voice. An individual must also demonstrate a reasonable expectation of privacy for a conversation to be oral communication. *Duchow* 2008 57, ¶ 19. An individual has a reasonable expectation of privacy when he or she has both (1) an actual subjective expectation of privacy in the speech, and (2) a subjective expectation of privacy that society is willing to recognize as reasonable (*Id.* at ¶ 20). An individual must exhibit some degree of an expectation of privacy for that individual to have an actual subjective expectation of privacy. Courts have held that subjective expectations of privacy are diminished in places that the individual shares with others, as compared with spaces exclusively for his or her use. (*Id.* at ¶ 25). When courts examine whether an individual has a expectation of privacy that society recognizes as reasonable, courts examine the totality of circumstances. (*Id.* at ¶ 22). Courts weigh six non-exhaustive factors to determine if an individual has a subjective expectation of privacy that society is willing to recognize as reasonable. (1) the volume of the statements; (2) the proximity of other individuals to the speaker, or the potential for others to overhear the speaker; (3) the potential for the communications to be reported; (4) the actions taken by the speaker to ensure his or her privacy; (5) the need to employ technological enhancements for one to hear the speaker's statements; and (6) the place or location where the statements are made (*Id.* at ¶ 22). For example, in a case involving the question of a reasonable expectation of privacy, federal agents outfitted a tire shop

owner with audio and surveillance equipment which the owner then used to record statements of an individual suspected of running a drug smuggling operation in the tire shop. *U.S. v Longoria.* 177 F.3d 1179 (10d Cir., 1999). The court held that the suspect had no expectation of privacy that society recognizes as reasonable because he voluntarily conducted conversations with the informant believing that the informant would not be able to reveal those conversations because the informant did not speak Spanish. *Longoria* (10d Cir., 1999). The court concluded that the suspect assumed the risk that the informant would reveal his incriminating statements to law enforcement, and in assuming that risk he relinquished any privacy that society would recognize as reasonable in his speech. The conversation between Heller and Bellows was not oral communication because they did not have a subjective expectation of privacy nor did they have a expectation of privacy that society would recognize as reasonable. The majority of the conversation between Heller and Bellows was verbal, but the two times they use sign language was not oral communication because the sign language did not force Heller and Bellows to make a noise with their voice. The oral conversation between Heller and Bellows indicates that Heller and Bellows did not exhibit a subjective expectation of privacy. In his memo, Sgt. Musah stated that the security cameras are quite visible to the naked eye, and that they are intentionally visible, but that there are parts of the park where individuals can meet without camera coverage. Heller and Bellows could have exhibited a subjective expectation of privacy if they sat where there was no camera coverage. However, they sat in the center of the park's lawn area where there was both a constant flow of people and visible security cameras. Additionally, Heller and Bellows did not have an expectation of privacy that society would recognize as reasonable because they sat in the middle of a very crowded park where the potential for their conversation to be reported was high, and the volume of their statements, and the proximity of individuals to their

conversation outweigh their use of a relatively obscure language and the need for MPD to hire Dr. Knight to translate the conversation. Similarly to when a criminal defendant voluntarily made incriminating statements in Spanish believing the informant did not speak Spanish, Heller and Bellows assumed a risk that their conversation would be revealed to law enforcement by speaking in a crowded park and in front of security cameras. The use of a relatively obscure language does not immediately signify an expectation of privacy that society would recognize as reasonable. Rather, because Heller and Bellows' conversation occurred in a public place where the potential for communications to be reported was relatively high and there was a large proximity of other individuals to Heller and Bellows, the conversation between Heller and Bellows did not contain any expectation of privacy that society would recognize as reasonable. Because Heller and Bellows do not have a subjective expectation of privacy nor an expectation of privacy that society would recognize as reasonable, the conversation between Heller and Bellows was not oral communication.

**Conclusion:**

The MPD did not violate the WESCL by acquiring the contents of the conversation between Heller and Bellows through the use of security cameras installed at Twining Park because there was no intent to intercept, the interception was in storage and not contemporaneous with the conversation between Heller and Bellows, and the conversation between Heller and Bellows did not fit the definition of oral communication in the WESCL. Though the MPD did not violate the WESCL, the MPD may have violated Wisconsin's version of the Stored Communications Act and should search out legal advice on this issue.



## Course History Report for ███████████

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022

| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|



### Spring 2023 - All Courses In Progress

| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|



Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR** OF **WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂

## Interview Evaluation Fillable Form

---

### <u>Interviewer Recommendation:</u>

■ **Outstanding Candidate**

☐ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, <u>jevans@wisbar.org</u> no later than January 23.**

**Student Name:** ▮▮▮▮▮▮▮

**Law School:** ■ **UW** ☐ **MULS**

**Interviewer:** <u>Jose</u> Castro

**A.** <u>**General Qualifications**</u>

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ■ 4 *↑ Highest*
Interviewer Comments:

▮▮▮ was very prepared and factual. He seems to know a lot about the legal market and is very prepared for a legal job. He was a great candidate.

**2.** *Communication Skills*:

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ■ 4 *↑ Highest*
Interviewer Comments:

Very clear, well spoken, and good answers. Confident and prepared.

**B.** <u>**Interview Characteristics:**</u>

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*
Interviewer Comments:

Clear answers. Prepared with information. Good eye contact. Confident with answers. Good at explaining information

## C.  Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:*  *What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score: *Lowest* ↓ ☐ 1 ☐ 2 ■ 3 ☐ 4 ↑ *Highest*
Interviewer Comments:

So many opportunities to be in legal field. Experiences. Appreciates linking law students who may not connections with opportunities Ensuring all students have access .

## D.  Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:*  *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

Interviewer Comments:

Even if not desired employer, not set to particular area of law. More than willing to take a position to gain experience

## E.  Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

Very impressive interview skills. Especially impressed with his preparedness and his confidence with his answers. Best of luck!



LinkedIn: https://www.linkedin.com/in/

## Education

**Marquette University Law School**, Milwaukee, WI
*Juris Doctor*, Expected May 2025
GPA: available in January 2023

| | |
|---|---|
| Honors: | Thomas More Law Scholarship Recipient |
| Leadership: | Asian Law Student Association, 1L Representative |

**University of Wisconsin-Madison**, Madison, WI
*Bachelor of Science in Human Development & Family Studies*, May 2020

| | |
|---|---|
| Certificates: | Asian American Studies | Criminal Justice |
| Honors: | Dean's List: Spring 2020 |
| Activities: | Hmong American Student Association, Grant Analyst |
| | Multicultural Student Grant Council, Grant Administrator |
| | Phoojywg Program |

## Legal Experience

**Immigrant Justice Clinic University of Wisconsin, Madison**, Madison, WI
*Intern*, January 2020 – May 2020
- Researched relevant information for ongoing detention hearings/projects and entered intake information into the National Immigrant Justice Center (NIJC) database
- Provided legal assistance to non-citizens detained by ICE to determine legal needs and eligibility for services, organized monthly intake data, and filed paperwork
- Adapted and translated NIJC's *Know Your Rights* packet from English to Hmong and distributed it to other service providers supporting Hmong community members

## Additional Professional Experience

**Hellermann Tyton**, Milwaukee, WI
*Talent Acquisition Administrator*, February 2022 – August 2022
- Scheduled and conducted interviews, new employee orientation, and assisted with onboarding activities to ensure readiness for each employee's first day
- Sourced and recruited employees through Indeed, LinkedIn, and MilwaukeeJobs
- Performed reference and background checks during the interview stage and processed employee referrals to ensure timely bonus payments
- Managed recruitment processes and open positions to ensure that vital positions were fulfilled efficiently to meet company demands

**Professional Services Group/Racine County Dept. of Children & Families**, Racine, WI
*Safety Support Worker - Child Protective Services*, June 2020 – July 2021
- Collaborated with professionals within Racine County to provide wrap-around care for vulnerable families
- Facilitated relationship between Initial Assessment and Ongoing Service workers to ensure that families were properly identified for services in the County
- Conducted home visits and presented parenting curriculum to parents lacking behavioral, cognitive, or emotional parental capacities to ensure that children could remain safely in parents' care
- Transported clients to medical and dental appointments to ensure health treatment for children

## Additional Information

| | |
|---|---|
| Interests: | Playing guitar, digital art and painting |
| Language: | Conversational in Hmong |

<span style="color:red">Exhibit 28</span>



████ | ████ @marquette.edu | ████
LinkedIn: https://www.linkedin.com/in ████

In the 90's, my parents had to wake up early every morning to make spring rolls, egg rolls, and other Hmong cuisine to sell at the local Asian markets. My parents had little English proficiency. My mom was working a full-time job to support my 3-siblings and I, and my dad's schooling at Lakeland College. She was also juggling the rigors of high school. Then in the early 2000s, it finally felt like my parents had struck the lottery with discovering a new financial endeavor in Sarcoxie, Missouri, running one of the largest turkey farms in the state. Life was going well until the 2008 financial crisis hit, the turkey farm was foreclosed, and we had to move back to the 53208-zip code of Milwaukee.

The dynamics of my life quickly unfolded. Playing outside freely was no longer an option. The fear of gunshots or our neighbors fighting robbed us of any childhood we had left. For a few Christmases, we received presents from the Salvation Army and my family was on EBT. At school, my parents picked us up in a rusted-old Toyota Sequoia that had several mechanical issues. I knew that I could not continue to live the life I once had, but I refused to accept my reality because I was so used to my parents figuring out things for us.

My siblings and I had to start figuring things out for ourselves, because my parents were at the end of the road, or so it seemed like. Every summer I joined a summer program in Milwaukee to keep me away from all the negative thoughts I had. The summer enrichment programs reminded me that I did not have to feel and be stuck forever. It was not my parent's fault that they arrived in the U.S. with limited English fluency. Through the midst of all of this, my parents were doing everything they could so my siblings and I could have a roof over our heads, enough food, water, clothing, and most importantly love.

████

Had I not gotten a chance to participate in the summer enrichment programs created for diverse students, graduate college, and attend law school, I would not have been able to embrace how much my racial and ethnic backgrounds contributed to the conversation of diversity in every space I entered.

As I sought for mentors throughout the years, there were few individuals who resembled my cultural and ethnic backgrounds. At the end of all of this, my parents were one of my greatest mentors. However, the road does not stop here. For so long, I asked for a helping hand from programs and mentors who were generous enough to give me a chance. Now I can become that helping hand for future generations of aspiring Hmong or Asian American lawyers. The unique experiences and hardships that I have endured as a Hmong American will continue to shape me in how I approach mentor-seeking students and professionals in the future.

3



LinkedIn: https://www.linkedin.com/in...

Attached you will find a copy of my writing sample that I wrote for Legal Writing, Research, and Analysis I. The interoffice memo has been revised based on feedback from my professor. No part of the memo has been omitted or excerpted. The assignment only asked me to analyze the legal question based on six cases that were provided. No outside legal research was allowed.

Under the facts of the simulation, our client was approached, casted, and filmed for a new reality TV show called *All Grown Up*. The show was premised on the contestants competing for the affection of a beautiful woman. Our client had prior bullying experiences from middle-school during a dodgeball game by a group of jocks. During the show, our client was forced to participate in a dodgeball game against new contestants. After filming subsided, our client was airlifted to the hospital, and has since been unable to return to work as a radio host, is currently in therapy for panic attacks, and has been diagnosed with depression.

The legal issue in the interoffice memo focuses on whether our client can bring a viable claim that the defendant's conduct was extreme and outrageous.

**From**: "Summer Associate" <summer-associate@MULSlawfirm.com>
**To**: "Steven Huss"<steven-huss@MULSlawfirm.com>
**Subject**: Kelly Applegate, Client/Matter # A-22-843
**Date**: Monday, October 17, 2022

   Mr. Applegate will not be able to establish a viable claim that Schultz's conduct was extreme

and outrageous under California law.  As a result, Applegate's IIED claim will likely not survive

a motion for summary judgement due to failure in satisfying the extreme and outrageous

element. To have a claim for intentional infliction of emotional distress (IIED), there are three

elements that must be satisfied: (1) the defendant's conduct must be extreme and outrageous; (2)

the defendant intended to cause harm or acted with reckless disregard with the likelihood of

causing emotional distress; and (3) the victim suffered severe emotional distress because of the

defendants conduct. Mahaffa v. McGraw, No. B300108, WL 2677897, at *8 (Cal. Ct. App. July.

30, 2021). Whether a defendant's conduct can "reasonably be found to be outrageous is a

question of law to be initially determined by the court." Mahaffa v. McGraw, No. B300108, WL

2677897, at *8 (Cal. Ct. App. July. 30, 2021) (quoting Berkley v. Dowds, No. B190963, at 518,

533 (Cal. Ct. App. 2007)). There is also no "'bright line'" test that separates conduct that is

actionable, and conduct that is not because each case depends on every individual's "values,

sensitivity threshold, and standards of civility." KOVR-TV, 37. Cal. Rptr. 2d at 433 (quoting

Yurick v. Superior Ct. of Butte Cnty, 257 Cal. Rptr. 665, 1116, 1118 (Cal. Ct. App. 1989)).

   For the purposes of this memo, we will only focus on the element of extreme and outrageous

conduct of Schultz and West Coast Reality LLC. Extreme and outrageous conduct is defined as

"'when it is so extreme as to exceed all bounds of [decency] that [are] usually tolerated in a

civilized community.'" Duronslet v. County of Los Angeles, 266 F. Supp. 3d 1218, 1219 (Cal.

Ct. App. 2017) (quoting Hughes v. Pair, 95 Cal. Rptr. 3d. 636, 209 (Cal. 2009)).

> Behavior may be considered outrageous if a defendant (1) abuses a relation or
> position which gives him power to damage the plaintiff's interest; (2) knows the
> plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally
> or unreasonably with the recognition that the acts are likely to result in illness
> through mental distress.

Duronslet v. County of Los Angeles, 266 F. Supp. 3d 1218, 1219 (Cal. Ct. App. 2017) (quoting Molko v. Holy Spirit Ass'n., 252 Cal. Rptr. 122, 762 (Cal. 1988)). Conduct that is outrageous does not include "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" Duronslet v. County of Los Angeles, 266 F. Supp. 3d at 1219 (Cal. Ct. App. 2017) (quoting Hughes v. Pair, 95 Cal. Rptr. 3d. 636, 209 (Cal. 2009)).

A person's conduct can be considered extreme and outrageous if they knowingly took advantage of someone else's vulnerability. In Mahaffa, Dr. Phil invited Mahaffa onto his show to film an episode regarding her boyfriend's childhood sexual abuse. Mahaffa v. McGraw, No. B300108, WL 2677897, at *1 (Cal. Ct. App. July. 30, 2021). Before Mahaffa appeared on the show, she signed an exculpatory agreement stating that she would not sue Dr. Phil for any misrepresentations, including any injuries suffered. Mahaffa, WL 2677897, at *2. While on air, Dr. Phil, the boyfriend's mother, grandmother, and the audience laughed at Mahaffa as Dr. Phil confronted and made comments about Mahaffa's mental health and supernatural abilities. Id., at *5. The basis of Mahaffa's suit came about because she felt humiliated by the way she was treated while on the show, which according to her exacerbated pre-existing health conditions. Id., at *5, *7. The court held that mere insults do not provide sufficient facts for outrageous behavior. Id. Dr. Phil's conduct of questioning her beliefs on national television was not extreme or outrageous conduct. Id., at *9. The act of questioning her beliefs was just an invitation to have a conversation. Id. The court reasoned that Mahaffa failed to cite sufficient evidence to prove that the Dr. Phil took advantage of her mental vulnerability due to the lack of evidence that she was a "'mentally-ill psychiatric patient' or was under the care of a mental health professional at the time of . . . [the] alleged acts." Id. at *8. All in all, Mahaffa's emotional reaction towards Dr. Phil mocking her supernatural abilities was short of any extreme and outrageous behavior. Id., at *8. At no point was Dr. Phil and his production team made aware that she was a mentally-ill

psychiatric patient, had they known and continued with the show, the outcome would have been different. Id.

Along with that, an employee's use of their official position to pursue a personal gain can be regarded as extreme and outrageous behavior depending on the circumstances. This is exemplified in K0VR-TV v. Super Ct. of Sacramento Cnty, where a woman murdered herself and her young children. KOVR-TV, Inc. v. Superior. Ct. of Sacramento Cnty, 37. Cal. Rptr. 2d **431, *1025 (Cal. Ct. App. 1995). Upon arriving to the neighborhood, a news reporter descended upon the next-door neighbor's home (neighbor and friends of the deceased family) to interview the family about the murders. KOVR-TV, 37. Cal. Rptr. 2d at *1025. Although realizing that there were no adults present in the residence and only three-minors, the news reporter continued to interview the children about the murders. When the minors expressed that they were unaware about any incidents at their friend's home, the news reporter proceeded to inform the children that their friends were now deceased. Id. KOVR-TV never broadcasted the interview, but the family of the minors sued KOVR-TV for an IIED claim after the children became traumatized and suffered severe emotional distress from the interview. Id. at **432, **435. The court held that a reasonable juror could find that the reporter deliberately manipulated the children during the interview to elicit a response from them, so that it would be newsworthy, making his conduct extreme and outrageous. Id. at **435. The court reasoned that the "minors were obviously too young either to consent to an intrusion by strangers into a private residence or to exercise control over a stranger who appeared there. It [did] not appear that [the minors] were given any choice as to whether their images and voice would be captured on the video tape and broadcast publicly on television." Id. at *1027-1028. As a result, the news reporter knew or should have known that his conduct was inappropriate when he proceeded to conduct an interview with the minors absent of an adult, did not give the children any choice to not be recorded, and volunteered information about the murders to minors who already informed

him that they were unaware of what just took place at their friend's home. Id. at *1028. The court stated that it is possible that the reporter did not give any thought into his conduct but having conducted himself in such a way to the children, posed as extreme and outrageous. Id. at 1030. As a result, the reporter's conduct went beyond all bounds of decency because he conducted the interview to advance his career. Id.

To start off, the way in which Dr. Phil mocked Mahaffa's supernatural abilities is analogous to how the "hunks" mocked and ridiculed Applegate and the other "trunks'" physical abilities on *All Grown Up*. Mr. Applegate stated in the client interview that he was initially approached by a West Coast Reality LLC casting agent and informed that he "had the look they were aiming for." Although vague, Mr. Applegate described himself in the client interview as middle aged, skinny as a pencil, and prematurely balding" man. Likewise, in Mahaffa, she alleged that she had "struggled with mental health issues since she was a child . . . [had] supernatural powers, including an ability to communicate with the dead, read minds, see with X-ray vision, and intuitively write ancient languages . . . [She] [also] [claimed] 'she died seven times' and was brought back to life to be a 'messenger for God.'" Mahaffa, WL 2677897, at *1-2. Mahaffa admitted several times to the production team that she had a history of mental health issues. As a "licensed psychologist and [someone who] practiced clinical psychology," Dr. Phil would have to assume that Mahaffa did have some form of mental health issue because a reasonable prudent adult would not believe they have seven lives and have X-ray vision. Mahaffa, WL 2677897, at 1. Through science, her supernatural abilities are inherently impossible. Even though this was the case, Mahaffa continued to sign a waiver stating that she had "'no pre-existing mental or medical condition that would increase the risk of injury to [herself] or others as a result of [her] participation.'" Mahaffa, WL 2677897, at *3. Only after realizing how much embarrassment, she had faced on the show, she retracted and claimed that Dr. Phil took advantage of her because she was a mentally ill psychiatric patient. Id. at *2.

Similarly, during his interview, Mr. Applegate informed the casting team that he was bullied repeatedly in grade-school by a "bunch of cruel jocks." However, he never made it clear to the casting team that these incidents caused him to suffer any mental illnesses. Mr. Applegate stated that he had never sought counseling for the bullying he endured in grade school. As a result, there was no indication that West Coast Reality LLC knew or should have known that Mr. Applegate had a mental health vulnerability relating to his grade school dodgeball experience. In fact, to ensure that Mr. Applegate was mentally fit to be a contestant on the show, he had to undergo a psychological test, which he passed before the production team began filming. Both plaintiffs were mocked and embarrassed on national television. However, as the Mahaffa court ruled, "'[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are not subject to an IIED claim because the court does not intervene when "'"some one's [] feelings are hurt.""" Mahaffa, WL 2677897, at *8 (quoting Agarwal v. Johnson, 25 Cal. 3d 932, 946 (Cal. 1979)). The fact that the humiliation of both participants was in public is not overly important because the comments made to them are still mere indignities. Dr. Phil mocking Mahaffa was not enough to prevent a motion for summary judgment in her case. As a result, it should not be considered significant in Applegate's case.

Along with that, although Mr. Applegate found it odd that the casting team had focused most of his casting interview on his grade school experience, he still decided to travel to San Francisco a week later to begin taping. A reasonable prudent adult would likely have not traveled to begin filming for a reality TV show that made them feel uncomfortable during the casting interview. By not presenting any evidence and communicating to the producers that he had vulnerabilities, Mr. Applegate left the door open for Schultz and his production team to spin the story line however they wanted, without precaution. Along with this, the Dr. Phil show, and reality TV shows altogether have been tolerated, accepted, and approved by many viewers. Mahaffa, WL 2677897, at *8. Society expects reality TV shows to portray even the most

intimate and uncomfortable parts of a contestant's life. When production sets portray such events do not exceed all bound of decency, as it is generally accepted by viewers.

In conclusion, Mahaffa and Applegate's cases are analogous to one another due to the way in which they were mocked on national television.

The considerable distinction between KOVR and Applegate is the mental capacity and maturity of the participants involved. In KOVR, the news reporter dealt directly with children of "tender years." KOVR-TV, 37. Cal. Rptr. 2d at *1028. This made it more outrageous because the news reporter picked on the emotions of young children who did not have the mental capacity and maturity to deal with shocking and devastating news of the death of a friend, let alone the topic of death. Adults on the other hand are more capable of handling such emotions. In Mr. Applegate's situation, it can be argued that the production team preyed on his childhood trauma and specifically targeted Applegate. The team was aware from the casting interview that Mr. Applegate was still haunted by his past trauma. As a result, they knew or should have known that even as an adult, he would still be vulnerable and susceptible to emotional trauma from it. However, this argument is weak because Mr. Applegate admitted in his client interview that during each of his interactions with the "hunks" none of them ever specifically looked at him or made comments at him. Rather, the hunks geared their comments towards the entire group of "trunks." Mr. Applegate also admitted during the client interview that the other "trunks" had terrible stories from their grade school years but that no one had stories as horrific as his. This statement alone is subjective, as grade school could have been just a horrific for the other "trunks," although they may have experienced something entirely different. Unless other "trunk" contestants come forward and speak about their experiences while filming *All Grown Up*, Mr. Applegate's argument is weak.

In addition, the court in KOVR noted that the taping of the minors "reveal[ed] an uninvited, intrusive encounter by adult strangers with children of tender years not in a public

place but in their home." <u>KOVR-TV</u>, 37. Cal. Rptr. 2d at *1028 (quoting <u>Miller v. National Broad. Co.</u>, supra, 187 3d Cal. Rptr. 668, 1487 (Cal. Ct. App. (1986))). The court in KOVR-TV, stated that it could be inferred that the news reporter was "bent upon making news, and not gathering it." <u>KOVR-TV</u>, 37. Cal. Rptr. 2d at **435. It is not common, expected, or accepted for news reporters to manipulate the emotions of citizens to their distress to create newsworthy clips. Reporters are just expected to report the news at face-value. Mr. Applegate on the other hand, was a willing adult who was approached in a parking lot about a reality TV show, decided to cast for the show, underwent a background check and psychological test, and traveled to San Francisco to begin filming. The level of acceptance in society for reality TV shows makes Mr. Applegate's situation distinguishable from the minors in KOVR. Society has made room for reality TV to humiliate and shock its contestants as a form of entertainment. People who watch reality TV shows expect plot twists and changing story lines amongst the contestants.

  In Mr. Applegate's client interview, he also mentioned that he had already broken into a cold sweat as soon as he saw the hunks arriving to the beach party. The good-looking nature of the hunks immediately brought Mr. Applegate back to his grade-school insecurities. The immediate presence of the hunks triggered Mr. Applegate's trauma, before they even got into a dodgeball game. The dodgeball game just brought back bad memories for Mr. Applegate, but it was not what triggered his emotions; it was an exacerbation of his existing emotions. A potential counter argument is that that West Coast Reality LLC misled Mr. Applegate as to the premise of the show. As a result, Mr. Applegate could argue that he did not consent to the actionable conduct of the production team. However, this counter is weak. During Mr. Applegate's client interview, he admitted to a West Coast Reality LLC staff during the dodgeball scene, that he had seen all the reality TV shows like Joe Millionaire. In Joe Millionaire the female contestants did not find out until the end of the show, that their millionaire was a penniless tractor driver. Mr. Applegate seemingly knew how reality TV shows worked with all the staged plot twists.

Mr. Applegate may argue that Schultz and his production team became aware of Applegate's vulnerability the moment he mentioned the dodgeball game from grade school, making their conduct extreme and outrageous. During Mr. Applegate's client interview, he also stated that the jocks threw dodgeballs so hard and said terrible things to him and the other "trunks". Although an adult would generally regard this behavior between school-aged children to be extreme and outrageous, a dodgeball game between adult contestants on a reality TV show was not. From Mr. Applegate's own interview, the facts do not suggest that he was specifically targeted by the new contestants nor the production team. All the "trunk" contestants were aware of their involvement in the reality TV show, and each of them were treated similarly. None of the "trunk" contestants were individually ousted and physically and emotionally targeted. Applegate's negative perception of the dodgeball episode was a product of his willingness to undergo a casting interview, a psychological test, and further travel to San Francisco to begin filming. Mr. Applegate stayed on the show a month after Mr. Schultz changed the entire scenario once already. He was one of the last eight contestants on the show, until the "hunks" showed up. A reasonable juror can conclude that Applegate only felt humiliated because he did not perform his best in the episodes involving the "hunks" (i.e., falling flat on his back, getting dodgeballs thrown at him). Regardless, being insulted is not a viable claim for IIED, and certainly consenting to being filmed for the show is sufficient evidence that Schultz's conduct was not extreme and outrageous.

Despite all the possible ways to avoid the emotional distress from being on the show, Mr. Applegate did not do anything to eliminate himself off the show early on. Instead, Mr. Applegate stated that he felt comfortable after becoming aware that other men like him existed on the show. He was aware of his preexisting and untreated mental health trauma from his grade school bullying. His participation in the show reignited this preexisting condition. As a result, the two cases are distinguishable because of Applegate's adult status and willingness to participate,

whereas the minors were neither adults nor willing participants in KOVR. <u>KOVR-TV</u>, 37. Cal. Rptr. 2d at *1028.

In conclusion, the court will rule that a jury cannot legally find the conduct of Schultz and West Coast Reality LLC as extreme and outrageous. As a result, the court will likely grant Schultz's motion for summary judgement.

**OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD**

**Name:**
**Student ID:**

Institution Info:      Marquette University
Print Date:             01/13/2023

Other Institutions Attended:
University of Wisconsin-Madison

**Beginning of Law Record**

**2022 Fall**

Program:              Law
Primary Major:     Law

| Course | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|

| | | Attempted | Earned | GPA Units | Points |
|---|---|---|---|---|---|
| Term GPA: | Term Totals | | | | |
| Cum GPA: | Cum Totals | | | | |

**2023 Sprg**

Program:              Law
Primary Major:     Law

| Course | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|

| | | Attempted | Earned | GPA Units | Points |
|---|---|---|---|---|---|
| Term GPA: | Term Totals | | | | |
| Cum GPA: | Cum Totals | | | | |

**Law Career Totals**
Cum GPA:              Cum Totals

End of OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂ ◂

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

- ☒ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ▮▮▮▮▮▮

**Law School:** ☐ UW ☒ MULS

**Interviewer:** April Toy

### A. General Qualifications

*1. Relevant Skills and Qualities:*

Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ☒ 4 ↑ *Highest*

Interviewer Comments:

*Prior professional experience will prepare her for 1st year internship*

*2. Communication Skills:*

Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ☒ 4 ↑ *Highest*

Interviewer Comments:

*Strong verbal and written communication skills*

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*

Interviewer Comments:

*very enthusiastic, driven a little nervous and lacking in eye contact but personality made me forgive that*

C. <u>Motivation for Participation in the Diversity Clerkship Program:</u>

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* **What is your motivation for participating in the Diversity Clerkship Program?**

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*

Interviewer Comments:

When she was in high school, she participated in the Summer Youth Program.  She saw the parallels and was inspired to apply for DCP.

D. <u>Interviewer's Perspective:</u>

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* **If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?**

Interviewer Comments:

Any form of experience she will get through the program will be beneficial even if it is not her top choice.

E. <u>Student Feedback:</u>

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

Be a little tighter on your answers, try to keep them direct and shorter.  Zoom is hard, but I noticed at the beginning you kept looking around the room.  Try to stay focused ahead.  Great Job.



https://www.linkedin.com/in/

## EDUCATION

**Wisconsin Law**                                                                                    **Madison, WI**
Juris Doctor Candidate                                                                       Expected 2025
**Activities:** Liaison - Wisconsin State Bar International Practice Section
        Member - Asian, Pacific Islander, Desi American Law Student Association (APIDALSA)

**University of Wisconsin-Madison**                                                 **Madison, WI**
**Degree:** Bachelor of Science                                                         December 2020
**Major:** Economics
**Certificates:** Digital Marketing & Business
**Honors:** Dean's List
**Activities:** Dancer - Wisconsin School of Bhangra

## EXPERIENCE

**Zendesk**                                                                                         **Madison, WI**
*Email Marketing Specialist*                                                      January 2021 - July 2022
- Gained email software certification in order to aid in campaign execution of over 25 planned campaigns
- Coordinated direct mail sends for regional, industry-specific campaigns in order to generate demand in targeted industries
- Inspected the current email program to make a case for fewer, more targeted sends

**CUNA Mutual Group**                                                                  **Madison, WI**
*Marketing Operations Intern*                                             August 2020 - November 2020
- Created a catalog system to describe 65 email marketing assets in order to increase synergies within the organization
- Rebranded the Trustage product email assets to help speed up renewal and mitigate delays in market launch
- Coordinated email marketing and direct mail processes in order to create synergy and foster a seamless customer experience

**UW-Madison Department of Economics**                                    **Madison, WI**
*Marketing Extern*                                                                    May 2020 - July 2020
- Selected out of hundreds of applicants for the marketing cohort of the EconEx program
- Conducted market research by personally interviewing 50 UW-Madison students about their experiences with Handshake Job Search
- Authored a report proposing a multi-faceted approach and recommendations to solve a distinct problem

**WPS Health Solutions**                                                               **Madison, WI**
*Events and Community Relations Intern*                              May 2019 - November 2019
- Planned 30 corporate events that helped bring awareness to brand standards, company achievements, and products sold
- Designed and administered an employee engagement campaign that had the highest participation score in years
- Built a cost-tracking document to accurately report event-related spending

## INTERESTS

- Cooking and recreating traditional Indian dishes
- Powerlifting
- Kayaking

Exhibit 29



**https://www.linkedin.com/in/**

████████. My doctors did not understand how ████████ culturally. My was much more prominent on my ████████ than it was on the skin of others. As a child who went to the doctor three times a week to an adult who is now doctor-avoidant, I have first-hand experience of what it feels like to be a patient first, and a person second. I want to be a catalyst for systematic change and shed light on unintentional social apathy. My experiences as a person of color, attention to detail, and enthusiasm for problem solving will make me a thoughtful and passionate addition to the Diversity Clerkship program.

Throughout my educational career, I have always tried to view challenges through the lens of fighting against systemic inequities for people of color. After being treated poorly by my childhood care providers, I chose to learn about our healthcare system. I immersed myself in STEM, volunteering at the hospital's ICU and clinically researching neurobiology in a lab, all while spending hours shadowing doctors of different specialties and managing my undergraduate coursework. My experience showed me the importance of diverse voices in positions of power. When people of color use their voices to foster inclusion from the top down, it sets a foundation for a brighter future. This exploration inspired me to become a lawyer.

It is important to pay close attention to the details to listen and communicate effectively in law. In the first year of my career, I worked in email marketing where every punctuation must be triple-checked and each link must be double-clicked. Email marketing helped me sharpen my attention to detail. When legally advocating for marginalized individuals, the facts—as minute as they may be—matter. My legal experiences through the Diversity Clerkship program will empower me to examine the legal dilemmas through critically assessing case details.

I know first-hand that diversity and inclusion are complex topics, each having robust intricacies that require strong problem-solving skills. While studying for my economics degree, I found passion in evaluating data and theory to improve how systems work and how they affect the individual. The law plays a continuous role in affording individual rights. I plan to help navigate the legal environment for clients who need an advocate.

Being a lawyer means having the ability to make a concrete, sustainable difference in our community, working towards the ideal that no one should have to feel marginalized. I plan to use my diverse background in STEM, economics, and marketing to fuel my pursuit of justice. My personal experiences along with my attention to detail and problem solving skills will help me communicate legal solutions to my clients.

# NORMAN LAW GROUP

**975 Bascom Mall**                                                      **T: (281) 330-8004**
**Madison, WI 53706**

November 20, 2022

To:      Andrew Norman, President and Primary Shareholder

From:   Associate

Re:      Jim Lawson

---

<u>Question Presented</u>

Under the First Amendment's protection of free speech, does someone have the right to stand on a median and ask motorists for money by panhandling when the median is on a busy street that is outlined in Wauwatosa Municipal Code section 11.20.100 ("Section 11.20.100") as a zone only accessible for cross-walking?

<u>Brief Answer</u>

Yes, because Section 11.20.100 is not constitutional under the First Amendment. The First Amendment's protection of free speech allows someone to exercise the right to stand and panhandle on a restricted median articulated in Section 11.20.100. To analyze the protections to free speech afforded by the First Amendment, one must consider if the location is a traditional public fora where the First Amendment would restrict most governmental interference with free speech. Then, one must ensure that the ordinance is content neutral, that it is narrowly tailored to serve a significant governmental interest, and that it leaves open other channels of communication. If all of these elements are met, then the government can place specific time, manner, or place restrictions on speech. Medians are traditional public fora, so they fall within the realm of First Amendment protections. However, the ordinance is not content neutral or narrowly tailored to serve a significant governmental interest because it excessively prohibits

1

speech on busy medians with little justification for the limitations. Because the ordinance does not satisfy all elements of the First Amendment analysis, someone would have the right to panhandle on a restricted median.

Statement of Facts

Our client, Mr. Lawson, received a citation for standing and panhandling on a large median on North Mayfair Road. The median of North Mayfair Road was a usual spot for Mr. Lawson's panhandling. In doing so, he claimed he did not intentionally cause danger to traffic or motorists. In the past, Mr. Lawson was told by police that he could not panhandle at that median anymore, but he was not given a reason why, so he dismissed the warning as an officer trying to give him a hard time. The next time an officer came to Mr. Lawson, it was to issue him a citation. When issued the citation, Mr. Lawson was told that he could not panhandle at the North Mayfair Road median anymore because of the new ordinance: Wauwatosa Municipal Code section 11.20.100.

When designing Section 11.20.100, the city held a common council meeting. During the meeting, the city discussed how panhandling was a major factor in creating this safety ordinance. City of Wauwatosa, http://wauwatosacitywi.iqm2.com/ (last visited Nov. 18, 2022). The Alderpersons mentioned one near-miss fatality incident that occurred because of panhandling on a median. Id. They also mentioned how the city police department is working on creating alternate mitigation techniques for panhandling, such as substance abuse support and other social work de-escalation techniques. Id. Matt Stippich, Alderperson for the First District asserted that "the focus of [the ordinance] is to address the panhandling that [is] occurring on the arterial streets coming into Wauwatosa". Id.

2

Section 11.20.100, now codified law, articulates that certain medians on busy streets are to be used only for cross-walking purposes to prevent traffic hazards. Wauwatosa, Wis., Code of Ordinances, Section 11.20.100 (Aug. 3, 2021). In identifying what medians are the riskiest, the city used crash data and traffic counts. Id. The ordinance, in subsection G, restricts the use of medians on twelve streets and their intersections. Id. North Mayfair Road is one of these streets. Id. Unauthorized personnel standing on these streets for more than two consecutive opportunities to cross are seen in violation of the ordinance. Id. Therefore, under the ordinance, these medians are only accessible for cross-walking and Mr. Lawson's panhandling is a violation of the ordinance.

Discussion

Mr. Lawson is within his First Amendment protection of free speech to panhandle on the median of North Mayfair Road because panhandling is a form of protected speech. Norton v. City of Springfield, Ill., 806 F.3d 411, 412 (7th Cir. 2015). To decide the acceptability of Section 11.20.100 under the First Amendment, one must consider four elements: 1) whether the forum where the speech takes place is a traditional public fora, 2) whether the ordinance is content neutral, 3) whether the ordinance is narrowly tailored to serve a significant governmental interest, and; 4) whether the ordinance leaves open additional channels for communication. Ovadal v. City of Madison, Wis., 469 F.3d 625, 627 (7th Cir. 2006). If all of these elements are met, then Wauwatosa has the right to impose specific time, manner, or place restrictions on panhandling. Id.

Traditional public fora are a category of locations where the First Amendment restricts most governmental interference with free speech. McCullen v. Coakley, 573 U.S. 464, 476 (2014). Courts have traditionally seen public ways and sidewalks as public fora, implying that

3

the government has very limited abilities to regulate speech in these locations. Id. at 464. Additionally, in McCraw, courts held that "medians share fundamental characteristics with public streets, sidewalks, and parks, which are quintessential public fora." McCraw v. City of Oklahoma City, 973 F.3d 1057, 1067 (10th Cir. 2020). Although medians create a risk of traffic coming from both directions, their width can counteract that risk and create a relatively safe environment for public exchange. Id. at 1072. While the McCraw case from the tenth circuit is a persuasive authority to our circuit, the court is likely to follow suit and extend medians to the category public fora. Therefore, the median of North Mayfair Road is a traditional public forum. Additionally, since the ordinance only names twelve streets and their medians as restricted, it leaves open alternative forms of communication through the ability to panhandle in non-restricted areas.

There is no question that the median Mr. Lawson was panhandling on will be extended by our circuit to be traditional public fora. Additionally, there is no question that there are available alternative means of communication through panhandling on non-restricted medians. The question remains whether Section 11.20.100 is content neutral and narrowly tailored to a significant governmental interest. The remainder of this memo will show that 1) Section 11.20.100 is not content neutral, and; 2) Section 11.20.100 is not narrowly tailored to a significant governmental interest.

I.   **Section 11.20.100 is not content neutral when you consider both the ordinance on its face and the justification for its enactment.**

Section 11.20.100 fails the justification prong of the content neutrality test because its justifications are targeted toward the behavior of panhandling. Content-based laws target a "particular speech because of the topic discussed or the idea or message expressed." Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163 (2015). Content-based laws are viewed with strict

4

scrutiny standards of review by the courts, so these laws are thoroughly inspected for a strong governmental interest that justifies speech restrictions. Id. at 159. On the other hand, Content neutrality in ordinances shows the absence of targeting toward specific types of speech. Content neutral laws are met with intermediate scrutiny, so the inspection by the court is less rigorous, but the court still requires an important governmental interest that justifies speech restrictions. When determining content neutrality of an ordinance, one must consider a two-prong test: 1) if the ordinance is content neutral on its face, and; 2) if the ordinance is content neutral in regard to its justifications. Reed, 576 U.S. at 156.

     **a. Section 11.20.100 is content neutral on its face.**

The writing of Section 11.20.100 is content neutral on its face because it is a safety ordinance. When considering whether an ordinance is content neutral on its face, one must investigate the plain meaning of the legislative text. In Ward, the Court established the Ward test for content neutrality of an ordinance on its face. Ward v. Rock Against Racism, 491 U.S. 781, 795 (1989). In articulating the Ward test, the court reasoned that a "guideline is content neutral, [if] it is justified without reference to the content of the regulated speech." Id. at 782. Therefore, if an ordinance does not explicitly state speech regulations in its purpose, then the ordinance is content neutral on its face.

Section 11.20.100 states its purpose as avoiding "safety hazards for pedestrians and distract drivers." Wauwatosa, Wis., Code of Ordinances, Section 11.20.100 (Aug. 3, 2021). The ordinance asserts that stopping and standing on medians of busy streets can create safety hazards for drivers and pedestrians alike due to the congestion of roads and the distraction of multiple stimuli. Id. To solve this problem, the ordinance states that "no person shall be upon a median of

5

a street listed in subsection G unless that person is in the process of crossing the highway in a safety zone or crosswalk." Id.

In our case, it is clear that Section 11.20.100 does not make explicit reference to speech. The ordinance illustrates the limitation of access to medians for any unauthorized person. This limitation focuses on the safety of people, and without referencing the content of regulated speech. Therefore, the ordinance, on its face, does not specify limiting the speech of a specific group, like panhandlers. It simply creates guidelines disallowing standing on medians of the twelve named streets. The lack of reference to speech, or activities that require speech makes the ordinance content neutral on its face.

   b. **The justification for Section 11.20.100 is not content neutral.**

Wauwatosa's justification for Section 11.20.100 is not content neutral because, although on its face it is a safety ordinance, the justification for creating this ordinance is to limit panhandling. When considering whether an ordinance is content neutral in its justification, one must investigate the legislative intent behind the ordinance. In Norton, the court examined an ordinance that prohibited panhandling and determined that it failed content neutrality. Norton, 806 F.3d at 413. The court reasoned that the ordinance was content neutral on its face because it opposed panhandling specifically, but did not suggest what viewpoints in panhandling speech should be restricted. Id. at 412. However, the ordinance was not content neutral in its justification. Id. In making this determination, the Norton court held that "a speech regulation targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter." Id. (quoting Reed, 576 U.S. at 169). Therefore, ordinances that are passed with the justification of limiting panhandling do not pass the justification prong of the content neutrality test.

6

Regarding Mr. Lawson, the main point of conversation during the enactment of Section 11.20.100 was about restricting panhandling due to one instance of near-miss fatality. City of Wauwatosa, http://wauwatosacitywi.iqm2.com/ (last visited Nov. 18, 2022). Matt Stippich clearly articulated that "the focus of [the ordinance] is to address the panhandling that [is] occurring on the arterial streets coming into Wauwatosa". Id. Therefore, the ordinance cannot be argued as content neutral for its justification because there is evidence of specific legislative intent to deter panhandlers, like Mr. Lawson. Section 11.20.100 fails the justification prong of the content neutrality test, and therefore it is not content neutral in its justification.

## II. Section 11.20.100 is likely not narrowly tailored to serve a significant governmental interest.

Section 11.20.100 is likely not narrowly tailored to serve the significant governmental interest of traffic control. For an ordinance to be narrowly tailored, it must specify restrictions that impose the least amount of burdens on speech. For an ordinance to be proven to serve a significant governmental interest, the government must develop thorough research into the causal relationship between the ordinance's burden and governmental interests.

In Weinberg v. City of Chicago, Weinberg brought action against the city of Chicago's new ordinance that prohibited non-licensed peddlers from peddling outside of the United Center. Weinberg v. City of Chicago, 310 F.3d 1029, 1034 (7th Cir. 2002). The city stated that the ordinance was "to alleviate traffic congestion and maintain pedestrian safety." Id. The court held in favor of Weinberg, stating that the ordinance was not narrowly tailored to a significant governmental interest because "Chicago has provided no objective evidence that traffic flow on the sidewalk or street is disrupted" because of peddling. Id. at 1039.

In McCraw, the court reviewed an ordinance that prohibited standing or stopping on medians in Oklahoma City. McCraw, 973 F.3d at 1061. The court presumed that the ordinance

7

was content neutral and reviewed it under intermediate scrutiny. Id. at 1070. The court held that "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." Id. at 1074 (quoting McCullen, 573 U.S. at 467). Then, court took a deeper look into the justifications for the ordinance and held that Oklahoma City's governmental research "[was] devoid of evidence that accidents involving vehicles and pedestrians on medians in Oklahoma City [was] an actual issue, as opposed to a hypothetical concern." McCraw, 973 F.3d at 1072. It was not enough for Oklahoma City to state traffic concerns as their reasoning, they had to have extensive research findings that this ordinance would mitigate risk and serve their significant governmental traffic-control interests. Id. at 1063.

In our case, Wauwatosa, like the City of Chicago in Weinberg, will be held liable for maintaining a depth of objective evidence that traffic flow is impacted by persons stopping or standing on restricted medians. Weinberg establishes that the seventh circuit will require thorough research and reasoning for the significant governmental interest in traffic control to justify burdening the speech of Mr. Lawson and other median users. Mr. Lawson claimed that he habitually panhandles on the median where he was cited, and he does it in a non-disruptive way. To display that Mr. Lawson's behavior is simply a traffic concern, Wauwatosa will need to satisfy the burden of proof that there is a causal relationship between Mr. Lawson's behavior and traffic obstruction.

Section 11.20.100 is much like the ordinance in McCraw because it is a broad ban on stopping and standing on specified medians in the city to alleviate the risk of pedestrian-vehicle conflicts. In McCraw, the tenth circuit took a deep dive into the rationale behind the governmental interest in traffic safety; questioning alternate tools of mitigation, data trends of

8

traffic hazards, and the efficacy of these restrictions. While the McCraw case is a persuasive authority on our circuit, the courts will likely follow suit in a detailed analysis of Wauwatosa's crash data and traffic counts, requiring the burden of proof for significant governmental interest to rest on Wauwatosa. When looking at alternate tools of mitigation, Wauwatosa makes it clear that the city police are beginning to pursue sociological remedies to the issue of panhandling, but this framework is not fully built out. City of Wauwatosa, http://wauwatosacitywi.iqm2.com/ (last visited Nov. 18, 2022). Additionally, Wauwatosa did not use these sociological remedies for Mr. Lawson. Instead, Wauwatosa police just gave Mr. Lawson a brief warning followed by a citation. Therefore, the court will likely not be satisfied that Wauwatosa completely exhausted these alternate mitigation tools before placing a burden on speech.

Next, there is not a clear trend when researching Wauwatosa's crash data and traffic counts. There is only a passing indication of a near-miss fatality during the council meeting. City of Wauwatosa, http://wauwatosacitywi.iqm2.com/ (last visited Nov. 18, 2022). It is unlikely that this one-off case will prove sufficient in Wauwatosa's burden of proof for a significant governmental interest because this issue does not have a long-standing history to justify a significant governmental interest in traffic safety around medians that leads to restricting speech. Wauwatosa will likely not have enough data to show that this ordinance is narrowly tailored to serve a significant governmental interest.

Conclusion

Mr. Lawson is within his rights to panhandle on medians restricted by Section 11.20.100 because the ordinance is unconstitutional under the First Amendment's protections to free speech. Medians are traditional public fora, so governmental restrictions on free speech must pass the elements of constitutionality under the First Amendment by 1) being content neutral, 2)

9

being narrowly tailored to serve a significant governmental interest, and; 3) leaving open additional channels for communication. While Section 11.20.100 leaves open other channels of communication, it is not content neutral and it is not narrowly tailored to serve a significant governmental interest.

10



# Course History Report for ██████████

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

## Fall 2022



| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|
| ████ | ██████ | █████ | █ | ███ |
| ████ | █████████ | █████ | | █ |
| ████ | ██████████ | █████ | | █ |
| Semester: | ████ ███████ | ████████ | ████ | |

## Spring 2023 - All Courses In Progress



| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|
| ████ | ████ ██████ | ███ | █ | |
| ████ | ███████ | ███ | | |
| ████ | ███ ███████ | ████████ | █ | ████ |
| ████ | ████ ████████ | ██████ | ████ | |

Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▶ ▶ ▶ ▶ ▶ ▶ ▶ ◀ ◀ ◀ ◀ ◀ ◀ ◀

## Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

- ☑ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ▮▮▮▮▮▮▮

**Law School:** ☑ **UW**  ☐ **MULS**

**Interviewer:** Sir Williams

### A. General Qualifications

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:  *Lowest ↓*  ☐ 1   ☐ 2   ☐ 3   ☑ 4   *↑ Highest*

Interviewer Comments:

▮▮▮▮ experiences at ZenDesk have prepared her well for a professional work environment. She's sharp, energetic, thoughtful, and mature.

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:  *Lowest ↓*  ☐ 1   ☐ 2   ☑ 3   ☐ 4   *↑ Highest*

Interviewer Comments:

▮▮▮▮ communicates very well with clarity and ease. She comes across as very authentic and thoughtful in oral communication

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

**Check a Score**: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

██████ is confident, poised, professional, and mature. She interviewed well, responded to all questions with good energy, and was appropriately dressed.

**C. Motivation for Participation in the Diversity Clerkship Program:**

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK: What is your motivation for participating in the Diversity Clerkship Program?*

**Check a Score**: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

## Interested in growing her communication and advocacy skills

**D. Interviewer's Perspective:**

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK: If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

**Interviewer Comments:**

She would focus on her desire to expand relevant legal skill sets and how she feels that particular org can help her achieve those goals.

**E. Student Feedback:**

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

**Interviewer Comments:**

Feedback provided directly to the student at the conclusion of the interview.



████████ | ████████@wisc.edu

## EDUCATION

**University of Wisconsin Law School**                                        Madison, WI
*Juris Doctor Candidate*                                                        *May 2025*
    **Activities:**    Black Law Students Association, 1L Class Representative, Access Lex Champion

**Illinois State University**                                                   Normal, IL
*Bachelor of Science in Sociology*                                             *May 2022*
    **Honors:**    Dean's List Fall 2020-Spring 2022, John A. Kinneman Scholarship Recipient, Sociology Senior of the Year, Redbird Scholar

    **Activities:**    Illinois State University College Council, Member; Black Student Union, Member of the College of Arts and Sciences Bylaws Committee

## EXPERIENCE

**Illinois State University College Council**                                   Normal, IL
*Council Member*                                                  *August 2020 – May 2022*
- Served as an Advisor to several Deans of the University on Diversity, Equity, and Inclusion initiatives within the College of Arts and Sciences curriculum
- Worked with the Dean of the College of Arts and Sciences to expand the relevance of a liberal arts and sciences education to current and future students to provide insights into the skill sets they obtain from the programs to better facilitate their transition into continuing their education or entering the workforce
- Worked with programs and departments/schools to promote diversity, equity, and inclusion by developing faculty training and awareness bylaws

**National Public Radio and Ruffalo Noel Levitz**                              Normal, IL
*Student Engagement Ambassador Supervisor and Fundraiser*         *January 2019 – August 2022*
- Raised $51,000 in donations over 18 months
- Supervised 15 Student Engagement Ambassadors and ensured they had the resources and support they needed to be successful
- Updated and maintained donor, alumni, and student records
- Fundraised subscription services and donations to NPR and universities across the nation

**Illinois State University Career Services**                                   Normal, IL
*Career Ambassador*                                                 *January 2020 – May 2022*
- Provided and career presentations on the creations of resumes, interviewing skills, and LinkedIn profiles to a wide range of campus audiences and sizes both in person and virtually
- Provided constructive feedback and assisted students with the creation of their resumes, cover letters and, LinkedIn profiles to help them achieve their personal, career, and professional goals
- Assisted with logistics at all programs held by the University by helping with guest check-in and support
- Embraced cultural differences and facilitated a supportive, welcoming, and inclusive environment

<span style="color:red;">Exhibit 30</span>

████████

**INTERESTS**

I am currently a blue belt in Brazilian Jiu Jitsu pursing certification as a self defense instructor.

My name is ▭▭▭▭▭▭▭, and I am a young Black man from the South Side of Chicago. Statistically speaking I am not supposed to be a first-year student at the University of Wisconsin Law School. In Chicago, many mothers hope that their sons will make it through high school alive, free from incarceration, and in a position to graduate high school. Four years ago, when I fulfilled all of these things my mother shed tears at my graduation. Four years later I stood a college graduate and admittee to eight of the best law schools in the nation. My mother was a first-generation college graduate who held aspirations of going to law school herself. Unfortunately, life circumstances deemed that it would not be so, but I am my mother's dream come true: a tangible symbol of success in a place where success that resembles myself is hard to find. Generational progress is an issue that is often viewed through the lens of progression as a society involving change at large. While crucial this change is slower to manifest. I believe that we can more easily achieve generational progress by improving upon the work of our family members who came before us as a starting point. My mother was a first-generation college graduate, and the first person to own a home in my family. I am motivated to honor her sacrifices by becoming the first lawyer in our family and building upon the foundation she has laid.

The inherent value of diversity is found both in the diversity of race and ethnicity and in the diversity of thought and perspective. In law school everyone is intelligent and competent, but at times legal thought can align itself with one homogenous body that excludes the unique perspectives of others. I came to law school to bring a unique perspective based on my own lived experience. The beauty of diversity is that it pools together unique talents and perspectives in order to create more effective solutions to the issues that confront us in all facets of life.

The journey and experience of making it out of the South Side of Chicago and into one of the finest institutions in the world has given me a work ethic, humbleness, and perspective that will bring value to any organization. My lived experience along with my undergraduate training in sociology enable me to see issues and provide a unique perspective different from the predominant ways of thinking. The name Nathaniel means "God has given" or "gift of God" a meaning that bears great importance to me. I know that I was given to advocate and serve as symbol of inspiration for those who will come after me. If I am lucky enough to receive this opportunity it would serve as another tangible step towards fulfilling my purpose.

Memorandum

To: Professor Peterson

From: ▮▮▮▮▮▮▮▮▮

Re: Luis Navarez v. Milwaukee Police Department

Date: 10/20/22

_____

STATEMENT OF FACTS

Luis Navarez is an 18-year-old student at MATC. He was charged with felony hit and run, a class A Misdemeanor. Ms. Winston, the individual who was injured, is the mother of s powerful Milwaukee Alderman. This put a lot of pressure on the Milwaukee Police Department to resolve the crime quickly. Luis got into an accident the day before Ms. Winston was hit, in a vehicular similar to the car captured on camera hitting Ms. Winston. Luis was brought in for interrogation where he was psychologically pressured into remaining for the interrogation, and he did not reasonably believe that he was free to leave. Psychological pressure from the Milwaukee Police Department led Luis to believe there was DNA evidence and a confession from Niko, a close friend, implicating Luis in the crime. Niko reported that he never spoke with the police, and the false statement the police presented to Luis contributed to him signing a false confession of guilt. An interview with Luis's high school counselor revealed that he has dyslexia. Dyslexia is a learning disability that affects reading, writing, and spelling skills.

QUESTIONS PRESENTED

1. Under Wisconsin law, was the police interrogation of the client a custodial interrogation where the client should have been mirandized?

2. Under Wisconsin law, were the police tactics used in the interrogation of the client coercive in producing a false confession? If so, is the client's confession eligible for suppression? The transcripts for the interrogation of Luis, and the interview with his school counselor are attached.

BRIEF ANSWER

1. Probably yes. Whether a suspect is in custody depends on whether, under the totality of the circumstances, a reasonable person would have felt that he or she was free to end the interview and leave the police department. In the absence of a formal arrest, the relevant circumstances must be considered, including the purpose of the interrogation, where it takes place, whether the suspect is free to leave, and the degree and nature of the restraint.

2. Probably yes. In determining whether a confession is voluntary under the totality of the circumstances, the personal characteristics of the confessor must be very carefully balanced against any pressures to which he was subjected to induce the confession. Among the factors to be considered are the age of the accused, his education and intelligence, his physical and emotional condition, whether he has had prior experience with the police, whether the defendant was apprised of his rights, whether he requested counsel and the response to any such request, the length and condition of his interrogation, and any physical or psychological pressures, inducements, methods or strategies used by the police to obtain the confession. Id. Here the defendant is a minor with dyslexia, who was psychologically lured into signing a false confession. When a

defendant seeks to suppress an allegedly involuntary witness statement, the coercive police misconduct at issue must be egregious such that it produces statements that are unreliable as a matter of law. Here our client was coerced into a false confession he did not fully understand, falsely made to believe that his DNA had been found at the crime scene and made to believe he would suffer consequences if he did not confess.

DISCUSSION

WAS THE INTERROGATION CUSTODIAL?

The interrogation of Luis was a custodial interrogation, and he should have been mirandized. A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in some significant way. *Miranda v. Arizona,* 384 U.S. 436 (1966). In determining whether a citizen is under custodial interrogation, Wisconsin has ruled the court should consider the totality of circumstances and consider whether a reasonable person would not feel free to terminate the interview. *State v. Martin,* 2012 WI 96, ¶¶ 30–31, 343 Wis.2d 278, 816 N.W.2d 270. The purpose of the Miranda rule requiring police to advise suspects of their rights is to ensure that suspects know about their rights before responding to custodial interrogation. *State v. Martin,* 2012 WI 96, ¶¶ 30–31, 343 Wis.2d 278, 816 N.W.2d 270. The Fifth Amendment requires law enforcement to inform suspects of their right to remain silent and to have an attorney present during custodial interrogations. These warnings are required because the circumstances of custodial interrogations operate very quickly to overbear the will of the suspect. Miranda v. Arizona, 384 U.S. 436 (1966). In these cases, the courts recognized that modern custodial interrogation is more psychologically than physically oriented. In Miranda, the Supreme Court recognized that a significant factor in a successful police interrogation for a detective is privacy

and depriving the suspect of every psychological advantage. *Miranda v. Arizona,* 384 U.S. 436 (1966). This factor heavily influenced the court to rule that suspects should be informed of their rights to protect against abusive police practices.

These rules are particularly important when considering the totality of the circumstances in the interrogation of Luis. Luis is a 17-year-old male with dyslexia, a high school student with a 3.1 GPA, and the son of a single mother with a younger brother who looks up to him. The transcripts show that Luis was deprived of the presence of his mother. Luis believed that the presence of his mother would help him in answering the questions during the interrogation, but he was threatened with the possibility of official action if he discontinued present questioning. In the transcript, Luis was told that he was free to leave at any time and have his mom present, but he was threatened with the reality that he may be brought back to the station on formal charges if he did not remain for the remainder of the interrogation. This deprived Luis of psychological comfort during his interrogation aligning with the reasoning for reading a suspect's rights in Miranda. The prospect of getting into legal trouble for leaving the interrogation was enough psychological pressure to compel him to remain. Luis was not aware of his rights not solely because of the psychological pressure he was under, but also because he was never explicitly notified of his rights as required by state and federal law. The circumstances Luis endured overbore his will, which is in direct confrontation with the Supreme Court's ruling in Miranda. The court will likely rule Luis was under custodial interrogation and should have been mirandized.

<u>WAS THE POLICE INTERROGATION COERCIVE, AND IF SO, CAN IT BE SUPPRESSED?</u>

In determining whether a confession is voluntary under the totality of the circumstances, the personal characteristics of the confessor must be very carefully balanced against any pressures to which he was subjected to induce the confession. *State v. Verhasselt,* 266 N.W.2d 342, 83 Wis.2d 647 (Wis. 1978). Among the factors to be considered are the age of the accused, his education and intelligence, his physical and emotional condition, whether he has had prior experience with the police, whether the defendant was apprised of his rights, whether he requested counsel and the response to any such request, the length and condition of his interrogation, and any physical or psychological[83 Wis.2d 654] pressures, inducements, methods or strategies used by the police to obtain the confession. In the context of a custodial interrogation, voluntariness must include a considerable deliberateness of choice. *State v. Hoyt*, 21 Wis.2d 284, 289, 128 N.W.2d 645 (1964). The greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair. *State v. Verhasselt,* 266 N.W.2d 342, 83 Wis.2d 647 (Wis. 1978).

The records show Luis was falsely made to believe the Milwaukee Police Department had DNA evidence and a signed confession from a passenger implicating him in the hit and run of Ms. Winston. Furthermore, Luis was notified of Ms. Winston's stature and position as the mother of a powerful Milwaukee alderman, which can be viewed as coercive psychological pressure. The police repeatedly used psychological pressure to coerce Luis into signing a false confession, using his fear of getting into trouble and missing practice against him.

In *State v. Samuel,* the Supreme Court of Wisconsin concluded that when a defendant seeks to suppress an allegedly involuntary witness statement, the coercive police misconduct at issue

must be so egregious such that it produces statements that are unreliable as a matter of law. *State v. Samuel,* 643 N.W.2d 423, 252 Wis.2d 26, 2002 WI 34 (Wis. 2002). In Miranda, the United States Supreme Court decided that the right protected by the Fifth Amendment requires that the government may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona,* 384 U.S. 436 (1966). The case of Luis falls clearly into the rules stated above. The transcript of Luis's interrogations provides clear evidence of egregious police misconduct through psychological pressure and coercion. In light of the evidence, it cannot reasonably be believed that the statements produced from the interrogation of Luis are reliable under the law. Luis denied hitting Ms. Winston several times, and still he was pressured into signing a confession admitting guilt. Luis was not afforded the procedural safeguards against self-incrimination, and he was never informed of his rights as required by Miranda. In our case, the police interrogation of Luis will likely be suppressed.

CONCLUSION

The interrogation of Luis was custodial and violated his Fifth Amendment rights under Miranda. Luis is eligible for the suppression of evidence found in his custodial interrogation. The Milwaukee Police Department's interrogation of Luis demonstrated egregious misconduct in violation of Miranda and Wisconsin state law. Viewing the interrogation under the totality of circumstances the court will likely rule to suppress the confession.



**Course History Report for** ▮▮▮▮▮▮▮▮▮▮▮

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022

| Course # | Title | Instructor | Credits | Grade |
|---|---|---|---|---|
| ▮▮ | ▮▮ | ▮▮ | ▮ | ▮ |



### Spring 2023 - All Courses In Progress

| Course # | Title | Instructor | Credits | Grade |
|---|---|---|---|---|



Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.*®

# 2023 Diversity Clerkship Program

◄ ◄ ◄ ◄ ◄ ◄ ◄ ◄ ► ► ► ► ► ►

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

☒ **Outstanding Candidate**

☐ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ██████████

**Law School:** ☒ **UW** ☐ **MULS**

**Interviewer:** <u>Tim Lindl</u>

### A. General Qualifications

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

**Check a Score:** *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 **X** 4 ↑ *Highest*

**Interviewer Comments:**

<u>There can be no question that ████ is ready for legal employment. He has worked with several college deans at his undergraduate institution on issues related to diversity, equity and inclusion – issues that no doubt initiated difficult conversations with people in power that ████ had to navigate. Not only did he navigate those conversations, he succeeded in changing the bylaws to accomplish his goals. The bylaw changes led to changes in curriculum that led to more heterogenous perspectives being included in class syllabi, meeting his goal of increasing the use of authors and sources that came from backgrounds similar to more of the students taking the classes.</u>

He also gathered student and administration feedback regarding some of the DEI training teachers were receiving and worked to revise those standards.

These skills – working with people in power, especially when they may disagree with you, to accomplish your goals – is a substantial part of what an attorney does; with their clients, with opposing parties, and with judges and decision-makers.

**2.** *Communication Skills***:**

    **Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

**Check a Score:**    *Lowest* ↓    ☐ **1**    ☐ **2**    ☐ **3**    **X 4**    ↑ *Highest*

**Interviewer Comments:**

██ is polite, friendly and a pleasure to speak with. He tells a good story, which is what matters in communicating the law. His written work showed he is a good legal writer, although I would have liked to see more precedent applied to the facts in his case – something that a supervising attorney can handle and not something I would expect a 1L to have a handle on.

**B.**  **Interview Characteristics:**

    **Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)**

**Check a Score:**    *Lowest* ↓    ☐ **1**    ☐ **2**    ☐ **3**    **X 4**    ↑ *Highest*

**Interviewer Comments:**

██ is confident, poised, mature professional and passionate. He is interested in in corporate law, focusing on labor and employment law. I asked him a difficult question about the potential tension between those interests and his interests in diversity, equity and inclusion initiatives; specifically, how would he respond if he was asked to defend against discrimination claims from an employee or a client's employee.

He handled the question well, responding immediately and fluidly. He discussed the importance of the attorney-client relationship and the duties he owes to his clients to do what it takes to advocate ethically on their behalf. But he also did not go so far as to suggest he would put his personal beliefs completely to the side, which I think is the right approach.

But the point is not the answer he gave; more so that he did not back down from the question and handled it well, giving a thoughtful and intelligent answer.

**C. Motivation for Participation in the Diversity Clerkship Program:**

**Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.**

*ASK:* **What is your motivation for participating in the Diversity Clerkship Program?**

**Check a Score:** *Lowest* ↓  ☐ 1   ☐ 2   ☐ 3   **X** 4   ↑ *Highest*
**Interviewer Comments:**

▮ answer to this question was the best of the night. ▮ statement and his interview discussed how he did not have a lot of access to people in power when he was growing up and that both becoming a lawyer and participating in the diversity clerkship program would give him an experience with that type of environment. This experience, the relationships he can build, and the more practical training (hands-on experience is how he learns best) motivated him to apply.

But I think he gave the best answer to this question of anyone over the course of the night becuase he said the fact the position was paid was important to him. Few people are willing to be that honest, and I found it refreshing for him to acknowledge it. He is an Access Lex Champion at Wisconsin, which apparently assists students in comparing their loans and potential salaries as well as providing other support (I am not familiar with the program). This discussion fit well with his participation in the program – he is aware of the realities he faces and was upfront about what he needs to address them. That is the kind of person I want to work with.

**D. Interviewer's Perspective:**

**Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.**

*ASK:* **If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?**

**Interviewer Comments:**

▮ stated he would conduct background research on what the employer does exactly and do his best to relate to that work. However, he said that from this background and perspective, "this honestly wouldn't matter." The entire point of him participating in this program is to gain exposure to the kinds of lawyers and companies to which he has not been exposed in his life. Even if they were his last choice, "the biggest thing for me is to get legal experience and get exposed to lawyers and gain and attain skills."

**E. Student Feedback:**

**Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.**

**Interviewer Comments:**
It was a real pleasure speaking with ██████ – he is certainly someone with whom I would enjoy working.

With regard to interviewing skills, my suggestion is to always do a little research on the person with whom you are interviewing. It was clear ██ had not "looked me up" before the interview, which led to him not knowing anything about me, my firm, or our practice areas.  That will be an important skill to master for the next round of interviews. Doing so familiarizes you with the work you would do and, more importantly, allows you to angle the stories you tell in an interview to the interviewee's subject matter or skill set.  That will give the interviewer confidence that you are the right person for the job.

Further, half the battle in getting a job is getting the people you are interviewing with to like you as a person – because those are the people with whome they want to work.  Few things make a person like you more than when you take an interest in them, their practice, and who they are.  It is a cheap little trick, but it can go a long way.