

████████ · ████████ @marquette.edu

## EDUCATION

**Marquette University Law School**, Milwaukee, WI
<u>Candidate for Juris Doctor,</u> May 2025
GPA: pending publication in January 2023

| Honors: | ABA Legal Opportunity Scholarship recipient (3-year renewable merit-based scholarship) |
| | Thomas More Law Scholarship recipient (3-year renewable merit-based scholarship) |

**Austin Peay State University**, Clarksville, TN
<u>Bachelor of Science in Political Science,</u> *magna cum laude*, May 2022
Minor: Leadership Studies
GPA: 3.72/4.00

| Honors: | Dean's List, 8 semesters |
| | Kappa Alpha Order Educational Foundation Scholarship, Recipient |
| Leadership: | Kappa Alpha Order - Zeta Tau Chapter Campus Affairs Chairman 2019-2022 |
| | Student Government Association Tribunal Justice 2019-2022 |
| | APSU 1000 Course Student Peer Leader 2019-2022 |

## LEGAL EXPERIENCE

**Marquette Volunteer Legal Clinic**, Milwaukee, WI
<u>Legal Volunteer,</u> Fall 2022
- Researched legal issues related to landlord tenant disputes
- Educated clients regarding legal service providers
- Interviewed clients to identify legally relevant facts and potential causes of action
- Collaborated with volunteer attorneys in presenting clients with next steps and likely outcomes
- Drafted summaries of attorney-client meetings for use by clients and for clinic records

**Patton & Pittman Attorneys**, Clarksville, TN
<u>Litigation Intern,</u> May 2021 to May 2022
- Reviewed and researched discovery
- Prepared documents for cases and litigation purposes

## ADDITIONAL EXPERIENCE

**Austin Peay State University**, Clarksville, TN
<u>Office of University Facilities Student Building Supervisor,</u> October 2019 to May 2022
- Completed room set-ups for organizations and businesses with room reservations
- Facilitated daily operation of the Morgan University Center

## INTERESTS

Fitness, reading self-improvement books, and spending time outdoors

<span style="color:red">Exhibit 31</span>

████████



## DIVERSITY CLERKSHIP PERSONAL STATEMENT

The story of my youth is one of perseverance, and it has shaped me into a person who sets goals and works hard to achieve them. By the age of sixteen, my mother and I were sharing canned chicken out of the homeless shelter where we lived. Homelessness was nothing new to me at this point due to the fact that since the age of thirteen, my mother and I lived in countless hotels, basements, and even cars. Without anyone knowing, I attended high school without a permanent home for the first three years. During this period of my life, instead of having the normal high school kid experience, I was working jobs to help support my mother. This situation allowed me to develop a drive for success before I ever set foot inside of Marquette University Law School. My time spent as an undergraduate student at Austin Peay State University was highly successful, as evidenced by the fact I graduated with *magna cum laude* honors. However, college was extremely difficult for me due to the lack of financial support I received as well as the long hours I spent working at a movie theater, sometimes till 3:00AM.

Upon arriving at Marquette University Law School, I believed that I was leaving behind the period of hardship that plagued my life for years. For the beginning of the fall semester, I was shocked by how many of my peers refused to acknowledge me and seemed to have already determined my worth because of the stereotypes surrounding black men that I visually fit into. I was so devastated that I called a mentor attorney who I previously interned with for advice. He exclaimed that often this was the way individuals in law school operated, but most importantly I must continue to work hard. Because of this experience, I firmly believe that it is my duty to represent all people who carry the weight of this skin color and truly understand what it is like to be marginalized. I made a personal commitment to be successful in this new chapter of life not only for myself, but more importantly for African American people. I was hurt, so I responded by consistently waking up at 4:00am everyday to study and to ensure I would not let down the people who look like me that never get the chance to make it this far. I plan to continue to use the internal motivation I have developed from these situations to make a substantial impact not only through the work I produce, but also on the lives of those around me. By continuing to display the strength of the people in my community, I believe that I can abate the stereotypes placed on us and continue to change the views of those who see us differently through my objective actions.

Sincerely,

/s/ ███████████

███████████



## WRITING SAMPLE

Attached you will find a copy of my writing sample. I am sharing a memorandum, analyzing whether the charge of Terroristic threats will stick to the behavior displayed by the defendant. I researched and wrote this document during my first semester Legal Analysis, Writing and Research class.

**M E M O R A N D U M**

**TO: District Attorney**

**FROM:** ▮▮▮▮▮▮▮▮

**RE: Whether to charge Ryan Bales with the crime of Terroristic threats**

**DATE: October 2022**

---

**DISCUSSION**

# I. The State can likely prove that Ryan Bales committed the crime of Terroristic threats.

The State will likely be able to obtain a conviction and prove that Bales committed the crime of Terroristic threats. To obtain a conviction for Terroristic threats, the State must prove that 1) the person communicates, either directly or indirectly 2) a threat to commit any crime of violence with intent to terrorize another. (Terroristic threats. 18.) Pa. Cons. Stat. § 2706 (2022). The purpose of § 2706 is to impose criminal liability on people who make threats that seriously impair personal security or public convenience. The nature of the threat and the totality of the circumstances surrounding the utterance of the threat must be examined to determine if a terroristic threat has been made. In the present situation, element one is easily satisfied because Bales has directly communicated by sending an email to Chloe Turner. Statutorily, communicates means "conveys in person or by written or electronic means including telephone electronic mail, internet, facsimile, telex and similar transmissions." This definition directly applies to the email Bales admitted to sending on September 24, specific communication by electronic mail. This will leave no room to argue that Bales has not directly communicated with Chloe Turner. Accordingly, the only elements that remain at issue are whether Bales actually made a Terroristic threat to commit a crime of violence and whether Bales had the intent to terrorize when doing so. Bales has acted in a way that will satisfy both issues raised and the State will more than likely be able to prove so.

## A. The State can prove that Ryan Bales made a threat to commit a crime of violence because it is unnecessary for an individual to specifically articulate the crime of violence that he or she intends to commit where the type of crime may be inferred from the nature of the statement and the context and circumstances surrounding the utterance of the statement.

Because of the circumstantial evidence around what constitutes a terroristic threat to commit a crime of violence, the State will have no problem displaying that Bales has done so. "§ 2706 was not designed to penalize spur-of-the-moment threats which arise out of anger in the course of a dispute." *Commonwealth v. Hudgens,* 582 A.2d 1352, 1358 (Pa. Super. Ct. 1990). "Neither the ability to carry out the threat nor a belief by the person threatened that it will be carried out is an essential element of the crime." *Id.* at 1352. Informing the victim that you are going to do something is enough to constitute a terroristic threat to commit a crime of violence. *Id.* at 1355. The nature of the threat itself and the overall circumstances surrounding the threat will be examined in determining if a threat to commit a crime of violence has been made. *Id. at* 1357.

The court will look at circumstantial evidence and the events that take place leading up to and surrounding the alleged terroristic threat to commit a crime of violence before entering a final judgment. *Hudgens,* 582 A.2d at 1352. When the circumstantial evidence and the nature of the threat both point towards the definite possibility of danger, a terroristic threat to commit a crime of violence has been established. *Id.* at 1357. For example, in *Hudgens,* a group of teenagers decided to bully an individual by the name of Lebert. *Id.* at 1355. The teenagers began teasing Lebert for the ninja costume he was wearing while inside an arcade. *Id.* The teenagers continued to tease Lebert until he left the arcade where they then approached him causing him to fear for his safety and run down an alley. *Id.* Defendant Hudgens became aware of the ongoing situation Lebert had been dealing with concerning the teenagers' actions. *Id.* This led Hudgens to also leave the arcade and ask a member of the group of teenagers known as Clyde Swope if he was responsible for harassing or teasing Lebert. *Id.* Swope responded that he was not to blame however, Hudgens felt indifferent. *Id.* This led to a continued exchange of words between the two until Hudgens threatened Swope informing him that he was "going to get him" and then unsheathed a sword from his trousers. *Id.* Consequently, a jury convicted Hudgens of simple assault, reckless endangerment, terroristic threats, and possession of an instrument of crime. *Id.* at 1354. On appeal the court affirmed the defendant's conviction for terroristic threats. *Id* at 1357. The court reasoned that the ability to carry out the threat nor a belief by the person threatened that it will be carried out mattered and that because Hudgens subjected the victim to a precise type of psychological harm and impairment of personal security which the statute seeks to prevent, thus he was criminally liable for his actions. *Id.* at 1358. The court viewed the totality of these circumstances which led to a rejection of Hudgens's argument that this was a mere spur-of-the-moment type of threat. *Id.*

In the present case, the totality of the circumstantial evidence reflects similarities from the conduct displayed in *Hudgens*. Here there is an issue with teenagers. Bales and Chloe are a teenage couple, and their interaction starts as what could be perceived as typical teenage drama. A statement made by Katherine York, a student in their grade, provides information that Bales' behavior had changed going into the new school year. Bales and Chloe started dating at the end of the previous school year and everyone noticed due to Chloe's popularity from cheerleading. When school started this year, Bales arrived wearing all black and was associating with a group of students referred to as the "Goths." The goths are described as people who are "sort of dark and scary who wear mostly black and listen to depressing music." Everyone expected Chloe to break up with Bales and she ended up doing so. Initially, the circumstances do not reflect that this situation could become criminal which is reflected in *Hudgens,* when the group of teenagers bullied Lerbet for the ninja costume, teased him until he left the arcade, and approached Lerbert causing him to run down the alley in fear. This encounter was sufficient for imposing criminal liability on the defendant.

On the same day the split occurred between Bales and Chloe, Bales sent an email to her at 10:06 stating: "The goth takes his revenge the haughty get doom Chloe say goodbye for you its kaboom." After reading this initially, Chloe had no worries. However, she later started to think about how angry Bales had been with her due to the breakup and connected that with many recent reports of violence by high school students. Bales has a past incident where it was only alleged that he may have "accidentally" started a fire in the school chemistry lab that was big enough to get attention in the local newspaper. This email has subjected Chloe to a precise type of psychological harm and impairment of personal security which the criminal statute attempts to avert. This is the same kind of psychological harm that is present in *Hudgens* when the defendant verbally exclaimed to Clyde Swope that he was "going to get him" and then accompanied that phrase with the conduct of unsheathing the sword from his trousers.

The opposing counsel could attempt to argue that there is a lack of depth in the seriousness of the threat posed by the email and that it cannot be proven that the threat itself induced the specific psychological harm that Chloe is dealing with. However, in both the present case and in *Hudgens* there was not a direct articulation of a threat to commit a crime of violence, which the statute does not require; instead, the statute requires inquiry into the circumstances surrounding the utterance of the statement itself. Therefore, the Court will likely determine that the circumstantial evidence around the email that Bales sent will be strong enough to constitute a Terroristic threat.

The State will more than likely be able to prove Bales made a threat to commit a crime of violence. Although Bales never articulated the crime of violence, articulation is not fundamental to § 2706. The circumstances allow the drawing of strong inferences that establish substantial similarities displayed in *Hudgens* which point towards an unfavorable outcome for Bales.

**B.** The State likely can prove that Ryan Bales had the intent to terrorize another because of Bales' conduct and premeditated statements.

The State will likely be able to prove Bales made a "threat to commit any crime of violence with intent to terrorize another." Pa. Cons. Stat. § 2706 (2022). To terrorize, a threat cannot be made in the ""spur-of-the moment, that is the product of a heated exchange between parties made out of hysteria or anger that do[es] not trigger foreseeable immediate or future danger." *In the Interest of B.R.,* 732 A.2d 633, 638 (Pa. Super. Ct. 1999). If a threat stems from an "emotional outburst resulting from anger" then it cannot be categorized as a threat that terrorizes. See *id.* at 638 (explaining that there was no conversation at all between Mr. Hudak and B.R. before B.R.'s unprovoked statements. To the contrary, these statements were delivered by B.R. in a deliberate, matter-of-fact manner only after the boys had talked among themselves. Thus B.R.'s statements cannot be characterized as a random ""spur-of-the moment"" emotional outburst resulting from anger). A threat that terrorizes must be delivered deliberately, and must provide a "demonstration of festering anger show[ing] an ample desire to terrify by means of threats of violence." *Commonwealth v. Fenton,* 750 A.2d 863, 865 (Pa. Super. Ct. 2000). The individual who is threatening someone must have the purpose to do so because if it is found by the court that the person "lacked a settled purpose to terrorize" then the threat cannot constitute one that is terroristic. *Commonwealth v. Anneski*, 525 A.2d 373, 376 (Pa. Super. Ct. 1987).

When a court determines that a threat is made purposefully and with deliberation, then that threat will be viewed as one with intent to terrorize. *Fenton*, 750 A.2d at 865. In *Fenton*, Randy Leventry, an insurance adjuster, was handling the defendant's truck repair claim. *Id.* at 864. The defendant complained about the repair and began to make threats stating that he had possession of a gun with bullets and that he was going to start killing people at the location where his truck was being prepared. *Id.* The defendant exclaimed that he was "going to shoot [Congressman] Murtha's fucking head off" and would ""shoot Mr. Hugya's [Congressman Murtha's aide] fucking head off."" *Id.* The defendant then proceeded to make more threats stating that "he would kill all the Erie Insurance employees, that Mr. Leventry should keep his doors locked, and that he would kill until he was killed himself." *Id.* These threats stemmed from the fact that the defendant believed Murtha and Hugya were conspiring against the defendant with the insurance company to have the defendant

killed or forced to commit suicide. *Id.* Leventry was told by the defendant "to keep his doors locked, because he didn't know what might happen if this thing got started, and that it may not happen today or tomorrow, but it would happen." *Id.* at 865. This caused Leventry to stay on the phone out of fear that hanging up would aggravate the situation. *Id.* The jury convicted the defendant of terroristic threats and imposed a five-year sentence of probation for the threats. Id. On appeal the defendant contended that the statement made did not have the intent to terrorize and instead was "the product of transitory anger." *Id.* The court did not agree with this argument reasoning that "the problems which led to the phone call occurred over several months; appellant clearly spent a long time reflecting upon his frustrations, and his threats cannot be characterized as less than premeditated and deliberate. *Id.* Their breadth and the sweeping choice of those threatened are not reflective of any "spur-of-the-moment" frustration. *Id.* The threats went beyond Mr. Leventry and his claim, demonstrating they were neither transitory nor unthinking" *Id.* This reasoning led to an affirmed conviction under terroristic threats against the defendant. *Id.* at 868.

A statement that is made without the proper motivation, lacks a terroristic purpose, and cannot be viewed as a threat with an intent to terrorize an individual. *Anneski*, 525 A.2d at 376. In *Anneski*, the defendant's neighbor, Lana Group, complained that the defendant's children were in her way when she drove down a rural roadway that the kids were required to walk along to arrive at the school bus stop. *Id.* at 375. The defendant had requested in the past that the school bus stop be relocated however, this request was unsuccessful. *Id.* These events led to an altercation between the defendant and Lana Group where the children explained that Group's vehicle had struck one of the bags on the back of the children. *Id.* The defendant already believed that the children were in danger and that it was possible that Group would run them down because Group had attempted to force her way through the group of children with her automobile in the past. *Id.* The prosecution explained that no contact had been made but the defendant's belief that one of the children had been struck was authentic. *Id.* at 376. On the same day of the incident, the defendant confronted Group and was provided a response stating that Group would "run into the children again if they didn't get out of her way." *Id.* at 375. Witnesses testified that the defendant's response to this statement was "if Mrs. Group ran into her children again she would get a gun and use it." *Id.* These events led the court to reason that "the surrounding circumstances in the instant case, although not absolutely precluding a finding that appellant intended to terrorize, suggest by their overwhelming weight that appellant lacked a settled purpose to terrorize." *Id.* at 376. Instead, her statement that she would get a gun and use it was a spur-of-the-moment threat resulting from transitory anger prompted by Mrs. Group's threat to hit the Anneski children again with her car if they obstructed her vehicle's passage. *Id.* The court exclaimed, "such a response, even if not dignified or noble, was

not the type of conduct made criminal by 18 Pa.C.S. § 2706." *Id.* This allowed a holding to be entered in favor of the defendant allowing "another opportunity [for justice] to prevail, therefore, a new trial will be granted." *Id.*

Here, the threat made by Bales is one that carries the necessary intent to terrorize another. After Chloe broke up with Bales, he aggressively sped off in his car. Bales also admitted in the police report that he was wearing dark goth-like clothes to explain how he felt. There is no doubt that Bales has displayed a sufficient purpose to terrorize Chloe similar to the situation in *Fenton* where the defendant believed people were conspiring against him which displayed the purpose for the terroristic threats that followed as a response that did not occur out of transitory anger. Bales continued to display his intent to terrorize Chloe by putting the image of the person with a bomb about to explode next to them in the email that was sent. Bales is known to have good grades in science as well as math and as stated previously, there is a situation where Bales is responsible for setting a classroom on fire. If Bales did not have the intent to terrorize Chloe, he would not have attached this image to the email which continues to reflect the purpose of his conduct. This is dissimilar to the facts of *Anneski*; because unlike the defendant there who responded as a passionate mother to conduct that was endangering children, Bales sent this email at 10:06pm with premeditation. In *B.R.* the threat that the students made was not in the spur of the moment and it lacked the intensity needed to deprive the threat of the necessary premeditated purpose. This is no different from the present case where there was a delayed period between the interaction with Chloe and the email sent, implying that Bales was able to fully process and purposefully email Chloe to induce the precise type of psychological harm that she has been forced to deal with due to Bales' intent to terrorize her. There is no room for the opposing counsel to argue against these statements because Bales has clearly shown in multiple ways through his conduct that he had the intent to terrorize Chloe Turner and the State will more than likely prove that Bales had the intent to terrorize another.

In summation, the State can likely prove that Bales has committed the crime of Terroristic threats. The strong and definitive conduct Bales has displayed will make it difficult to form a sufficient argument to say otherwise. Therefore, proceeding to charge Bales with Terroristic threats should stick to the behaviors and the resulting outcome of his conduct.

## OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD

**Name:**
**Student ID:** ███████

| | |
|---|---|
| Institution Info: | Marquette University |
| Print Date: | 01/13/2023 |

Other Institutions Attended:
Austin Peay State University

**Beginning of Law Record**

**2022 Fall**

| Program: | Law |
|---|---|
| Primary Major: | Law |

| Course | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|
| ███████ | ███████ | | | | |

| | | | Attempted | Earned | GPA Units | Points |
|---|---|---|---|---|---|---|
| Term GPA: ███ | | Term Totals | | | | |
| Cum GPA: ███ | | Cum Totals | | | | |

**2023 Sprg**

| Program: | Law |
|---|---|
| Primary Major: | Law |

| Course | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|
| ███████ | ███████ | | | | |

| | | | Attempted | Earned | GPA Units | Points |
|---|---|---|---|---|---|---|
| Term GPA: ███ | | Term Totals | | | | |
| Cum GPA: ███ | | Cum Totals | | | | |

**Law Career Totals**
| Cum GPA: ███ | | Cum Totals | | | | |
|---|---|---|---|---|---|---|

End of OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

- ☑ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

Or you can print it and scan it with your handwritten notes.

Return to Jacque Evans, jevans@wisbar.org no later than January 23.

**Student Name:** ███████ ██ ████

**Law School:** ☐ UW  ☑ MULS

**Interviewer:** Steven M. DeVougas

### A. General Qualifications

*1. Relevant Skills and Qualities:*

Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

**Check a Score:** *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ☑ 4 *↑ Highest*

**Interviewer Comments:** ████████ is very accomplished and the prototypical candidate who does really well in the DCP. He worked as a litigation intern prior to coming to law school and was on Dean's List for 8 semesters).

*2. Communication Skills:*

Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

**Check a Score:** *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ☑ 4 *↑ Highest*

**Interviewer Comments:** ████████ is very well-read and articulate. From his writing samples, he appears to be developing a strong writing style.

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:  *Lowest* ↓  ☐ 2  ☐ 3  ☑ 4  ↑ *Highest*

Interviewer Comments: ████████ *was the most Enthusiastic 3 prepared candidate I interviewed. He was dressed appropriately 3 asked great questions.*

## C. Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* **What is your motivation for participating in the Diversity Clerkship Program?**

Check a Score:  *Lowest* ↓  ☐ 1  ☐ 2  ☐ 3  ☑ 4  ↑ *Highest*

Interviewer Comments: ████████ *stated he wants to work for an employer that values diverse ...es 3 perspective, while honing his craft...*

## D. Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* **If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?**

Interviewer Comments: *He stated that he is an open book and just wants to add value to wh████ e is paired with. Any experience is a good experience.* ████████ *would be a great addition to any employer.*

## E. Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments: *keep up the good work 3 keep building relationships 3 network. Remember to send a thank you email/note to everyone you interview with.*

██████████ ███████████ ██ ███████████████ @marquette.edu

### EDUCATION

**Marquette University Law School**, Milwaukee, Wisconsin
*Candidate for Juris Doctor*, May 2024
GPA:          Available late January 2022
Activities:   Black Law Student Association, Member
              Hispanic-Latino Law Student Association, Member
              Sports Law Program, Diversity Inclusion Committee Member

**University of Kansas**, Lawrence, Kansas
*Bachelor of Arts in Political Communication, minor in Spanish*, December 2020
GPA:          3.310/4.000
Honors:       Dean's List, Spring 2019 and Fall 2018
              Communication Studies Departmental Honors, Fall 2020
              Lamda Pi Eta National Communication Honor Society, Member
Thesis:       *Code-Switchers*: Black English Vernacular Use by Young, Bidialectal African-Americans
Activities:   Club Water Polo Team, President of Communication and Outreach
              Students for Sensible Drug Policy, Founding Member

### EXPERIENCE

**Golf Course Superintendents Association of America**, Lawrence, Kansas
*Government Affairs Intern*, August 2019 – August 2021
Conducted policy research and lobbied legislative and regulatory topics, such as: Waters of the U.S., COVID-19 Federal Action, H-2B Visa Program. Conducted 50-state governor outreach to establish golf as a safe, social distanced activity at start of COVID-19 pandemic. Served as golf industry point of contact for White House Environmental Justice Federal Advisory Committee. Provided public comments on environmental justice initiatives on behalf of golf industry. Served on Diversity, Equity, and Inclusion Employee Task Group charged with reviewing departmental business plans, marketing materials, and member demographics. Lobbied EPA and U.S. Senate offices in Washington, DC regarding priority issues for golf industry.

**Pendleton & Sutton, LLC**, Lawrence, Kansas
*Legal Intern*, January 2019 – August 2019
Served as an interpreter for Spanish speaking clients and respondents. Communicated with clients and other involved parties to gather and track case information.

**Branigan Communications**, Milwaukee, Wisconsin
*Communications and Marketing Intern*, June 2018 – August 2018
Wrote articles and performed research for *The Wisconsin 100*, a digital journalism platform featuring 100-word stores and 100-second podcasts. Drafted scripts for radio ads.

**iHeartMedia**, Milwaukee, Wisconsin
*Promotions Intern*, June 2018 – August 2018
Created unique and engaging social media content for seven radio stations and their distinct audiences. Coordinated meet-and-greets between promotion winners and recording artists, athletes, and performers.

### COMMUNITY SERVICE

Willow Domestic Violence Center, Spanish Document Translator; Christ the King Baptist Church, Nursery Supervisor; Jack and Jill of America, Alumna

### LANGUAGE SKILLS

Spanish, Fluent

<span style="color:red">Exhibit 32</span>

██████████   **60**

Personal Statement

For most of my youth, my experience with issues of race were characterized by compartmentalization and assimilation. Being raised in a wealthy, white community, I quickly settled into my role as the only Black woman in the class, on the team, and in the room. I routinely held my tongue in the face of discrimination and tried desperately to avoid fulfilling stereotypes. As a child, I believed that getting by as the minority meant assimilating – checking my politics, culture, and identity at the door. To me, existing as a woman of color within this community was an act of defiance in itself; so, I shied away from anything that drew more attention to my race.

In high school that meant not picking a fight when my teammates rapped along to music in the locker room, shouting the N-word thoughtlessly. In college it meant keeping my cool despite being cut off and spoken over in political science courses as a member of the racial and political minority. At work it meant mingling at the National Republican Club, lobbying for bills and regulation that were directly opposed by the party I had voted for.

In Summer 2020, the murder of George Floyd and events that followed forced the entire nation to confront the reality of racism in our communities, within law enforcement, and our justice system. Reactions and responses to the murder and the Black Lives Matter movement, saturated social media and television. Racial inequity became a trending topic and now, as the only Black woman in the room all eyes were on me. Suddenly, compartmentalization was no longer an option, and it became clear to me that assimilation did not lead to progress.

I began to incorporate my full identity into my everyday life. I had awkward, but overdue conversations with friends explaining the different realities that we operate in. I chose code-switching among Black, bidialectal youth as the focus of my honors thesis, a topic inherent to me but largely ignored by academia. At work I served as the point person for environmental justice in the golf industry and helped launch a campaign to "Make Golf Your Thing", introducing the game to younger generations and a more diverse audience.

I realized diminishing my blackness to avoid conflict was a disservice to myself and those who had fought, marched, and died for my freedom. By stripping back my culture I neglected a major part of myself and the value that I add. It was only once I stopped sacrificing those parts of myself in effort to avoid conflict that I was able to realize my full potential.

I learned that being the first Black woman to achieve a feat is good but being the first of many is better. Broaching an uncomfortable, polarizing topic now means that the next woman of color in my position won't have to grin and bear it. After all, having a seat at the table does not matter if I don't meaningfully contribute to the conversation.

TO: Senior Partner
FROM: ███████████████
DATE: October 12, 2021
RE: Mortimer v. Milwaukee Athletics, File No. 2021-CV-159

## ISSUE

Whether Mr. Mortimer was contributorily negligent due to failure to act with ordinary care and assumption of risk when he was injured by a racing Cheese Curd while conversing with his back to the field in an unprotected seating area.

## STATEMENT OF FACTS

The Milwaukee Athletics, like many other baseball teams, provide between inning entertainment for fans. The most popular event is the racing Cheese Curds which features four spectators racing between baselines on behalf of their section of seats. Each volunteer wears a large, clunky Cheese Curd costume which partially obstructs their vision and occasionally leads to a collision or fall.

On the day of the incident, Mr. Mortimer had purchased unprotected, front row seats along the baseline path of the Cheese Curd race. Though the tickets did not express any warning of injury to spectators, Mr. Mortimer, an avid baseball fan was aware of the dangers associated with his proximity to the field. Additionally, Mr. Mortimer had previously attended many games in the client's stadium and was aware that his selected seats were in the path of the Racing Cheese Curds.

During the start of the race, Mr. Mortimer was returning to his seat from the concession stand. At his seat, Mr. Mortimer briefly turned opposite the field to set down concessions as he continued a conversation with a friend. Just then, a Cheese Curd

1

tripped, fell over the wall and knocked Mr. Mortimer into the seats, hitting his face and causing momentary unconsciousness. Mr. Mortimer sustained a broken nose and cheekbone from the impact. Days later, the Mr. Mortimer filed suit against the Athletics.

<u>**DISCUSSION**</u>

I. **Mr. Mortimer will likely be found contributorily negligent because he did not act with ordinary care and assumed the risk of injury presented by the Cheese Curd race.**

Wisconsin's Safe Place Statute requires employers and owners of a place of employment to maintain an establishment that is safe for employees and people who frequent it. Employers and building owners must do everything reasonably necessary to protect the safety and wellbeing of employees and frequenters. Wis. Stat. § 101.11 (2020-21). Contributory negligence is an absolute, affirmative defense to a Safe Place Statute claim where the plaintiff was at least as negligent as the defendant. *Powless v. Milwaukee Cty.*, 94 N.W.2d 187, 191 (Wis. 1959).

Contributory negligence is established by the standards of ordinary care and assumption of risk. Accordingly, whether the Athletics may make a motion to dismiss the case is dependent on their meeting these two standards. Based on Mr. Mortimer's conduct in the moments leading up to his injury and his intimate familiarity with Athletics games and between inning entertainment the Athletics have sufficient evidence to present a formidable argument of contributory negligence on the grounds of ordinary care and assumption of risk, respectively.

    **A.**    **Mr. Mortimer did not exercise ordinary care because he had his back to the field, conversing with a friend and attending to his concessions at the time of the Cheese Curd Race despite being in the unprotected path of racers.**

The court will look to Mr. Mortimer's conduct around the time of the injury to determine whether he exercised the ordinary care necessary to negate the claim of contributory negligence. In doing so, they will show several of Mr. Mortimer's actions constitute a breach of ordinary care, despite a potential counterargument of a lack of warning in his surroundings.

Failure to exercise ordinary care establishes contributory negligence. *Powless v. Milwaukee Cty.*, 94 N.W.2d 187, 191 (Wis. 1959). What constitutes ordinary care is dependent on context and surroundings. *Id.* at 191. A sporting spectator can be found contributorily negligent by breach of ordinary care if: (1) they voluntarily attended the game, (2) sat in their seat as opposed to others available, (3) ignored the activity on the field, (4) ignored excitement or warnings in surroundings, and (5) failed to take precautions for their own safety. *Id.* at 191.

For instance, in *Powless v. Milwaukee County*, the court held that the plaintiff, a spectator at a baseball game, was contributorily negligent because she failed to exercise ordinary care *Powless v. Milwaukee Cty.*, 94 N.W.2d 187 (Wis. 1959). In Powless, the plaintiff attended a baseball game and sat in an unscreened area where she was struck by a baseball. *Id.* at 190. The plaintiff testified that she heard the batter make contact, noted the excitement of the crowd surrounding her and, rather than take cover, continued to mark her scorecard. *Id.* at 191. The court reasoned that because the plaintiff

sat in the unscreened area, ignored the game's activity and noise around her, and accordingly failed to take any precaution for her own safety, she had failed to exercise ordinary care, thereby making her contributorily negligent. *Id.* at 191.

A court will probably determine that Mr. Mortimer failed to exercise ordinary care. The court will view Mr. Mortimer's actions and inactions in the context of a baseball game as a guide in making this determination. Because Mr. Mortimer himself chose to purchase unprotected seats, the Athletics can show voluntary attendance and seat selection. By turning his back on the field and conversing with his friend during the Cheese Curd race, Mr. Mortimer ignored the activity on the field and neglected to join the rest of his section in watching and cheering for their respective Cheese Curd. Given that Mr. Mortimer was in the unprotected and direct path of people racing in large, heavy costumes, these actions show that he failed to act with regard for his safety given his surroundings.

Moreover, Mr. Mortimer's inattention to on-field activity closely mirror the facts of in *Powless*. In *Powless*, the plaintiff's marking of her scorecard during the game and inaction despite fellow spectators' warnings of incoming danger led the court to reason that she had failed to act with ordinary care. Comparable to *Powless*, Mr. Mortimer was conversing with a friend and attending to his food with his back to the field during the Cheese Curd race. As such, the court will likely follow the same reasoning to find Mr. Mortimer's attention being diverted away from the field as a failure to exercise with ordinary care emulative of that in *Powless*.

4

In countering the claim that he failed to exercise ordinary care, Mr. Mortimer could argue that there were no warnings in his surrounding area that would have provoked him to take cover. To his favor, unlike the plaintiff in the *Powless* case, Mr. Mortimer did not testify to any excitement or noise around him immediately preceding the injury. Conversely, crowd reaction to an incoming object or threat of imminent danger would arguably be along the same lines whether the object was a foul ball or racing Cheese Curd. Further, it is stated that the racing Cheese Curds are the most popular between-inning act and that Mr. Mortimer's attendance at prior Athletics games had rendered him familiar with the event and the path they would take on the day of the accident. However, given the popularity of the event and its division of fans into sections Mr. Mortimer will have difficulty proving that those spectators surrounding him in his section were not engaged in cheering for their respective Cheese Curd, growing louder as the Curds drew closer to their section. Further discovery should be conducted to confirm that Mr. Mortimer heard the cheering. Ultimately, Mr. Mortimer's conduct at the time of the injury appears consistent with a breach of ordinary care.

> **B. Mr. Mortimer assumed the risk of injury because he had prior knowledge of the Cheese Curd race was aware of his seat's location in the unprotected path of the racing Cheese Curds, and chose to attend the Athletics game, nonetheless.**

The court's analysis of Mr. Mortimer's assumption of risk will call into question whether he had reason to know of risks associated with the Athletics' Cheese Curd race.

5

Given the uncontested fact that Mr. Mortimer was familiar with the races, he presents as having assumed the risk of injury.

Contributory negligence can also be shown when an individual assumes the risk of injury. *Moulas v. PBC Prods.*, 570 N.W.2d 739 (Wis. Ct. App. 1997). As an element of contributory negligence, assumption of risk contends that the situation the plaintiff entered (e.g., sporting event) bore inherent hazards such that they knew the risk of injury and assumed this risk by proceeding. *Id.* at 744. A spectator assumes the risk of injury if: (1) a reasonable person would know the risks associated with attending the event, (2) the spectator was aware of the risks, and (3) the spectator chose to attend the event despite knowing and receiving warning of the risk *Id.* at 745.

For instance, in *Moulas*, the court held that the plaintiff, a spectator at a hockey game, assumed the risk of injury, thereby making her contributorily negligent. *Id* at 745. In *Moulas*, the plaintiff attended a hockey game and was knocked unconscious by a puck while in her seat. *Id.* at 739. Affidavits filed by the defendant show that program booklets urged spectators to always watch the puck, admissions tickets stated that spectators expressly assumed the risks and danger of hockey pucks, and repeated announcements warned spectators to pay attention to the puck. *Id.* at 742. Additionally, deposition revealed that the plaintiff had attended multiple hockey games prior to the one where she was injured and had previously witnessed pucks flying into spectators' sections. *Id.* at 742. The court reasoned that because the plaintiff knew the risks associated with the event, as would a reasonable person, and chose to attend the event

6

despite knowledge and warning of this risk, she had assumed the risk of injury and was contributorily negligent. *Id*. at 745.

It is likely that the court will find that Mr. Mortimer assumed the risk of injury. The court will weigh whether a reasonable person would know the risks associated with attending a Milwaukee Athletics game, Mr. Mortimer's awareness of these risks, and that Mr. Mortimer voluntarily attended the event despite his knowledge. Additionally, the court will consider whether Mr. Mortimer was issued or ignored any additional warnings of the risk.

In *Moulas*, the court reasoned that the plaintiff's prior knowledge of risks associated with attending hockey games based on having witnessed pucks flying into the seats before, being issued repeated warnings throughout the game, and decision to attend the game regardless established an assumption of risk. As was the case in *Moulas*, Mr. Mortimer had previously attended Athletics games and witnessed Cheese Curd races, which on occasion included Cheese Curds falling or running into each other. Stated facts assert that the costumes the participants wear are visibly flarge and difficult to maneuver in and prior participants have collided. This, coupled with Mr. Mortimer's habitual attendance at games, creates a knowledge of the event and risks associated with it. Contrary to the plaintiff in *Moulas*, the facts do not suggest that Mr. Mortimer was issued warnings at the game. Here again, Mr. Mortimer's familiarity with the event and the visibly oversized costumes and proximity to their path should have constituted an alert of possibility for injury.

7

As a counter to the assumption of risk argument, Mr. Mortimer may contend in prior Cheese Curd races he had witnessed the Cheese Curds collisions never reached the stands. As such, his knowledge of the event does not create an automatic assumption of risk. While this counter attacks an integral factor in the court's determination of a plaintiff's assumption of the risk of injury, Mr. Mortimer would be hard pressed in asserting that a reasonable person who had seen multiple races, was conscious of the bulk of the costumes, and was aware of his proximity to the racers' path would not qualify as aware of risks associated with the event. In summation, Mr. Mortimer's previous attendance at games and decision to purchase tickets in an unprotected section near the grandstand point to a more than probable assumption of the risk of injury.

<u>CONCLUSION</u>

The court will likely find that Mr. Mortimer was contributorily negligent by failure to exercise ordinary care and his assumption of the risk of injury. Mr. Mortimer was engaged in a conversation with his back to the field at the time of the race despite purchasing tickets in an unprotected area he knew to be in the race's path. Moreover, Mr. Mortimer had frequented Athletics games and knew the Cheese Curds to be ungainly and quite heavy. This lack of attention to on-field activity combined with his familiarity with the event in question indicate that a court is likely to assess Mr. Mortimer as contributorily negligent.

8

**OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD**

**Name:** ▮▮▮▮
**Student ID:** ▮▮▮▮

Institution Info: Marquette University
Print Date: 01/27/2022

Other Institutions Attended:
University of Kansas-Main Campus



**Beginning of Law Record**

**2021 Fall**

Program: Law
Primary Major: Law

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

| | Term Totals | Attempted | Earned | GPA Units | Points |
|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ |

**2022 Sprg**

Program: Law
Primary Major: Law

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| LAW | 06 | Property | ▮ | ▮ | | ▮ |

| | Attempted | Earned | GPA Units | Points |
|---|---|---|---|---|
| Term Totals | ▮ | ▮ | ▮ | ▮ |
| Cum Totals | ▮ | ▮ | ▮ | ▮ |
| Cum Totals | ▮ | ▮ | ▮ | ▮ |

IAL INTRA-UNIVERSITY LAW SCHOOL RECORD



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2022 Diversity Clerkship Program

◄◄◄◄◄◄◄◄ ►►►►►►►►

### Interview Evaluation Fillable Form

### <u>Interviewer Recommendation:</u>

- ☒ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 24.**

**Student Name:** ▮▮▮▮▮▮▮▮

**Law School:** ☐ **UW** ☒ **MULS**

**Interviewer:** Jamie Yu

## A.  <u>General Qualifications</u>

*1.  Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:  *Lowest ↓*  ☐ 1  ☐ 2  ☐ 3  ☒ 4  ↑ *Highest*

Interviewer Comments:

▮▮▮▮ unique experience in lobbying as well as interning for a law firm position her well for employment in the legal profession. It is clear she has a background in communications.

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:  *Lowest ↓*  ☐ 1  ☐ 2  ☐ 3  ☒ 4  ↑ *Highest*

Interviewer Comments:

I thought ▮▮▮▮▮ writing sample was excellent and I was impressed by her personal statement.

## B.  <u>Interview Characteristics:</u>

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:    *Lowest* ↓    ☐ 1    ☐ 2    ☐ 3    ◼ 4    ↑ *Highest*

Interviewer Comments:

███████ did an excellent job during the interview. She was professional, engaging, and asked great questions. Not to mention, she was refreshingly funny.

## C. Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* **What is your motivation for participating in the Diversity Clerkship Program?**

Check a Score:    *Lowest* ↓    ☐ 1    ☐ 2    ☐ 3    ◼ 4    ↑ *Highest*

Interviewer Comments:

# Great answer!

## D. Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* **If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?**

Interviewer Comments:

███████ answered this question well, and I think she genuinely would seize any opportunity as a learning experience.

## E. Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

You are going to do well in the legal profession. Keep doing what you are doing during the interview process, it's working. Best of luck!

 @marquette.edu

## Education

**Marquette University Law School**, Milwaukee, WI
*Candidate for Juris Doctor*, May 2024
GPA: Available late January 2022
    Activities:
             Black Law Students Association, Member

**St. Norbert College**, De Pere, WI
*Bachelor of Science in Environmental Science*, May 2019
Certificate: Spanish
GPA: 3.34/4.00
    Honors and Activities:
        St. Norbert Distinguished Trustee Scholarship for Academics, 2015-2019
        Dean's List, 2 Semesters
        Track and Field, 2015-2019 (Record holder in 400m hurdles)
        Teacher Assistant for Ecology, Fall 2018

## Experience

**Milwaukee Justice Center Family Forms Clinic**, Milwaukee, WI
*Legal Volunteer*, Winter 2022
- Assist clients in filling out family law forms (child placement/custody, divorce, name changes).

**U.S. Department of Agriculture**, **Forest Service,** Milwaukee, WI
*NEPA Planner*, August 2020-August 2021
- Shadowed and assisted the Litigation Coordinator in writing of litigation reports and updating litigation database.
- Provided support in performing administrative review duties in responding to objection letters and reviewing documents prior to sending to public.

*Resource Assistant, Planning, Appeal, Litigation (PAL)*, June 2019 to August 2020
- Responded to objection letters regarding National Environmental Protection Act (NEPA) projects from public.
- Reviewed closure of administrative review documents to be sent to public.
- Reviewed criteria, laws, regulations, and program authority to ensure compliance with NEPA.
- Stayed up to date on changes in policy, regulations, and legal authorities affecting NEPA.
- Developed spreadsheets using tracking system to analyze responses, trends, and data.

## Interests

Music, gardening, hiking, travel

<span style="color:red">Exhibit 33</span>

135

I think people are often shocked when I, a black woman, tell them I am interested in environmental science. It's a sad realization that many black people don't take much of an interest in the environment, but that is no coincidence. Looking at some of the environmental conditions that many black people live in and around, it's easy to understand. I started exploring my interests in nature at a young age, and I'm very grateful I had opportunities to do so. But this is not the case for everyone— especially black people— and this is an issue, along with the declining health of our environment, I'd like to address in my career.

Knowing and understanding the law would not only be beneficial to my career goals of being an ally of the environment, but it is also important for me as a black woman in America. Systemic racism has long produced the segregation of minorities in America. From this, what we tend to see are minority communities coincidently located in areas that are environmentally neglected. These areas have higher pollution, lower air quality, are sites for toxic waste dumps, and are the most effected by natural disasters. Not only is this an aspect of the environment that we are allowing to be degraded, but this is affecting the health and livelihood of people.

Often, minority communities are in areas of low property value. Though undesirable for residence, industries may take advantage of this, building facilities that release pollutants. As stated above, minority neighborhoods are also more likely to be or have been sites of toxic waste dumping grounds. For example, cities such as Chicago, Atlanta, and Memphis, which have an overrepresentation of black populations, are home to large numbers of abandoned toxic waste sites. Black communities are also disproportionately located in areas more susceptible to natural disasters. To compound this, there is also less funding going to these communities to help protect them in the event of disaster. Hurricane Katrina demonstrated this where the city of New Orleans, a largely black population, was devasted by the storm.

Societal and environmental neglect fuel my interest in environmental law and environmental justice. In my time at law school, I will be able to learn more about the laws, regulations, and policies surrounding these kinds of issues and to become an advocate to help better protect these areas and the people. Injustices done to minorities reach all aspects of life. Environmental justice is just a piece of the puzzle, one that I want to incorporate into my future career. I believe pursing this path in law school will deepen my knowledge of two important causes, and I will hopefully be able to do justice to our environment all while being a part of the long ongoing fight for equality for all people.



@marquette.edu

### Writing Sample

Attached is a writing sample of a final paper submitted for my first semester legal writing class. The document has been excerpted due to length and provides the statement of facts and discussion section for one of the issues presented in the assignment.

### Statement of Facts

Mr. Haugh's cabin was allegedly burglarized by Brandon Tremble. Mr. Haugh and his wife have been using the cabin for about ten years, usually staying there three to four weeks out of the year. Three of those weeks were usually in the summer and one week in the winter. Though, in the recent past five years, the couple has not been there in the winter. The cabin is lightly furnished. The couple do not keep the beds made unless they are at the cabin. The kitchen is kept scarcely stocked with dry items that do not require refrigeration. Due to the rare use, there is no running water or electricity. There is no bathroom in the cabin itself, but an outhouse off the back. The cabin also has an attached screened in porch. The door to the porch is kept padlocked.

Tremble was arrested and charged for second degree burglary of Mr. Haugh's cabin. Tremble was bow hunting on foot for deer in Dickenson County, Virginia. He carried with him only his bow and arrows. At one point, Tremble tripped a fell, snapping the arrows he was carrying. He got frustrated, threw the arrows on the ground, and decided to return to his truck. After walking for a bit, he got lost, and at around 5:45pm, he saw a cabin and walked to it hoping to get help or use the phone.

Tremble could tell no one had been there because there were no footprints in the snow. He tried to look through the windows, but it had become dark by this point, so he could not see in. Though, the woods were not dark due to the light of the full moon reflecting on the snow, so Tremble decided to again try to find his truck. If he could not find his truck, Tremble decided he'd return to the cabin, break in, and build a fire to warm up.

Before leaving, Tremble went to the side of the cabin where there was a screened-in porch. Inside the porch, he saw a metal locker, which he thought may have supplies that may

help him if he was unable to make it out of the woods. Tremble tried the door to the porch, but it was padlocked. He then noticed where a branch had fallen and ripped a hole in one of the screens. The hole was large enough for Tremble to walk through, but the rip was filled with twigs and branches from the larger branch. He pulled away the branch and easily slipped through the hole without touching it. He opened the locker and put on a pair of gloves and a scarf that he found inside. Tremble then left to try to reach his vehicle. Another hunter saw Tremble "poking around" the cabin and called the police. Tremble was picked up by the police and arrested for second degree burglary. This memo will analyze whether Tremble's actions satisfy each element of burglary and if so, whether the burglary would be charged as a Class 2 or Class 3 felony.

**Discussion**

**I.    Tremble should not be charged with burglary.**

The court will likely find that Tremble did not commit burglary. Burglary laws were made with the purpose to protect the security of habitation. Giles v. Commonwealth, 658 S.E.2d 703, 705 (Va. App. 2008). They were made considering the dangers created to personal safety during burglary situations, especially when one is sleeping and most vulnerable. Rash v. Commonwealth, 383 S.E.2d 749, at 751 (Va. App. 1989). Under Virginia law, the following elements must be present to establish a burglary: (1) there must be a breaking, (2) the person must have entered a dwelling of another, (3) it must have occurred at nighttime, and (4) there must have been intent to commit a felony or any larceny. Va. Code Ann. § 18.2-89 (West 2021). The occurrence at nighttime element is met because it was dark outside, and the moon was out. The intent to commit a felony or larceny element is also met because Tremble took gloves and a scarf. The elements in question and discussed in this memo are the elements of (1) breaking and (2) whether the cabin is a dwelling. Based on the facts of the case and case law, both the

3

breaking and dwelling elements are likely not met. Tremble did not commit a breaking because he entered through an opening in the porch screen without touching it. He also did not enter a dwelling, because the cabin is very rarely occupied and not ready for use. Thus, Tremble did not commit burglary.

### A. Tremble did not commit a breaking.

There are two types of breaking: constructive breaking and actual breaking. <u>Johnson v. Commonwealth</u>, 275 S.E.2d 592, 594 (Va. 1981). Constructive breaking occurs when entrance is obtained by threat of violence, fraud, or conspiracy. <u>Id.</u> Actual breaking requires the application of some force. <u>Id.</u> A very minimum amount of force will satisfy the "some force" requirement. <u>Id.</u> Examples include pushing open a door, turning a key, or lifting a latch. <u>Id.</u> at 595. Physical force must be applied to remove or displace anything attached to the house and relied upon by the occupant for safety of the house. <u>Finch v. Commonwealth</u>, 55 Va. 643, 644 (Va. 1958).

Courts have held that entrances obtained without physical force are not breakings. In <u>Doan</u>, the victim opened her kitchen door to let her dog out and did not close the door. <u>Doan v. Commonwealth</u>, 422 S.E.2d 398, 399 (Va. App. 1992). A few minutes later, four men ran in through the opened door and proceeded to rob the victim of cash and jewelry. <u>Id.</u> at 399-400. The court ruled that there was no evidence to support the breaking element of burglary. <u>Id.</u> at 405. The sliding door in which the men entered through was left open, so the men were able to run in without need of physical force, threat of violence, fraud, or conspiracy. <u>Id.</u>

4

Case 2:23-cv-01697 Filed 12/19/23 Page 32 of 259 Document 1-2

Courts have ruled that fraud and even the slightest bit of force can be sufficient to establish a breaking. In <u>Johnson</u>, the assailant went to the victim's apartment posing as maintenance there to fix a problem with the fuses. 275 Va. at 593. When the victim refused the services, the assailant repeated his request and then asked for some water. <u>Id.</u> The victim went to get him some water, leaving the door open by about a foot. <u>Id.</u> After getting the water, the victim turned to see that the assailant had followed her into the kitchen. <u>Id.</u> The court stated that there was enough information for the jury to find that the assailant committed both constructive and actual breakings. <u>Id.</u> at 595. To obtain entry into the apartment, he posed as a maintenance man and then asked for a glass of water that he did not actually want. <u>Id.</u> at 594. These actions constituted constructive breaking. Additionally, the assailant committed actual breaking when he let himself in to the apartment. The victim testified that when she left to get the glass of water, she told the assailant to wait there and left the door slightly open. <u>Id.</u> The door was not opened wide enough for the assailant to walk in without touching it, so he had to apply some physical force to push the door open wide enough for him to get in. <u>Id.</u>

The <u>Doan</u> case is analogous to our case in that there was no use of force for entrance. The men in <u>Doan</u> walked right into the house through an open doorway while the victim was in a different room. Similarly, in our case, the cabin was unoccupied, and Tremble entered the porch through a large rip. In both cases there was no application of physical force, threat of violence, fraud, or conspiracy used to enter because there was nothing or no one stopping or preventing the entrance. Additionally, the openings in which entrance was obtained were wide enough for the perpetrators to enter without touching anything. In <u>Doan</u>, the door was left open, and wide enough for the men to run through with having

5

to open it anything further. In our case, the tear in the porch screen was large enough for Tremble to easily slip through, untouched. Under these facts, it is likely the court would find that neither an actual breaking nor constructive breaking occurred in our case.

The Johnson case is distinguishable from the present case in regard to the use of force to gain entrance. In Johnson, the assailant tried to gain entrance by claiming to be at the apartment as maintenance to fix fuses. When that didn't work, he asked for a glass of water which he did not actually want. Both were ploys to be invited in by the victim and the court held that they constituted a constructive breaking. In our case, Tremble did not lie to get into the porch; there was no one there for him to persuade to let him in. In Johnson, the assailant also let himself in by pushing the apartment door open. When the victim left to get the water, she only left the door sightly open, not wide enough for the assailant to enter without pushing it further open. The assailant thus committed an actual breaking as well. Conversely, in the present case, Tremble did not use any physical force to get into the porch. He did not need to widen the entry opening as it was already large enough for him to get through without touching. Thus, a court would likely hold that Tremble did not commit an actual nor constructive breaking.

One fact that may be construed to show evidence of a breaking is that Tremble removed a large branch from the tear in the porch screen. The branch fell from a tree, causing the tear. It was likely blocking the way for Tremble to enter through the tear, so he removed it. Though this was a physical force used to gain entry, it is not likely a strong argument. When force is applied to gain entrance for a breaking, the force must be applied to something that is attached and relied upon for the safety of the house. Finch,

6

55 Va. at 644. The branch wasn't something that was attached to the house nor was it something that the owners relied upon for safety.

Given the lack of evidence to show that Tremble used physical force, threat of violence, fraud, or conspiracy to get into the porch, the court would likely find that he did not commit a breaking when he entered the cabin porch.

**B. The cabin is likely not a dwelling.**

A dwelling is a place regularly used by human beings for sleeping. <u>Giles</u>, 658 S.E.2d at 705. It is not necessary that a building be regularly occupied to be considered a dwelling, nor that the dwelling be occupied during the time of the burglary. <u>State v. Bair</u>, 166 S.E. 369, 370 (W. Va. 1932). Generally, a building can be classified as a dwelling as long as the occupant intends to return, thus temporary absence does not declassify a place as a dwelling. <u>Rash</u>, 383 S.E.2d at 751. The term dwelling extends to structures attached or immediately connected to a dwelling. <u>South Dakota v. Celli</u>, 263 N.W.2d 145, 147 (S.D. 1978). Along with the use for sleeping, the place must also be used for other functions related to habitation such as preparing and eating meals, bathing, etc. <u>Giles</u>, 658 S.E.2d at 705. The place must be maintained to make it suitable for immediate and rapid habitation. <u>Id.</u> at 708. This may include power supply, water, food, furniture, clothing, and other items. <u>Id.</u> Finally, it is necessary that the use of the place be more than rare or infrequent. <u>Id.</u> at 708. There is no established time frame or amount of time to constitute this but depends on the facts and circumstances of each case. <u>Id.</u>

Courts have held that how often the place is used for sleeping and its readiness for occupants are factors in determining whether a place is a dwelling or not. In a South

7

Dakota case, two men were trying to hitchhike from South Dakota to Wyoming in January. Celli, 263 N.W.2d at 146. After no success of catching any rides and walking all day, they decided to head back to home, but by this point the sun was setting, and the men were getting cold. Id. The men spotted a cabin which they broke into to warm up. Id. They were able to get a fire started in the cabin, but a neighbor saw the smoke from the cabin and called the police. Id. The men were arrested and charged for burglary. Id.

The Supreme Court of South Dakota ruled that the cabin the men broke into was not a dwelling, reasoning that an unoccupied cabin that is not ready for occupancy does fit the definition of a dwelling. Id. at 147. The cabin was used every summer and occasionally during the day in the winter and fall. Id. The cabin owners had not stayed in the cabin at night for the past three to four years prior to the incident. Id. This information shows that the cabin is unoccupied for a majority of the year. At the time the defendants entered, the cabin was unoccupied and determined to not have been ready be for occupancy. Id. It had been unoccupied for several months prior to the unlawful entry. Id. There was no power, and the bathroom fixtures were disconnected for the winter. Id. These facts led the court to conclude that the cabin was not a dwelling.

Courts have also ruled that for a place to be a dwelling, it should be used regularly. In Giles, three men broke into a house in Martinsville, Virginia and took various items. 658 S.E.2d at 704. One of the men was convicted of burglary but appealed on grounds that the house was not a dwelling. Id. at 705-06. The court ruled that the house was in fact a dwelling due to its regular use and ability to be readily occupied. Id. at 708. Regular use includes humans sleeping in it and participating in other habitation related activities such as cooking, eating, and bathing. Id. at 707-08. The house should also be maintained so

8

that it is readily available for habitation. Id. at 708. This may include the house having power, running water, food supply, furniture, beds, and clothing. Id. Additionally, someone should be staying at the house on a usual or periodic basis. Id.

The owner of the burglarized house lived in Baltimore, Maryland, but he stayed at the house in Martinsville when he visited on the weekends. Id. at 704. This was generally around one weekend every month. Id. at 708. The owner kept the refrigerator and pantry stocked, the sleeping quarters maintained, and the electricity and water remained on. Id. at 704. The house had three bedrooms, a living room, a family room, and a kitchen, all furnished. Id. Based on these facts, the court ruled the house in Virginia met the standards for regular use and ability to be readily occupied, so the house could be classified as a dwelling.

The Celli case is analogous to our case in that both cabins were rarely occupied and that they were not ready for occupancy. The owners in the Celli case testified that the cabin is used in the summer and occasionally during the winter and fall. Similarly, in our case, Mr. Haugh stated that they used their cabin mostly in the summer and maybe a week in the winter. Though, in recent years, their use of the cabin had been limited to the summer. In both cases, the cabins were used mostly in the summer, but generally unoccupied and unused the rest of the year. Additionally, both cabins were not ready for occupants. In Celli, the court established that the lack of power and disconnected bathroom facilities made the cabin not ready for occupants. Based on this information, it is likely that Mr. Haugh's cabin would also be classified as not having been ready for occupants. Mr. Haugh stated that his cabin does not have electricity or running water. There also is not a bathroom in the cabin itself. Thus, due to the lack of readiness for

9

12
Case 2:23-cv-01697   Filed 12/19/23   Page 37 of 259   Document 1-2

occupancy and the rareness of occupancy, the court would likely rule that Mr. Haugh's cabin is not a dwelling.

The <u>Giles</u> case is distinguishable from the present case in regard to regular usage. In <u>Giles</u>, the owner stayed at the burglarized house approximately one weekend a month, which amounts to about fifteen weeks a year. In contrast, Mr. Haugh stayed at the cabin three to four weeks out of the year. Compared to the house in the <u>Giles</u> case, there was quite a bit less time spent, and thus less usage at the Haugh cabin. The owner in the <u>Giles</u> case also spread his use out over the course of the year as opposed to in our case where Mr. Haugh used his cabin almost solely in the summer. The burglary statute is meant to protect the security of habitation and people's personal safety. It is more likely that someone would be affected by a burglary if they are spending a lot of time at a place as opposed to someone spending very little time there. Additionally, if one spreads that time out over the year, the chances of being present at any given time during a burglary are higher compared to someone spending time at a place during a single, short time frame.

Other factors that led the court in <u>Giles</u> to establish the house to be a dwelling were that the kitchen remained stocked, the sleeping areas were maintained, there was running water, a power supply, and the house was furnished. Though, in the present case the cabin was also furnished, it did not have electricity or running water, the sleeping areas weren't made, and the kitchen was very scarcely stocked. If the cabin is used often, it would more than likely be ready for the occupants. Mr. Haugh's cabin's lack of readiness for occupants may lead one to infer that it is not frequently used. Thus, the court would likely rule that Mr. Haugh's cabin is not a dwelling.

10

A relevant fact to address is the Haughs' intent to return to their cabin. A place designated as a dwelling remains a dwelling in absence of occupants so long as they intend to return. <u>Rash</u>, 383 S.E.2d at 751. The Haughs returned to their cabin every summer for about ten years, so it may be safe to assume they still had the intent to return. Though intent to return is a factor in determining dwelling status, it is likely not enough to constitute a dwelling. The Haugh's intent to return to their cabin is likely outweighed by the many other factors discussed. Further, based on the language "remains a dwelling", the cabin would already have had to have been established as a dwelling.

Additionally, it could be argued that the cabin is a dwelling because it is furnished. This is a strong point, but the cabin is furnished with the bare minimum. The presence of some furniture will not prevail over the facts that there was no food, water, electricity, made beds, or even a bathroom facility in the cabin. Keeping in mind that it was wintertime at the time of the incident, it is more difficult to occupy a place without these, especially the electricity and water. There would need to be a steady supply of wood to heat the cabin. Mr. Haugh stated they would get water from a nearby lake for their water, but that's assuming the water is not frozen. Though, the Haughs used the cabin sometimes in the winter, they were there for only a week. It is much easier to deal with those circumstances for a short period of time. Mr. Haugh also stated that they "[did] not use the cabin enough to worry about [electricity and running water]."

Thus, based on the facts supporting the rare use and unreadiness for occupants of Mr. Haugh's cabin, the court would likely hold that the cabin is not a dwelling.

11

## OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD

**Name:** ▉▉▉▉▉▉▉▉

Institution Info:       Marquette University
Print Date:             01/27/2022

Other Institutions Attended:
Saint Norbert College

**Beginning of Law Record**

**2021 Fall**

Program:          Law
Primary Major:    Law



| Course | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|

|  |  | Attempted | Earned | GPA Units | Points |
|---|---|---|---|---|---|
| Term GPA: ▉ |  | Term Totals |  |  |  |
| Cum GPA: ▉ |  | Cum Totals |  |  |  |

**2022 Sprg**

Program:          Law
Primary Major:    Law

| Course | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|

|  |  | Attempted | Earned | GPA Units | Points |
|---|---|---|---|---|---|
| Term GPA: ▉ |  | Term Totals |  |  |  |
| Cum GPA: ▉ |  | Cum Totals |  |  |  |
| **Law Career Totals** ▉ |  | Cum Totals |  |  |  |

End of OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.*®

# 2022 Diversity Clerkship Program

▲ ▲ ▲ ▲ ▲ ▲ ▲ ▲ ▲ ► ► ► ► ► ►

### Interview Evaluation Fillable Form

---

## <u>Interviewer Recommendation:</u>

☐ **Outstanding Candidate**
■ **Very Good Candidate**
☐ **Average Candidate**
☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, <u>jevans@wisbar.org</u> no later than January 24.**

**Student Name:** ██████████

**Law School:** ☐ **UW**   ■ **MULS**

**Interviewer:** <u>Jamie</u> Yu

### A. <u>General Qualifications</u>

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ■ 4   ↑ *Highest*

**Interviewer Comments:**

████ has demonstrated through her experience that she is prepared for a job in the legal profession.

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ■ 4   ↑ *Highest*

**Interviewer Comments:**

████ writing sample and personal statement were both well-prepared and well-written.

### B. <u>Interview Characteristics:</u>

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

**Check a Score:**     *Lowest* ↓   ☐ 1     ☐ 2     ■ 3     ☐ 4     ↑ *Highest*

**Interviewer Comments:**

███ gave an overall good impression during the interview. She was a good conversationalist, but I noticed she was a very fast talker, said "you know" a lot and, most importantly, didn't have a lot of questions for me.

## C. <u>Motivation for Participation in the Diversity Clerkship Program:</u>

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* **What is your motivation for participating in the Diversity Clerkship Program?**

**Check a Score:**     *Lowest* ↓   ☐ 1     ☐ 2     ☐ 3     ■ 4     ↑ *Highest*

**Interviewer Comments:**

# Great answer!

## D. <u>Interviewer's Perspective:</u>

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* **If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?**

**Interviewer Comments:**

███ answered this question well, and I think she genuinely would seize any opportunity as a learning experience.

## E. <u>Student Feedback:</u>

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

**Interviewer Comments:**

You are going to do well in the legal profession. Remember that it's okay to slow down a little when you talk, and don't be afraid to ask more questions!

█████ @wisc.edu

## EDUCATION

**University of Wisconsin Law School**                                Madison, WI
Juris Doctor Candidate                                                  May 2024
> Activities:     1L Black Law Student Association representative, 1L Middle Eastern Law Student Association Treasurer

**The University of Illinois at Chicago**                              Chicago, IL
Bachelor of Arts in Criminology, Law, and Justice and General Psychology        May 2021
> GPA:     3.88, *magna cum laude*
> Activities:     Criminology, Law, and Justice Association, Phi Alpha Delta Law Fraternity, Arab Student Union, Northwestern University School of Law Pathway to the Legal Profession

## EXPERIENCE

**Greenline Foods**                                                    Chicago, IL
*Grocery Department Manager*                               December 2016-Present
- Responsible for sustaining store maintenance and day-to-day operations and services of the grocery department, one of four of the store's departments
- Orders grocery department inventory and reports to operations manager weekly or on an as-needed basis to ensure complete customer satisfaction, service, and stock
- Assists in daily store functions or in other departments as needed

**Elmosa & Associates Law Office**                                     Worth, IL
*Intern*                                                    February 2020-July 2020
- Assisted lead attorney(s) in client appointments, meetings, trials, mediations
- Accommodated in implementing a standard office form/client information sheet
- Drafted, reviewed, and revised a wide range of legal Immigration documents (I-485, I-765, etc.)

**Roderick and Solange MacArthur Justice Center**                      Chicago, IL
*Intern*                                                      March 2020-July 2020
- Researched documents and publications for details that would establish evidence
- Documented legal issues and case law related to each assigned present/historical case
- Restructured and updated a social media calendar of all current/past cases that the firm represented

**IdeaFire**                                                          Chicago, IL
*Intern/Media Coordinator*                                   June 2019-August 2019
- Managed and sorted files by uploading images through Heroku App as the Head Coordinator of Media-infographics, fliers, etc.
- Created and directed database/excel documents that provided career and volunteer opportunities, available positions, job descriptions, and employer contact information
- Communicated through work management websites like Slack to update as needed

**Center for College Access and Success**                             Chicago, IL
*Lead Peer Tutor*                                          July 2017-March 2020
- Monitored and reviewed student academic progress submitting required reports accurately and timely
- Supervised students in completing all academic assignments as required, and assisted in delivering assistance to students regarding scholarship opportunities
- Presented learning strategies to all assigned students and established cordial, working relationships with teaching faculty and school administrators

## ADDITIONAL INFORMATION
Language:     Fluent in Arabic
Interests:     Trained in Mixed Martial Arts (MMA)

<span style="color:red">Exhibit 34</span>

1

My ethnic background, consisting of both Middle Eastern and African American descent has caused many controversies. Some may call it the best of both worlds, while others portray it as the collision of the outliers. Growing up, the word "terrorist" became flippantly used toward anyone who appeared to be of Middle Eastern descent post 9/11. Growing up in Chicago, ranging from the socio-economic issues to the violent complexities, the aspect of my diverse background only contributed to my identity. Although I was born and raised in the United States, my parents grasped onto outdated values of my mother's home village in The West Bank, Turmusaya. Little did I know, due to my parent's iron grip on this culture, my childhood experiences were going to be altered. One typical stereotype founded by the culture is that the more education an individual completes the more westernized they will become. This was one of the main reasons why my parents never finished high school, along with the idea of higher education being overlooked within the culture. When I was just nine years old, my family, and I made a dramatic shift in leaving Chicago to the West Bank to ensure I would be able to maintain my language, culture, and religion. I felt like this transition heavily impacted my learning experiences as I was removed from the Chicago Public School systems only to be enrolled in an even more underdeveloped school in Turmusaya. At the time, tensions regarding the Palestine and Israel conflict were still an ongoing issue, and with circumstances only escalating, returning to America seemed to be distant to the young boy that I was. Luckily, my mother made the wise decision in bringing us all back, but as we escaped the violence in The West Bank, Chicago introduced a whole new concept of violence to me.

Death is truly never a reality unless it hits close to home, and the death of my best friend during the summer of my high school sophomore year left me devastated. Michael was ambitious, outgoing, and intelligent, but most of all he was my support system. We discussed our future goals, career interests, and held each other accountable by a little friendly competition. Adverse life experiences taught me the importance of building a strong work ethic through perseverance. Though unfortunate, these are the building blocks that have prepared me to seek a challenging yet fulfilling career in law. From my education, I gained the intellect needed to interact with others as well as a confident understanding of the

world around me. I learned to work with people, and influence decisions that would affect people's lives. Community service, legal internships, and paid positions proved invaluable in allowing me to better understand myself in environments that dramatically facilitated my personal development. This helped me not only grow in terms of skill set but also survive within the gang-infested West-side of Chicago throughout my upbringing. My perseverance to not be a statistic hangs heavy on my shoulders.

3

## MEMORANDUM

To:     William  Reindhardt

From:   ▮▮▮▮

Date:   November  24, 2021

RE:     Possible  Sex Discrimination  Claim  for Fareeha  Amari

### QUESTION  PRESENTED

Under  Title  VII Civil  Rights  Act of 1964, there are four  elements  to establish  a sexual
discrimination  claim  against  an employer,  does Pharah  have a claim  against  Snowstorm
Entertainment  when  she was subjected  to both physical  and verbal  sexual  harassment  by her
coworker,  and her employer  disregarded  her complaints?

### BRIEF ANSWER

Yes, Pharah  will  likely  make a successful  claim  for sexual  discrimination  against  her
employer,  Snowstorm.  Under  Title  VII, a plaintiff  must establish  four  elements  for a sexual
harassment  claim:  (1) the harassment  is unwelcome;  (2) the harassment  is because of gender;  (3)
the harassment  is so pervasive  it makes the conditions  of employment  humiliating  and creates  a
hostile  or abusive  work  environment;  and (4) the employer  is liable  for the harassment
propounded  upon the plaintiff.  In Pharah's  case, the first  claim  is met as Pharah  has endured
unwelcomed  sexual  harassment  because she never asked for Morrison  to touch her. Similarly,
the second claim  was met because Morrison's  comments  towards  Pharah's  gender regarded  her
female  body characteristics.  Also, Pharah  has a claim  that the third  element  of a hostile  work
environment  is subjectively  and objectively  supported,  along with the fourth  claim  of employer
liability,  due to her employer's  negligence  in remedying  and discovering  the harassment.

1

▮▮▮▮▮▮▮▮▮                    **4**

## STATEMENT OF FACTS

Fareeha Amari, also known as Pharah, is a senior game designer employee at Snowstorm Entertainment. One coworker in particular, Jack Morrison, makes the office environment uncomfortable for Pharah.

On Pharah's very first encounter with Morrison, she noticed his gaze constantly dropping down to look at her breasts. He also asked her "Why a pretty girl like her would want to work around a bunch of 'neckbeards' like himself." Later that same week, Pharah and Morrison encountered each other at a nearby bar for a work happy hour. He approached her and quickly steered the conversation towards her looks. Morrison told her how pretty she looked, kept looking down her breasts, and said that she really filled out the blouse she was wearing. Morrison playfully patted Pharah's leg, which later turned into his hand lingering on her knee. As they continued talking, he attempted to touch Pharah again, this time rubbing her lower thigh with his thumb. This is when Pharah told Morrison to please stop, then walked towards other coworkers at the bar.

Later that month, Pharah went to the annual gaming convention. There, Morrison again approached Pharah and told her that she had nice legs and that her behind looked great in her tight little skirt. Morrison then put a hand on Pharah's thigh and then leaned in towards her to try to kiss her. Pharah then pushed him off and told him, you're drunk – please stop. After that night, Morrison started making offensive comments towards Pharah in the office. This included comments like, girls like you should be artists with your paintbrushes and crayons, and when Pharah was slightly bent over, Morrison told her to stay in that perfect position, baby. He then threw a pencil on the floor and told her to pick it up as he grabbed onto his crotch.

2

Finally, Pharah went to Human Resources to report these incidents. The HR associate, Ashe, told her, "You know how gamers are – this is the kind of things that are going to happen… Boys will be boys – they are just joking around – you should expect that here." HR recommended Pharah to just be meaner, rather than being too nice. Morrison continued his comments which consisted of phrases like girls don't belong in the game design; Snowstorm was better before all the know-it-all girls came; even calling Pharah frigid and that she just needed to get laid. Pharah met with Ashe again about the incidents, to which Ashe said, "It's not harassment. He didn't touch you, and that if it is so bad, why aren't you crying or more hysterical? You're acting entitled – just suck it up… this is not a fight you want to fight."

Afterward, Pharah had another encounter with Morrison. In this encounter, he pinched the side of her stomach, telling her that she should work out more to lose weight. Pharah emailed the company's vice president of global human resources, Baptise Augustine, and told him about what had been happening. Unlike Ashe, Augustine took initiative, which stopped Morrison from making sexual advances altogether.

**DISCUSSION**

The claim for sexual harassment under the Title VII Civil Rights Act of 1964 42 U.S.C.S. § 2000e-2, will likely be successful for the plaintiff employee, Pharah. For a sexual harassment claim to be successful, plaintiff employee must prove the existence of the following four elements: (1) the harassment is unwelcome; (2) the harassment is because of gender; (3) the harassment is so pervasive it makes the conditions of employment humiliating and creates a hostile or abusive work environment; and (4) the employer is liable for the harassment propounded upon the plaintiff. *See* Parkins v. Civ. Constructors of Illinois, Inc., 163 F.3d 1027, 1031 (7th Cir. 1998).

3

The first and second elements will likely not be in dispute in Pharah's case. The first element is met because Pharah endured unwelcomed sexual harassment from Morrison. On different occasions, she told him to stop touching her and even pushed him away when he tried to kiss her. These occasions established that Pharah did not welcome Morrison's sexual advances. Similarly, the second element which requires that the alleged sexual conduct was because of Pharah's gender is met since Morrison's remarks focused on Pharah's female body characteristics. Also, Morrison's remarks to Pharah explicitly used gender language. Morrison said, "Girls like Pharah do not belong in the gaming industry", and that "Pharah was one of those know-it-all girls." The focus of this memorandum will therefore be on the third and fourth elements of sexual harassment conduct. Based on the facts of the case, Pharah can likely prove that Morrison's unwelcome sexual conduct towards her resulted in a hostile work environment, and that her employer's failure to address her complaints about his conduct would likely make the employer liable for sexual discrimination under Title VII.

**I.     Pharah can likely prove that Morrison's harassment was so pervasive that it created a hostile work environment**

Pharah will likely be able to state a claim that she encountered pervasive sexual harassment in her work environment. A work environment is hostile when both subjective and objective tests are met. The subjective test is met where the plaintiff feels subjectively uncomfortable. The objective test considers the factors of the severity and the frequency of the hostile acts within that work environment. An objective test is one where a reasonable person would also find the work environment to be threatening or humiliating, which essentially determines whether the conduct affected the overall job performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S. Ct. 367, 368 (1993).

4

In <u>Boumehdi v. Plastag Holdings, LLC</u>, the court found that a verbal attack with anti-female animus could have contributed to a hostile environment for female employees. <u>Boumehdi v. Plastag Holdings, LLC</u>, 489 F.3d 781, 788 (7th Cir. 2007). In this case, the plaintiff encountered at least 18 anti-female comments by her harasser. For example, some of these comments consisted of the harasser telling the plaintiff to stay bent over while she was bent over, and that it was perfect, that women should work in flower shops, that women should wear low cut blouses and shorter shorts, and even to the extent of generalizing women as individuals who think they know everything. <u>Boumehdi</u>, 489 F.3d at 782. These comments were subjectively hostile to the plaintiff, which was evident through her discomfort and numerous complaints. <u>Boumehdi</u>, 489 F.3d at 784. Additionally, they were objectively hostile because a reasonable individual could conclude that being subjected to anti-female comments 18 times in about 10 months is severe and frequent as well as humiliating. <u>Boumehdi</u>, 489 F.3d at 786. Even though most of the harasser's comments were sexist rather than sexual, sexual harassment claims are not limited to sexual desires. <u>Boumehdi</u>, 489 F.3d at 785. The Court concluded that the comments were both subjectively and objectively pervasive enough to create a hostile work environment.

In contrast, in <u>Baskerville v. Culligan Int'l Co.</u>, the court concluded that no reasonable jury could find that the accused harasser's remarks created a hostile working environment. <u>Baskerville v. Culligan Int'l Co.</u>, 50 F.3d 428, 431 (7th Cir. 1995). In this case, plaintiff encountered nine comments from the accused harasser. For example, some of these comments consisted of calling her a pretty girl, referencing all women as "tillies," (an Irish word for something added for good measure, and a World War II British slang term for a truck) and even that the accused better clean up his act and better think of the plaintiff as Ms. Anita Hill. <u>Baskerville</u>, 50 F.3d at 429. These comments were subjectively hostile to the plaintiff. However,

5

it was found not to be objectively hostile because these incidents were spread over seven months, were neither frequent nor severe, and did not necessarily make the workplace hellish for the reasonable individual. Id. at 429. The work environment was not hostile enough to the point where the accused touched the plaintiff, nor did he ever imply for her to have sex with him. He never said anything to the plaintiff that cannot be repeated on primetime television. Baskerville, 50 F.3d at 430. The conduct towards plaintiff was neither severe nor humiliating and was not pervasive enough to create a hostile work environment.

In the case at hand, Pharah will likely be able to state a hostile work environment claim due to coworker Morrison's harassment. Just like in Boumehdi, the work environment was subjectively hostile towards plaintiff because of the 18 sex-based comments by her harasser, the harassment Morrison created towards Pharah consisted of over 10 sex-based comments. This is also the case in Baskerville, as the nine comments made were also subjectively hostile to the plaintiff.

On the other hand, Morrison's harassment can reasonably be seen as hostile through an objective perspective. Just like in Boumehdi, the harassment consisted of the harasser making comments like telling the plaintiff to stay bent over. In Pharah's case, Morrison also tells her to stay bent over while holding onto his crotch. Not only did the comments undermine Pharah's credibility as a professional, but it also made the workplace feel sexually humiliating, and made it difficult for her to work. Furthermore, in Boumehdi, the harasser made comments that women should work in flower shops, and women also think that they know everything. Similarly, In Pharah's case, Morrison made comments that girls like her should be artists with their paintbrushes and crayons and that the gaming industry was better before all the know-it-all girls came. These comments are also humiliating enough to create a hostile work environment

6

because each incident would disrupt Pharah's concentration, making it difficult to continue working. Going on, in <u>Boumehdi</u>, the harasser made a comment that the plaintiff should wear short shorts and low-cut shirts. In Pharah's case, Morrison makes a similar comment regarding Pharah really filling out her blouse, and how good she looks in a tight skirt. These comments are not only severe but are also humiliating enough to impact work conditions. In contrast, in <u>Baskerville</u>, although nine comments were made, they were not as sexually humiliating. The comments were not as severe considering they could have been said on primetime television.

Additionally, the sexual conduct Pharah encountered with Morrison was not only severe and humiliating but also frequent enough to impact job performance. Just like in <u>Boumehdi</u> the harasser's conduct was frequent because of the 18 comments made within a span of 10 months, in Pharah's case, over 10 comments and three incidents were initiated by Morrison within a span of six months. In addition to the comments, Morrison also humiliates Pharah through his lean-in for a kiss, the touching of her legs, and even pinching the side of her stomach all within six months. Pharah's case has both frequent comments and physical incidents, so it is likely her claim will stand. However, in <u>Baskerville</u>, the nine comments made by the accused harasser were not as frequent because they were made over a span of seven months. Pharah encounters more comments than the plaintiff in <u>Baskerville</u>, with the addition of the physical encounters. All of these encounters were within six months rather than seven months. Pharah's complaints fulfill that she was subjectively uncomfortable and that a reasonable individual would understand that the severity, humiliation, and frequency of the comments/incidents were pervasive enough to impact her job performance and create a hostile work environment.

**II.      Snowstorm was likely liable for Jack Morrison's conduct towards Pharah**

Pharah will likely be able to prove that Snowstorm is liable for Morrison's sexual harassment. An employer must be negligent in both discovering and remedying the harassment to be liable. Parkins v. Civ. Constructors of Illinois, Inc., 163 F.3d 1027, 1035 (7th Cir. 1998). In Loughman v. Malnati Org., Inc., the court ruled that a reasonable jury could find that the employer was negligent in addressing the coworker's harassment. Loughman v. Malnati Org. Inc., 395 F.3d 404, 407 (7th Cir. 2005). The plaintiff in Loughman encountered sex-based comments and three incidents with coworkers that have either leaned in for a kiss or even forcibly touched her in a sexual manner. Although plaintiff spoke to her manager about the sexual comments, nothing was done. The first incident was also reported to the manager regarding the kiss attempt, and no more than threats of being fired were made. Loughman, 395 F.3d at 404, 405. The second sexual incident resulted in the plaintiff speaking to a second manager, which resulted in him saying "This is the kind of stuff that's going to happen and something the plaintiff should expect"; and to just be a bitch to her harassers. Id. at 405. This finally led to the third incident that was also handled by the second manager, which sparked the district manager to get involved. Id. at 405. It was evident that the district manager should have known about the ongoing harassment because of the workers that testified. Id. at 405. The employer's response to the harassment was therefore insufficient. The severity of the harassment, along with the frequency of discussions regarding the harassment suggests that a different approach was needed in remedying it. Loughman, 395 F.3d at 406. Therefore, the court concluded that the employer's insufficient actions were negligent.

However, in Parkins v. Civil Constructors, the court held that the employer was not liable for the co-worker's sexual harassment. Parkins v. Civ. Constructors of Illinois, Inc., 163 F.3d 1027 (7th Cir. 1998). In this case, when the plaintiff filed a complaint, the employer immediately

launched an investigation and punished the harassers. <u>Parkins</u>, 163 F.3d at 1028. The complaint consisted of foul language, sexual stories, and touching, stemming from 1994. Although plaintiff encountered this harassment, she did not make a complaint immediately following the interactions. The plaintiff saw the superintendent in charge of her division and the defendant's EEO officer almost every day, but she did not complain to them until 1996. Id. at 1028. Once the employer was notified of the harassment in 1996, the employees involved were immediately either reprimanded verbally or even suspended without pay. Id. at 1028. Although plaintiff argued that she complained about the harassment to a coworker, that coworker enjoyed little or no supervisory authority. <u>Parkins</u>, 163 F.3d at 1030. A lack of authority involves the inability to hire, fire, promote, demote, or discipline employees <u>Parkins</u>, 163 F.3d at 1032. The employer acted immediately once the plaintiff complained to the appropriate supervisor about the other employees. Therefore, the employer could not be found negligent.

In this case, Pharah will likely be able to state a claim for employer liability due to Snowstorm's negligence in discovering and remedying the harassment. Just like in <u>Loughman</u>, the harassment took a total of four complaints by the plaintiff for action to be taken. In Pharah's case, she reported her harasser's conduct three times for action to be taken. Similarly, in <u>Loughman</u>, the plaintiff's first complaint was ignored by her manager. In Pharah's case, the first complaint was also dismissed with human resources saying, "You know how gamers are – this is the kind of thing that's going to happen," "Boys will be boys – you should expect that here," and that Pharah was being too nice to Morrison. The second complaint in <u>Loughman</u> only led to a second manager threatening the harassers with termination. In Pharah's case, the second complaint consisted of human resources asking Pharah why she was not more hysterical if the conduct really was harassment, following up by saying that this was not a fight she wanted to

9

take on. This shows that the complaints were overlooked, and no prompt action was taken. The third complaint in <u>Loughman</u> consisted of the second manager saying that this stuff was going to happen and for the plaintiff to just be a bitch back to her harassers. The third complaint response in <u>Loughman</u> is the same response Pharah gets in her first complaint to human resources, saying that she should just be meaner since the conduct was likely to happen. The fourth complaint is when action was finally taken in <u>Loughman</u>. Furthermore, after Pharah was ignored by the human resources person, she filed a third complaint with the vice president of human resources which was when action was finally taken. This clearly shows that the employer failed in both reporting the harassment by ignoring the first two cries of help and finally deciding to remedy the harassment two complaints too late.

On the other hand, in <u>Parkins</u>, the plaintiff decided to speak to a coworker instead of an employer who had the authority to deal with her sexual harassment. The employer was not liable in this case because the plaintiff reported the incidents to coworkers with no superiority over her, and when she did report the harassment to the right individual, prompt action was taken. In Pharah's case, she gave prompt notice to human resources right after her encounters. However, despite Pharah's prompt notice, HR disregarded her sexual harassment claims more than once. Pharah did not mistake authority in reporting Morrison's harassment straight to HR.

**Conclusion**

Under Title VII, Pharah will likely have a sexual discrimination claim. Given that Morrison made unwelcomed sexual approaches towards Pharah because of her gender, the subjective and objective claims will likely be met. The employer Snowstorm will likely be liable for Morrison's conduct due to their negligence. Regarding potential legal action, Pharah should pursue her sexual harassment claims under Title VII.

10

**Course History Report for** ▇▇▇▇▇▇▇▇▇▇

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during his/her current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

**Fall 2021**



**Spring 2022 - All Courses In Progress**

Report Generated on 01/18/2022

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2022 Diversity Clerkship Program

◀ ◀ ◀ ◀ ◀ ◀ ◀ ◀ ▶ ▶ ▶ ▶ ▶ ▶ ▶

### Interview Evaluation Fillable Form

---

### <u>Interviewer Recommendation:</u>

- ☑ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, <u>jevans@wisbar.org</u> no later than January 24.**

**Student Name:** ▮▮▮▮▮▮▮▮▮▮▮▮

**Law School:** ☑ **UW** ☐ **MULS**

**Interviewer:** Jose Castro

### A. <u>General Qualifications</u>

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ☑ 4 ↑ *Highest*
Interviewer Comments:

Prior work in law office and Justice Center provide a strong base for start of legal career, especially in criminal justice advocate area that he is interested in.

**2.** *Communication Skills*:

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ☑ 4 ↑ *Highest*
Interviewer Comments:

Communicated well and gave clear, confident answers. He was able to tell a compelling narrative of the challenges he had faced so far and how they helped him to push forward and succeed.

### B. <u>Interview Characteristics:</u>

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score: *Lowest* ↓ ☐ 1    ☐ 2    ■ 3    ☐ 4    ↑ *Highest*

Interviewer Comments:

Pretty good poise and demeanor. Gave strong answers.


**C. Motivation for Participation in the Diversity Clerkship Program:**

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK: What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score: *Lowest* ↓ ☐ 1    ☐ 2    ☐ 3    ■ 4    ↑ *Highest*

Interviewer Comments:

Very strong motives for participation in program. Has faced cultural and general challenges and wants to turn his experience into advocating and helping others. Diversity to him means being proud of who you are and sharing that and learning from others.

**D. Interviewer's Perspective:**

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK: If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

Interviewer Comments:

No such thing as a top choice. With his background, just getting to where he is is a dream. Thought he was interested in criminal justice, but his main goal is to help others.


**E. Student Feedback:**

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

██████ is a very strong candidate that would be able to turn his past challenges and experiences into a future helping others. He is very motivated and has a strong background. ██████ would make a very strong candidate in this program.



@wisc.edu

**EDUCATION**

**University of Wisconsin Law School**                                            Madison, WI
*Juris Doctor Candidate*                                                               *May 2024*
    **G.P.A.**
    **Activities:**    Black Law Students Association

**University of Wisconsin – La Crosse**                                        La Crosse, WI
*Bachelor of Science in Sociology*                                                     *May 2017*
    **Honors:**    Dean's List
    **Activities:**    Optimist Club, undergraduate research (Sociology)

**EXPERIENCE**

**Science Writers for Rural America**                                            Madison, WI
*Vice-President*                                              *March 2020 – September 2021*
- Started a non-profit to connect early career scientists with local newspapers in order to spread scientific literacy to rural communities.
- Developed skills related to bylaw writing, advocacy, and creativity.

**Aptiv**                                                                          La Crosse, WI
*Behavior Skills Trainer*                                        *December 2017 – May 2021*
- Assisted juvenile youth, people with disabilities, and families with a multitude of services.
- Addressed social skills, learning how to live independently, and fostering a more cohesive home environment for families.
- Learned on to communicate in stressful environments and to develop solutions quickly.

**Menards**                                                                       Onalaska, WI
*Receiving Team Member*                                          *May 2013 – September 2015*
- Loaded and unloaded trucks from early in the morning to late at night.
- Required to have updated product knowledge of all departments.

**Uptown Pizza**                                                                    Barron, WI
*Closing Supervisor*                                                   *May 2010 – May 2013*
- Trained staff and closed restaurant.
- Handled all customer service issues and next-day orders.

**ADDITIONAL INFORMATION**

**Volunteer:**    Wafer Food Pantry, Clearwater Farm, Catholic Charities, Habitat for Humanity
**Interests:**    Reading (fiction novels), hiking, and history podcasts (such as History of Rome)

<span style="color:red">Exhibit 35</span>

200

Dear Diversity Clerkship Program Selection Committee,

I believe the life experience that contributed most to my experiences with diversity and my desire to further contribute to diversity is growing up in a small town in northern Wisconsin. I was one of the only minorities in my school. My dad is black, and my mom is white. Therefore, from a young age I was always very aware of just how different I looked compared to my classmates. Furthermore, after the age of six, my father removed himself from my life and my link to one half of my heritage was cut off. This was very influential in the shaping of my identity today because for much of my childhood what it meant to be black in America was talked about to me by people who looked nothing like me.

This experience help create a foundation of tolerance and understanding. There is a weight to knowing for many of the people around you that you are one of the only experiences they have for interacting with people who look nothing like them and that is from a group that is treated nothing like them. To some of them saying "of course you're athletic" or "well you don't sound black" was never meant as a derogatory statement to me but a verbalization of their complete understanding of a different race. This gave me many of opportunities to reach out have meaningful discussions with people who don't see inequalities in the world.

When I finished my undergrad degree and started working with juvenile offenders is when I finally learned just how I could use my identity and experiences to help other minorities. In La Crosse, there were not many people, in my profession, who looked like me or the kids that I was trying to help. It was a shared experience for me to work with young biracial men who had white moms and black dads that were absent or incarcerated. I could become a role model for these people and to help them navigate something that I had to learn to navigate for myself.

This is what led me to the legal profession not just because I could work at the next level with these kids as they become adults and try to keep them out of a system that has lifelong detrimental effects but to be even more of an example for them and my future kids. I want to be another example for kids and young adults to see that they can become lawyers too even if they don't look like the ones that they see around them. Therefore, I believe that as an attorney I will be able to influence diversity inside and outside the law office. Hopefully, I can be an encouragement to others to pursue law for more representation. However, in the law office, I hope to be seen as someone to engage with in discussions that help others with their own understanding of diversity.

Sincerely,

███████

## MEMORANDUM

## STATEMENT OF FACTS

A school official searched Cedric Pascal's backpack because she suspected that Cedric stole a replica Japanese sword from a gift shop. The official did not find the sword, but she did find several vapes and Cedric will now potentially be charged with the illegal distribution and sale of those vapes. Cedric Pascal is a 14-year-old boy who went on a school field trip with his 16-year-old brother's class to the Art Museum in Milwaukee. Cedric was allowed to go on this field trip, even though he did not attend that school, as his mom was one of the chaperones. There were 88 students, two teachers, one administrator, and six parent chaperones on the trip. The students were split into two groups and Cedric's group was headed by Ms. Moss, the vice-principal, the history teacher, two parent chaperones, and Cedric's mother Brittany. There were no incidents when touring the museum. After the tour, the students were sent into the museum gift shop in groups of 10-12 students at a time. Cedric and his brother went into the gift shop together while their mother waited in the lobby outside of the shop. Cedric and Barclay came out of the gift shop after about 15 minutes. Barclay went off to talk to some friends, and their mother was off talking to other chaperones. Cedric was sitting alone reading a pamphlet. Around 10 minutes after they had left the gift shop, Ms. Moss walked over to Cedric with the gift shop clerk. The clerk told Ms. Moss that he thought Cedric was the one to take the replica Japanese sword. This replica Japanese sword was 31 inches long. Cedric denied that he stole it and stated that he would never steal. Ms. Moss attempted to confirm that Cedric was the thief, but the clerk could not be sure. The clerk stated that Cedric looked to be the same height and build as the person who the clerk saw walking out of the gift shop right before noticing the sword was gone. Cedric is 5'5" and 150 pounds and similar in height and build to many of the other students on

the trip. Based on this information from the clerk, Ms. Moss decided to look in Cedric's backpack for the sword. There was no sword in the backpack, but several vapes were found. These findings are what led to the potential charges of illegal distribution and sale of vapes.

## QUESTION PRESENTED

Under Wisconsin law, did the school official violate Cedric Pascal's Fourth amendment rights when she searched Cedric's backpack under the circumstances that Cedric was not a student, the search was off school grounds, and she was searching for an allegedly stolen sword?

## BRIEF ANSWER

Probably no. Wisconsin has not specifically ruled on whether school officials can conduct a search on a non-student, on a school field trip. However, Wisconsin courts have extended the less stringent requirement of reasonableness, to cases involving non-students on school grounds. Other jurisdictions have extended that same reasonableness standard to cover students that are not on school grounds on field trips. In both cases, the court reasoned that the reasonableness standard was important was done to foster a safe environment for the kids the school officials had a duty to protect. This requirement of reasonableness, under all the circumstances is less stringent search requirement as it does not require probable cause. To determine whether a search is reasonable, the court examines: (1) whether the action was justified at its inception and (2) whether the search was reasonably related in scope to the "circumstances which justified the interference in the first place and not excessively intrusive considering the age and sex" of the individual searched. *New Jersey v. T.L.O.*, 469 U.S. 325, 326 (1985). A search is justified at its inception when there are reasonable grounds for suspecting the search will turn up evidence of a violation. The court will likely conclude that, the search of a

backpack was justified at its inception. There was a moderate chance of finding evidence of wrongdoing since the clerk specifically pointed out that he believed Cedric was the thief based on his looks. Furthermore, the search of a backpack can be reasonably related to the objectives of the search to find the stolen sword and not excessively intrusive, since the backpack is where the stolen sword would most likely be found. Therefore, the search was likely reasonable, and the vapes are unlikely to be precluded from evidence under the exclusionary rule.

### DISCUSSION

Under Wisconsin law, the schools' search of Cedric Pascal's backpack is likely constitutional and that the exclusionary rule would not preclude evidence of the vapes being used in court. The Fourth Amendment of the U.S. Constitution does not allow unreasonable search and seizures and evidence gathered during an illegal search excluded from evidence. U.S. Const. amend. IV. The exclusionary rule prevents the use of illegally obtained evidence in a criminal trial. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Furthermore, the Fourth Amendment of the U.S. Constitution does apply to school official's searches in prohibiting unreasonable searches or seizures. *T.L.O.,* 469 U.S. at 325. However, the *T.L.O.* standard created for school official searches is only one of reasonableness, under all the circumstances and not probable cause. *Id.* at 340. In Wisconsin, this standard has only been applied to students and most recently, non-students, on school grounds. *State v. Vang*, 2021 WI App 28, 398 Wis. 2d 311, 960 N.W.2d 434. However, other states have extended the standard to apply to field trips. For example, persuasive authority from the Eighth Circuit extended the reasonableness standard to students not on school grounds on a field trip. *Shade v. City of Farmington, Minnesota,* 309 F.3d 1054 (8th Cir. 2002). Therefore, Wisconsin would likely follow the same reasoning to extend the *T.L.O.* standard. Furthermore, as Wisconsin has already equated students and non-students on school grounds the new extension would

follow that a search of a non-student on a school field trip would also be subjected to the *T.L.O.* standard.

The reasonableness standard states that students may be searched without probable cause or a warrant if the search was reasonable under all the circumstances. There are two elements that must be met to determine reasonableness: (1) whether the action was justified at its inception and (2) whether the search was reasonably related in scope to the "circumstances which justified the interference in the first place and not excessively intrusive considering the age and sex" of the individual searched. *T.L.O.,* 469 U.S. at 326. *See, Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 379 (2009) (holding a strip search of a 13-year-old based on groundless suspicion that medicine might be hidden in underwear was "excessively intrusive"). Therefore, if the Wisconsin court applied its previous reasoning behind extending the *T.L.O.* standard to this case, the search of Cedric's backpack will likely be considered a reasonable search and the other evidence (vapes) found will be admissible and not precluded under the exclusionary rule.

**I.     Would the T.L.O. standard of reasonableness, under all the circumstances apply?**

Wisconsin courts have not addressed whether a non-student not on school grounds can be searched by a school official under the reasonableness standard set forth in the *T.L.O.*. Recently, however, Wisconsin has been willing to extend the *T.L.O.* ruling to non-students on school grounds in *Vang* and would likely continue to extend that ruling like the Eighth Circuit did in *Shade*.

The court first extended the reasonableness standard to non-students on school grounds, reasoning that school officials' have a duty to keep a safe environment. For example, in *State v. Vang,* Vang (a non-student) was searched, along with his car, on school grounds and two

firearms were found in his vehicle during the search. *Vang,* 960 N.W.2d 434, ¶ 11. Vang contended that the less stringent reasonableness standard, did not apply to a non-student and that therefore, the evidence found should be excluded under the exclusionary rule. *Id.* ¶ 18. The court held, however, that the *T.L.O.* standard was properly applied. *Id.* ¶ 26. The rational for extending the *T.L.O.* standard to non-students was that the duty of school officials was to keep a safe environment for students and that reasoning applied equally to threats posed by students and non-students. *Id.* ¶ 3. Thus, if the search is reasonably believed to pose a threat to school safety, and as long as a school official initiates the search, the test is of reasonableness and not probable cause that, for example, a police officer would need to have to initiate a search. *Id.* ¶ 24.

Also, the court does not strictly hold to school boundary lines as the test for elevating the *T.L.O.* standard to probable cause, for the public-school setting, in keeping students safe. *Shade,* 309 F.3d at 1061. For example, in *Shade v. City of Farmington, Minnesota¸* the defendant was searched during a school field trip to an autobody shop. The search was conducted to promptly eliminate the safety threat of a dangerous weapon. *Id.* at 1060. Even though the search was done away from "traditional school grounds" the court applied the reasonableness standard. *Id.* at 1061. The defendant was seen with a knife, and this generated a possible threat to students' safety. Shade was searched and, instead of a knife being found, there was an item found that was classified as a dangerous weapon. *Id.* at 1058. Shade faced expulsion based on the possession of the item that was found in his pocket during the search for the knife. *Id.* Shade also believed that the search being done by a police officer instead of a school official was unreasonable. *Id.* at 1057. Even though, the search was done by a police officer it was initiated by a school official which falls under the *T.L.O.* standard. *Id.* at 1060. Therefore, a search, initiated by a school official, occurring not on school grounds, falls under the application of the *T.L.O.* standard as the

teachers still had the same obligation to protect students even when they are not on campus. *Id.* at 1061.

The court will likely conclude that the *T.L.O.* standard should be extended to cover a search by school officials of a non-student on a school field trip in this case. In Wisconsin, non-students have already been held to fall under the *T.L.O.* standard of searches by school officials. *Vang,* 960 N.W.2d 434, ¶ 21. School officials (teachers and vice principal) supervised Cedric, a non-student. In addition, the *T.L.O.* standard exists to maintain a safe environment for students and non-students. *Id.* ¶ 3. School officials have a duty to ensure the safety of the students under their care on school field trips. *Shade,* 309 F.3d at 1061. This theft incident with Cedric occurred on a school field trip supervised by school officials. Furthermore, like *Shade,* Cedric was searched on a school field trip. A replica sword could be considered a dangerous weapon like the knife that was being searched for in *Shade. Id.* at 1057. The potentially dangerous weapon adds weight to the reasonableness of the search. However, just the accusation of an act of theft alone is enough for a reasonable suspicion that a crime or violation had been committed. *Id.* at 1059. Therefore, extending the *T.L.O.* standard to protect the safety of those involved is consistent with previous rulings. The court will likely conclude that because Cedric was still under the supervision of school officials, as a non-student, these school officials had a duty to keep a safe learning environment for all members on the <u>school field trip</u>. *Id.* at 1061. Therefore, the search will be considered reasonable as long as it satisfies the elements in the *T.L.O.* standard.

Weighing the need to create a safe environment and to protect students and non-students against privacy expectations of the Fourth Amendment, it is likely that courts will extend the *T.L.O.* standard to cover the search by a school official of a non-student on a field trip. In this case, the court will likely determine that the extension is similarly necessary as to the ones

granted in *Vang* and *Shade.* Therefore, the T.L.O. standard of reasonableness, under all the circumstances will be applied to see if the action was justified at its inception and whether the search was reasonably related in scope to the "circumstances which justified the interference in the first place and not excessively intrusive in light of the age and sex" of the individual. *T.L.O.,* 469 U.S. at 342.

**II.      Applying the *T.L.O.* standard of reasonableness, under all the circumstances**

There are two elements that are required to prove the reasonableness of a search under the *T.L.O.* standard: (1) whether the action was <u>justified at its inception</u> and (2) whether the search was <u>reasonably related in scope</u> to the "circumstances which justified the interference in the first place and not excessively intrusive in light of the age and sex" of the person searched. *Id.* An action is <u>justified at its inception</u> when there are reasonable grounds for suspecting a search will turn up evidence that the law or rules of the school has been violated. If this first part is satisfied then the court examines if the search measures adopted are <u>reasonably related in scope</u> to the objectives of the search and not <u>excessively intrusive</u> considering the age and sex of the individual searched. *Id.*

The action must be <u>justified at its inception</u> and search measures adopted must be <u>reasonably related in scope</u> to the objectives of the search and not <u>excessively intrusive</u> considering the age and sex of the party searched. For example, in *Safford Unified School Dist. No 1 v. Redding*, a school administrator strip searched a 13-year-old to look for prescription drugs based on a groundless suspicion that the student hid drugs inside her undergarments. *Safford*, 557 U.S. 364, 380. The court the strip search was found to not be <u>justified at the inception, not reasonably related in scope</u> and <u>excessively intrusive.</u> *Id.* The student in *Safford* was suspected giving out contraband pills and that these pills were on the person or in the backpack. Therefore, it is

justified at the inception, reasonably related in scope, and not excessively intrusive to search the backpack and outer garments. However, that was not reasonable grounds to assume that the pills were hidden inside the undergarments of the student and to search there. *Id.* at 381.

The search of Cedric's backpack was justified at the inception, reasonably related in scope, and not excessively intrusive. Unlike the strip search in *Safford*, the school official searched only Cedric's backpack based on the gift store clerk's statement that he believed Cedric stole the replica Japanese sword. Therefore, the action was justified at the inception of the search. Searching a backpack is a justified action under reasonable suspicion of theft. *Id.* at 389. Furthermore, the objectives of the search were to find a stolen Japanese replica sword. A sword of that size would be able to be hidden in a backpack but not a pocket or in undergarments. A search of the backpack would be deemed reasonably related in scope to find out if the stolen sword was inside the backpack and would not be excessively intrusive considering the age and sex of the party searched. A search of a backpack doesn't have the same result as an exposure of intimate parts. *Id* at 377.

The court will likely conclude that this search passes the elements of the *T.L.O.* standard for reasonableness, under all the circumstances. Therefore, the vapes that were found during the search for the sword will not fall under the exclusionary rule as this search is not an unreasonable search and did not violate the Fourth Amendment of the U.S. Constitution.

**CONCLUSION**

The Wisconsin court will likely determine that the evidence does not need to be suppressed under the exclusionary rule as this search will most likely fall under an extension of the *T.L.O.* standard of reasonableness, under all the circumstances and found to be reasonable because of

the duty of school officials to protect the ones under their care and foster a safe environment. The Wisconsin court has already extended this *T.L.O.* standard in cases involving non-students to keep a safe environment and given the illegal act of theft, or possible dangerousness of a replica sword, there will likely be a similar extension in this case to a search by a school official of a non-student on a school field trip. The court will likely conclude, based on the two elements of the *T.L.O.* standard being satisfied, the search was reasonable and therefore, does not violate the defendant's right against unreasonable search and seizure. Therefore, no evidence will need to be suppressed making the vapes admissible in court.



## Course History Report for ███████████

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during his/her current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2021

| Course # | Title | Instructor | Credits Grade |
|----------|-------|------------|---------------|
| ████ | ████████ | █████ | █ █████ |
| ████ | ████████████████ | ██████ | █ |
| ████ | ████████████ | ████████ | █ |
| ██████ | ████████ █████████ | █████████ ██ | ██████ |



### Spring 2022 - All Courses In Progress

| Course # | Title | Instructor | Credits Grade |
|----------|-------|------------|---------------|
| ████ | ██████████ | █████ | █ |
| ████ | █████████ | █████ | |
| ████ | ████████ ████████ | █████ ██ | █ █████ |
| █████ | ████████ █████████ | █████████ ██ | ██████ |



Report Generated on 01/18/2022

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2022 Diversity Clerkship Program

◄ ◄ ◄ ◄ ◄ ◄ ◄ ◄ ► ► ► ► ► ► ►

### Interview Evaluation Fillable Form

---

## Interviewer Recommendation:

- ☑ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 24.**

**Student Name:** ████████████

**Law School:** ☑ **UW**    ☐ **MULS**

**Interviewer:** <u>Jose</u> Castro

### A. General Qualifications

*1. Relevant Skills and Qualities:*

   **Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*
Interviewer Comments:
His prior work as a behavioral skills trainer with youth and families shows his ability to be a leader and will help his advocacy. Additionally, his work in writing will help he get started with usual legal work.

**2. *Communication Skills*:**

   **Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*
Interviewer Comments:
Strong interviewer and able to communicate clearly and confidently.

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ■ 4   ↑ *Highest*

Interviewer Comments:

Strong poise and confidence. Leadership skills through his work with youth. Very good interviewer.

### C.  Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:*  *What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ■ 4   ↑ *Highest*

Interviewer Comments:

Wants to work at a company that actually strives for diversity, not just talks about it. Additionally, wants to use his experiences in rural Wisconsin and working with youth to advocate for less advantaged people in the community.

### D.  Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:*  *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

Interviewer Comments:

He is open to experiences and would strive to get positives out of any opportunity, so would tell them that. He also wants to find his path and get experience working as an attorney. His experience and answers make it seem like he is ready to succeed in this clerkship.

### E.  Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

██████ is a motivated, confident individual. He shows experiences and skills that will help him succeed as an attorney in this clerkship. He would make a very strong candidate.



@marquette.edu |

## EDUCATION

**Marquette University Law School,** Milwaukee Wisconsin      May 2025
*Candidate for Juris Doctor*      GPA: pending
    <u>Leadership</u>:    Hispanic Latino Law Student Association, 1L Representative

**The University of Wisconsin-Madison,** Madison, Wisconsin      Dec 2021
*Bachelor of Arts in Political Science*      GPA: 3.33/4.00
    <u>Leadership</u>:    Latino Pre-Law Student Association, Vice President
                     Badger Catholic, Events Team Leader
    <u>Activities</u>:    Dreamers of Wisconsin, Member
                      Latino Student Union

## EXPERIENCE

**Landmark Credit Union,** Milwaukee, WI
*Personal Finance Officer, Milwaukee South Branch*     Jan 2022 – Current
- Processed wire transactions of up to $100,000 to be reviewed by management
- Aided members applying for personal loans, auto loans, and home equity lines of credit
- Opened over 50 checking and savings accounts per month
- Filed disputes on fraudulent charges posted on members' accounts
- Problem solved on behalf of members encountering issues with their online banking accounts

**Wisconsin State Assembly,** Madison, WI
*Legislative Intern, Wisconsin State Capitol*     Jan 2021 – Dec 2021
- Prepared legislative briefs to inform the representative about salient policy
- Wrote policy memoranda to promote legislation to the general assembly
- Communicated with constituents to ensure that their concerns were addressed by the office
  Utilized coding program R-Studio to create data visualizations
- Administered internal data to organize constituent contact information

**DNC Campaign,** Milwaukee, WI
*Intern, Northshore Field Office*     Sep 2016 - May 2018
- Conducted political surveys for internal polling
- Recruited and trained new volunteers to expand the office

## ADDITIONAL INFORMATION
    <u>Languages</u>: Spanish (fluent), English (fluent)

    <u>Interests</u>: Writing poetry and short stories; History Junkie; Traveling to visit family in Mexico

    <u>Service</u>: Centro Hispano: Domestic Violence Hotline, English Conversation Time

**Exhibit 36**

**Personal Statement:** ██████████

"The apple never falls far from the tree," people say. Thankfully, the apple tree that I fall from has roots which extend from the fertile lands of Mexico to the great American Midwest.

As a first-generation Mexican American, I have benefited from the courageous journey that my parents undertook to offer me the chance to triumph in the land of opportunity. I am the son of undocumented parents: a story not uncommon in this chapter of American history. The struggles that my parents endured as they acclimated to a brand new culture taught me lessons in perseverance and courage. My parents were exploited by their employers due to their immigration status and publicly berated for their inability to speak English. Nonetheless, they persevered. Despite speaking a word of English, my parents were able to place a roof over my head and a bowl of rice and beans at the dinner table. Despite only receiving an elementary school education, my parents were able to place me in the position to become an attorney.

Today, I proudly stand by my peers learning to use the legal system to advocate for underprivileged people in the United States. However, my initiative to advocate for underprivileged people began much earlier in my life than law school. As a teenager, I worked alongside the Greater Milwaukee Foundation to increase funding at inner city schools. In college, I volunteered with local organizations to teach immigrants English and aid victims of domestic abuse. By witnessing domestic abuse at a young age, and learning English as my second language, I uniquely understood the struggles of the people that I was helping every day. I was motivated by the positive impact I was having on my community, but I was not yet satisfied. To this day, my parents remain undocumented with no viable path to citizenship. I am scarred by the thought that my parents will never be able to return to their homeland. This scar has sparked my dream to become an attorney an advocate for their rights and the rights of other Americans similarly situated.

As an attorney, I will continue to serve underprivileged communities to provide them with the resources necessary to attain their dreams. The city of Milwaukee has offered me with a plethora of resources to pursue higher education and it is only just that I give back. I plan on collaborating with other attorneys from all backgrounds to tackle issues that require the work and dedication of more than one individual. The future of the legal community is bright: there exists a sea of diverse voices that will contribute to a fairer society. I will be one of those voices.

███████████

**Regarding:** Whether to charge Mr. Schrute with disorderly conduct
**Date:** December 2, 2022

### Question Presented:

Whether a person loudly smashing his own property with a sledgehammer or confrontation with police in his private residence a half-mile away from the nearest neighbor constitutes "otherwise disorderly" conduct under Wisconsin Statute section 943.01.

### Brief Answer

Although over the past few decades the definition of otherwise disorderly conduct has expanded through case law to include a wide variety of conduct, the conduct of Dwight Schrute is factually unanalogous to that presented in the case law and thus distinguishes this case from other decisions previously rendered by Wisconsin courts. As a result, it is not in the best interest of the state to charge Dwight Schrute with disorderly conduct since it will be insurmountable to prove beyond a reasonable doubt that his conduct was like the enumerated conduct in Wisconsin Statute 947.01 or that defined as "otherwise disorderly" in ending to cause a disturbance.

### Facts

Dwight Schrute, an employee at Dunder Mifflin, contacted law enforcement to report that one of his co-workers had committed theft of a person by taking his phone and refusing to give it back. After a brief investigation at Dunder Mifflin, police discovered that the whole incident was part of an elaborate prank orchestrated by his co-worker, James Halpert.

Police then proceeded to interview Dwight Schrute at Mr. Schrute's secluded farmhouse a half-mile away from his nearest neighbor. Upon arriving at the front door of Schrute's farmhouse the police officer at the scene heard loud crashing and breaking sounds coming from inside the residence. The police officer became concerned after announcing "she would break down the door if no one replied" and receiving no answer from inside the residence. Before

knocking down the door, the police officer radioed for backup in case the situation would escalate. After knocking down the door, the police officer flashed her badge at the male inside the premises and discovered it to be Dwight Schrute smashing his own property with a sledgehammer. Schrute immediately set down the sledgehammer and cooperated with the police investigation— even thanking the officer for arriving at his premises.

Schrute stated that no one else was inside of the residence but acknowledged that his cousin, Mose, was outside as Mose preferred the outdoors. When questioned by police whether he was the sole owner of the property, Dwight replied that he had inherited the property and had sole ownership of the property: Mose was just allowed to live there. The police officer noted much of Dwight's own property destroyed: a cellphone, kitchen table, and other household objects. Schrute stated that he was smashing his property because he had "had enough" of Jim Halpert and "needed to vent some anger."

Once the backup police officer arrived, both officers searched for Mose Schrute who was found sitting in a field and staring into space. When questioned by the police officers, Mose did not reply or make any eye contact. An ambulance was called to the scene as a standard procedure for a nonresponsive person. Dwight objected to the ambulance stating that Mose Schrute's behavior was "very normal for Mose." Mose, however, did consent to a paramedic exam and was transported to the hospital. He was released from a local hospital after hospital personnel assessed that he was not a danger to himself or others. A formal psychiatric diagnosis was not conducted at the hospital, but staff recommended that Mose follow-up with a psychiatrist for evaluation.

**Discussion**

2

This memorandum evaluates whether the state can prove, beyond a reasonable doubt, that Dwight Schrute is guilty of (1) criminal destruction of property Wis. Stat **§**943.01 and (2) disorderly conduct Wis. Stat §947.01. Before discussing whether Dwight's conduct, under the circumstances, is sufficient to warrant a conviction under Wisconsin's disorderly conduct statute, this memo briefly considers whether it could charge Dwight Schrute with criminal damage to property under Wisconsin Statute section 943.0.

To find a defendant guilty of criminal destruction of property, the court must find that the defendant did not have sole ownership interest in the property destroyed. *State v. Sevelin* 204 Wis. 2d 127 (Ct. App. 1996). Since Dwight had sole ownership of the property that was destroyed, the court cannot find him guilty of criminal destruction of property; thus, this charge should not be pursued.

To convict Dwight of disorderly conduct the state must prove that Dwight's conduct (1) consists of one of the six enumerated conducts or "otherwise disorderly" conduct and (2) that such conduct, under the circumstances, tended to cause or provoke a disturbance. In *Givens,* using the rule of *ejusdem generis,* the court held that the "otherwise disorderly" conduct catchall provision in Wisconsin Statute section 947.01 is defined as any conduct which tends to provoke a disturbance. *State v. Givens*, 28 Wis. 2d 109, 115 (1965). Based on this interpretation, if a defendant's conduct satisfies the first element of disorderly conduct by tending to cause a disturbance, then the state is left with the burden of proving that the defendant's actions—under the circumstances— do in fact tend to cause or provoke a disturbance (the second element of the crime of disorderly conduct).

Consequently, this memorandum will focus on whether the state can prove that Dwight Schrute is guilty of disorderly conduct Wisconsin Statute section 947.01 by assessing if

3

Schrute's conduct falls under the "otherwise disorderly" conduct catchall provision in Wisconsin Statute section 947.01 and if under the circumstances Schrute's actions do in fact cause a disturbance. The state is unlikely to succeed in proving Dwight's conduct is like that defined as "otherwise disorderly" conduct.

**I. The court will likely conclude that Dwight Schrute's conduct is not like that defined as "otherwise disorderly" conduct, after considering the circumstances, because Schrute's actions did not offend the sense of decency of the community or spill over into the community.**

When determining whether a defendant's actions constitute "otherwise disorderly conduct" it is necessary to examine the conduct and circumstances surrounding the conduct. *State v. A.S* 243 Wis. 2d 173, *197* (2001) (*citing State v. Werstein* 60 Wis. 2d 668, at 672-73(1989)). In *A.S,* the defendant, a 14-year-old student, told two other students that he intended to kill everyone at the middle school, rape one of his classmates, and shoot school faculty. *Id.* at 193. One of the students reported the conversation to the police fearing that the defendant would carry out his threats to fruition. *Id.* The student testified that the defendant made multiple references to a Colorado school shooting in his remarks and spoke in "very matter-of-fact manner." *Id.* Once interviewed by police, the defendant admitted to making the statements about shooting faculty and raping a classmate. *Id.* at 194. The court held that the defendant's conduct could be defined as "otherwise disorderly" conduct considering the totality of the circumstances: where the threats were made, whether the threats were directed towards the people who heard the comments, and if it would cause the listeners to be concerned about the safety of others. *Id.* at 198.

Considering the totality of the circumstances, a court is unlikely to find Schrute's conduct constitutes "otherwise disorderly" conduct. Similar to the defendant's speech in *A.S*, Schrute's smashing of his property did cause listeners to be concerned about the safety others, the police

4

officer at Schrute's farmhouse was concerned about others on the premises. Furthermore, the presence of Mose on the property, and the nonresponsive manner in which he was found by police could be an indication that Schrute's conduct was "otherwise disorderly," but for reasons which will be further discussed in this memo (that Mose is more likely than not a hypersensitive individual) this is not enough evidence to convince a jury that Schrute's conduct was otherwise disorderly. First off, Schrute's conduct was not directed towards anyone. Although he did admit he "needed to blow off some steam" due to Jim Halpert, there is no evidence that smashing his own property was a threat of violence towards his coworker. Secondly, unlike the defendant in *A.S,* Schrute's conduct did not take place in a public building. Schrute smashed his property on his private residence far from his nearest neighbor. Moreover, when confronted by police Mr. Schrute responded in a reasonable manner and spoke politely with the officers on the scene. Finally, Dwight's conduct did not disturb the peace of the community. A.S, on the other hand, disturbed the peace of the community by communicating abhorrent ideas with other students and threatening staff and students at his school with violent crimes. Given these circumstances a court will likely find that Schrute's conduct is not like that defined as "otherwise disorderly" in tending to cause a disturbance.

Additionally, "otherwise disorderly" conduct does not include conduct that might offend only a hypersensitive individual: "otherwise disorderly" conduct is limited to conduct that unreasonably offends the sense of decency or propriety of the community. *State v. Zwicker* 41 Wis. 2d 497, 508 (1969). In *Zwicker,* the court held that a protestor's conduct, by disobeying police orders and screaming profanities in a public building, did not offend only a hypersensitive individual but also offended the sense of decency of the community. *See State v. Zwicker* 41 Wis. 2d 497, 510 (1969). In *Zwicker,* a group of protestors, including the defendant, entered a

5

campus building which did not permit the use of signs during protests. The protestors initially complied with campus policy, but after a short period of time, police officers arrested protestors who failed to comply with the campus' zero-tolerance policy on signs inside of buildings. *Id. a*t 503. Zwicker refused to surrender or put down the sign when instructed by police. *Id* at 516. At the time of his arrest, Zwicker further incited a disturbance through his conduct: Zwicker "went limp," spat on a police official, and yelled profanities at the arresting officers. The court held that the evidence of Zwicker's conduct was sufficient for a jury to find him guilty of disorderly conduct. *Id* at 509. Zwicker by disobeying police orders offended the sense of decency of the community, not merely offended a hypersensitive individual.

　　The court is unlikely to find that Schrute's conduct constitutes "otherwise disorderly conduct" because Schrute's actions did not offend the sense of decency of the community and merely offended a hypersensitive individual. Like the defendant in *Zwicker,* Dwight Schrute was confronted by police officers which ordered him to cease his conduct. However, instead of disobeying police orders and screaming profanities at the police officers, Schrute immediately surrendered his sledgehammer and complied with law enforcement in a polite manner— even thanking the officer for arriving at his premises. Moreover, unlike the defendant in Zwicker, whose resistance to law enforcement and profane language was visible to the public, Schrute's destruction of property and confrontation with police took place in his private residence, a rural farmhouse half-a-mile away from Schrute's nearest neighbor. Schrute's polite confrontation with police in his private residence is in clear contrast to the offensive manner in which Zwicker responded to confrontation by law enforcement officers in a public space. Therefore, a court will likely conclude that Schrute's conduct does not constitute "otherwise disorderly conduct."

Although the state could argue that Dwight's cousin, Mose, was offended by Dwight's violent destruction of property, there is not enough evidence to prove beyond a reasonable doubt that Moses is not a hypersensitive individual. To reiterate, "otherwise disorderly conduct" does not include conduct that might offend only a hypersensitive individual. *Id* at 510. When Mose was approached by a police officer for questioning, he did not make any eye contact or answer any of the officer's questions. Mose did, however, willingly submit to a paramedic exam and was subsequently transported to a hospital. Medical personnel made no official medical diagnosis but recommended that Mose follow-up with a psychiatrist. Given these facts, a court will likely find that Mose is a hypersensitive individual.

Additionally, even if a defendant's conduct is personal or private in nature, it can fall under "otherwise disorderly conduct" if there exists the real possibility that the disturbance will spill over by disrupting the peace of the surrounding community. *State v. Schwebke* 253 Wis. 2d 1, 670 (2002). In *Schwebke*, the court held that the defendant's mailings to multiple members of the community, although private in nature, constituted disorderly conduct since the conduct created a disturbance which spilled over and disrupted the peace of the community. *Id* at 689. In that case, the defendant sent multiple envelopes containing records, notes, and disturbing newspaper clippings to a young woman's home and workplace. *Id* at 671. A few months later, the defendant sent similar envelopes to the initial victim's sister which overwhelmed the victims' family with panic. *Id* at 672 The disturbing pattern of mailings culminated in a police investigation once the defendant sent lewd material to a Racine County Sheriff's Department. The court stated that the defendant's mailings "permeated the lives of not only the recipients . . . but those who were close to the recipients." *Id.* at 673. The defendant argued that disorderly conduct could not apply to his conduct because the mailings were private in nature and therefore

7

could not provoke a "public disturbance." *Id.* at 676. The court rejected the defendant's argument holding that the mailings, although private in nature, had the effect of spilling over into the community by disturbing the peace of the community. *Id.* at 680.

Similar to the defendant in *Schwebke*, Dwight Schrute's conduct was private in nature; however, there existed no real possibility that Dwight's would spill over and disturb the peace of the surrounding community. Therefore, a court would likely find that Dwight's actions do not fall under "otherwise disorderly conduct." Dwight's destruction of property took place inside of his secluded farmhouse half-a-mile away from his nearest neighbor. Thus, there was no real possibility that Dwight's conduct would spill over and threaten the surrounding community: the only people on the premises on the day of the incident was Dwight's cousin, Mose, and the police officers who were called by Dwight Schrute. In contrast, Schwebke conduct spilled over and disrupted the peace of the community by virtue of sending mailings to people's homes and public workplaces. *Id.* at 671. By sending unnerving mailings to people's homes and public workplaces, Schwebke disrupted the peace of the people he targeted but also the peace of other individuals in the community who live and work on these premises. Unlike Schwebke targeted mailings which overwhelmed the family members of those targeted, Dwight's outburst and destruction of property with a sledgehammer did not target any individual which would disrupt the peace of those close to the individual.

After considering the totality of the circumstances and analyzing whether Schrute's conduct offended the sense of decency of the community or spilled over by disturbing the peace of the community, it is unlikely that a court will find that Schrute's conduct is like the enumerated conduct in Wisconsin Statute section 947.01 or that defined as "otherwise

8

disorderly" in tending to cause a disturbance. Therefore, it is not in the best interest of the state to charge Dwight Schrute with disorderly conduct.

9

**OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD**

**Name:**
**Student ID:**

| Institution Info: | Marquette University |
|---|---|
| Print Date: | 01/24/2023 |

Other Institutions Attended:
University of Wisconsin-Madison

**Beginning of Law Record**

**2022 Fall**

| Program: | Law |
|---|---|
| Primary Major: | Law |

| Course | Description | | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|

| | | | Attempted | Earned | GPA Units | Points |
|---|---|---|---|---|---|---|
| Term GPA: | | Term Totals | | | | |
| Cum GPA: | | Cum Totals | | | | |

**2023 Sprg**

| Program: | Law |
|---|---|
| Primary Major: | Law |

| Course | Description | | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|

| | | | Attempted | Earned | GPA Units | Points |
|---|---|---|---|---|---|---|
| Term GPA: | | Term Totals | | | | |
| Cum GPA: | | Cum Totals | | | | |

**Law Career Totals**
| Cum GPA: | | Cum Totals | | | | |

End of OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD



**STATE BAR** OF **WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸▸▸▸▸▸▸▸ ◂◂◂◂◂◂◂

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

- ◼ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ███████████

**Law School:** ☐ UW  ◼ MULS

**Interviewer:** April Toy

### A. General Qualifications

*1. Relevant Skills and Qualities:*

   Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

Check a Score:  *Lowest* ↓  ☐ 1  ☐ 2  ☐ 3  ◼ 4  ↑ *Highest*
Interviewer Comments:

## Good professional work experience.  Will prepare for internship.

*2. Communication Skills:*

   Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

Check a Score:  *Lowest* ↓  ☐ 1  ☐ 2  ☐ 3  ◼ 4  ↑ *Highest*
Interviewer Comments:

Great written and verbal skills.  His writing samples were concise and well drafted.

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ■ 4   ↑ *Highest*
Interviewer Comments:

Professional demeanor and appearance.  His enthusiasm really came through.  I loved how excited he was.

**C.** <u>Motivation for Participation in the Diversity Clerkship Program:</u>

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* *What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ■ 4   ↑ *Highest*
Interviewer Comments:

He is grateful to be in the program.  The fact that an employer is making a commitment to the program makes him hopeful that he will be in an inclusive environment.

**D.** <u>Interviewer's Perspective:</u>

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

Interviewer Comments:

He's open to getting legal experience.  He is grateful to be placed anywhere.

**E.** <u>Student Feedback:</u>

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

You have a great conversational interview style.  You were calm, engaging and kept your answers direct and concise.



@wisc.edu

## Education

| | |
|---|---|
| **University of Wisconsin Law School** | Madison, WI |
| *Juris Doctor Candidate* | Expected 2025 |

     **Activities:** Women's Law Student Association, State & Local Government Society

| | |
|---|---|
| **University of St. Thomas- MN** | St. Paul, MN |
| *Bachelor of Arts in Political Science     Magna Cum Laude* | Dec. 2020 |

     **Honors:** Recipient of G.W.C Ross Scholarship, Aquinas Scholar, Pi Sigma Alpha, Pi Alpha Theta
     **Activities:** Mixed- Race Coalition *Founder and President,* St. Thomas Swimming Team
     Student Conduct Board Representative, Hispanic Organization for Leadership and Achievement

## Experience

| | |
|---|---|
| **Texas Rio Grande Legal Aid** | El Paso, TX |
| *Paralegal III, Tenant Eviction Relief Project* | Sep. 2021- Aug. 2022 |

- Maintained client caseload, exercising professional judgement required of an advocate on all aspects of each individual case.
- Assisted in negotiation with opposing parties including landlords, public housing managers, and opposing counsel.
- Assisted in litigation support, by drafting motions.

| | |
|---|---|
| **University of St. Thomas** | St. Paul, MN |
| *College of Arts and Sciences Student Ambassador* | Aug. 2019- Dec. 2020 |

- Served in an advisory capacity regarding administrators and other topics affecting the St. Thomas College of Arts and Sciences.
- Promoted awareness of the College of Arts and Sciences through social media and by planning, hosting, and attending events.

| | |
|---|---|
| **District 29 Texas Senate Office of Jose Rodriguez** | El Paso, TX |
| *Intern* | May 2019- Aug. 2019 |

- Provided administrative support in clerical and community outreach including writing a variety of statements, performing research, and meeting with community leaders.
- Managed community case files that involved state government issues.
- Followed legislative bills and updated the media on District 29 news.

| | |
|---|---|
| **City of El Paso, District 7 Office of Representative Henry Rivera** | El Paso, TX |
| *Office Assistant* | May 2018-Aug. 2018 |

- Helped with the launch of various community projects and constituent communication.
- Researched and made policy suggestions regarding the City of El Paso's Ethics Ordinance.

| | |
|---|---|
| **Law Office of Steve Spurgin** | El Paso, TX |
| *Legal Assistant* | May 2017-Aug. 2017 |

- Answered phone calls providing case updates to clients.
- Assisted with client intake, case filing, and case binding.

## Additional Information

     **Languages:** Professional Working Proficiency in Spanish
     **Interests:** Baking, Dog lover, Thriller movies

<span style="color:red">Exhibit 37</span>

I want to be an attorney because I firmly believe all are entitled to equal, just, and fair treatment. However, the law can sometimes be applied unfairly because of bias, and societal labels. I believe it is important for those who have been treated unfairly to be represented by someone who knows what it feels like to overcome struggle.

One of the most important aspects of my education at the University of St. Thomas was starting a club called Mixed-Race Coalition, which ultimately led me to pursue law school. Before starting university, I thought little about what my identity as a Half-Mexican individual meant outside of El Paso, Texas. El Paso is a distinct community because of its proximity to Ciudad Juarez, Mexico. This geographic seamlessness accentuates the shared community and hospitality among Hispanic and non-Hispanic people because of their culture and history tied to the U.S.-Mexico border.

Thus, I was extremely lucky to be raised in a society where I did not have to worry about what my peers thought of me when I was sitting in classes next to them or walking down the street. I had never experienced racism first-hand. But this changed when I began college in St. Paul, Minnesota, a highly cosmopolitan area in comparison to where I grew up. I noticed a shift, suddenly, my peers began to assume my identity and heritage for me. Many would assume based on the color of my skin that I was white.

After my racial identity was revealed, I became a target for unjustified racist comments such as, "Wow you must be Mexican, because you're always cleaning." This bothered me because I am proud of my Mexican roots; especially since my maternal grandfather was a *Bracero. Braceros* served a vital role during World War II, sustaining agricultural production while American men went off to war. The work was very difficult, and my grandfather earned very little all of which was sent back to Mexico to support his family. My grandfather overcame

tremendous adversity to obtain US citizenship after the *Bracero* program ended and he ultimately came to the United States in 1961.

Due in large part to the pride, I felt in my mixed heritage, after my sophomore year I started a group called Mixed-Race Coalition. I knew that there were countless people like me who did not identify with a single racial and or ethnic background and faced challenges trying to determine where they fit into society. My university's administration was unwilling to place my club with other ethnically diverse clubs, instead, they sought to classify Mixed-Race Coalition as a general organization. I believe people crave clarity and simplicity; unique identities confuse people and may at times make them uncomfortable. As a lawyer, I want to advocate for those who are misrepresented before the law; whether they be individuals of diverse racial backgrounds or those who have faced unjust violence and abuse because of their backgrounds.

**Memorandum**

To: Andrew Turner

From: ███████████

Date: October 23, 2022

Re: Did Putnam violate the False Claims Act?

**Question Presented**

Does a landlord when reporting to the United States Department of Housing and Urban Development (HUD) the racial and ethnic makeup of an apartment complex violate 31 US Code §3729 (a) (1) (B) when the landlord does not question or seem interested in further investigating residents who self-report their ethnicity as Hispanic even though they do not fit the stereotypical definition of Hispanic?

**Brief Answer**

No. A landlord does not violate 31 US Code §3729 (a) (1) (B) when choosing not to question or further investigate self-reported racial and ethnic data by reporting to HUD that twenty residents identify as Hispanic. 31 US Code §3729 (a) (1) (B) states that a person violates the False Claims Act if they knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim. Under the False Claims Act, there are two prongs that must be found: (1) that an individual knowingly whether through actual knowledge, reckless disregard, or deliberate ignorance presented false information 31 US Code §3729 (b) (1) (A)(i-iii); that (2) was material or influenced the government into providing funds 31 US Code §3729 (b) (4). A landlord does not make a false claim to the government for money when residents are legally Hispanic. Furthermore, a landlord does not knowingly act with reckless disregard when interpreting administrative text for the federal collection of data on race and ethnicity in an objectively reasonable manner.

**Facts**

Oliver Putnam, a landlord at Arconia apartment complex, in Madison, Wisconsin, is required to submit forms regarding the racial and ethnic makeup of Arconia to qualify for a HUD grant. Putnam reported to HUD that 20% of the tenants at the complex are Hispanic. However, Madison's overall Hispanic population is only approximately 7%. Charles Hayden, a disgruntled ex-employee, sent Putnam an email threatening to file a qui tam suit.

Two families comprise the 20 residents that reported on their rental forms, White-Hispanic, the Hellers and Bellows families. The Hellers and Bellows families are fair-skinned, blonde, and blue-eyed Mennonites from Santa, Cruz Bolivia. They moved to Madison after qualifying for green cards but still retain their Bolivian citizenship. As a part of their Mennonite tradition, men learned to speak Spanish to engage with non-Mennonites for business, while women did not. The Mennonites in Bolivia migrated from Russia to South America beginning in 1927. Currently, more than 60 colonies reside in Santa Cruz and each family has many children. Uma, John Bellow's daughter, was born in Bolivia but does not speak Spanish. The Bellows family self-reported White-Hispanic because John Bellows figured that his daughter, Uma, who identifies strongly as Latinx would want him to identify as such even though he was unsure what to claim as his racial and ethnic background. The Heller family asked John Bellows what he selected for his family's ethnic background, to which he replied "Latino", Mr. Heller said," whatever" and did the same.

In an email entitled "Donezo," Hayden argues that Putnam lied to HUD about the Hellers and Bellows' ethnic identities. Putnam refused to investigate each family's selection of White-Hispanic and dismissed Hayden's concerns in favor of watching the television show "Masked Singer." Hayden believes that neither family seems to be Hispanic because they not only look European but most of them do not speak Spanish. Furthermore, Hayden argues that failing to

verify racial and ethnic identities of residents not only defrauds HUD but hurts other families that depend on race-conscious policies for housing. Hayden also explains that when talking to Putnam he discusses the idea of moving on from his position at Arconia apartments, to which Putnam condescendingly replied that Hayden needs to have an exit strategy. Hayden then says his exit strategy is getting Putnam sued by the federal government because his girlfriend, a law student, learned about qui tam relators and will be helping him prepare a lawsuit against Putnam.

### Discussion

Putnam did not violate 31 US Code §3729 (a) (1) (B). Under the False Claims Act, there are two prongs that must be found: (1) that an individual knowingly whether through actual knowledge, reckless disregard, or deliberate ignorance presented false information 31 US Code §3729 (b) (1) (A)(i-iii); that (2) was material or influenced the government into providing funds 31 US Code §3729 (b) (4). To state a claim under the False Claims Act, plaintiffs must show that (1) the defendant made a statement in order to receive money from the government; (2) the statement was false; (3) the defendant knew the statement was false; and (4) the false statement was material to the government's decision to pay or approve the false claim. *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 558 (7th Cir. 2015). Putnam did not submit a false claim to receive money from the government because the Heller and Bellows families are legally Hispanic. Secondly, Putnam did not knowingly submit a false claim because he interpreted an administrative text in an objectively reasonable manner.

### A. Putnam did not submit a false claim to the government for money because the Heller and Bellows families are legally Hispanic.

Putnam did not submit a false claim to the government for money because the Heller and Bellows families are legally Hispanic. The False Claims Act requires that one of two categories is presented by a plaintiff either a factually false claim or a legally false claim. *United States of*

*Am. ex rel. Howard v. KBR, Inc.*, 139 F. Supp. 3d 917, 945 n.9 (C.D. Ill. 2015). A factually false

claim is one in which the defendant misrepresents goods or services provided to the government,

*Id.* A legally false claim is one where the defendant knowingly falsely certifies that they have

complied with a government regulation, *Id.* Legally false claims can rest on express false

certification or implied false certification. *United States v. Molina Healthcare of Ill., Inc.*, No. 17

C 6638, 2020 U.S. Dist. LEXIS 99784, at *8 (N.D. Ill. June 8, 2020). Express false certification

is when compliance is falsely certified regarding a regulation or standard that is a prerequisite to

payment, *Id.* Implied false certification is when an individual fails to disclose that they have

violated a regulation or standard, *Id.* Unless there is a violation of a regulation or standard there

is no legally false claim, *Id.* For example, in a case where a mental healthcare clinic falsely

claims that members of its staff are licensed, a condition for obtaining Medicaid reimbursement,

a court held that even when conditions are required for payment, not every violation of failure to

comply with a condition gives rise to liability. *Universal Health Servs. v. United States*, 579 U.S.

176, 181, 136 S. Ct. 1989, 1996, 195 L.Ed.2d 348, 357 (2016). Thus, the court concluded that

what matters is not what the government attaches to a requirement but whether the defendant

knowingly violated a requirement that the defendant knows is material to the government's

payment decision, *Id.* An omission or misrepresentation must be material or intend to influence

payment in order to be actionable, *Id.*

  Material to receiving HUD funds is the total number of residents who identify as

Hispanic, or Latino as defined by the Office of Management and Budget (OMB). Revisions to

the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58782, 1

(1997). OMB sets standards that account for the growing diversity of race and ethnicity in the

United States, *Id.*

While not explicitly defined by HUD regulations, it is helpful to understand what role the court plays when deciding whether it is proper for an individual to identify as legally Hispanic. For example, the court held that a committee's determination not to certify a business as minority-owned Hispanic rests on a rational basis of interpretation of administrative guidelines. *Major Concrete Constr., Inc. v. Cty. of Erie*, 134 A.D.2d 872, 872, 521 N.Y.S.2d, 959 (App. Div. 1987). While an administrative agency's interpretation and construction of its own regulations and of the statute under which it functioned should be given the greatest weight, the courts will interfere if the individual's choice to identify as a minority is arbitrary and capricious. *Major Concrete Constr., Inc. v. Cty. of Erie*, 134 A.D.2d 872, 873, 521 N.Y.S.2d, 960 (App. Div. 1987). The OMB defines Hispanic or as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race. Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58782, 8 (1997). OMB states that the collection of race and ethnicity is to be done by allowing each individual resident to self-report their identity, *Id*. While OMB does not provide any information regarding how to verify each resident's respective identity, OMB's definition of Hispanic suggests that the definition of Hispanic has no distinct skin color boundaries and any individual regardless of race can identify as Hispanic. Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58782, 1 (1997).

Furthermore, other areas of law suggest that the federal government places little if any emphasis on physical characteristics that distinguish someone as Hispanic. *Sauceda v. Cent. Pool Supply, Inc.*, 2015 U.S. Dist. LEXIS 10798, 2015 WL 428167, *12 (C. D. Ill. Jan. 30, 2015). For example, in a discrimination case, the court held that a plaintiff need not be physically distinguishable from white people, but merely demonstrate that they belong to an identifiable

class of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. *Sauceda v. Cent. Pool Supply, Inc.*,2015 U.S. Dist. LEXIS 10798, 2015 WL 428167, *13 (C. D. Ill. Jan. 30, 2015). Thus, the court concluded that a distinctive physiognomy is not essential to qualify for discrimination protection. *Sauceda v. Cent. Pool Supply, Inc.*,2015 U.S. Dist. LEXIS 10798, 2015 WL 428167, *12 (C. D. Ill. Jan. 30, 2015).

Putnam submitted a claim about the racial and ethnic makeup of Arconia to HUD for money, but it was not a legally false claim. The Heller and Bellows families are legally Hispanic. Therefore, Putnam could not have submitted a legally false claim by express false certification by stating that both families are Hispanic in order to receive money from HUD. The Heller and Bellows families are from South America, maintain ties to their heritage because several family members still live in Bolivia, several of them speak Spanish, and they still retain Bolivian citizenship. Thus, it is reasonable to conclude that the Hellers and Bellows fit the definition of Hispanic. While Hayden argues that neither family seems very Hispanic to him because they look European, race and physical characteristics are not important to distinguish someone as Hispanic which is why Putnam refuses to inquire further. The Heller and Bellows families can legally identify as Hispanic because they retain membership and continue to participate in a culture that differentiates them from the non-Hispanic w hite population. While both families may not fit into a perfect box of what it means to be Hispanic, they do meet OMB definitions and the federal government's interpretation of Hispanic. In conclusion, Putnam did not submit a false claim to the government for money because the Hellers and Bellows are legally Hispanic.

### B. Putnam did not knowingly submit a false claim because he interpreted an administrative text in an objectively reasonable manner.

Putnam did not knowingly submit a false claim because he interpreted an administrative text in an objectively reasonable manner. It is not enough that a defendant suspects or believes that a claim was false, liability is established only for knowingly false claims. *United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455, 470 (7th Cir. 2021). The False Claims Act defines knowingly as someone who with respect to information (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information and requires no proof of specific intent to defraud 31 USC §3729 (1863).

While actual knowledge addresses subjective knowledge, deliberate ignorance addresses whether there is a willful blindness from which subjective intent can be inferred. *United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455, 470 (7th Cir. 2021). An individual does not act with reckless disregard if their interpretation of the relevant statute or regulation was objectively reasonable. *United States v Supervalu Inc.*, 9 F.4th 455, 464 (7th Circ. 2021). Therefore, a defense to reckless disregard exists if there is an authoritative guide that can warn away defendants from an erroneous interpretation. *United States v Supervalu Inc.*, 9 F.4th 455, 464 (7th Circ. 2021). For guidance to be authoritative, it must come from a source with the authority to interpret a relevant text. *United States v Supervalu Inc.*, 9 F.4th 455, 464 (7th Circ. 2021).

For example, when a pharmacy applied a price match discount to drugs that it failed to report to a government agency, the pharmacy does not act with reckless disregard because it interpreted the statute in an objectively reasonable manner and no authoritative guidance warned

the defendant away from that interpretation *United States ex rel. Proctor v. Safeway, Inc.*, 30 F.4th 649, 658-660 (7th Circ. 2022).

The OMB instructs participant landlords in their federal government-funded programs on the accurate collection of each resident's race and ethnicity. Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58782, 1 (1997). Therefore, it can be inferred that the OMB's instruction serves as an authoritative guide that highlights the preferred method of racial and ethnic data collection, self-reporting.

Self-reported information is the preferred means of obtaining information about an individual's race and ethnicity except in instances where observer identification is more practical for example when there is a death certificate. Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58782, 1 (1997). Mainly, respect for individual dignity is what should guide the processes and methods for collecting data on race and ethnicity, *Id*. Ideally, respondent self-identification should be facilitated to the greatest extent possible. Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58782, 2 (1997). Furthermore, the OMB states that it is against policy to tell an individual who he or she is, to specify how an individual should classify himself or herself. Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58782, 4 (1997). It is also against policy to establish criteria or qualifications to be used in determining a particular individual's racial or ethnic classification, *Id*.

If the common definition of facilitate is used in OMB guidelines, then Putnam should be making respondent self-identification easier. By not questioning the Heller or Bellows families' choice to identify as Hispanic, Putnam is respecting their dignity and freely allowing them to self-report their ethnicity. Therefore, he is using an objectively reasonable approach to following

OMB guidelines for racial and ethnic data collection. His decision to not question or follow up on their ethnicity does not constitute reckless disregard.

Putnam knows it is not his duty to verify either family's ethnic background because his duty is simply to report the information he has collected from his residents to HUD. If Putnam were to dismiss the Hellers and Bellows based on what they selected as their racial and/or ethnic identity he would be going against the self-reporting standard. In this case, observer identification is not practical because each family has the ability to report their identity. By refusing to question, judge, or investigate the information reported by his tenants Putnam interprets the self-reporting standard in an objectively reasonable way. It is his duty to follow the guidelines of self-reporting by facilitating collection and respecting individual dignity, and his actions demonstrate that he is following the appropriate course of action. Thus, Putnam did not knowingly submit a false claim because he interpreted an administrative text in an objectively reasonable manner.

## Conclusion

Putnam did not violate 31 US Code §3729 (a) (1) (B) by choosing not to question or further investigate self-reported racial and ethnic data when reporting to HUD that twenty residents identify as Hispanic. Putnam did not submit a false claim to the government for money because the Heller and Bellows families are legally Hispanic. Putnam did not knowingly submit a false claim because he interpreted an administrative text in an objectively reasonable manner. Therefore, Putnam did not violate The False Claims Act.



## Course History Report for ▮▮▮▮▮▮▮▮▮▮

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022

| Course # | Title | Instructor | Credits Grade |
|----------|-------|------------|---------------|



### Spring 2023 - All Courses In Progress

| Course # | Title | Instructor | Credits Grade |
|----------|-------|------------|---------------|



Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂

## Interview Evaluation Fillable Form

---

## Interviewer Recommendation:

☐ **Outstanding Candidate**
◼ **Very Good Candidate**
☐ **Average Candidate**
☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ██████████

**Law School:** ◼ **UW**   ☐ **MULS**

**Interviewer:** Veronica Mantilla

## A. General Qualifications

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ◼ 4   ↑ *Highest*
**Interviewer Comments:**

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ◼ 4   ↑ *Highest*
**Interviewer Comments:**

## B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

**Check a Score:** *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

# She was a little shy, I think she was nervous.

**C.** <u>**Motivation for Participation in the Diversity Clerkship Program:**</u>

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* *What is your motivation for participating in the Diversity Clerkship Program?*

**Check a Score:** *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

▮▮▮▮ was motivated to apply to this program because she is the first person in her family to go to law school she believes this experience will be a great stepping stone for her as she learns more about what it means to be a legal advocate.

**D.** <u>**Interviewer's Perspective:**</u>

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

**Interviewer Comments:**

▮▮▮ shared that it is okay if an employer wasn't her top choice. She said mentioned that she was interested in this program because it is organized by the State Bar. For this reason, she believes that they have thoroughly vetted every employer that participates in this program. She believes that all of the e...

**E.** <u>**Student Feedback:**</u>

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

**Interviewer Comments:**

▮▮▮ I really enjoyed speaking with you. I hope that you continue to pursue opportunities that encourage your passion to pursue legal advocacy.



## EDUCATION

University of Wisconsin-Madison Law School,        Madison, WI
*Juris Doctor Candidate*        Anticipated May 2025
       **Activities:** Queer Law Student Association – 1L Representative
                Labor and Employment Student Association – 1L Representative

University of Wisconsin-Madison, Madison, WI        May 2022
*Bachelor of Arts in History, Bachelor of Arts in Economics*
       **GPA:** 3.96
       **Honors:** Comprehensive Honors in History Program and in College of Letters and Science,
       Hilldale Scholar, Fred Harrington History Thesis Prize, Iwanter Prize, Phi Beta Kappa Member
       **Activities:** Phi Alpha Theta Secretary, Badger Volunteer
       **Thesis:** *Arsenal of Progressivism: How Family Bonds Made and Broke the La Follette Political Dynasty (1924-1965)*

## EXPERIENCE

**Unemployment Appeals Clinic**        Madison, WI
*Volunteer/Advocate*        September 2022-Present
- Created a flexible schedule to meet with clients during a busy 1L semester
- Facilitated client intake meetings and organized a client's case to prepare for a UI hearing
- Presented cases in front of Administrative Law Judges to argue for unemployment benefits

**UW-Madison Archives**        Madison, WI
*Public Service Assistant*        September 2020-Fall 2022
- Resolved online archival research requests from around the UW campus and the public
- Found and gathered research materials for UW students and faculty visiting the Archives

**UW-Madison Political Science Department**        Madison, WI
*Congressional Correspondence Research*        Fall 2019-Fall 2022
- Authored FOIA requests from several federal agencies for constituent correspondence
- Analyzed and summarized thousands of constituent correspondence letters to federal agencies

***ARCHIVE:*** **UW-Madison's Student Historical Journal**        Madison, WI
*Editorial Board Member/ Editor-In-Chief*        Spring 2021/Spring 2022
- Researched and analyzed each paper to ensure it its argument's academic integrity and originality
- Gathered and curated archival materials to tell story of UW-Madison's history with COVID-19

**Pewaukee Municipal Court**        Pewaukee, WI
*Internship under Judge Melissa B Murray*        Summer 2020
- Assisted in creating a plan to continue in-person court proceedings in the height of COVID-19

## ADDITIONAL INFORMATION

Languages: Spanish fluency with reading and writing

Community: Badger Volunteer, Lifetime Girl Scout, Undergraduate Research Symposium

<span style="color:red; font-size:2em;">Exhibit 38</span>

1/12/2023
State Bar of Wisconsin
5302 Eastpark Blvd
Madison, WI, 53718

### Personal Statement - Diversity Clerkship Program

As a mixed White and Mexican, bisexual woman in a white, Catholic suburb of Milwaukee, WI, I quickly learned that advocacy often only went so far. In high school, I had close friends in school that loved when I shared Mexican food with them, but they stayed silent when other students made fun of me for my identity during the 2016 election. I had my siblings whom I loved dearly, but they were the first to tell me to "deal with it," when my mother told me that bisexual people did not exist rather than sticking up for me. People were always empathetic enough to listen, but not enough to actually stick up for me when it mattered.

I learned true advocacy in college when I worked for the University Archives. While working there, we partnered with the Public History Project to research the history of racism in the university. Specifically, there was a housing discrimination problem in UW-Madison that lasted beyond the Civil Rights movement. After a black student documented their experience with housing discrimination and publicized the story, the university called for the film and all of its copies to be burned. Presently, another archivist, Cat Phan, found the letter calling for the film burning. This discovery sparked a months-long search for any trace of the documentary for the entire Archives staff. And for months after that, the film had to be restored because of age. Eventually, we could watch the housing discrimination film and release it. But the fight was not over. UW-Madison's Chancellor's Office, who was funding the research, was not in support of releasing the video, telling our staff that releasing it was a bad idea. But the Archives staff and the Public History project debated and compromised for years, and ultimately, convinced the university to release. In 2022, the film was shown to the public in the Chazen Museum of Madison.

To me, this fight to release UW-Madison's history of discrimination against the university's will was a true showing of advocacy. If one wants to show real compassion towards marginalized people, it does not take a safe bet, but a risky one. In this situation, the least our staff could do is care enough to listen to marginalized peoples. But in order to truly advocate for diversity, we had to go further than just listening. At the risk of good standing with the Chancellor of the University of Madison, we had to fight to release the video of housing discrimination. This is the difference between advocacy and complacency.

While I planned on going to law school before this situation, it emboldened me to continue my path. There are people everywhere, even in the most innocuous places like the University of Wisconsin, whose stories are being listened to, but not fought for. I want to continue fighting for those who had their voices silenced through legal advocacy, and stick my neck out for those that feel they have no one fighting for them.

**Final Memorandum of Law**

To: Attorney Strange
From: █████████
Date: November 22, 2022
Re: Constitutionality of Witness identification procedures

**Question Presented:**

Under Wisconsin criminal law governing witness identification, does a police department's witness identification procedure violate the due process clause when an officer uses single show ups and single photograph identification to identify and arrest a defendant even when the victim was not sure of the suspect's appearance, was attacked in a dark alley for a couple of minutes, and gave an inaccurate prior description in height and weight?

**Brief Answer:**

Yes. Witness identification procedures are unconstitutional when the witness is clearly unreliable. The Court examines reliability through a totality of the circumstances test. The five factors that imply reliability include: (1) how accurate the witness's prior description of the perpetrator was, (2) opportunity to see the perpetrator during the crime, (3) level of certainty during the confrontation, (4) degree of attention during the crime and, (5) time between the crime and confrontation. In this case, while the time between crime and confrontation is short, Simon Harriot is unreliable because: his prior description of the suspect was inaccurate in height and weight, was attacked in a dark alley for only two minutes, was only ninety percent certain of the suspect's appearance. Therefore, a Court would find that Harriot's identification unreliable and in violation of the Due Process Clause.

**Statement of Facts:**

On December 13th, 2021, at approximately 9:30 pm, Simon Harriot was working as a bouncer at Miller's Bar. During the night, Harriot stopped a man and questioned him about a

1

possible fake ID. The man and Harriot began arguing, which quickly turned into a physical scuffle between the two men. Later at 12:30 a.m., Harriot was sitting on a stool with his back turned to the bar. When the police arrived, Harriot was conscious with an injury to his ribs and his right eye. Though his speech was unsteady, Harriot recounted that he had drunk two whisky cokes that night and was stunned when the attack began. The attacker pushed Harriot to the ground, kicked him in the stomach and ribs, and punched him in the face multiple times with brass knuckles for about two minutes. Harriot eventually pushed away his attacker, punched him twice, but did not chase his attacker down the dark alley.

After the incident, the detective, Officer Stipe, asked Harriot to describe his attacker. Harriot said that the attacker was about 5'6" in height, one hundred and seventy pounds. Harriot also mentioned that the assailant wore black pants, a white shirt, and a hat. He thought that the man was the same one that he checked ID for earlier in the evening, but he was not sure of the man's name. After being transported to the hospital, the Stipes asked the bar's supervisor, Walter Hayes, about the incident. According to Hayes, Harriot's scuffle that night over an ID was with someone much taller than him. Hayes identified the patron as Bobby Marks, a 6'2" man weighing about two hundred pounds. He also stated that Marks was not wearing a hat that night.

The detective then investigated Bobby Marks's identity and found a picture of him on Twitter. The detective showed the singular photo to the Harriot and asked if it was the same person he got into a scuffle about fake IDs that night. The victim responded that he was one hundred percent sure that it was the same person. Then the detective asked if this was the person who attacked the victim. Harriot responded that he was seventy five percent sure and that "it would make sense that they were the same person."

2

Stipe handed the investigation over to Detective Holmes, who set up a show up between Bobby Marks and Simon Harriot. A week after the attack, at around 9:30 a.m., the detective found Bobby Marks in Waterwheel Park and asked him a few questions about the night of December 13th. Marks told Holmes that he left the bar around 11:30 pm and that he knew nothing about the assault. Holmes then beckoned the victim to examine Mr. Marks.

Harriot emerged from his car and stood within ten feet of the suspect. Stipes asked if he recognized Marks. Harriot said he did. Stipes then asked how Harriot knew Marks. The victim responded that he was, "pretty sure that this was the man who attacked him." Lastly, Stipes once again asked Harriot how sure he was that Marks was the attacker, Harriot said he was ninety percent sure. After that interaction, Stipes read Marks his rights amidst Marks's protests that he did not assault Harriot. Marks is now charged with assault and battery of Simon Harriot.

**Discussion:**

Wisconsin law looks to federal law when analyzing whether witness identification procedures violate the Due Process Clause. In the broadest terms, the Wisconsin Constitution's Due Process Clause looks to protect citizens from being arrested through misidentification. To determines when a witness identification violates the due process clause, Wisconsin and federal courts employ a two-step burden shifting test laid out in *Roberson*. Under the first part of the test, the defense must prove that the procedures are both: (1) impermissibly suggestive and, (2) unnecessary. *State v. Roberson*, 2019 WI 102, 389 Wis. 2d 190, 935 N.W.2d 813. If the defense proves that the police utilized impermissibly suggestive information, then the burden shifts to the State to prove that the witness is reliable based on the totality of the circumstances. *Id.* At ¶26.

I.  **Out-of-court identification procedures are considered impermissibly suggestive when there is a substantial risk of misidentification.**

3

Out-of-court identification procedures are considered impermissibly suggestive when there is a substantial risk of misidentification. *Roberson,* 2019 WI 102, ¶26. The Court will find there is a substantial risk of misidentification when one-on-one confrontations are used. *Stovall v. Denno,* 388 U.S. 293 (1967); *Roberson,* 2019 WI 102, ¶26. Substantial risk of irreparable misidentification is clearer when officers' words and actions lead the witness to identify a suspect. *Id.* at ¶68. Even impermissible suggestive procedures are constitutional if courts deem them necessary. Necessary procedures occur when there are other exigent circumstances that hinder police from using procedures such as photo arrays or lineups. *Roberson,* 2019 WI 102, ¶29. An example of an exigent circumstance is if the witness's health is in critical condition. *Stovall,* 388 U.S. 293 at 295.

One-on-one confrontations such as single show ups are known to greatly increase the risk of misidentification. *Neil v. Biggers,* 409 U.S. 188 (1972). For example, in *Biggers*, a man raped a young woman. *Id.* at 194. Months after her assault, the police introduced her to several suspects in a single show up style. *Id.* at 195. When they at last found the man who raped her, she recognized him immediately and affirmed that this was her assailant. He was arrested after her verbal confirmation. *Id.* In their ruling, the Supreme Court decided that even though single show ups are widely condemned, that the procedure's constitutionality still rests upon the totality of the circumstances and the reliability of the witness. *Id.* at 196.

Courts are even more likely to find the risk of substantial misidentification in one-on-one confrontations identification procedures when officers add their own input through words and actions outside of the procedure. *Roberson,* 2019 WI 102, ¶68. For example, in *Roberson*, after the victim, C.A.S, was shot, Officer Reblin presented a single Facebook photograph of an African American man to him. *Id.* at ¶17. The victim immediately nodded in affirmation. *Id.*

4

Only after he nodded did Reblin ask, "That's him?" C.A.S verbally responded, "yes." *Id.* The Wisconsin Supreme Court acknowledged that the officer did not ask the leading question until after the victim nodded and mentioned that the chances of misidentification were unclear. *Id.* at ¶68. In the end, however, the Court still assumed that single photographic identification, especially with leading questions, meets the defense's burden of proving substantial risk of misidentification and moved on to the second test of witness reliability. *Id.*

Even if the witness identification procedures do risk misidentification and reliability is examined, necessity will be determined if the police have no chance to set up photo arrays or lineups. *Stovall,* 388 U.S. 293 at 302. For example, in *Stovall,* an assailant fatally stabbed a doctor and then stabbed the doctor's wife eleven times. *Id.* at 295. While the wife was in the hospital, five policemen brought a single suspect into the room. *Id.* After speaking a few words for verbal confirmation, one of the officers asked the wife if he, "was the man." *Id.* She affirmed his identity, and the suspect was arrested and convicted. *Id.* The Supreme Court held that this show up was indeed suggestive enough to meet the initial burden of substantial risk of misidentification and move to examine witness reliability. *Id.* at 302. These procedures, however, were deemed constitutional because the wife was in critical condition and the only person who could have exonerated the suspects. *Id.* The police needed to act quickly, and so the single show up was permissible. *Id.*

In this case, the single show up in Harriot's case will create a substantial risk of irreparable misidentification. Like *Biggers*, Officer Stipes scheduled a one-on-one confrontation via single show up after the crime. Stipes also asked for verbal confirmation from Harriot like *Biggers*. The procedure was the same, therefore, Wisconsin Courts will hold that the single show up will meet the bar for substantial risk of misidentification and move to reliability.

5

In addition, the Court will find that Stipes's use of single photograph identification will be more than enough to meet the burden of substantial risk of misidentification. Like *Roberson*, Stipes only presented Harriot with one photo from social media to identify the suspect. Also, like *Roberson*, Stipes asked leading questions while showing Harriot the picture, asking if, "That's him" before the victim had a chance to verbally respond. By only showing the victim a single photo and asking leading questions outside of the procedure, Wisconsin Courts would find that this procedure easily meets the burden for substantial risk of misidentification.

Lastly, the Court will not find that these suggestive procedures were necessary. Unlike in *Stovall*, the police were not racing against time because Simon Harriot was not on the brink of death. While Harriot was the only person who could identify his attacker, Officer Stipes could have easily scheduled a lineup or utilized a photo array rather than single photograph identification or a show up. Therefore, the defense will pass the initial two-factor test by showing that Officer Stipes's procedures were: (1) impermissible suggestive and, (2) unnecessary.

II. **After the defense proves that the police procedures were impermissibly suggestive and unnecessary, the second step of the test requires that the burden of proof shifts to the State to show that their witness is reliable based on the totality of the circumstances.**

After the defense proves that the police procedures were impermissibly suggestive and unnecessary, the second step of the test requires that the burden of proof shifts to the State to show that, based on the totality of the circumstances, their witness is reliable. Courts find witnesses reliable based on five factors: (1) the opportunity of a witness to view the suspect at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the suspect, (4) level of certainty at the confrontation and, (5) time between crime

6

and confrontation. *Roberson,* 2019 WI 102, ¶35. There are no structured rules to decide reliability, so the Court must rule on reliability on a case-by-case basis. In all comparable cases, witnesses are reliable because they satisfy more than one factor. Witness reliability has become the linchpin of whether police witness identification procedures are constitutional or not. *Id.* at ¶28. Therefore, there are valid public policy concerns that low witness reliability standards could increase the risk of misidentification. *Id.* at ¶105.

Witnesses are not required to pass every factor, but Courts will favor reliability on the totality of the circumstances test when they satisfy any combination of the five factors. For example, Courts find a witness reliable when they can produce an accurate prior description and have a high degree of attention during the crime. *Biggers,* 409 U.S. at 200. When returning to *Biggers,* the victim testified at trial that her rapist's face was something that, "she would never forget." *Id.* at 200. She spent over a half an hour with her assailant and was also able to accurately describe his height, age, weight, complexion, skin texture, and voice. *Id.* Therefore, the Court found that the victim in *Biggers* was reliable because she could accurately describe nearly every physical feature of the perpetrator. *Id.* Furthermore, the Court found that Biggers's degree of attention was high because she was, "no casual observer, but the victim of one of the most humiliating crimes." *Id.*

Wisconsin Courts also favor reliability when the witness has ample opportunity to view the suspect. *Clarke,* 49 Wis. 2d at 172. In *Clarke,* a man robbed a woman in the street and proceeded to rape her. *Id.* at 166. The area was a well-illuminated street, allowing the witness to look at the defendant, "very good." *Id.* at 173. The police also scheduled the confrontation only a day later than the crime. *Id.* at 168. Therefore, the Court ruled that the witness' opportunity to

7

look at the suspect favored reliability because the alley was well-illuminated and her "very good," look at the suspect. *Id.*

Lastly, Courts find reliability when the witness has a high level of certainty at the confrontation and when there is a reasonable time between crime and confrontation. *Roberson,* 2019 WI 102, ¶70, ¶76. Returning to *Roberson,* when Officer Reblin presented the single photo to C.A.S, the victim, and asked if he was one hundred percent sure that this was the perpetrator. *Roberson,* 2019 WI 102, ¶17. C.A.S responded, "100 percent." *Id.* Additionally, the time between the shooting and the show up was two weeks. In their holding, the Wisconsin Supreme Court ruled that being one hundred percent sure during a show up favors reliability. *Id.* at ¶75. Furthermore, a two-week time frame between crime and confrontation raises no suspicions on reliability. *Id.* at ¶76. Consequently, the victim was reliable partly due to their level of certainty during the confrontation and a short time between crime and confrontation. *Id.* at ¶70.

In the first place, Due Process Clause's purpose is to protect all citizens from unlawful arrests from misidentification. Other justices on the Wisconsin Supreme Court have questioned eyewitness identification as a matter of public policy. In *Dubose,* a Wisconsin case overturned by *Roberson,* the court holds that witness misidentification often leads to wrongful conviction, and that it can be, "hopelessly unreliable." *State v. Dubose,* 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582. Similarly, in Justice Dallet's dissent in *Roberson,* she points out that eyewitness misidentification accounts for sixty nine percent of wrongful convictions. *Roberson,* 2019 WI 102, ¶105. The risk of misidentification was even larger when the suspect is someone of a different race. *Id.* Relying on reliability of the witness, especially when the suspect is of a different race, still concerns the Wisconsin Courts who wish to uphold the Wisconsin's Due Process Clause at a higher standard than federal precedent. *Dubose,* 2005 WI 126, ¶39.

8

The State in the instant case, however, will be unable to prove that Harriot is reliable partly because his prior description of the perpetrator is inaccurate, and because he did not have a high degree of attention. In *Biggers,* the victim accurately described every physical trait about her attacker, meanwhile Harriot was inaccurate in height, weight, and headwear. Also, in *Biggers*, she remained with her rapist for over half an hour, while the attacker punched Harriot for two minutes and then ran off into a dark alley. While Harriot was the victim, assault and battery is not the humiliating attack Biggers faced. Therefore, the Court would find Harriot less reliable because he cannot produce an accurate description of the perpetrator and because he did not have a high degree of attention at the time of the assault.

Furthermore, Wisconsin Courts would disfavor reliability for Harriot because he did not have an ample opportunity to view the suspect. Unlike *Clarke,* where she was able to get a "very good," look at her attacker, Harriot could not see the perpetrator. Additionally, the alleyway that Clarke was attacked in was well-illuminated, whereas the alley that Harriot was attacked in was very dark. Therefore, the Court would not be able to find that Harriot had an ample opportunity to see the perpetrator due to the conditions of the alleyway.

Lastly, while Harriot satisfies one factor because time between the crime and confrontation was quite short, courts would still not find him reliable because he does not have a high level of certainty in the confrontation. In *Roberson,* the time between the crime and confrontation was about two weeks. Here, Officer Stipes set up a confrontation only four days after the crime. Therefore, Harriot's memory would be fresh and satisfy the factor. Unlike in *Roberson*, however, where C.A.S was one hundred percent sure that the man in the single photograph was the perpetrator, Simon noted that he was only seventy five percent sure. Even when coming face to face with Bobby Marks, he was only ninety percent sure. Even if Harriot's

9

memory was fresh due to the short time between crime and confrontation, he does not pass any of the other factors of reliability, making it unlikely for the Court to find Harriot reliable.

Lastly, the Court may find that a witness who only passes one factor of reliability to dangerously lower the Due Process Clause standard in Wisconsin. Wisconsin Courts are already wary of witness misidentification because it is the leading cause of wrongful convictions, especially for people of different races. As referenced in the majority opinion in *Dubose* and Dallet's dissent in *Roberson,* this lower standard could be a slippery slope where potentially unreliable and prejudiced racial profiling can be taken as constitutional. Therefore, in Wisconsin where some justices wish to hold a higher standard for eyewitness identification, finding that a witness who only passes one factor of reliability as reliable may be against public policy.

### Conclusion:

Officer Stipes's witness identification procedures do violate the Due Process Clause because he utilized suggestive one-on-one confrontations such as single photograph identification and a single show up with a witness who is unreliable because he: was only ninety percent sure that the suspect was the perpetrator, was attacked in a dark alley for only two minutes and gave an inaccurate height and weight in his prior description of the suspect.

10



## Course History Report for ▉▉▉▉▉▉▉▉

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022



| Course # | Title | Instructor | Credits | Grade |
|---|---|---|---|---|

### Spring 2023 - All Courses In Progress



| Course # | Title | Instructor | Credits | Grade |
|---|---|---|---|---|

▉▉▉▉▉▉▉▉ on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.*®

# 2023 Diversity Clerkship Program

▸▸▸▸▸▸▸▸ ◂◂◂◂◂◂◂

### Interview Evaluation Fillable Form

---

### <u>Interviewer Recommendation:</u>

- ■ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ██████

**Law School:** ■ **UW**   ☐ **MULS**

**Interviewer:** <u>Mason A. Higgins</u>

### A. <u>General Qualifications</u>

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:   *Lowest ↓*  ☐ 1   ☐ 2   ☐ 3   ■ 4   *↑ Highest*
Interviewer Comments:

■ Interviewed very well and was able to relate her experience with the Unemployment Appeals Clinic to her career goals. She could also share real, tangible ways her clinical experience has challenged her to grow as a person and as an advocate. This is invaluable.

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:   *Lowest ↓*  ☐ 1   ☐ 2   ■ 3   ☐ 4   *↑ Highest*
Interviewer Comments:

██████ communicated very effectively throughout the interview.

### B. <u>Interview Characteristics:</u>

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

**Check a Score**: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ◼ 4 ↑ *Highest*

**Interviewer Comments:**

◼ s an engaging and confident speaker. She related several very compelling stories and is clearly very passionate about the path she is on. Her demeanor was very professional and she demonstrated active listening by asking follow up questions and clarifying questions.

## C. Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* *What is your motivation for participating in the Diversity Clerkship Program?*

**Check a Score**: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ◼ 4 ↑ *Highest*

**Interviewer Comments:**

◼ gave an incredibly compelling explanation as to why she is applying for the DCP. She is extremely interested in advancing diversity, and she asked several tough questions about my experiences as a POC in a "big law" firm.

## D. Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

**Interviewer Comments:**

◼ indicated an interest in working for GE Healthcare (I believe), but expressed that she would be happy to make the best of any opportunity.

## E. Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

**Interviewer Comments:**



@marquette.edu

## EDUCATION

**Marquette University Law School**, Milwaukee, WI
*Candidate for Juris Doctor*, May 2024
GPA: Available late-January 2022
Honors:         Thomas More Law Scholarship
Leadership:     Asian Law Student Association (1L Representative), Organization for Student Wellbeing
                 (Diversity Chair), Peer+ Lead Facilitator (Wellness Peer Educator)
Activities:      Association for Women Lawyers, First Generation Professionals, Hispanic-Latino Law
                 Students Association, Marquette Immigration Law Association

**Marquette University Graduate School of Management**, Milwaukee, WI
*Candidate for Master of Business Administration*, May 2025

**Marquette University**, Milwaukee, WI
*Bachelor of Science in Business Administration, cum laude*, December 2021
Minor in Spanish for the Professions
GPA: 3.555/4.000
Honors:         Chicago Alumni Club Scholarship, Père Marquette Award, Dean's List (4/6 Semesters),
                 Emerging Leader, Homecoming Court (2020), NRHH Leadership, Pin, NRHH Service
                 Pin, Pre-Law Scholar, St. Joan of Arc Leadership and Service in Action Award
Leadership:     Campus Ministry (Retreat Leader), La Sociedad Nacional Honoraria Hispánica (Social
                 Media Coordinator), Peer+ Sexual Violence Prevention and Education Team (WPE)
Activities:      Bayanihan Student Organization, National Residence Hall Honorary

## LEGAL EXPERIENCE

**Legal Action Wisconsin**, Milwaukee, WI
*Unemployment Insurance Intern*, August 2021-December 2021
- Research legal issues with Unemployment Insurance and Pandemic Unemployment Assistance
- Guide clients and collaborate with supervising attorneys in completing documents and drafting closing and consent documents for attorneys and clients (English & Spanish)
- Schedule clinic appointments (English & Spanish)

## OTHER EXPERIENCE

**Michael Best & Friedrich LLP**, Waukesha, WI
*Recruiting Intern*, May 2021-August 2021
- Coordinated summer program activities for summer associates
- Evaluated and assessed summer program to adjust for future summer programs
- Scheduled appointments across 12 firm offices

## LANGUAGE SKILLS

Proficient in Spanish (written and oral)

## INTERESTS

Cooking, hot yoga, painting, and photography

<span style="color:red">Exhibit 39</span>

24



Personal Statement

I am a product of the American Dream. My grandparent's struggles, sacrifices, and drive have given me opportunities they only dreamed of when leaving the Philippines to come to America. "Bayanihan" is a Filipino word meaning "togetherness." This word is short and simple, but it encapsulates my identity. I am Kaitlin Clancy, a second-generation Asian-American and first-generation college and professional student. I am driven by my cultural background and have carried my family's legacies forward by pursuing a career in labor and employment and immigration law. I am a pre-law scholar working toward a J.D. from the Marquette University Law School and an MBA from the Marquette University Graduate School of Management.

Bayanihan made sense to me because I grew up in a household that celebrated my mixed Filipino and Irish heritage–understanding the importance of a person's background and experience. I am a combination of the best parts of my parents and that makes it easier for me to connect, understand, and be empathetic with others. I want to be a champion of diversity and inclusion, using my voice to support those who cannot advocate for themselves. I am on track to pay this forward in my career. My minor in Spanish allows me to connect with others more directly, especially with my intention of working in corporate immigration. Speaking to someone who needs advocacy in their native tongue can bring the immense sense of security and comfort they may need at that moment.

I have seen the power of my education and appreciation for diverse backgrounds in action through English cases and Spanish pro bono cases. On my first assignment with the unemployment insurance clinic at Legal Action of Wisconsin, I was meant to observe a court hearing. When the attorney explained the process of the hearing to the client and the client looked at me in confusion, I jumped right into bridging the language barrier for the English-speaking attorney and the Spanish-speaking client. For an hour, my capacity to speak two languages allowed me to translate and prepare the client, resulting in the client visibly calming down from the stress of their pending hearing. It was a remarkable feeling that I hope to continue throughout my career in this service-oriented profession.

My emotional intelligence and intercultural communication skills make me an effective advocate for others. I aim to step away from every conversation having left a positive effect on others, encouraging them to do the same in their day-to-day lives. I foster a community of bayanihan where people are seen as a culmination of every experience, lesson, and opportunity they had in life. I help others embrace their background with pride and excitement. In doing this, I encourage my teammates and peers to bring all that they are to the table because what they have to offer is unique and important. My background and experience assist in my ability to effectively serve my community and provide a sense of bayanihan to campus and in my future career.

1

Attorney-Client privileged Communication

Attorney Work Product

MEMORANDUM

TO: Anne Kearney
FROM: ████████
DATE: December 8, 2021
RE: Memorandum – Saul Goodman; File No. 2553-809;
Validity of Exculpatory Contract

Magic Sun Water Sports, "Magic Sun," alleges our client, Saul Goodman, signed a release of liability on a valid exculpatory contract. The client asks us to investigate the enforceability of the exculpatory contract.

**Issue**

Whether an exculpatory contract is enforceable where the public policy considerations require that it be appropriately limited in its release or waiver of claims and provide adequate notice in the circumstance of a parasailing event and where the injured party talked to the owner before signing a waiver and an accident occurred and that there be an opportunity for bargaining.

**Brief Answer**

No. The preprinted form did not set reasonable or specific expectations of liability, provide adequate notice of rights waived, nor allow an opportunity for voluntary bargaining. The overly broad scope of the contract's liability coverage and the absence of adequate notice and bargaining opportunity likely make this contract void.

**Statement of Facts**

While on vacation in Door County in July 2020, Saul Goodman and Kim Wexler decided to parasail. The pair were first-time parasailers and were attracted to a local parasailing company, Magic Sun Water Sports, through an advertisement displaying a breathtaking view of the shoreline. Magic Sun is an established parasailing company in Fish Creek, owned by Chuck McGill. To adventure with them, guests are first required to sign a release and waiver of liability, otherwise

1

Attorney-Client privileged Communication

Attorney Work Product

known as an exculpatory contract. This is a contract where parties relieve themselves from liability or harm caused by their negligence. They are common with businesses that work with potentially dangerous activities. The wording of the release and waiver of liability signed by Goodman and Wexler read as follows:

### RELEASE AND WAIVER OF LIABILITY

I, _____, understand that there are inherent risks to parasailing and I AGREE TO HOLD MAGIC SUN WATER SPORTS HARMLESS ON ACCOUNT OF ANY INJURY, INCLUDING DEATH, THAT MAY BE INCURRED BY ME DURING MY TIME AND ACTIVITY WITH MAGIC SUN WATER SPORTS. Risks include, but are not limited to, parasail collapse and subsequent immersion in water, drowning, injury or death due to unexpected gusts of wind, injury or death due to equipment failure, injury or death due to ordinary negligence of any and all personnel under the employ of Magic Sun Water Sports. I UNEQUIVOCALLY ASSUME ALL RISK ASSOCIATED WITH THE WATER EXCURSION TAKING PLACE ON THIS DATE: _____. This RELEASE AND WAIVER includes all activities associated with the parasailing excursion, including boat travel to and from the parasailing site, getting on and off the boat, lift-off and descent from the boat deck, as well as while riding as a passenger in the boat.

Signature: _____     Date: _____

Before signing the release and waiver of liability, Goodman and Wexler spoke with McGill. Goodman questioned how long the company had been in business and whether there had been any accidents. McGill confirmed that Magic Sun's participants had not had a single accident in their 17 years of operation and promised a wonderful excursion. The excursion took place on a large speedboat; a crew member assisted participants with their harness and parachute before standing on the back platform, or flight deck, for takeoff. Wexler inquired about the frequency of equipment inspections. McGill personally inspected all the equipment daily and replaced the faulty or damaged equipment as needed.

2

Attorney-Client privileged Communication

Attorney Work Product

The release and waiver of liability merit specific attention as a single, preprinted form:

## RELEASE AND WAIVER OF LIABILITY

I, _____, understand that there are inherent risks to parasailing and I AGREE TO HOLD MAGIC SUN WATER SPORTS HARMLESS ON ACCOUNT OF ANY INJURY, INCLUDING DEATH, THAT MAY BE INCURRED BY ME DURING MY TIME AND ACTIVITY WITH MAGIC SUN WATER SPORTS. Risks include, but are not limited to, parasail collapse and subsequent immersion in water, drowning, injury or death due to unexpected gusts of wind, injury or death due to equipment failure, injury or death due to ordinary negligence of any and all personnel under the employ of Magic Sun Water Sports. I UNEQUIVOCALLY ASSUME ALL RISK ASSOCIATED WITH THE WATER EXCURSION TAKING PLACE ON THIS DATE: _____. This RELEASE AND WAIVER includes all activities associated with the parasailing excursion, including boat travel to and from the parasailing site, getting on and off the boat, lift-off and descent from the boat deck, as well as while riding as a passenger in the boat.

Signature: _____     Date: _____

As seen above, there are variations in capitalization and emphasis. The contract required Goodman and Wexler to "unequivocally assume all risk." McGill was there to answer questions throughout the signing period. On July 25, 2020, Goodman and Wexler signed and dated their release and waiver of liability form then boarded the boat.

Goodman decided to take off first, his parachute filled with air, and he became airborne up to 500 feet over the water. After approximately 15 minutes, the winch began to pull him back into the boat. When Goodman was about 30 feet above the water, the driver's hat blew off. As the driver reached for his hat, he sped up the boat and failed to notice that he had dragged Goodman and the parachute under the water. Wexler eventually noticed and immediately called upon the others for help.

3

5

Attorney-Client privileged Communication

Attorney Work Product

The damage to Goodman was severe: Goodman wound up tangled in the cords and lines from the parachute while being jolted underwater. His lifejacket could not help with the rapidly accelerating boat dragging him.

The driver soon maneuvered the boat so the crew member on the lookout could cut away the ropes and safely pull him onto the boat, but the damage had already been done. The driver radioed for an ambulance to meet them at the shore. Goodman was rushed to the hospital, having sustained nerve damage to his arms and legs from deep lacerations and pneumonia from the 15-second plunge into the water before the crew could free him and pull him onto the boat.

Looking to recover a portion of his medical expenses, Goodman (and Wexler) seek to test the enforceability of the contract they signed. Furthermore, they would like to know whether Goodman has a claim against Magic Sun for his injuries.

<u>Discussion</u>

   I.   **The Exculpatory Contract Signed by Goodman Is Likely Not Enforceable Under Wisconsin Law.**

The Second Restatement provides that exculpatory contracts may be unenforceable due to the absence of adequate notice, use of overly broad and all-inclusive terms, or failure to provide an opportunity to negotiate terms with participants. Restatement (Second) of Contracts § 195 (2019). Based on the terms of the waiver provided by Magic Sun, Goodman and Wexler can likely argue for its invalidity. As explained below, the exculpatory contract signed by Goodman and Wexler is problematic when public policy considerations are considered. To begin, Wisconsin courts will look to whether the activity involved is covered by the exculpatory contract. Here, the activity of parasailing is covered by the exculpatory contract and, therefore, the court can continue with its analysis.

4

Attorney-Client privileged Communication

Attorney Work Product

Wisconsin courts will then turn to public policy considerations to determine whether the terms of the contract provide adequate notice, are appropriately broad in their terms, or permit voluntary bargaining power on behalf of the participant signing the release and/or waiver. *See, e.g., Atkins v. Swimwest Family Fitness Ctr.*, 2005 WI 4, 277 Wis. 2d 303, 691 N.W.2d 334, *Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, 348 Wis. 2d 251, 831 N.W.2d 445, *Roberts v. T.H.E. Ins. Co.*, 2016 WI 20, 367 Wis. 2d 386, 879 N.W.2d 492.

**A.** **The Release and Waiver of Liability That Goodman Signed Is an Unenforceable Exculpatory Contract Because It Fails to Provide Adequate Notice.**

Wisconsin case law does not typically favor exculpatory contract agreements and analyzes exculpatory contracts based on both principles of contract law and public policy grounds. *See Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 8, 348 Wis. 2d 251, ¶ 8, 831 N.W.2d 445, ¶ 8. Valid exculpatory contracts must set reasonable expectations for participants. Restatement (Second) of Contracts § 195 (2019). Furthermore, a proper exculpatory contract should enforce a limited scope of applicability, but the exculpatory contract here covers an excessive number of activities that are not relevant to the excursion in which the signers are consenting to participate. *See Atkins v. Swimwest Family Fitness Ctr.*, 2005 WI 4, ¶ 18, 277 Wis. 2d 303, ¶ 18, 691 N.W.2d 334, ¶ 18.

By way of example, concerns about no limitations in the scope of applicability troubled the court in *Brooten. See Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 11, 348 Wis. 2d 251, ¶ 11, 831 N.W.2d 445, ¶ 11. In *see id*, the court concluded that the preprinted form did not constitute adequate notice of liability release because of the overreach of terms and failure to clarify the resulting responsibility or liability for any injuries incurred. *See id*. Further, the contract in *Brooten* covered a wide range of activities without specifying risks that would not typically be included while participating in the activity. *See id*. Rather, the contract aimed to completely

5

Attorney-Client privileged Communication

Attorney Work Product

absolve the company from any harm that could come during the participant's time with the company. *See id.* The court concluded that these issues contributed to the contract's invalidity. *See id.* In Goodman's case, the same issues would appear to apply to that exculpatory contract. [terms].

A valid exculpatory contract lays out the terms and conditions of the agreement, so the signee has the full picture understanding of where liability lies for certain actions and happenings. An additional issue with notice to a signer of an exculpatory contract arises where the document appears to have more than one purpose. Such a dual-purpose waiver was at issue in *Atkins*. In *Atkins*, the son of the decedent files a wrongful death claim due to an unenforceable exculpatory contract his mother signed before drowning at a fitness center. *See Atkins v. Swimwest Family Fitness Ctr.*, 2005 WI 4, ¶ 27, 277 Wis. 2d 303, ¶ 27, 691 N.W.2d 334, ¶ 27. The court determined that the registration card and waiver of liability *Atkins* signed before her participation in activities with the fitness center was not sufficient to satisfy a valid exculpatory contract because it did not explicitly specify that, by signing the card, the participant released the facility from negligent acts *See Id.*

The form in *Atkins* had a dual purpose and that was a problem, according to the court, because there was nothing outwardly conspicuous in the way the waiver was attached to the registration and presented to the participant. *See id.* Someone in the position of *Atkins* would likely not notice the extent of the liability release by reading the standard form, especially when it is required to join the activity.

The registration card and waiver of liability that was, like Goodman and *Brooten*, used on a take-it-or-leave-it basis. Magic Sun's release and waiver of liability emphasized terms that influence patrons's understanding of the rights they're signing off on. As demonstrated by the

6

Attorney-Client privileged Communication

Attorney Work Product

court in *Brooten* and *Atkin*, a participant is owed a duty of care during an excursion and fair notice of what risks are associated with the given activity for which they are consenting.

**B. The Release and Waiver of Liability That Goodman Signed Is an Unenforceable Exculpatory Contract Because It Is Overly Broad and All-inclusive.**

A preprinted form does not allow room for bargaining for the signer. The language in *Brooten*'s release was overly broad and all-inclusive of acts, including unforeseen negligence. *See Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 10, 348 Wis. 2d 251, ¶ 10, 831 N.W.2d 445, ¶ 10. The court expressed its concern in *Brooten* that the language used in that exculpatory contract of "any injury of any type" is not specific enough for a participant to consent fully through an exculpatory contract as it does not provide adequate notice for specific harms that may come throughout participation with the company. When joining the fitness club, *Brooten* signed a preprinted registration and waiver that "voluntarily agree[d] to release, waive, discharge, hold harmless, defend, and indemnify" the fitness center in the event of "bodily injury, property damage, wrongful death, loss of services or otherwise which [could] arise out of [her] use of any equipment or participation in these activities." *See Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 6, 348 Wis. 2d 251, ¶ 6, 831 N.W.2d 445, ¶ 6, *citing Atkins v. Swimwest Family Fitness Ctr.*, 2005 WI 4, ¶ 11, 277 Wis. 2d 303, ¶ 11, 691 N.W.2d 334, ¶ 11. This was not narrow enough to constitute definite and reasonable expectations of liability relief for the fitness center, making the contract unenforceable.

Like the contract in *Brooten*, the release and waiver of liability from Magic Sun describes coverage of "all activities associated with the parasailing excursion, including boat travel to and from the parasailing site, getting on and off the boat, lift-off and descent from the boat deck, as well as while riding as a passenger in the boat," but not specific activities that may come along with the unpredictable actions of the company or their employees during these events. The contract

7

Attorney-Client privileged Communication

Attorney Work Product

speaks to ordinary negligence, but no injuries that could occur under unusual circumstances. There is no room for voluntary bargaining of terms in the set form; it is used on a take-it-or-leave-it basis. The absence of specificity and opportunity for negotiation contributes to the contract being contrary to public policy.

Contracts require terms that are relevant, reasonable, and delivered with clarity. Magic Sun's release and waiver of liability emphasized its terms between capital and lowercase letters that appear to draw attention from the terms of liability to the signature and date themselves; the examples of possible risks are written in lowercase letters, but the release of all injuries is in capital letters. This broadened language is overly inclusive because it extends to "any" possible injuries that could occur "during [patrons's] time and activity" with the company," extending to the actions of the company or its employees during their operation of the excursion. Patrons were not aware that signing off on these take-it-or-leave-it waivers covered most torts. The lack of adequate notice does not permit this release to be a valid, enforceable contract.

**C. The Release and Waiver of Liability That Goodman Signed Is an Unenforceable Exculpatory Contract Because It Does Not Permit Voluntary Negotiation of The Terms.**

The patrons of Magic Sun sign off on a preprinted contract that does not permit accommodations, clarifying language, or thoughtful consideration of terms. Although McGill was available for questions, McGill did not answer any regarding the excursion and release and waiver of liability form; McGill answered questions about the company itself, not the terms of the agreement. As an all-or-nothing contact with no opportunity for negotiation on the specific risks and intent of the release of liability waiver, Magic Sun's release and waiver of liability are against public policy.

8

Attorney-Client privileged Communication

Attorney Work Product

The court in *Brooten* found the contract unenforceable because of its take-it-or-leave-it basis as "[t]he form itself must provide an opportunity to bargain." *See Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 9, 348 Wis. 2d 251, ¶ 9, 831 N.W.2d 445, ¶ 9, *citing Richards v. Richards*, 181 Wis. 2d 1007, 513 N.W.2d 118 (1994)). *See also Roberts v. T.H.E. Ins. Co.*, 2016 WI 20, 367 Wis. 2d 386, 879 N.W.2d 492 (court held exculpatory contract unenforceable where there is not sufficient bargaining opportunity as it was a no-questions-asked requirement for signing the contract). Like Magic Sun's release and waiver of liability, the form in *Brooten* did not provide the opportunity to request specific details of activities. Rather, the pre-printed contract covered all activities throughout the participant's time with the company. The forms in both instances include terms that relieve the company from "liability for any harm and any cause under the sun" *quoting Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 13, 348 Wis. 2d 251, ¶ 13, 831 N.W.2d 445, ¶ 13. Furthermore, if they did not sign the standard forms, they would not have been able to participate in the activity at all. The signers did not have the opportunity to bargain with the companies over the exculpatory language in the forms they signed, violating public policy.

<u>**Conclusion**</u>

It is likely to be found that Goodman and Wexler did not sign a binding, enforceable exculpatory contract with Magic Sun for the period during which they were participating in a parasailing excursion with the company. An exculpatory contract is unenforceable where the contract serves purposes that are not identified or distinguished, overly broad and all-inclusive, and yields little or no opportunity for voluntary bargaining. The release and waiver of liability that Goodman and Wexler signed off on covered the duration of anything while on the excursion. It did not specify actions of covered liability release and was on a standard preprinted agreement that did not allow an opportunity for negotiation. Given that none of these elements were

9

Attorney-Client privileged Communication

Attorney Work Product

fulfilled by Magic Sun, the company should not be relieved from liability arising from the

injuries incurred by Goodman during the excursion.

10

**OFFICIAL INTRA-UNIVERSITY  LAW SCHOOL RECORD**

**Name:**

**Student ID:**

Institution Info:          Marquette University
Print Date:                01/21/2022

Other Institutions Attended:
Marquette University

**Beginning of Law Record**

**2021 Fall**



External Degrees

Marquette University
Bachelor of Business Admin    12/01/2021

End of OFFICIAL INTRA-UNIVERSITY  LAW SCHOOL RECORD



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2022 Diversity Clerkship Program

◄ ◄ ◄ ◄ ◄ ◄ ◄ ► ► ► ► ► ► ►

### Interview Evaluation Fillable Form

### Interviewer Recommendation:

[  ]    **Outstanding Candidate**
☒    **Very Good Candidate**
☐    **Average Candidate**
☐    **Below Average Candidate**

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

Or you can print it and scan it with your handwritten notes.

Return to Jacque Evans, **jevans@wisbar.org** no later than January 24.

**Student Name:** ██████████████

**Law School:**    ☐ UW    ☒ MULS

**Interviewer:**    AH

### A. General Qualifications

*1. Relevant Skills and Qualities:*

Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

**Check a Score:**   *Lowest ↓*   ☐ 1    ☐ 2    ☐ 3    ☒ 4   *↑ Highest*

**Interviewer Comments:**

She's interned at two notable legal offices in the past and seems very involved at the law school. It seems like she needs something more heavy duty when it comes to legal experience.

*2. Communication Skills:*

Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

**Check a Score:**   *Lowest ↓*   ☐ 1    ☐ 2    ☐ 3    ☒ 4   *↑ Highest*

**Interviewer Comments:**

Her writing is good and she is a very good communicator. She needs a challenging legal experience, something where she could really shine.

### B. Interview Characteristics:

✱ ██████ has been through a lot of challenge but still managed to persevere and finish her 1L year. She is in a better place now and ████ a place where she can shine and sh

 ● ▮ @wisc.edu

## EDUCATION

**University of Wisconsin Law School**                                                                    Madison, WI
*Juris Doctor Candidate*                                                                                          May 2025
  Honors  Quarles & Brady Law Firm Fellowship Candidate, Godfrey & Kahn Law Firm
        Fellowship Candidate, Wisconsin Law Advanced Opportunity Fellowship Recipient
  Activities:  Asian Pacific Islander Desi American Law Student Association, First Generation
        Lawyers, Business & Tax Law Association, Real Estate Securities Investment
        Law Society

**University of Wisconsin-Madison**                                                                      Madison, WI
*Bachelor of Arts in Legal Studies and Bachelor of Arts in Political Science*  May 2022
  Honors  Academic Dean's List (2019, 2020, 2021)
  Activities:  Women & Well Being 4W Global Artisan Initiative (Vietnam), Pre-Law Society,
        Alexander Hamilton Society, American Red Cross, Wisconsin Fishing Team

## EXPERIENCE

**Schreiber Government Relations Group**                                                            Madison, WI
*Policy Analyst Intern*                                                                                  August 2020 - August 2022
- Assessed local, state, and national media outlets.
- Conducted comprehensive research on issues relevant to clients.
- Advised during legislative and agency hearings.
- Assisted with writing testimony, talking points, columns, and newsletters for clients.

**State Party of Wisconsin**                                                                                  Madison, WI
*Finance & Research Intern*                                                                        May 2020 - August 2020
- Contacted an average of 75 donors per day through mailings and managing phone calls.
- Administered tasks for the Finance Department using Microsoft Excel and Word.
- Served all departments with projects involving editing statements and preparations for conferences.
- Implemented analytical and critical thinking skills to address constituent concerns.

**Wisconsin State Legislature**                                                                              Madison, WI
*Legislative Intern*                                                                                   August 2019 - May 2020
- Spearheaded policy research, answered phone calls, attended committee hearings or briefings with the
  Senator/Representative and staff.
- Facilitated constituent inquiries/concern and edited press releases, statements, and other correspondences.
- Revitalized data entry and analysis systems.

**University of Wisconsin-Madison Turfgrass Diagnostic Lab**                          Madison, WI
*Research Assistant*                                                                           May 2019 - September 2019
- Coauthored over 20 scientific reports published by UW-Madison, sponsored by globally renowned
  multibillion-dollar companies.
- Executed diagnostic testing, data analysis, and implementing multiple scientific field skills to clients.

## ADDITIONAL INFORMATION

**Community/Interest:** Big Brothers & Big Sisters of America, Global Health & Policy Certificate, Investing &
          Entrepreneurial Podcasts, Personal Fitness, Piano, Green Bay Packers, Milwaukee Bucks

<span style="color:red">**Exhibit 40**</span>



@wisc.edu

*Fashion.* One word that can be tied to a deceased passion, a struggle for equality in diverse societies, an instrument for self-discovery of my cultural identity, and the inspiration for pursuing a career in law.

"Change your clothes. Change the world." was the mantra of Jody, the deceased mother of my best friend and the inspiration behind her business, "Fair Indigo." Fair Indigo is a company committed to providing quality, sustainable products to consumers. They go beyond most apparel brands' idea of sustainability to ensure workers are treated well and paid fair wages.

Reflecting on my knowledge of Fair Indigo's mission, I decided to pursue an undergraduate minor in Global Health. The goal of this minor is to teach students how to improve health equity for all people worldwide. In this program, I chose to pursue the 4W Global Artisans Initiative because it seeks to build on community well-being and strengthen cultural heritage by improving artisans' working conditions and giving them resources to overcome challenges. Through 4W, I was matched with Lan, a young Vietnamese businesswoman, who was motivated to start her company after witnessing many large corporations taking advantage of local artisans and profiting off their culture. I developed a strong relationship with Lan and eventually created a 25-page analysis of her business model, which included a strategic plan for how she could improve her business.

This experience furthered my desire to explore my cultural heritage. My grandparents are from the Island of Luzon in the Philippines. They shared examples of similar instances that occurred in the Philippines as those that Lan faced in Vietnam. They described how large companies have consumed the market with cheap, low-quality mass-manufactured fashion goods that have mass appeal. They stated how "fast fashion" not only fills up waste sites but contains harmful chemicals that pollute the surrounding areas. They shared how the Philippines is facing water shortages, and yet fashion production consumes a large amount of the country's natural resources.

While the intersection between fashion and law was not obvious to me at first, it represents the foundation from which my career aspirations are derived. I have found the direction I want to pursue in my legal career through the inspiration of Jody's mission, the work of Lan, and by learning more about "fast fashion" influences in the Philippines. I have seen firsthand how the minority status of various groups makes them more vulnerable to cultural assimilation, conflict, hostility, and violence. I am enticed by the services an attorney can provide to promote equality in society. As an aspiring lawyer, I am proud of and look forward to sharing my heritage. I intend to share my experiences as an underrepresented minority in my personal and professional interactions to improve cultural awareness and shape future discussions on race and ethnicity. I hope to continue these discussions as a law student and a lawyer, where I can bring a significant, but sometimes missing perspective to the legal community.



@wisc.edu

## QUESTION PRESENTED

Under Wisconsin's "Safe Place Statute," which requires an employer or an owner of a public building to furnish safe premises for both employees and frequenters, can VinyLand, LLC be found not liable for the plaintiff's injuries sustained from falling on a stock room stair, when VinyLand, LLC contends customers can only access the stock room when accompanied by an employee if the plaintiff entered the stock room of VinyLand, LLC without express or implied consent rendering her a trespasser?

## BRIEF ANSWER

Yes. A Wisconsin court should deem VinyLand, LLC not liable for the plaintiff's injuries on the premises because the plaintiff was trespassing at the time she was injured, and thus is not entitled to the protections of the Wisconsin "Safe Place Statute." Wisconsin case law obligates employers to a lesser duty of care to trespassers than frequenters. Here, VinyLand, LLC should show the plaintiff was a trespasser because the plaintiff did not have express or implied consent to enter the stock room where she was injured. The plaintiff did not have express or implied consent to enter the stock room at the time she was injured. Also, the stock room was represented to the public for restricted use, and the stock room being located near public spaces is not enough to deem the plaintiff had express or implied consent to use the stock room. Thus, VinyLand, LLC's defense to an alleged violation of the Safe Place Statute should be viable.

## STATEMENT OF FACTS

Our client, VinyLand, LLC ("VinyLand"), owns the premises known as VinyLand Records ("Store") and employs Sharon Kim ("Kim"). Kim is the sole member and manager of the store. On Monday, January 31, 2022, the plaintiff, Camille Wagner ("Wagner"), was working

part-time as a private process server and was tasked with personally serving Kim with court papers. Wagner's colleagues had informed her that Kim would likely be at the store. Wagner was familiar with the store layout because she had previously visited the store on prior occasions as a patron. Moreover, she and an employee had previously gone into the stock room area, where they viewed certain vinyl albums that had not yet been inventoried or displayed for the store.

On January 31, 2022, Wagner entered the store to serve Kim with court papers. Wagner approached the cashier at the counter and stated she needed to speak with Kim. The cashier gave Wagner specific directions to Kim's office in the back of the store. The store consisted of the public sales floor and an open hallway in the back of the store. The hallway included entrances to two public restrooms, Kim's office, the stock room, and the closet. The employee did not tell Wagner to keep out of any areas, or that she was not allowed to enter other areas in her quest to find Kim. Wagner followed the cashier's directions to Kim's office but found Kim was not there.

Wagner was then compelled to enter the stock room after hearing a noise from the stock room and decided to investigate. Wagner alleges that given her previous visits to the store she knew the area she heard the noise from was the stock room. Moreover, she knew she had access so long as an employee accompanied her. Wagner said, "Sharon Kim?" to which she heard a response, "yes." Believing she had located Kim, Wagner began to walk through the open door, down the stairs to the stock room. Kim stated the stock room door is typically locked unless she or another employee is using it. Kim said she left the door to the stock room open that day because she was moving between the stock room and her office. Wagner alleges she did not see any signs in the hallway or on the stock room door, which indicated that customers were not allowed to enter. Kim stated there is a sign on the door that says, "Employees Only," but the sign is not easily visible if the door is open. Kim confirmed that customers could access the stock

2

room, but only with a store employee accompanying them. Moreover, Kim maintained the stock room's customary use was to store rare or unlabeled items.

Kim is unaware of any instances where a customer accessed the stock room without an employee. However, Kim said she saw Wagner walking down the stock room stairs by herself. Before Kim could say anything, Wagner stepped on the broken stair and injured herself. Kim admitted that the stair had been broken for a couple of weeks. She stated that she had not repaired the stair due to personal turmoil in her life, especially the divorce proceedings. This also happened to be the reason Wagner was attempting to locate Kim, to serve her with divorce papers.

Kim did not think it was necessary to put any signs or barricades around the broken stair because all employees knew of it, and customers were not allowed to be in the stock room without an employee's accompaniment. To her knowledge, no other customers accessed the room while the stair was broken, and no employees were ever injured on the broken stair. Nonetheless, Wagner alleges she sustained immediate and long-term injuries from the stock room accident. Thus, Wagner has sued VinyLand for violating the Safe Place Statute due to its alleged negligence in failing to maintain safe premises.

### DISCUSSION

VinyLand should have a viable defense to the plaintiff's claim brought forth under the Safe Place Statute that can shield the company from being liable for the plaintiff's injuries. The Safe Place Statute requires the employer or an owner of a public building to maintain safe premises for employees and frequenters. Wis. Stat. § 101.11(1) (2019-20). A frequenter is "every person, other than an employee, who may go in or be in a place of employment or public building under circumstances which render such a person other than a trespasser." Wis. Stat. §

3

101.01(6). Wisconsin statutes distinguish a trespasser from a frequenter by stating that a trespasser is a person who "enters or remains upon the property in possession of another without the express or implied consent from the possessor." Wis. Stat. § 895.529 (1)(b) (2019-20). "Express consent [is] when the possessor expressly invites or authorizes another person to be on his or her premises." Wis JI-Civil 8015 (2013). In the absence of expressed consent, courts will also consider whether an individual had implied consent to be on the premises. Id.

Courts are instructed to look at the totality of circumstances to ascertain whether a person has implied consent. The factors of implied consent include: (1) the permission of the possessor, if any, in the previous use of the premises by others (including the plaintiff) under similar circumstances; (2) the customary use, if any, of the premises by others (including the plaintiff); (3) possessors representation to the public that the land may be entered for a particular purpose; and (4) the general arrangement or design of the premises. Id. If the court concludes the possessor did not impliedly consent to the individual to be on the premises, then that individual may be deemed a trespasser. Id.

Accordingly, property owners are obligated to a lesser duty of care to trespassers than employees or frequenters. Hofflander v. St. Catherine's Hosp., Inc., 2003 WI 77, ¶ 103, 262 Wis. 2d 539, 664 N.W.2d 545. This "lesser duty" requires owners to refrain from willful, wanton, or reckless conduct directed towards the trespasser. Hofflander, 262 Wis. 2d 539, ¶ 103 (citing Nalepinski v. Durner, 259 Wis. 583, 586, 49 N.W.2d 601 (1951); Wis JI-Civil 8025 (2022). Thus, a defendant who can show an individual entered the premises as a trespasser, without express or implied consent, may have a viable defense against an alleged violation of the Safe Place Statute. Id. ¶ 104.

4

A person can lose their frequenter status and become a trespasser when they deviate from a public area into a restricted area, whether intentionally or by mistake. Monsivais v. Winzenried, 179 Wis. 2d 758, 769, 508 N.W.2d 620, 626 (Ct. App. 1993). In Monsivais, a person was deemed a "frequenter" upon entry to a bar. 179 Wis. 2d at 762. He then received specific directions, regarding the bathroom's location. Id. The individual mistakenly did not follow the directions he was given to the bathroom. Id. Instead, he walked through a door and onto a staircase leading to the basement of the bar, where he fell and was fatally injured. Id. The public bathroom was in the back of the bar, while the entry to the basement was on the side of the bar. Id. at 761-62. The owners maintained that they did not allow frequenters to enter the basement, and a sign on the basement door indicated it was for "private" or a restricted use. Id. at 769.

The court reasoned that the injured party was a trespasser because the tavern owners showed: (1) they did not maintain the basement for the use of frequenters in the past, (2) its customary use was not for frequenters, (3) the sign stating "private" was adequate to represent to the public it was for restricted use only, and (4) the nearness of public spaces to the basement where the plaintiff was injured was not enough to suggest the plaintiff had implied consent to enter the basement. Id. at 769. See also Donaldson v. K & R Cross, Inc., No. 2016AP800, 2017 LEXIS 285, ¶ 14 (Wis. Ct. App. Apr. 25, 2017) (unpublished opinion) (reasoning that the nearness of a restricted area to a public space was not enough to deem implied consent given to enter the restricted area). Thus, a frequenter can become a trespasser when one deviates into a different location on the premises without express or implied consent from the possessor. Id. See also Donaldson, 2017 LEXIS 285, ¶ 14 (explaining that the four factors of implied consent were not established after the patron wandered beyond an area of permissive use).

5

Regarding our client, VinyLand should be able to establish that it is not liable for injuries to Wagner under the Safe Place Statute because Wagner was a trespasser. Moreover, if Wagner is deemed a trespasser, the only duty VinyLand owed her was to refrain from willful, wanton, or reckless conduct. However, Wagner does not allege any willful, wanton, or reckless conduct, so that issue is immaterial here. Also, it should be undisputed that Wagner lacked express consent to enter the stock room because Kim never expressly invited or authorized Wagner to be in the stock room. Therefore, the court will likely consider whether Wagner had implied consent.

First, a court should consider how the stock room was used in the past by individuals, including Wagner. The court should weigh whether individuals' prior uses of the stock room were similar to Wagner's use of the stock room at the time she was injured. Here, the uses by past individuals of the stock room were not similar to Wagner's use at the time she was injured. In <u>Monsivais</u>, the court reasoned that a patron was a trespasser after he wandered into a restricted area in pursuit of the bathroom. Similarly, Wagner wandered into a restricted area in pursuit of serving Kim.

Wagner may attempt to distinguish the <u>Monsivais</u> case by arguing that unlike the plaintiff in <u>Monsivais</u>, Wagner had used the stock room in the past. Also, in <u>Monsivais</u>, the defendant contended that the basement had not previously been given permission for frequenters to use. By contrast, the store had given frequenters the ability to use the stock room in the past, but strictly when accompanied by an employee. However, this distinction will likely not be enough to deem Wagner had implied consent. Unlike her previous use, Wagner wandered to the stock room without an employee and without the intent to shop at the store. Thus, Wagner should not meet the first factor suggesting she had implied consent to enter the stock room given the differences

6

in her use of the stock room at the time she was injured and how the stock room was accessed on previous occasions.

Second, a court should weigh the customary use of the stock room by others, including Wagner. In Monsivais, the court reasoned that the customary use of the basement was not for frequenters. Kim contends the stock room's customary use was to store unlabeled or rare items. Wagner may argue that she used the stock room in the past, suggesting it was customary for frequenters to use it. However, unlike Kim's use of the stock room that resulted in injury, she did so in the prior uses while abiding by store policies. The stock room's customary use was to store items. Only on occasion were frequenters allowed to use it and an employee had to be present. Therefore, Wagner should be deemed a trespasser because the customary use of the stock room was for storage purposes and not for frequenters to use unless they expressly asked, and an employee accompanied them.

Third, courts will consider how the stock room was represented to individuals on the premises. Kim stated that the door is typically locked unless she or another employee is using it. Similarly to Monsivais, the stock room contained a "Employees Only" sign that indicated to frequenters it was of restricted use. Even if Wagner did not see a sign, she admits knew the stock room could not be entered without the accompaniment of an employee. This signals she was aware of its restricted nature. Like in Monsivais, a court should conclude that VinyLand's representation of the stock room signaled restricted use and implied consent was not given.

Fourth, courts will weigh whether the general design of the store as a whole was enough to suggest individuals had implied consent to use the stock room. In Monsivais, the basement entry was near the public bathroom, but the court held that proximity to public spaces itself was not enough to establish implied consent. Here, the entrance to the stock room is also near public

7

spaces. By analogy to <u>Monsivais</u>, the court should conclude that even though the restricted area was near places for public use, this factor is not enough to deem Wagner had implied consent.

Thus, Wisconsin courts will likely want to continue to uphold policies that protect possessors' interests from unlawful entrances to their premises. The court should conclude, by analogy to <u>Monsivais</u>, that VinyLand is not liable for Wagner's injuries because she lacked expressed and implied consent to be in the stock room, deeming her a trespasser in that area at the time she was injured.

## CONCLUSION

VinyLand should have a viable defense to shield it from liability under the Safe Place Statute because a court should find Wagner was a trespasser, who is owed a lesser duty of care. Wagner will likely argue that she was a frequenter, and VinyLand violated the statute by failing to maintain a safe premises. VinyLand should attack those arguments by emphasizing the lack of express and implied consent given the stock room's: distinguishable previous uses compared to Wagner's use at issue, customary usage, restricted representation to the public, and the proximity to public spaces itself is not enough to establish implied consent. Thus, despite Kim's failure to fix the broken stair, VinyLand should not be liable for Wagner's injuries under the Safe Place Statute because Wagner should be a trespasser.

8



## Course History Report for ██████████

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022



| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|

### Spring 2023 - All Courses In Progress



| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|

Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



# 2022 Diversity Clerkship Program

◄ ◄ ◄ ◄ ◄ ◄ ◄ ◄ ► ► ► ► ► ►

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

☒ **Outstanding Candidate**

☐ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 24.**

**Student Name:** ████████

**Law School:** ☒ UW ☐ MULS

**Interviewer:** Tim Lindl

## A. General Qualifications

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 **X** 4 ↑ *Highest*

**Interviewer Comments:**

████ is a well-polished candidate that is clearly ready for legal employment. His transcript made him a finalist for 1L internships at two prestigious Wisconsin law firms (Quarles & Brady and Godfrey & Kahn), although he did not get either. He has worked at the Wisconsin Capitol as a lobbyist and been exposed to and succeeded in an advisor-client relationship, in addition to preparing legislative testimony.

He had clearly researched me prior to our interview and then angled the stories and anecdotes he told toward my practice, which is a skill. He was able to discuss with me legislation on which I had worked as though I was a colleague. Hiring ████ is a no-brainer in terms of his qualifications.

**2. Communication Skills:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

**Check a Score:** *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 X 4 *↑ Highest*
**Interviewer Comments:**

███ is a great legal writer and does fine in person when communicating.  He could be a better oral story-teller, which is what matters the most in persuading decision-makers.

**B.  Interview Characteristics:**

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

**Check a Score:** *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 X 4 *↑ Highest*
**Interviewer Comments:**

███ would fit well in a large law firm or corporation.  He exhibits substantial confidence and would not get lost within a large organization.  It is clear he has been in the professional world previously, and he expressed a lot of pride in helping large companies already in his career (like Monsanto).  He was appropriately dressed for an interview.

**C.  Motivation for Participation in the Diversity Clerkship Program:**

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* *What is your motivation for participating in the Diversity Clerkship Program?*

**Check a Score:** *Lowest ↓* ☐ 1 ☐ 2 X 3 ☐ 4 *↑ Highest*
**Interviewer Comments:**

███ believes his extracurricular activities and professional experience all have one thing in common: a passion for helping other people achieve their personal or business goals.  That has motivated him to both become a lawyer and participate in the program; he thinks his diverse perspective can help any organization while helping him develop his legal skills.

**D.  Interviewer's Perspective:**

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

**Interviewer Comments:**

███ did not clearly answer this question but noted that he looks forward to getting some real world experience and working on his legal skills. He noted that is scientific research skills – sifting through the minutiae – should help him in the legal world.

**E.  Student Feedback:**

**Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.**

**Interviewer Comments:**

It was a real pleasure speaking with ███. He had researched my practiced and angled his comments and anecdotes towards that practice, and he sent me a thank you note, which are both pro moves.  With regard to interviewing skills, my suggestions to ███ would be to (a) shorten his answers a bit – he was a little long-winded and (b) be a little humbler with regard to his experience.  He has some impressive credentials, but real-world practice is different than his prior experience, and I would suggest acknowledging during future interviews that he still has a lot to learn.



@marquette.edu

## EDUCATION

**Marquette University Law School**, Milwaukee, Wisconsin
<u>Candidate for Juris Doctor</u>: May 2024
GPA: Available late-January 2022

    Activities:    Business Law Society, Member
                          Asian Law Students Association, Member
                          Association for Women Lawyers, Member

**Marquette University**, Milwaukee, Wisconsin
<u>Bachelor of Arts in History</u>: May 2022
Minor: Spanish
GPA: 3.881/4.000

    Honors:       Dean's List, 6 semesters
                         Pre-Law Scholar (earn undergraduate and law degrees in 6 years)
    Activities:    Indian Student Association, Executive Board Member
                         Phi Alpha Theta (History Honor Society), Member
                         Boden Award, Nominee (2021)

## LEGAL EXPERIENCE

**Milwaukee Justice Center Family Law Forms Clinic**, Milwaukee, Wisconsin
<u>Student Volunteer</u>: September 2021-November 2021; October 2018 -December 2018
· Assisted clients with filling out post-judgment and divorce forms
· Facilitated discussions between clients and other parties to identify issues and relevant facts regarding their cases

## NON-LEGAL EXPERIENCE

**Professor Alison Efford, Marquette University,** Milwaukee, Wisconsin
<u>Research Assistant</u>: February 2021-May 2021
· Researched the role of women's physical and political empowerment in the Milwaukee Turners
· Received a mini-grant from the Institute for Women's Leadership for the research
· Assisted in organizing archival material dating back to the 1880s
· Published on Marquette University's history faculty blog, Historians@Work

## LANGUAGE SKILLS

Fluent in Spanish (earned Global Seal of Biliteracy, May 2021)

<span style="color:red">Exhibit 41</span>



@marquette.edu

As a first-generation immigrant from India, I faced my own set of challenges while my parents experienced theirs as we tried to fit into our new lives. I was learning a new language, finding new friends, and figuring out social expectations all while trying to hold onto my culture and identity. I am lucky in the sense that I went to public schools where many of my peers were in the same position as me because we had the chance to share our experiences and help each other understand that we can balance our different cultures.

Thus, diversity had never been something that I differentiated from other parts of my life because it was inherent in everything I did. However, when I transitioned from a diverse public high school to a private university that had a prominently white demographic, it was the first time in my life when I noticed the importance of diversity. I began noticing the differences that had not been present in my life before such as there being fewer people of color and women in my classes. I had taken for granted what it was like to be part of a diverse community and the opportunities that come from surrounding myself with people who contribute different ideas to the conversation because of our differences.

Yet, there are people that were not as fortunate as me to have a diverse welcoming to a new country. My mother had to find a job in a new country while learning how to speak English. For the first time in her life, she was surrounded by people who did not look like her, who did not speak like her, and who did not share similar cultural mannerisms as her. My mother has played a large part in how I see myself practicing law because I have seen first-hand how humiliating it is to try your best to communicate your needs and be shut down. However, my mother always felt

1

169

comfortable and confident talking to someone who spoke the same language as her, or even just looked like her, a woman of color. There is a certain amount of comfort that comes from explaining your needs and wants to a person that you can relate to. I want to be the attorney people feel confident turning to instead choosing not to hire an attorney at all because they feel intimidated or uncomfortable expressing themselves.

Therefore, my commitment to diversity is unconditional and inherent. In fact, the lack of representation in the law profession was a large motivation for me when deciding to go to law school because I wanted to be the attorney people like my mother could come to for help. As an attorney, I hope to promote diversity in my workplace as well as mentor other people of color and women to continue to build networking bonds that exist today. I earned my admission to law school based on a personal statement I wrote on diversity, and I am determined to keep that sentiment throughout law school and in my career as an attorney.

2



@marquette.edu

### Writing Sample

Attached please find a copy of a Memorandum. I created this document in Marquette University's course "Legal Analysis, Writing and Research 1." The prompt for this Memorandum was created by the professor for a figurative town in Wisconsin.

███████

**M E M O R A N D U M**

To:     ███████
From:   ███████
Date:   
Re:     Jerry Jankowski
        Client No. 0922.42

---

**QUESTION PRESENTED**

Under Section 895.476(3), is Jerry Jankowski and The Crawl Inn immune from civil liability for exposing customers to COVID-19 when Jankowski decided not to enforce the city's mask mandate and when a COVID-positive employee sneezed into a customer's drink and several customers contracted COVID-19?

**BRIEF ANSWER**

Likely no. Section 895.476(3) states that civil immunity cannot be applied to an entity if "the act or omission involves reckless or wanton conduct or intentional misconduct." Courts that have interpreted "reckless and wanton conduct or intentional misconduct" from similar statutes have interpreted the phrase to mean "intentional disregard of the rights of the plaintiff." Intentional disregard requires only the intent to disregard rights of the victim, not an intent to injure the victim. The court may determine that Jankowski's failure to enforce the city's mask mandate and a COVID-positive employee sneezing into a customer's drink are intentional disregard of the right to health and safety of their customers because they were aware of the risk of exposing their customers to COVID.

**STATEMENT OF FACTS**

As established in my September 18 email, Jerry Jankowski is the owner of The Crawl Inn, a drinking establishment, in Milwood. Due to COVID, The Crawl Inn closed business on March 19, 2020. Later, in June 2020, Milwood allowed bars to reopen if safe business practices

2

███████

were followed as part of the city's Phase 3 of a plan to reopen businesses. The safe business practices were laid out in the City of Milwood Health Department Order #2 that was issued May 21, 2020. These practices include covering coughs or sneezes (into the sleeve or elbow), wearing a mask or cloth face covering, and adopting policies to prevent workers from entering the premises if they displayed respiratory symptoms.

The Crawl Inn reopened June 12, 2020. Between July 12, 2020, and June 13, 2021, Milwood had a mask mandate requiring anyone 3 years and older to wear a face covering whenever the person was in a building open to the public such as a bar. Milwood, Wis., Code of Ordinances § 62-8(1) (2020). In the ordinance, a face covering is defined as "protective mask covering the nose and mouth." *Id*. § 62-1(11). A person is not required to wear a face covering if they are eating or drinking in a public place. *Id*. § 62-8(4)(c).

In addition to the safe business practices Jankowski had to follow to reopen The Crawl Inn, Jankowski posted a sign, as a preventive measure against COVID, on The Crawl Inn's front door that said, "FACE MASKS REQUIRED FOR ENTRY"; and the sign had a graphic that showed a person's head with a face mask covering the person's mouth and nose. Another preventive measure Jankowski took was instructing his employees to wear a mask while working. However, Jankowski admitted that employees routinely wore their masks below their noses, and he did not correct his employees' improper mask wearing.

On January 24, 2021, Aubrey Briggs entered The Crawl Inn as a customer. Jankowski's grandson Tanner Jankowski was working as an employee. Jankowski sat next to Briggs and took off his face covering to eat. While Tanner was making Briggs a drink, Tanner sneezed and attempted to cover the sneeze with his elbow. Jankowski witnessed the sneeze. Tanner then set

Case 2:23-cv-01697   Filed 12/19/23   Page 150 of 259   Document 1-2

the drink in front of Briggs who drank it. Briggs left shortly after the incident. When Jankowski asked Tanner if he was okay, Tanner claimed his sneeze was due to allergies.

After the occurrence, Jankowski recalled that Tanner wore his mask below his nose on January 24. Tanner tested positive for COVID after the incident. Briggs and other customers tested positive for COVID after entering The Crawl Inn on January 24, 2021.

## DISCUSSION

Jankowski is likely not immune under the statute. My email of September 18 established that Section 895.476(2) determined that immunity would be available unless Section 895.476(3) applied to the circumstances. Wis. Stat. § 895.476(2) (2019-2020); *id.* § 895.476(3). Section 895.476(3) states, "Subsection (2) does not apply if the act or omission involves reckless or wanton conduct or intentional misconduct." *Id.* However, there is no explicit definition of "reckless or wanton conduct or intentional misconduct" noted in Section 895.476. *Id.*

To interpret a statute, the court looks first to the plain meaning, and if it the statute is ambiguous, the court will look to the legislative history and intent to determine the meaning of the ambiguous statute. *State on behalf of Kalal v. Circuit Court for Dane County*, 681 N.W.2d 110, 126 (Wis. 2004). Further, "nontechnical words and phrases are to be construed according to their common and ordinary usage." *Ervin v. City of Kenosha*, 464 N.W.2d 654, 663 (Wis. 1991). Statutory language is interpreted "in context in which it is used, [and] in relation to the language of surrounding or closely-related statutes. If this process of interpretation yields a plain meaning, the statute is unambiguous, and courts apply its plain meaning." *Stroede v. Soc'y Ins.*, 939 N.W.2d 614, 620 (Wis. Ct. App. 2020), *rev'd on other grounds & remanded*, 959 N.W.2d 305 (Wis. 2021) (quoting *Mayo v. Boyd*, 844 N.W.2d 652, 655 (Wis. Ct. App. 2014)).

4

**Marquette University Law School** / State Bar of Wisconsin Diversity Clerkship Program Application Packet


While no court has interpreted Section 895.476(3), Wisconsin courts have interpreted Section 895.529, the duty to owed to trespassers statute. The statute states, "A possessor of real property may be liable for injury or death to a trespasser [if] the possessor of real property willfully, wantonly, or recklessly caused the injury or death." Wis. Stat. § 895.529(3)(a) (2011-2012). In *Stroede v. Society Insurance*, 939 N.W.2d 614 (Wis. Ct. App. 2020), *rev'd on other grounds & remanded*, 959 N.W.2d 305 (Wis. 2021), the plaintiff was highly intoxicated when ordered to leave a bar. After the plaintiff re-entered, an off-duty employee grabbed him by the shoulders and led him towards a stairway. The plaintiff fell down the stairway and injured his head. *Stroede*, 939 N.W.2d at 616-17. Afterwards, the employee picked up the plaintiff and took him outside the bar. *Id*. The court held that the employee was not liable for the plaintiff's injury because the employee lacked intent to disregard the rights of the plaintiff. *Id*. at 617. The court reasoned that "[a]lthough specific definitions of the terms 'willful,' 'wanton,' and 'reckless' vary among case law, the overarching principle is that 'willful, wanton, or reckless' conduct requires . . . an intentional disregard of the rights of the plaintiff." *Stroede*, 939 N.W.2d at 619 (citing *Wosinski v. Advance Cast Stone Co*, 901 N.W.2d 797, 821 (Wis. Ct. App. 2017)).

The language in Section 895.529 is similar to the language in the punitive damages statute. Also, the court mentioned how "legislature replaced the common law language of 'wanton, willful, and reckless' with the term 'intentional.'" *Strenke v. Hogner*, 694 N.W.2d 296, 300 (Wis. 2005). Now, under the statute, "[t]he plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." *Id*.

By looking to legislative intent, a court can conclude that "an 'intentional disregard of the rights of the plaintiff' does not require 'intent to cause injury to the plaintiff.'" *Id*. at 301. In

5

███████

*Strenke v. Hogner*, 694 N.W.2d 296 (Wis. 2005), the defendant intentionally drank alcohol and intentionally decided to drive after drinking when he was involved in an automobile accident with the plaintiff, who was injured by the accident. *Id.* at 299. The victims sued the plaintiff and requested punitive damages. *Id.* at 299. During trial, the plaintiff argued that he had not intended to injure the victims. *Id.* The court held that the defendant was liable for the injury and had to pay punitive damages because he disregarded the rights to safety and health of the victims. The court reasoned that "a person acts in an intentional disregard of the rights of the plaintiff if the person . . . is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded." *Id.* at 308.

Likewise, *Wischer v. Mitsubishi Heavy Industries America, Inc.*, 694 N.W.2d 320 (Wis. 2005), also illustrates how a defendant does not have to intend injury to intentionally disregard a person's rights. In *Wischer*, three ironworkers fell and died because a special crane collapsed and hit another crane that held the victims. *Id.* at 14-15. The defendant had failed to calculate the "maximum safe wind speed for operating the crane" for the specific task and weather that the plaintiffs were asked to undertake. *Id.* at 336. The wives of the ironworkers sued the defendant and requested punitive damages. Section 895.85(3) reads, "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted . . . in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.85(3) (2006).

Thus, the defendant intentionally disregarded the rights of the plaintiff by failing to calculate the "maximum safe wind speed operating a crane [forty-five] stories high while lifting a billboard-size load of nearly one million pound in a windy afternoon." *Wischer*, 694 N.W.2d at 336. By omitting the calculation, the defendant did not properly regard the plaintiffs' right to safety while working. *Id.* On that basis, the court held that the defendants were liable for the

6

deaths of the ironworkers because they did not have to intend to cause death, only to intend to disregard the rights of the ironworkers. *Id.*

Here, a court will likely look at both the plain meaning of the statute as well as the legislative intent to determine whether Jankowski is immune from civil liability. With the plain meaning approach, the court might conclude that terms within the exceptions to immunity to civil liability in chapter 895 are similar in meaning. Also, the court here will look at the phrase "reckless or wanton conduct or intentional misconduct" and apply the common usage definition of the words in the context of Tanner's sneezes and Jankowski's failure to enforce safe business practices as well as the mask mandate.

Unlike *Stroede*, where the employee did not "willfully, wantonly, or recklessly cause [an] injury," here, Tanner's sneeze and Jankowski's failure to enforce the mask mandate may be interpreted as "reckless or wanton conduct or intentional misconduct" because Jankowski disregarded his customers' rights to safety and health by failing to take action to avoid exposing his customers to COVID. By allowing Tanner to continue working after he sneezed into the drink, Jankowski condoned Tanner to work while sick without warning the customers and put his customers at risk of contracting COVID.

Also, the city placed the mask mandate to prevent the spread of COVID; therefore, Jankowski's customers had a right to safety created by the mask against COVID. Jankowski disregarded this right to safety. Like in *Wischer,* where calculating safe speed winds is a part of preventing risks in the construction industry, here the mask mandate is a part of preventing the risk of contracting COVID in restaurants. Therefore, Jankowski intentional disregarded the rights of his customers by failing to enforce the mask mandate in The Crawl Inn.

███████

Moreover, with the legislative intent approach, the court will determine why the legislature included the exception of an "act or omission involv[ing] reckless or wanton conduct or intentional misconduct." Wis. Stat. § 895.476(3). The court may conclude that the legislature meant to prevent businesses from prioritizing profits over preventing exposure to COVID through the exception. Like in *Strenke*, where the defendant was aware of the recklessness of his act as he decided to drive intoxicated, here Jankowski was aware that, by not following the mask mandate and allowing Tanner to serve the drink that he sneezed in, he put his customers in danger of being exposed to COVID. Tanner's sneeze—into a customer's beverage—is intentional disregard of the customer's right to safety and health because sneezes carry germs that spread with the velocity of the sneeze.

However, Jankowski did not believe in the severity of COVID, and therefore he did not know the danger he put his customers in. Nevertheless, the "intentional disregard of the rights" of his customers was present. Jankowski did not have to have intended to expose his customers to COVID, but to have intended to disregard their right to health. Therefore, the court might conclude that the legislature included this exception to ensure that entities are held liable for disregarding the right to health of others.

In this case, Jankowski and Tanner's acts can be determined to have disregarded the right to health of their customers because they were aware that the mask mandate and safe business practices were put in place to have regard of the right to health of others.

**CONCLUSION**

Therefore, Jankowski is not likely immune from civil liability because he intentionally disregarded his customers' rights to safety and health by failing to enforce safe business practice

8

such as following the mask mandate as well as allowing Tanner to serve drinks after he sneezed into a beverage.

9

**OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD**

**Name:** ▮▮▮▮▮
**Student ID:** ▮▮▮▮

Institution Info:   Marquette University
Print Date:   01/27/2022

Other Institutions Attended:
Marquette University



**Beginning of Law Record**

**2021 Fall**

Program:   Law
Primary Major:   Law

| Course | Description | Attempted | Earned | Grade | Points |
|--------|-------------|-----------|--------|-------|--------|

| | | Attempted | Earned | GPA Units | Points |
|--------|-------------|-----------|--------|-----------|--------|
| Term GPA: | | | | | |
| Cum GPA: | | Cum Totals | | | |

**2022 Sprg**

Program:   Law
Primary Major:   Law

| Course | Description | Attempted | Earned | Grade | Points |
|--------|-------------|-----------|--------|-------|--------|

| | | Attempted | Earned | GPA Units | Points |
|--------|-------------|-----------|--------|-----------|--------|
| | | Cum Totals | | | |
| | | Cum Totals | | | |

IAL INTRA-UNIVERSITY LAW SCHOOL RECORD



**STATE BAR** OF **WISCONSIN**
*Your Practice. Our Purpose.®*

# 2022 Diversity Clerkship Program

◂◂◂◂◂◂◂◂ ▸▸▸▸▸▸▸

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

☐ **Outstanding Candidate**

☑ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 24.**

**Student Name:** ▮▮▮▮▮▮▮▮▮

**Law School:** ☐ **UW**   ☑ **MULS**

**Interviewer:** Christopher Shattuck

### A.  General Qualifications

*1.  Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*
Interviewer Comments:

Candidate has prior legal experience working for the Milwaukee Justice Center and as a research assistant for a professor.

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*
Interviewer Comments:

## Candidate did very well in all of these areas.

### B.  Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:   *Lowest* ↓   ☐ 1      ☐ 2      ☐ 3      ☒ 4    ↑ *Highest*

Interviewer Comments:

Candidate was personable, had great poise, and a lot of positive energy and enthusiasm for the opportunity.

**C.  Motivation for Participation in the Diversity Clerkship Program:**

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* *What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score:   *Lowest* ↓   ☐ 1      ☐ 2      ☐ 3      ☒ 4    ↑ *Highest*

Interviewer Comments:

As a first generation immigrant from India, candidate experienced what it is like to be from another country and be afraid to ask for legal advice. Hopes to help others feel more comfortable seeking help under the law.

**D.  Interviewer's Perspective:**

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

Interviewer Comments:

Candidate feels every employer has learning opportunities and advantages. Candidate indicated they would work hard to fit into and help promote a positive work environment.

**E. Student Feedback:**

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

Great job on the interview! You have great skills that will suit you well in the legal industry. Try to keep those things in mind and be confident about your abilities when interviewing.



@wisc.edu |

## Education

**University of Wisconsin Law School, J.D.**                                                        **May 2025**
  *Activities*: 1L Student Bar Association Rep.; Asian Pacific Islander Desi American Law Students
  Association Social Chair; First-Gen Lawyers; Public Interest Law Foundation - JMA Sponsorship Chair;
  *Pro Bono*: Veterans Law Center (Dane County Bar Association Clinic)

**Sacramento State University, Graduate Certificate** Applied Policy & Government          **May 2021**

**Colorado College, B.A.** Political Science & English Literature                              **May 2018**
  *Athletics*: Track & Field Captain, 7x All Conference, 4x Academic Honor Roll, 2 school records
  *Activities*: Justice Corps Self-Help Center Intern, El Paso County Courthouse; Track Clinic Coach
  *Study Abroad:* University College London, Fall 2016

## Professional Experience

**Superior Court of California, County of Butte, Oroville/Chico, CA**
**Court Services Analyst I** *(hired on post-fellowship in August 2021)*          **Aug. 2021 – July 2022**
  • Implemented new legislation operationally to ensure court compliance. Provided civil and criminal
    departments and judges with regular updates on new laws and the California Rules of Court.
  • Configured case management system, including fee codes and mappings to generate state reporting.
**Judicial Fellow (California Capitol Fellows Program)**          **Oct. 2020 – Aug. 2021**
*Selected as one of nine fellows. Program included certificate through CSU-Sacramento's graduate school.*
  • Created statewide training course for self-help center staff, now live across California.
  • Wrote language for grants which resulted in a combined $150K+ to improve court operations.
  • Worked with Glenn Superior Court CEO, DA and law enforcement to design new warrants process.
  • Deployed language access kiosk to facilitate court usage by Spanish speakers.

**Colorado Center on Law & Policy, Denver, CO**
**Grants Coordinator** *(Promoted in September 2019)*          **Sept. 2019 – Sept. 2020**
  • Director of 2019 Women's Legislative Breakfast (250 ticketed attendees).
  • Coordinated $1.6M, 86% grant-funded budget. Wrote grants upwards of 40+ pages for 25+ funders.
  • Secured $400K for CCLP's new litigation program, used to hire managing attorney.
**Policy Associate** *(Promoted in June 2019)*          **June 2019 – Aug. 2019**
  • Lead community engagement efforts and aided in Executive Director Leadership transition.
**Policy & Communications Fellow (Public Interest Fellowship Program)**          **May 2018 – May 2019**
  • Drafted legislative declaration for the Eviction Legal Defense Fund (SB19-180)
  • Coordinated presentation of 2018 Self Sufficiency Standard Report with the Women's Foundation
    of Colorado – 36 customized events in rural, metro, and suburban communities.
  • Lobbied for 13 successful bills in 2019 session on tenant, health, family, and worker protections.

**Colorado College Admissions, Sr. Communications Ambassador, Colorado Springs, CO** July 2017 – May 2018

**Nat'l Conference of State Legislatures, Public Interest Fellowship Program Fellow, Denver, CO** Summer 2016
  • Co-authored LegisBrief with energy analyst on electricity usage in Colorado's marijuana industry

**Palestine Festival of Literature, Book Sales Staff Member – Palestine**          **Spring 2016**

**South Asian Journalism Association, Researcher, Northern Province, Sri Lanka**          **Summer 2015**
  • Awarded research grant for project on former LTTE militants & post-war rehabilitation efforts.

<span style="color:red">Exhibit 42</span>

████████████ – Personal Statement

My life has been defined by duality, adaptability, and a drive to reconcile opposing views. My Sri Lankan mother arrived in the US fleeing a civil war; my father is from Connecticut. Throughout my life, I have had to reconcile two identities which were in many ways incompatible, but which together formed a critical worldview of what an inclusive space requires. My identity combined with my experiences living, studying and working across the United States and internationally make me an excellent fit for this clerkship.

Growing up in predominantly white spaces, I witnessed regular racism against my mother. Law enforcement, shopkeepers, and neighbors in our suburban Philadelphia neighborhood targeted her based on skin color. As a result, I became both acutely aware of the harm that a lack of diversity can cause, and firmly committed to breaking down systems that continue to further discrimination.

This mindset was also informed by the fact that I spent my earliest years in Sri Lanka. Until 2008, the island was enmeshed in a civil war, spurred by aftereffects of colonialism. Bus bombings and gunshots were frequent in my family's city of Colombo. At the war's conclusion, I completed a research project on the Sinhalese government's compassionate rehabilitation of ex-Liberation Tigers of Tamil Eelam (LTTE) militants. This showed me the power of restorative justice, and continues to inform my legal approach.

Today, I walk into exclusionary spaces conscious of their impact on people of color, the systems that have created them, and most importantly, a drive to challenge them. Prior to law school, I advocated for basic needs policies at the Colorado legislature. While building coalitions, I focused on affordability, translation services, childcare, and transportation. Later, at a trial court in California, I created a curriculum for self-help center staff that is now available for every California trial court. The course covered race equity, LGBTQ+ issues, language access, and disability equity, so that staff could holistically understand their clients.

At UW, I have stayed connected to my identity as the social chair for the Asian, Pacific Islander & Desi American Law Students Association (APIDALSA). I am also a member of First-Generation Lawyers. I have received incredible guidance in both organizations, and am eager to mentor future students like myself.

Spending time in Sri Lanka and working alongside communities in poverty caused me to adopt a slogan I first heard in the disability rights community: "Nothing about us without us." This reminds me that anyone affected by those in power must have a seat and microphone at the decision-making table. How I learn, live, and communicate is informed by my work with American communities in poverty and my connection to Sri Lanka, a country very much affected by countries like the United States.

My experiences have taught me when to listen, when to advocate, and when to walk alongside. I am dedicated to keeping these values at the forefront of my legal career, and would be honored to learn from attorneys with similar values this summer.

**Writing Sample Cover Sheet**

████████████████

**Content:** The following is an excerpt from a legal memorandum, submitted during the fall semester of 2022 as the final assignment for Legal Research & Writing I. This work is fully my own and does not include edits from outside sources, including professors and peers.

**Task:** Assess the merits of a potential Lanham Act false advertising claim. Client is The Northern Company, a Wyoming-based outdoor gear company. Northern has already brought a lawsuit against an industry competitor, Bridger Gear, and its advertising firm, IKEAZI. Northern now seeks information on whether it can bring a similar claim against three social media "influencers" who were responsible for spreading the advertisements via social media posts. Students were provided with depositions from the influencers and the original Lanham Act complaint against the industry competitor and advertising firm.

**Limitations:** 3,200-word limit. Professor directed students to focus on the Lanham Act claim, not legal procedural issues or potential defenses. The following sample has been edited to conform to the 10-page limit.

████████████

## QUESTION PRESENTED

Under the Lanham Act, can The Northern Company bring a successful claim in the 10th Circuit against three influencers who made disparaging, false statements on social media about The Northern Company?

## BRIEF ANSWER

No. The influencers did make false and misleading statements, in commerce, with the intent of influencing consumers to purchase products from a competing company. However, Northern's standing to bring a Lanham Act claim against them rests on shaky ground; the influencers are not Northern's direct competitor, and their statements may not be the proximate cause of Northern's commercial injury. Further, no court has ever recognized a Lanham Act claim against an influencer; rather, these claims are always brought against companies who pay influencers to advertise. Other agencies are better suited to manage the influencers' actions.

## STATEMENT OF FACTS

Plaintiff is the Northern Company, a Wyoming-based outdoor recreation and gear corporation. Northern creates "high-quality" products for elite athletes, and is firmly committed to being sustainable and environmentally friendly in the production of its goods. Northern alleges that recently, it has fallen victim to false advertising. A competing company, Bridger Gear, paid advertising firm IZEAKI, who in turn scripted posts that included false statements about Northern and paid three influencers to disseminate them. The captions and posts were nearly fully scripted by IZEAKI and Bridger. The influencers, who travel and work as professional athletes, collectively have a following of nearly four million. Each post made at least one disparaging statement against Northern's products, while lauding Bridger as an alternative. Northern has already brought a Lanham Act claim against Bridger and IZEAKI, and is now

1

considering a second claim against the influencers: climber Alecia Diguill, fly fisher Anne Daprah, and retired Olympic skier Cory Jones Miller.

The influencers' posts criticized both the quality of the materials used in Northern's products, and the environmental sustainability of Northern as a company. Diguill, in a photo of herself in a Northern shirt, stated that she will no longer purchase clothes "not made from organic materials." Daprah shared an image of herself in Northern gear, captioned "just heard that some gear is made with harmful chemicals and dyes that pollute our waterways […] make sure you source your gear from companies that care about our environment," with hashtags such as "#CorporateSelloutIsTheWorst." Miller posted a torn Northern backpack, questioned its durability, and stated that he was looking for "real, quality" gear. He also posted a fully staged photo of himself falling on a ski run while wearing Northern products.

The influencers also encouraged followers to consider Bridger products based on Bridger's supposedly high-quality, sustainably sourced gear: Diguill and Miller referenced Bridger's website; Daprah praised Bridger's environmentally friendly textile sourcing; Miller commended Bridger for its "durable goods for the socially-conscious consumer." In Miller's staged photo, he stated that he would be sticking to Bridger products in the future.

The influencers, though doubtful of the accuracy of the posts, did not verify the claims made within them before posting. No post included a disclosure of the fact that it was a paid post. The influencers did not actively wish to harm Northern, rather, IZEAKI's five-figure payouts were very attractive and served to support their lifestyles. Diguill even expressed regret, stating she "didn't feel good" about her post, and Daprah said that she saw Northern as a family company and did not want to disparage its brand.

2

Northern has claimed that due to the false advertising, it has suffered "irreparable" harm, citing lower sales, slippage in rank as the top ranked adventure gear provider, and reputational damage. Northern now seeks information on whether it can bring a Lanham Act claim against Diguill, Daprah, and Miller.

### DISCUSSION

The Lanham Act is a federal policy that was enacted to prevent unfair commercial competition that arises from false advertising. 15 U.S.C.A. § 1125(a)(1). To bring a successful claim, a plaintiff must show that (1) in commerce, a defendant (2) made a false or misleading statement about plaintiff's product which (3) likely confused consumers as to the nature of plaintiff's product, and that (4) a commercial injury resulted. *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir.1999). In the 10th Circuit, the statements must also be commercial speech, made for the purpose of influencing consumers to buy defendant's products, and disseminated sufficiently to the relevant purchasing public. *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1270 (10th Cir. 2000). Speech is commercial if it references two commercial entities and expresses a preference. *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 638 (1985).

Until recently, a Lanham Act defendant also had to be a direct competitor of the plaintiff, but this test has since been overruled. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 124-25 (2014). However, the 10th Circuit has been reluctant to dispose of the direct competitor element in subsequent cases. *Strauss v. Angie's List, Inc.*, 951 F.3d 1263, 1268-69 (10th Cir. 2020) (post-*Lexmark* case in which court required plaintiff to be a direct competitor).

It is indisputable that in this case, the influencers made their statements in commerce, for the purpose of influencing consumers to buy Bridger's products, and that their statements were

3

Case 2:23-cv-01697   Filed 12/19/23   Page 165 of 259   Document 1-2

commercial speech. The influencers were paid to make the statements, indicated that they would be buying Bridger products in the future, and directed viewers to Bridger's website. The influencers also expressed a preference for Bridger over Northern. However, determining whether the influencers meet our Circuit's inconsistent test regarding standing, assessing the falsity of their statements, and evaluating whether they proximately caused Northern's commercial injury to the level needed for Lanham Act liability requires a closer examination.

**I.    Influencers are not Northern's direct competitors; therefore, this claim risks dismissal**

The influencers are not direct competitors of Northern, and a claim against them may face dismissal in our jurisdiction. The 10th Circuit has long required that a defendant be plaintiff's direct competitor. *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 873 (10th Cir. 1995) (citations omitted). However, the Supreme Court seemingly did away with the direct competitor requirement when it resolved a national circuit split on the issue of Lanham Act standing. *Lexmark Int'l Inc.*, 572 U.S. at 136. *Lexmark* established a new test which focused on injury, stating that the plaintiff must allege a commercial injury to its reputation or sales (*Id.* at 132); and demonstrate that the injury was proximately caused by defendant's false statements. *Id.* at 133.

Nevertheless, the 10th Circuit has applied *Lexmark* inconsistently. In *Strauss v. Angie's List*, the 10th Circuit expressly declined to dispose of the direct-competitor requirement. *Strauss*, 951 F.3d at 1267 (citations omitted). However, in other cases since *Strauss*, the 10th Circuit has applied *Lexmark*. *Atlas Biologicals, Inc. v. Kutrubes*, No. 19-1404, 2022 WL 2840484, at *4 (10th Cir. July 21, 2022); *Choq, LLC v. Holistic Healing, LLC*, No. 20-CV-00404, 2020 WL 8175553, at *1 (D. Wyo. July 28, 2020) (post-*Strauss* cases which applied only *Lexmark's* test).

Although this irregularity makes it difficult to determine what may be the actual "standing," test, the court since *Strauss v. Angie's List* continues to reference the fact that a

4

plaintiff is typically a direct competitor, even if it ultimately applies *Lexmark*, suggesting that being a competitor is still an important factor. *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th 1250, 1265 (10th Cir. 2022); *Am. Soc'y of Home Inspectors, Inc. v. Int'l Ass'n of Certified Home Inspectors*, 36 F.4th 1238, 1241 (10th Cir. 2022) (both cases applied competitor element). The Supreme Court even recognized shortly after *Lexmark* that competitors are the proper actors to bring a Lanham Act claim, since they are the actors that can suffer a commercial injury. *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014).

In this case, defendants are not Northern's direct competitors. Although they use outdoor gear to succeed in their sport, the influencers' direct competitors are other athletes or other influencers competing for contracts. None of the influencers produce gear of their own. Though *Lexmark* has been applied variably, both the 10th Circuit and the Supreme Court recognize that Lanham Act claims are *overall* better suited to direct competitors; therefore, the competitor factor remains an important component, even if it is not the keystone. If the court chooses to focus on the 10th Circuit's direct-competitor factor, it may immediately dismiss this claim.

**II.    Influencers' statements are false, and likely confused consumers as to the nature of Northern's products**

If the court finds that the direct-competitor test does *not* preclude our case, it will then assess whether the influencers' statements were false, and whether they misled or confused consumers. The court will find that the influencers' statements were unequivocally false, and that they confused consumers regarding the nature of Northern's products. False statements can either be literally false, or literally true but misleading. *Bimbo Bakeries USA, Inc.*, 39 F.4th at 1266. Actionable statements must be clear, affirmative, and identifiable, rather than amorphous. *Id.* at 1269. Grand statements of opinion that sellers use to sell products are "puffery," and do not qualify, as no reasonable person would rely upon them. *Alpine Bank v. Hubbell*, 555 F.3d 1097,

1106-07 (10th Cir. 2009). Superlative statements are usually puffery. *Intermountain Stroke Ctr.,*

*Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 787 (10th Cir. 2016) (the phrases

"best possible" care, and "excellent care of the highest quality" were deemed puffery).

        Statements must also be likely to mislead or confuse consumers concerning the nature of

a product. The confusion may be about the nature of a company's goods, services, or commercial

activities. 15 U.S.C. § 1125(a)(1)(B). Since companies often market products based on both

utility and the values the products promote, values are included under the definition of

"commercial activities." *Proctor & Gamble Co.*, 222 F.3d at 1272. In *Proctor & Gamble, Co.*,

defendant used a voicemail distribution system to allege that Proctor & Gamble's CEO donated a

significant portion of the company's profits to the church of Satan. *Id.* The court found that

attacking the morality of Proctor & Gamble's values misrepresented their "commercial

activities" and therefore met the "likely to mislead and confuse" element. *Id.* at 1270.

        The statements made by the influencers were literally false. Diguill's statement that

Northern's shirt was "not made from organic materials," and Daprah's statement that her

Northern gear was made with "harmful chemicals and dyes," was literally false. Unlike in

*Intermountain Stroke Ctr.*, where the statements were superlative and grandiose, the influencers'

statements were specific and clear. Miller, in an egregious example of literal falsity, admitted

that he fully staged the photo that faulted Northern products for his fall. It could be true that

Northern's gear is not quite as sustainable or as high of quality that Northern purports it to be.

However, this does not change the level of literal falsity in Miller's post, and would only shift

Diguill and Daprah's statements into the second category: literally true, but misleading.

        The posts were also likely to mislead or confuse customers as to the nature of the values,

and therefore commercial activities, of Northern. At the heart of the influencers' statements was

the idea that Northern was an environmentally harmful company. In *Proctor & Gamble, Co.*, the statements connecting Proctor & Gamble to Satan made customers question the potential immoral values of the company. Similarly, in our case, the statements alleging that Northern made their gear from harmful chemicals and inorganic materials stand at odds with Northern's values of conservation and sustainability. The court will therefore find that the statements likely confused or misled consumers as to whether Northern is a sustainable company.

III. **Influencers' representations were not clearly the proximate cause of Northern's commercial injury; this, combined with lack of legal precedent against influencers, indicate that a Lanham Act claim is not the best approach**

It is debatable whether the influencers were the proximate cause of Northern's commercial injury. To meet this *Lexmark*-established test, a plaintiff must show that defendant's false statements caused consumers to withhold trade from the plaintiff. *Lexmark Int'l, Inc.*, 572 U.S. at 133. Due to this murkiness and the lack of legal precedent against influencers in general, Northern should turn to other administrative options regarding the influencers.

a. **The proximate causal connection between influencers' statements and Northern's commercial injury is weak at best**

It is unclear whether the influencers' statements were the proximate cause of Northern's commercial injury. A commercial injury is one that harms sales or reputation. *Id.* at 140. In the 10th Circuit, statements must also be disseminated to the "relevant purchasing public," or consumers who are interested either in plaintiff's industry or in purchasing a plaintiff's product. *Wilson v. AdvisorLaw LLC*, 780 F. App'x 649, 653 (10th Cir. 2019). The percentage of potential customers that a defendant must reach is ambiguous. *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, 275 F.3d 996, 1003 (10th Cir. 2002) (court deemed that two out of 150 potential customers were too few but did not suggest what would constitute an ideal number).

7

An increase in defendant's sales is not sufficient to prove a proximately caused commercial injury; rather, plaintiff must allege harm to its *own* sales or reputation. *Am. Soc'y of Home Inspectors, Inc. v. Int'l Ass'n of Certified Home Inspectors*, 36 F.4th 1238, 1242 (10th Cir. 2022). In *Am. Soc'y of Home Inspectors Inc.*, plaintiff alleged that defendant's misleading tagline harmed its own membership levels, since defendant's membership doubled after adding the tagline. *Id.* at 1243. The court ruled, however, that because the plaintiff did not allege an injury to *its* sales or reputation, plaintiff's claim failed the proximate cause test. *Id.* In addition to specific allegations, consumer reaction surveys can also help establish commercial injury by revealing consumer beliefs. *Cottrell, Ltd.*, 191 F.3d at 1252.

The social media influencer's role in advertising is relatively recent, which could make proximate cause difficult to determine. *Ariix, LLC. v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021). Influencers, unlike traditional advertisers, maintain an elevated level of trust with their followers and are thus key actors in social media's ability to influence commerce; studies have shown that 74% of consumers rely on social media content when making purchasing decisions. *False Influencing*, 109 Geo. L.J. 81, 97–98 (2020). "Nano-influencers," or those who have a niche, specialized following within an industry, hold an even higher level of audience trust and therefore substantial advertising power. *Id*. at 90-91.

In this case, Northern's commercial injury is an alleged drop in rank, reputation, and sales. Focusing the injury on their company rather than on Bridger's gain means Northern does not risk dismissal for the reason that the plaintiff in *Am. Soc'y of Home Inspectors, Inc.* did when it focused on a boost in defendant's sales without citing a harm to itself. However, it is still not clear whether the influencers' statements were the proximate cause of Northern's injury. Northern has not put forth any evidence, such as consumer surveys, that the influencers'

8

statements were the proximate cause. In total, the influencers made only six posts. Followers could easily have scrolled past the posts or missed Northern's logo on the influencer's clothing. The court may even rule, as in *Sports Unlimited, Inc.*, that the number of posts was too few to qualify as reaching the relevant purchasing public.

A court could, however, find that the influencers, who are "nano-influencers," with a small but loyal following within a particular athletic industry, had a powerful effect on consumers who then withheld trade from Northern. Social media enables consumers to distribute information beyond the influencers' four million collective followers through sharing tools. However, it is vital to remember that the influencers are two levels removed from the primary and secondary origin points of the false advertising campaign: Bridger and IZEAKI. The fact that these posts may have circulated beyond the influencers' following only further dilutes an already diluted degree of causation.

      **b. Lack of Lanham Act precedent against influencers inhibit this claim; administrative avenues provide a better option**

The lack of legal precedent that any court has established against an influencer does not bode well for this claim. Administrative avenues, such as the FTC, provide an alternative to civil suit. The FTC requires influencers to conspicuously disclose paid partnerships with brands on their posts. 16 C.F.R. § 255.5 (2022). The FTC also requires that any type of endorsement must reflect an endorser's honest opinions. 16 C.F.R. § 255.1a (2022).

Some courts outside our jurisdiction have considered whether an influencer's disclosure omission can be construed as an actionable Lanham Act statement; however, these claims were brought against the company that paid the influencer, *not* the influencer themselves. *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 640 (S.D.N.Y. 2018) (influencer's lack of disclosure did not qualify as actionable under Lanham Act, company was named

9

defendant); *EIS, Inc. v. WOW Tech Int'l GmbH*, No. CV 19-1227-LPS, 2020 WL 7027528, at *4 (D. Del. Nov. 30, 2020) (first federal case that recognized influencer's disclosure failure was actionable; but company was still the named defendant).

**[Section on National Advertising Division/Better Business Bureau omitted here for length]**

Since companies, rather than influencers, are always the named defendants in Lanham Act suits, Northern's current claim against IZEAKI and Bridger is the better civil action. However, Northern can still pursue an administrative action against the influencers. Each influencer failed to disclose their financial connection with Bridger or IZEAKI. Their opinions also did not reflect their honest opinions: Diguill felt uncomfortable about her post; Daprah saw Northern as a family company but nonetheless insinuated they were a corporate sellout. No influencer attempted to confirm the truthfulness of the scripted posts before posting them. These are clearly FTC violations. Pursuing an FTC complaint, or an arbitration claim with the NAD is a more tested, effective approach against the influencers' actions.

## CONCLUSION

Although the influencers' posts were false and confused consumers as to the nature of Northern's products, the uncertain degree of causation between their statements and Northern's commercial injury, and the lack of legal precedent against influencers does not forecast a successful Lanham Act claim against them. This is particularly relevant in the 10th Circuit, where the court still strongly suggests that a defendant should be plaintiff's direct competitor, and the influencers are not. Northern can instead file an FTC or NAD complaint against the influencers, and should focus efforts on its current Lanham Act claim against IZEAKI and Bridger. Bridger is Northern's direct competitor who, with IZEAKI, originally spearheaded the false advertising campaign. Together, these actors are the ones truly liable for Northern's commercial injury.

10



## Course History Report for ▮▮▮▮▮▮▮▮▮▮

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022

| Course # | Title | Instructor | Credits Grade |
|----------|-------|------------|---------------|



### Spring 2023 - All Courses In Progress

| Course # | Title | Instructor | Credits Grade |
|----------|-------|------------|---------------|



Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸▸▸▸▸▸▸▸▸ ◂◂◂◂◂◂◂◂◂

## Interview Evaluation Fillable Form

---

## Interviewer Recommendation:

■ **Outstanding Candidate**

☐ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ███████████

**Law School:** ■ **UW**   ☐ **MULS**

**Interviewer:** <u>Sir Williams</u>

### A. General Qualifications

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:  *Lowest ↓*  ☐ **1**   ☐ **2**   ☐ **3**   ■ **4**   *↑ Highest*
Interviewer Comments:

████████ experience working in legal and policy settings has prepared her well for legal employment.

**2. Communication Skills:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:  *Lowest ↓*  ☐ **1**   ☐ **2**   ☐ **3**   ■ **4**   *↑ Highest*
Interviewer Comments:

████████ communicates exceptionally well orally and in writing. Her writing sample brief was well organized.

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:     *Lowest* ↓     ☐ 1          ☐ 2          ☐ 3          ■ 4     ↑ *Highest*

**Interviewer Comments:**

███████ is confident, poised, professional, and mature. She interviewed well, responded to all questions, and seems particularly adaptable and adept at building community.

**C. <u>Motivation for Participation in the Diversity Clerkship Program:</u>**

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:  What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score:     *Lowest* ↓     ☐ 1          ☐ 2          ☐ 3          ■ 4     ↑ *Highest*

**Interviewer Comments:**

Appreciates the cohort model for supporting diverse candidates, the array of available program opportunities

**D. <u>Interviewer's Perspective:</u>**

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:  If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

**Interviewer Comments:**

She would focus on what that organization has to offer and her desire to be part of a tight knit community.

**E. <u>Student Feedback:</u>**

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

**Interviewer Comments:**

Feedback provided directly to the student at the conclusion of the interview.



LinkedIn: https://www.linkedin.com/in/

## Education

**Marquette University Law School**, Milwaukee, WI
*Juris Doctor*, Expected May 2025
GPA: available in January 2023

| | |
|---|---|
| Honors: | Thomas More Law Scholarship Recipient |
| Leadership: | Asian Law Student Association, 1L Representative |

**University of Wisconsin-Madison**, Madison, WI
*Bachelor of Science in Human Development & Family Studies*, May 2020

| | |
|---|---|
| Certificates: | Asian American Studies \| Criminal Justice |
| Honors: | Dean's List: Spring 2020 |
| Activities: | Hmong American Student Association, Grant Analyst |
| | Multicultural Student Grant Council, Grant Administrator |
| | Phoojywg Program |

## Legal Experience

**Immigrant Justice Clinic University of Wisconsin, Madison**, Madison, WI
*Intern*, January 2020 – May 2020
- Researched relevant information for ongoing detention hearings/projects and entered intake information into the National Immigrant Justice Center (NIJC) database
- Provided legal assistance to non-citizens detained by ICE to determine legal needs and eligibility for services, organized monthly intake data, and filed paperwork
- Adapted and translated NIJC's *Know Your Rights* packet from English to Hmong and distributed it to other service providers supporting Hmong community members

## Additional Professional Experience

**Hellermann Tyton**, Milwaukee, WI
*Talent Acquisition Administrator*, February 2022 – August 2022
- Scheduled and conducted interviews, new employee orientation, and assisted with onboarding activities to ensure readiness for each employee's first day
- Sourced and recruited employees through Indeed, LinkedIn, and MilwaukeeJobs
- Performed reference and background checks during the interview stage and processed employee referrals to ensure timely bonus payments
- Managed recruitment processes and open positions to ensure that vital positions were fulfilled efficiently to meet company demands

**Professional Services Group/Racine County Dept. of Children & Families**, Racine, WI
*Safety Support Worker - Child Protective Services*, June 2020 – July 2021
- Collaborated with professionals within Racine County to provide wrap-around care for vulnerable families
- Facilitated relationship between Initial Assessment and Ongoing Service workers to ensure that families were properly identified for services in the County
- Conducted home visits and presented parenting curriculum to parents lacking behavioral, cognitive, or emotional parental capacities to ensure that children could remain safely in parents' care
- Transported clients to medical and dental appointments to ensure health treatment for children

## Additional Information

| | |
|---|---|
| Interests: | Playing guitar, digital art and painting |
| Language: | Conversational in Hmong |

Exhibit 43



LinkedIn │ https://www.linkedin.com/in

In the 90's, my parents had to wake up early every morning to make spring rolls, egg rolls, and other Hmong cuisine to sell at the local Asian markets. My parents had little English proficiency. My mom was working a full-time job to support my 3-siblings and I, and my dad's schooling at Lakeland College. She was also juggling the rigors of high school. Then in the early 2000s, it finally felt like my parents had struck the lottery with discovering a new financial endeavor in Sarcoxie, Missouri, running one of the largest turkey farms in the state. Life was going well until the 2008 financial crisis hit, the turkey farm was foreclosed, and we had to move back to the 53208-zip code of Milwaukee.

The dynamics of my life quickly unfolded. Playing outside freely was no longer an option. The fear of gunshots or our neighbors fighting robbed us of any childhood we had left. For a few Christmases, we received presents from the Salvation Army and my family was on EBT. At school, my parents picked us up in a rusted-old Toyota Sequoia that had several mechanical issues. I knew that I could not continue to live the life I once had, but I refused to accept my reality because I was so used to my parents figuring out things for us.

My siblings and I had to start figuring things out for ourselves, because my parents were at the end of the road, or so it seemed like. Every summer I joined a summer program in Milwaukee to keep me away from all the negative thoughts I had. The summer enrichment programs reminded me that I did not have to feel and be stuck forever. It was not my parent's fault that they arrived in the U.S. with limited English fluency. Through the midst of all of this, my parents were doing everything they could so my siblings and I could have a roof over our heads, enough food, water, clothing, and most importantly love.

Had I not gotten a chance to participate in the summer enrichment programs created for diverse students, graduate college, and attend law school, I would not have been able to embrace how much my racial and ethnic backgrounds contributed to the conversation of diversity in every space I entered.

As I sought for mentors throughout the years, there were few individuals who resembled my cultural and ethnic backgrounds. At the end of all of this, my parents were one of my greatest mentors. However, the road does not stop here. For so long, I asked for a helping hand from programs and mentors who were generous enough to give me a chance. Now I can become that helping hand for future generations of aspiring Hmong or Asian American lawyers. The unique experiences and hardships that I have endured as a Hmong American will continue to shape me in how I approach mentor-seeking students and professionals in the future.

3



LinkedIn: https://www.linkedin.com/in

Attached you will find a copy of my writing sample that I wrote for Legal Writing, Research, and Analysis I. The interoffice memo has been revised based on feedback from my professor. No part of the memo has been omitted or excerpted. The assignment only asked me to analyze the legal question based on six cases that were provided. No outside legal research was allowed.

Under the facts of the simulation, our client was approached, casted, and filmed for a new reality TV show called *All Grown Up*. The show was premised on the contestants competing for the affection of a beautiful woman. Our client had prior bullying experiences from middle-school during a dodgeball game by a group of jocks. During the show, our client was forced to participate in a dodgeball game against new contestants. After filming subsided, our client was airlifted to the hospital, and has since been unable to return to work as a radio host, is currently in therapy for panic attacks, and has been diagnosed with depression.

The legal issue in the interoffice memo focuses on whether our client can bring a viable claim that the defendant's conduct was extreme and outrageous.

**From**: "Summer Associate" <summer-associate@MULSlawfirm.com>
**To**: "Steven Huss"<steven-huss@MULSlawfirm.com>
**Subject**: Kelly Applegate, Client/Matter # A-22-843
**Date**: Monday, October 17, 2022

Mr. Applegate will not be able to establish a viable claim that Schultz's conduct was extreme and outrageous under California law. As a result, Applegate's IIED claim will likely not survive a motion for summary judgement due to failure in satisfying the extreme and outrageous element. To have a claim for intentional infliction of emotional distress (IIED), there are three elements that must be satisfied: (1) the defendant's conduct must be extreme and outrageous; (2) the defendant intended to cause harm or acted with reckless disregard with the likelihood of causing emotional distress; and (3) the victim suffered severe emotional distress because of the defendants conduct. Mahaffa v. McGraw, No. B300108, WL 2677897, at *8 (Cal. Ct. App. July. 30, 2021). Whether a defendant's conduct can "reasonably be found to be outrageous is a question of law to be initially determined by the court." Mahaffa v. McGraw, No. B300108, WL 2677897, at *8 (Cal. Ct. App. July. 30, 2021) (quoting Berkley v. Dowds, No. B190963, at 518, 533 (Cal. Ct. App. 2007)). There is also no "'bright line'" test that separates conduct that is actionable, and conduct that is not because each case depends on every individual's "values, sensitivity threshold, and standards of civility." KOVR-TV, 37. Cal. Rptr. 2d at 433 (quoting Yurick v. Superior Ct. of Butte Cnty, 257 Cal. Rptr. 665, 1116, 1118 (Cal. Ct. App. 1989)).

For the purposes of this memo, we will only focus on the element of extreme and outrageous conduct of Schultz and West Coast Reality LLC. Extreme and outrageous conduct is defined as "'when it is so extreme as to exceed all bounds of [decency] that [are] usually tolerated in a civilized community.'" Duronslet v. County of Los Angeles, 266 F. Supp. 3d 1218, 1219 (Cal. Ct. App. 2017) (quoting Hughes v. Pair, 95 Cal. Rptr. 3d. 636, 209 (Cal. 2009)).

> Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress.

Duronslet v. County of Los Angeles, 266 F. Supp. 3d 1218, 1219 (Cal. Ct. App. 2017) (quoting Molko v. Holy Spirit Ass'n., 252 Cal. Rptr. 122, 762 (Cal. 1988).  Conduct that is outrageous does not include "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" Duronslet v. County of Los Angeles, 266 F. Supp. 3d at 1219 (Cal. Ct. App. 2017) (quoting Hughes v. Pair, 95 Cal. Rptr. 3d. 636, 209 (Cal. 2009)).

 A person's conduct can be considered extreme and outrageous if they knowingly took advantage of someone else's vulnerability. In Mahaffa, Dr. Phil invited Mahaffa onto his show to film an episode regarding her boyfriend's childhood sexual abuse. Mahaffa v. McGraw, No. B300108, WL 2677897, at *1 (Cal. Ct. App. July. 30, 2021). Before Mahaffa appeared on the show, she signed an exculpatory agreement stating that she would not sue Dr. Phil for any misrepresentations, including any injuries suffered. Mahaffa, WL 2677897, at *2. While on air, Dr. Phil, the boyfriend's mother, grandmother, and the audience laughed at Mahaffa as Dr. Phil confronted and made comments about Mahaffa's mental health and supernatural abilities. Id., at *5. The basis of Mahaffa's suit came about because she felt humiliated by the way she was treated while on the show, which according to her exacerbated pre-existing health conditions. Id., at *5, *7. The court held that mere insults do not provide sufficient facts for outrageous behavior. Id. Dr. Phil's conduct of questioning her beliefs on national television was not extreme or outrageous conduct. Id., at *9. The act of questioning her beliefs was just an invitation to have a conversation. Id. The court reasoned that Mahaffa failed to cite sufficient evidence to prove that the Dr. Phil took advantage of her mental vulnerability due to the lack of evidence that she was a "'mentally-ill psychiatric patient' or was under the care of a mental health professional at the time of . . . [the] alleged acts." Id. at *8. All in all, Mahaffa's emotional reaction towards Dr. Phil mocking her supernatural abilities was short of any extreme and outrageous behavior. Id., at *8. At no point was Dr. Phil and his production team made aware that she was a mentally-ill

psychiatric patient, had they known and continued with the show, the outcome would have been different. Id.

Along with that, an employee's use of their official position to pursue a personal gain can be regarded as extreme and outrageous behavior depending on the circumstances. This is exemplified in K0VR-TV v. Super Ct. of Sacramento Cnty, where a woman murdered herself and her young children. KOVR-TV, Inc. v. Superior. Ct. of Sacramento Cnty, 37. Cal. Rptr. 2d **431, *1025 (Cal. Ct. App. 1995). Upon arriving to the neighborhood, a news reporter descended upon the next-door neighbor's home (neighbor and friends of the deceased family) to interview the family about the murders. KOVR-TV, 37. Cal. Rptr. 2d at *1025. Although realizing that there were no adults present in the residence and only three-minors, the news reporter continued to interview the children about the murders. When the minors expressed that they were unaware about any incidents at their friend's home, the news reporter proceeded to inform the children that their friends were now deceased. Id. KOVR-TV never broadcasted the interview, but the family of the minors sued KOVR-TV for an IIED claim after the children became traumatized and suffered severe emotional distress from the interview. Id. at **432, **435. The court held that a reasonable juror could find that the reporter deliberately manipulated the children during the interview to elicit a response from them, so that it would be newsworthy, making his conduct extreme and outrageous. Id. at **435. The court reasoned that the "minors were obviously too young either to consent to an intrusion by strangers into a private residence or to exercise control over a stranger who appeared there. It [did] not appear that [the minors] were given any choice as to whether their images and voice would be captured on the video tape and broadcast publicly on television." Id. at *1027-1028. As a result, the news reporter knew or should have known that his conduct was inappropriate when he proceeded to conduct an interview with the minors absent of an adult, did not give the children any choice to not be recorded, and volunteered information about the murders to minors who already informed

him that they were unaware of what just took place at their friend's home. Id. at *1028. The court stated that it is possible that the reporter did not give any thought into his conduct but having conducted himself in such a way to the children, posed as extreme and outrageous. Id. at 1030. As a result, the reporter's conduct went beyond all bounds of decency because he conducted the interview to advance his career. Id.

   To start off, the way in which Dr. Phil mocked Mahaffa's supernatural abilities is analogous to how the "hunks" mocked and ridiculed Applegate and the other "trunks'" physical abilities on *All Grown Up*. Mr. Applegate stated in the client interview that he was initially approached by a West Coast Reality LLC casting agent and informed that he "had the look they were aiming for." Although vague, Mr. Applegate described himself in the client interview as middle aged, skinny as a pencil, and prematurely balding" man. Likewise, in Mahaffa, she alleged that she had "struggled with mental health issues since she was a child . . . [had] supernatural powers, including an ability to communicate with the dead, read minds, see with X-ray vision, and intuitively write ancient languages . . . [She] [also] [claimed] 'she died seven times' and was brought back to life to be a 'messenger for God.'" Mahaffa, WL 2677897, at *1-2. Mahaffa admitted several times to the production team that she had a history of mental health issues. As a "licensed psychologist and [someone who] practiced clinical psychology," Dr. Phil would have to assume that Mahaffa did have some form of mental health issue because a reasonable prudent adult would not believe they have seven lives and have X-ray vision. Mahaffa, WL 2677897, at 1. Through science, her supernatural abilities are inherently impossible. Even though this was the case, Mahaffa continued to sign a waiver stating that she had "'no pre-existing mental or medical condition that would increase the risk of injury to [herself] or others as a result of [her] participation.'" Mahaffa, WL 2677897, at *3. Only after realizing how much embarrassment, she had faced on the show, she retracted and claimed that Dr. Phil took advantage of her because she was a mentally ill psychiatric patient. Id. at *2.

Similarly, during his interview, Mr. Applegate informed the casting team that he was bullied repeatedly in grade-school by a "bunch of cruel jocks." However, he never made it clear to the casting team that these incidents caused him to suffer any mental illnesses. Mr. Applegate stated that he had never sought counseling for the bullying he endured in grade school. As a result, there was no indication that West Coast Reality LLC knew or should have known that Mr. Applegate had a mental health vulnerability relating to his grade school dodgeball experience. In fact, to ensure that Mr. Applegate was mentally fit to be a contestant on the show, he had to undergo a psychological test, which he passed before the production team began filming. Both plaintiffs were mocked and embarrassed on national television. However, as the Mahaffa court ruled, "'[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are not subject to an IIED claim because the court does not intervene when "'"some one's [] feelings are hurt."'" Mahaffa, WL 2677897, at *8 (quoting Agarwal v. Johnson, 25 Cal. 3d 932, 946 (Cal. 1979)). The fact that the humiliation of both participants was in public is not overly important because the comments made to them are still mere indignities. Dr. Phil mocking Mahaffa was not enough to prevent a motion for summary judgment in her case. As a result, it should not be considered significant in Applegate's case.

Along with that, although Mr. Applegate found it odd that the casting team had focused most of his casting interview on his grade school experience, he still decided to travel to San Francisco a week later to begin taping. A reasonable prudent adult would likely have not traveled to begin filming for a reality TV show that made them feel uncomfortable during the casting interview. By not presenting any evidence and communicating to the producers that he had vulnerabilities, Mr. Applegate left the door open for Schultz and his production team to spin the story line however they wanted, without precaution. Along with this, the Dr. Phil show, and reality TV shows altogether have been tolerated, accepted, and approved by many viewers. Mahaffa, WL 2677897, at *8. Society expects reality TV shows to portray even the most

intimate and uncomfortable parts of a contestant's life. When production sets portray such events do not exceed all bound of decency, as it is generally accepted by viewers.

In conclusion, Mahaffa and Applegate's cases are analogous to one another due to the way in which they were mocked on national television.

The considerable distinction between KOVR and Applegate is the mental capacity and maturity of the participants involved. In KOVR, the news reporter dealt directly with children of "tender years." KOVR-TV, 37. Cal. Rptr. 2d at *1028. This made it more outrageous because the news reporter picked on the emotions of young children who did not have the mental capacity and maturity to deal with shocking and devastating news of the death of a friend, let alone the topic of death. Adults on the other hand are more capable of handling such emotions. In Mr. Applegate's situation, it can be argued that the production team preyed on his childhood trauma and specifically targeted Applegate. The team was aware from the casting interview that Mr. Applegate was still haunted by his past trauma. As a result, they knew or should have known that even as an adult, he would still be vulnerable and susceptible to emotional trauma from it. However, this argument is weak because Mr. Applegate admitted in his client interview that during each of his interactions with the "hunks" none of them ever specifically looked at him or made comments at him. Rather, the hunks geared their comments towards the entire group of "trunks." Mr. Applegate also admitted during the client interview that the other "trunks" had terrible stories from their grade school years but that no one had stories as horrific as his. This statement alone is subjective, as grade school could have been just a horrific for the other "trunks," although they may have experienced something entirely different. Unless other "trunk" contestants come forward and speak about their experiences while filming *All Grown Up*, Mr. Applegate's argument is weak.

In addition, the court in KOVR noted that the taping of the minors "reveal[ed] an uninvited, intrusive encounter by adult strangers with children of tender years not in a public

place but in their home." KOVR-TV, 37. Cal. Rptr. 2d at *1028 (quoting Miller v. National Broad. Co., supra, 187 3d Cal. Rptr. 668, 1487 (Cal. Ct. App. (1986))). The court in KOVR-TV, stated that it could be inferred that the news reporter was "bent upon making news, and not gathering it." KOVR-TV, 37. Cal. Rptr. 2d at **435. It is not common, expected, or accepted for news reporters to manipulate the emotions of citizens to their distress to create newsworthy clips. Reporters are just expected to report the news at face-value. Mr. Applegate on the other hand, was a willing adult who was approached in a parking lot about a reality TV show, decided to cast for the show, underwent a background check and psychological test, and traveled to San Francisco to begin filming. The level of acceptance in society for reality TV shows makes Mr. Applegate's situation distinguishable from the minors in KOVR. Society has made room for reality TV to humiliate and shock its contestants as a form of entertainment. People who watch reality TV shows expect plot twists and changing story lines amongst the contestants.

In Mr. Applegate's client interview, he also mentioned that he had already broken into a cold sweat as soon as he saw the hunks arriving to the beach party. The good-looking nature of the hunks immediately brought Mr. Applegate back to his grade-school insecurities. The immediate presence of the hunks triggered Mr. Applegate's trauma, before they even got into a dodgeball game. The dodgeball game just brought back bad memories for Mr. Applegate, but it was not what triggered his emotions; it was an exacerbation of his existing emotions. A potential counter argument is that that West Coast Reality LLC misled Mr. Applegate as to the premise of the show. As a result, Mr. Applegate could argue that he did not consent to the actionable conduct of the production team. However, this counter is weak. During Mr. Applegate's client interview, he admitted to a West Coast Reality LLC staff during the dodgeball scene, that he had seen all the reality TV shows like Joe Millionaire. In Joe Millionaire the female contestants did not find out until the end of the show, that their millionaire was a penniless tractor driver. Mr. Applegate seemingly knew how reality TV shows worked with all the staged plot twists.

Mr. Applegate may argue that Schultz and his production team became aware of Applegate's vulnerability the moment he mentioned the dodgeball game from grade school, making their conduct extreme and outrageous. During Mr. Applegate's client interview, he also stated that the jocks threw dodgeballs so hard and said terrible things to him and the other "trunks". Although an adult would generally regard this behavior between school-aged children to be extreme and outrageous, a dodgeball game between adult contestants on a reality TV show was not. From Mr. Applegate's own interview, the facts do not suggest that he was specifically targeted by the new contestants nor the production team. All the "trunk" contestants were aware of their involvement in the reality TV show, and each of them were treated similarly. None of the "trunk" contestants were individually ousted and physically and emotionally targeted. Applegate's negative perception of the dodgeball episode was a product of his willingness to undergo a casting interview, a psychological test, and further travel to San Francisco to begin filming. Mr. Applegate stayed on the show a month after Mr. Schultz changed the entire scenario once already. He was one of the last eight contestants on the show, until the "hunks" showed up. A reasonable juror can conclude that Applegate only felt humiliated because he did not perform his best in the episodes involving the "hunks" (i.e., falling flat on his back, getting dodgeballs thrown at him). Regardless, being insulted is not a viable claim for IIED, and certainly consenting to being filmed for the show is sufficient evidence that Schultz's conduct was not extreme and outrageous.

Despite all the possible ways to avoid the emotional distress from being on the show, Mr. Applegate did not do anything to eliminate himself off the show early on. Instead, Mr. Applegate stated that he felt comfortable after becoming aware that other men like him existed on the show. He was aware of his preexisting and untreated mental health trauma from his grade school bullying. His participation in the show reignited this preexisting condition. As a result, the two cases are distinguishable because of Applegate's adult status and willingness to participate,

whereas the minors were neither adults nor willing participants in KOVR. <u>KOVR-TV</u>, 37. Cal. Rptr. 2d at *1028.

In conclusion, the court will rule that a jury cannot legally find the conduct of Schultz and West Coast Reality LLC as extreme and outrageous. As a result, the court will likely grant Schultz's motion for summary judgement.

## OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD

**Name:** ███████
**Student ID:** ███████

Institution Info:     Marquette University
Print Date:     01/13/2023

Other Institutions Attended:
University of Wisconsin-Madison

**Beginning of Law Record**

**2022 Fall**

Program:     Law
Primary Major:     Law

| Course | Description | Attempted | Earned | Grade | Points |
|--------|-------------|-----------|--------|-------|--------|
| ███████ | ███████ | | | | |

| | | Attempted | Earned | GPA Units | Points |
|--|--|-----------|--------|-----------|--------|
| Term GPA: ███ | Term Totals | | | | |
| Cum GPA: ███ | Cum Totals | | | | |

**2023 Sprg**

Program:     Law
Primary Major:     Law

| Course | Description | Attempted | Earned | Grade | Points |
|--------|-------------|-----------|--------|-------|--------|
| ███████ | ███████ | | | | |

| | | Attempted | Earned | GPA Units | Points |
|--|--|-----------|--------|-----------|--------|
| Term GPA: ███ | Term Totals | | | | |
| Cum GPA: ███ | Cum Totals | | | | |

**Law Career Totals**
Cum GPA: ███     Cum Totals

End of OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD



**STATE BAR** OF **WISCONSIN**
*Your Practice. Our Purpose.®*

## 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂ ◂

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

- ☒ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ▮▮▮▮▮▮

**Law School:** ☐ UW     ☒ MULS

**Interviewer:** April Toy

### A. General Qualifications

*1. Relevant Skills and Qualities:*

Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

Check a Score:     *Lowest* ↓  ☐ 1     ☐ 2     ☐ 3     ☒ 4     ↑ *Highest*

Interviewer Comments:

*Prior professional experience will prepare her for 1st year internship*

**2. Communication Skills:**

Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

Check a Score:     *Lowest* ↓  ☐ 1     ☐ 2     ☐ 3     ☒ 4     ↑ *Highest*

Interviewer Comments:

*Strong verbal and written communication skills*

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*

Interviewer Comments:

*very enthusiastic, driven a little nervous and lacking in eye contact but personality made me forgive. this*

C.  <u>Motivation for Participation in the Diversity Clerkship Program:</u>

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* **What is your motivation for participating in the Diversity Clerkship Program?**

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*

Interviewer Comments:

When she was in high school, she participated in the Summer Youth Program.  She saw the parallels and was inspired to apply for DCP.

D.  <u>Interviewer's Perspective:</u>

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* **If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?**

Interviewer Comments:

Any form of experience she will get through the program will be beneficial even if it is not her top choice.

E. <u>Student Feedback:</u>

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

Be a little tighter on your answers, try to keep them direct and shorter.  Zoom is hard, but I noticed at the beginning you kept looking around the room.  Try to stay focused ahead.  Great Job.



@marquette.edu

## EDUCATION

**Marquette University Law School**                                                                    Milwaukee, WI
   *Candidate for Juris Doctor*                                                                                    *May 2025*
       GPA:              Unavailable until January 2023
       Honors:          Thomas More Scholarship
       Activities:      First Generation Professionals
                    Association for Women Lawyers
                    Alternative Dispute Resolution Society

**University of Wisconsin, Oshkosh**                                                                    Oshkosh, WI
   *Bachelor of Science - Political Science and Art, cum laude*                                *December 2021*
       GPA:              3.549/4.00
       Honors:          Honor Roll 6/7 semesters and Dean's List 1/7 semesters
       Activities:      Women's Golf Team-Captain
                    Student Athlete Advisory Committee
                    Inter-Tribal Student Organization

## LEGAL EXPERIENCE

**Marquette Volunteer Legal Clinic**                                                                    Milwaukee, WI
   *Legal Volunteer*                                                                                    *January 2023-Present*
- Research and draft court forms, client letters, and requests for discovery
- Educate clients regarding legal service providers

**Tusler Law, S.C.**                                                                                    Appleton, WI
   *Intern/Paralegal*                                                                                    *May 2020-August 2022*
- Developed legal documents, including demands and interrogatories, to support litigation process and court proceedings
- Coordinated trial exhibits by organizing materials, writing documentation, and preparing digital materials and displays

## ADDITIONAL EXPERIENCE

**Political Campaign-Ron Tusler State Assembly**                                                    Appleton, WI
   *Intern*                                                                                    *May 2020-December 2020*
- Initiated redesign of office management systems resulting in easier access to information
- Interacted with diverse constituents on a consistent basis
- Presented research findings from 2020 election to a team
- Designed future strategy for next election

**University of Wisconsin, Oshkosh**                                                                    Oshkosh, WI
   *Art Gallery Attendant*                                                                    *September 2019-January 2020*
- Organized and collaborated with marketing team and artists to promote exhibitions

   *Peer Mentor*                                                                                    *September 2019December 2019*
- Established and maintained good rapport with several faculty members
- Developed and facilitated presentations

**Ahlstrom-Munksjo Papermill**                                                                    Kaukauna, WI
   *Paint Crew Leader*                                                                                    *June 2018-May 2020*

## ADDITIONAL INFORMATION

**Certification:**     Wisconsin Notary Public
**Interests:**        Avid traveler and ceramicist

<span style="color:red">**Exhibit 44**</span>



@marquette.edu

## PERSONAL STATEMENT

When my peers see my first name, they assume that I am Scottish. When they see my last name, they assume that I am German. But I am neither, and I am both. I am also a woman and a first-generation college student. And I am much more than that.

I can also see confusion in the eyes of my peers when I tell them that I am a proud member of the Oneida Nation Tribe of Wisconsin.

Unlike many who, inadvertently or intentionally, compartmentalize and label people to make themselves feel empowered, I thrive by drawing my strength from all my roots. My personal diversity informs the ways I interact with friends and strangers and affords me a unique perspective. I relied on these qualities when working part-time at Tusler Law, S.C., at an art gallery, and on a political campaign, with each of these environments presenting a different venue and opportunities to interact with a variety of people.

But I have to make a little confession. I was not always proud of my diverse heritage, probably because I heard some negative comments here and there. I also have to admit that law was not my initial career choice. I contemplated becoming a teacher or a politician. I too was a little guilty of compartmentalizing people. All of this changed on September 13, 2021, when my mom was diagnosed with cancer. That day, my sheltered life was no more. As I delved into researching available healthcare and insurance coverage and access to affordable medication for my mom, I realized that my structured life with a predictable and well-planned future was in a shambles. I learned of shattered lives from uncountable narratives of caring relatives, less privileged than I am, who must overcome financial burdens, limited medical coverage, language barriers, immigration status, and other unsurmountable obstacles to care for their loved ones. I saw their struggle through my own eyes.

I returned to Tusler Law with a new understanding and perspective. I was no longer just a

part-time paralegal. Assisting the attorney, gathering records, drafting legal documents, and supporting trial work was no longer a job—it was a passion. The traumatic experiences that the low-income and minority clients brought to the office were not only theirs; they were mine too. Although I am no longer with Tusler Law because I am a law student now at Marquette University, I have seized the opportunity to continue my passion for helping the underprivileged by starting pro bono work.

While I admit that I am a little bit of an idealist, I am also a realist. I know that a single person cannot change the world, as a Native American wisdom reminds me: "One finger cannot lift a pebble." But the Diversity Clerkship Program would offer me an ideal opportunity to continue helping those who cannot help themselves and, along with my peers, to lift not only a pebble but perhaps even to move mountains.



@marquette.edu

**<u>Writing Sample</u>**

   Attached please find a copy of a Memorandum I wrote in my Legal Writing and Research 1 course. In accordance with the instructions from my professor, the document excludes a statement of facts. This is the full and final copy of the document.

Page 1 of 7

███████

I.     **The State can prove that Ryan Bales committed the crime of terroristic threats.**

A person commits a crime of terroristic threats in Pennsylvania if a person "communicates, either directly or indirectly, a threat to commit any crime of violence with intent to terrorize another." 18 Pa. Cons. Stat. § 2706(a)(1) (2022). Thus, to obtain a conviction for terroristic threats, the State must prove (1) a person communicated indirectly or directly (2) a threat to commit any crime of violence (3) with the intent to terrorize another. *Id*. Furthermore, the jury will consider, "the totality of the circumstances surrounding the utterance of the threat." *Commonwealth v. Hudgens*, 582 A.2d 1352, 1358 (Pa. Super. Ct. 1990). The statute is meant to punish those who make threats in circumstances that go beyond petty offenses like disorderly conduct or breach of the peace. *Commonwealth v. Anneski*, 525 A.2d 525, 586 (Pa. Super. Ct. 1987).

The email Ryan Bales sent to Chloe Turner on the evening of September 24, 2022, unequivocally satisfies the first element. Section 2706(e) defines the term communicates to "convey in person or by written or electronic means, including telephone, electronic mail, Internet, facsimile, telex and similar transmissions." § 2706(e). It is undisputed that Ryan Bales sent an email to Chole Turner. Therefore, the State can prove that Ryan communicated directly or indirectly by electronic means.

Consequently, the only elements that remain at issue are whether Ryan Bales made a threat to commit any crime of violence and whether he did so with the intent to terrorize another. As acknowledged below, the State can likely prove that Ryan Bales made a threat to commit a crime of violence. Even though the email does not explicitly articulate a crime, there are multiple signals that would allow a person to infer the threat to commit a crime of violence was present. Moreover, the State can likely prove that Ryan Bales intended to terrorize another therein: the implied messages written between the lines of the email coupled with the history between the two parties indicate an intent to terrorize another. Therefore, the State can likely prove that Ryan Bales committed a terroristic threat under Section 2706(a)(1).

A.     **Ryan Bales made a threat to commit any crime of violence.**

In addition to establishing that there was communication, the State will likely have success in demonstrating that Ryan Bales made a threat to commit any crime of violence. Whether there was a threat to commit any crime of violence is a question for the jury. *Hudgens,* 582 A.2d at 1356. It is unnecessary for a person to specifically articulate the crime of violence which he or she intends to commit. *Id*. The type of crime may be inferred from the nature of the statement and the context and circumstances surrounding the utterance of the statement. *In re B.R.*, 732 A.2d 633, 635 (Pa. Super. Ct. 1999). Likewise, neither the ability to carry out the threat, nor a disbelief by the person threatened that it will be carried out, is an essential element of the crime. *Hudgens*, 582 A.2d at 1358. To prove that there was a threat to commit any crime of violence the threat needs to be for future or present harm towards another. *Commonwealth v.*

Page 2 of 7

*Walls*, 144 A.3d 926, 938 (Pa. Super. Ct. 2016). The words and actions a defendant use need to indicate that they want to commit a threat of violence. *Hudgens*, 582 A.2d at 1357.

The nature of a defendant's statement coupled with the surrounding circumstances can allow the jury to infer there was a threat to commit any crime of violence. *Hudgens*, 582 A.2d at 1355. In *Hudgens*, the defendant was at a Video Game Arcade with his friends. *Id*. at 1354. After learning that one of his friends was harassed by a different group of teenage boys in the parking lot, the defendant confronted the group of teenage boys. *Id*. at 1355. They denied teasing the defendant's friend. *Id*. The defendant revealed a sword from his trousers and held it in close proximity to one of the teenage boys while saying he was going to get them. *Id*. The court affirmed the jury's conviction of terroristic threats despite the fact that the defendant never informed the victim of the nature of the crime which he intended to commit. *Id*. at 1358. The court held that the defendant does not have to state the direct threat, it can be inferred based on the actions and other words used. *Id*. at 1357. Moreover, the swords dullness and inability to penetrate the skin did not impact the outcome of the decision. *Id*.

In the present case, a jury will likely infer Ryan Bales threatened to commit a crime of violence based on the words and image used in the email. The incident has similar circumstances to *Hudgens* that confirm there was a threat to commit a crime of violence. Like *Hudgens*, the nature of Ryan's statement does not explicitly state the crime he threatened to commit. However, the jury will be able to infer what the threat was based on the image of a silhouette human figure next to a lit explosive, coupled with the word "kaboom" in the poem. In *Hudgens* the jury relied on the defendant's use of a sword and the statement he made, telling the victim that he "was going to get him" to infer whether the threat was to commit a crime of violence. Both cases establish that the defendant threatened to commit an act of violence against a victim based on the surrounding circumstances of the threat. Arguably, Ryan's poem and the image lay out a stronger foundation for the jury to infer what type of violence he threatened to commit against Chloe. Simply looking at the words that *Hudgens* states, the jury would not have been able to infer there was a threat to commit a crime of violence. Whereas the poem Ryan wrote may be enough for a jury to conclude that Ryan threatened to commit a crime of violence. The image that Ryan attached eliminates any ambiguity that is still present after reading the poem. Although it is not necessary for the crime to actually have a possibility of being committed, a jury may be more inclined to satisfy a threat to commit a crime of violence because Ryan's intelligence supports the notion that he may be able to produce an explosive.

The State would have a strong case to establish that Ryan threatened to commit a crime of violence under Section 2706(a)(1). A jury is likely to find that Ryan threatened to use some sort of explosive toward Chloe based on the word "kaboom" and the silhouetted image attached to the email.

**B. Ryan Bales intended to terrorize another.**

Page 3 of 7

███████

   Finally, the State will likely prove that Ryan Bales intended to terrorize Chloe Turner when he sent the threatening email to her. Section 2706(a)(1) requires a defendant to have the intent to terrorize another. *Commonwealth v. Fenton*, 750 A.2d 863, 865 (Pa. Super. Ct. 2000). The purpose of the statute is to impose criminal liability on persons who make threats that seriously impair personal security or public convenience. *Commonwealth v. Sullivan*, 409 A.2d 888, 889 (Pa. Super. Ct. 1979). A defendant has the intent to terrorize another when psychological distress follows from an invasion of another's sense of personal security. *Fenton*, 750 A.2d at 885. In other words, terrorizing means to cause extreme fear by the use of violence or threats. *Sullivan*, 409 A.2d at 889. Section 2706(a)(1) is not intended to penalize "mere spur-of-the-moment" threats that result from anger. *Walls*, 144 A.3d at 936. However, being angry does not render a person incapable of forming the intent to terrorize. *Commonwealth v. Walker*, 836 A.2d 999, 1001 (Pa. Super. Ct. 2003). A person's demonstration of festering anger can show the intent was premediated and deliberate. *Fenton*, 750 A.2d at 865. Intent to terrorize another is a question for the jury. *Walker*, 836 A.2d at 1002. Frequently, the jury will analyze the nature of the threat itself as evidence of the intent on the part of the speaker to terrorize the recipient. *In re B.R.*, 732 A.2d at 637. The jury can infer from the actor's actions and words regarding the threat. *Walker*, 836 A.2d at 1002. Intent *mens rea* requires the jury to consider the totality of the circumstances. *Walls*, 144 A.3d at 936. A "climate of apprehension" at the time the statement was made is a factor that can be considered. *In re B.R.*, 732 A.2d at 637.

   A defendant's festering anger and the time allocated for manifestation of the threat toward a person is sufficient to establish a defendant intended to terrorize another. *Fenton*, 750 A.2d at 864. In *Fenton*, the defendant called an insurance agent that was handling his truck repair. *Id*. After complaining about the months the repair was taking to resolve, the defendant made numerous threats to kill various groups of people, including: newspaper employees, government employees, and insurance company employees. *Id*. The defendant ensured the agent that he would kill him. *Id*. The court found that there was sufficient evidence to satisfy intent to terrorize another because the defendant spent a long time reflecting upon his frustrations and formulated a plan to terrorize the agent. *Id*. at 865. Therefore, the threats could not be characterized as less than premeditated and deliberate. *Id*.

   Conversely, when a defendant makes a threat out of transitory anger the threat is insufficient to show that there was intent to terrorize another. *Sullivan*, 409 A.2d at 889. In *Sullivan*, the defendant was charged with two counts of terroristic threats. *Id*. at 888. On the first occasion, the defendant called State Police to inform them that his father had been assaulted by a sheriff. *Id*. Before a trooper arrived at the defendant's house to investigate, the defendant called the officer again threatening to "blow that son of a bitch's head off." *Id*. The next day, the defendant unexpectedly ran into the sheriff on a public street, and they started shouting at each other. *Id*. Throughout the interaction, the defendant threatened to kill the sheriff. *Id*. at 889. The court found that there was not sufficient evidence to establish intent to terrorize another because the threat was made from transitory anger with no purpose to carry out the threat or to terrorize

Page 4 of 7

the sheriff. *Id*; *see also Commonwealth v. Walls*, 144 A.3d 926, 930 (Pa. Super. Ct. 2016) (holding that a former prisoner did not make a threat to commit a crime of violence when he spontaneously ran into and threatened an assistant district attorney, whom he mistakenly believed had prosecuted him). The court concluded that the defendant did not intend to put the sheriff in a state of "extreme fear or fear that agitates body and mind." *Id*. at 890. Instead, the defendant's comments were categorized as mere-spur-of-the-moment. *Id*. at 889.

After examining the motivation behind the threat, a court can consider whether the threat related to a climate of apprehension to further strengthen the claim for intent to terrorize another. *In re B.R.*, 732 A.2d at 637. In *In re B.R.*, the defendant was a student waiting in the school hallway with two friends for a delinquency hearing. *Id*. at 635. Mr. Hudak was a teacher assigned to monitor the boys. *Id*. As the students and teacher were waiting in the hallway, the defendant conspired with his two classmates to destroy school property and shoot school staff members. *Id*. The defendant never explicitly stated the teacher's name. *Id*. However, the teacher was able to draw conclusions that the threat was directed at him as well. *Id*. A jury found that the evidence was sufficient to show the defendant had the intent to terrorize another. *Id*. at 639. The court affirmed the jury's conviction of terroristic threats, reasoning that threats like this are the exact type of impairment to a person's security that the terroristic threats statute was enacted to avoid. *Id*. Intent was established by acknowledging that the defendant made statements regarding gun related violence in the presence of a teacher during a climate of apprehension nationwide. *Id*. Furthermore, the defendant deliberately devised the plan in front of the teacher to create phycological distress. *Id*. at 638.

Here, a jury will likely find that Ryan Bales' festering anger between the time he sent the email and the breakup suggest a manifestation of intent to terrorize Chloe. One could infer from Ryan Bales's conduct, as the court did in *Fenton* from the defendant's conduct, that the threat was premeditated and deliberate. Ryan claims that the email was just to "blow off some steam". Yet, he spent approximately two hours composing and sending the email while showing signs that he was frustrated and upset on his drive to Harveys Lake. In *Fenton*, the defendant was outwardly upset and indicated a manifestation of anger due to an unproductive automobile insurance claim that was taking months to resolve. Even though *Fenton*'s anger happened over several months, and here there is only two hours, the jury will likely find Ryan's festering anger over the two hours is enough to show a manifestation of intent to terrorize. The anger Ryan experienced is similar to the anger the defendant in *Fenton* built up. In both cases the anger intensified and led to both defendants deliberately communicating a threat with intent to terrorize a specific victim. Therefore, the State can likely prove that Ryan's conduct and built-up anger support finding intent to terrorize another.

Ryan Bales alluded to the defense's possible argument that he did not really mean what he wrote, and that he sent the email out of transitory anger. Unlike the defendant in *Sullivan*, Ryan's email was not a mere spur-of-the-moment writing. In *Sullivan*, the defendant was

impatient and reacted to upsetting news regarding his father being assaulted. Whereas, here, Ryan did not state the threat in the heat of the moment when Chloe broke up with him in the parking lot. Nor did he immediately send the email out within the same day. Rather, Ryan spent two hours thoughtfully drafting a poem. This shows that Ryan's reaction was deliberate and planned out. It is very unlikely that a jury will reach the same conclusion that the jury in *Sullivan* did. Unlike *Sullivan,* where the defendant had a mutual exchange of shouting with the officer when the threat was made, Ryan's threat was made unprompted. This further supports that Ryan manifested the intent to terrorize Chloe on his own.

Moreover, the threat made by Ryan Bales further strengthens the intent to terrorize another because it directly related to a climate of apprehension surrounding violence in schools. Although Ryan never stated exactly what he planned to do to Chloe, the words "kaboom" coupled with the photograph depicting a bomb implied that Ryan threatened to use explosives to harm Chloe. The inference of intent can be drawn the same way here, as in *In re B.R.* where the defendant never actually stated the teachers name, yet the threat still evoked fear in the teacher. Arguably, Ryan explicitly stated Chloe's name in the email and directed the email to her, shows a stronger claim for intent to terrorize another. Moreover, Ryan's threat violates the same public policy the threat in *In re B.R.*. Just like the court alluded to a "climate of apprehension" surrounding gun violence in schools in *In re B.R.*, the explosive symbol could be viewed in the same manner. Throughout history, explosives have always violated public policy, especially when used against children. Undoubtedly, Ryan purposefully made a threat that ignited phycological terror to Chloe.

The State would have a strong case to establish Ryan's intent to terrorize another under Section 2706(a)(1). A jury is likely to find that intent to terrorize another was present when Ryan sent the email to Chloe based on his festering anger, impairing Chloe's safety, and the fact that the threat deliberately violated public policy.

Page 6 of 7

████████

### Conclusion

The State has a viable claim for convicting Ryan Bales of terroristic threats under Section 2706(a)(1). The facts from this case indicate that the State would be able to satisfy all of the following elements: (1) a person communicated indirectly or directly (2) a threat to commit any crime of violence (3) with intent to terrorize another. 18 Pa. Cons. Stat § 2706(a)(1) (2022). I would be remiss if I failed to acknowledge that even though the State could likely convict Ryan Bales of terroristic threats, it may not be the most effective solution. The legislature created the statute with intent to punish those who make threats in circumstances that go beyond petty offenses. *Anneski*, 525 A.2d at 586. Ryan Bales is a young adult that is still trying to navigate the world. He gave no reason for the State to believe that he is an imminent threat to the public's safety. This is not what justice is serving to protect the public from. Perhaps imposing a lesser charge would be a more practical solution for deterring his behavior and offer him an opportunity to learn from his mistake.

Page 7 of 7

**OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD**

**Name:**
**Student ID:**

Institution Info:     Marquette University
Print Date:           01/23/2023

Other Institutions Attended:
University of Wisconsin Oshkosh

**Beginning of Law Record**

**2022 Fall**



Program:        Law
Primary Major:  Law

| Course | Description | Attempted | Earned | Grade | Points |
|--------|-------------|-----------|--------|-------|--------|

| | | Attempted | Earned | GPA Units | Points |
|--|--|--|--|--|--|
| Term GPA: | | Term Totals | | | |
| Cum GPA: | | Cum Totals | | | |

**2023 Sprg**

Program:        Law
Primary Major:  Law

| Course | Description | Attempted | Earned | Grade | Points |
|--------|-------------|-----------|--------|-------|--------|

| | | Attempted | Earned | GPA Units | Points |
|--|--|--|--|--|--|
| Term GPA: | | Term Totals | | | |
| Cum GPA: | | Cum Totals | | | |

**Law Career Totals**
Cum GPA:        Cum Totals

End of OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD

11



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose®*

# 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂

### Interview Evaluation Fillable Form

### Interviewer Recommendation:

☒ **Outstanding Candidate**
☐ **Very Good Candidate**
☐ **Average Candidate**
☐ **Below Average Candidate**

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

Or you can print it and scan it with your handwritten notes.

Return to Jacque E▮▮▮s ▮▮▮s@wisbar.org no later than January 23.

**Student Name:** ▮▮▮▮▮▮▮▮▮▮▮▮

**Law School:** ☐ UW   ☒ MULS

**Interviewer:** Devona Wright-Cottrell

## A. General Qualifications

*1. Relevant Skills and Qualities:*

Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ☒ 4   ↑ *Highest*

**Interviewer Comments:**

Great legal experience as a volunteer and intern/paralegal. Understands the demands of legal profession and ready for the challenge.

*2. Communication Skills:*

Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ☒ 4   ↑ *Highest*

Intervi▮▮▮▮▮▮ ▮▮▮▮▮ was an absolute pleasure ▮ew. communicates very well. ▮▮▮▮▮▮▮▮ writing was interesting, engaging + well organized

## B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ☒ 4 ↑ *Highest*

In ██████████ : is kind, professional & very open-minded. She is conversational and confident.

## C. Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* **What is your motivation for participating in the Diversity Clerkship Program?**

Check a Score: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ☒ 4 ↑ *Highest*

Interviewer Comments: The DCP Program connects w/ ██████████ background as part of Oneida Tribe and her gender which is important to her. She explained that the DCP aligned well with her values

## D. Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee. and how she desires to contribute

*ASK:* **If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?** to the profession.

Interviewer Comments:

Open-Minded & eager to work.

## E. Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

I was extremely impressed with ██████████ !!

**Education**

**Marquette University Law School • Milwaukee, WI**
Candidate for Juris Doctor, May 2025
GPA available later January 2023

| | |
|---|---|
| Leadership: | Labor and Employment Law Society, 1L Representative |
| Membership: | First Generation Professionals, Member |
| | Out and Allies, Member |

**University of Wisconsin-Madison • Madison, WI**
Bachelor of Arts in History and Political Science, May 2016

| | |
|---|---|
| Certificate: | LGBT Studies |
| Leadership: | College Democrats of Wisconsin, LGBTQ Caucus Chair |
| | Student Labor Action Coalition, Organizer |

**Experience**

**State Representative Daniel Riemer • Madison, WI**
Chief of Staff, January 2021 – Present
- Communicate with Legislative Council and Legislative Reference Bureau regarding proposed legislation, including on matters of workforce, tax, and military personnel
- Manage staffing, schedules, and the office budget
- Draft speeches, press releases, and social media posts
- Attend and document discussions during Assembly committees, a joint legislative committee, and a study committee, including as a ranking member

**State Senator Mark Miller • Madison, WI**
Communications Director, August 2020 – January 2021
Legislative Aide/Scheduler, November 2018 – August 2020
Constituent Services Director, August 2017 – July 2018
- Prepared Sen. Miller for interviews and floor sessions.
- Drafted all outgoing communications.
- Managed all legislation and casework relating to workforce and taxation.

**Lori Hawkins for Wisconsin • Bristol, WI**
Campaign Manager, July 2018 – November 2018
- Managed a voter contact goal of 24,000 households in the 21st Senate District.
- Helped raise and administer an $80,000 budget throughout the campaign.

**Additional Information**

Interests: listening to podcasts, martial arts, playing piano

<span style="color:red">Exhibit 45</span>



January 6, 2023

Thank you for the opportunity to apply for the State Bar's Diversity Clerkship Program. In applying for this prestigious program, I took time to reflect on the experiences that originally led me to apply for law school. Two experiences come to mind: being queer and working class.

I was born into a working-class family in southeastern Wisconsin. My mom mostly raised me on her own while working third shift at a factory in my hometown. I would eventually work alongside my mom at this factory during college to help pay for living expenses. However, upon entering college, I discovered that my class identity differentiated me from other students. The realities that my family endured: student loans, medical debt, and opioid abuse; were completely foreign to almost all my classmates.

My collegiate experience regarding my sexuality was very different. During my senior year of high school, I came out as bisexual to my closest circle of friends. In college, I was elected the LGBTQ Caucus Chair for the College Democrats of Wisconsin, and I graduated with a certificate in LGBT Studies. In my personal and social life, I live life proud of all my identities.

When I graduated in 2016, I became the first person with my last name to graduate from college. I am incredibly grateful for these opportunities and all I have accomplished. However, these experiences: graduating from college and coming out as bisexual, created an unspoken rift between my family and I. My extended family almost exclusively blue-collar workers with socially conservative beliefs. My education alienates me from them. I also have actively lied to them about my sexuality to avoid probing questions or ridicule. My mom is the only member of my family that I have disclosed my sexuality to, and it will probably stay that way for the remainder of my life.

These diversities, being queer and being working class, make up who I am, but they also sever my relationships with either. I am too educated or too queer to be close with my extended family. I have also felt too poor or not queer enough to fully participate in the LGBTQ+ community. I can chalk these up to realities. College is too expensive for many poor families. Many people hold onto homophobia because of generations of violence enacted against queer people throughout our nation's history. However, those realities do not excuse the pain it has caused.

My life experiences motivate me to pursue a more just world for those also living at the edges of identities. I hope to one day to directly address the many disparities that affect poor, queer people through the legal profession. I aspire to assist workers with employment disputes, help tenants fight against eviction, or fight for people facing discrimination in any facet of life. My legal education, and this prestigious program, will give me the tools I need to fight for these causes.

**To:** Professor Blemberg
**From:** █████████
**RE:** Mr. Tully's Case
**Date:** October 10, 2022

**Facts**

Mr. Louis Tully decided to take surfing lessons on the beach. He signed up for a seven-day course with Zedmore Suring Academy. When Mr. Tully signed up for the course, an employee of Zedmore had him fill out an "Enrollment Form and Liability Waiver." Among other terms and representations, the waiver included the following term:

> I know that there are inherent risks of injury associated with surfing in the ocean. The ocean contains many obvious and non-obvious hazards including rip currents, reefs, rocks, swells of waves, wildlife, other surfers and swimmers, and ocean craft, any of which may pose risk of injury and even death to surfers. I accept such risks and assume full responsibility for my participation in surfing instruction. I am aware that any open water activity, and surfing in particular, involves inherent risks. Even professional surfers get injured while surfing. My instructors will try to help me as much as possible, knowing that I am a novice surfer, but I acknowledge injuries could happen due to the dangerous nature of surfing. I agree to release and hold harmless Zedmore Surfing Academy and its employees, instructors, agents and representatives from all liability.

Mr. Tully signed the agreement and began taking classes.

On the second day of surfing lessons, Mr. Tully and his instructor were talking on the beach before beginning the lesson and holding their surfboards. Mr. Tully was holding a soft "beginner's board" while his instructor was holding a regular surfboard. During their conversation, another surfer down the beach started yelling, "Shark! Help! Shark!!" Their friend was being attacked by the shark. Upon hearing the cries for help, Mr. Tully's instructor turned quickly toward the surfers, and his surfboard hit Mr. Tully in the head. Mr. Tully was knocked into the sand, and his instructor ran away to assist the other surfers. Mr. Tully believes he briefly lost consciousness.

By the time the instructor returned, Mr. Tully was bleeding from his head. Mr. Tully asked the instructor for assistance, but the instructor told Mr. Tully, "Dude, walk it off. You're fine." Eventually, a lifeguard came to assist Mr. Tully and called for medical help. Mr. Tully received treatment at a local hospital. He was diagnosed with a mild concussion, received ten stitches on his face, and his jaw was broken in two places.

**Discussion**

This memorandum considers whether Mr. Tully could prevail in a negligence claim against Zedmore Surfing Academy. Specifically, this memorandum evaluates two questions, (1) whether the exculpatory clause in the Zedmore release precludes Mr. Tully from bringing action, and (2) whether the assumption of risk doctrine bars Mr. Tully from recovering damages. An exculpatory clause is unenforceable if it is unclear and ambiguous. *Brooks v. Paul*, 219 So.3d 888 (Fla. Dist. Ct. App. 2017). Additionally, a defendant may not be able rely on the assumption of risk doctrine if the defendant's actions increase the risk of an inherently dangerous activity. *O'Connell v. Walt Disney World,* 413 So.2d 449 (Fla. Dist. Ct. App. 1982). It is likely that Mr. Tully could succeed in a negligence suit against Zedmore Surfing Academy because the exculpatory clause in the release is most likely unenforceable, and the defendant's actions likely increased the risk of injury to Mr. Tully.

**I. The exculpatory clause in the Zedmore release is most likely not enforceable because the preceding qualifying statement, the small font, and the specific exclusion of circumstances in which Mr. Tully was injured indicate that the clause is unclear and ambiguous.**

An exculpatory clause releases a party from any liability for injuries resulting from their own negligence. *Id*. at 446. Exculpatory clauses are generally disfavored by courts because they tend to shift the risk of an activity from the offeror, usually a business with greater resources, to

the party less equipped to prevent the risk of injury. *See e.g., Brooks*, 219 So.3d at 887-88. However, a court may find an exculpatory clause enforceable if it is clear and unambiguous. *Id.* at 888. An exculpatory clause may be unclear and ambiguous for multiple reasons. First, a qualifying statement may make the exculpatory clause seem contradictory and thus ambiguous. *Id.* at 891. Second, an exculpatory clause may be considered unclear and ambiguous if the clause uses smaller font or is vague. *Id.* Third, if a release is constrained in one section and overly broad in another, it may be ambiguous. *Fresnedo v. Porky's Gym III, Inc.*, 271 So.3d 1188 (Fla. Dist. Ct. App. 2019). However, a release may still be clear and unambiguous even if it does not specifically mention the term "negligence." *Sanislo v. Give Kids the World, Inc.*, 157 So.3d 271 (Fla. 2015).

A qualifying statement expressing a duty of care may make an exculpatory clause contradictory and, thus, ambiguous. *Brooks*, 219 So.3d at 891. In *Brooks*, the plaintiff suffered permanent injury during a surgery performed by the defendants. Before the surgery, the plaintiff signed a release waiving her right to sue the defendants for any injuries resulting from the surgery. The first two sentences in the waiver acknowledged that the defendants did not have any medical malpractice insurance and that the plaintiff agreed not to sue them for any reason. The next sentence following the exculpatory clause stated that, "…I realize that Dr. Michael D. Paul and his staff will do the very best to take care of me according to community medical standards." *Id.* at 887. The court noted that all terms of a contract must be read as a whole to give meaning to every provision. *Brooks*, 219 So.3d at 889 (quoting *Goyings v. Jack & Ruth Eckerd Foundation*, 403 So.2d 1146 (Fla. Dist. Ct. App. 1981)). The court found that the duty of care clause made the release ambiguous because a person could believe that they were waiving their right to sue even

3

if they were injured by the doctors when the doctors were using reasonable care. *Brooks*, 219 So.3d at 891.

However, a court may still find that an exculpatory clause is clear despite the existence of a qualifying statement when the risk of injury is clear. *Elalouf v. School Board of Broward County*, 311 So.3d 866 (Fla. Dist. Ct. App. 2021). In *Elalouf*, the plaintiff was injured when an opposing player inadvertently shoved him into an unpadded concrete barrier that was located just off the soccer field. *Id*. at 864. The plaintiff then filed a negligence claim against the school district for not padding the barrier and keeping it close to the field. *Id*. The court held that this case was different from *Brooks* because the "qualifying statements…clearly warn that serious injuries can occur even if reasonable precautions are taken." *Id*. at 866. The release specified that the signee waived their right to sue if they are injured during athletic participation, and Elalouf was injured during the soccer game. Therefore, the court held that the release demonstrated "a clear and understandable intention for the school board to be relieved from liability." *Id*.

The holding in *Brooks* strengthens the argument that the exculpatory clause in the Zedmore release is unenforceable because it contains a similarly contradictory qualifying statement. The sentence immediately preceding the exculpatory clause in the waiver states, "My instructors will try to help me as much as possible, knowing that I am a novice surfer…" This language seems to similarly contradict the exculpatory clause because the qualifying statement specifically references the act of surfing while the injury took place before they began surfing. Additionally, the "My instructor will try to help me as much as possible" portion of the clause is completely contradicted by the facts of the instant case. Following his injury, the surfing instructor refused to render aid, call for assistance, or "help" Mr. Tully in any way. Lastly, the contradiction between the duty of care and exculpatory clauses creates the same ambiguity

4

present in *Brooks*. A reasonable person could interpret the clause to mean that they were waiving their right to sue even if they were injured despite the defendant exercising reasonable care. *Brooks*, 219 So.3d at 891.

While the *Elalouf* decision could potentially hurt Mr. Tully's negligence claim, the facts of the instant case are different enough to distinguish it from *Elalouf*. First, the court in *Elalouf* distinguished liability between public school activities and private commercial activities and chose not to extend a previous holding because of this distinction. *Elalouf*, 311 So. 3d at 867. Mr. Tully's injuries happened in the context of commercial activities which suggests that the *Elalouf* holding may not apply. Additionally, the plaintiff in *Elalouf* was injured while participating in an activity explicitly stated in the release, whereas Mr. Tully was injured on the beach before he and his instructor had started surfing that day. The court in *Elalouf* stated that the qualifying statement was clear about the risks associated with playing soccer. There are no such clarifications in the Zedmore release about the circumstances under which Mr. Tully was injured.

A court may also find an exculpatory clause unclear and ambiguous if it is printed in smaller font or not particularly thorough or detailed. *Brooks*, 219 So.3d at 891. In *Brooks*, the court specifically mentioned that the exculpatory clause was in smaller font when discussing how the "release is rife with ambiguity and uncertainty." *Id*. The court also stated that the "provision is not thorough or detailed." *Id*. The court reached this conclusion because the release was not clear about what actions the plaintiff was waiving her right to sue for. *Id*. at 887. However, the court in *Elalouf* held that the release was still enforceable even though the exculpatory clause was written in smaller font. *Elalouf*, 311 So.3d at 867. The court stated that the smaller font did not change the meaning of the release or make it unclear. *Id*.

5

The main difference between *Brooks* and *Elalouf* in this context appears to be the level of detail in the actions covered by each release. The release in *Brooks* was unclear about the actions the plaintiff was waiving her right to sue over, *Brooks*, 219 So.3d at 889, whereas in *Elalouf*, the court seemed willing to overlook the small font and qualifying statement because the waiver stated clearly that the plaintiff released the school district from liability for "any injury or claim resulting from…athletic participation." *Elalouf*, 311 So.3d at 866. Since Elalouf's injuries resulted directly from the soccer game, the court found that this incident was the type of liability the waiver intended to release. This distinction is important to Mr. Tully's case because the Zedmore release does not specify which of Zedmore's actions are released from liability. It is closer to the non-specific release in *Brooks* since it states that the signee "agree[s] to release and hold harmless Zedmore…and its employees…from all liability." The Zedmore release is also distinguished from *Elalouf* because Mr. Tully's injuries did not occur while surfing which is specifically listed in the release, like the activities listed in the *Elalouf* release.

A release that is constrained in one portion and much broader in another may be ambiguous. *Fresnedo* 271 So.3d at 1188. In *Fresnedo*, the plaintiff brought a claim against Porky's Gym when another guest purposefully knocked him unconscious. *Id*. at 1186. There was evidence in the record that the guest had been acting aggressively, and the plaintiff argued that gym owed a duty to protect their customers from dangerous guests. *Id*. When signing up for the gym, the plaintiff signed a waiver that released the gym for any injuries sustained on the premises. *Id*. at 1187. In analyzing the release, the court found that when read collectively with the entire waiver, the exculpatory clause could reasonably be limited to the detailed list of injuries and scenarios listed earlier in the form. *Id*. at 1188. Injuries from aggressive patrons of the gym was not on the list of potential injuries. *Id*. The court then held, that since there were

6

multiple interpretations of the release, a jury could find it ambiguous and, thus, unenforceable. *Id*. at 1189.

The Zedmore release signed by Mr. Tully similarly had a detailed list of possible injuries preceding the exculpatory clause at the end of item four, making the release ambiguous. When reading the entirety of item four of the release collectively, one could reasonably believe that the release is limited to the list of potential hazards; none of which cover the scenario or injuries sustained by Mr. Tully. Like the release in *Fresnedo*, the Zedmore release has a juxtaposition in language, which means the Zedmore release is ambiguous and unenforceable.

Finally, an exculpatory clause can still be clear and unambiguous even if it does not explicitly include the term "negligence." *Sanislo*, 157 So.3d at 271. In *Sanislo*, the plaintiff brought a negligence claim against the defendant for injuries sustained when a wheelchair lift collapsed at the resort operated by the defendant. The plaintiff argued that an exculpatory clause must expressly contains the term "negligence" in order to be enforceable. *Id*. at 260. The Supreme Court of Florida analyzed the portion of the waiver that released Give Kids the World from "any liability whatsoever in connection with the preparation, execution, and fulfillment of said wish...." *Id*. at 270. The release also specifically covered injuries connected to transportation, which is how Sanislo was injured. *Id*. The court determined that "it is unclear what this agreement would cover if not the negligence of Give Kids the World." *Id*. at 271.

The holding in *Sanislo* will not preclude Mr. Tully's negligence claim against Zedmore because Mr. Tully's injuries are not clearly covered in the release which distinguishes the instant case from *Sanislo*. The court in *Sanislo* focused on the language of the release that stated, "any liability whatsoever in connection with the preparation, execution, and fulfillment of said wish…" *Id*. The court found that the circumstances of Sanislo's injuries clearly fell within the

7

meaning of the exculpatory clause. Conversely, Mr. Tully's injuries occurred before the activities explicitly covered by the Zedmore waiver. In item four, the Zedmore waiver referenced "the risk of injury associated with surfing in the ocean" and "the dangerous nature of surfing." Mr. Tully was injured on the beach, before surfing.

The majority of caselaw regarding exculpatory clauses seems to support the argument that the Zedmore release is unenforceable. The qualifying statement, small font, and exclusion of the circumstances where Mr. Tully was injured creates a strong enough argument to negate the challenges posed by the *Sanislo* ruling.

**II. The assumption of risk doctrine most likely does not bar Mr. Tully from bringing a negligence claim because Mr. Tully's injuries were not part of the implied risks of surfing, and Zedmore's employee increased the risk of injury.**

The state of Florida adopted the Second Restatement's approach to assumption of risk. The Second Restatement defines the assumption of risk doctrine as the concept that a person who voluntarily assumes a risk of injury arising from the negligent action of the defendant may not recover damages. Restatement (Second) of Torts § 496A cmt. a (Am. L. Inst. 1965). While this concept is most easily applied to instances where a plaintiff explicitly agreed to assume the risk of an activity, it can also include circumstances where the plaintiff implicitly assumed the risk. Restatement (Second) of Torts § 496D cmt. a. Implied assumption of risk can exist when there are certain risks inherent and unavoidable in an activity, and, therefore, the defendant has no duty to protect a plaintiff from those risks. *O'Connell*, 413 So.2d at 448. However, in order to prove that a plaintiff assumed a risk the defendant must show that (1) the plaintiff understood the existence of the risk and (2) the defendant did not increase or add risk to the activity. *Id*.

In order to invoke the implied assumption of risk defense, a defendant must show that the risk should have been known by the injured party. *Id*. In *O'Connell*, the plaintiff was injured by

8

falling off a horse while horseback riding. *Id*. at 445. The defendant argued that the plaintiff assumed all implied risks associated with horseback riding. *Id*. at 446. However, the court held that the defendant did not establish that the plaintiff fully understood the risks associated with horseback riding. *Id*. at 449.

The Zedmore liability waiver clearly articulated that Mr. Tully voluntarily assumed the risks explicitly listed, but Mr. Tully was not aware of the risks associated with standing on the beach. The release stated that "there are inherent risks of injury associated with surfing in the ocean…" Mr. Tully assumed the implied risks associated with surfing by signing the release. However, nothing in the release alerts customers to the potential risks that led to Mr. Tully's injuries. Since Mr. Tully is a novice surfer, he also lacks the experience to understand the risks associated with standing on the beach with a surfboard or other similar scenarios that aren't explicitly included in the activity he signed up for.

If a defendant's actions increase or add new risks not normally inherent in the activity, they may be found negligent and may not raise the assumption of risk as a defense. *Van Tuyn v. Zurich American Insurance Co.*, 447 So.2d 321 (Fla. Dist. Ct. App. 1984). In *Van Tuyn*, the plaintiff was injured while riding a mechanical bull. She alleged that the operator of the ride intentionally increased the danger of the ride while she was on it. *Id*. at 319-320. The court held that a jury could reasonably infer that the injuries sustained by the plaintiff were not inherent to the activity but instead caused by negligent or intentional actions by the defendant's employee. *Id*. at 321.

There are multiple instances where a jury could reasonably conclude that Zedmore's employee either negligently or intentionally created risk of injury to Mr. Tully. The first instance was the employee's negligent handling of his surfboard. The facts indicate that the surfing

9

instructor was acting negligently by standing close to Mr. Tully with his surfboard and turning quickly causing his board to strike Mr. Tully in the face. Additionally, following the incident, the instructor returned to find Mr. Tully bleeding from his injuries. Mr. Tully asked him to call for medical assistance, but the instructor refused to render aid or assist in any way. It was only when the lifeguard responded that Mr. Tully was able to get medical assistance for his injuries. Both of these actions could be seen as increasing the risk of injury to Mr. Tully, thus negating the implied assumption of risk argument.

There are multiple assumption of risk elements present in the Zedmore liability waiver. First, there is a question of express assumption of risk regarding the reference to "inherent risks of injury associated with surfing in the ocean." Second, there is a question of whether there existed an implied assumption of risk. As explained above, Mr. Tully's injuries were most likely not covered in the express assumption of risk present in item four of the waiver, and the injuries were most likely not "inherent and unavoidable in the activity." *O'Connell*, 413 So. at 448. Even if Mr. Tully's injuries were covered by either of these doctrines, a reasonable jury could conclude that the instructor's actions increased or added risk not normally inherent in the activity. *Van Tuyn*, 447 So.2d at 321. Therefore, Zedmore cannot shield itself from liability using the assumption of risk defense.

10

**OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD**

**Name:**
**Student ID:**

**Institution Info:** Marquette University
**Print Date:** 01/23/2023

**Other Institutions Attended:**
University of Wisconsin-Madison



**Beginning of Law Record**

**2022 Fall**

| Program: | Law | | | | |
| Primary Major: | Law | | | | |
| Course | | Description | Attempted | Earned | Grade | Points |

| | | | Attempted | Earned | GPA Units | Points |
| Term GPA: | | | Term Totals | | | |
| Cum GPA: | | | Cum Totals | | | |

**2023 Sprg**

| Program: | Law | | | | |
| Primary Major: | Law | | | | |
| Course | | Description | Attempted | Earned | Grade | Points |

| | | | Attempted | Earned | GPA Units | Points |
| Term GPA: | | | Term Totals | | | |
| Cum GPA: | | | Cum Totals | | | |

**Law Career Totals**
| Cum GPA: | | | Cum Totals | | | |

End of OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD



**STATE BAR** OF **WISCONSIN**
*Your Practice. Our Purpose.*®

## 2023 Diversity Clerkship Program

▸▸▸▸▸▸▸▸ ◂◂◂◂◂◂◂

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

- ☒ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ███████████

**Law School:** ☐ UW  ☒ MULS

**Interviewer:** April Toy

### A. General Qualifications

*1. Relevant Skills and Qualities:*

Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

Check a Score:  *Lowest* ↓  ☐ 1  ☐ 2  ☐ 3  ☒ 4  ↑ *Highest*

Interviewer Comments:
*Great prior work experience*

**2. Communication Skills:**

Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

Check a Score:  *Lowest* ↓  ☐ 1  ☐ 2  ☐ 3  ☒ 4  ↑ *Highest*

Interviewer Comments:
*Great verbal and written communication*

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:  *Lowest* ↓  ☐ 1  ☐ 2  ☐ 3  ☑ 4  ↑ *Highest*

Interviewer Comments:

*Very professional + poised. Write a thank you.*

It is an incredible program. The program is crucial. Many doors are closed to people from different backgrounds.

**C.** Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* **What is your motivation for participating in the Diversity Clerkship Program?**

Check a Score:  *Lowest* ↓  ☐ 1  ☐ 2  ☐ 3  ☑ 4  ↑ *Highest*

Interviewer Comments:

**D.** Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* **If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?**

Interviewer Comments:

Any legal experience is going to be great legal experience. The experience will be invaluable regardless of where he ends up.

**E.** Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

*Great job on the interview. You were direct and concise with your answers and let your personal shine through*

███████████████ – he/him)

██████████████████████████ • █████@wisc.edu

### Education

| | |
|---|---|
| **University of Wisconsin Law School** | Anticipated May 2024 |
| *Juris Doctor Candidate* | *Madison, WI* |

    Activities:   Student Bar Association, 1L Representative
                      American Constitution Society, Finance Committee
                      Pro Bono Unemployment Appeals Clinic

| | |
|---|---|
| **University of San Francisco** | 2014 |
| *B.S. Organizational Behavior & Leadership* | *San Francisco, CA* |

### Work Experience

| | |
|---|---|
| **Recruiter & Account Manager** | Aug 2019-Jul 2021 |
| Premier Talent Partners | *Palo Alto, CA* |

- Placed talent in executive/personal assistant, marketing, sales, and G&A positions. Wrote job postings, reviewed resumes, and interviewed 15+ candidates weekly. Interfaced with clients daily, managed 20+ accounts, won new business, and grew existing lines of business.
- Co-founded LGBTQ employee resource group; DEIB Task Force; Awarded *"Rookie of the Year"*

| | |
|---|---|
| **Marketing and Digital Consultant, Freelance** | Nov 2007-Aug 2019 |
| Clay Goetz Consulting | *San Francisco Bay Area, CA* |

- Prepared marketing strategy and digital communications plans for 12+ entertainment, startup, and SMB clients. Created investor and sponsorship strategy for leading hip-hop label's concert tour.
- Began in high school by developing websites and providing production services for print, video, and web to local small businesses.

| | |
|---|---|
| **Sales Consultant** | Jul 2017-Feb 2019 |
| The Home Depot Interiors | *San Francisco Bay Area, CA* |

- Designed and sold kitchen remodeling services using consultative sales approach.
- Acted as trainer and knowledge manager for in-home services across two area retail stores.
- Received awards for pipeline growth through improved in-store lead generation and qualification.

| | |
|---|---|
| **Sales & Marketing Manager** | Dec 2015-Sep 2016 |
| Alameda Mortgage Corporation | *Walnut Creek, CA* |

- Designed a 3-month training curriculum for loan officers in preparation of licensing.
- Created sales pipeline using online leads and experimented with digital avenues of growth.

**Other Experience:** Co-Founder, Marketing (*Ember – Kickstarter Campaign*) '13-'14;
Assistant Account Executive (*Edelman Digital*) '12-'13; Intern (*H3O Communications*) '12-'12

### Volunteering

| | |
|---|---|
| **Steering Committee, San Francisco Bay Area** | Nov 2017-Jul 2021 |
| The Human Rights Campaign ("HRC") | *San Francisco, CA* |

### Campaigns and Civic Engagement

**2020 Election Volunteer:** Biden for President; Josh Harder for Congress (CA-10). Ran phone/text banks through CADEM Coordinated Campaign and HRC.

**2018 Election Volunteer:** Grassroots – Swing Left, Sister District; Josh Harder for Congress (CA-10). Phone/text banked. Canvassed CA-10. Planned HRC events supporting campaigns.

**2016 Election Volunteer:** Hillary for America, Catherine Cortez Masto for Senate (NV). Voter registration in Reno, NV. Phone/text banked.

### Interests and Highlights

Love to bake recipes from The Great British Baking Show; writing a science fiction/fantasy novel; language learning enthusiast: intermediate Spanish, basic Arabic (read/write), some Polish.

<span style="color:red">Exhibit 46</span>

████████    **175**



█████████████████ – he/him)
████████████████████████████ ██@wisc.edu

### Personal Statement

I came out as gay when I was 21 years old. My later teenage years were spent on staff at an evangelical megachurch, instilling many positive experiences and values in me, but at the cost of denying a fundamental part of who I was. At the height of the Proposition 8 battle in California, I changed my profile picture to a small red equal sign in support of marriage equality. A student I used to mentor in a small group at the church reached out to let me know how much it meant for him to a see a former church leader supporting LGBTQ+ rights. He had recently come out and faced discriminatory abuse from the church community we both belonged to. Unbeknownst to him, I had been distancing myself from that community because of tensions around the issue of marriage equality. My younger friend's spark of courage lit something in me, and I was able to finally face myself and acknowledge that I, too, was gay.

A few years later, I found an email in my inbox with the familiar equal sign logo, only this time in blue and yellow. I forgot that I signed up to a volunteer email list for LGBTQ+ organizations in my area. The email with the familiar logo soon led me to volunteer at an annual fundraising gala for the Human Rights Campaign, where I found myself surrounded by a vibrant queer community that embodied a spirit of love and acceptance I had never experienced before. It was the first of many galas I would support as a volunteer. I became a member of the San Francisco Steering Committee and met with other activists in the former photo shop where Harvey Milk organized his campaign for equality decades before. We organized volunteer events to support local shelters and queer organizations, engaged our member base to elect pro-equality candidates, lobbied for the passage of the Equality Act, supported area Pride events by marching in parades and staffing booths, and raised funds to continue our work.

The LGBTQ+ community gave me freedom and the opportunity to live proudly as my most authentic self. Beginning with my own experience of liberation and to this day, I am driven by a deep conviction to give back and support my community of chosen family, especially our most marginalized members. I hope to spark courage and spread love in return for how I received it.

Since arriving at the University of Wisconsin Law School, I've continued in this spirit of commitment by volunteering with QLaw, the student affinity group for LGBTQ+ students and allies, and working with clients from all walks of life as a pro bono student advocate in the Unemployment Appeals Clinic. I look forward to increasing the diversity of the legal profession as a proudly out, gay member of the bar and by championing diversity, equity, and inclusion initiatives within the organizations I join.

███████████████ **176**

 – he/him)

@wisc.edu

### **Writing Sample**

     I prepared the attached memorandum as part of my first semester Legal Research and Writing class. The memorandum examined whether evidence of narcotics obtained during a warrantless search could be suppressed at trial under the exclusionary rule, or if the good faith exception to the exclusionary rule permitted the search under Wisconsin law.

177

MEMORANDUM

To:     Prof. Peterson

From:   ███████████

Date:   October 29th, 2021

Re:     Denise Winters – 2021DWMC

STATEMENT OF FACTS

On February 26, 2021, Officer Jimenez of the Waukesha Police Department arrested Denise Winters for possession of narcotics. Officer Jimenez responded to a 911 call reporting disturbing noises coming from a neighbor's home. The caller, Amy Aranda, was Ms. Winters' neighbor and had been friends Ms. Winters for approximately three years before a falling out due to Ms. Winters' relationship with Mr. Brandon Frasier. On the call, Ms. Aranda expressed concern that Ms. Winters was being abused by her ex-boyfriend. Officer Jimenez arrived and spoke to Ms. Aranda. Ms. Aranda explained that Mr. Frasier and Ms. Winters lived together for a time but had broken up about one month earlier. When they lived together, Ms. Aranda often heard loud fights through the walls of the apartment. She stated that Ms. Winters and Mr. Frasier sometimes did drugs together. Although the couple was no longer dating, Ms. Aranda saw Mr. Frasier at Ms. Winters' house earlier that day and thought it was strange. At 9:30pm, she heard a loud bang as though something fell in Ms. Winters' apartment followed by loud groaning or crying sounds for approximately twenty-five to thirty minutes. She wasn't sure if Mr. Frasier was still at Ms. Winters' apartment and decided to call 911.

After speaking with Ms. Aranda, Officer Jimenez knocked on Ms. Winters' apartment door and there was no answer. He knocked again and heard rustling around. He waited several minutes and there was still no answer. He announced "Ms. Winters, this is Officer Jimenez, I am

here to check on your safety" at which point Ms. Winters answered the door. He asked if she was okay, and she said she was fine and did not understand why he was there. Officer Jimenez informed her that neighbors contacted police because they heard strange noises and were concerned that she may be in trouble. She again said she was fine. Officer Jimenez noticed she appeared to be nervously looking around while talking, was avoiding eye contact, had messy hair, was hesitant, and seemed scared. He heard a noise from the back room and asked what it was. Ms. Winters did not immediately answer and did not want Officer Jimenez to come in. Before she could reply, Officer Jimenez stepped inside. He claimed she seemed to be inviting him in with her body language. As he looked around from inside the front hallway, he saw narcotics on the dining table, seized them, asked additional questions, and arrested Ms. Winters for possession of narcotics. The district attorney's office is pursuing charges of possession of a controlled substance under Wis. Stat. § 961.41(3g)(am).

## QUESTION PRESENTED

1. Under Wisconsin law, will the community caretaker exception to the Fourth Amendment warrant requirement apply to the search of Ms. Winters' apartment when Officer Jimenez searched her home without a warrant in response to a caller concerned about her safety?

2. Under Wisconsin law, if the community caretaker exception does not apply, will the good faith exception to the exclusionary rule apply to Officer Jimenez's search under Wisconsin precedent as it was at the time of the search?

## BRIEF ANSWER

1. Probably no. The United States Supreme Court in *Caniglia* explicitly excluded home searches from the community caretaker exception to the Fourth Amendment warrant requirement. *Caniglia v. Strom*, 141 S. Ct. 1596, 1598, 209 L. Ed. 2d 604 (2021).

2. Probably no. The exclusionary rule is the remedy for unconstitutional searches. *State v. Dearborn*, 2010 WI 84, ¶ 2, 327 Wis. 2d 252, 257, 786 N.W.2d 97, 100. Evidence obtained from an unconstitutional search is excluded from consideration at trial. *Id.* The good faith exception to the exclusionary rule allows evidence to be considered if an officer relied on clear and settled law that is later overturned. *Id.* ¶ 4. The search conducted by Officer Jimenez was probably not reasonable under clear and settled law as it was at the time of the search, prior to the Supreme Court's decision in *Caniglia*.

<u>DISCUSSION</u>

A motion to suppress evidence obtained during the warrantless search of Ms. Winters' apartment is likely to succeed. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches can be conducted without contravening the Fourth Amendment when a valid warrant is obtained. *Caniglia*, 141 S. Ct. at 1599. There are exceptions to the warrant requirement, including when law enforcement is acting in a community caretaker capacity. *State v. Pinkard*, 2010 WI 81, ¶ 17, 327 Wis. 2d 346, 356, 785 N.W.2d 592, 597. However, the United States Supreme Court recently held that the community caretaker exception does not apply to searches of homes. *Caniglia*, 141 S. Ct. at 1598. Evidence obtained from an unconstitutional search is excluded from trial by the exclusionary rule. *Dearborn*, 2010 WI ¶ 2. The exclusionary rule does not apply to a search conducted in good faith reliance on clear and settled Wisconsin precedent later deemed unconstitutional by the United States Supreme Court. *Id*. The good faith exception to the exclusionary rule will probably not apply to the search of Ms. Winters' apartment because, under Wisconsin precedent at the time of the search, the search probably failed as a reasonable application of bona fide community caretaker activity under the

circumstances. Because the good faith exception will probably not apply, and community caretaker searches of houses are expressly unconstitutional, *Caniglia*, 141 S. Ct. at 1598, the exclusionary rule will probably apply and a motion to suppress evidence obtained from the warrantless search of Ms. Winters' apartment will probably succeed.

The good faith exception to the exclusionary rule will probably not apply because the community caretaker warrant exception, as it was at the time of the search, probably did not apply. The good faith exception is applied when a search is conducted in objectively reasonable reliance upon clear and settled Wisconsin precedent that is later deemed unconstitutional by the United States Supreme Court. *Dearborn*, 2010 WI 84 ¶ 4. The standard for objectively reasonable reliance is that an officer acted on clear and settled precedent. *Id.; see United States v. Leon*, 468 U.S. 897, 919 n.20, 104 S. Ct. 3405, 3418 (1984). To determine what is clear and settled precedent, the court reviews a history of case law to see how it would have ruled on a challenged search at the time the search was conducted. *Dearborn*, 2010 WI 84 ¶ 19.

Under precedent as it was at the time Officer Jimenez searched Ms. Winters' apartment, the community caretaker exception probably would not have applied because although Officer Jimenez was engaged in bona fide community caretaker activity, he did not do so reasonably considering the circumstances. Wisconsin courts apply three elements to determine if the community caretaker exception applies. *Pinkard*, 2010 WI 81 ¶ 29.

First, the court determines if a search occurred. Warrantless unconsented police entry into a residential unit constitutes a search. *Id.* ¶ 30. If the parties do not dispute that the officers conducted a warrantless search within the meaning of the Fourth Amendment, then this element is met. *State v. Maddix*, 2013 WI App 64, ¶ 19, 348 Wis. 2d 179, 191, 831 N.W.2d 778, 784.

Second, the court determines if the search consisted of bona fide community caretaker activity. *Pinkard*, 2010 WI 81, ¶ 31. The totality of the circumstances at the time of the officers' conduct must demonstrate there was an objectively reasonable basis to believe that a member of the public needed assistance. *State v. Kramer*, 2009 WI 14, ¶¶ 30 & 32, 315 Wis. 2d 414, 432, 759 N.W.2d 598, 608. Particular attention is paid to the officer's concern for which community caretaker activity was conducted. *See Pinkard*, 2010 WI 81, ¶ 26. For example, in *Pinkard*, police exercised bona fide community caretaker activity when entering a residence where the back door was open, and its occupants were unresponsive after receiving a call about two people who appeared to be sleeping next to some cocaine. *Id.* ¶¶ 1 & 4. The court accepted officers' contention that the occupants could have been victims of a crime or suffering from overdose. *Id.* ¶ 35. Response time would have been essential to avoid loss of life, justifying warrantless police entry into the home under the community caretaker exception. *Id.* Conversely, where there is no urgency, it is less likely that a member of the public needed assistance. In *Maddix,* officers conducted a warrantless search within an apartment after responding to a call reporting a domestic disturbance. *Maddix*, 2013 WI App 64, ¶ 2. The officers heard screams upon arrival and encountered Maddix and a woman, who claimed to be the only ones in the apartment. *Id.* ¶¶ 3 & 5. After twenty-five to thirty minutes, without hearing noises or noticing nervous behavior from the two occupants, officers conducted a search which revealed hidden marijuana plants on the theory that someone else may have been hidden in the apartment. *Id.* ¶ 6. There was no bona fide community caretaker activity because there was no objectively reasonable basis to believe a member of the public needed assistance. *Id.* ¶ 27.

Third, even if an officer's actions demonstrate a bona fide community caretaker function, the court will only apply the community caretaker exception if the function was reasonably

exercised. *State v. Ultsch*, 2011 WI App 17, ¶ 23, 331 Wis. 2d 242, 253, 793 N.W.2d 505, 51.

Four factors are considered to determine reasonable exercise: (1) degree of public interest and

exigency, including the safety or distress of an individual for whom the officer is concerned, *see*

*Id.* ¶ 25; (2) Attendant circumstances consisting of whether time, location, and degree of

authority and force displayed were appropriate or coercive under the circumstances, *see Kramer*,

2009 WI 14, ¶ 43; (3) if an automobile is involved, there is a lesser expectation of privacy,

whereas a home has comparatively heightened privacy interest, *Pinkard*, 2010 WI 81, ¶ 56; and

(4) availability, feasibility, and effectiveness of alternatives to the type of intrusion

accomplished, *Id.* ¶ 57. The court imagines feasible alternatives on a case-by-case basis. In

*Maddix*, when officers believed a person might be hiding in an apartment, the court found there

were feasible alternatives available, such as asking the two people present if anyone else was

there before conducting a search to find out. *Maddix*, 2013 WI App 64, ¶ 36.

     In Ms. Winters' case, although Officer Jimenez probably engaged in bona fide

community caretaker activity, the search fails the balancing test for reasonable exercise

considering the circumstances. First, there is no dispute that a search occurred when Officer

Jimenez stepped into the front hall of Ms. Winters' apartment and began looking around.

Therefore, the first element is met.

     Under a totality of the circumstances, Officer Jimenez probably engaged in bona fide

community caretaker activity via his search. While Officer Jimenez did not express any specific

concern, based on his conversation with Ms. Aranda, Officer Jimenez might have inferred Ms.

Winters' ex-boyfriend, Mr. Frasier, was hidden in the apartment and posed a threat to Ms.

Winters' safety. However, Ms. Winters told Officer Jimenez twice upon questioning that she was

fine. He reported that she was nervously looking around, did not make eye contact, seemed

aloof, and was slow to answer his questions. Also, before entering the apartment, he heard a noise from the back room. The court in *Maddix* explicitly mentioned nervous behavior and hearing noises as possible evidence to support the theory of a person hidden in an apartment. *Id.* ¶ 28. Officer Jimenez noticed old bruising on Ms. Winters' arms and had been informed by Ms. Aranda that Ms. Winters had broken up with Mr. Frasier a month prior. Under the totality of the circumstances, Officer Jimenez's search was probably bona fide community caretaker activity.

The search probably fails to demonstrate a reasonable application of bona fide community caretaker activity. Like in *Maddix,* where officers heard screaming and were told by those present that the screams were a result of their argument, Ms. Winters told officer Jimenez twice that she was fine. *Id.* ¶ 2. Ms. Aranda had mentioned occasional drug use by Mr. Frasier and Ms. Winters to Officer Jimenez, but there was nothing in Officer Jimenez's report which suggested current drug use or concern for overdose as in *Pinkard*. *See Pinkard*, 2010 WI 81, ¶ 1 & 4. Officer Jimenez did not control the time or location of the encounter as it was a response to a call, and he did not display weapons, make threats or issue orders.  However, he did display authority when he initially announced his presence by saying he "was there to check on her safety." The search did not involve an automobile and was subject to stricter scrutiny as a search upon a home. Finally, Officer Jimenez could have asked if anyone else was in the apartment, or otherwise stated his concerns. As in *Maddix*, where the court found officers concerned about a hidden party did not pursue available and feasible alternatives, Officer Jimenez–while not required to accept Ms. Winters' response–could have conducted further inquiry before beginning his search. *Maddix*, 2013 WI App 64, ¶ 36.

Wisconsin precedent probably did not allow Officer Jimenez to warrantlessly search Ms. Winters' apartment under the community caretaker exception because although he demonstrated

bona fide community caretaker activity, he did not reasonably exercise it. Because the search was not subject to the community caretaker exception as clear and settled Wisconsin precedent at the time it was conducted, the good faith exception to the exclusionary rule will probably not apply. Accordingly, a motion to suppress evidence obtained from the search will probably succeed.

11



## Course History Report for ███████████

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during his/her current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2021



| Course # | Title | Instructor | Credits | Grade |
|---|---|---|---|---|
| ███ | ████ ██ | ████ | █ | █ |
| ███ | ████ ████████ | ████ ██ | █ | █ |
| ███ | ████ ████████ | ████ | █ | █ |
| ████ | █████ ████ ██████ | █████████ | ████ | |

### Spring 2022 - All Courses In Progress



| Course # | Title | Instructor | Credits | Grade |
|---|---|---|---|---|
| ███ | ████ ██████ | ████ ██ | █ | |
| ███ | ████ ██ | ██ | █ | |
| ████ | █████ ████ ██████ | ████ █████ | ██████ | |
| ████ | █████ ████ ██████ | █████████ | ████ | |

Report Generated on 01/18/2022

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**

*Your Practice. Our Purpose.*®

# 2022 Diversity Clerkship Program

◄ ◄ ◄ ◄ ◄ ◄ ◄ ► ► ► ► ► ►

## Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

☒ **Outstanding Candidate**

☐ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

Or you can print it and scan it with your handwritten notes.

Return to Jacque Evans, jevans@wisbar.org no later than January 24.

**Student Name:** ███████████████

**Law School:** ■ UW      ☐ MULS

**Interviewer:** <u>Steven M. DeVougas</u>

### A. General Qualifications

*1. Relevant Skills and Qualities:*

Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

Check a Score:   *Lowest* ↓ ☐ 1   ☐ 2   ■ 3   ☐ 4   ↑ *Highest*

Interviewer Comments: ███████ HAS EXTENSIVE EXPERIENCE IN recruiting, human resources and marketing. He also worked on the Human Rights Campaign. This background will be invaluable to a legal employer.

*2. Communication Skills:*

Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

Check a Score:   *Lowest* ↓ ☐ 1   ☐ 2   ☐ 3   ☒ 4   ↑ *Highest*

Interviewer Comments: ███████ has exceptional people skills and oral communication skills. He is high energy.

### B. Interview Characteristics:

 · ████@wisc.edu

## Education

**University of Wisconsin Law School** — Madison, WI
*Juris Doctor Candidate* — *May 2025*

     Activities:    Law Run Club
                     QLaw

**Marquette University** — Milwaukee, WI
*Bachelor of Arts in Political Science, Minor in History* — *December 2021*

     GPA:    3.763, *magna cum laude*
     Honors:    Phi Beta Kappa

## Work Experience

**Woofs** — Madison, WI
*Bartender* — *August 2022 - Present*
- Mix drinks and exceed customer expectations through effective service
- Reconcile cash against sales total each shift

**Holy Cross School** — Green Bay, WI
*Long-Term Substitute Teacher* — *December 2021 - June 2022*
- Curated science curriculum for 6th, 7th, and 8th-grade students, including an individualized learning plan for non-traditional learners
- Maintained regular communication with parents regarding the progress and behavior of their children
- Volunteer coached an after-school volleyball program for approximately 20 students

**Riverwalk Boat Tours and Rentals** — Milwaukee, WI
*Dock/Deck Staff* — *May 2021 - August 2021*
- Oversaw dock procedures as dock manager
- Provided safety education to customers through dynamic presentations
- Executed safety measures while aboard private charters

**Office of Congressman Mike Gallagher** — Washington, D.C.
*Legislative Intern* — *January 2020 - March 2020*
- Responded to and logged the concerns of constituents
- Attended briefings on telecommunication related legislation and wrote memoranda addressed to legislative advisors
- Guided tours of the Capitol Building while providing historic background and interesting facts

## Additional Information

Interests:    Long distance running (Celcom Marathon - 2022, Twin Cities Marathon - 2022)
                Loon calling (Loon Calling Contest Grand Champion - 2013)

Exhibit 47

@wisc.edu

My changing relationship with the word gay is representative of the journey I took to embrace my identity as a gay man. For the first twenty-one years of my life, I constantly avoided the word. Whenever it was brought up, I would instantly change the subject for fear that someone may attach the word to me. When I finally did come out as gay, I would often find ways to tell people about my identity without actually using the word gay. For about one year after initially coming out I was very cautious with whom I told and attempted to control the spread of this information. However, this reluctance to embrace my identity would change when I moved to Madison and began my first semester of law school.

Upon arriving in Madison, I decided to embrace the opportunity of moving to a new city. On my second day in the city, I got a job working for a bar that primarily caters to LGBTQ+ individuals. On my second day of work, we held our annual pride block party. This was the first time I had ever been to any pride event in my life. In four short days, I went from avoiding the word gay to working an event for over one thousand members of the LGBTQ+ community. This experience shattered all apprehension I had about embracing being gay. Working for a gay bar allowed me to integrate the word gay both into both my vocabulary and my identity.

Now that I am confidently gay, I seek opportunities to help others in their journey toward self-acceptance. As a bartender at a gay bar, I have been given the opportunity to meet and befriend individuals from a wide array of backgrounds. Individuals come to the bar for a wide variety of reasons, but often people will come in because they feel ostracized by society. Regardless of where they are on their personal journeys, I always take the time to listen to their stories and make them feel comfortable and eventually confident in who they are.

2

In applying for the State Bar's Diversity Clerkship Program, I am confident that my experiences working with the LGBTQ+ community will be an asset to any organization. I am confident in who I am and the skills I have acquired. Further, I am especially impassioned to assist members of my community in any way possible. Providing effective legal assistance while also sharing common identities with members of the LGBTQ+ community will prove to be an invaluable experience in my career development.

3



@wisc.edu

### Question Presented

Under Wisconsin constitutional law, does a police identification procedure violate due process when the police use impermissibly suggestive techniques to make the identification, but the identification is otherwise reliable?

### Brief Answer

No. Under Wisconsin constitutional law, a witness identification procedure violates a defendant's right to due process if the identification procedure is impermissibly suggestive and the resulting identification is unreliable under the totality of circumstances. Here, the court will first determine that the identification of Bobby Marks was manufactured by the police through influential language and isolating identifications, causing it to be impermissibly suggestive. Despite the suggestiveness, the court will likely still find the identification reliable because the totality of circumstances surrounding the identification indicates reliability. Accordingly, the court will likely admit the identification.

### Statement of Facts

Simon Harriot is a white male, 5'6", and 170 lbs. He is a bouncer at Miller's Bar & Grill (Miller's). To ensure all patrons allowed into Miller's are of legal drinking age, he regularly checks their IDs to verify authenticity.

On December 13, 2021, at roughly 12:30 a.m., an unknown assailant attacked Harriot outside Miller's. The assailant ambushed Harriot, and although he was initially stunned by the attack, Harriot regained his composure and fought back. Harriot punched the assailant in the stomach before pushing him to the ground. The assailant then ran away down a dark alley.

Harriot attempted to follow but became dizzy and fell to the ground. The attack lasted approximately two minutes.

Following the attack, Officer Stipe arrived at the scene and began an investigation into the incident. Harriot initially recalled his assailant as a white male whom Harriot estimated to be a similar height and weight as himself. He recalled the assailant wearing black pants, a white shirt, and a hat. Harriot also reasoned that the assailant was probably the same man he questioned about an ID earlier in the night. Stipe then investigated Miller's premises. He observed that the lights above the door did not work, and he found a hat laying on the ground near blood.

Stipe then questioned Harriot's supervisor, Walt Hayes. Hayes recalled that on the night of the attack, at 9:30 p.m., he had to separate Harriot from another man after the two got into an argument over a potential fake ID. Hayes identified this man as Bobby Marks, a semi-frequent customer of Miller's. He described Marks as a white male who stood approximately 6'2" and weighed around 200 lbs. Hayes recalled Marks having a buzzed haircut. He also recalled Marks wearing black pants and a white jacket. He does not recall Marks wearing a hat. Stipe then showed Hayes a photo of Marks and Hayes confirmed Marks to be the man in the photo.

Following his interview with Hayes, Stipe went to the hospital and again questioned Harriot about the evening of the attack. Stipe showed Harriot the same photo of Marks that he had shown Hayes. Harriot said he was 100% sure Marks was the man he argued with about the ID. Stipe then asked if Marks was the man who had attacked him later in the night. Harriot said yes, that he was 75% sure, and that it would make sense that it was the same person.

Detective Enola Holmes was tasked with continuing the investigation. Relying on the report of Stipe, Holmes questioned Marks about the night of the attack. The questioning was four days after the attack and was conducted in a public park. She began by identifying her title and

motive for speaking with Marks. In response to her questions, Marks first identified himself as the man in the photo that had been shown to Hayes and Harriot. He then recounted his altercation with Harriot about the ID. He added that Harriot had pushed him against the wall during the altercation. He ended by stating that he left the bar at 11:30 p.m. When Marks was told about the attack, he reaffirmed that he had left an hour before and that he did not assault anyone.

Holmes then called Harriot and requested he join Holmes and Marks in the park. Upon arrival, Holmes asked Harriot if he recognized Marks. This singular, in-person identification technique is known as a show-up. Harriot asserted that he recognized Marks and that he was 90% sure he was the man who attacked him. Marks vehemently denied the accusation and rebutted that he had been the one who was assaulted. Holmes then arrested Marks.

### Discussion

A court will likely admit the identification of Marks because, although suggestive, it was ultimately reliable and did not, therefore, violate his right to due process. Under Wisconsin law, courts use a two-step analysis to determine if a witness identification procedure violates a defendant's due process rights. *State v. Roberson*, 2019 WI 102, ¶27, 389 Wis. 2d 190, 935 N.W.2d 813. Under that test, the defendant has the initial burden of showing that the identification process was impermissibly suggestive. *Id.* If the defendant succeeds in showing that the procedure is impermissibly suggestive, then the burden shifts to the state to determine whether the identification was nonetheless reliable. *Id.* Here, Marks will meet his burden by showing the procedure was impermissibly suggestive because the police heavily influenced the identification of Marks. However, the state can ultimately prove the identification is nonetheless reliable because the totality of circumstances surrounding the identification makes the identification reliable enough to be admitted. Thus, the court will likely admit the identification.

I. **The identification procedures used to identify Marks were impermissibly suggestive because of the overtly influential identification techniques used by police.**

The identification procedures used to identify Marks were impermissibly suggestive because of the overtly influential identification techniques used by police. The Wisconsin Constitution protects criminal defendants from violations of their right to due process. Wis. Const. Art. I, § 8. To determine if an identification process is a violation of due process, Wisconsin uses a two-part test outlined by the United States Supreme Court. *Roberson,* 2019 WI 102, ¶27. First, the defendant bears the burden of providing evidence that the identification was impermissibly suggestive. *Id.* The court will deem the identification process to be impermissibly suggestive if the identification was, "manufacture[d] . . . by the police". *Perry v. New Hampshire*, 565 U.S. 228, 235 (2012).

Presenting a singular image to a witness is not impermissibly suggestive on its own. *Kain v. State*, 48 Wis. 2d 212, 219, 179 N.W.2d 777 (1970). In *Kain*, the witness was shown a single photo of the defendant when she made her identification. *Id.* at 218. Although showing a singular photo is suggestive, the court did not find that it was suggestive enough on its own to warrant impermissibility. *Id.* at 219. Rather, the court requires additional suggestive procedures to conclude that it was impermissible. *Id.*

Suggestiveness can arise during a photographic identification because of the language of the overseeing officer. *State v. Mosley*, 102 Wis. 2d 636, 652, 307 N.W.2d 200 (1981). In *Mosley*, the photographic identification used to identify the defendant was not impermissibly suggestive. *Id.* The court reasoned that there was no language encouraging identification. *Id.* Had there been encouraging language, the court would have been far more likely to deem the identification impermissibly suggestive. *See Id.* at 652-653.

Similarly, in Roberson, suggestive language is an indication that a single photo identification is impermissibly suggestive. *Roberson,* 2019 WI 102, ¶68. In *Roberson*, the court acquiesced that the single photo used to identify the suspect was impermissibly suggestive. *Id.* ¶67. They highlight that law enforcement did not use suggestive language during their identification process. *Id.* The court contends that influential language used by police to obtain an identification can indicate impermissible suggestiveness. *Id.*

While single photos are not inherently suggestive, physical show-ups are inherently suggestive because showing suspects singularly can increase the chance of misidentification. *See Stovall v. Denno*, 388 U.S. 293, 302 (1986) (Condemning use of show-ups); *see also Walton v. Lane*, 852 F.2d 268, 275 (7th Cir. 1988) (holding show-ups more suggestive than line-ups). In *Stovall*, the suspect was identified using a show-up. *Id.* at 294. Although the court found the identification admissible, they noted that this technique has been widely condemned, asserting that showing suspects in isolation increases the likelihood of misidentification. *Id.* at 302.

Impermissible suggestiveness arises when the police create conditions leading to a specific person being identified. *Perry,* 565 U.S at 232. In *Perry*, the court rejects allegations of an impermissibly suggestive identification because the identification was not arranged by the police. *Id.* However, the court distinguished this from situations that involve suggestive procedures used by the police to obtain a particular identification. *Id.* The court indicated that improper police influence can cause an identification to be impermissibly suggestive. *See Id.*

Marks will likely meet his burden of demonstrating that his identification is impermissibly suggestive because police used incriminating language when presenting Harriot with the photo of Marks and then follow that procedure with an inherently suggestive show-up.

The influential language used during the single photo presentation indicates the suggestiveness of the identification. When obtaining the initial identification, Stipe first had Harriot identify the man in the photo as Marks. Harriot was then asked to confirm if Marks was his assailant. Both *Roberson* and *Mosley* indicated that using such direct and incriminating language would be substantially suggestive. Thus, Marks can argue that this influential language propelled the suggestiveness of the single photo identification to the level needed to meet his burden of production. Furthermore, Marks was subsequently identified using a show-up, which the court has indicated is inherently suggestive. The suggestiveness of this identification is magnified by prior suggestive procedures used by Stipe during the initial identification.

The police manufactured the identification of Marks by using impermissibly suggestive procedures. Both Stipe and Holmes employed suggestive techniques to identify Marks. The direct language used when presenting the singular photograph and the isolating nature of the show-up act as building blocks for the police's finished product, Marks's identification. The influential techniques used to obtain Marks's identification will cause the court to determine the entire process was impermissibly suggestive.

II.     **The identification of Marks is admissible because the totality of circumstances surrounding the identification makes the identification reliable.**

The identification of Marks is admissible because the totality of circumstances surrounding the identification makes the identification reliable. Under the test in *Roberson*, once the defendant has met the burden of production by demonstrating impermissible suggestiveness, the state will have to prove that the totality of circumstances makes the identification reliable. *Roberson,* 2019 WI 102, ¶27.

To determine whether a witness identification is nonetheless reliable, courts consider five factors on a case-by-case basis. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). The factors are, (1)

the opportunity for the witness to see the suspect and the witness's degree of attention during the crime, (2) the accuracy of the witness's prior description of the criminal, (3) the level of certainty displayed by the witness in identification, and (4) the time between the crime and the identification. *Id.* Of these factors, the time between the crime and the identification will undoubtedly favor reliability. Only four days lapsed between the attack and the identification of Marks, and courts have found larger gaps to be reliable. *E.g., Armstrong v. Young,* 34 F.3d 421, 428 (7th Cir. 1994) (Holding nine days between crime and identification sufficient for reliability) Thus, the decision in this case is likely to turn on the court's evaluation of the remaining factors.

A high-stress situation will sharpen a witness's attentiveness, causing a reliable identification even during a brief interaction. *United States v. Traeger,* 289 F.3d 461, 474 (7th Cir. 2002). Andrew Traeger was identified by the bank teller he robbed. *Id.* at 465. The teller's interaction with Traeger was only 2-3 minutes long. *Id.* at 474. Despite the brevity of this interaction, the court held that it was long enough to be considered reliable. *Id.* at 474; *See also United States v. Gonzalez,* 863 F.3d 576, 586 (7th Cir. 2017) (Holding a 2-minute interaction sufficient time for a reliable identification). The court reasoned that the proximity between the teller and Traeger paired with the stressful nature of their interaction heightened the teller's awareness. *Traeger,* 289 F.3d at 474. The teller's heightened awareness further demonstrated that the identification of Traeger was reliable. *Id.*

A partially inaccurate, initial description of a suspect can still be reliable. *Mosley,* 102 Wis. 2d at 655. In *Mosley,* an employee of Kentucky Fried Chicken wrote down descriptions of the individual robbing his store. *Id.* The descriptions accurately recalled the robber's skin color and clothing, while incorrectly recalling his tattoo's wording and his height by roughly six inches. *Id.* at 639, 655. The court determined that the description of the defendant was accurate

despite these inaccuracies. *Id.* at 655. The court concluded that these imprecise recollections did not have enough heft to make the initial description unreliable. *Id.* at 655.

The certainty of a witness's identification will be a factor determined by the jury. *Roberson,* 2019 WI 102, ¶74. Here, the witness exhibited doubts about his ability to accurately identify African Americans. *Id.* ¶20. He subsequently identified an African American as the suspect. *Id.* In analyzing the certainty in his identification, the court reasoned that a jury could determine the credibility of the witness's identification by considering their initial skepticism. *Id.*

In analyzing the totality of circumstances, courts require an overwhelming amount of unreliability to exclude an identification from a jury. *Lee v. Foster,* 750 F.3d 687, 692 (7th Cir. 2014). Here, the court found that the lack of attention of the witness during the crime and that the identification occurred nine months after the crime both raised concerns about reliability. *Id.* Acknowledging the flaws of the identification, the court ultimately found the identification to be constitutionally reliable. *Id.* The court reasoned that the jury could determine if minor issues in reliability make the identification unreliable. *Id.*

In this case, a court will likely find under the totality of circumstances that Harriot's identification of Marks was reliable, despite its suggestiveness. Both *Traeger* and *Gonzalez* demonstrate that two minutes is an adequate window of opportunity to view a suspect and make an accurate identification, especially when the interaction occurs during a stressful situation. Thus, a court will rule that Harriot's opportunity to view the Marks is sufficient for reliability.

Furthermore, Harriot's active engagement in the fight demonstrates a high degree of attention. Although initially stunned, Harriot's recovery and subsequent counterattack demonstrated that he was fully engaged in the stress-inducing activity. While engaging in the fight, Harriot was able to land several well-calculated blows to fend off Marks. Specifically,

punching Marks in the stomach and ultimately pushing him to the ground requires a high degree of attention to the situation. Thus, just like the witness in *Traeger*, the stressful situation in which Harriot views the suspect would lead a court to rule similarly and determine that two minutes was an adequate window to view the assailant.

Additionally, Harriot's initial description of Marks is sufficiently accurate for the court to deem it reliable. The initial description correctly recalls Marks's skin color and the clothing he was wearing. However, there were also discrepancies present in Harriot's initial description. First, Harriot misidentified the height of Marks by eight inches. Although this seems to make the description unreliable, the court held in *Mosley* that a discrepancy of six inches was still reliable. An additional two-inch discrepancy is unlikely to sway the court away from determining the description is reliable. Additionally, there is a discrepancy as to whether Marks was wearing a hat during the attack. The court will likely come to one of two conclusions. It could reason that the hat found by Stipe outside Miller's fell off Marks during the fight. Alternatively, it could find that wearing a hat is a minor cosmetic detail, and similarly to incorrect tattoo recollection in *Mosley,* determine it not relevant to the overall reliability of the description.

Finally, Harriot's initial reluctance to identify Marks with certainty will not outweigh all the other factors in determining reliability. Similar to *Roberson*, Harriot displayed an initial skepticism about confirming the identification of Marks. However, upon his second viewing of Marks, Harriot displayed more certainty that he was the assailant. The court will not conclude that Harriot's initial indication that he is 75% sure Marks is his assailant makes the identification unreliable. Rather, the jury will determine how much Harriot's skepticism factors into reliability.

The jury will be left to consider if any unreliability present in the identification of Marks undermines its credibility. Several of the reliability factors assuredly favor admission. The time

between the attack and the identification is within the period previously held to be reliable. Harriot also had sufficient time to view the assailant and demonstrated attentiveness to the situation. However, Harriot's identification of Marks undoubtedly raises a few questions about its reliability. This includes inaccuracies in Harriot's initial description of Marks and the lack of certainty during the first identification. The court requires a high degree of unreliability to exclude an identification. The potential issues of Harriot's identification are minor. This will lead the court to determine that the identification procedures used did not infringe upon Marks's right to due process and will allow the jury to determine the overall credibility of the identification.

### Conclusion

The court will likely determine that the identification process did not violate Marks's right to due process. The identification of Marks is thus admissible because the identification process was reliable despite being suggestive. Marks's incarceration is the product of a manufactured identification process orchestrated by the police. By influencing Harriot into identifying Marks at every step of the process, the court will determine that identification procedures were impermissibly suggestive. This shifts the burden to the state to prove that the identification was reliable, despite the suggestiveness. In looking at the totality of the circumstances surrounding the identification, the court will conclude the factors determining reliability predominantly support the admission of the evidence. The court will likely determine the identification was reliable, making the identification of Marks admissible.



## Course History Report for ███████████

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022



| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|
| ████ | ████████ | ██████ | █ | █ |
| ████ | ████████████ | ██████ | █ | █ |
| ████ | ███████████ | ██████████ | █ | █ |
| █████ | ████████ ███████ | ████████████ | ████ | █ |

### Spring 2023 - All Courses In Progress



| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|
| ████ | ███████████ | ██████ | █ | |
| ████ | ███ | ██████ | █ | |
| █████ | ██████ █████ | █████████ | █ | |
| ████ | ████████ ███████ | ██████████ | ████ | |

Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂

## Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

- ☒ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ▮▮▮▮▮▮▮

**Law School:** ☒ **UW**   ☐ **MULS**

**Interviewer:** Veronica Mantilla

### A. General Qualifications

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ☒ 4   ↑ *Highest*

Interviewer Comments:

<small>Prior to attending law school, ▮▮▮ was a substitute teacher. He expressed that this experience was particularly helpful because it encouraged him to advocate for the students and ensure that their needs were met.</small>

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ☒ 4   ↑ *Highest*

Interviewer Comments:

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

**Check a Score:** *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

███ was very engaging and smiled often in his interview. He is very passionate about the law and excited about this opportunity and meeting other attorneys in the field.

## C. <u>Motivation for Participation in the Diversity Clerkship Program:</u>

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* *What is your motivation for participating in the Diversity Clerkship Program?*

**Check a Score:** *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

███ explained that this opportunity will help him connect with LGBTQ lawyers in the community. As a person who came out and started to embrace his identity, he believes that the Madison community will be responsive to his background and experiences.

## D. <u>Interviewer's Perspective:</u>

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

**Interviewer Comments:**

███ said he was really interested in this program knowing that he would learn from the experience regardless. He said that he reviewed the list of employers and believes that he will find value wh le working for any of them whether he discovers a new area of law he enjoys or finds an area of law that he

## E. <u>Student Feedback:</u>

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

**Interviewer Comments:**

I really enjoyed speaking with with ███ . He is very engaging and professional. I think his charisma and drive will contribute to his success in this program and beyond.

█████████

[@WISC.EDU |]

─── **EDUCATION** ───

**UNIVERSITY OF WISCONSIN LAW SCHOOL** ⸱ Madison, Wisconsin
Juris Doctor Candidate ⸱ *anticipated May 2025*

| | |
|---|---|
| *Honors:* | Law-In-Action Full-Tuition Scholarship |
| | Stearns-Shaw Scholarship *(LGBTQ+ Advocacy)* |
| *Activities:* | State & Local Government Law Society, 1L Representative |
| | American Constitutional Society, Member |
| | Q-Law, Member |

**BOWDOIN COLLEGE** ⸱ Brunswick, Maine
B.A., Government & Legal Studies and Religion, Minor in Chinese ⸱ *May 2022*

| | |
|---|---|
| *G.P.A.:* | 3.83 |
| *Honors:* | Sarah and James Bowdoin Scholar *(Academic Excellence)* |
| | Richard Morgan Prize for Excellence in the Study of the Constitution |
| | Bowdoin Public Service Fellow |
| *Activities:* | Bowdoin Democrats, President |
| | Curling Team, Competitor, Placed 15th at National Championship, 2022 |
| | *The Bowdoin Orient*, Crossword Puzzle Creator |
| *Study Abroad:* | Danish Institute of Study Abroad, Copenhagen, Denmark, Fall 2021 |

─── **EXPERIENCE** ───

**INNOVENN, INC.** ⸱ Madison, WI
*Legal Intern* ⸱ *December 2022 - Present*
- Proactively participate in counsel meetings regarding issues of FDA regulatory law, informed consent, protection of human subjects, and intellectual property law.

**STATE PARTY ADVANCEMENT NETWORK (S.P.A.N.)** ⸱ Madison, WI
*Organizational Intern* ⸱ *June - August 2021*
- Performed in-depth research into successful campaign tactics to revamp state party training materials.
- Produced new campaign training videos for organizers and volunteers to effectively get out the vote.
- Developed and presented a four-week training program for Florida's regional field directors and organizers.
- Facilitated meetings between high-dollar donors and state parties to help secure investments.

**OFFICE OF REPRESENTATIVE MORGAN RIELLY** ⸱ Maine State House, Augusta, ME
*Graphic Design Intern* ⸱ *January - March 2021*
- Examined legislation proposals and designed easy-to-read infographics to present information effectively to constituents and fellow representatives to gain their support.

**SARA GIDEON FOR MAINE (U.S. SENATE CAMPAIGN)** ⸱ Portland, ME
*Field Organizing Intern* ⸱ *June - November 2020*
- Independently recruited and mobilized over 40 consistent volunteers by phone banking and organizing.
- Exceeded my voter outreach metric goals, such as Voter IDs and Absentee Ballot requests, every week.

**ASSOCIAZIONE CULTURALE LINGUISTICA EDUCATIONAL (A.C.L.E.)** ⸱ San Remo, Italy
*International English Instructor and Camp Counselor* ⸱ *June - August 2019*
- Taught English to children ages 6 to 16 at five different summer camps throughout northern Italy.

─── **SKILLS & INTERESTS** ───

| | |
|---|---|
| **LANGUAGES:** | Intermediate Mandarin Chinese |
| **CERTIFICATIONS:** | Certified to Teach English as a Second Language (Oxford Seminars, 2018) |
| **INTERESTS:** | NHL hockey, solving crossword puzzles, going to the movies during Oscars season, streaming Taylor Swift, and trying new foods while traveling. |

<span style="color:red">Exhibit 48</span>



*"To dream the impossible dream. To fight the unbeatable foe..."*

As I stood singing on stage at music camp, butchering a rendition of "The Impossible Dream" from *Man of La Mancha*, my knees almost gave out. Stage fright was only partly to blame. It was June 26th, 2015, and just before performing, I had learned the Supreme Court's ruling in *Obergefell v. Hodges*. Having spent six years thinking a core part of my identity was illegal, my body barely knew how to react.

"The Impossible Dream" is from Don Quixote's perspective. While Quixote is often ridiculed for believing in the impossible, he is admirable for never losing faith. Similarly, I saw *Obergefell* as a milestone deserving of optimism. Through the legal system, what once had been deemed impossible had now become possible. I knew then that I wanted to continue the fight for change, even if at times it seemed impossible.

Growing up as a gay teen in rural Wisconsin, I often felt like an outsider. Boys were expected to fit the masculine stereotype: play with trucks, hunt deer, and cheer fanatically for the Packers. I preferred to play piano, host art camp for the neighborhood, and watch *Project Runway*. Ultimately, I was lucky to receive a full scholarship to boarding school. Hotchkiss was a safe environment to grow academically and personally after coming out freshman year. Being different was not just tolerated, it was celebrated. I became a respected leader, creating change with both my strong academic drive and empathetic ability to bring people together.

*Obergefell* was a hopeful first step, but I realized after the 2016 election that the fight for equality was not finished. I had benefitted from the efforts of others and wanted to similarly dedicate myself to achieve positive change. I therefore chose to major in both Government and Religion at Bowdoin. Growing up Catholic, I had already engaged in a balancing of conflicting principles between my religion and my identity, so I was drawn to the intersection of the two disciplines.

I also began political organizing for candidates fighting for issues I cared about. I became action-oriented by recruiting volunteers and speaking directly with thousands of voters about the issues they cared about. Although my political campaign experience was fulfilling, I was drawn back to the academic world to effect further change. With the drive to make a difference and the soft skills to be a leader, law school felt like the next logical step.

A perfect world is an "unreachable star," but that is not a reason to give up its pursuit. Don Quixote's fantasies served as his impetus to achieve the impossible. My own experience has illuminated how the legal system can be utilized to achieve positive change with hard work. This clerkship program offers valuable opportunities to gain practical experience, learn from experienced attorneys, and develop skills necessary for a successful career in the legal field – and I am excited and ready to put in the work.

**MEMORANDUM**

Re: Narvaez v. Milwaukee Police Department
Date: October 23, 2022

QUESTIONS PRESENTED

1. Under Wisconsin law, can a 17-year-old high school student argue they were under custody during an interrogation, and thus suppress their written confession due to the police's failure to read his *Miranda* rights, if he was interrogated at school, had access to his phone, and was explicitly told he could leave at any time and end the interrogation?

2. Under Wisconsin law, can a 17-year-old high school student suppress their confession on grounds that it was involuntarily given when the police interrogated the student for over four hours long with breaks, exaggerated the amount of evidence against him, urged him that cooperation would be to his benefit, and never informed him of his *Miranda* rights?

BRIEF ANSWER

1. Probably no. The court will likely not consider Luis to have been in custody. An interrogation is custodial if a reasonable person in the same circumstances would not feel free to end the interview and leave the scene. *State v. Lonkoski*, 2013 WI 30, ¶ 27, 346 Wis. 2d 523, 828 N.W.2d 552. Luis was explicitly told four times that he could leave. He had access to his phone when he confessed. In these circumstances, a reasonable person would likely feel they could leave the interrogation or stop answering questions, if they desired.

2. Probably no. The court will likely conclude that Luis was not particularly vulnerable and that the evidence of police coercion was not to a degree to render the confession involuntary. The court must consider the totality of the circumstances of the interrogation to determine if a confession was voluntary. *State v. Clappes*, 136 Wis. 2d 222, 236, 401 N.W.2d 759, 765-66 (1987). Luis was not a juvenile, his dyslexia and education did not suggest he was

1

particularly vulnerable, and his demeanor and emotional state were not particularly concerning. While he was threatened with false incriminating evidence and incentivized to answer with claims that the court would look more favorably on his case if he confessed, these pressures were not excessively coercive to render the confession involuntary.

STATEMENT OF FACTS

After an 80-year-old woman was killed in a hit-and-run accident, the police suspected Luis Narvaez, who was seen driving a similar car with his friend, Nilo, in the same area when the accident occurred. At the time of accident, Luis was a 17-year-old high school student. He is a good student with a 3.1 GPA and has dyslexia. He was interrogated by police at school was never informed of his *Miranda* rights. The police showed him a graphic image of the victim's body. They also falsely asserted that they had DNA evidence that proved Luis' car hit the woman and showed Luis a fake statement from his friend that stated Luis hit her and drove away. While Luis stated that he felt he didn't "have a choice," he ultimately wrote, signed, and verbally confirmed a confession at the end of the interrogation stating that he hit the woman with his car. Subsequently, Luis was charged with felony hit and run, a class A misdemeanor. He is now seeking to suppress this confession.

DISCUSSION

Luis likely cannot suppress his confession because the court will likely conclude that the interrogation did not take place in custody and that the confession was made voluntarily. An involuntary confession can be suppressed as a violation of due process of law and the right against self-incrimination protected under the 5th and 14th Amendments. *State v. Moore,* 2015 WI 54, ¶ 55, 363 Wis. 2d 376. A defendant has two ways to demonstrate that a confession is involuntary. If the interrogation took place in custody and the police did not inform the suspect

2

of his *Miranda* rights, the court will determine any confession made during the interrogation to be made involuntarily. *Oregon v. Mathiason*, 429 U.S. 494-95 (1977). However, if the interrogation did not take place in custody, the police are not required to read *Miranda* rights. *Thompson v. Keohane*, 516 U.S. 102 (1995). In this case, considering Luis was interrogated at a school and was told repeatedly that he could stop answering questions and end the interrogation whenever he wanted, the court will likely conclude that he was not in custody. Thus, the fact that the police did not read Luis his *Miranda* rights alone cannot render his confession involuntary.

To suppress a confession from a noncustodial interrogation, the court must find that the defendant did not voluntarily confess by his own will. *State v. Clappes*, 136 Wis. 2d 222, 236. To determine voluntariness, the court will consider the totality of the circumstances, weighing the characteristics of the suspect that render the suspect particularly vulnerable against the tactics and pressures applied by the police. *Clappes*, 136 Wis. 2d 222, 236. In this case, the court will likely conclude that Luis was not particularly vulnerable. While he is young, he is still legally considered an adult. Nor will the court likely determine that his dyslexia impacted his ability to participate voluntarily in the interrogation. Additionally, the behavior of the police was likely not coercive enough to raise to the level required to suppress a confession.

**A. Luis' Interrogation Was Likely Noncustodial.**

The police can likely prove that Luis was not in custody when they questioned him since a reasonable person in his situation would likely feel they had the ability to leave the interrogation. If a reasonable person would feel unable to end the questioning and leave, a person is in custody. *State v. Lonkoski*, 2013 WI 30, ¶ 27. Importantly, this test is objective and does not consider the defendant's personal characteristics. *Yarborough v. Alvarado*, 541 U.S. 652, 653 (2004). Instead, the court considers 1) the purpose, place, and length of the interrogation; 2) the

3

defendant's freedom to leave; and 3) the degree of restraint used by police. *Id* at ¶ 28. If the state

cannot prove that the interrogation was noncustodial, they must show they informed the suspect

of their rights or else all statements from the custodial interrogation will be inadmissible.

*Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

When considering the suspect's freedom to leave, the court will look to see if the person

was, or believed they were, essentially "cut off from the outside world." *Miranda v. Arizona*, 384

U.S. 436, 444-45. Critical factors considered in this objective inquiry include where the

questioning took place, whether the suspect arrived on their own volition, and how many people

were present. *State v. Clappes*, 117 Wis. 2d 279, 344 (1984). This includes whether the person

facing questions was told by police they could leave at any time, and whether they physically

had the ability to do so. *In re Dionicia M.*, 2010 WI App 134, ¶ 10, 329 Wis. 2d 531 (holding

questioning in the backseat of a locked police car was custodial). When considering the degree of

restraint applied by the police, the restraint does not have to be physical. *State v. Bartelt*, 2018

WI 16, ¶ 3, 379 Wis. 2d 594. For example, a noncustodial situation in which a suspect agreed to

come to the police department to answer questions became a custodial situation when the police

took his cell phone and instructed him to remain in the interview room. *Id.*

In Luis' case, the court will likely conclude that he was not in custody. Luis was

interrogated in an administrative office at his high school, not a police facility. He was told four

separate times that he could leave the interrogation. He was never handcuffed or frisked. While

the police took his phone for the first portion of the interrogation, they returned his phone to him

*before* he confessed. Under these circumstances, a reasonable person in Luis' position would feel

they had the freedom to leave the interrogation. Therefore, an argument that Luis' statement

4

must be suppressed simply because the police did not read his *Miranda* rights to him will likely not succeed because he was likely not in custody.

**B. Luis' Confession Was Likely Voluntary Under the Totality of the Circumstances.**

      The state has the burden to demonstrate the voluntariness of any confession, made in custody or not, by a preponderance of the evidence. *State v. Moore.* 2015 WI 54, ¶ 55. A statement is voluntary if reflects deliberateness of choice and is a result of the suspect's free will. *State v. Hoppe*, 2003 WI 43, ¶ 36, 261 Wis. 2d 294, 309. The court must consider the totality of circumstances surrounding the confession, which requires balancing the personal details about the defendant against the pressures resulting from police conduct during the interrogation. *Etherly v. Davis*, 619 F.3d 654, 660 (7th Cir. 2010). Improper police conduct *must* be present. *State v. Moore.* 2015 WI 54, ¶ 55. A subject's personal characteristics alone cannot render a confession involuntary. *Id.*

      Youth is one personal characteristic that is considered an important factor in the voluntariness inquiry because young people are seen as more vulnerable to coercive tactics and pressures. *Haley v. State of Ohio,* 332 U.S. 599, 68 S.Ct. 302. Under Wisconsin law, a person being investigated for violating a state or federal criminal law that is younger than 17-years-old is considered a juvenile. Wis. Stat. § 938.02(10m). While not necessarily dispositive, the court has determined that the younger the person, the more uncommonly susceptible a person can be to police pressures. Thus, the younger the suspect is, the more this factor will weigh in favor of involuntariness, especially if the suspect has no prior history with police and is unfamiliar with the criminal system. *In re Jerrell C.J.*, 2005 WI 105, ¶ 24, 28-29.

      A person's level of education and intellectual disabilities are additional factors that can render a suspect vulnerable and therefore weigh against voluntariness. *Id.* at ¶ 27. However, an

5

intellectual or learning disability does not necessarily weigh against voluntariness unless it is likely to impact their ability to participate fully in the interrogation. *See Cairel v. Alderden,* 821 F.3d 823, 836 (7th Cir. 2016).

Because personal characteristics alone cannot render a confession involuntary, the court must also consider if there is evidence of improper police tactics. *State v. Moore.* 2015 WI 54, ¶ 55. Courts typically consider the use of excessive physical or psychological pressures, the use of threats or methods to compel responses, and whether the suspect was informed of their *Miranda* rights as relevant factors. *State v. Ward,* 2009 WI 60, ¶ 20. A very long interrogation or the use of repeated frequent interrogations can be coercive, especially if the suspect is left wondering if the inquisition will ever end. *In re Jerrell C.J.*, 2005 WI 105, ¶ 33. Coercive police conduct need not be egregious; subtle pressures can be considered coercive if they exceed the suspect's ability to resist or if they "shock the conscience." *State v. Bean,* 2011 WI App 129, ¶ 35, 337 Wis. 2d 406, 424. *See also Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016).

As for what the police can say to the suspect, the court has set a high bar to meet to render conduct impermissible. General misrepresentations by police do not necessarily make a confession involuntary, but they are a relevant factor. *State v. Ward,* 2009 WI 60, ¶ 27. Additionally, police interrogators can tell a suspect that cooperation would be to their benefit. *Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017). Officers may also deceive suspects through appeals to a suspect's conscience or by posing as a false friend. *Id.* False promises have similarly not been viewed as *per se* coercion, as long as they are not too specific. *Id. See also Arizona v. Fulminante*, 499 U.S. 279, 285 (1991) (holding that a promise to protect suspect from threatened violence was too specific and rendered the confession involuntary.)

6

While personal characteristics or certain police tactics considered alone may not suggest involuntariness, the court may determine in considering the totality of circumstances that multiple factors paired together can rise to the level of involuntariness. In *In re Jerrell, C.J.*, the state failed to meet its burden of proving that Jerrell's confession was the product of a free and unconstrained will. 2005 WI 105, ¶ 33. After being arrested as a suspect in a robbery, 14-year-old Jerrell was interrogated by police at the station for over five hours and not allowed to call a parent. *Id.* at ¶ 11. He was informed of his *Miranda* rights. *Id.* at ¶ 7. The police used raised voices after he repeatedly denied involvement. *Id.* at ¶ 8. Eventually, Jerrell signed a written confession. *Id.* at ¶ 11. The court considered Jerrell's age and lower-than-average IQ as important factors in the voluntariness inquiry. *Id.* at ¶¶ 25-27. While Jerrell did not seem to suffer any significant emotional or psychological condition, the court determined that if the interrogation continued for much longer, he could have. *Id.* at ¶¶ 35-36. In considering the police's conduct, the court found that the length of the interrogation, that Jerrell had no friendly adult in the room, the police's continued accusations, and their strong raised voices all evidenced police coercion. *Id.* The court ultimately determined that the unequal confrontation between Jerrell and the police, exacerbated by Jerrell's vulnerable characteristics, resulted in an involuntarily confession. *Id.*

However, when no personal factors make a suspect particularly vulnerable, seemingly intense conduct by the police may still not be enough to render the confession involuntary. In *State v. Lemoine,* the suspect, who was 22 years old, had a high school diploma, and knew one of the interviewing officers, was charged with first degree sexual assault of a child. 2013 WI 5, ¶ 37, 345 Wis. 2d 171, 193–94, 827. During the 80-minute interrogation, the police never informed Lemoine of his *Miranda* rights. *Id.* at ¶ 25. They also exaggerated evidence (specifically warning

7

Lemoine that it was not "going to look good" for him when medical results came in) and provided Lemoine with incentives to give information. *Id.* at ¶ 19. These tactics were not considered very coercive because Lemoine could check any overstatements with his own memory of the event and know the interviewer was lying. *Id.* at ¶ 32. Ultimately, the court determined that Lemoine's personal characteristics did not make him particularly vulnerable, and thus, the conduct of the officers was insufficient to overcome Lemoine's ability to resist, rendering the confession voluntary. *Id.* at ¶ 26.

Luis' confession was made voluntarily, and he will likely be unsuccessful at suppressing it. As in *Lemoine*, most of Luis' personal characteristics do not render him particularly vulnerable. While the court may still factor in his young age, Luis is not a juvenile under Wisconsin law. Therefore, his age cannot weigh very strongly in favor of involuntariness unlike the juvenile in *Jerrell*. Additionally, Luis' dyslexia unlikely impacted his ability to participate in the interrogation and verbally answer questions. Luis also does not have a limited level of education or a below average intelligence like in *Jerrell*, as evidenced both by his 3.1 GPA and his guidance counselor's observation that he is "smart and understands the work." Nor was Luis' demeanor or emotional state particularly concerning to suggest involuntariness.

The court is also likely to determine that the actions of the police during Luis' interrogation did not rise to the level of coercion. As in *Lemoine*, Luis was not read his *Miranda* rights, was threatened with false incriminating evidence, and provided with incentives to give information including that the court would look favorably upon him. However, many of these pressures could be overcome from Luis' own knowledge of his actions on the day of the accident. Additionally, while his interrogation was about as long as the one in *Jerrell*, Luis was told multiple times he could end the interrogation at any point. Even though Luis stated that he

8

did not "have a choice" but to confess, the court is likely to determine that he actually did when considering the totality of the circumstances. Because he was not particularly vulnerable and the police tactics used were not excessively coercive, Luis can likely not suppress his written confession made during his noncustodial interrogation.

9