

## Course History Report for █████████

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022



| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|
| ███ | ████ ███ | ███ | █ | ██ |
| ███ | ██████ | ███ | █ | ██ |
| ███ | ██████ | ███ | █ | ██ |
| ██ | █████ ████ | █████ | ██ | |

### Spring 2023 - All Courses In Progress



| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|
| ███ | ███ ████ | ███ | █ | |
| ███ | █████ | ██ | █ | |
| ███ | ████ ████ | ████ | █ | ██ |
| ██ | █████ ████ | █████ | ███ | |

Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR OF WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂

## Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

- ◼ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ▉▉▉▉▉▉▉▉

**Law School:** ◼ **UW** ☐ **MULS**

**Interviewer:** Elizabeth Lanzhammer

## A. General Qualifications

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ◼ 4 *↑ Highest*

**Interviewer Comments:**

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ◼ 4 *↑ Highest*

**Interviewer Comments:**

## B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

**Check a Score**: *Lowest* ↓ ☐ 1    ☐ 2    ☐ 3    ■ 4    ↑ *Highest*

**Interviewer Comments:**


C. **Motivation for Participation in the Diversity Clerkship Program:**

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK*: *What is your motivation for participating in the Diversity Clerkship Program?*

**Check a Score**: *Lowest* ↓ ☐ 1    ☐ 2    ☐ 3    ■ 4    ↑ *Highest*

**Interviewer Comments:**
He wanted to try different areas of the law. His previous experience had been in election law.


D. **Interviewer's Perspective:**

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK*: *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

**Interviewer Comments:**
He explained that even if an employer wasn't his top choice, it could still be a good fit.


E. **Student Feedback:**

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

**Interviewer Comments:**
Great job on the interview. I like that you were open and honest with your interests. Your personality came through.



@marquette.edu | she/her/hers

## EDUCATION

**Marquette University Law School**, Milwaukee, WI
*Candidate for Juris Doctor*, May 2025
GPA: available in later January 2023

| | |
|---|---|
| Activities: | First Generation Professional, Member |
| | Labor and Employment Law, Member |
| | Out and Allies, Member |
| Honors: | St. Thomas More Scholarship, Recipient |

**Marquette University**, Milwaukee, WI
*Bachelor of Arts in Political Science,* May 2023 (Pre-law Scholar 3 + 3)
GPA: 3.79/4.00

| | |
|---|---|
| Honors: | Dean's List: 4/6 Semesters |
| Activities: | MUsic (Club for student musicians), Member |
| | Marquette Radio, Host of weekly radio show |
| | Marquette Democrats, Member |

## EXPERIENCE

**Wisconsin Governor's Office**, Milwaukee, WI
*Intern*, January through May 2022
- Reviewed and coded constituent concerns and correspondence in order to respond
- Responded to constituent questions and concerns
- Prepared presentations regarding Governor Evers legislative changes

**Ott Memorial Writing Center**, Marquette University, Milwaukee WI
*Writing Tutor*, August 2021 through current
- Collaborate with student clients regarding writing, presentations, theses, and resumes
- Educate student clients regarding grammar, punctuation, and organization of written materials

Additional work experience primarily in the service industry as a server and hostess.

## Community Service

Adult Learning Center, *Volunteer Tutor*, January through March 2020
Wisconsin Democrats, *Volunteer*, August through November 2021

## Interests

Radio Hosting, Watercolor, Photography, Bass Guitar, and Guitar

<span style="color:red">Exhibit 49</span>

███████

Diversity Clerkship Program

Personal Statement

Belonging to the LGTBQ+ community is something I take tremendous pride in. My community is one, like many ostracized by a homogenous society, that has flourished and screamed in the face of forced silence. A persistent movement towards the acceptance of love between human beings is something to be admired and celebrated. While recognizing the beauty of belonging to such a vibrant and uplifting community, it is vital to also acknowledge the pain members of my community face on a varied scale.

I am endlessly appreciative of my family for their unwavering acceptance of my identity. Despite knowing they would support me no matter what, the day I told my parents about my sexual identity was one of the scariest. Even in my own home, where I had grown up knowing unconditional love, I dreaded my family's reaction. I felt immense relief when my parents both reacted in an unphased manner I have come to know and love. To my parents, my expression of my sexuality wasn't anything to fuss about, but I knew that wasn't true for the rest of the world; it was something that could make others uncomfortable and hostile towards me.

High school was where I was first exposed to the real-world consequences of belonging to the LGBTQ+ community. A close friend of mine planned to come out to their parents after school after months of preparing. The worst had happened, and my friend wasn't at school the next day. No one could reach them. Every imaginable outcome raced through my mind and made me sick to my stomach. My friend had run away in the middle of the night via train from Chicago to New York City. I was relieved to know they were alive but broke down at the thought of my incredibly vulnerable friend alone in such an unfamiliar place. Who would be kind to them? Who wouldn't be? Their family had chosen to prioritize their insecurities about the LGBTQ+ community rather than support their child. I felt completely helpless; there was no way for me to ease the pain they felt. Prior to this experience, I thought I understood how cruel others could be towards the LGBTQ+ community, but to witness it firsthand was something I was unprepared for.

This experience, along with numerous others, has pushed me to prioritize the expression of my identity. As a queer woman, I have learned that I am allowed to exist in a space that has traditionally not welcomed my presence, and it has taken a significant effort to unlearn acts that suppress my identity. While I advocate for my personal identity, I aim to support other members of my community that face different struggles such as racism and xenophobia, both of which make their experiences significantly more difficult than my own. Vast differences within the LGBTQ+ community are what makes us such a colorful and beautiful community, that of which I am eternally grateful to be a part.



@marquette.edu | she/her/hers

### Writing Sample

The attached writing sample is a memorandum I wrote as my second final writing assignment for Legal Analysis, Writing & Research in the Fall Semester of 2022. Due to the length of my original memorandum, I have removed the Statement of Facts and Point Heading Three.

To: District Attorney
From: ███████
Date: December 1, 2022
Re: Whether to charge Dwight Schrute with disorderly conduct

<div align="center">

**Questions Presented**

</div>

To prove a defendant of disorderly conduct, the prosecution must show that the defendant's behavior was disorderly in an enumerated and/or otherwise disorderly manner and that the conduct was likely to cause a disturbance. In the immediate case, Dwight Schrute was destroying property with a sledgehammer when a responding officer forcefully entered his home to ensure the safety of whoever was inside the residence. Can the prosecution prove beyond a reasonable doubt that Dwight Schrute is guilty of disorderly conduct? If so, is it in the interest of justice to issue the charge?

<div align="center">

**Brief Answer**

</div>

Yes. The prosecution can likely prove, beyond a reasonable doubt, that Dwight Schrute behaved in a manner that constitutes disorderly conduct. Dwight Schrute was loudly destroying property in his home using a sledgehammer. His actions were so loud that he could not hear the responding officer announce their presence and did not realize they were inside his home until they forcefully entered. The conduct by Dwight Schrute caused concern in the responding officer for the safety of anyone inside the home. This conduct is likely to be interpreted as "unreasonably loud", "violent", and/or "otherwise disorderly." Wis. Stat. § 947.01 (2019-2020). Additionally, the court will likely find that Dwight Schrute's behavior satisfied the second element of Wis. Stat. § 947.01. Mr. Schrute's conduct was the kind that tends to provoke a disturbance; the first responders called to address this situation were removed from their other duties to attend to the disturbance created by Mr. Schrute at his private home. Additionally, it is

not in the interest of justice to charge Mr. Schrute with disorderly conduct. Mr. Schrute's conduct satisfied the elements of disorderly conduct, but using discretion, it appears that his behavior would not have resulted in any actual harm to anyone, including himself.

### Discussion

The purpose of this memorandum is to evaluate whether the District Attorney of Fictional, Wisconsin can prove Dwight Schrute is guilty of disorderly conduct. To convict Mr. Schrute, the prosecution must prove the following elements of Wis. Stat. § 947.01 beyond a reasonable doubt: (1) defendant's conduct, in public or private, is violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly, and (2) is under circumstances in which that conduct tends to cause or provoke a disturbance. Wis. Stat. § 947.01 (2019-2020). The prosecution can likely prove that Dwight Schrute's behavior satisfied both elements of disorderly conduct.

**I. The state can likely prove that Mr. Schrute's conduct was sufficient to satisfy the first element of disorderly conduct because his act of destroying his property in private was unreasonably loud, violent, and/or otherwise disorderly.**

The first element of disorderly conduct requires that the defendant's behavior is conducted in a manner that is violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly. § 947.01 (2019-2022). Proving one of the enumerated behaviors is enough to satisfy the first element of the disorderly conduct statute. State v. Siekierzynski, 2016 WL 4626487 (Wis. Ct. App. 2016). If the conduct is not enumerated, the state can still secure a conviction if the conduct falls into the "otherwise disorderly" catchall provision; "otherwise disorderly" conduct is conduct that tends to disrupt good order and provoke a disturbance. State v. Givens, 28 Wis. 2d 109 (1965).

Before turning to that analysis, a supplemental question was asked if Mr. Schrute could be charged with criminal damage to property; a similar situation was analyzed in <u>State v. Sevelin.</u> The defendant Sevelin was charged with criminal damage to property after destroying items he and his wife jointly owned; he argued that he could not be charged because the items were his property. <u>State v. Sevelin</u>, 204 Wis. 2d 127 (Ct. App. 1996). The court held that he could still be convicted of criminal damage to property because of his wife's joint interest in the items. <u>Id.</u> at 523. Therefore, this rule of law does not apply to the case at hand; Mr. Schrute's cousin had no interest in the items Dwight destroyed.

If there is sufficient evidence of enumerated conduct, like abusive behavior, there is sufficient evidence to satisfy the first element of disorderly conduct. <u>Siekierzynski</u>, 2016 WL 4626487 at *1. Abusive conduct occurred in <u>Siekierzynski</u> when the defendant became increasingly aggressive towards his ex-wife during the course of an argument; he grabbed her arm "very hard," pushed her, and made several comments to her that were offensive. <u>Id</u>. The State was able to provide sufficient evidence of one example of enumerated conduct listed in the statute of disorderly conduct and therefore did not have to prove or address any other enumerated conduct or the "otherwise disorderly" conduct. Id. The court held that proving one of the enumerated behaviors is enough to satisfy the first element of the disorderly conduct statute. <u>Id</u>. Similarly to the defendant's conduct in <u>Siekierzynski</u>, Mr. Schrute's conduct satisfied at least one of the enumerated behaviors listed in the first element § 947.01. Because of the loud volume and intensity of Mr. Schrute's conduct, it likely satisfies the enumerated conduct of "unreasonably loud," meaning the first element of the disorderly conduct statute would be satisfied.

Additionally, if the conduct is not enumerated, the state can still secure a conviction if the conduct falls into the "otherwise disorderly" catchall provision; "otherwise disorderly" conduct is conduct that tends to disrupt good order and provoke a disturbance. <u>Givens</u>, 28 Wis. 2d at 109. In 1963, protestors with the CORE movement for racial equality were protesting at the office of Mr. Grobschmidt. <u>Id.</u> at 112. The defendant and several other protestors were removed from the office and told to leave, or they risked being arrested; the defendant chose to stay and was therefore arrested for disorderly conduct. <u>Id.</u> The conduct displayed by the protestors did not explicitly fall into any of the six enumerated conduct listed in the first element of § 947.01. Despite this, the court held that the conduct carried out by the defendant satisfied the "catchall clause" of "otherwise disorderly." <u>Id.</u> at 116. The court defined conduct as otherwise disorderly when it tends to "disrupt good order and provokes a disturbance." <u>Id</u>. Further, the court explained that the catchall clause is intended to cover conduct that disrupts the proper functions of society and disrupts public morals. <u>Id</u>.

Mr. Schrute's conduct falls into the category of "otherwise disorderly" because it was conduct that could disrupt good order and provoke a disturbance by being outwardly aggressive. First, good order was directly disrupted by Mr. Schrute's actions; when he began destroying his property, he was behaving in a manner that was not cohesive with good order. Good order typically does not involve aggressive destruction of property, especially not inside one's home. Second, Mr. Schrute's conduct was the capable of provoking a disturbance. Had Mr. Schrute not lived one-half mile away from his nearest neighbor, it seems likely that someone would have witnessed or heard his conduct. It is not normal conduct to behave in the way he was and it could cause a reasonable person to become disturbed. In the immediate case, the responding officer was disturbed; she found the circumstances of Mr. Schrute's conduct to be concerning enough to

call for backup. Additionally, there was a package placed on Mr. Schrute's front door, meaning that a potential delivery driver could have been disturbed by his behavior as well. Conversely, Mr. Schrute's behavior is unlike the behavior shown in <u>Givens</u>. Mr. Schrute's behavior did not disrupt any public order because it takes place inside his own private home. Regardless of this circumstance, because the officer found his behavior disturbing and called for backup to mitigate the situation, it is obvious that Mr. Schrute's conduct provoked a disturbance and had the potential to disturb others that approached the residence. Mr. Schrute's conduct was both disruptive of good order and provocative of disturbance, therefore satisfying the catchall clause in the first element of disorderly conduct

**II. The State can likely prove the second element of disorderly conduct — Mr. Schrute's behavior was of a kind that tends to provoke or cause a disturbance — because its effects have the potential to spill over into the surrounding community.**

An act is considered disorderly if it occurs under the circumstances in which that conduct tends to cause or provoke a disturbance. § 947.01. The focus of disorderly conduct is not dependent upon the reaction it provokes, but instead on the circumstances in which the conduct occurred. <u>In re A.S.</u>, 243 Wis. 2d 173 (2001). If conduct is directed at someone, even in private, it can still be considered disorderly. <u>State v. Vinje</u>, 201 Wis. 2d 98 (1996). Conduct that is personal or private constitutes disorderly when there is a real possibility that the disturbance will spill into the surrounding community. <u>State v. Schwebke</u>, 253 Wis. 2d 1 (2002).

The focus of disorderly conduct is not dependent upon the reaction it provokes, but instead on the circumstances in which the conduct occurred. <u>In re A.S.</u> 243 Wis. 2d at 201. In <u>A.S.</u>, the defendant was charged with disorderly conduct after making several disturbing comments to two girls at a youth center. <u>Id</u> at 182. The defendant's statements contained several threats of death and violence towards teachers, students, and police officers in their community.

Id. at 183. Included in the defendant's statements were comments about committing violence inside of their school in a way similar to the massacre at Columbine High School; the highly specific threats caused the girls to become scared and report his behavior to the police. Id. at 184. The defendant argued that he could not be convicted of disorderly conduct because his conduct was only speech with no physical element and therefore caused no actual disturbance. Id. at 186. The court held that the defendant's conduct satisfied the second element of disorderly conduct despite not causing an actual disturbance. Id. at 199. To make this determination, the court examined the circumstances in which the defendant made his threats. Id. Because of the recency of the Columbine massacre at the time of his comments, the specificity of his threats, and the comparisons he made to the massacre at Columbine, the court held that the only purpose his statements could have served was to "frighten and cause serious concern to the listeners." Id. at 200.

Finally, if conduct is directed at someone, even in private, it can still be considered disorderly. Vinje, 201 Wis. 2d at 100. In Vinje, the defendant became violent with his wife during a domestic dispute and was given a twenty-four-hour no-contact provision by the police to protect his wife from additional unwanted behavior. Id. at 100. He broke the provision, and his wife then called the police. Id. at 101. When the police arrived, they saw the defendant physically attacking his wife and arrested him. Id. The defendant was charged with both disorderly conduct and intimidation of a victim. Id. The defendant argued against his charges with the claim that the crime of disorderly conduct could not be paired with a charge of intimidation of a victim because disorderly conduct does not require a victim. Id. at 103. The court noted that the statute does not include language about a necessary victim, but stated that the lack of language does not mean a person cannot become a victim of disorderly conduct. Id. at

104. The court held that because the disorderly conduct was directed at a person, the defendant's wife was the victim of disorderly conduct. Id.

Mr. Schrute's conduct did not align with the circumstance rule established from In re A.S. but satisfied the private conduct rule in determined in Vinje. The circumstances surrounding Mr. Schrute's conduct do not align with the rule established by In re A.S. because Mr. Schrute's conduct occurred while he was alone in his private home. The defendant's conduct in In re A.S. was disorderly because it caused fear in others due to the circumstances it occurred in. Id. at 200. The circumstances Mr. Schrute's conduct occurred in are not similar; unlike in In re A.S., here, Mr. Schrute's conduct occurred in an isolated location. His farm is 0.5 miles away from any other neighbors in a largely rural community. He was alone and isolated, with no practical means of disturbing anyone else. His conduct in his own home was not done to cause fear or concern in anyone else. Conversely, his conduct had the potential to cause a disturbance despite occurring in private. Like the defendant's conduct in Vinje, here, disturbing conduct that occurred inside someone's personal home was could be used to satisfy the elements of the disorderly conduct statute. Mr. Schrute was in his home, smashing his belongings when the responding officer became concerned for the safety of whoever was inside the residence. When she broke down the door, Mr. Schrute was alone; the officer established that no one else was in the home and that no animals resided inside the home. Nevertheless, his conduct can still be considered disorderly because it satisfied the enumerated conduct, the catchall clause, and/or both. The Wisconsin statute for disorderly conduct does not require that the conduct of a defendant is directed at another person, therefore, Mr. Schrute's acts in private can still constitute disorderly conduct.

Additionally, conduct that is personal or private is disorderly when there is a real possibility that the disturbance will spill into the surrounding community. Schwebke, 253 Wis. 2d at 22. In Schwebke, the defendant was charged with several counts of disorderly conduct after sending disturbing letters through the mail to three individuals. Id. at 5. The letters caused the victims to become so disturbed that they altered their regular functioning in their day-to-day lives; they moved several times, changed their phone numbers, and warned their family and friends about the potential dangers of the defendant. Id. at 11,12. The defendant argued that because his conduct only offended the victims in private, his conduct could not be of the kind that tends to provoke a disturbance. Id. at 18. The focus of the defendant's argument was that his actions that caused personal discomfort could not be found to threaten public order; he claimed that his conduct was not the kind that, "threatened to spill over and disrupt the peace and tranquility of the surrounding community." Id. at 19. The court held that the plain language of the disorderly conduct statute does not require a public disturbance, just one that would tend to disrupt good order. Id. The court further explained that in past cases where disorderly conduct has been found in a private disturbance, there is a potential threat that the conduct will disrupt the peace of the surrounding community. Id. at 22. The defendant's conduct, while directed at individual victims, caused other people in close relation to the victims to become disturbed, therefore causing a spillover into the surrounding community. Id. at 24.

Mr. Schrute's conduct was consistent with the defendant's conduct in Schwebke because his conduct spilled over into the community when a responding officer felt obligated to call for backup. Therefore because of the effects on the community, Mr. Schrute's conduct aligned with the second element of disorderly conduct. The first disruption occurred when the officer had to attend to Mr. Schrute's initial call at his place of work; the officer interviewed Mr. Schrute's

coworkers. Mr. Schrute's coworkers are members of the community that had their lives disrupted by his call to the police. The second disruption to the community occurred when the officer interviewed Mr. Schrute at his home. Because of Mr. Schrute's fairly isolated location, tending to this instance was presumably an inconvenience for the responding officer. When the officer was concerned about the well-being of Mr. Schrute or whoever was inside, she was obligated to call for backup. Her call drew more community resources to an isolated location. Additionally, when the officer checked on Mr. Schrute's cousin and determined he needed an ambulance, another important community resource was diverted into Mr. Schrute's rural, isolated home. First responders are community safety resources, and they must be within a close proximate location to their callers to be effective. By requiring these community resources to attend to Mr. Schrute's disruptive behavior, his conduct had effects that spilled out into the surrounding community in a negative way. The resources were rendered ineffective to people who may have needed them, therefore causing a disturbance in the community.

Conversely, it is possible that the second element of the disorderly conduct statute is not satisfied under Schwebke's holding because of Mr. Schrute's initial act of calling the police himself. Unlike the defendant in Schwebke, Mr. Schrute called the police to report behavior that was occurring to him, and he was the one seeking intervention from authorities. If Mr. Schrute had not been the one to call the police himself, it is uncertain whether any calls would have ever been made to report the conduct occurring inside his private home therefore removing safety resources from the surrounding community. The absence of Mr. Schrute's initial call would have eliminated the disturbance of community resources in two ways. First, the police officers would have never had to visit Mr. Schrute's home or his place of work. Without their visit, there is no initial disturbance created. Second, the ambulance would have likely not been called without the

involvement of the police officers stemming from Mr. Schrute's first call to the police, therefore, eliminating the other instance of a continued disruption. Without these interventions from community safety resources, it is not clear that the second element of disorderly conduct is satisfied because of the lack of effect on the surrounding community.

### OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD

**Name:** ██████████
**Student ID:** ██████████

Institution Info:     Marquette University
Print Date:           01/23/2023

Other Institutions Attended:
Marquette University

**Beginning of Law Record**

**2022 Fall**

Program:         Law
Primary Major:   Law

| Course | Description | Attempted | Earned | Grade | Points |
|--------|-------------|-----------|--------|-------|--------|
| ████████████████████████████████████████████████████ | | | | | |

| | | | Attempted | Earned | GPA Units | Points |
|--|--|--|-----------|--------|-----------|--------|
| Term GPA: ████ | | Term Totals | ████ | | | |
| Cum GPA: ████ | | Cum Totals | ████ | | | |

**2023 Sprg**

Program:         Law
Primary Major:   Law

| Course | Description | Attempted | Earned | Grade | Points |
|--------|-------------|-----------|--------|-------|--------|
| ████████████████████████████████████████████████████ | | | | | |

| | | | Attempted | Earned | GPA Units | Points |
|--|--|--|-----------|--------|-----------|--------|
| Term GPA: ████ | | Term Totals | ████ | | | |
| Cum GPA: ████ | | Cum Totals | ████ | | | |

**Law Career Totals**
| | | | | | | |
|--|--|--|--|--|--|--|
| Cum GPA: ████ | | Cum Totals | | | | |

End of OFFICIAL INTRA-UNIVERSITY LAW SCHOOL RECORD

14



## STATE BAR OF WISCONSIN
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸▸▸▸▸▸▸▸ ◂◂◂◂◂◂◂

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

☐ **Outstanding Candidate**
☑ **Very Good Candidate**
☑ **Average Candidate**
☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

Or you can print it and scan it with your handwritten notes.

Return to Jacque Evans, jevans@wisbar.org no later than January 23.

**Student Name:** ▮▮▮▮▮▮▮▮▮

**Law School:** ☐ UW   ☐ MULS

**Interviewer:** *Emily Selner*

### A. General Qualifications

*1. Relevant Skills and Qualities:*

   Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

   Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☑ **3**   ☐ 4   ↑ *Highest*

   Interviewer Comments:

*2. Communication Skills:*

   Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

   Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☑ **3**   ☐ 4   ↑ *Highest*

   Interviewer Comments:

### B. Interview Characteristics:

**Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)**

Check a Score:   *Lowest* ↓   ❑ 1      ❑ 2      ☒ 3      ❑ 4     ↑ *Highest*

Interviewer Comments:

C.  <u>Motivation for Participation in the Diversity Clerkship Program:</u>

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* *What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score:   *Lowest* ↓   ❑ 1      ❑ 2      ❑ 3      ☒ 4     ↑ *Highest*

Interviewer Comments:

D.  <u>Interviewer's Perspective:</u>

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

Interviewer Comments:

*candidate was eager to add to any work environment*

E.  <u>Student Feedback:</u>

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

*This candidate had some of the best answers to question. I appreciated her authenticity.*

███████████ · ████@wisc.edu

## EDUCATION

**University of Wisconsin Law School**                                        **Madison, WI**
*Juris Doctor*                                                        *Anticipated May 2025*
    Activities:  American Constitution Society, 1L Representative
                 Women's Law Student Association, Logistics Committee Member
                 Queer Law Students Association, Fundraiser Committee Member

**Tulane University, School of Liberal Arts**                               **New Orleans, LA**
*Bachelor of Arts in Political Economy and Spanish*                               *May 2020*
    GPA:      3.96, *summa cum laude*
    Honors:    Phi Beta Kappa Inductee
              Departmental Awards in Political Economy and Spanish
              Stamps Leadership Scholarship Recipient (four-year, full academic scholarship)
    Thesis:     *The Effects of State Gun Control Laws on the Intimate Partner Homicides of Women*
              Awarded with honors
    Activities:  Athletics Tutor, Volunteer Swim Instructor, Peer Mentor, Club Sailing Executive Board
    Exchange:  University of Buenos Aires, Fall 2018; University College London, Spring 2019

## WORK EXPERIENCE

**Ministry of Education and Vocational Training of Spain**                       **Madrid, Spain**
*English Language and Cultural Assistant*                            *September 2021—July 2022*
- Developed engaging daily lesson plans focused on English grammar, vocabulary, and conversation skills for students ages 12-17
- Assessed students' needs and abilities, creating individualized plans to improve speaking, reading, writing, and listening skills

**Sinars Slowikowski Tomaska LLC**                                           **Chicago, IL**
*Legal Assistant*                                                   *August 2020—July 2021*
- Supported a team of seven partners and associates from discovery to case closure
- Prepared and revised motions, notices, orders, and related court filings
- Communicated daily with courts, clients, and opposing counsel to facilitate case management

**Murphy, Rogers, Sloss, Gambel, and Tompkins**                         **New Orleans, LA**
*Legal Intern*                                                      *January 2020—April 2020*
- Condensed medical and employment records into summarized and digestible reports for attorneys
- Prepared summons and subpoenas after reviewing depositions, working alongside firm paralegals
- Proofread motions, pleadings, and other legal memorandums to ensure clarity and accuracy

**Geneva Lake Sailing School**                                            **Fontana, WI**
*Summer Camp Administrator*                                        *Summers 2019, 2020, & 2022*
- Managed 15 sailing instructors teaching over 400 campers, ensuring efficient daily activity
- Communicated continually with staff, parents, and campers to assess and address ongoing issues
- Generated written weekly reports for parents and staff to maintain open lines of communication

## ADDITIONAL INFORMATION

**Languages:**    Spanish, professional working proficiency, CEFR Level B2
**Certifications:** Teaching English as a Foreign Language, 150-Hour Certificate, 2021
**Interests:**       Competitive Scow Sailor, Beginner Pickleballer

<span style="color:red">Exhibit 50</span>

██████ @wisc.edu

## Personal Statement

      I am a queer, fat woman. In a society that views fatness as a moral failure, values women by their image, and continues to ostracize queer people, publicly embracing my body and sexuality is an inherently ambitious project. Growing up in a predominantly conservative, Catholic environment in the U.S. instilled a deep internal sense that my queerness is unacceptable and that my body is just not good enough. In fact, my sexuality meant I was a societal threat; my body signified that I am lazy and undesirable. Strangers, the media, friends, and even family combined forces to tell me repeatedly, both overtly and indirectly, that I should be ashamed of what I look like and who I love. And for most of my life, I *was* deeply ashamed.

      Recently, I have begun to change my self-perception. Queer people are more visible now than ever, both in cultural and legal spheres. Advocates for fat acceptance are making waves in every part of society, from informal social media networks to the House floor. The work of these activists has helped me to forge a new self-image in which I find power, beauty, and the potential to succeed. Merely by writing this essay, I am showing myself the extent to which I can reject the societal pressure to hide away my sexuality and my body.

      Although my own perception has shifted, occasionally I am visually assessed and dismissed before even uttering a word. After any kind of discriminatory encounter, from dates to doctor's offices, I leave feeling dejected and ashamed, despite my efforts not to let it affect me. As a law student, a future lawyer, and a human being, it is my mission to never make another person feel that way. When someone eventually calls me 'Counselor,' I want them to trust in my counsel and know that I respect their inherent worth and unique perspective. My experience as a queer, fat woman has enabled me to access a depth of empathy that I may not have known

1

2

otherwise, which will prove invaluable in my time as a potential clerk in the Diversity Clerkship Program and in my career in the law.

Finally, in my intended career as a public interest lawyer, I hope to use my position to advocate for members of my communities and other diverse groups. Though I am not sure what form yet my work will take, I would relish any opportunity to address accessibility issues for people of all body sizes or legally defend LGBTQ+ people, particularly those in the trans community who are under seemingly constant attack. In this way, I intend to make a lifelong commitment to diversity and further the goals of the Wisconsin State Bar's Diversity Clerkship Program.

2



@wisc.edu

### Memorandum of Law

#### Question Presented

Under Wisconsin's constitution, does a showup violate a defendant's due process rights when the witness sees the suspect for two minutes at close proximity during the crime, is familiar with the suspect, provides a sufficiently accurate description of the suspect, is near certain of the suspect's identity, and identifies him within four days of the attack?

#### Brief Answer

No. In Wisconsin, a showup, or witness identification procedure where the witness sees only a single suspect, is constitutional, even if the procedure itself was impermissibly suggestive. A showup is reliable when a witness (1) clearly views the suspect for two minutes at close proximity during the crime, (2) repeatedly interacts with the suspect, (3) describes the suspect with multiple accurate characteristics before the showup, (4) is certain about the identity of the attacker, and (5) identifies the suspect within two weeks of the crime. Here, Simon Harriot saw his assailant at close proximity for two minutes during the attack, saw Marks for five minutes earlier in the evening, accurately described Marks' clothing prior to the showups, was 90% sure of Marks' identity during the second showup, and identified Marks both within hours and four days after the crime. Under the totality of the circumstances, the showups were reliable. Therefore, the State did not violate Marks' constitutional rights during the showup procedures.

#### Statement of Facts

On the night of December 12th and early morning of the 13th, Simon Harriot was working as a bouncer at Miller's Bar & Grill in Waterwheel, Wisconsin. At about 9:30 PM, patron Bobby Marks approached Harriot at the door of the bar. Harriot accused Marks of using a fake ID, and a shouting match ensued for about five minutes. Harriot's supervisor, Walter Hayes,

1

recognized Marks and allowed him to enter the bar. After the altercation, Harriot went back to the staff lounge and drank two whiskey cokes.

Later, at about 12:30 a.m., Harriot was seated facing away from the bar when he was pushed off his stool from behind, fell to the ground, and was kicked in the stomach and ribs. The attacker then jumped on top of him and punched him in the face with brass knuckles. Harriot said the attack lasted about two minutes before he pushed the attacker off of him. The attacker then ran away. No other witnesses were present, and no camera captured the assault.

Lt. Stipe of the Waterwheel Police Department arrived on the scene shortly after the attack and spoke to Harriot before an ambulance took him to the hospital. Harriot described his attacker as a white male about his own size (5'6" and 170 lbs), wearing black pants, a white shirt, brass knuckles, and a hat of unknown color. Stipe found a red UW Badgers hat at the scene on the ground. Stipe also noted that no light was on in the area outside the bar where the attack occurred, nor did the light switch function when he attempted to turn the light on.

Stipe then spoke to Hayes, who described the earlier encounter between Harriot and Marks. Hayes said Marks was a semi-regular patron that he recognized. Hayes described Marks as a white male about 6'2" and 200 pounds with short hair, who wore black pants and a white puffy jacket that night. He did not recall that Marks wore a hat. Stipe showed Hayes a picture of Marks that he pulled from Twitter; Hayes confirmed that was the man that Harriot confronted about the fake ID. Hayes said he did not recall seeing Marks again in the bar after 9:30 p.m.

Later, Stipe went to the hospital and spoke to Harriot again. Stipe asked Harriot to "tell him about his evening," at which point he described his altercation with Marks. Stipe then showed Harriot the same photo of Marks from Twitter and asked if he recognized the man. Harriot said he was 100% sure that the man in the photo was the one he confronted about the ID.

2

Then, Stipe asked Harriot if the same man was the one who attacked him. He responded that he was 75% sure that it was the same man, and that "it would make sense it was the same person."

Four days later, on December 17th, Detective Enola Holmes of Waterwheel PD located Marks in a public park. Holmes identified herself and showed Marks the Twitter photo; Marks confirmed that the photo was his. Holmes asked him to describe what happened at the bar on the night of the 12th, and he described the altercation with Harriot regarding the fake ID. He then said that he watched the Packers-Bears game at the bar and left by 11:30 p.m. He stated that he went home, but no one else was at home when he got there. He said that he was not aware of the assault and vigorously asserted that he was gone by the time it happened.

Holmes asked Marks if he would stay in the park while she called Harriot, and he agreed. Harriot arrived shortly afterwards, and then he and Marks stood about ten feet away from each other in the park. Holmes asked Harriot if he recognized the man standing opposite him, and Harriot said that he was 90% sure that he was the man who attacked him. Marks again denied assaulting Harriot. Holmes then placed Marks under arrest.

*Waterwheel Police Department Identification Procedures* states that its officers must avoid multiple identifications in which the same witness views a suspect more than once. The manual also instructs officers not to suggest any opinions to the witness that the suspect committed the crime. Finally, the manual states that single photographs of a suspect should only be presented to a witness to confirm the suspect's identity when the suspect is actually known to the witness prior to the incident.

### Discussion

The showups conducted by Stipe and Holmes were impermissibly suggestive but did not violate Marks' constitutional due process rights under Wisconsin law because Harriot's

3

identification was reliable. Eyewitness testimony can only be admitted in a criminal trial when law enforcement upholds due process of law as established in the Wisconsin Constitution, which mirrors the due process clause of the U.S. Constitution. Wis. Const. Art. 1, § 8; U.S. Const. Amend. XIV, § 1; *State v. Roberson*, 2019 WI 102, ¶ 55, 389 Wis. 2d 190, 213, 935 N.W.2d 813, 824. Due process rights may be implicated during a showup, or an out-of-court, pretrial method of identification where a witness sees only a single suspect at a time while attempting to identify them, either by photograph or in-person. *Roberson*, 2019 WI 102, ¶ 47; *United States v. Gonzalez*, 863 F.3d 576 (7th Cir. 2017). A showup violates due process protections when it is suggestive to a degree that misidentification becomes substantially likely, *and* when the witness identification is unreliable. *Roberson*, 2019 WI 102, ¶ 4. A defendant bears the initial burden of proof to show that the showup procedure was impermissibly suggestive. *Id.* If the defendant meets that burden, then the burden of proof shifts to the State, who must show that the identification is reliable under the totality of the circumstances. *Id*. An impermissibly suggestive identification procedure is admissible into evidence if it is nonetheless reliable. *Id.* Wisconsin courts look to United States Supreme Court precedent and other federal precedent to apply this burden-shifting test due to the similarity in each jurisdiction's due process clauses and the use of the same test. *Id.*, ¶ 55. This memorandum addresses suggestiveness and reliability in turn.

    **I.**    **The identification procedure was impermissibly suggestive due to Stipe's suggestive remark and the suggestive effect the photo showup had on the later in-person showup.**

        The identification procedure was impermissibly suggestive due to Stipe's suggestive remark and the suggestive effect the photo showup had on the later in-person showup. In Wisconsin, showups are not per se impermissibly suggestive. *State v. Streich*, 87 Wis. 2d 209, 274 N.W.2d 635 (1979). Rather, the court considers the totality of the circumstances when

<div align="center">4</div>

determining suggestiveness. *State v. Mosley*, 102 Wis. 2d 636, 307 N.W.2d 200 (1981). To determine suggestiveness during photographic identifications, including showups, courts consider several factors, including how a photo is presented to the witness, the language used by law enforcement, the characteristics of the photos themselves, and any exigent circumstances. *Id.* at 652. Statements made by law enforcement that imply they believe a suspect committed the crime render a photo showup impermissibly suggestive. *See Streich*, 87 Wis. 2d at 216; *Simmons v. United States*, 390 U.S. 377, 383, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968). Moreover, a photo showup is impermissibly suggestive when a witness indicates that they took the officer's suggestion of a suspect. *See Gonzalez*, 863 F.3d at 584. Additionally, when an impermissibly suggestive photo showup is used, "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent… identification." *Simmons*, 390 U.S. at 383-384. In this way, an impermissibly suggestive photo showup has a suggestive effect on subsequent identification procedures. *Id.*

Showups are not impermissibly suggestive when police do not make statements to the witness that suggest that a suspect committed the crime. *Streich*, 87 Wis. 2d at 217. In *Streich*, a witness identified a suspect in a police station showup when he saw the suspect through a door in another part of the station. *Id.* at 216. Officers made no statements regarding the suspect to the witness before the showup. *Id.* The court held that this procedure was not impermissibly suggestive, particularly because police made no suggestive statements to the witness prior to the identification. *Id.* at 217.

A photo showup is impermissibly suggestive when a witness specifies that they took the officer's suggestion of the suspect, and an impermissibly suggestive showup renders subsequent identification suggestive. *Gonzalez*, 863 F.3d at 584. In *Gonzalez*, police presented a single photo

5

of a suspect to the primary witness in a bank robbery when they arrived on the scene shortly after the crime. *Id*. After the photo showup, the witness stated on the record that she assumed that the photo presented to her was of the most likely suspect. *Id*. at 585. Two days later, she identified the witness during a photo lineup. *Id*. The court held that the photo showup was impermissibly suggestive because it "telegraph[ed] to Miller that the police thought this was the robber." *Id*. at 584. Specifically, the court noted that because the witness said she knew the police suspected the man presented in the showup, the procedure was impermissibly suggestive. *Id*. The court also held that the lineup identification was impermissibly suggestive because the witness had seen a single photograph of the suspect two days prior, negatively affecting her ability to rely on her original memory of the crime. *Id*. at 585.

The showup conducted by Stipe was impermissibly suggestive due to (1) Stipe's suggestive remark, (2) Harriot's statement specifying that he took Stipe's suggestion, (3) and the suggestive effect the photo showup had on the later in-person showup. First, unlike *Streich,* Lt. Stipe made a plainly suggestive remark to Harriot during the photo showup when he asked if the same man that Harriot confronted about the fake ID was the one who attacked him. The presence of the suggestive statement, unlike the absence of such a statement in *Streich*, will likely persuade the court to rule that the photo showup was impermissibly suggestive. In addition, the statement contrasted with the guidance of Waterwheel PD's procedural handbook, which instructs officers not to suggest any opinions to the witness that the suspect committed the crime. A violation of this manual further supports an impermissible level of suggestiveness.

Second, Harriot clearly indicated that he took Lt. Stipe's suggestion that Marks was the likely assailant when he said that "it would make sense it was the same person." As in *Gonzalez,*

6

the court will likely find that the procedure is impermissibly suggestive because Harriot admitted he took the Stipe's suggestion that the Marks committed the assault.

Finally, like *Gonzalez*, and as stated in *Simmons*, the suggestiveness of the photo showup likely carried over to the in-person showup. The procedural handbook also states that officers should avoid multiple identifications, which further supports that one suggestive identification will affect the witness's ability to make an accurate identification later.

Overall, the court will likely find that the entire identification procedure was impermissibly suggestive because Stipe implied that Marks was the assailant during the photo showup, Harriot admitted that he took Stipe's suggestion, and the suggestiveness of the photo showup negatively affected the in-person showup.

**II.    The witness identification was reliable because Harriot saw his attacker for two minutes at close proximity, was familiar with the suspect, provided a sufficiently accurate description of his clothing, was nearly certain of his identity, and identified him four days after the attack.**

The witness identification was reliable because Harriot saw his attacker for two minutes at close proximity, was familiar with the suspect, provided a sufficiently accurate description of his clothing, was nearly certain of his identity, and identified him four days after the attack. If the defendant meets the burden of proof to show that the identification procedure was impermissibly suggestive, then the burden shifts to the State to prove that the procedure was nevertheless reliable. *Roberson*, 2019 WI 102, ¶¶ 3-4; *Perry v. New Hampshire*, 565 U.S. 228, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). To determine reliability, the court uses a totality of the circumstances test. *Roberson*, 2019 WI 102, ¶ 35; *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The principal factors considered under the test are:

"(1) the opportunity of the witness to view the suspect at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the suspect, (4)

7

the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation."

*Roberson*, 2019 WI 102, ¶ 35. Showups are reliable when a witness views the suspect in close proximity for at least two minutes and is familiar with the suspect. *Roberson*, 2019 WI 102, ¶ 69-79; *see Gonzalez*, 863 F.3d at 586; *Brathwaite*, 432 U.S. at 114. Showups are also reliable when a witness provides a description of the suspect with multiple accurate characteristics prior to the showup, is certain about the identity of the suspect, and identifies them within two weeks of the crime. *Gonzalez*, 863 F.3d at 586; *Roberson*, 2019 WI 102, ¶ 76; *see Brathwaite*, 432 U.S. at 114.

Showups are reliable when the witness views the suspect at close proximity, is familiar with the suspect, is certain of their identity, and identifies the suspect within two weeks of the crime. *Roberson*, 2019 WI 102, ¶ 69-79. In *Roberson*, the defendant shot the victim at close range. *Id.*, ¶ 69. The victim interacted with the suspect on two occasions prior to the shooting. *Id.*, ¶ 70. During a photo showup two weeks after the crime, the victim was 100% certain the suspect was his assailant. *Id.*, ¶ 75. The court held that the identification was reliable under the totality of the circumstances. *Id.*, ¶ 78. The court specified that the victim's close-range view of defendant and repeated interactions with him made the showup more reliable. *Id.*, ¶ 69-71. The court also explained that the victim's certainty during the identification favored reliability, and that two weeks was an acceptable window of time in which to make an identification. *Id.*

Showups are reliable when the witness views the suspect for two minutes from a close distance and provides an accurate description of the suspect's clothing and physical characteristics prior to the showup. *Gonzalez*, 863 F.3d at 587. In *Gonzalez,* the witness to a bank robbery stood two feet from the robber for the two minutes he was inside the bank. *Id.* at 586. Before the photo showup or photo lineup later conducted by police, the witness described the

8

robber as Hispanic male with a shaved head and facial hair, about 5'7" and 130-150 pounds, and wearing a gray sweatshirt. *Id.* at 586. During the photo lineup conducted two days after the robbery, the witness was 100% certain of the suspect's identity as the robber. *Id.* The court held that the identification was reliable. *Id.* The court reasoned that two minutes was sufficient time to view the suspect from a distance of two feet and later identify him, and the description was sufficiently accurate, as the suspect was a 180 pound, 5'9" Hispanic male with a shaved head, facial hair, wearing a gray-blue sweatshirt. *Id.* at 587. *See also Brathwaite*, 432 U.S. at 116 (finding identification reliable because witness viewed suspect for two minutes through a doorway, provided accurate description including clothing, was 100% certain of identity, and identified suspect two days after crime.)

Here, under the totality of the circumstances, the showups were reliable because Harriot (1) saw his assailant at close proximity for two minutes during the attack, (2) saw Marks for five minutes earlier in the evening, (3) accurately described Marks' clothing prior to the showups, (4) was 90% sure of Marks' identity during the second showup, and (5) identified Marks both within hours and four days after the crime. First, like the witness in *Gonzalez,* Harriot saw his attacker for about two minutes, which the court held to be a sufficient amount of time to make a reliable identification. Second, during the ID altercation, Harriot had previously interacted with Marks for five minutes, which the *Roberson* court held to increase reliability.

Third, Harriot's description of his attacker's clothing (black pants and white shirt) matched a description of Marks' attire that evening (black pants and white jacket), like the witness description in *Gonzalez*. Harriot's estimated weight for the attacker was within 30 pounds of Marks' weight (170 pounds estimated; 200 actual), which the court found acceptable in *Gonzalez* (130-150 pounds estimated; 180 actual).

9

Fourth, during the in-person showup, Harriot was 90% sure Marks was his attacker, which is near the total certainty of the witnesses in *Roberson* and *Gonzalez*. Finally, Harriot made the identifications within hours of the crime and four days later, which is within the acceptable two-week range established in *Roberson*. Overall, under the totality of the circumstances, the court will likely find the showups to be reliable— each of the principal factors outlined in *Roberson* favors the reliability of Harriot's identification of Marks as his assailant.

Marks may object to the reliability of the identification because Harriot arguably had a limited opportunity to view his assailant's face. The overheard light in front of the bar was not on or functioning, the attacker was wearing a hat, and Harriot was being punched in the face while attempting to view his attacker. Moreover, Harriot consumed alcohol before the attack, possibly reducing his degree of attention. Harriot also made an error about the Mark's height in his description prior to the showup, and Marks was not seen wearing a hat that evening. Finally, Harriot was never 100% certain about Marks' identity. These factors may weigh against reliability; however, courts repeatedly rule in favor of admission where multiple other factors indicate reliability. *E.g., Roberson*, 2019 WI 102, ¶ 76; *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *Brathwaite*, 432 U.S. at 114; *Gonzalez*, 863 F.3d at 587. As such, the factors that indicate reliability in this case will likely outweigh those that weigh against it, and the court will likely rule in favor of admissibility as it most often has in the past.

### Conclusion

The showups conducted by Stipe and Holmes were impermissibly suggestive but did not violate Marks' constitutional due process rights under Wisconsin law because Harriot's identification was reliable under the totality of the circumstances.

10



## Course History Report for Mary Berg

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022



### Spring 2023 - All Courses In Progress



Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



# STATE BAR OF WISCONSIN
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸▸▸▸▸▸▸▸ ◂◂◂◂◂◂◂

## Interview Evaluation Fillable Form

---

## Interviewer Recommendation:

■ **Outstanding Candidate**

☐ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ██████

**Law School:** ■ UW ☐ MULS

**Interviewer:** Veronica Mantilla

## A. General Qualifications

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment**.

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

██ has various experiences as a legal intern and legal assistance, as well as being a teacher. She shared that these experiences were integral in her decision to apply to law school. She will be very prepared because of her prior experiences.

**2. Communication Skills:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score: *Lowest ↓* ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

## B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

**Check a Score**: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

I enjoyed talking with ███. She is professional and mature. She is enthusiastic about giving back to her community.

## C. Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK: What is your motivation for participating in the Diversity Clerkship Program?*

**Check a Score**: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

**Interviewer Comments:**

███ is interested in this program because it is a thoroughly vetted program. She believes that all of the employers will help her grow and support her in all facets of her iden ity.

## D. Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK: If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

**Interviewer Comments:**

███ shared that any experience is good experience. She expressed that she looked at the list of employers ahead of time and believes that any of the employers would be a great fit. She understands that the State Bar has vetted these employers for a reason and that they are familiar with working with div

## E. Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

**Interviewer Comments:**

███ is wonderful! I really enjoyed speaking with her, she has many goals to give back to the LGBTQ+ community and I am confident that she will accomplish this goal.



████ @wisc.edu | ████████████████

## EDUCATION

**University of Wisconsin- Madison- Law School**                    **Madison, WI**
*Juris Doctor Candidate*                                              *May 2025*
  Activities:    La Alianza
                 Black Law Students Association

**University of Wisconsin- Milwaukee**                             **Milwaukee, WI**
*Bachelor of Arts- Political Science- Pre-Law Certificate*        *December 2021*
  Activities:    Collegiate Entrepreneurship Organization
                 National Society of Black Engineers

## PROFESSIONAL EXPERIENCE

**Foley & Lardner, LLP**                                          **Milwaukee, WI**
*Legal Assistant*                                        *January 2022-August 2022*
- Edited, compiled, and managed client documents on behalf of partners and associates
- Collaborated with partners, associates, and paralegals to help produce and edit attorney work product
- Communicated with clients regarding delivery of documents, bills, and other related communications
- Created infographics, slideshows, and other custom graphics for client communications and presentations

**Zywave**                                                      **Wauwatosa, WI**
*Data Analyst*                                   *September 2018-January 2020*
- Managed and compiled large data pools to implement software solutions for clients
- Connected directly with clients to effectively implement software
- Combined efforts with colleagues to automate dataflow processes using coding languages Python and R
- Developed macro-enabled spreadsheets aiding to overall team workflow and efficiency

**The World Race- Adventures in Missions**                      **Location Varied**
*Logistics Coordinator*                         *October 2017-September 2018*
- Volunteered in 12 countries throughout Southeast Asia, Southern Africa, and South/Central America
- Worked in various non-profit environments including hospitals, orphanages, food programs, schools, and construction projects
- Coordinated logistics for country-to-country travel for 40 individuals across 4 continents
- Maintained relationships with non-profit directors and host families to further coordinate accommodations for individuals and teams

## INTERESTS

**Hobbies:**      International travel and sociology (travelled to, or volunteered in over 40 countries), personal health

**Community:**   At the onset of COVID-19, my wife and I banded together with local non-profits to provide food services to families experiencing food scarcity in the Milwaukee area.

<span style="color:red">Exhibit 51</span>



@wisc.edu |

There are multiple ways in which I think my diverse background could be beneficial in providing new perspectives and experiences to the workplace. I will address my childhood and my culture.

Growing up, my mother was a heroin addict. I remember waking up to use the restroom some nights to see her still on the couch with a needle in her arm. Through fights and much quarreling, my mother attended a rehab and got clean. She was clean for a long time, almost 10 years. One day she got a migraine and took one of my dad's pain pills, and jumped right back into her old ways. When she was high, she was pleasant to be around; we would go on walks, spend time together, play games. But it was the times that she didn't have her pills that made it hard. She would become verbally, emotionally, and mentally abusive.

Today, she is clean, entirely chemical-free, and we have a great relationship. But looking back and remembering how difficult life was and how much I hated being home is incredibly sobering as an adult. I had a blessed childhood in many ways; I had two parents who loved me and supported me but had their issues, and that is the way that I choose to see it. A lot of people don't have the chance to have 1 parent in the house, let alone both, that is a privilege in and of itself that has likely impacted me more than anything. Nonetheless, my exposure to addiction and abuse as a child provides me with a point of view that may be unique in some spaces. Additionally, my cultural background is very important to me.

My mother grew up in Wisconsin and my father immigrated from Mexico when he was young. His mother was ½ Iberian Jew and ½ native Mexican, his father was 100% Aztec. This connection to Mexico resulted in frequent road trips from Milwaukee to Monterrey to visit family members across the border. When we would visit Mexico, I always felt most at home. The food we ate, the time we shared with family, the sights, the smells; all of this culminated in some of the best childhood memories. Fast-forwarding to law school, I realize that my Mexican culture has become increasingly important to who I am.

When I left home and moved from Milwaukee to Madison, I realized that I needed to find a community of individuals that had similar cultural experiences to mine. I felt alone when I started law school; luckily, I joined La Alianza and BLSA, gaining a community here in Madison. These groups have given me the opportunity to further explore experiences and opportunities in the legal community, as well as provided me with a group of diverse thinkers and individuals. The unfortunate part about this is that these groups are rather small, meaning that the field is lacking in racial diversity. My long-term goal is to be a positive example for people who have similar upbringings to mine and to motivate struggling young people to try hard and achieve hard things.

I believe that my diverse background and varied experiences would make me a fantastic candidate for this program.

Thank you,

**MEMORANDUM**

To: XXXXX

From: YYYYY

Date: November 22, 2022

Re: Midlands Police Department Surveillance Question

**Question Presented**

Is a law enforcement agency in violation of Wisconsin Statute § 968.31(1)(a) when they review a video recording from a conspicuously placed security camera in a public park of two individuals that they suspect are participating in illegal activity that has no audio and requires the use of a third-party lip-reader and sign language interpreter to transcribe?

**Brief Answer**

No. Wisconsin Statute § 968.31(1)(a) provides that whoever intentionally intercepts, attempts to intercept, or procures another person to intercept or attempt to intercept, any wire, electronic or oral communication is in violation of Wisconsin law. The law enforcement agency acted intentionally in procuring a third party to intercept a communication between two individuals, the communication between the two individuals was not wire, electronic or oral. Oral communication implies an expectation to privacy based on the circumstances. The circumstances in the instant case are that two individuals had a discussion in plain view of conspicuously placed cameras in a public park, thus mitigating their expectation to privacy.

**Factual Background**

On September 5, 2022, Midlands Police Department ("MPD") received a call from an anonymous tipster alleging a trafficking operation of illegal animals, artifacts, and other similar

products into the United States by two individuals. The individuals in question are two Bolivian immigrants, Heller and Bellows. Heller migrated to the United States legally through a green card lottery and later helped Bellows and his family migrate illegally across the Mexico-United States border. Before immigrating to the United States, Heller and Bellows left their Mennonite community and moved to a more urban area of Bolivia. The Mennonite communities in Bolivia speak an old dialect of German known as Plautdietsch and most of the men also speak Spanish. According to the tipster, prior to immigration, Heller began selling endangered animals and looted artifacts to make ends meet in urban Bolivia. Heller decided to continue this practice after immigrating to the United States and used Bellows as a conspirator. The tipster stated that Heller and Bellows would meet regularly in Twinning Park to have discussions about this trafficking operation.

Twinning Park is a large public park in Midlands, Wisconsin. In mid-October, MPD dispatched several officers to the park in an attempt to catch Heller and Bellows participating in any illegal activity; this effort was unsuccessful as they never saw either man. However, two years prior, because of increased crime in the park, MPD installed several security cameras that keep a 30-day visual record of events, but do not record audio. The cameras were installed to deter crime and are purposefully conspicuous. During a review of the camera's recordings, Heller and Bellows were seen in the park on September 25, 2022, seated together. September 25 was a particularly busy day in the park and bystanders frequently wandered near to where Heller and Bellows were seated. While they were not seen exchanging any illegal products, Heller and Bellows can be seen speaking to each other in the recording.

With no audio component, but a clear recording of both Heller and Bellows' faces, MPD consulted an expert lip-reader who was unable to determine what language Heller and Bellows were speaking. The lip-reading expert suggested that MPD contact a linguist. A Wisconsin State University linguist determined that, because of Heller and Bellows' Mennonite origins, they were likely speaking Plautdietsch. The linguist recommended Dr. Knight, an expert on languages spoken by Mennonite communities. Additionally, Dr. Knight, who has a deaf brother, is adept at lip-reading and American Sign Language ("ASL") as she learned both at a young age. While reviewing the recordings, Dr. Knight confirmed the language was Plautdietsch and recognized that on a few occasions, Heller and Bellows transitioned from speech into Bolivian Sign Language ("BSL"), which is nearly identical to ASL. Heller and Bellows performed this transition when adults in the park would linger nearby, but not when adults or children were just passing by.

Dr. Knight was able to successfully transcribe both the spoken Plautdietsch and BSL exchanged by Heller and Bellows. Dr. Knight's transcription of the lip-reading and BSL align with the allegations that the tipster made. In the transcription, Heller and Bellows discuss a shipment that would be arriving the following week in Chicago, and that Bellows would need to "feed and water … them." This is consistent with the tipster's allegation that Heller and Bellows were trafficking endangered animals into the United States. Further, in the transcription, Heller claims to have the power to send Bellows "back to Bolivia" if he abandoned the trafficking operation, consistent with the tipster's allegation that Heller would "call ICE on him."

Heller learned of MPD's video recordings and is threatening legal action for what he considerers "illegal surveillance" of his conversation with Bellows.

<u>**Discussion**</u>

MPD did not violate Wisconsin law by intentionally procuring Dr. Knight to intercept a communication between Heller and Bellows. Wisconsin law states that one must: (1) act intentionally; (2) intercept, attempt to intercept, or procure another person to intercept or attempt to intercept, (3) any wire, electronic or oral communication. Wis. Stat. § 968.31(1)(a) (2022). Wire communication requires the use of facilities for the transmission of communication by the aid of wire, cable, or similar connections. Wis. Stat. § 968.27 (2022). Electronic communication requires the use of electronic equipment to transmit a message between two parties. *Id*. Heller and Bellows spoke verbally to one another and used sign language to have a conversation that day in the park, their communication does not fit into either definition of wire or electronic, even though it was recorded on camera. The linguist and Dr. Knight recognized that Heller and Bellows were speaking Plautdietsch verbally to one another and BSL. Therefore, the intercepted communication will only be analyzed as oral communication, not wire or electronic. Thus, applying the statute: (1) MPD intentionally procured Dr. Knight to make a transcription of Heller and Bellows' discussion, (2) Dr. Knight intercepted a communication between Heller and Bellows, but (3) Heller and Bellows' communication was not oral.

I.   **MPD intentionally procured Dr. Knight to make a transcription of Heller and Bellows' discussion.**

MPD intentionally procured Dr. Knight to make a transcription of Heller and Bellows' discussion. In Wisconsin, intent is characterized by the legislature as a two-pronged concept requiring either purpose or knowledge. *State v. Smith*, 170 Wis. 2d 701, 709 (1992). Intentionally means that the actor either has a purpose to do the thing or cause the result specified or believes

that his act will cause that result and the actor must have knowledge of the facts necessary to make their conduct criminal. Wis. Stat. § 939.23 (2022). Intent does not require proof of knowledge of the section under which the actor is prosecuted or the terms in the section. *Id.* In addition, the Court of Appeals of Wisconsin has stated that acting either with purpose or with knowledge is sufficient for liability for most offenses. *State v. Moreno-Acosta*, 2014 WI App 122, ¶11. Further, the court saw that intention implies purposeful action, while knowledge suggests only awareness. *Id.* ¶13. MPD had purposeful action in procuring Dr. Knight.

MPD's purpose in procuring Dr. Knight was to receive a transcription of what Heller and Bellows were discussing in the video recording in the park. MPD procured Dr. Knight to lip-read and sign language interpret the video recording of Heller and Bellows and for Dr. Knight to transcribe what she lip-read and interpreted Heller and Bellows discussing in the video recording. MPD acted with specific purpose, to have Heller and Bellows' discussion transcribed by Dr. Knight, whom they intentionally procured.

Take for instance when a woman in Wisconsin discovered that her social security number was used by an undocumented immigrant to gain employment and other benefits. *Id.* ¶2. The woman did not know the immigrant, testified to never having met him, and never gave him permission to use her social security number. *Id.* The court found that the immigrant acted intentionally as he did so for the purpose of gaining employment and other benefits. *Id.* ¶15 Similarly, MPD acted intentionally because they procured Dr. Knight with the purpose of having Heller and Bellows' discussion transcribed. Like the immigrant using the stolen social security number with purpose, Dr. Knight was procured with a purpose. Dr. Knight was exclusively procured in order to understand what Heller and Bellows were discussing. Dr. Knight, whether

successful or not was procured intentionally and with specific purpose by MPD. Thus, MPD intentionally procured Dr. Knight to make a transcription of Heller and Bellows' discussion.

## II.     Dr. Knight intercepted a communication between Heller and Bellows.

Dr. Knight intercepted a communication between Heller and Bellows. Intercept means the acquisition of any wire, electronic or oral communication using any electronic, mechanical, or other device. Wis. Stat. § 968.27 (2022). Electronic, mechanical, or other device means any device which can be used to intercept a wire, electronic or oral communication. *Id.* For the purposes of this section, it will be presumed that Heller and Bellows' communication fits the definition of oral communication. Oral communication is any communication uttered by a person made under the circumstances that the speaker has a reasonable expectation of privacy. *State v. Duchow*, 2008 WI 57, ¶14.

The recording that MPD gave to Dr. Knight for review was taken from a camera, an electronic device. Heller and Bellows spoke audibly, but because there was no audio in the recording, Dr. Knight lip-read and sign language interpreted their communication. Take for instance when a hearing-impaired juror relied on lip-reading during trial in order to properly understand what was being said. *State v. Ward*, 2010 Wisc. App. LEXIS 792, ¶6. Both parties in the case were made aware of the juror's condition, and the court did not find this to be erroneous. *Id.* The state found lip-reading to be a sufficient form of communication for the juror. *Id.* Similarly, in a case in Iowa, an expert lip-reader's interpretation of a video recording of two men speaking was allowed as evidence. *State v. Henricksen*, 2020 Iowa App. LEXIS 842, ¶7. Further, the expert had no formal training in lip-reading, but the Court found that the expert's extensive

experience with lip-reading was acceptable. *Id.* ¶4. Additionally, in Wisconsin, sign language is an aid of oral communication. *State v. Jones*, 2009 Wisc. App. LEXIS 600, ¶17. Dr. Knight intercepted a communication between Heller and Bellows by lip-reading and sign language interpretation and was able to make an accurate transcription of their communication.

With the presumption that Heller and Bellows' communication was oral, and because it was retrieved through the use of an electronic device, we can conclude that Dr. Knight intercepted a communication between Heller and Bellows. However, this is not the only potential point of interception, but this is the most significant as this attempt was able to produce a transcription of what was discussed.

MPD also attempted, prior to hiring Dr. Knight, to intercept Heller and Bellows' communication. Additionally, MPD first hired a linguist from Wisconsin State University before hiring Dr. Knight. Therefore, it could also be stated, that MPD intentionally attempted to intercept Heller and Bellows discussion. However, because little was acquired through this initial attempt, and because MPD continued in their attempts by procuring first a linguist, then Dr. Knight, MPD's action in hiring Dr. Knight bred the result MPD hoped for from their initial attempted interception. Thus, Dr. Knight intercepted a communication between Heller and Bellows.

### III.     Heller and Bellows' communication was not oral.

Heller and Bellows' communication was not oral. Oral communication is any communication uttered by a person made under the circumstances that the speaker has a reasonable expectation of privacy. *Duchow*, 2008 WI 57, at ¶14. Wisconsin has held previously,

admitting lip-reading was permissible for a juror to understand what was occurring in a case. *Ward*, 2010 Wisc. App. 792. Further, Wisconsin has recognized that sign language is an aid of oral communication. *Jones*, 2009 Wisc. App., at ¶17. Dr. Knight utilized lip-reading and sign language interpretation to create a full transcription of Heller and Bellows' discussion. However, despite the fact that Heller and Bellows' discussion was oral on its face, it is not oral because Heller and Bellows do not have a reasonable expectation of privacy in the middle of a public park surrounded by conspicuous police cameras.

Take for instance when an individual was pulled over by a police officer for suspected drunk driving. *State v. Netzer*, 1997 Wisc. App. LEXIS 1226, ¶3. The police officer recorded the traffic stop on video camera. *Id.* The individual attempted to have what was said in the video suppressed, arguing that the video recording was intercepted and violated his right to privacy. *Id.* ¶4. The court denied the request for suppression because it is known that during a traffic stop, the communication is being received by law enforcement, thus mitigating one's expectation of privacy *Id.* ¶8. This is what Heller and Bellows are missing, they are seated in a public park surrounded by MPD cameras and other people. The cameras in the park were placed in a way that would make them obvious to those in the park and the cameras were placed there by MPD. The purpose of the cameras was to prevent crime, and it is not unreasonable to suspect that the cameras would be recording conversations and activity within the park and that that will be communicated to law enforcement. This is similar to the case with the suspected drunk driver, as there is general expectation that the recordings are being transmitted to law enforcement, mitigating Heller and Bellows' expectation of privacy. *Id.*

Additionally, when an inmate in a Wisconsin jail placed an outbound call to a non-attorney. *State v. Riley*, 2005 WI App 203, ¶4 There was a warning message prior to the call stating that the call may be recorded. *Id.* ¶5. The inmate was placing an outbound call to a friend in an attempt to have drugs removed from his car prior to the police finding the drugs. *Id.* ¶1. The court determined that the institution's need for safety is outweighed by an inmate's expectation of privacy, allowing for the recording of calls. *Id.* ¶12. Further, the court added that because of the warning message, and because the inmate continued in their conversation after the warning message, they have provided implied consent to surveillance. *Id.* ¶15. The officers relied on the implied consent of the inmate in their investigation. *Id.* Similarly, Heller and Bellows forfeit their expectation of privacy by holding their meeting in a public park, surrounded by MPD cameras and other people. Heller and Bellows provide their implied consent by holding their conversation in a public park in plain view of MPD cameras. Any reasonable person would be able to determine that what they did in a public park, in the sight of police cameras would be subject to interception and provides implied consent thus, diminishing one's expectation of privacy.

Due to the fact that Heller and Bellows held their discussion in a public park, surrounded by MPD cameras, Heller and Bellows did not have a reasonable expectation to privacy. Reaffirmed here, oral communication requires an expectation of privacy, considering the circumstances. *Duchow*, 2008 WI 57, at ¶14. Considering the circumstances in the instant case, that the conversation was held in a public park and because that park was full of MPD cameras, Heller and Bellows' discussion was not oral.

**Conclusion**

While MPD acted intentionally in procuring Dr. Knight to intercept Heller and Bellows' communication, the communication was not wire, electronic or oral. Therefore, MPD is not in violation of Wisconsin Statute § 968.31(1)(a).



**Course History Report for** ▮▮▮▮▮▮▮▮▮

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022



| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|

### Spring 2023 - All Courses In Progress



| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|

Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR** OF **WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂

## Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

- ☑ **Outstanding Candidate**
- ☐ **Very Good Candidate**
- ☐ **Average Candidate**
- ☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ███████████

**Law School:** ☑ **UW**   ☐ **MULS**

**Interviewer:** <u>Jose</u> Castro

### A. General Qualifications

*1.  Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*

Interviewer Comments:

███ seems very prepared for legal employment. His experience in a law firm and his skills displayed in his legal studies show that he has the makings of a successful associate.

**2. *Communication Skills*:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:   *Lowest ↓*   ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*

Interviewer Comments:

Confident, clear answers and writing style. He gave detailed answers about his legal experiences.

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

Interviewer Comments:

Very very good. Clear answers. Prepared. Good pace, consince but not too fast.

## C. Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* *What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score: *Lowest* ↓ ☐ 1 ☐ 2 ☐ 3 ■ 4 ↑ *Highest*

Interviewer Comments:

Great experience to work in legal field. This is a great experience to connect with his diverse Hispanic heritage.

## D. Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

Interviewer Comments:

Be honest. Likes to give everyone a fair shot and fair opportunity. What does position have to offer based on the things he is looking for. Thank them for the consideration.

## E. Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

Very impressive interview skills. The legal experience he has accumulated will help a lot in hitting the ground running in his first legal position. Best of luck!



@wisc.edu

## EDUCATION

**University of Wisconsin Law School** — Madison, WI
*Juris Doctor Candidate* — *May 2025*
Activities: Student Bar Association, 1L Class Representative
Wisconsin Association of Criminal Defense Lawyers, 1L Representative
Asian Pacific Islander Desi American Law Students Association, Member

**University of Wisconsin-Madison** — Madison, WI
*Bachelor of Arts: History, Certificate in Criminal Justice* — *December 2020*
Honors: Dean's List, Spring 2020
Activities: Wisconsin School of Bhangra, Team Captain
Sikh Student Association, Board Member
Wisconsin Historical Museum, Volunteer

## EXPERIENCE

**Wisconsin Army National Guard** — Madison, WI
*Paralegal Specialist* — *December 2017 - Present*
- Serve as the primary point of contact for active military members seeking legal counsel
- Conduct legal research of Army regulations to effectively counsel company and battalion commanders in instilling good order and discipline within respective units
- Draft memoranda for court-martials and military sanctions
- Assist hundreds of Soldiers in family law through powers of attorney, wills, and separation decrees

**Reinhart Boerner Van Deuren s.c.** — Milwaukee, WI
*Legal Administrative Assistant* — *October 2021 - May 2022*
- Drafted stock certificates and client letters for timekeepers to ensure swift service in a B2B Corporate Law environment
- Assisted timekeepers with tracking deadlines and organizing projects
- Processed new matter forms, requested conflict checks, maintained and opened new filings
- Proofread apostilles, articles of organization, memoranda of understanding, partnership agreements, and company bylaws for proper spelling, punctuation, grammar and use of firm style

**State Public Defender, Trial Division** — Madison, WI
*Investigation Intern* — *September 2020 – January 2021*
- Interviewed clients and witnesses to ensure quality reporting when aiding criminal investigations
- Served numerous subpoenas and investigation reports for misdemeanor and felony crimes
- Prepared reports of findings to testify and present at court hearings

**Community Justice, Inc.** — Madison, WI
*Legal Assistant* — *September 2019- December 2019*
- Conducted intake of indigent and underrepresented families to secure fair representation in court
- Interviewed and referred over 50 clients to local and state programs to assist with bankruptcy, divorce, landlord-tenant disputes, discrimination, and domestic abuse intervention services
- Ensured clients understood the court proceedings they were involved in

## INTERESTS
Weightlifting, cooking Indian dishes, playing Dungeons & Dragons

<span style="color:red">Exhibit 52</span>



On August 5, 2012, a white supremacist killed 7 people at the gurdwara in Oak Creek, Wisconsin, the Sikh temple my family attends every Sunday. That day was a tragedy that changed my world forever. Because of the love, solidarity, and hope shown by the diversity of different communities, it was the beginning of my commitment to diversity. On June 6, 2013, the day I graduated 8th grade, I started growing my hair out, joining the brotherhood of men and women donning the crown of the turban, standing out for others to recognize their commitment to advocacy. As a Sikh, this inherent commitment to diversity and inclusion inspired me to attend law school.

To continue contributing to diversity, I enlisted in the Wisconsin Army National Guard as a Paralegal Specialist in December 2017 to gain ground level experience learning the intricacies of military law.

After enlisting, I began to understand the attention to detail, motivation, drive, and passion the legal field required. It wasn't until a normal trivial morning in September 2018 when my whole perspective on being committed to diversity had changed.

On the beginning of a regular duty day in what felt like the dozenth conversation about my turban and beard in uniform, a cook laughed out of amazement, stating how I "looked like Osama". Without skipping a beat I laughed it off as if it were just another encounter I had in high school. I was shocked to learn the Soldier beside me had informed a drill sergeant and harshly condemned the incident that had occurred. No one had ever stood up for me in such a way before. I had minimized these types of incidents for the last 5 years, simply dismissing them as ignorance and not taking them to heart. I asked the Soldier why he did not ignore it since I laughed it off. He replied, "you would have done the same for me." I had always rolled with the punches and was ready to fight for others at any sight of ridicule or insult against them. It wasn't until this Soldier spoke on behalf of me that I realized to what extent I needed to commit to diversity. I never knew I was slowly stifling my own inner voice of condemning hate and ignorance. I needed an advocate to understand what it takes to be one.

Upon graduating law school, my goal is to commission as a Judge Advocate Officer to represent military members in need of a voice. My unique experience of being a practicing Sikh in the military legal corps has given me a new meaning of what it means to commit to diversity. As a Sikh I stand ready to selflessly serve others as a lifelong student, inclusive of others and their ideas; as a Soldier I stand ready to serve and treat others with loyalty, respect, and integrity. These different aspects of my identity will forever serve as a reminder of the importance of diversity when advocating for others.

██████████

LRW Section 10

## QUESTION PRESENTED

Under Wisconsin law governing contracts, is court-ordered contract reformation an available remedy after Ms. Kendrick mistakenly signed a severance agreement with her former employer that does not accurately reflect the parties' previously agreed upon terms?

## BRIEF ANSWER

Yes. Ms. Kendrick's unilateral mistake of signing an agreement without full knowledge of its terms coupled with her former employer's inequitable conduct of failing to disclose a change to a significant provision of the agreement deems reformation of contract appropriate under Wisconsin law.

## STATEMENT OF FACTS

Our client, Ms. Kendrick, is in a contract dispute involving the terms of her severance agreement with her former employer, MedTech, Inc ("MedTech").

On June 17, 2022, Ms. Kendrick met with MedTech's president and CEO Alan Sullivan ("Mr. Sullivan") and MedTech's Director of HR ("Ms. Mullins"); they informed Ms. Kendrick that her position of National Sales Manager was being eliminated. After facing what she believed as possible age and disability discrimination, Ms. Kendrick believed she earned an increased severance rate equal to one year of her salary (at the time being $78,000) rather than the standard severance formula of one week of pay per year of service. After private discussion with Ms. Mullins, Mr. Sullivan offered to adjust the severance rate to four weeks of severance for each of Ms. Kendrick's 12 years of service equating to the one-year-of salary figure Ms. Kendrick proposed. Mr. Sullivan offered the alteration to the severance formula in exchange for Ms.

1

Kendrick's immediate resignation and release of all claims against MedTech for the purpose of avoiding litigation. After Ms. Kendrick orally agreed to the newly presented terms, Mr. Sullivan said he would have MedTech's attorney prepare an agreement in accordance with the terms that they had discussed.

On June 28, 2022, Ms. Kendrick received an e-mail from Mr. Sullivan, part of which stated the following: "Attached please find MedTech's Service & Release Agreement, prepared pursuant to our discussion on June 17, 2022. I have approved and signed the agreement on behalf of MedTech, Inc." Ms. Kendrick signed the contract based on the firm belief that it contained the adjusted severance formula of four weeks per year of service. Ms. Kendrick only briefly glanced over the contract since she was suffering from a terrible headache that day as she continues to suffer from "chronic fatigue syndrome" resulting in lingering fatigue and headaches due to suffering from long-COVID. Ms. Kendrick received a check for $19,500 rather than the agreed-upon $78,000. Ms. Kendrick reached out to Ms. Mullins regarding the error, and Ms. Mullins followed-up stating that the amount was correct and in accordance with the terms of the signed severance agreement. Ms. Kendrick was told that any further communications should be directed to MedTech's attorney, Carla Reyes (Ms. Reyes) who Ms. Kendrick received a letter from. In that letter, Ms. Reyes stated she has "no knowledge of any request or agreement to alter [the] standard formula for calculating severance in your case." Ms. Kendrick wants to pursue contract reformation as a remedy to meet the previously agreed upon terms with MedTech.

## DISCUSSION

The legal issue at hand is the availability of contract reformation as a remedy under Wisconsin law. The court should conclude that Ms. Kendrick is entitled to reformation of contract as a result of her unilateral mistake coupled with MedTech's inequitable conduct.

2

This primary legal principle is outlined in *Hennig v. Ahearn,* where the court deemed reformation of a contract appropriate when there is justified reliance of a contract that "fails to express the intent of the parties either by mutual mistake of the parties, or because of the mistake of one party coupled with fraud or inequitable conduct of the other." Hennig v. Ahearn 230 Wis.2d 149 (1999). *Hennig v. Ahearn* involved an executive (Hennig) seeking reformation of a compensation agreement based on the last-minute alteration of the agreement by the president (Ahearn). Hennig claimed that "Ahearn altered a crucial provision of the agreement at the last minute but failed to point out the alteration." Id. at 154. After presenting credible evidence at trial, Hennig's failure to carefully read the contract and discover the last-minute alteration did not bar his claims for reformation. Id. at 155. After multiple contract negotiations with full disclosure to any changes, Ahearn delivered the final version of the agreement to Hennig without pointing out any of the changes that had been made to the document. Id. at 159. In terms of Ahearn's possible duty to disclose alterations, the court held that a jury could conclude that Ahearn engaged in a form of swindling in which Hennig was led by appearances into a bargain that was a trap. Id. at 168. Ultimately, in order for the reformation claim to stand, Hennig had to show clear and convincing evidence that (1) he mistakenly believed the final version of the document represented the terms to which he previously agreed, and was thus induced to sign it; (2) Ahearn knew that Hennig was mistaken about the contents of the final version of the document, but did nothing to correct Hennig's error; and (3) the alteration of the provision was not apparent on cursory examination. Id. at 177. The court held that Hennig was mistaken about the contents of the final document and a jury could conclude that the alteration was not apparent, maintaining that failure to carefully reread of the entire document was reasonable.

3

In *Bank of Sun Prairie v. Esser* the Supreme Court of Wisconsin held that there is no established "rule that a person who fails to read a contract is barred from making a claim of misrepresentation" cautioning that "all circumstances must be considered, including the intelligence and experience of the misled individual and the relationship between the parties, to determine whether the individual acted reasonably when relying on the misrepresentation." Bank of Sun Prairie v. Esser 155 Wis. 2d 724 (1990). This "justified reliance" to a contract that fails to meet the intent of both parties is essential in meeting the conditions necessary for contract reformation when examining the presence of a mistake.

A unilateral mistake refers to a mistake when only one party is mistaken regarding the terms of the contract agreement. A unilateral mistake coupled with fraud or inequitable conduct where one party fails to point out the mistake despite being aware of it is grounds for contract reformation as a remedy, Hennig v. Ahearn 230 Wis. 2d 149 (1999).

Hennig established the basis for a reformation claim by presenting evidence of his unilateral mistake in not identifying the significant change in the compensation agreement and Ahearn's possible fraudulent or inequitable conduct of not disclosing the change as both parties had done in prior contract negotiations.

Regarding our client, there is evidence of Ms. Kendrick being entitled to reformation of her contract with MedTech as a result of her unilateral mistake in conjunction with MedTech's inequitable conduct as outlined by the *Hennig* decision.

Ms. Kendrick came to an oral agreement with Mr. Sullivan after negotiating the terms of her severance package, agreeing upon four weeks of severance for each year of employment amounting to $78,000; she justifiably relied on these new terms after Mr. Sullivan assured her that a new contract would be drafted by Ms. Reyes in accordance with the terms they had

4

discussed, confirming so in the e-mail Ms. Kendrick received from Mr. Sullivan on June 28, 2022. As Hennig believed in Ahearn's duty to disclose significant changes to their compensation agreement, Ms. Kendrick reasonably believed MedTech would disclose such a large discrepancy in the severance agreement. As stated in the *Bank of Sun* Prairie decision, all circumstances must be considered including the relationship between the parties. Bank of Sun Prairie. 55 Wis. 2d at 734. Because of her respectable 12 year career at MedTech, Ms. Kendrick was justified in relying on Mr. Sullivan's word as CEO of the employer she was loyal for. Ms. Mullins was a witness to the negotiations taking place on June 17, 2022, giving more weight to the justified reliance Ms. Kendrick held on the newly adopted agreement.

Under the clear impression the agreement was in accordance with the oral agreement, Ms. Kendrick signed the contract expecting to receive $78,000 rather than $19,500. Although it is undisputable that Ms. Kendrick made a unilateral mistake by failing to read the entire contract, MedTech displayed inequitable conduct by failing to give notice to the terms of the contract Ms. Kendrick had signed despite Mr. Sullivan's promise to create a contract in accordance with the oral agreement. The *Hennig* decision clearly supports her position after identifying failure to disclose a known mistake as inequitable conduct. Hennig, 230 Wis. 2d at 175. Like Hennig, Ms. Kendrick committed a unilateral mistake in not noticing a significant provision change that ought to result in the remedy of contract reformation as a result of inequitable conduct.

## CONCLUSION

A court should rule that Ms. Kendrick's claims for reformation is one of these exceptions to the general rule that Ms. Reyes cites. Given evidence of MedTech's failure to disclose a significant change to an oral agreement with Ms. Mullins as witness, the court should find reformation of contract appropriate.

5



## Course History Report for ▬▬▬▬▬▬▬▬

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

### Fall 2022



| Course # | Title | Instructor | Credits Grade |
|----------|-------|------------|---------------|

### Spring 2023 - All Courses In Progress



| Course # | Title | Instructor | Credits Grade |
|----------|-------|------------|---------------|

Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



### STATE BAR OF WISCONSIN
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▸ ▸ ▸ ▸ ▸ ▸ ▸ ◂ ◂ ◂ ◂ ◂ ◂ ◂

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

■ **Outstanding Candidate**

☐ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 23.**

**Student Name:** ▮▮▮▮▮▮▮▮▮

**Law School:** ■ **UW**   ☐ **MULS**

**Interviewer:** Sir Williams

### A. General Qualifications

*1. Relevant Skills and Qualities:*

**Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.**

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ■ 4   ↑ *Highest*

Interviewer Comments:

▮▮▮▮ paralegal experience in the WI Nat'l Guard has prepared him exceptionally well for legal employment

**2. Communication Skills:**

**Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.**

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ■ 4   ↑ *Highest*

Interviewer Comments:

▮▮▮▮ communicates exceptionally well in a clear and professional manner.

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:   *Lowest* ↓   ☐ 1     ☐ 2     ☐ 3     ■ 4     ↑ *Highest*
Interviewer Comments:

████ is confident, poised, mature, and possess exceptional interpersonal skills and good energy

## C. Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK: What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score:   *Lowest* ↓   ☐ 1     ☐ 2     ☐ 3     ■ 4     ↑ *Highest*
Interviewer Comments:

Saw weight given to diversity and was impressed as a man of color whose fai h practice is visible, also attracted to embrace of idea that everyone has something to offer

## D. Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK: If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

Interviewer Comments:

Would express gratitude for the opportunity, and focus on common ground and how him the org could move forward together.

## E. Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:

Feedback provided directly to the student at the conclusion of the interview.

 @marquette.edu

## EDUCATION

**Marquette University Law School**, Milwaukee, WI
*Candidate for Juris Doctor*, May 2024
GPA: Available late-January 2022
Honors:          Thomas More Law Scholarship
Leadership:     Asian Law Student Association (1L Representative), Organization for Student Wellbeing
                (Diversity Chair), Peer+ Lead Facilitator (Wellness Peer Educator)
Activities:       Association for Women Lawyers, First Generation Professionals, Hispanic-Latino Law
                Students Association, Marquette Immigration Law Association

**Marquette University Graduate School of Management**, Milwaukee, WI
*Candidate for Master of Business Administration*, May 2025

**Marquette University**, Milwaukee, WI
*Bachelor of Science in Business Administration*, *cum laude*, December 2021
Minor in Spanish for the Professions
GPA: 3.555/4.000
Honors:          Chicago Alumni Club Scholarship, Père Marquette Award, Dean's List (4/6 Semesters),
                Emerging Leader, Homecoming Court (2020), NRHH Leadership Pin, NRHH Service
                Pin, Pre-Law Scholar, St. Joan of Arc Leadership and Service in Action Award
Leadership:     Campus Ministry (Retreat Leader), La Sociedad Nacional Honoraria Hispánica (Social
                Media Coordinator), Peer+ Sexual Violence Prevention and Education Team (WPE)
Activities:       Bayanihan Student Organization, National Residence Hall Honorary

## LEGAL EXPERIENCE

**Legal Action Wisconsin**, Milwaukee, WI
*Unemployment Insurance Intern*, August 2021-December 2021
- Research legal issues with Unemployment Insurance and Pandemic Unemployment Assistance
- Guide clients and collaborate with supervising attorneys in completing documents and drafting
  closing and consent documents for attorneys and clients (English & Spanish)
- Schedule clinic appointments (English & Spanish)

## OTHER EXPERIENCE

**Michael Best & Friedrich LLP**, Waukesha, WI
*Recruiting Intern*, May 2021-August 2021
- Coordinated summer program activities for summer associates
- Evaluated and assessed summer program to adjust for future summer programs
- Scheduled appointments across 12 firm offices

## LANGUAGE SKILLS

Proficient in Spanish (written and oral)

## INTERESTS

Cooking, hot yoga, painting, and photography

<span style="color:red">Exhibit 53</span>

24



Personal Statement

I am a product of the American Dream. My grandparent's struggles, sacrifices, and drive have given me opportunities they only dreamed of when leaving the Philippines to come to America. "Bayanihan" is a Filipino word meaning "togetherness." This word is short and simple, but it encapsulates my identity. I am Kaitlin Clancy, a second-generation Asian-American and first-generation college and professional student. I am driven by my cultural background and have carried my family's legacies forward by pursuing a career in labor and employment and immigration law. I am a pre-law scholar working toward a J.D. from the Marquette University Law School and an MBA from the Marquette University Graduate School of Management.

Bayanihan made sense to me because I grew up in a household that celebrated my mixed Filipino and Irish heritage–understanding the importance of a person's background and experience. I am a combination of the best parts of my parents and that makes it easier for me to connect, understand, and be empathetic with others. I want to be a champion of diversity and inclusion, using my voice to support those who cannot advocate for themselves. I am on track to pay this forward in my career. My minor in Spanish allows me to connect with others more directly, especially with my intention of working in corporate immigration. Speaking to someone who needs advocacy in their native tongue can bring the immense sense of security and comfort they may need at that moment.

I have seen the power of my education and appreciation for diverse backgrounds in action through English cases and Spanish pro bono cases. On my first assignment with the unemployment insurance clinic at Legal Action of Wisconsin, I was meant to observe a court hearing. When the attorney explained the process of the hearing to the client and the client looked at me in confusion, I jumped right into bridging the language barrier for the English-speaking attorney and the Spanish-speaking client. For an hour, my capacity to speak two languages allowed me to translate and prepare the client, resulting in the client visibly calming down from the stress of their pending hearing. It was a remarkable feeling that I hope to continue throughout my career in this service-oriented profession.

My emotional intelligence and intercultural communication skills make me an effective advocate for others. I aim to step away from every conversation having left a positive effect on others, encouraging them to do the same in their day-to-day lives. I foster a community of bayanihan where people are seen as a culmination of every experience, lesson, and opportunity they had in life. I help others embrace their background with pride and excitement. In doing this, I encourage my teammates and peers to bring all that they are to the table because what they have to offer is unique and important. My background and experience assist in my ability to effectively serve my community and provide a sense of bayanihan to campus and in my future career.

1

Attorney-Client privileged Communication

Attorney Work Product

MEMORANDUM

TO: Anne Kearney
FROM: ████████
DATE: December 8, 2021
RE: Memorandum – Saul Goodman; File No. 2553-809;
Validity of Exculpatory Contract

Magic Sun Water Sports, "Magic Sun," alleges our client, Saul Goodman, signed a release of liability on a valid exculpatory contract. The client asks us to investigate the enforceability of the exculpatory contract.

**Issue**

Whether an exculpatory contract is enforceable where the public policy considerations require that it be appropriately limited in its release or waiver of claims and provide adequate notice in the circumstance of a parasailing event and where the injured party talked to the owner before signing a waiver and an accident occurred and that there be an opportunity for bargaining.

**Brief Answer**

No. The preprinted form did not set reasonable or specific expectations of liability, provide adequate notice of rights waived, nor allow an opportunity for voluntary bargaining. The overly broad scope of the contract's liability coverage and the absence of adequate notice and bargaining opportunity likely make this contract void.

**Statement of Facts**

While on vacation in Door County in July 2020, Saul Goodman and Kim Wexler decided to parasail. The pair were first-time parasailers and were attracted to a local parasailing company, Magic Sun Water Sports, through an advertisement displaying a breathtaking view of the shoreline. Magic Sun is an established parasailing company in Fish Creek, owned by Chuck McGill. To adventure with them, guests are first required to sign a release and waiver of liability, otherwise

1

Attorney-Client privileged Communication

Attorney Work Product

known as an exculpatory contract. This is a contract where parties relieve themselves from liability or harm caused by their negligence. They are common with businesses that work with potentially dangerous activities. The wording of the release and waiver of liability signed by Goodman and Wexler read as follows:

### RELEASE AND WAIVER OF LIABILITY

I, _____, understand that there are inherent risks to parasailing and I AGREE TO HOLD MAGIC SUN WATER SPORTS HARMLESS ON ACCOUNT OF ANY INJURY, INCLUDING DEATH, THAT MAY BE INCURRED BY ME DURING MY TIME AND ACTIVITY WITH MAGIC SUN WATER SPORTS. Risks include, but are not limited to, parasail collapse and subsequent immersion in water, drowning, injury or death due to unexpected gusts of wind, injury or death due to equipment failure, injury or death due to ordinary negligence of any and all personnel under the employ of Magic Sun Water Sports. I UNEQUIVOCALLY ASSUME ALL RISK ASSOCIATED WITH THE WATER EXCURSION TAKING PLACE ON THIS DATE: _____. This RELEASE AND WAIVER includes all activities associated with the parasailing excursion, including boat travel to and from the parasailing site, getting on and off the boat, lift-off and descent from the boat deck, as well as while riding as a passenger in the boat.

Signature: _____     Date: _____

Before signing the release and waiver of liability, Goodman and Wexler spoke with McGill. Goodman questioned how long the company had been in business and whether there had been any accidents. McGill confirmed that Magic Sun's participants had not had a single accident in their 17 years of operation and promised a wonderful excursion. The excursion took place on a large speedboat; a crew member assisted participants with their harness and parachute before standing on the back platform, or flight deck, for takeoff. Wexler inquired about the frequency of equipment inspections. McGill personally inspected all the equipment daily and replaced the faulty or damaged equipment as needed.

2

Attorney-Client privileged Communication

Attorney Work Product

The release and waiver of liability merit specific attention as a single, preprinted form:

### RELEASE AND WAIVER OF LIABILITY

I, _____, understand that there are inherent risks to parasailing and I AGREE TO HOLD MAGIC SUN WATER SPORTS HARMLESS ON ACCOUNT OF ANY INJURY, INCLUDING DEATH, THAT MAY BE INCURRED BY ME DURING MY TIME AND ACTIVITY WITH MAGIC SUN WATER SPORTS. Risks include, but are not limited to, parasail collapse and subsequent immersion in water, drowning, injury or death due to unexpected gusts of wind, injury or death due to equipment failure, injury or death due to ordinary negligence of any and all personnel under the employ of Magic Sun Water Sports. I UNEQUIVOCALLY ASSUME ALL RISK ASSOCIATED WITH THE WATER EXCURSION TAKING PLACE ON THIS DATE: _____. This RELEASE AND WAIVER includes all activities associated with the parasailing excursion, including boat travel to and from the parasailing site, getting on and off the boat, lift-off and descent from the boat deck, as well as while riding as a passenger in the boat.

Signature: _____     Date: _____

As seen above, there are variations in capitalization and emphasis. The contract required Goodman and Wexler to "unequivocally assume all risk." McGill was there to answer questions throughout the signing period. On July 25, 2020, Goodman and Wexler signed and dated their release and waiver of liability form then boarded the boat.

Goodman decided to take off first, his parachute filled with air, and he became airborne up to 500 feet over the water. After approximately 15 minutes, the winch began to pull him back into the boat. When Goodman was about 30 feet above the water, the driver's hat blew off. As the driver reached for his hat, he sped up the boat and failed to notice that he had dragged Goodman and the parachute under the water. Wexler eventually noticed and immediately called upon the others for help.

3

Attorney-Client privileged Communication

Attorney Work Product

The damage to Goodman was severe: Goodman wound up tangled in the cords and lines from the parachute while being jolted underwater. His lifejacket could not help with the rapidly accelerating boat dragging him.

The driver soon maneuvered the boat so the crew member on the lookout could cut away the ropes and safely pull him onto the boat, but the damage had already been done. The driver radioed for an ambulance to meet them at the shore. Goodman was rushed to the hospital, having sustained nerve damage to his arms and legs from deep lacerations and pneumonia from the 15-second plunge into the water before the crew could free him and pull him onto the boat.

Looking to recover a portion of his medical expenses, Goodman (and Wexler) seek to test the enforceability of the contract they signed. Furthermore, they would like to know whether Goodman has a claim against Magic Sun for his injuries.

**Discussion**

I. **The Exculpatory Contract Signed by Goodman Is Likely Not Enforceable Under Wisconsin Law.**

The Second Restatement provides that exculpatory contracts may be unenforceable due to the absence of adequate notice, use of overly broad and all-inclusive terms, or failure to provide an opportunity to negotiate terms with participants. Restatement (Second) of Contracts § 195 (2019). Based on the terms of the waiver provided by Magic Sun, Goodman and Wexler can likely argue for its invalidity. As explained below, the exculpatory contract signed by Goodman and Wexler is problematic when public policy considerations are considered. To begin, Wisconsin courts will look to whether the activity involved is covered by the exculpatory contract. Here, the activity of parasailing is covered by the exculpatory contract and, therefore, the court can continue with its analysis.

4

Attorney-Client privileged Communication

Attorney Work Product

Wisconsin courts will then turn to public policy considerations to determine whether the terms of the contract provide adequate notice, are appropriately broad in their terms, or permit voluntary bargaining power on behalf of the participant signing the release and/or waiver. *See, e.g., Atkins v. Swimwest Family Fitness Ctr.*, 2005 WI 4, 277 Wis. 2d 303, 691 N.W.2d 334, *Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, 348 Wis. 2d 251, 831 N.W.2d 445, *Roberts v. T.H.E. Ins. Co.*, 2016 WI 20, 367 Wis. 2d 386, 879 N.W.2d 492.

### A. The Release and Waiver of Liability That Goodman Signed Is an Unenforceable Exculpatory Contract Because It Fails to Provide Adequate Notice.

Wisconsin case law does not typically favor exculpatory contract agreements and analyzes exculpatory contracts based on both principles of contract law and public policy grounds. *See Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 8, 348 Wis. 2d 251, ¶ 8, 831 N.W.2d 445, ¶ 8. Valid exculpatory contracts must set reasonable expectations for participants. Restatement (Second) of Contracts § 195 (2019). Furthermore, a proper exculpatory contract should enforce a limited scope of applicability, but the exculpatory contract here covers an excessive number of activities that are not relevant to the excursion in which the signers are consenting to participate. *See Atkins v. Swimwest Family Fitness Ctr.*, 2005 WI 4, ¶ 18, 277 Wis. 2d 303, ¶ 18, 691 N.W.2d 334, ¶ 18.

By way of example, concerns about no limitations in the scope of applicability troubled the court in *Brooten. See Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 11, 348 Wis. 2d 251, ¶ 11, 831 N.W.2d 445, ¶ 11. In *see id*, the court concluded that the preprinted form did not constitute adequate notice of liability release because of the overreach of terms and failure to clarify the resulting responsibility or liability for any injuries incurred. *See id*. Further, the contract in *Brooten* covered a wide range of activities without specifying risks that would not typically be included while participating in the activity. *See id*. Rather, the contract aimed to completely

5

Attorney-Client privileged Communication

Attorney Work Product

absolve the company from any harm that could come during the participant's time with the company. *See id.* The court concluded that these issues contributed to the contract's invalidity. *See id.* In Goodman's case, the same issues would appear to apply to that exculpatory contract. [terms].

A valid exculpatory contract lays out the terms and conditions of the agreement, so the signee has the full picture understanding of where liability lies for certain actions and happenings. An additional issue with notice to a signer of an exculpatory contract arises where the document appears to have more than one purpose. Such a dual-purpose waiver was at issue in *Atkins*. In *Atkins*, the son of the decedent files a wrongful death claim due to an unenforceable exculpatory contract his mother signed before drowning at a fitness center. *See Atkins v. Swimwest Family Fitness Ctr.*, 2005 WI 4, ¶ 27, 277 Wis. 2d 303, ¶ 27, 691 N.W.2d 334, ¶ 27. The court determined that the registration card and waiver of liability *Atkins* signed before her participation in activities with the fitness center was not sufficient to satisfy a valid exculpatory contract because it did not explicitly specify that, by signing the card, the participant released the facility from negligent acts *See Id.*

The form in *Atkins* had a dual purpose and that was a problem, according to the court, because there was nothing outwardly conspicuous in the way the waiver was attached to the registration and presented to the participant. *See id.* Someone in the position of *Atkins* would likely not notice the extent of the liability release by reading the standard form, especially when it is required to join the activity.

The registration card and waiver of liability that was, like Goodman and *Brooten*, used on a take-it-or-leave-it basis. Magic Sun's release and waiver of liability emphasized terms that influence patrons's understanding of the rights they're signing off on. As demonstrated by the

6

Attorney-Client privileged Communication

Attorney Work Product

court in *Brooten* and *Atkin*, a participant is owed a duty of care during an excursion and fair notice of what risks are associated with the given activity for which they are consenting.

**B. The Release and Waiver of Liability That Goodman Signed Is an Unenforceable Exculpatory Contract Because It Is Overly Broad and All-inclusive.**

A preprinted form does not allow room for bargaining for the signer. The language in *Brooten*'s release was overly broad and all-inclusive of acts, including unforeseen negligence. *See Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 10, 348 Wis. 2d 251, ¶ 10, 831 N.W.2d 445, ¶ 10. The court expressed its concern in *Brooten* that the language used in that exculpatory contract of "any injury of any type" is not specific enough for a participant to consent fully through an exculpatory contract as it does not provide adequate notice for specific harms that may come throughout participation with the company. When joining the fitness club, *Brooten* signed a preprinted registration and waiver that "voluntarily agree[d] to release, waive, discharge, hold harmless, defend, and indemnify" the fitness center in the event of "bodily injury, property damage, wrongful death, loss of services or otherwise which [could] arise out of [her] use of any equipment or participation in these activities." *See Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 6, 348 Wis. 2d 251, ¶ 6, 831 N.W.2d 445, ¶ 6, *citing Atkins v. Swimwest Family Fitness Ctr.*, 2005 WI 4, ¶ 11, 277 Wis. 2d 303, ¶ 11, 691 N.W.2d 334, ¶ 11. This was not narrow enough to constitute definite and reasonable expectations of liability relief for the fitness center, making the contract unenforceable.

Like the contract in *Brooten*, the release and waiver of liability from Magic Sun describes coverage of "all activities associated with the parasailing excursion, including boat travel to and from the parasailing site, getting on and off the boat, lift-off and descent from the boat deck, as well as while riding as a passenger in the boat," but not specific activities that may come along with the unpredictable actions of the company or their employees during these events. The contract

7

Attorney-Client privileged Communication

Attorney Work Product

speaks to ordinary negligence, but no injuries that could occur under unusual circumstances. There is no room for voluntary bargaining of terms in the set form; it is used on a take-it-or-leave-it basis. The absence of specificity and opportunity for negotiation contributes to the contract being contrary to public policy.

Contracts require terms that are relevant, reasonable, and delivered with clarity. Magic Sun's release and waiver of liability emphasized its terms between capital and lowercase letters that appear to draw attention from the terms of liability to the signature and date themselves; the examples of possible risks are written in lowercase letters, but the release of all injuries is in capital letters. This broadened language is overly inclusive because it extends to "any" possible injuries that could occur "during [patrons's] time and activity" with the company," extending to the actions of the company or its employees during their operation of the excursion. Patrons were not aware that signing off on these take-it-or-leave-it waivers covered most torts. The lack of adequate notice does not permit this release to be a valid, enforceable contract.

**C. The Release and Waiver of Liability That Goodman Signed Is an Unenforceable Exculpatory Contract Because It Does Not Permit Voluntary Negotiation of The Terms.**

The patrons of Magic Sun sign off on a preprinted contract that does not permit accommodations, clarifying language, or thoughtful consideration of terms. Although McGill was available for questions, McGill did not answer any regarding the excursion and release and waiver of liability form; McGill answered questions about the company itself, not the terms of the agreement. As an all-or-nothing contact with no opportunity for negotiation on the specific risks and intent of the release of liability waiver, Magic Sun's release and waiver of liability are against public policy.

8

Attorney-Client privileged Communication

Attorney Work Product

The court in *Brooten* found the contract unenforceable because of its take-it-or-leave-it basis as "[t]he form itself must provide an opportunity to bargain." *See Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 9, 348 Wis. 2d 251, ¶ 9, 831 N.W.2d 445, ¶ 9, *citing Richards v. Richards*, 181 Wis. 2d 1007, 513 N.W.2d 118 (1994)). *See also Roberts v. T.H.E. Ins. Co.*, 2016 WI 20, 367 Wis. 2d 386, 879 N.W.2d 492 (court held exculpatory contract unenforceable where there is not sufficient bargaining opportunity as it was a no-questions-asked requirement for signing the contract). Like Magic Sun's release and waiver of liability, the form in *Brooten* did not provide the opportunity to request specific details of activities. Rather, the pre-printed contract covered all activities throughout the participant's time with the company. The forms in both instances include terms that relieve the company from "liability for any harm and any cause under the sun" *quoting Brooten v. Hickok Rehab. Servs., LLC*, 2013 WI App 71, ¶ 13, 348 Wis. 2d 251, ¶ 13, 831 N.W.2d 445, ¶ 13. Furthermore, if they did not sign the standard forms, they would not have been able to participate in the activity at all. The signers did not have the opportunity to bargain with the companies over the exculpatory language in the forms they signed, violating public policy.

<u>**Conclusion**</u>

It is likely to be found that Goodman and Wexler did not sign a binding, enforceable exculpatory contract with Magic Sun for the period during which they were participating in a parasailing excursion with the company. An exculpatory contract is unenforceable where the contract serves purposes that are not identified or distinguished, overly broad and all-inclusive, and yields little or no opportunity for voluntary bargaining. The release and waiver of liability that Goodman and Wexler signed off on covered the duration of anything while on the excursion. It did not specify actions of covered liability release and was on a standard preprinted agreement that did not allow an opportunity for negotiation. Given that none of these elements were

9

Attorney-Client privileged Communication

Attorney Work Product

fulfilled by Magic Sun, the company should not be relieved from liability arising from the injuries incurred by Goodman during the excursion.

10

**OFFICIAL INTRA-UNIVERSITY  LAW SCHOOL RECORD**

**Name:**
**Student ID:**

Institution Info:          Marquette University
Print Date:                01/21/2022

Other Institutions Attended:
Marquette University

**Beginning of Law Record**

**2021 Fall**

External Degrees

Marquette University
Bachelor of Business Admin    12/01/2021

End of OFFICIAL INTRA-UNIVERSITY  LAW SCHOOL RECORD

Unofficial



**STATE BAR OF WISCONSIN**

*Your Practice. Our Purpose.®*

# 2022 Diversity Clerkship Program

◄ ◄ ◄ ◄ ◄ ◄ ◄ ► ► ► ► ► ► ►

### Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

[ ] **Outstanding Candidate**

[☒] **Very Good Candidate**

[ ] **Average Candidate**

[ ] **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

**Or you can print it and scan it with your handwritten notes.**

**Return to Jacque Evans, jevans@wisbar.org no later than January 24.**

**Student Name:** ▬▬▬▬▬▬

**Law School:** [ ] UW    [☒] MULS

**Interviewer:** AH

## A. General Qualifications

*1. Relevant Skills and Qualities:*

Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

Check a Score:    *Lowest ↓*   [ ] 1    [ ] 2    [ ] 3    [☒] 4    ↑ *Highest*

Interviewer Comments:

She's interned at two notable legal offices in the past and seems very involved at the law school. It seems like she needs something more heavy duty when it comes to legal experience.

**2. Communication Skills:**

Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

Check a Score:    *Lowest ↓*   [ ] 1    [ ] 2    [ ] 3    [☒] 4    ↑ *Highest*

Interviewer Comments:

Her writing is good and she is a very good communicator. She needs a challenging legal experience, something where she could really shine.

## B. Interview Characteristics:

✱ ▬▬▬ has been through a lot of challenge but still managed to persevere and finish her 1L year. She is in a better place now and ... a place where she can shine and sh...

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score:   *Lowest* ↓   ☐ 1   ☒ 2   ☐ 3   ☐ 4   ↑ *Highest*

**Interviewer Comments:**
She was the only candidate that was not professionally dressed and did her interview from her bedroom with dogs barking in the background. However, she had the strongest interpersonal skills of all.

C. <u>Motivation for Participation in the Diversity Clerkship Program:</u>

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:*  *What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score:   *Lowest* ↓   ☐ 1   ☐ 2   ☐ 3   ☒ 4   ↑ *Highest*

**Interviewer Comments:**
She explained how only 2% of attorneys are Asian American and she wants to help change that.

D. <u>Interviewer's Perspective:</u>

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:*  *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

**Interviewer Comments:**
She said she would be interested in learning more about the cultural values of the company, and she would find a way to help it strengthen her skills.

E. <u>Student Feedback:</u>

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

**Interviewer Comments:**

 · ███@wisc.edu

## EDUCATION

**University of Wisconsin Law School**                                          Madison, WI
*Juris Doctor Candidate*                                                          *May 2025*
    **Honors:**    Full-Tuition Law-In-Action Scholarship
    **Activities:**    Unemployment Appeals Clinic

**Macalester College**                                                           St. Paul, MN
*Bachelor of Arts in Political Science and Latin American Studies*               *May 2019*
    **GPA:**    3.23
    **Honors:**    Kofi Annan Scholarship; Latin American Studies Capstone Presentation
    **Study Abroad:** IFSA-Butler program in Buenos Aires, Argentina, Fall 2017

## EXPERIENCE

**MyMusicTaste Co., Ltd**                                                        Seoul, Republic of Korea
*Legal Assistant*                                                                *Aug. 2019 - Apr. 2020*
- Reviewed and updated performance agreements and local promoter agreements for concert tours abroad for music artists, primarily K-pop groups
- Researched copyright laws pertinent to concert locations, mainly in Europe and North America
- Resolved tax issues with concert venue company in Germany
- Managed records of accounts receivable, international transactions, and company invoices

**James H. Binger Center, University of Minnesota Law School**                   Minneapolis, MN
*Legal Intern*                                                                   *Sept. 2018 - May 2019*
- Researched security conditions of asylum seekers' countries and produced summary reports for lawyers at the immigration clinic
- Trained 15 volunteers to visit immigration courts and survey the proceedings to ensure hearings met established quality standards
- Translated legal documents and letters between English and Spanish for immigrant detainees

**Goodwill-Easter Seals Minnesota**                                             St. Paul, MN
*Advocacy Intern*                                                                *Feb. 2018 - May 2018*
- Tracked the progress of legislative bills by attending weekly committee hearings
- Organized advocacy events, reaching out to over 200 participants and 3 coalition organizations
- Connected constituents to their congressmen to express support for bills related to disability

**Political Science Department, Macalester College**                            St. Paul, MN
*Office Assistant*                                                               *Sept. 2015 - May 2018*
- Designed posters and conference pamphlets to promote and organize department events
- Coordinated with student workers to conduct online research and organize data for professors

## ADDITIONAL INFORMATION

**Languages:**  Fluent in Korean, Intermediate in Spanish
**Interests:**    Travel, mountain hiking, cooking for groups

<span style="color:red">Exhibit 54</span>

Diversity matters. Before coming to the states, I grew up in Korea – one of the most homogenous countries in the world – barely experiencing cultural or ethnic diversity. Everyone looked and talked like me, but my world changed when I moved to California to study. When I heard the stories of my Taiwanese friend about her high school and college studies in America, I decided, I could do that too. My parents encouraged me to cold email the principal of her school, prepare for the school admission interview in second language despite my rudimentary English, and fly to the other side of the globe by myself – all at the age of fourteen.

Since then, my life has been colorful and exciting, full of interactions with people of different cultures and languages. Life as an international student was not all peaches and creams. I worked at least two to three times harder to achieve similar academic results as my peers. When communication with others fell short, I always wondered whether it was my fault, whether I missed something unsaid or implied, or whether I should have spoken differently. Still, I treasured how differently people think and express themselves because of their rich, diverse backgrounds. Differences no longer intimidated me. I embraced them and thus, expanded my understanding the world and learned to open to others.

Along my journey, I found inspiration in a chance encounter with a lawyer. I had never considered law school before, but she showed me that women lawyers could be powerful advocates for women. My work experience as a legal assistant in a software technology startup affirmed that my bilingual skills and conviction in the importance of diversity were valuable assets that would prepare me to become an attorney. During my one semester of law school, my studies and connections with many attorneys and classmates have enriched my journey towards becoming an international business attorney. It would be a privilege to grow through this internship opportunity as a legal professional, and more importantly, as an advocate for others. Representation matters.

2

Section 10

## QUESTION PRESENTED

Under the First Amendment of the United States Constitution and 42 U.S.C. § 1983, which protect one's freedom of speech and the injured party whose constitutional right has been violated, can Dr. Saumya Anand, as a public employee, bring a First Amendment retaliation claim against the Department of Health Services ("DHS") when she was abruptly demoted and transferred to a much less desirable office location after she spoke to her supervisor about the public health data discrepancies between her team's reports and those of a higher official?

## BRIEF ANSWER

Yes. Dr. Anand can bring a First Amendment retaliation claim under 42 U.S.C. § 1983 against DHS for violation of her constitutional right to freedom of speech by demoting and transferring her to a less desirable office because (1) her speech was constitutionally protected; (2) this speech was a cause of her employer's action; and (3) she suffered adverse employment action as a result. Dr. Anand's speech satisfies the three elements necessary to be constitutionally protected, which are that the speech was made as a private citizen, addressing a matter of public concern and that Dr. Anand's interest in addressing the matter of public concern outweighed the interest of her employer in promoting the efficiency of the public services it performs.

## STATEMENT OF FACTS

Our client Dr. Anand has worked at DHS as the Chief Epidemiologist for over fifteen years and has kept a spotless and exemplary employment record. Dr. Anand's job description includes supervising all the staff on her Data Analytics Team ("DAT-1") and reviewing and approving the monthly data reports generated by DAT-1. The monthly reports approved by Dr. Anand are sent to her supervisor Mr. Prasad, the Bureau Director, who then submits them to Ms. Martens, the Community Health Liaison ("CHL"). Ms. Martens compiles and summarizes the

1

health reports into grant proposals and funding requests sent to the Centers for Disease Control and Prevention ("CDC") and other governmental agencies. Though Ms. Martens received reports from Dr. Anand's team, she was neither Dr. Anand's supervisor nor in the direct chain of command.

The problem arose in March 2022, when DAT-1 investigated the emergence of a new, highly contagious virus known as the respiratory syncytial virus ("RSV"). Dr. Anand was following the number of RSV outbreaks closely because the symptoms of RSV are so similar to those of COVID-19 that it could be mistaken and go undiagnosed and untreated. Left untreated, it can develop into pneumonia and cause severe respiratory distress or failure. RSV is also most common in young children, which motivated Dr. Anand to pay close attention to the reports as she also had two children.

On Thursday, August 4th, Dr. Anand received an email from Ms. Martens titled "July 2022 CHL Summary Report for CDC/HHS." Dr. Anand believes the email was sent to her by mistake because her work never required her to communicate directly with Ms. Martens. When Dr. Anand opened the attachment in the email, she noticed that the cases of RSV in the report did not match those that the DAT-1 had reported for that month. The numbers reported to CDC were ten percent higher when compared directly to her reports. To check whether this was a one-time mistake, Dr. Anand compared RSV data reported from March through July and found that none of the numbers matched the reports she approved. Data reported by CHL all included higher numbers by five to ten percent. Dr. Anand became very concerned about the possible repercussions for her team and DHS, not to mention the impact of the falsely reported RSV numbers on the public health of her community. Over the weekend, Dr. Anand prepared a

2

detailed memorandum and chart with a side-by-side comparison showing discrepancies in the numbers reported.

The following Monday, Dr. Anand called Mr. Prasad to set up a meeting and to discuss this issue "of utmost importance." The next day, she met with Mr. Prasad and showed him the memo and chart she had prepared. Mr. Prasad appeared shocked but instructed Dr. Anand not to speak with anyone about the issue until he discusses it with HR and Ms. Martens' office. He also advised her not to contact CDC directly since it may compromise the internal investigation. Dr. Anand understood this very well because Ms. Martens was a subject of a scandal when her office was suspected of misappropriating DHS' federal COVID relief funds. After her meeting with Mr. Prasad, Dr. Anand did not discuss the issue with anyone but learned nothing about the internal investigation. About two weeks later, Dr. Anand was called into the DHS HR Director's office and told that she was being demoted from Chief to Staff Epidemiologist and transferred to an off-site lab.

The HR Director explained that Dr. Anand was being transferred because of a staffing shortage in the off-site lab. The Director also mentioned a concern "from above" that Dr. Anand showed a lack of trust in CHL's office that could compromise the work environment. Dr. Anand suspects that her demotion and transfer directly resulted from her discovery of the misreported numbers of RSV. After all, the amount of financial support and resources that DHS receives from the federal government is tied directly to the demonstrated need and the size of a live outbreak like that of RSV.

## DISCUSSION

Dr. Anand has a viable First Amendment retaliation claim against DHS under 42 U.S.C. § 1983 because (1) her speech was constitutionally protected; (2) this speech was a cause of her

3

employer's action; and (3) she suffered adverse employment action as a result. Kristofek v. Village of Orland Hills, 832 F.3d 785, 792 (7th Cir. 2016). The First Amendment of the United States Constitution protects the freedom of speech, and 42 U.S.C. § 1983 provides the remedy to the injured party for "the deprivation of any rights, privileges, or immunities secured by the Constitution." The last two issues, that Dr. Anand's demotion and transfer to a less desirable location were the results of her speech addressing the data discrepancies, are not disputed. Thus, the analysis will focus on the first issue, that the public employee's speech was constitutionally protected. Three elements must be proven. First, the public employee made the speech as a private citizen. Kristofek, 832 F.3d at 792. Second, the speech addressed a matter of public concern. Id. Third, the public employee's interest in addressing the matter of public concern outweighed the employer's interest in promoting the efficiency of the public services it performs. Id.

In Kristofek, the Seventh Circuit Court held that a former village police officer's spoken concerns about possible official misconduct to other officers and the FBI were protected under the First Amendment and that his termination violated his constitutional right. Id. at 788. While working, David Kristofek cited and arrested Alonzo Marshall for several car insurance-related infractions. Id. at 790. After several phone calls between Mr. Marshall's mother, local politicians, and Thomas Scully, the Village's chief of police, Mr. Marshall was released, and the citations against him were voided. Id. at 791. Several months later, Kristofek participated in a police training session that involved hypothetical instances of official police misconduct. Id. Based on the training, Kristofek became concerned that official misconduct may have occurred involving the voided citations. Id. Two weeks after the training, Kristofek consulted with an attorney and shared his concerns with the FBI and two other officers involved in the voided citations. When

the two officers reported Kristofek's concerns to Scully, Kristofek was terminated. Id. The court ruled that the termination violated Kristofek's constitutional right because his speech was made as a private citizen about a matter of public concern, and his interest in speaking outweighed Scully's interest in promoting efficiency within the department. Kristofek, 832 F.3d at 792.

I. **Dr. Anand's speech is constitutionally protected because she made the speech as a private citizen.**

The Supreme Court instructs that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. However, the public employee's speech loses constitutional protection when it falls within the scope of her duties and not simply because it concerns her work. Id. at 793. Moreover, the scope of an employee's official duties is determined by the job description and the unwritten responsibilities the employee is expected to perform. Id. Kristofek's responsibilities as a police officer involved traffic enforcement and placing calls for public service and officer backup. Id. Voiding citations or determining when arrestees could be released was never commissioned by his employer and, thus, is not under his official duties. Id. Therefore, Kristofek was found to be speaking as a private citizen to his colleagues and the FBI. Id. at 794.

Our client, Dr. Anand, can show that her speech on the RSV data discrepancies to Mr. Prasad is constitutionally protected because she was speaking as a private citizen. As the Chief Epidemiologist at DHS, Dr. Anand's official duties under the job description do not include monitoring public health data beyond her team's reports. Dr. Anand's work is completed when she sends the reports on RSV cases to Mr. Prasad. How she received CHL's RSV reports was purely accidental, and the subsequent investigation by Dr. Anand was motivated by her concern

5

for the bigger public health implications. Making sure that the data her team reported is accurately reported to CDC by Ms. Martens also could not be seen as an unwritten responsibility that Dr. Anand is expected to perform. Ms. Martens was never Dr. Anand's direct chain of command, nor was communication with her a regular part of Dr. Anand's job. Therefore, Dr. Anand spoke as a private citizen when she alerted Mr. Prasad of RSV data discrepancies in CHL's reports.

**II. Dr. Anand's speech is constitutionally protected because the speech addressed a matter of public concern.**

The speech addresses a matter of public concern when it fairly relates to any matter of political, social, or other concern to the community. Kristofek, 832 F.3d at 794. A statement of purely personal interest would not be constitutionally protected, but "a mere personal aspect of the speaker's motivation will not defeat the entire speech" for First Amendment purposes. Id. Likewise, the court ruled that it does not matter that Kristofek was motivated, at least in part, by self-interest. Id. at 795. He did not merely express his concern for being punished but took clear steps to alert outside law enforcement that official misconduct may have occurred and encouraged others to do so. Id. More importantly, approximately two weeks passed before he contacted the FBI, thus indicating that self-preservation was not the only motivation behind his speech. Id.

The speech's content, form, and context must then be examined to determine that a speech addresses a public concern. Id. at 794. In Kristofek, the content of the speech was that Mr. Marshall's citations were voided and that he was released solely on account of political favoritism. Regarding the form, the court looks at whether it was "the employee's point to bring wrongdoing to light" or to simply raise issues of public concern because they are of public

6

concern. Id. Kristofek first reached out to two of his colleagues and then to the FBI as he sought to alert a larger audience of the possible harm at issue. Id. Moreover, before mentioning the details, Kristofek told his colleagues that he was considering reporting official misconduct. Id. This created a "communicative element," putting the listeners on notice that a matter of public concern was being raised. Kristofek, 832 F.3d at 795. The communicative element provided the context that Kristofek did not intend to keep his conversation or the matter of public concern confidential. Id. at 794.

Dr. Anand's speech should also be constitutionally protected because it addressed a matter of public concern in its content, form, and context. Dr. Anand was partially motivated to follow RSV data closely for personal reasons, her children. However, the Seventh Circuit Court ruled that the mere personal aspect of her motivation does not bar her speech from First Amendment protection. Id. In her speech, Dr. Anand expressed her concerns about the broader public health implications that would be caused by false data on RSV, especially on children's health.

Regarding the form of her speech, like Kristofek, Dr. Anand did not immediately contact her superior after receiving Ms. Martens' email. Id. at 795. She confirmed that not only the data from one month included in the email were inaccurate, but took time to review all reports beginning from March to July. She prepared a detailed memorandum and chart with a side-by-side comparison showing the discrepancies in the RSV case numbers from the DAT-1 and the CHL reports. She went as far as to check if there were discrepancies in other disease variants. When she called Mr. Prasad to express her concern, she also had a "communicative element," as Kristofek did, which put him on notice that an issue "of utmost importance" would be discussed. Id. at 794. Lastly, the context of Dr. Anand's speech indicates that she aimed to

alert a greater audience to the possible harm. In her meeting with Mr. Prasad, Dr. Anand mentioned that she planned to contact the CDC directly to alert them to these data discrepancies. Overall, Dr. Anand's speech should be constitutionally protected because her speech, in its content, form, and context, addressed a matter of public concern.

**III.    Dr. Anand's speech is constitutionally protected because her interest in addressing the public concern outweighs the interest of her employer.**

In order for a public employee's speech to be constitutionally protected, she must show that her interest as a citizen in commenting on matters of public concern outweighs the interest of the employer in promoting the efficiency of the public services it performs through its employees. Kristofek, 832 F.3d at 795 (citing Pickering v. Board of Education, 391 U.S. 563 (1968)). The following seven factors are considered in balancing a public employee's free-speech interests against an employer's management interests:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision making; and (7) whether the speaker should be regarded as a member of the general public.

Id. at 796. In Kristofek, Scully testified that he was unaware of any concrete way that Kristofek's speech interfered with the actual operations of the department. Id. Kristofek's speech was measured and succinct. Id. at 797. Before talking to his colleagues, Kristofek had also consulted with an attorney who suggested that he contact the FBI. Id. Kristofek's belief that official misconduct may have occurred within the highest ranks of the police department represented a matter of strong public concern and one that was communicated discreetly to the FBI and to two co-workers. Id. Kristofek's interest in making this speech was paramount and did outweigh those of Scully's department. Id.

8

Similar to Kristofek, Dr. Anand voiced her concern cautiously on RSV data discrepancies. Id. As mentioned earlier, Dr. Anand notified Mr. Prasad that she had an important issue to discuss with him in a scheduled meeting. She intentionally did not tell anyone else at work because she did not want to compromise any potential internal investigation or cause disruption within her team. Because no one except Dr. Anand knew about the problem and she prepared the memorandum over the weekend, it is impossible for her speech to have negatively affected her workplace. Dr. Anand also contemplated contacting the CDC directly out of concern for the greater public health implications but was prevented by Mr. Prasad. She understood that it was important not to openly share her concern because Ms. Martens was already the subject of a scandal and had every incentive to keep the RSV data issue under wraps. Dr. Anand's findings that the RSV cases have been inflated and inaccurately reported to the CDC represent a matter of strong public concern, which was communicated clearly and discreetly to her supervisor. Thus, Dr. Anand's interest in addressing the data discrepancies is not outweighed by DHS's interest since her speech actually improved the public service performed by DHS by noticing inaccurate reports.

**CONCLUSION**

Dr. Anand's speech is constitutionally protected because she was speaking as a private citizen on a matter of public concern, and her interest in addressing the public concern outweighed that of her employer. The court will sustain Dr. Anand's First Amendment retaliation claim because not only was her speech constitutionally protected, but she also suffered adverse employment action as a result of her protected speech. The Seventh Circuit Court has stated that the courts must be careful in concluding that employees have spoken pursuant to their official duties when the speech concerns allegations of public corruption. Kristofek, 832 F.3d at 793.

9

Section 10

One reason is that public employees who actually witness corruption would be in the best place to report it. Id. More importantly, if the law does not protect public employees' speech like that of Dr. Anand, it would place those employees in an impossible position where the very kind of speech necessary to prosecute corruption by public officials may never form the basis for a First Amendment retaliation claim. Id.

10



# Course History Report for ▮▮▮▮▮▮

This document lists the courses, credits, and reported grades for the above-named student of the University of Wisconsin Law School during their current matriculation. This letter is not an official transcript and does not contain information concerning previous course work at the University of Wisconsin-Madison.

## Fall 2022

| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|



## Spring 2023 - All Courses In Progress

| Course # | Title | Instructor | Credits | Grade |
|----------|-------|------------|---------|-------|



Report Generated on 01/19/2023

Official transcripts available from the University of Wisconsin Office of the Registrar.



**STATE BAR** OF **WISCONSIN**
*Your Practice. Our Purpose.®*

# 2023 Diversity Clerkship Program

▶ ▶ ▶ ▶ ▶ ▶ ▶ ◀ ◀ ◀ ◀ ◀ ◀ ◀

## Interview Evaluation Fillable Form

---

### Interviewer Recommendation:

☐ **Outstanding Candidate**

☑ **Very Good Candidate**

☐ **Average Candidate**

☐ **Below Average Candidate**

---

**\*\*YOU WILL NEED TO DOWNLOAD THIS PRIOR TO FILLING OUT FOR EACH STUDENT.**

Or you can print it and scan it with your handwritten notes.

Return to Jacque Evans, jevans@wisbar.org no later than January 23.

**Student Name:** ████████████

**Law School:** ■ UW   ☐ MULS

**Interviewer:** Tanya Salman

### A. General Qualifications

*1. Relevant Skills and Qualities:*

Based on the candidate's interview and prior work experience or other appropriate activities, assess candidate's relevant skills and qualities and how prepared the candidate may be for legal employment.

Check a Score:  *Lowest* ↓ ☐ 1   ☐ 2   ☐ 3   ☑ 4   ↑ *Highest*

Interviewer Comments: *Immigration is my music — dealt w/ so many issues, incl. int'l.*

**2. *Communication Skills:***

Assess the candidate's ability to effectively communicate in English, both orally and in writing, as well as his/her ability to understand and communicate legal issues, professional issues and general instructions.

Check a Score:  *Lowest* ↓ ☐ 1   ☐ 2   ☐ 3   ☐ 4   ↑ *Highest*

Interviewer Comments:

### B. Interview Characteristics:

Based on the interview, give your impression of such characteristics as the candidate's confidence, poise, professional demeanor, maturity, interpersonal skills, personality, energy, enthusiasm, responsiveness, and appearance (in terms of dress, grooming, body language, eye contact, etc.)

Check a Score: *Lowest* ↓ ☐ 1 ☐ 2 ☑ 3 ☐ 4 ↑ *Highest*

Interviewer Comments: Not in a suit. But poised, well spoken

## C. Motivation for Participation in the Diversity Clerkship Program:

Evaluate the candidate's motivation for/interest in the Diversity Clerkship Program as shown by his or her personal essay and their responses to questions asked during your interview.

*ASK:* *What is your motivation for participating in the Diversity Clerkship Program?*

Check a Score: *Lowest* ↓ ☐ 1 ☐ 2 ☑ 3 ☐ 4 ↑ *Highest*

Interviewer Comments: Interested in practical experience - jumping into real work & getting hands on stuff. Nothing re: diversity. Between 2 and 3.

## D. Interviewer's Perspective:

Please provide specific comments relating to this candidate that you feel give additional insight to the selection committee.

*ASK:* *If an employer was not one of your top choices, what would you tell the interviewers if they asked you why you wanted to work for the organization?*

Interviewer Comments: Started slow but got to one nGrs spot - can learn from anywhere, but interested in joining a place that's on her dial

## E. Student Feedback:

Please provide feedback for this candidate regarding his or her interview skills, i.e. tips, skills to work on, etc. Please note: your answer below is the *only* feedback we provide to the candidate regarding his or her interview.

Interviewer Comments:
- Can tell very smart & will do very well. Part n it may be zoom, but I wanted more energy.
- Also no suit.
- But overall good! Thoughtful, provided examples, and clearly will be successful.

15

**State Bar of Wisconsin**

**Diversity Clerkship Program**

For the Twelve Months Ending

| | FY2024 Budget |
|---|---|
| **Revenues** | |
| Grant Income | 1,558 |
| **Total Revenues** | **1,558** |
| | |
| **Expenditures** | |
| Catering Expense | 2,900 |
| Awards & Recognition Expense | 500 |
| Miscellaneous Expense | 1,000 |
| Postage Expense | 200 |
| Printing Expense | 550 |
| Staff Travel Reimbursement Exp | 645 |
| Volunteer Mileage Reimbursement | 500 |
| Total Direct Expenditures | 6,295 |
| | |
| **Net Surplus (Deficit) Before Allocated Expenses** | **(4,737)** |
| | |
| Allocated Overhead | 9,151 |
| Allocated Personnel | 23,646 |
| Total Allocated Expenses | 32,797 |
| | |
| **Total Expenditures** | **39,092** |
| | |
| **Net Surplus (Deficit) After Allocated Expenses** | **(37,534)** |

Exhibit 55

| **Subject:** | RE: Request for Information & Records Concerning the Diversity Clerkship Program |
| --- | --- |
| **Date:** | Thursday, September 14, 2023 at 9:26:22 AM Central Daylight Time |
| **From:** | Larry Martin |
| **To:** | Skylar Croy |
| **CC:** | amunoz@brookdale.com |
| **Attachments:** | image001.png, Request for Information - FINAL.pdf, FY24 - Final Budget - Diveristy Clerkship Program.pdf, DCP PP 2023.pdf |

Dear Attorney Croy,

I write in response to your letter dated September 5, 2023, in which you request certain documents and other information regarding the State Bar's Diversity Clerkship Program pursuant to the State Bar's Access to Records Policy and Wisconsin's Public Records Law. First, as you may know, the Public Records Law is not applicable to the State Bar of Wisconsin. Entities created by the Wisconsin Supreme Court are not state agencies for purposes of that statute. *See State ex rel. Lynch v. Dancey*, 71 Wis. 2d 287, 291–98, 238 N.W.2d 81, 83–87 (1976); *see also* the Attorney General's Open Meetings Compliance Guide (beginning on Page 7; footnotes omitted):

> **Bodies Created by the Wisconsin Supreme Court**
> The Wisconsin Supreme Court has held that bodies created by the Court, pursuant to its superintending control over the administration of justice, are not governed by the open meetings law. Thus, generally speaking, the open meetings law does not apply to the Court or bodies created by the Court. In the *Lynch* case, for example, the Court held that the former open meetings law, Wis. Stat. § 66.77(1) (1973), did not apply to the Wisconsin Judicial Commission, which is responsible for handling misconduct complaints against judges. Similarly, the Attorney General has indicated that the open meetings law does not apply to: the Board of Attorneys Professional Responsibility; the Board of Bar Examiners; or the monthly judicial administration meetings of circuit court judges, conducted under the authority of the Court's superintending power over the judiciary.

Notwithstanding the inapplicability of the Public Records Law, the State Bar's Access to Records Policy does, as you note, voluntarily establish a general policy of transparency with respect to member requests for information. That policy is not, however, without exception and, as noted below, certain of the materials requested are excepted from the general policy of availability to members.

Responding to the specific questions and requests set forth in your letter:

<u>Questions</u>

- Has any employee of the Bar, who is paid using membership dues, performed work related to the Diversity Clerkship Program?

  Yes, but note that membership dues are less than half of the State Bar's annual revenues.

  If the answer is no, how is Ms. Evans being paid?

<span style="color:red; font-size:2em;">Exhibit 56</span>

N/A
- What were the two-line items mentioned above [in the FY2024 Budget under "Staff Adjustments"] referring to if not the Diversity Clerkship Program? Were membership dues used to pay for these items?

  These line items reference the Diversity Clerkship Program (DCP). The DCP has its own annual budget submitted and approved by the State Bar Board of Governors as part of the budget development, review, and approval process. A copy of the Fiscal Year 2024 budget for DCP is attached. As one of the State Bar's subsidized programs (in which expenses exceed direct revenues of the program), revenue sources inclusive of membership dues and others are used to fund this program.

- Were membership dues used to pay for the YouTube video? If not, how was it funded? Are any advertisements for the Diversity Clerkship Program funded using membership dues?

  See answer to previous question.

- Were any employees of the Bar at the law school events?

  Yes. Note: When employees attend law school events, their time is allocated based upon the function they are serving while attending the event, which may include DCP.

- Do you know if any of the governmental agencies noted above paid the clerks? Did these clerks receive scholarships, grants, or other funding from either the Bar or their respective schools?

  We can only speak to the State Bar with certainty. No scholarships/grants were provided from the State Bar to the DCP clerks for their work experience as part of this program. As to the participating employers, as noted in the materials you have reviewed online, the program contemplates payment to the clerks, with the details of those arrangements negotiated between the individual employer and employee.

- Were membership dues used to pay for the Diversity Clerkship Reception?

  See answer above re: funding for the DCP generally.

- How did the Executive Committee account for the Diversity Clerkship Program in calculating the upcoming *Keller* dues reduction? If the Executive Committee did not account for this program, is it open to reconsidering its calculation?

  The Executive Committee in its most recent *Keller* evaluation (August 25, 2023) once again confirmed the DCP as chargeable to State Bar membership dues, consistent with the opinion of the U.S. Court of Appeals for the Fifth Circuit. *See, McDonald v. Longley*, 4 F.4th 229, 249 (5th Cir. 2021), *cert. denied* ___ U.S. ___, 142 S.Ct. 1442 (Apr. 4, 2022) ("The Bar's various diversity initiatives through OMA, though highly ideologically charged, are germane to the purposes identified in *Keller*.") .

## Requests

- Any communications from Ms. Evans or any other employee or officer of the Bar concerning the Diversity Clerkship Program created or sent in the past year, including:

- o Any communications with prospective employers; and
- o Any communications with applicants.
  These records are not available to members, as set forth in the Access to Records Policy, Exceptions, Paragraph 6.
- Any documents that explain or further break down the two-line items mentioned above;
  These records are not available to members, as set forth in the Access to Records Policy, Exceptions, Paragraphs 2, 6.
- Any invoices, checks, or other documentation showing how the YouTube video was financed.
  These records are not available to members, as set forth in the Access to Records Policy, Exceptions, Paragraphs 2, 6.
- Any agendas or other documentation discussing what happened at the law school events.
  There are no agendas. A copy of the PowerPoint presentation used is attached.
- Any invoices, checks, or other documentation showing how the Diversity Clerkship Reception was financed.
  These records are not available to members, as set forth in the Access to Records Policy, Exceptions, Paragraphs 2, 6.

- Any documents showing how the *Keller* dues reduction is calculated.
  A full explanation is provided in the annual dues notice. The 2024 "Keller Dues Insert" can be found here:
  https://www.wisbar.org/formembers/membershipandbenefits/Documents/2024%20Keller%20Dues%20Insert.pdf.

Thanks for your inquiry.

*Larry*

Larry J. Martin
Executive Director
State Bar of Wisconsin
www.wisbar.org
(608) 257-3838

Support the Wisconsin Law Foundation.
Secure Online Donations here

Follow the State Bar on Facebook and Twitter.

**Your Practice. Our Purpose.®**

*This email message, including any files attached to it, is confidential and it is intended solely for the individual or entity to which it is addressed. If you have received this message in error, please do not read it, notify the sender by return email mail that you have received it, and delete all copies of this message from your email system.*

**From:** Skylar Croy <skylar@will-law.org>
**Sent:** Tuesday, September 5, 2023 10:03 AM
**To:** Larry Martin <lmartin@wisbar.org>
**Cc:** amunoz@brookdale.com

**Subject:** Request for Information & Records Concerning the Diversity Clerkship Program

Dear Executive Director Larry Martin:

Please see the attached letter. Also please confirm receipt of this request for information under the Bar's *Access to Records Policy* and request for records under Wisconsin's Public Records Laws.

Best Wishes,

**Skylar Croy** I Associate Counsel
Wisconsin Institute for Law & Liberty, Inc.
330 E. Kilbourn Ave., Suite 725 I Milwaukee, WI 53202
(920) 422-1861 I Cell



CONFIDENTIALITY NOTICE: The information contained in this e-mail and attached document(s) may contain confidential information that is intended only for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or taking of any action in reliance upon the information is prohibited. If you have received this e-mail in error, please immediately notify the sender and delete it from your system.

The Wayback Machine – https://web.archive.org/web/20231003173759/https://www.linkedin.com/po...

 **Linked**in

Join now     Sign in

## Wisconsin Department of Corrections' Post

 **Wisconsin Department of Corrections**
3,048 followers
2y     ···

DOC received the Champions of Diversity Award, honoring 17 years of service and involvement with the State Bar's Diversity Clerkship Program. The program is a paid summer employment opportunity connecting local Law School students of diverse backgrounds with employers. Read more here:
**https://lnkd.in/eQA4bFf**





👍🌐 12 · 2 Comments

👍 Like     💬 Comment     ➦ Share

**Keith Brockman**     2y ⋮
Oracle & SQL Server Database Administrator at Wisconsin Department of Corrections

Congrats

👍 Like · 💬 Reply

**State Bar of Wisconsin**     2y ⋮

<span style="color:red">**Exhibit 57**</span>

Thank you for your long-time support of the State Bar's Diversity Clerkship Program!

👍 Like · 💬 Reply

**See more comments**

To view or add a comment, **sign in**

# See other posts by Wisconsin Department of Corrections

**Wisconsin Department of Corrections**
3,048 followers
2h · Edited



**#VETERANS**, we want to partner with you! 🏅

Join Secretary Kevin Carr virtually on Wednesday, November 8 at 12pm CST for a short presentation about the rewarding career opportunities with **#WICorrections**, followed by a panel discussion with employees currently enrolled in the **#military**!

Why **#ChooseCorrections**? Our employees enjoy excellent state benefits & a nationally-ranked pension, and positions are available in virtually every field all across **#Wisconsin**!

Check out the Facebook event to learn more ⬇️

**Military Open House & Career Fair**
facebook.com

Like                              Comment                              Share

Case 2:23-cv-01697   Filed 12/19/23   Page 97 of 129   Document 1-3

To view or add a comment, **sign in**

**Wisconsin Department of Corrections**
3,048 followers
1d

**#WICorrections** is recruiting **#Financial** Specialists to fill current and future statewide vacancies over the next 6 months. These positions typically work with the accounts and payroll of persons in our care. Starting salary is $20.46–$23.93 (Senior), plus excellent **#benefits** and a nationally-ranked **#pension**! Learn more or apply at **State of Wisconsin** ⬇️

**#Wisconsin #corrections #nowhiring #financejobs #wijobs #wisconsinjobs #govjobs #madisonwi #applynow #statejobs #finance #payroll #hiring**

**Job Description**
wj.wi.gov

1

Like        Comment        Share

To view or add a comment, **sign in**

**Wisconsin Department of Corrections**
3,048 followers
4d

#reentrymatters

**Former inmate able to rebuild life through work in construction trades**
https://dailyreporter.com

17

| Like | Comment | Share |
|------|---------|-------|

To view or add a comment, **sign in**

**Wisconsin Department of Corrections**
3,048 followers
6d

This position functions as the Security Governance, Risk & Compliance (GRC) Team Supervisor. This group is responsible for supporting **#WICorrections**' administrative information **#security** needs,

including the oversight of secure development, conducting e-investigations, security awareness & compliance with agency, state and federal security standards.

Starting salary is $100,000–$121,700 per year, plus excellent #benefits and a nationally-ranked #pension! Apply at State of Wisconsin by October 12 ⬇️

#Wisconsin #corrections #nowhiring #ITjobs #wijobs #wisconsinjobs #govjobs #madisonwi #applynow #statejobs #IT #ITsecurity #hiring

### Job Description
wj.wi.gov

1

| Like | Comment | Share |

To view or add a comment, **sign in**

---

**Wisconsin Department of Corrections**
3,048 followers
1w

📣 TAYCHEEDAH CORRECTIONAL INSTITUTION is hosting an open house & walk-in interviews for interested candidates this Sunday, October 1 from 1–4pm. Application assistance will be provided on-site. Those new to State of Wisconsin service may be eligible for a $2,000 #signonbonus! Learn more: https://lnkd.in/gHQHERSB

#Wisconsin #corrections #WICorrections #hiring #wijobs #wisconsinjobs #govjobs #correctionsofficers #publicsafety #publicsafetyjobs

2

Like                              Comment                              Share

To view or add a comment, **sign in**

**Wisconsin Department of Corrections**
3,048 followers
1w

#WICorrections goes purple in support of #NationalRecoveryMonth. 💜

9

Like                              Comment                              Share

Case 2:23-cv-01697   Filed 12/19/23   Page 101 of 129   Document 1-3

To view or add a comment, **sign in**

**Wisconsin Department of Corrections**
3,048 followers
1w

**#WICorrections** welcomed its second-largest class this year of new uniformed staff! 🎓

A total of 63 Correctional Officers, Sergeants and Youth Counselors were recognized at **Madison Area Technical College** yesterday for completing an intensive six-week training program and will soon begin their careers in locations all across the state.

NEXT ACADEMY BEGINS NOVEMBER 6! If you want to join the next class of grads, don't wait. Candidates new to **State of Wisconsin** service may be eligible for a $2,000 sign-on bonus! Apply by October 11: **https://lnkd.in/gHQHERSB**

**#Wisconsin #corrections #correctionsofficer #nowhiring #publicsafety #wijobs #wisconsinjobs #govjobs #training #trainingacademy**

Case 2:23-cv-01697 · Filed 12/19/23 · Page 102 of 129 · Document 1-3

36 · 1 Comment

| Like | Comment | Share |
| --- | --- | --- |

To view or add a comment, **sign in**

**Wisconsin Department of Corrections**
3,048 followers
1w

✏️ Mark your calendars to attend one of these upcoming **#hiring** events! Ask **#WICorrections** staff questions, apply and interview to become a **#CorrectionalOfficer** — the same day. Application assistance will be provided on-site. Candidates new to **State of Wisconsin** service may be eligible for a $2,000 sign-on bonus!

Learn more ▶ **https://lnkd.in/gHQHERSB**

**#Wisconsin #corrections #nowhiring #correctionsofficer #wijobs #wisconsinjobs #publicsafety #security #securityjobs #govjobs**

**Job Description**
wj.wi.gov

1

| Like | Comment | Share |
| --- | --- | --- |

To view or add a comment, **sign in**

**Wisconsin Department of Corrections**
3,048 followers
2w · Edited



STUDENTS, we are hitting the road! 🚌

Our schedules are jam-packed this fall as we search for passionate individuals to join our team. Stop by our booths to explore exciting career opportunities in nearly every field, network with staff and jumpstart your career with #WICorrections!

State of Wisconsin employees enjoy competitive pay, outstanding benefits and a nationally-ranked pension. Learn more ➡️ https://lnkd.in/gixk9gNH

Northeast Wisconsin Technical College · Gateway Technical College · University of Wisconsin Oshkosh · University of Wisconsin-Platteville · University of Wisconsin-Eau Claire · University of Wisconsin-Stout

1

| Like | Comment | Share |
|------|---------|-------|

To view or add a comment, **sign in**

Case 2:23-cv-01697 · Filed 12/19/23 · Page 104 of 129 · Document 1-3

**Wisconsin Department of Corrections**
3,048 followers
2w · Edited

Last month, #WICorrections offered a unique opportunity for non-uniform staff who wish to assist security within their own classifications: a three-day Security Operations Support (SOS) program at Oshkosh Correctional Institution.

This advanced #training provided a better understanding of uniform staff responsibilities and #security and #security functions, and helped participants gain confidence while assisting security staff! THANK YOU to these dedicated employees who stepped up to support their peers! 👏

#Wisconsin #corrections #securitytraining #uniformstaff #correctionsofficer #workforcesolutions

14 · 1 Comment

| Like | Comment | Share |

To view or add a comment, **sign in**



3,048 followers

View Profile          + Follow

# Explore topics

Sales

Marketing

Public Administration

Business Administration

HR Management

Engineering

Soft Skills

See All

© 2023                                    About

Accessibility                             User Agreement

Privacy Policy                            Your California Privacy Choices

Cookie Policy                             Copyright Policy

Brand Policy                              Guest Controls

Community Guidelines                      Language

See Link for Exhibit: https://www.youtube.com/watch?v=rPr4iOITMio

Exhibit 57A

# BLM DEMANDS

## ADD YOUR NAME TO CO-SIGN BLM'S 7 DEMANDS

## BLM's 7 Demands

### 1. Convict and ban Trump from future political office:

We are joining Rep. Ilhan Omar, Rep. Ayanna Pressley, Rep. Cori Bush, Rep. Jamaal Bowman, and others who are demanding Trump be immediately convicted in the United States Senate. Trump must also be banned from holding elected office in the future. **Call your members of Congress and demand they support conviction by dialing (202) 224-3121.**

### 2. Expel Republican members of Congress who attempted to overturn the election and incited a white supremacist attack:

More than half the Republican representatives and multiple senators stoked Trump's conspiracy theories and encouraged the white supremacists to take action to overturn the election. We are supporting Rep. Cori Bush's resolution to expel them from Congress for their dangerous and traitorous actions. We also support steps to bar them from seeking another office.

### 3. Launch a full investigation into the ties between white supremacy and the Capitol Police, law enforcement, and the military:

The Capitol was able to be breached and overrun by white supremacists attempting to disrupt a political process that is fundamental to our democracy. We know that police departments have been a safe haven for white supremacists to hide malintent behind a badge, because the badge was created for that purpose. We also know off-duty cops and military were among the mob at the Capitol on January 6th. Guilty parties need to be held accountable and fired. We are supporting Rep. Jamaal Bowman's COUP Act to investigate these connections.

### 4. Permanently ban Trump from all digital media platforms:

Trump has always used his digital media platforms recklessly and irresponsibly to spread lies and disinformation. Now it is clearer than ever that his digital media is also used to incite violence and promote its continuation. He must be stopped from encouraging his mob and further endangering our communities, even after inauguration.

### 5. Defund the police:

The police that met our BLM protestors this summer with assault rifles, teargas, and military-grade protective gear were the same police that, on Wednesday, met white supremacists with patience and the benefit of the doubt, going so far as to pose for selfies with rioters. The contrast was jarring, but not for Black people. We have always known who the police truly protect and serve. D.C. has the most police per capita in the country; more funding is not the solution.

### 6. Don't let the coup be used as an excuse to crack down on our movement:

In response to the coup, Politicians have already introduced the Domestic Terrorism Prevention Act of 2021. We've seen this playbook before. These laws are used to target Black and brown communities for heightened surveillance. Republicans are already busy trying to create an equivalence between the mob on January 6th and our Freedom Summer. We don't need new domestic terror laws, facial recognition, or any other new police power for the state. Our government should protect righteous protest and stay focused on the real issue: rooting out white supremacy. There are enough laws, resources, and intelligence, but they were not used to stop the coup. Our elected officials must uncover why.

### 7. Pass the BREATHE Act:

The police were born out of slave patrols. We cannot reform an institution built upon white supremacy. We need a new, radical approach to public safety and community investment. President Biden has already drawn on the BREATHE Act in his executive actions calling for racial equity screens in federal programs, investing in environmental justice at historic levels, and engaging with system-impacted communities. The BREATHE Act paints a vision of a world where Black lives matter through investments in housing, education, health, and environmental justice.

## Add Your Name

First Name

Not in US?

ADD YOUR NAME

☑ Opt in to email updates from Black Lives Matter Global Network

Exhibit 58

Case 2:23-cv-01697   Filed 12/19/23   Page 108 of 129   Document 1-3

Zip/Postal Code *

Email *

**Sponsored by:** Black Lives Matter Global Network





LIKE IT?
**SHARE IT**

Case 2:23-cv-01697   Filed 12/19/23   Page 109 of 129   Document 1-3





Transparency Center    News    About BLM    Shop    Contact    Privacy Policy    State Disclosure Statement



Exhibit 59






Search the site

WISBAR NEWS

JUNE 02, 2020

## Jill Kastner: 'Change Does Not Happen When We Are Comfortable or Complacent'

JILL M. KASTNER

Comments (6)

SHARE THIS:

I know I am not the only one deeply troubled by the tragic death of George Floyd in Minneapolis and the toll it has taken on the public's trust in the fairness of our justice system. The plain truth is that there are racial disparities in our legal system and that many Wisconsin residents, particularly those of color, lack access to justice. But change does not happen when we are comfortable or complacent. It happens when we recognize we can make a difference, and in fact, must make a difference.

Over 15 years ago, I became active in the State Bar of Wisconsin so that I could be part of building a better and more fair justice system. I wanted to eliminate barriers to accessing justice and create systems where the rule of law applied equally to all. While we have made strides in advancing equal justice, these events remind us that much more work is still needed.

The State Bar's Mission and Vision provides that we, the members of the State Bar of Wisconsin, "are the respected guardians of the dignity and integrity of the rule of law within a fair and accessible justice system." We must now work together to help rebuild the public's trust and confidence in the rule of law while at the same time work to ensure that all Wisconsin residents have access to a fair and impartial system of justice.

Please join me in working toward the goal of equal justice for all.



**Jill M. Kastner**
President, State Bar of Wisconsin

Comments (6)

SHARE THIS:

<div style="color:red; font-size:2em; text-align:right;">Exhibit 60</div>



Exhibit 61

1


STATE BAR
OF WISCONSIN

Log In here





Search the site

JUNE
2020
VOLUME
12
NUMBER
11

InsideTrack

Exhibit 62

JUNE 17, 2020

## Racial Equity of Black Americans: It's Time to Step Up | A Statement

We must demand real change. And, we need your help.

JILL M. KASTNER, KATHLEEN A. BROST, CHERYL FURSTACE DANIELS, CHRISTOPHER EARL ROGERS & LARRY J. MARTIN

Comments (6)

SHARE THIS:



June 17, 2020 – Systemic racism and discrimination is an inescapable reality for Black Americans and other marginalized people in our communities – despite Congress passing the Civil Rights Act nearly 60 years ago. In recent weeks, millions of people across our communities have come together in a historic movement calling for fundamental change.

Black Americans suffer from police brutality and crippling fear caused by systemic racism and implicit bias that is ingrained in our legal system, law enforcement institutions, and countless other facets of American life. This is unacceptable. Black Lives Matter.

Many of us cannot fathom the pain that the Black community experiences daily. Many of us don't know the agony of losing a father, a mother, a sister or brother, a son, or daughter to police violence. Many of us don't know what it's like to live in fear for our lives due to the color of our skin.

## We Have a Responsibility to Act

Whether we realize it or not, all of us are negatively impacted by the long history and sustained legacy of oppression of Black Americans. As lawyers, we have a duty to act. We have a responsibility to our communities.

> *Jill Kastner is State Bar of Wisconsin president, **Kathy Brost** is president-elect, **Cheryl Daniels** is incoming president-elect, and **Chris Rogers** is past president. **Larry Martin** is the executive director of the State Bar of Wisconsin.*

As lawyers, we take an oath to support the U.S. and Wisconsin constitutions. These documents speak of individual freedom and equal protection of the laws.

**The State Bar of Wisconsin, with more than 25,000 attorneys, must play a stronger role in this national awakening.** Lawyers are an important part of the justice system, stewards of the rule of law, and must take collective action to help right wrongs. We cannot be silent.

"Equal Justice Under Law" is engraved on the U.S. Supreme Court building. We hear "equal justice" but continue to see unequal justice, justice denied. Aspirational pronouncements mean nothing without collective efforts to achieve them.

As members of the legal profession and as citizens striving to create a more just society, we stand with Black Lives Matter to protect against and to change our justice system and in the other institutions inflicted

by systemic racism and implicit bias.

You will hear from us shortly about what the State Bar of Wisconsin will do to step up its efforts to combat racial injustice and disparities, advance equal justice, and promote diversity and Inclusion.

We know this is not easy work. It will be uncomfortable. We must insist on real change. And, we need your help. Don't sit on the sidelines.

It is time for real change.

---

## Advocate for Change: How You Can Help

The State Bar of Wisconsin **needs your help to expand access to justice for all.** Our policy priorities aim to significantly address disparities throughout Wisconsin's justice system, including:

- expungement and bail reform;
- juvenile justice;
- civil legal funding;
- exoneree compensation; and
- adequate investment in all aspects of the justice system.

**Get Involved**

- Join the **State Bar of Wisconsin Advocacy Network** to follow priority issues and take action, find a directory of elected officials, and stay on top of key state and federal legislation.

- Use the Advocacy Network as a first step in building a relationship with your lawmakers on State Bar priority issues.

- Stay in touch by **subscribing to Rotunda Report newsletter** and following **@SBWRotundaRpt** on Twitter.

- Contact Devin Martin, grassroots outreach coordinator, to learn more.

---

Comments (6)

SHARE THIS:



Log In here





Search the site

JUNE
2022
VOLUME
95
NUMBER
6



<span style="color:red">Exhibit 63</span>

JUNE 09, 2022

# Creating a More Diverse and Equitable Legal System

Attorney leaders are committed to making positive change toward racial justice both within and beyond the State Bar of Wisconsin's organizational structure.

JILL M. KASTNER, STARLYN ROSE TOURTILLOTT MILLER & ALEXANDER M. LODGE

Comments (6)

SHARE THIS:



George Floyd. Breonna Taylor. Ahmaud Arbery. Jacob Blake. These are just a few of the names that drew national attention in 2020 and sparked a summer of national, state, and local protests. From La Crosse to Appleton, from Superior to Kenosha, people throughout Wisconsin were calling for justice. Rather than merely echo this call, State Bar of Wisconsin leadership decided that this was the time to act.

As her first official act after being sworn into office, State Bar President Kathy Brost formed the Racial Justice Task Force (RJTF). The RJTF was charged with ensuring "that the State Bar, including its sections, divisions and committees … work[ed] toward the goal of racial justice and/or increasing diversity, equity, and inclusion in Wisconsin's legal profession."

State Bar leaders did not want some pro forma group. Instead, they wanted attorney leaders who are dedicated to making positive change toward racial justice and have the power and commitment to make that change happen. President Brost appointed all of the State Bar's elected officers to the RJTF, including the three presidents, the treasurer, and both the incoming and the outgoing secretaries. The RJTF also included the outgoing chair of the Board of Governors, the Section Leaders Council chair, the Diversity and Inclusion Oversight Committee (DIOC) chair, and the Building Bridges liaison from the Wisconsin Association of African Americans Lawyers (WAAL). Jill Kastner, who was then SBW immediate past president, chaired the RJTF and devoted much of her final year as a State Bar officer to its work.

The RJTF began its work in June 2020 with a sense of urgency. Rather than relying on others to implement its recommendations, the RJTF quickly developed a list of short-term initiatives and goals and immediately began implementation.

The RJTF also had deep conversations about racial inequality in the justice system and how inequality directly conflicts with the State Bar's mission, vision, and purposes. Racial disparities in the justice

system are real, documented, and irreconcilable with the State Bar's commitment to equal justice under the law. The RJTF also addressed issues of diversity, equity, inclusion, and accessibility (DEIA) in Wisconsin's legal profession.

Words not followed up by deeds would never achieve the desired goals, and anything less would ultimately be viewed as performative. Deliberate and intentional actions are necessary to eliminate barriers, disparity, and injustice. That is why the RJTF focused on developing actionable recommendations to advance racial justice and DEIA.

## The Work is Important

The Racial Justice Task Force Report is important because it is part of a continuum of efforts by the State Bar to address diversity, inclusion, equity, and justice. Past work includes the 2009 Diversity Task Force Recommendations and the 2012 Diversity Task Force Report and Recommendations. In the wake of events in 2020, the RJTF was faced with many questions. In a world swirling with images of division and discord, peaceful protests, riots, fires, torches, and a COVID-19 pandemic, what, if anything, should the State Bar Board of Governors be doing or saying?

- Was the State Bar of Wisconsin doing enough on diversity, inclusion, equity, and justice?

- Did we need to do more?

- If we needed to do more, what did that mean?

We are living in a time of lightning-speed communications – the pressure to react is constant. The pressures in 2020 were real. But the Racial Justice Task Force Report did not happen only because of the events of 2020. Instead, the State Bar was doing this work on a constant continuum. At times, progress seemed slow. But the work of developing State Bar policy is by necessity a deliberative process – if done correctly, the result is thoughtful consensus and better reflection of our collective constituents and community.

## Highlights of Racial Justice Task Force Work

In summer 2020, the State Bar's Policy Committee was given the task of evaluating State Bar systems using a lens of racial justice and specifically considering law enforcement reform issues. The goal was to identify any policies that needed to be amended or adopted. The ensuing discussions were long, intense, heated, and cooled. The breadth of issues was difficult to broach with such a varied group of individuals. The Policy Committee included public defenders, district attorneys, corporate attorneys, tribal government attorneys, education law attorneys, and nonprofit attorneys. The legal experience represented was expansive.


**Jill M. Kastner**, *UCLA 2000, is a former president of the State Bar of Wisconsin (2019-20) and chair of the Racial Justice Task Force. She is the supervising attorney for Legal Action of Wisconsin's EvictionFreeMKE project in Milwaukee.*


**Starlyn Tourtillott Miller**, *U.W. 2008, is a former secretary of the State Bar of Wisconsin (2018-20), member of the Racial Justice Task Force, and chair (2021) of the Board of Governors Policy Committee. She is the Native Lands Partnership Director for The Wilderness Society. She previously practiced with the Menominee Indian Tribe of Wisconsin – Legal Services Department in Keshena.*


**Alexander M. (Alex) Lodge**, *Iowa 2016, served as a Building Bridges Liaison to the State Bar of Wisconsin Board of Governors, serves on the Racial Justice Task Force, and is an advisor to the Wisconsin Association of African American Lawyers. He practices law in Minneapolis.*

*Get to know the authors: Check out Q&A below.*

The first question the committee asked was whether the State Bar had any written policies on racial justice and the legal system and whether any such policies needed to be updated. There was one on racial profiling, which the Policy Committee quickly updated and amended without much difficulty, including by expanding the definition of discrimination in the justice system. The policy passed unanimously.

Next, the Policy Committee considered whether the State Bar should develop any policies on racial justice and the legal system. Law enforcement reform was the subject of many meetings and challenging discussions. In the end, no one walked away with everything they wanted but everyone walked away with something they could believe in. What resulted was a policy that supports community policing, law enforcement training, public transparency, and preservation-of-life and de-escalation tactics – statewide models for use of force. The policy is nimble but also provides parameters. After passing out of the Policy Committee on a 15-2 vote, the policy went to the full Board of Governors for its approval, which it gained. These policies are not in any way perfect, but law and policy often are not. These policies merely express a collective voice. These policies should not be the end; they are the beginning. They should be a medium of continuance of progress toward true equity for all participants in the legal system.

At the same time, the State Bar's Strategic Planning Committee reviewed the State Bar's strategic plan and proposed amendments to the language centering on "equity" and "accessibility." The Strategic Planning Committee made recommendations related to similar amendments to the State Bar's diversity statement and worked with the Diversity and Inclusion Oversight Committee. The amendments to the strategic plan and diversity statement were approved unanimously by the Board of Governors in June 2021.

The State Bar Governance Committee also looked at what was needed to ensure that all members were represented and had a voice within State Bar governance. Wisconsin's major affinity bar associations have building bridges liaisons to the Board of Governors. These liaisons, appointed by the State Bar president, can speak on issues during meetings and in committees, though they are not voting members. To provide guidance, the Governance Committee worked to create a role description for building bridges liaisons. The Governance Committee better defined the liaisons' role and created a building bridges self-assessment tool to help the State Bar and the liaisons to reflect on their experiences and insights. The committee also examined infrastructure, such as the bylaws, for areas in need of amendments or updates related to diversity, equity, inclusion, and justice.

The State Bar has created other opportunities to address diversity, equity, inclusion, and justice by developing partnerships with the law schools and strengthening conversations and work with affinity groups, recognizing that the profession is strongest when we set a table for all who want to volunteer and bring their life experiences to the conversation.

## Kenosha Expungement Clinic

In 2019, the State Bar began planning to hold an in-person Board of Governors' meeting in Kenosha. But after the shooting of Jacob Blake in Kenosha in August 2020, State Bar leaders wondered what message might be conveyed by having a meeting in the city. The RJTF and the Board of Governors decided this was an opportunity to put words into action. The Board would go to Kenosha – and hold an expungement clinic.

Legal Action of Wisconsin, the Urban League of Racine and Kenosha, the Kenosha Bar Association, and the Wisconsin Association of African-American Lawyers helped plan and conduct this free expungement clinic, held in downtown Kenosha, for low-income individuals. Volunteers helped 62 people at the clinic. Dozens of dismissed cases were removed from records, five people received expungements and valid orders were written and helped with expungement applications.

expungements, and half a dozen more were helped with pardon applications.

## Work with Law Schools

The State Bar has historically focused on leadership development and, importantly, engaging the next generation of Wisconsin lawyers by providing meaningful training and opportunities. The RJTF did not overlook the feelings, concerns, and calls to action expressed by students at the University of Wisconsin Law School and the Marquette University Law School.

The RJTF met with students and the deans of both law schools to better assist in supporting the law schools and law students in advancing their goals with respect to diversity, equity, inclusion, and justice. Additionally, RJTF members met with and organized substantive skills training workshops for law students participating in the State Bar's Diversity Clerkship Program, which matches students with diverse backgrounds with employers who provide paid summer employment. Diversity Clerkship Program participants met with affinity bar association members who highlighted the unique challenges that diverse attorneys face within the legal profession.

The State Bar CLE Committee also worked on the issue of gaining continuing legal education (CLE) credit for training programs related to promoting diversity, equity, inclusion, and accessibility and eliminating bias. While many attorneys are required to take this type of training as part of their work, the Board of Bar Examiners does not recognize most of the programs for CLE credit. The Board of Governors adopted the CLE Committee's proposal to petition the Wisconsin Supreme Court to approve CLE credit for this type of training. State Bar President Cheryl Daniels also created a new task force to examine whether such training should be required for all Wisconsin attorneys.

## The Path Forward

In Martin Luther King Jr.'s final book, *Where Do We Go From Here: Chaos or Community?*, he wrote, "the absence of brutality and unregenerate evil is not the presence of justice." Few people emerged from 2020 without change. Billions of people faced anxiety because of the COVID-19 pandemic, and countless numbers saw video of the 9 minutes and 29 seconds on May 25, 2020, when Minneapolis police officers took the life of George Floyd. This tragic event sparked a collective reckoning with the injustice, inequality, and inequity that Black people and members of other marginalized communities face. The work of the RJTF provided an immediate response to the killings of George Floyd, Breonna Taylor, and Ahmaud Arbery and the shooting of Jacob Blake and to the global movement for racial justice that followed. This important work must continue.

This article has outlined the work done so far. But the RJTF's swift work in the moment is simply not enough. So, where do we go from here?

First and foremost, lawyers must listen – particularly to residents of the communities who are greatly affected by inequities in the justice system. More often than not, this requires becoming educated on salient issues of diversity, equity, inclusion, accessibility, and access to justice affecting the communities we serve. The RJTF discussed and provided recommendations for implementing trainings on topics specific to DEIA for State Bar leaders and staff and throughout the Wisconsin legal community. In doing so, we fully embody our oath as Wisconsin lawyers to "never reject, from any consideration personal to myself, the cause of the defenseless or oppressed."

Second, it is vital to tackle areas of immediate need with respect to access to justice. The State Bar has made considerable efforts to provide access to expungement relief for the roughly 1.4 million individuals in Wisconsin who have criminal records. (Wisconsin Policy Forum, "A Fresh Start: Wisconsin's Atypical Expungement Law and Options for Reform," June 2018.) Because criminal records can pose a significant barrier to obtaining adequate employment and housing, the RJTF highlighted the need to direct relevant State Bar committees to conduct a review of Wisconsin's limited expungement law and its efficacy in eliminating collateral consequences of conviction and to develop means to promote broader expungement reform. While expungement is only one measure, eliminating barriers to adequate

employment and housing advances efforts to dismantle root causes of inequity in the justice system. In addition to addressing expungement reform, the State Bar must continue to seek support for policies to reform juvenile shackling, juvenile jurisdiction, cash bail, and adequate compensation of stakeholders.

Third, the RJTF's work highlighted the continuous need to strengthen our collaborations with Wisconsin's law schools and other initiatives that support the pipeline to legal careers for diverse students. This means helping to ensure diverse law students not only gain meaningful education at our institutions but also have confidence that Wisconsin can be a great place for diverse young lawyers to begin and continue their careers. In doing so, the State Bar must increase the number of diverse law students and new attorneys, strengthen investment in mentoring programs serving diverse law students and new attorneys, and continue to educate the state's law schools and broader legal communities on DEIA issues.

While we still have hard work to do and heavy loads to lift to truly achieve equity and equality in Wisconsin's justice system, we can remain hopeful in creating a better future for the next generation of Wisconsin lawyers.

## Meet Our Contributors

**How do you recharge your batteries?**



After sitting behind a desk all week, nothing recharges my batteries more than a good hike on one of Wisconsin's beautiful hiking trails. I've hiked more than 500 miles of the Ice Age Trail – from Door County through Baraboo and Waupaca. My favorite part is an eight-mile stretch in Monches. It has everything I could ask for: breath-taking views, a picturesque walking bridge over flowing water, interesting geographic features, including big, ice-age boulders, and a great café to eat lunch afterward. Taking the time to unplug and enjoy these simple pleasures always refreshes me.

*Jill M. Kastner, Legal Action of Wisconsin, Milwaukee*

**What was your funniest or oddest experience in a legal context?**



During my judicial externship with my mentor and friend, Menominee Tribal Judge Wendell Askenette, I asked Judge Askenette this exact question. He thought for a moment, then told me about watching his predecessor Judge Sarah Skubitz. He recalled watching her in the courtroom in awe of her natural command of it.

One day, an elderly gentleman was a defendant before her and he seemed somewhat aloof. When Judge Skubitz asked him a question, the defendant replied, "Yes, ma'am." Swiftly, Judge Skubitz reminded him that she was "Judge Skubitz." It must have made the man nervous. The next time Judge Skubitz asked him a question, the defendant quickly replied, "Yes, your highness!" The whole courtroom, including Judge Skubitz, busted out laughing.

I love that story and when I tell it, I am once again with my friend who has passed on.

*Starlyn Tourtillott Miller, The Wilderness Society, Washington, D.C.*

**How has your career surprised you?**



The fact that I'm practicing law at all still surprises me. Before entering law school, I had envisioned a career in research and development or in academia. Later, I expected to grow and develop as an IP attorney. I did not expect a legal career that would include a deep commitment to pro bono service and legal education. This was a big surprise for me.

A significant part of my career today includes advocating for underserved clients through pro bono clinics, such as WAAL's expungement and arrest-record-correction clinics, or providing educational

workshops about Fourth Amendment rights to high school and law students through the Justice101 nonprofit that I cofounded with a law school classmate. As I continue to mature in my legal career, I look forward to the surprising and new directions it will take me.

*Alexander M. (Alex) Lodge*, *Minneapolis*

**Become a contributor!** Are you working on an interesting case? Have a practice tip to share? There are several ways to contribute to *Wisconsin Lawyer*. To discuss a topic idea, contact Managing Editor Karlé Lester at (800) 444-9404, ext. 6127, or email klester@wisbar.org. Check out our writing and submission guidelines.

» **Cite this article:** *95 Wis. Law. 34-38 (June 2022).*

Comments (6)

SHARE THIS:

The Wayback Machine - https://web.archive.org/web/20231213035123/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?…



Log In here





Search the site

MARCH
2021
VOLUME
94
NUMBER
3



Exhibit 64

MARCH 10, 2021

## 20/20 Hindsight: 20 Legal Tech Trends

With 2020 behind us, we can see the brights spots for the legal profession in an otherwise challenging year. Here are 20 developments in legal technology and innovation that were long overdue.

ROBERT J. AMBROGI

[Comments (6)](#)

SHARE THIS:



Whoa, what the f*&% just happened?

2020 was a year few of us will ever forget. It brought untold hardships for many and unfamiliar challenges for all of us.

In the world of legal technology and innovation, the phrase I heard often repeated this year was "silver lining." It was a silver lining in the form of an accelerant. As never before, we were forced to rethink how legal services are delivered and how justice is administered.

The silver lining of 2020 is that we have been forced to consider changes that were long overdue and then given the opportunity to implement those changes.

We will all be beneficiaries of these changes – but those who will benefit the most are those the legal system is meant to serve.

Here are my candidates — in no particular order — for last year's top 20 developments in legal technology and innovation.

## 1. Technology Became a Lifeline

Overnight, our businesses were upended. We were shut out of our offices, shut off from our colleagues and clients, and effectively locked down in our homes. Business as usual could continue no more.



**Bob Ambrogi** *is a lawyer, legal journalist, media consultant, and award-winning blogger and podcaster. Earlier in his career, he was editor-in-chief of several legal publications. At LexBlog, he oversees* [LexBlog.com](#), *the global legal news and commentary network. This article was adapted from a recent post on his blog,* [LawSites](#).

Overnight, technology transformed from a tool to a lifeline, from a nicety to a necessity. Those among us who were already technologically astute took their use of technology to an even higher level. Those who were less advanced had no choice but to accelerate their adoption of technology.

The pandemic has forever changed the legal industry's relationship with technology, for the better. I have written for years about the ethical duty of technology competence and about how slow – even

resistant – many lawyers have been to becoming competent.

Technology competence became a survival skill. No longer can legal professionals stay afloat without the lifeline tech provides. The legal industry is not yet where it should be in use of technology, but 2020 pushed it forward by leaps and bounds.

## 2. Work-from-home Redefined the Workplace

At first, forced shutdowns of legal offices seemed unthinkable and unworkable. But then some legal professionals found that they kind of liked working from home. And many law firms and legal departments realized they could carry on quite nicely even with their workers dispersed and remote.

Rent is a law firm's second-biggest expense, after salaries. Estimates say it generally eats up 6-15 percent of gross revenue, depending on firm size and location. Well before the pandemic, many firms were already looking to reduce their physical footprints as a way of cutting expenses, and technology increasingly made that possible.

But now, we are comfortable meeting clients and colleagues via video. We've cut out commuting to find more hours in our days. We are home for dinner with our families and to help our kids with homework.

Practicing law is a profession, not a place. With technology, where we practice hardly matters, neither to us nor to our clients. The physical office will not implode anytime soon. But its footprint will dramatically shrink, I believe, and its purpose will evolve from a place of full-time work to one of part-time convenience.

## 3. Courts Answered the Wake-up Call

The forced shutdown of courts was a shock to the justice system but also a wake-up call. For courts, the wake-up call to modernize has been ringing off the hook for years. This year, they had no choice but to pick up the phone.

The "poster judge" of 2020 may have been Scott U. Schlegel, who, as chair of the Specialty Treatment Courts in Jefferson Parish, La., manages what may be one of the most advanced courts in the country for delivering justice online. Remarkably, he does it almost entirely with off-the-shelf software he cobbled together himself.

While Judge Schlegel had started putting his courts online even before the pandemic, other courts had to scramble to catch up. Notably, they did an admirable job of it, given how quickly they had to act and how unfamiliar was this new territory of dispensing justice online. In fact, through the That's a Fine Idea: Legal Innovation Wisconsin initiative, the State Bar of Wisconsin honored the state's court system, which implemented videoconferencing software and livestreamed court hearings to keep the state's legal system moving despite limitations and restrictions once the pandemic began.

Seeing the effects of COVID-19 in China and Europe, in mid-March 2020, Judge Randy Koschnick, director of Wisconsin state courts, and his court operations and automation teams leapt into action. They bought 400 Zoom licenses and began integrating Zoom with the videoconferencing already in place and training each of the state's 249 circuit judges, as well as clerks, to use it.

Of course, courts still have a long way to go.

Most importantly, the changes courts have been forced to initiate last year will endure beyond the pandemic and change how courts operate forever, and for the better. In Wisconsin, Judge Koschnick has pulled together a committee of several judges, clerks, and private- and public-sector attorneys to determine how the state can and should continue to use Zoom going forward.

State Bar of Wisconsin
**WISCONSIN LEGAL INNOVATOR**

**2021**

*Know a legal innovator?*

*Are you one? Nominations for 2021 open March 1 and close on June 30. To learn more, visit ThatsaFineIdea .com.*

The pandemic does not mean the end of courthouses. But it does mean there is no going back to the old ways, and it does mean the beginning of a new era of modernization for the courts that will better serve all who traditionally entered those courthouse doors – and some who never did.

## 4. Legal Conferences Learned the Stages of Grief

In her seminal 1969 book, _On Death and Dying_, psychiatrist Elisabeth Kübler-Ross outlined the five stages of grief: denial, anger, bargaining, depression, and acceptance.

Her outline well describes what happened in 2020 with producers of major legal conferences. At first, many of them seemed to be in denial, holding off from publicly cancelling their physical events. When cancellations become inevitable, no doubt there was anger and most certainly there was bargaining, as they sought dispensation from major hotel and conference venues.

The depression arrived as they came to realize they could never replicate online the experience of a physical conference – neither for the attendees nor for the exhibitors whose booths and sponsorships help pay the bills. But sooner or later, they accepted what they could not change and went on to produce virtual versions – many of them superb – of their physical events.

Here again, it is likely that 2020 will forever change conferences and how we present and attend them. Even after the pandemic subsides, many organizers expect to always include some virtual component in their conferences. We've learned that virtual connections and presentations can, in fact, enhance, if not replace, the traditional physical conference.

## 5. Regulatory Reform Got Real

In a perfect-storm-style confluence of events, 2020 brought major advances in regulatory reform – advances that came about independent of the pandemic but that could not have been better timed, as the pandemic exposed the fundamental weaknesses in the delivery of legal services and the administration of justice and the dire need for reform.

In a historic vote in August, the Utah Supreme Court approved sweeping changes in legal services regulation in that state. It created a two-year pilot of a regulatory sandbox — a regulatory body under the oversight of the supreme court, to be called the Office of Legal Services Innovation, whose charge is to license and oversee new forms of legal providers and services.

The changes, the Utah court said, would enable individuals and entities to explore creative ways to safely allow lawyers and nonlawyers to practice law and to reduce constraints on how lawyers market and promote their services.

Two weeks later, the Arizona Supreme Court went even farther, becoming the first state in the nation to completely eliminate the ban on nonlawyers having economic interests in law firms and the prohibition on lawyers sharing legal fees with nonlawyers. Those changes took effect Jan. 1, 2021.

"The Court's goal is to improve access to justice and to encourage innovation in the delivery of legal services," Chief Justice Robert Brutinel said. " … These new rules will promote business innovation in providing legal services at affordable prices."

Understanding, as we now do, how deeply the justice system demands modernization, regulatory reform will help enable us to achieve that.

## 6. On-premises Software Withered on Premises

In the great migration to working from home, a few things got left behind and forgotten in the office. Chief among them was on-premises software.

The legal profession's move to the cloud has been plodding. In my 2018 year-end review, I opined that we had finally reached the point of the legal profession's general acceptance of the cloud as something to embrace, not fear. That was the year that marked the 10th anniversaries of the launches of Clio and

Rocket Matter, the first two practice management applications to launch in the cloud.

Last year, in my review of the decade in legal tech, I carried that point further, writing that we had come 180 degrees in our use of the cloud, and that what started the decade as still an outlier technology ended the decade as the core of most law practices.

Now, to the extent on-premises software retained any viability, 2020 has snuffed it out. One dramatic example of this came in October, when Intapp, a major provider of business applications for larger law firms and financial services firms, said that it would transition to cloud software exclusively and launch all new customers only on its cloud platform.

If we accept the premise that 2020 has permanently spawned a more-distributed and mobile workforce, then on-premises software no longer has relevance or usefulness. The software that enabled us to survive 2020 was in the cloud, and the software of the future will continue to be in the cloud.

## 7. Legal Professionals Learned to Pivot

This year showed us that law firms can quickly pivot when need be. And it wasn't just law firms, it was the entire legal profession.

As an example, the global law firm DLA Piper was able to move more than 3,000 staff to working from home in just 36 hours. And, in March, Brigham Young University Law School decided to close down live classes, send students home, and teach the remainder of the semester online.

Bar associations also pivoted. In April, the American Bar Association, through its Disaster Legal Services Program and Paladin, a justice tech company specializing in pro bono software, responded to the coronavirus crisis by launching the first national Disaster Relief Pro Bono Portal.

The New York State Bar Association took just two weeks to respond to a request from Gov. Andrew Cuomo to help with the expected onslaught of unemployment claims, launching a website to help those who need unemployment assistance, again with help from Paladin and also practice management company Clio.

In fact, it should be noted that Paladin deserves singular kudos for its work in 2020, helping to launch not just the ABA and New York portals described above but also pro bono portals in Wisconsin and in Oklahoma.

These are only a few examples of how the legal industry this year demonstrated its ability to pivot and be agile in the face of crisis and need. Having now proven it can be agile, the legal industry now has no excuse not to continue apace.

## 8. The Bar Exam Flunked

It befuddles me that anyone truly believes that the bar exam is any measure of one's competence to practice law. It seems to me that we continue with it only because we cannot agree on an alternative.

But if the bar exam was already a failing system, then this year it completely flunked out. No doubt, there are many reasons why the bar exam failed to make the grade in 2020, but a big one was technology.

As an example, more than one-third of those who sat for the California bar exam in October, which used the ExamSoft testing software, had their proctoring videos flagged for possible cheating – 3,190 out of 8,920 total test-takers, or nearly 36 percent.

"[R]emote proctoring software is surveillance snake oil – you simply can't replicate a classroom environment online, and attempting to do so via algorithms and video monitoring only causes harm," said the Electronic Frontier Foundation of this news.

And then there was the woman who went into labor during the Illinois bar exam but was unable to leave her seat or turn off her camera, and the one who was forced to urinate in a chair, unable to move to

her seat because of the exam software's prohibition against breaking eye contact. One was able to finish her essays before going to the hospital, where she gave birth less than five hours later. (BTW, she passed.)

The problem here was not so much faulty technology as it was a faulty system that technology could not fix. Rote regurgitation of memorized rules under the stern eye of a proctor, whether done in person or on camera, should not be the measure of a lawyer.

Jennifer L. Mnookin, dean of UCLA Law School, along with Erwin Chemerinsky, dean of U.C. Berkeley Law School, wrote an op-ed in *The National Law Journal* urging states to provisionally license law school graduates, without a bar exam.

I'm no expert, but that kind of approach – some sort of provisional licensing and mentoring – makes a lot more sense to me. I don't know what the right answer should be, but I do know that what happened this year wasn't it.

## 9. Investments and Acquisitions Continued Apace

One aspect of legal technology that seemed undaunted by the pandemic was investments. In my decade-end post last year, I wrote about the accelerating influx of investments in legal technology.

This year saw that trend continue with any number of major investments in and acquisitions of legal technology companies. As an example, Ironclad, the San Francisco-based digital contracting platform for legal departments, raised at least $100 million in a Series D funding round at a post-investment valuation of more than $950 million. And there are other examples.

But in 2020, the investment story distinctly tracked along two dominant themes. One was the ever-increasing flow of investment capital into legal tech companies that focus on contract management and automation. The other was the surge of interest in practice management technology and, as a subset of that, e-payments technology.

With regard to the spate of practice management investments and acquisitions, I speculate that the pandemic was a key factor behind them. Over the course of roughly a month, during September and October, private equity firms made major investments in practice management companies.

News arrived on Sept. 22 that ASG LegalTech, the company that owns cloud practice management platforms PracticePanther, Bill4Time, and MerusCase, had acquired Headnote, the online payments platform that provides e-payments and accounts-receivable management for law firms.

Then, on Sept. 24, we learned that the practice management company Rocket Matter had been acquired by the private equity firm Lightyear Capital LLC, making it part of a new company, ProfitSolv, that also includes two other recently acquired companies.

The final investment came Oct. 6, when Actionstep, a cloud-based practice management system founded in New Zealand and with a significant presence in the U.S., received an investment from Serent Capital, a San Francisco private equity firm focused on investing in high-growth technology and services businesses.

Also worth noting is that, while not acquisitions, two other practice management platforms debuted this year: Lexicon, which launched June 1, and Xira. These companies shared two important characteristics that became critical during the pandemic: They were all cloud based and they all related to e-payments.

## 10. Zoom Blasted Off

Since March, Eric Yuan, the founder and CEO of Zoom, has reportedly made over $12 billion and now ranks among the 400 richest people in America. I can confidently say I contributed to those billions, in my own small way, as I am sure many of us did. I might even say he deserved it, as Zoom seemed to do everything right while competing companies faltered. (Yes, Skype, I'm talking to you.)

Case 2:23-cv-01697   Filed 12/19/23   Page 129 of 129   Document 1-3