Zoom became conference room, meeting room, classroom, lunchroom, and even happy hour room. It brought us together virtually when we could not be together physically.

But Zoom was not the only video technology used by legal professionals in 2020. Early on in the year, Legaler, a company that specializes in secure online video meetings for lawyers and clients, offered its platform free to solo and small-firm lawyers to help them during the pandemic.

The year also brought several new platforms for conducting depositions remotely, including Prevail Legal, launched in August; Steno, a court reporting agency that also offers its own videoconferencing technology for remote depositions; and vTestify, a cloud-based platform specifically designed for conducting depositions remotely.

Now that we are all comfortable with virtual meetings, we are not likely to dispense with them.

## 11. We All Became Producers

One of the quirky side effects of our year of living at home, isolated from our colleagues, was that many more of us became producers – producers of podcasts, of video programs, and even of conferences.

One uniquely 2020 subgenre was the daily legal podcast. A few examples follow.

We were barely into our long year of seclusion when Greg Lambert, chief knowledge services officer at Jackson Walker, launched In Seclusion, a daily podcast miniseries about the new default for the legal industry of working from home. Jack Newton, cofounder and CEO of Clio, launched a daily podcast, Daily Matters, eventually producing 101 episodes. Laurence Colletti, producer at the Legal Talk Network, launched Legal Talk Today, a "dailyish" show covering legal issues.

Perhaps the legal tech world's most ambitious production initiative of the year came in March. In response to what it saw as increased demand for quality content, the document-automation company Litera launched Litera.TV, providing three hours per day of live programming on a range of legal topics and with a variety of hosts.

Even as traditional conference producers all transitioned to virtual events, the relative ease of staging an event online prompted some newcomers to become conference producers.

## 12. The Legal Hierarchy Flattened

The legal profession in general, and law firms in particular, have traditionally been organized in a hierarchical, pyramidal structure, with lawyers at the top and partners at the pinnacle. But in recent years, there has been increasing pushback against the lawyer-nonlawyer dichotomy, recognizing the latter as demeaning and demoralizing. One law firm has even banished use of the phrase "nonlawyer," replacing it with "allied professional."

This year, we were all stripped of the artifices that helped bolster this hierarchy. No longer were lawyers behind fancy desks in ornate corner offices. No longer were support staff in windowless cubicles. We were all in our makeshift home workspaces, with kids crawling over our laps and dogs barking in the background.

This year has brought about a leveling among legal professionals. Working from home has made us all better appreciate the work done by and the contributions of the others in our organizations.

Legal organizations of every size and type are made up of a variety of roles and individuals, and each plays a critical role in the success of the overall operation.

## 13. Diversity Demanded Action

In 2020, their names, tragically, became iconic: George Floyd, Breonna Taylor, Ahmaud Arbery. Floyd's desperate final pleas, "I can't breathe," became a haunting symbol of our nation's legacy of racial injustice and the slogan of the Black Lives Matter movement.

It cannot be denied that the legal profession, through its lack of diversity, has been complicit in perpetuating racial injustice and inequality. This is true, as well, of the legal technology industry, where a 2018 study found that Blacks make up only 2.3 percent of legal tech founders and Latinx only 3.1 percent.

In 2020, a handful of legal tech companies made themselves part of the solution:

Launched late in 2019, Legal Innovators is an alternative legal services provider that provides top legal talent to law firms and legal departments but that does so in a way that makes diversity and inclusiveness a top priority.

In October, SixFifty, the technology subsidiary of the law firm Wilson Sonsini Goodrich & Rosati, launched a tool designed to help organizations develop and implement diversity and inclusion plans.

In November came the launch of Anü, a company that uses AI to match startups with the lawyer best suited to represent them, and which puts a particular focus on diversity by helping diverse founders get the right legal help and encouraging the hiring of diverse law firms.

Commendable as were these initiatives, my sense is that the legal profession as a whole, and the legal tech industry specifically, made little progress in 2020 toward enhancing diversity and may even have taken a few steps backwards. As a profession and as individuals, I believe, we must make equality our top priority going forward.

The greater the diversity in legal tech, the more we all stand to benefit, whether we are developers of products or purchasers, whether we are those who deliver legal services or those who receive them. And we can all play a role in helping to make greater diversity a reality.

## 14. Marketplaces Multiplied

Well, ain't that a coinkydink? Late in 2020, we saw the launch of three marketplace-style websites created to help legal professionals sift through the clutter and cacophony of competing legal tech products.

First came the Legaltech Hub, a website that aims to be the most complete global directory of commercial legal tech worldwide. That was followed by Orrick Herrington & Sutcliffe's launch of The Observatory, a directory of more than 600 legal technology products, followed soon after by Thomson Reuters' beta launch of its Thomson Reuters Marketplace, an online store where users can research, demo, and buy products and services.

Also somewhat quietly launched this year, with plans to go bigger in 2021, is Theorem, which is a marketplace as well as a platform and workflow engine for law firms and legal departments.

This spate of marketplace launches comes in a year that already saw the formal launch, in January 2020, of Reynen Court, the so-called app store of law, whose mission is to make it easier for law firms and legal departments to adopt and manage modern cloud-based software applications without having to trust firm or client content to the rapidly growing universe of vertically integrated SaaS providers.

And, while not a marketplace, also related is the launch of LexFusion, which aims to change the paradigm for how law firms and legal departments purchase technology by acting as the go-to-market representative of a collective of pre-vetted legal tech companies.

There is no coincidence in these launches. Rather, they reflect the ever-growing breadth and diversity of the legal tech market and the ever-greater challenge that presents for consumers of legal technology to select the right product. The legal tech market has exploded in recent years, and these marketplaces all aim to help legal professionals make sense of it.

## 15. Cybersecurity Stumbled

Early in 2020, a new round of ransomware attacks began targeting law firms. In some cases, the

Case 2:23-cv-01697   Filed 12/19/23   Page 2 of 65   Document 1-4

attackers, seeking to extort payment from the firms, began posting confidential client data online, gradually increasing the release of data until the firm paid up.

Then in March, Epiq Global, the international e-discovery and managed services company, took its systems offline globally after becoming the target of a ransomware attack. It would be nearly a month before the company was able to fully restore all of its systems.

Throughout 2020, ransomware attacks continued against law firms and legal organizations, but possibly the most notorious was in May, when an attack hit a New York City law firm that represents superstar musicians such as Lady Gaga, Elton John, and Madonna, and the attackers began posting celebrities' legal documents online.

An organization's cybersecurity is only as strong as its weakest link, and with individuals throughout the legal industry working from home during 2020, those weakest links became even more vulnerable.

## 16. Briefs Got Brains

One of the most intriguing legal tech products introduced this year is Compose, from the legal research company Casetext. The first of its kind, it helps automate the creation of the first draft of a litigation brief, significantly cutting the time the draft would normally take.

Casetext cofounder and CEO Jake Heller said the product was "poised to disrupt the $437 billion legal services industry and fundamentally change our understanding of what types of professional work are uniquely human."

Over the course of the year, Casetext added new subject areas to Compose, including briefs for employment law and products liability. In October, it introduced an add-in for Microsoft Word that allows automated brief drafting directly within documents on their desktops.

Another product introduced this year that helps make briefs smarter was Quick Check Judicial from Thomson Reuters. Designed for judges but available for any Westlaw Edge subscriber, this AI brief-checking tool helps judges understand and validate the briefs submitted in their courts.

Quick Check Judicial is a variation on Quick Check, introduced by TR in 2019, and is in the vein of a line of brief-checking products that trace their heritage back to Casetext's CARA.

One other related development in 2020 was the acquisition by legal publishing company Fastcase of the innovative legal research platform Judicata. Among the core Judicata products that Fastcase acquired is Clerk, a tool that analyzes the strengths and weaknesses of legal briefs and predicts the legal outcomes they will produce.

## 17. Legal News Made Headlines

Just as the news industry broadly has struggled financially in recent years, so too has the legal news industry, with long-standing print publications disappearing and editorial staffs getting cut back. Yet, counter to this trend, 2020 saw the launch of three new services for legal news.

In January, the legal research and publishing company Fastcase launched Law Street Media, a free legal news service that leverages both case law from Fastcase and docket information and analytics from Docket Alarm, the docket search platform Fastcase owns.

Soon after came the launch by legal and business news company ALM – publisher of Law.com, The American Lawyer, Corporate Counsel, and other legal publications – of Legal Radar, also delivering news drawn from court dockets, but with a unique twist. Its summaries of PACER news are generated algorithmically, rather than by human editors.

In December, ALM brought Legal Radar out of beta, renaming it as Law.com Radar and adding news of corporate transactions to the litigation news it already included.

Case 2:23-cv-01697   Filed 12/19/23   Page 3 of 65   Document 1-4

Possibly the most ambitious launch came in July, when Thomson Reuters quietly introduced its Westlaw Today, a premium legal news service driven by its Reuters news division and available only to subscribers of Westlaw and Westlaw Edge for an additional cost. TR hired several legal news editors, reporters, and columnists for the new service, which was rumored to be the first phase of a larger initiative on par with Law360 from LexisNexis.

All three of these services help legal professionals better track the developments that matter to their practices and their clients.

## 18. The Justice Gap Widened

One area in which there were no silver linings to be found in 2020 is in access to justice. If anything, the pandemic has widened the justice gap, as legal woes multiplied around issues of unemployment, housing, medical debt, immigration, and domestic violence.

In 2016, the ABA's Report on the Future of Legal Services in the United States issued a call for the legal profession to work toward ensuring 100 percent access to effective assistance for essential civil legal needs, regardless of ability to pay.

Asked whether he thought we had made progress toward that goal in the four years since, Andrew Perlman, Suffolk Law School dean and vice chair of the commission that issued that report, said, "I'm not sure that we have, at least not yet and not in a meaningful way."

An ABA report in July highlighted one aspect of the justice gap that has received little attention, that of legal deserts – large swaths of the country that have few or no lawyers. Of 3,100 U.S. counties, the report documented, 54 have not a single lawyer, and another 182 have just one or two lawyers.

The true impact of the pandemic on low-income individuals is yet to be seen, but there is little question that the legal consequences will be enormous, further straining a system that was already unable to meet most legal needs.

## 19. ALSPs and the Big Four Made Inroads

Anecdotal reports indicate that the pandemic has driven more corporations and law firms to employ alternative legal services providers (ALSPs). Andrea Markstrom, Taft Stettinius & Hollister chief information officer, says, "I think with COVID we're all evaluating how we work and how we can overall ensure we're being efficient internally as well as for our clients."

But while there has been some uptick in outsourcing to ALSPs, it has been far from universal. Across the board, it seemed, business dropped off in the first quarter for law firms and ALSPs alike. But as clients adapted to the "new normal" and some parts of the economy picked up, so too did legal work.

The result was that there was no across-the-board trend for ALSPs in 2020. Some did fairly well. Some struggled. And they also faced competition from a new front, as Big Four professional services firm Deloitte launched its Legal Business Services practice in the United States, offering legal management consulting and legal managed services for corporate legal departments.

Of course, this was also the year that saw the final demise of Atrium, the $75 million company that had vowed to "revolutionize legal services."

Yet this might also be the year that best highlights the value proposition ALSPs offer. Offering distributed services that can be rapidly scaled up or down, and adaptable to specific projects or general staffing needs, they are well suited to times that demand flexibility in deployment and cost.

## 20. Innovation Accelerated

In this most difficult and challenging of years, and amid all these other developments, an odd thing happened within the world of legal technology: Innovation accelerated.

Never in recent memory has legal technology moved as fast as it did over the past year – new

Never in my years of covering legal technology do I remember seeing so much activity in one year — new products launched and existing products refined or enhanced.

I started this piece talking about silver linings. From the standpoint of legal technology development and innovation, there is no denying that, in the annus horribilis that was 2020, the silver lining was the acceleration of innovation.

## 21. Honorable Mention: Generosity

Many law-related companies responded to the coronavirus crisis by offering free access to their products and services to legal professionals and others in need. Early in the year, I began to compile a list of these, and that list still exists, even though some of the offers may now be out of date.

While so many companies were generous this year, a special shout-out goes to practice management company Clio, which responded rapidly to the crisis by committing $1 million to a disaster relief fund to help the legal community navigate the challenges and hurdles presented by the pandemic.

» Cite this article: *94 Wis. Law. 30-37 (March 2021).*

---

Comments (6)

SHARE THIS:



Exhibit 65



Log In here





Search the site

Exhibit 66

WISBAR NEWS

DECEMBER 07, 2023

## Diversity Counsel Program: 'There's a Space for You Here'

Lawyers gathered in Milwaukee to connect and learn how to retain attorneys with varied experiences as part of the State Bar's 2023 Diversity Counsel Program on Dec. 4.

JEFF M. BROWN

Comments (6)

SHARE THIS:



*Lawyers gathered at the Italian Community Center in Milwaukee for the State Bar of Wisconsin's 2023 Diversity Counsel Program on Monday, Dec. 4. From left, Rock County Circuit Court Judge Ashley Morse and State Bar Diversity & Inclusion Specialist Jacque Evans share perspectives on closing the diversity leadership gap.*

Dec. 7, 2023 – More than 40 lawyers gathered at the Italian Community Center in Milwaukee for the State Bar of Wisconsin's 2023 Diversity Counsel Program on Monday, Dec. 4.

The State Bar of Wisconsin's Diversity and Inclusion Oversight Committee organized the program, emceed by Milwaukee County Circuit Court Judge Kori Ashley.

Launched by the State Bar in 2004, the Diversity Counsel Program was modeled after the original American Bar Association Minority Counsel Demonstration Program.

Originally designed to increase opportunities for women and minority lawyers, the program expanded in 2008 to include efforts aimed at benefitting the state's legal system as a whole.

"The thing I hope you leave with today is not just why retention of attorneys with varied experiences is important, but the how," Judge Ashely told attendees the start of the program.



*Sherri Charleston, J.D., Ph.D., gave the keynote address at the State Bar's Diversity Counsel Program on Dec. 4.*

## The Battle over *Brown*

Sherri Charleston, J.D. Ph.D., the chief diversity and inclusion officer at Harvard University, gave the keynote address. She talked about the impact of recent constitutional developments on efforts to promote diversity in the legal profession.

Charleston, who obtained her doctorate in history before attending law school, discussed the constitutional throughline stretching from Brown v. Board of Education of Topeka, 347 U.S. 483 (1954) to Grutter v. Bollinger, 539 U.S. 306 (2023).

In *Brown,* the U.S. Supreme Court unanimously held that a racially segregated public school system violated the Equal Protection Clause of the Fourteenth Amendment, even though the racially segregated schools may have been equal.

In *Grutter*, the Supreme Court, by a 6-3 vote, dramatically curtailed the use of race in college admission decisions.

According to Charleston, the received wisdom about *Brown v. Board* is misguided.

"*Brown* was not aimed at race itself – it was aimed at inequality," Charleston said.

However, Charleston said, the Supreme Court in *Brown* declined to declare that education was a fundamental right.

As a result, Charleston said, "We find ourselves, 60-plus years on the other side of *Brown* … recognizing that *Brown* left other crucial aspects of racial inequality in the education system completely untouched."

"We're left her to fight over what [*Brown*] means, all these years later, even as we all argue over how important *Brown* is," Charleson said.

## No Constitution But the One We Make

The notion of a colorblind constitution, propounded by Justice John Harlan in his dissent in Plessy v. Ferguson, 163 U.S. 537 (1896), is a non-sequitur, Charleston said.



*Jeff M. Brown*, *Willamette Univ. School of Law 1997, is a legal writer for the State Bar of Wisconsin, Madison. He can be reached by* email *or by phone at (608) 250-6126.*

In *Plessy*, the Supreme Court held that a Louisiana law that mandated racially segregated railroad cars was not unconstitutional, as long as the cars were of equal quality.

"The Constitution is an inanimate object," Charleston said. "It is ultimately something to be wielded by people … it has to be interpreted."

Charleston pointed out that the plaintiffs in *Plessy* didn't argue that the Constitution was or should be colorblind. Rather, they relied upon principles from the French and Haitian revolutions to argue for "public rights."

"They said, 'If I am in public, I want to be respected in public,'" Charleston said.

But the Supreme Court in *Plessy* held that the government was powerless to end all racial distinctions and that any attempt to do so would only make things worse.

"That's not what [the plaintiffs] asked, that's not what they argued, that's not what they wanted," Charleston said. "It's a twisting, and it's a twisting that pulls at the heartstrings of those who might believe that racial inferiority is somehow natural."

Unfortunately, Charleston said, *Plessy's* notion that the Constitution is powerless to remedy racial disparities continues to animate federal appellate court decisions today.

Charleston told the attendees they should keep that constitutional history in mind when attempting to advance diversity, equity, and inclusion in the legal profession.

"The Constitution cannot be colorblind unless we make it so," Charleston said.



*Milwaukee County Circuit Court Judge Kori Ashley emceed the State Bar's Diversity Counsel Program on Dec. 4.*

## Panel Discusses Leadership Gap

After Charleson spoke, Rock County Circuit Court Judge Ashley Morse moderated a panel on closing the diversity leadership gap.

Morse, whom Governor Tony Evers appointed in 2022, is the first woman of color to serve as a judge in Rock County.

Judge Morse said that creating opportunities for diverse talent isn't limited to organization-wide initiatives – it can also involve smaller changes, like changes to physical space.

When she stepped off the elevator on the fifth floor of the Rock County Courthouse to go to her chambers for the first time, Morse said, she looked down the hallway at the photos of the judges who'd come before her.

"It's a row of white men that goes from one end to the other," Judge Morse said. "For me, walking into that space, the message that I received ... was 'This space isn't for you.'"

Morse said she keeps a variety of diverse images in her courtroom.

"Hopefully, everybody who walks in there knows that you are seen, you are recognized, there's a space for you here," Judge Morse said.

Abigail Churchill, product manager with TruStage Insurance Agency and founder of TransLaw Help Wisconsin, said that employers should ask themselves, "How many board members of color do we have? How many board members who identify as LGTBQIA+ do we have?"



*Milwaukee County Circuit Court Judge Jorge Fragoso spoke on a panel at the State Bar's Diversity Counsel Program on Dec. 4.*

## An Extra Burden

Milwaukee County Circuit Court Judge Jorge Fragoso said that employers should be aware that minority attorneys are asked to do extra work related to their identity.

Judge Fragoso said that when he worked as a public defender, an assistant district attorney once called him out of court so that he could translate a document written in Spanish.

"People don't realize the toll it takes when you're singled out like that," Fragoso said. "It's adding something to your job description."

Jacque Evans, the State Bar's diversity and inclusion specialist, said that diverse employees are often reluctant to give the type of feedback necessary to help employers diversify their workforces, even if they've been asked to do so.

"You've been asked to give the feedback, and you give the feedback, and then somehow you're let go, because you gave honest feedback, or now your job becomes more difficult because you gave honest feedback," Evans said.

Case 2:23-cv-01697   Filed 12/19/23   Page 11 of 65   Document 1-4



*State Bar leadership at the State Bar's Diversity Counsel Program on Dec 4 (from left): President Dean Dietrich; Sherri Charleston, J.D., Ph.D.; Milwaukee County Circuit Court Judge Kori Ashley; Past President Margaret Hickey; Executive Director Larry Martin.*

## Program Sponsors

The State Bar of Wisconsin's Diversity and Inclusion Oversight Committee spearheads the Diversity Counsel Program. The Diversity Counsel Program is funded in part by a grant from the Wisconsin Law Foundation.

Sponsors for the program include Wisconsin Association of African American Lawyers, Stafford Rosenbaum LLP, Von Briesen & Roper, The Marcus Corporation, and MWH Law Group.

Comments (6)

SHARE THIS:

The Wayback Machine - https://web.archive.org/web/20231213050219/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.aspx?Volum…

 STATE BAR OF WISCONSIN

Log In here





Search the site

NOVEMBER
2023
VOLUME
15
NUMBER
21

# InsideTrack

Exhibit 67

NOVEMBER 15, 2023

# Milwaukee Attorneys Pitch Ideas for Closing Diversity Gap at Hackathon Contest

Winning team seeks to tap the paraprofessional pipeline to promote diversity in the legal profession.

NORA M. PLATT

Comments (0)

SHARE THIS:



*An idea for creating a pathway for diverse paraprofessionals to become attorneys with mentoring and networking opportunities, as well as financial support, won the First Place award. The team noted that the pool of paraprofessionals is inherently more diverse than the pool of attorneys.*

Nov. 15, 2023 – Mentoring and networking opportunities; technology for more equitable work distribution; and metrics on behavioral data impacting lawyer training and retention. These were just a sampling of solutions proposed by 13 teams of attorneys during the DEI Hackathon Pitch Contest held at Northwestern Mutual on October 30.

The Hackathon was a six-week, team-based problem-solving effort aimed at positively impacting diverse lawyer recruiting and retention in the Milwaukee legal community.

In her opening remarks to full house of more than 120 members of the legal community, Milwaukee County Circuit Court Judge Kori Ashley, Chair of the State Bar's Diversity and Inclusion Oversight Committee, shared that "it's not an easy time to be engaged in D&I work," emphasizing "it's so important that we dig in and continue having these conversations."

Northwestern Mutual hosted a September kickoff event, as well as the Pitch Contest. Teams from Milwaukee law firms and in-house legal departments ultimately pitched their ideas to a panel of nine judges, which included four members of the Milwaukee County Circuit Court and Wisconsin appellate court benches, as well as local business leaders. The judges narrowed the field of teams to six finalists, who then pitched in the finals.

At the Pitch Contest finals, Northwestern Mutual Executive Vice President and Chief Legal Officer Ray Manista welcomed the crowd.

"One of the things about diversity and inclusion work is that it takes a village, but it also takes non-traditional partnerships and non-traditional thinking. That's what today is all about and what we see here today," said Manista.

## And the Winners Are ...

An idea for creating a pathway to diverse legal paraprofessionals to become attorneys with mentoring and

An idea for creating a pathway for diverse paraprofessionals to become attorneys with mentoring and networking opportunities, as well as financial support, won the **First Place** award. The team noted that the pool of paraprofessionals is inherently more diverse than the pool of attorneys. Team member attorney Pat Maxwell shared, "We've all worked with paralegals who produce consistently excellent work… and who are indispensable," and the idea capitalizes on that talent pool.

>  **Nora Platt**, *Marquette University Law 1992, is an Assistant General Counsel and Assistant Secretary in Northwestern Mutual's Law Department.*

A technology application that uses algorithms to ensure that young attorneys have access to quality work experiences took **Second Place**. The app, "My Associate," takes bias out of the work assignment process and aims to boost associate retention by promoting equitable work distribution. "A large law firm loses approximately $200,000 by losing associates," shared team member attorney Amy Eisenbeis.

"When You Know, You Know" – another application that allows associates to rate senior colleagues on inclusiveness in real time – came in **Third Place**. The app provides data on behaviors that contribute to attorney training and retention.

"The goal here is disruption," shared team member attorney Nick Desiato. "If you are not participating, why aren't you participating? Because if we're taking the Hackathon seriously… we want actual change."

The winning teams are eligible for seed money grants, funded by Hackathon sponsors, to take their ideas from concept to reality.

The **State Bar of Wisconsin** and **Northwestern Mutual** were **Presenting Sponsors** (the highest sponsorship level) for the DEI Hackathon. The Hackathon had 17 total sponsors, including the Milwaukee Bar Association.

The group enjoyed food and drinks while viewing the top six teams' pitches. The event was also live-streamed.

The pitch decks for all ideas presented at the Hackathon (all of which are open source) will be available to the entire legal community via the Hackathon's website.

---

Comments (0)

SHARE THIS:

The Wayback Machine - https://web.archive.org/web/20231213051326/https://www.wisbar.org/NewsPublications/Pages/General-Article.aspx?ArticleID=…

 STATE BAR
OF WISCONSIN

Log In here



Search the site

Exhibit 68

# Elder Law and Special Needs Blog

*Elder Law and Special Needs Section*

AUGUST 15, 2023

## Do You Have a Multicultural Law Practice?

Your clients' planning goals are affected by their unique cultural histories and circumstances – are you asking the questions that allow you to best serve them? Iris Christenson discusses the considerations for elder law and health law attorneys to gain multicultural competence.

IRIS M. CHRISTENSON

Comments (0)

SHARE THIS:



Let's start with the assumption that you want to have a multicultural law practice with a focus on estate planning and Medicaid planning – and you want to work with clients and staff who are diverse. How are you going to move forward with those objectives?

Is being multicultural enough?

Is it possible to complete the necessary estate planning forms and Medicaid applications with a good understanding of the client's current financial status and plans regarding the person's finances? Or do best practices require that we do more – that we ask more questions? Does an attorney who handles an estate planning case or a Medicaid planning case need to know the racial or ethnic history of the client? Is a client's history relevant? Why?

## What is Multicultural Competence?



**_Iris M. Christenson,_** *U.W. 1990, retired in 2019 after 29 years practicing elder and special needs law. She is a volunteer attorney with the Catholic Multicultural Center's Immigration Program in Madison.*

Paul Kivel, a social justice educator, activist and writer, the author of numerous books, including *Uprooting*

Case 2:23-cv-01697    Filed 12/19/23    Page 17 of 65    Document 1-4

*Racism: How White People Can Work for Racial Justice*, has this to say:

We are all culturally competent in our own culture. We know the language, the nuances, and the assumptions about how the world is defined and organized. We know where there are disagreements and differences and generally what the rules are for solving problems. Most of know how to get around in our own cultural neighborhood. Multicultural competence is fluency in more than one culture, in whichever cultures are part of your surroundings. Learning to be sensitive to cultural expressions of another group is not difficult but does require time and energy.[1]

Although I practiced estate planning and long-term care planning for close to three decades, I know I did not consistently ask questions about a client's racial or ethnic background. I made assumptions about how clients would want to plan for a secure financial future for themselves and any family or friends the client hoped to support.

Consciously or unconsciously, I used my own life experiences as the basis for my assumptions. I came from a white working-class family and grew up in Madison. My Scandinavian ancestors settled in the Midwest in the early 1800s, became property owners, served in the military, and received benefits from multiple federal programs that were only available to white property owners and/or veterans (VA benefits, Social Security death benefits, farm subsidies, FHA approved mortgages, etc.).[2]

As a result, my inquiry into my clients' past didn't go much further than "What do you currently own or earn?" "Are you expecting an inheritance?" "Have you or your spouse ever served in the military?" and "Have you received an inheritance?"

I tried to be fair and equal in my representation by using the same set of questions for everyone, and ultimately, creating very similar plans for everyone.

Now, I'm not so sure my approach was fair or equitable, especially for my nonwhite clients.

## After 29 Years of Practice, I Have Some Regrets

I did have a multicultural client base, but I admit it rarely occurred to me to ask more questions about the clients' background or immigration status. I assumed that those "stories" would be interesting but not necessarily relevant to the service I was going to provide.

Recently, I asked colleagues who practice estate planning and Medicaid planning law if they typically inquire about their clients' racial or ethnic background. The answers varied from, "I always ask" to "I never ask and I simply let the client know that I'm willing to draft their documents to conform to their wishes and assume that they'll tell me about any special circumstances I should consider."

I have some regrets about how, in the past, I failed to provide legal services based on a full understanding of my clients' backgrounds. I have learned that knowing the immigration status and history of a client can be central to the planning you will recommend.

Beyond that, the advocacy work you can do for older people and persons with disabilities can and should be affected by your cultural competence.

## Knowing Their History Makes a Difference

The history I'm referring to is the racial and ethnic history of the client and their parents. The history of race relations in the community where the client lives now or plans to live in the future can also affect the client's planning goals. Other aspects of the client's history that could affect your planning services and advice is the history of their ability to access health care services and their ability to access health care or home care services in the future.

Of course, some of a client's history may seem obvious based on their assets and current or past employment. However, information about how a client acquired their education and wealth may not be obvious and could affect that client's estate planning and/or Medicaid planning goals.

In addition, your client's decisions about who will act as their agent or trustee, crucial decisions in any estate plan or long-term care plan, could be affected by the client's family's customs and beliefs related to health care and financial decision making.

I'll offer three examples to illustrate these points.

## Example #1

If your client was born in a refugee camp in Thailand but is now a 40-year-old married doctor with a husband and three children, what sort of estate plan would you recommend for her family?

Let's say you learn that her parents are illiterate, have only been employed in custodial jobs that don't require reading or writing, and they live in subsidized housing. Your client says she wants to be sure the plan provides for the financial security of both her children *and* parents.

Their estate plan will have to be based on a solid understanding of family history and cultural differences. You can't assume that they'll want to plan for parents to reside in a nursing home because in the Hmong culture, elderly family members are usually cared for in the homes of their children or grandchildren and very rarely reside in a residential care facility.

On the other hand, they may need to plan for costly funerals for themselves and their parents because in the Hmong culture, funerals take place over the course of several days and include providing meals and housing for scores of mourning extended family members.

These are just two of the aspects of their estate plan that could be quite different from your typical plan.

## Example #2

If your white client grew up on a farm that had been in his family for more than three generations in southeastern Wisconsin, and had never in his 35 years of life met a Black person – until he met and married his wife, who is Black and was from a farm community in South Carolina, would the estate plan you recommend reflect their different backgrounds?

You learn that his wife's grandparents were descendants of enslaved people and were themselves sharecroppers during the years Jim Crow laws were enforced by KKK members and the local sheriffs.

You also learn that they met while teaching at the same high school, and are in the process of buying a home and plan to raise their two teenage sons (the wife's children) in a suburb near Milwaukee with very few Black residents.

Do you need to know more about their racial histories before you start creating their estate planning documents? Will your clients need to appoint agents who understand the struggles their parents and grandparents endured?

Will your clients, or their agents, need to understand how to navigate health care systems that may be discriminatory? Will the client's options for housing, employment, and long-term care be limited because of their mixed-race family?

## Example #3

What if the couple you are beginning to work with to create an estate plan that includes long-term care planning are first generation immigrants with different immigration documents?

The husband is a naturalized US citizen, and the wife is a Lawful Permanent Resident (LPR). They entered the U.S. about 10 years ago. Many of their relatives (several siblings, both parents and their two living grandparents) still live in Guatemala, and your clients plan to travel to Guatemala as often as possible to visit them.

They are looking to you for advice about how to set aside funds for travel and their own long-term care costs. Do you need to know more about immigration law to determine the amount they should set aside for

travel expenses?

What if the husband can travel more often because he is a U.S. citizen, and the wife has to limit her time out of the U.S. to maintain her status as an LPR? Will that change your planning strategies? Can you use Marital Property Agreement planning to preserve their assets? Will the wife be able to become a U.S. citizen soon? Will their plan need to be changed if they are both U.S. citizens?

## You Want Your Law Practice to be a Multicultural Practice

However, you are usure about how you can let your new or potential clients know that you are somewhat culturally competent (and still learning), and want to learn more about their history.

Exactly how do you do that?

The questions you ask and how you ask them during your initial consultation must signal that you are going to incorporate whatever you learn into the documents you draft and the advice you provide. The following questions may help you open the door:

- "Will your health care agent's decisions be affected by customs that have been part of your family's life for generations or affected by racism in the health care system?"

- "What are your financial goals related to your long-term care?"

- "Are you concerned about paying for nursing home care for yourselves or other family members or do you feel confident that a family member will provide for your care?"

- "What have your family members done, in the past, when someone needed 24-hour care?"

- "Do have any concerns about the availability of health care services in your community, if you ever need home care services?"

- "Does the community where they live serve persons of color with the same level of care?"

## Conclusion: How You Best Serve Your Clients

Elder law and health law attorneys who want to create multicultural practices to best serve their clients should consider how best to listen and talk to clients about their racial and ethnic backgrounds. Your approach must come from a place of concern and genuine interest. Estate planning and Medicaid planning require cultural competence, since clients' planning goals are affected by their unique cultural histories and circumstances.

As you listen and learn from your diverse clients, you could become an advocate for democratic, anti-racist multiculturalism within your law practice.

It all starts when you create a culture within your office that addresses the legacy of racism by asking your clients for their stories, and in being willing to change how you provide your services to reflect the unique cultural and ethnic backgrounds of your clients.

When you and your staff become allies who are committed to working for racial justice in the legal system and the health care system, you will be serving your clients' estate planning and long-term care planning needs now and into the future.

*This article was originally published on the State Bar of Wisconsin's* Elder Law and Special Needs Blog*. Visit the State Bar* sections *or the* Elder Law and Special Needs Section *webpages to learn more about the benefits of section membership.*

## Endnotes

[1] Paul Kivel, *Uprooting Racism: How White People Can Work for Racial Justice, c.* 2017 (1st edition c. 1996) New Society Publishers, p. 323.

[2] Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government Segregated America*, c. 2017, Liveright Publishing Corporation. Chapter 10: Suppressed Incomes.

---

Comments (0)

SHARE THIS:

---

**Need help? Want to update your email address?**
**Contact <u>Customer Service,</u> (800) 728-7788**

Elder Law and Special Needs Section Blog is published by the State Bar of Wisconsin; blog posts are written by section members. To contribute to this blog, contact Greg Banchy and Ryan Long and review Author Submission Guidelines. Learn more about the Elder Law and Special Needs Section or become a member.

**Disclaimer:** Views presented in blog posts are those of the blog post authors, not necessarily those of the Section or the State Bar of Wisconsin. Due to the rapidly changing nature of law and our reliance on information provided by outside sources, the State Bar of Wisconsin makes no warranty or guarantee concerning the accuracy or completeness of this content.

© 2023 State Bar of Wisconsin, P.O. Box 7158, Madison, WI 53707-7158.





Log In here





Search the site

NOVEMBER
2023
VOLUME
96
NUMBER
10

# Lawyer

Exhibit 69

NOVEMBER 09, 2023

## Qualified Immunity: A Dubious Doctrine and a 21st Century Wisconsin Solution

Many legal scholars have criticized the doctrine of qualified immunity. Some make the point that it has no textual anchor in the language of 42 U.S.C. section 1983 – it is completely a judicial creation. Others have emphasized the grave injustices that flow from the doctrine's application. The author suggests there is a state-law solution to what he views as a qualified immunity problem, at least in Wisconsin.

JEFF SCOTT OLSON

Comments (0)

SHARE THIS:



In 2019, the U.S. Court of Appeals for the 11th Circuit dismissed a civil-rights-damages case against a police officer who, while hunting a fugitive, ended up at the wrong house and forced six children, two of them under the age of three, to lie on the ground at gunpoint. The officer then tried to shoot the family dog but missed and shot a 10-year-old child who was lying face down, 18 inches away from the officer. The court held that the case had to be dismissed under the doctrine of qualified immunity because there was no prior case in which an officer accidentally shot a child laying on the ground while the officer was aiming at a dog.[1]

That same year the Ninth Circuit Court of Appeals granted qualified immunity from suit for damages to officers sued for stealing hundreds of thousands of dollars in cash and rare coins while executing a search warrant. The court stated, "We recognize that the allegation of any theft by police officers – most certainly the theft of over $225,000 – is deeply disturbing. Whether that conduct violates the Fourth Amendment's prohibition on unreasonable searches and seizures, however, would not be clear to a reasonable officer."[2]

## An Immunity Doctrine Run Amok

The doctrine of qualified immunity defeats many otherwise meritorious civil-rights-damages actions, in Wisconsin and across the country. In 2023, the Seventh Circuit Court of Appeals affirmed the dismissal of a Fourth Amendment action brought by "a staunch supporter of the Second Amendment who believes that by openly carrying firearms in public, she brings attention to one's right to bear arms."[3] The plaintiff had been arrested for disorderly conduct for carrying a rifle with a bayonet attached to it in a local park. The court explained that "while a reasonable officer should have known in April, 2020, that simply carrying a firearm or a knife in public does not constitute disorderly conduct, much more is

required to show that the legality of [the plaintiff's] conduct was 'beyond debate.'"[4]

Examples like these and increased public interest in civil-rights-damages actions as a means to deter police misconduct have spurred legislative initiatives in many states to enable litigants to get around the defense of qualified immunity. Some of these enactments provide victims with immunity-free state-law paths to damages recoveries, but none of them work to extinguish the defense in cases brought under the U.S. Constitution. This article lays out in broad strokes the nature of the defense and then suggests a Wisconsin solution that would, if enacted, effectively consign it to the dustbin of history.

## Scope of the Qualified Immunity Defense

Qualified immunity is the principle "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."[5] As the Seventh Circuit has explained, "The standard is objective, based on what a reasonable official would or should have known and thought in the same circumstances, given the state of the law at that time."[6] "[W]here the law at the time of the act was not sufficiently developed to put the official on notice that his or her act would violate the plaintiff's statutory or constitutional rights, the official is immune from liability."[7]



*Jeff Scott Olson*, *U.W. 1976, has been litigating civil rights cases for Wisconsin plaintiffs for over 40 years, in settings from administrative hearings to the U.S. Supreme Court. He operates* The Jeff Scott Olson Law Firm SC *in Waunakee.*

Three principles are key to understanding and applying qualified immunity law.

First, qualified immunity is available only to individual governmental employees facing federal law claims.Qualified immunity is a defense to federal causes of action, based on the U.S. Constitution or federal statutes only. It does not protect state or local governmental employees from claims based upon state law.[8] Municipalities[9] and private parties[10] are not entitled to invoke qualified immunity, even in defending federal-law claims.

Second, qualified immunity is inapplicable to claims for equitable relief.Courts have uniformly held that qualified immunity shields governmental defendants only from liability for damages and does not bar an action for declaratory or prospective injunctive relief.[11]

Third, subjective good faith and malice are irrelevant to the qualified immunity defense.The seminal case of *Harlow v. Fitzgerald*[12] took the element of subjective good faith out of what had previously been called "good faith immunity." The courts have continued to hold that subjective good faith does not aid a defendant asserting qualified immunity[13] and that evidence of malice does not help to defeat a claim of qualified immunity.[14]

## Reasonably Competent Public Officials Are Presumed to Know Case Law

One important legal fiction originated by *Harlow*,[15] which is necessary to the U.S. Supreme Court's scheme of keeping state-of-mind evidence out of qualified immunity determinations, is that "a reasonably competent public official should know the law governing his conduct."[16] As the 10th Circuit Court of Appeals put it in *Mellon v. City of Oklahoma City*,[17] "in sum, officials are presumed to know and abide by clearly established law. When their actions are otherwise, their claim of qualified immunity will fail."[18] The Seventh Circuit has said that "all public officials are presumed to know clearly established law, whether or not they have in fact ever cracked a law book."[19]

" Qualified immunity is a defense to federal causes of action, based on the United States Constitution or

federal statutes only. It does not protect state or
local governmental employees from claims based
upon state law.

"

## The Source of Prior Authority: Is Binding Precedent Required?

The Supreme Court recently said that "[t]o be clearly established, a legal principle must have a
sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is
dictated by controlling authority or a robust consensus of cases of persuasive authority."[20]

**The Content of Prior Authority: How Analogous Must It Be?** The great majority of qualified immunity
decisional law is an effort to apply the following language from *Anderson v. Creighton*:

"The contours of the right must be sufficiently clear that a reasonable official would understand that
what he is doing violates that right. This is not to say that an official action is protected by qualified
immunity unless the very action in question has previously been held unlawful … but it is to say in light
of pre-existing law the unlawfulness must be apparent."[21]

The Supreme Court has emphasized that the question of whether a right was clearly established need
not be determined through rigid analysis of materially identical case law. In *Hope v. Pelzer,*[22] the
Supreme Court reminded litigants that while "earlier cases involving fundamentally similar facts can
provide strong support for the conclusion that the law is clearly established," "officials can still be on
notice that their conduct violates established law even in novel factual circumstances."[23] In 2020, in
*Taylor v. Riojas,*[24] the Court held that prison officials responsible for a state inmate's confinement in cells
awash in human waste were not entitled to qualified immunity, despite the lack of controlling precedent
regarding the precise form of cruel and unusual punishment that the inmate alleged had occurred.

Still, many courts have refused to hold public officials to legal rules in the absence of reported cases
applying those rules to nearly identical fact situations. One of the most extreme examples of this sort of
decision is *Rich v. City of Mayfield Heights,*[25] in which the plaintiff sued jailers who had found him
hanging by the neck from his socks in his jail cell and, instead of taking immediate action to get him
down, called the fire department rescue squad. Observing that "no case has been brought to this
Court's attention which recognizes a constitutional duty on the part of jail officials to immediately cut
down a prisoner found hanging in his or her cell,"[26] the Sixth Circuit reversed the decision of the district
court and granted the defendant jailers qualified immunity from damages.

A second lamentable trend is that the growth of the law has been stunted. At one point, the Supreme
Court required courts considering cases involving qualified immunity to decide first whether the
defendant had violated a constitutional right, and then, only if the decision were that a violation had
occurred, to decide whether the law had been clearly established at the time of the defendant's act.[27] In
a 2009 decision, *Pearson v. Callahan*, the Court eliminated the requirement that courts decide whether a
violation occurred.[28] Because courts no longer must say what the law required in order to dismiss the
cases before them, the incremental growth of the law is stunted.

## Qualified Immunity Doctrine has been Extensively Criticized

Many legal scholars have criticized the doctrine of qualified immunity. Some make the point that it has
no textual anchor in the language of 42 U.S.C. section 1983 – it is completely a judicial creation.[29]
Others have emphasized the grave injustices that flow from the doctrine's application, when people who
are seriously injured by abhorrent conduct go uncompensated because there is no prior case on
point.[30] In 2020, Reuters published a major study showing that qualified immunity is granted in a much
greater proportion of cases in states in the geographic middle of the U.S. than on either coast.[31]

This criticism has come from the political right as well as the political left. The Cato Institute has taken a
firm position that qualified immunity ought to be abolished.[32] Judge Lynn Adelman, of the U.S. District
Court for the Eastern District of Wisconsin, has expressed concern that the

Court for the Eastern District of Wisconsin, has written, "It is a little-known and disturbing fact that the Supreme Court is in the process of gutting what may be the most important civil rights statute Congress has ever passed,"[33] referring to the effect of the Court's qualified immunity decisions on the ability of plaintiffs to enforce their rights under 42 U.S.C. section 1983.

Judge James O. Browning has written that the Supreme Court is "crafting its recent qualified immunity jurisprudence to effectively eliminate [42 U.S.C. section] 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong."[34] In 2018, Judge Jack B. Weinstein wrote a long critique of the doctrine, saying, "Qualified immunity has recently come under attack as over-protective of police and at odds with the original purpose of [42 U.S.C.] section 1983: 'to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.'"[35] Even U.S. Supreme Court Justice Clarence Thomas has written that "our qualified immunity jurisprudence stands on shaky ground."[36]

## A Solution for Wisconsin

Some states are making efforts to evade qualified immunity by creating new state-law causes of action under which the defense is unavailable.[37] These laws do not do anything about the ubiquity of qualified immunity as a defense in 42 U.S.C. section 1983 cases, so they will consign plaintiffs to state-law remedies in state courts, which may come with their own sets of disadvantages. There *is* a state-law solution to the qualified immunity problem, though, at least in Wisconsin.

The one purpose of qualified immunity that makes sense is "to protect government officials, including law enforcement officers, by giving them the ability to predict when their actions will create liability for them."[38] The reason for protecting state actors from personal financial exposure is to avoid deterring qualified individuals from entering public service.[39]

But in Wisconsin, the public employee indemnification statute, Wis. Stat. section 895.46, protects employees of state and local government from any personal exposure if they are sued for something they did in the scope of their employment. Governmental employees are acting within the scope of their employment if they are motivated to any significant extent by a desire to serve their employer's interests,[40] even if they go about advancing those interests in an improper or even criminal way. The only cases in which governmental employers do not routinely defend civil rights actions against their employees from the outset and pay any settlements or judgments are sexual misconduct cases.[41]

Although it is structured as an indemnification statute, under which it might be supposed that individual public employees pay their own lawyers and pay the settlements or judgments in their cases out of their own pockets and then get indemnified by their governmental employers, in practice the governmental unit or its insurer provides a lawyer for the individual defendant from the outset and pays any settlement or judgment directly.

So, in Wisconsin, the doctrine of qualified immunity is not needed to protect public employees from personal liability for their official actions because the state indemnification statute accomplishes that end. There is no reason for persons who have been injured by violations of federal law to go uncompensated to protect the pocketbooks of public servants, because they are already protected by the indemnification statute.

The obvious solution is for the Wisconsin Legislature to amend the indemnification statute to provide that, if individual defendants accept the defense and indemnification benefits provided by their governmental employers under it, they must, in return, waive the defense of qualified immunity. The fact that qualified immunity is an affirmative defense that can be waived[42] would make such a scheme workable, and, in practice, almost all governmental employees would choose to accept the defense and indemnification benefits of Wis. Stat. section 895.46, even if it meant waiving the defense of qualified immunity. Such an amendment would all but eliminate the defense of qualified immunity in Wisconsin, and plaintiffs injured by serious violations of their rights by state actors would no longer see their cases

Case 2:23-cv-01697   Filed 12/19/23   Page 26 of 65   Document 1-4

dismissed because sufficiently similar violations had not been litigated in the past.

## Endnotes

1 *Corbitt v. Vickers*, 929 F.3d 1304 (11th Cir. 2019).

2 *Jessop v. City of Fresno*, 936 F.3d 937 (9th Cir. 2019) (internal quotation marks and citations omitted).

3 *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1041-42 (7th Cir. 2023).

4 *Id*. at 1046 (quoting *District of Columbia v. Wesby*, 583 U.S 48, 63 (2018)).

5 *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

6 *Pounds v. Griepenstroh,*970 F.2d 338, 340 (7th Cir. 1992).

7 *Id*.

8 *Andreu v. Sapp,* 919 F.2d 637, 640 (11th Cir. 1990).

9 *Owen v. City of Independence,* 445 U.S. 662 (1980).

10 *Wyatt v. Cole,* 504 U.S. 158 (1992). In *Richardson v. McKnight,* 521 U.S. 399 (1997), the U.S. Supreme Court held that a correctional officer working for a private contractor engaged by Tennessee to manage its prisons was not entitled to claim qualified immunity. *See also**Malinowski v. DeLuca*, 177 F.3d 623 (7th Cir. 1999) (holding that privately employed building inspectors were not entitled to claim qualified immunity under *Richardson*).

11 *Supreme Video v. Schauz*, 15 F.3d 1345 (7th Cir. 1994); *Fry v. Melaragno*, 939 F.2d 832 (8th Cir. 1991); *American Fire, Theft & Collision Managers Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991); *Cagle v. Gilley*, 957 F.2d 1347 (6th Cir. 1992).

12 *Harlow, 457* U.S. 800.

13 *Courson v. McMillian,* 939 F.2d 1479, 1487 (11th Cir. 1991).

14 *Carlier v. Lussier,* 955 F.2d 841, 846 (2d Cir. 1992); *Winn v. Lynn,* 941 F.2d 236, 239-240 (3d Cir. 1991).

15 457 U.S. 800 (1982).

16 *Id.* at 819.

17 *Mellon v. City of Oklahoma City,* 879 F.2d 706 (10th Cir. 1989).

18 *Id.* at 731.

19 *Donald v. Cook Cnty. Sheriff's Dep't*, 95 F.3d 548, 560 (7th Cir. 1996) (quoting *Woods v. Indiana Univ.-Purdue Univ. at Indianapolis*, 996 F.2d 880, 887 (7th Cir. 1993)); *see also**Gary v. Sheahan*, No. 96 CV 7294, 1997 WL 201590, at *10 (N.D. Ill. Apr. 18, 1997) (unpublished) ("[I]f the law was clearly established, the immunity defense should fail because a reasonably competent public official is presumed to know the law governing his conduct."); *Winn,* 941 F.2d at 241 ("officials should be aware of the law governing their actions.")

20 *District of Columbia,* 583 U.S. at 63 (internal quotation marks and citations omitted).

21 *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

22 *Hope v. Peltzer,* 536 U.S. 730 (2002).

23 *Id.* at 742.

24 *Taylor v. Riojas,* 141 S. Ct. 52, 53 (2020).

25 *Rich v. City of Mayfield Heights,* 955 F.2d 1092 (6th Cir. 1992).

26 *Id.* at 1097.

27 *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

28 *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

29 William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 101.

30 Clark Neily, *An Unqualified Injustice*, Cato Inst. (Jan. 1, 2018),
https://www.cato.org/commentary/unqualified-injustice (reprinted from The Washington Times).

31 Andrew Chung, Lawrence Hurley, Andrea Januta, Jackie Botts, & Jaimi Dowdell, *Shot by Cops,
Thwarted by Judges and Geography*, Reuters Investigates,
https://www.reuters.com/investigates/special-report/usa-police-immunity-variations/ (last visited Oct.
12, 2023).

32 Cato Inst., *End Qualified Immunity*, https://www.cato.org/qualified-immunity (last visited Oct. 12,
2023).

33 Lynn Adelman, *The Supreme Court's Quiet Assault on Civil Rights*, Am. Const. Soc'y (Jan. 12, 2018),
https://www.acslaw.org/expertforum/the-supreme-courts-quiet-assault-on-civil-rights/.

34 *Gutierrez v. Geofreddo*, No. CIV 20-0502 JB/CG, 2021 WL 1215816, at *11, n. 7 (D.N.M. Mar. 31,
2021) (unpublished).

35 *Thompson v. Clark,* No. 14-CV-7349, 2018 WL 3128975, at *6 (E.D.N.Y. June 26, 2018) (unpublished)
(quoting *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)).

36 *Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021) (Thomas, J., dissenting from denial of certiorari).

37 *See, e.g.*, Daniele Selby, *New Mexico Is the Second State to Ban Qualified Immunity*, Innocence
Project (April 7, 2021) https://innocenceproject.org/new-mexico-bans-qualified-immunity-police-
accountability/.

38 *Koser v. Cnty. of Price*, 834 F. Supp. 305, 310-11 (W.D. Wis. 1993) (quoting *Anderson*, 483 U.S. at
640).

39 *Delgado v. Jones*, 282 F.3d 511, 516 (7th Cir. 2002).

40 *Olson v. Connerly,* 151 Wis. 2d 663, 671, 445 N.W.2d 706 (Ct. App. 1989), *aff'd*, 156 Wis. 2d 488, 457
N.W.2d 479 (1990).

41 *Martin v. Milwaukee Cnty.*, 904 F.3d 544, 555 (7th Cir. 2018).

42 *Siegert v. Gilley*, 500 U.S. 226, 231 (1991) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)).

» Cite this article: *96 Wis. Law. 10-15 (November 2023).*

Comments (0)

SHARE THIS:

 STATE BAR OF WISCONSIN

Log In here





Search the site

MAY
2023
VOLUME
96
NUMBER
5



Exhibit 70

MAY 10, 2023

Marketing
## What Your Firm Should Have in Common with Sports Illustrated

Using a content calendar for website and social media postings makes it easier to bring in the types of clients you want.

EMILY STEVER KELCHEN

Comments (0)

SHARE THIS:



About the time this *Wisconsin Lawyer* arrives in your mailbox, the swimsuit issue of *Sports Illustrated* will be hitting newsstands. As it does every year, *Vogue*'s "September issue" will highlight the fashion trends for the coming year. In December, *Time* will name its "Person of the Year." These signature issues are planned many months – often as many as 6-12 months – in advance of publication. That planning is key to their success.

These hotly anticipated publications are carefully crafted to attract attention and maximize sales. While your firm's website might never draw as many views as one of these publications, you can and should consider creating your own content calendar to help amp up your marketing and boost your bottom line.

## The Benefits of Creating a Content Calendar for Your Firm

Consistently posting fresh content is key to improving your firm's search engine results and connecting with potential clients.


**Emily Kelchen**, *U.W. 2011, is a member of the State Bar of Wisconsin's Nonresident Lawyers Division board and the Communications Committee. She is the owner of* Kelchen Consulting, *a government affairs and legal marketing firm.*

Google,[1] Bing,[2] and other search engines protect specific details about their algorithms, but it is clear that websites that do well without spending a substantial amount of money on keyword advertising stand out by consistently posting quality content. This generally means making substantive changes to a website at least once per month. The most efficient way to do this is by having a blog on the site and adding new posts each month.

Another advantage of blog posts is that they can be repurposed as social media content. Each social media platform has its own algorithm that boosts engaging posts and highlights users who frequently contribute to the site. Packaging blogs as social media posts can engage readers, highlight your knowledge, and prompt potential clients to contact you.

Creating a content calendar can help ensure that law firm employees are consistently posting blogs on the firm's website and updating social media accounts. Rather than scrambling for content, you will have a rough idea of what you want to discuss for the next few months. You might be able write posts ahead of time and schedule them to post automatically.

## The Ethics Rules Favor Planned Content

Planning the type of content you want to post, and linking it to your marketing goals, can prevent you from posting something that violates ethics rules or is otherwise unprofessional.

The Rules of Professional Conduct prohibit attorneys from communicating with judges, juries, and represented parties.[3] Giving legal advice, claiming expertise, and posting untrue or unsafe information are also big no-nos.[4] And you don't want to create the impression that you are entering into an attorney-client relationship with people reading your online content.

If you face a complaint about your marketing, you can check your content calendar to remind yourself why a particular piece was posted. The calendar can also serve as evidence that a post was not targeted at a specific individual – such as a judge – but was part of a broader plan to highlight your work in a particular area or knowledge of a certain topic.

## How to Create a Content Calendar

Content calendars don't have to be elaborate to be effective. Start with a blank page or spreadsheet and then jot down topics you want to blog about or post about. Don't avoid being creative, but keep in mind that you are posting online to generate business.

Think about the topics your "ideal" clients might search for online. Plan posts filled with information you think those clients want to know by anticipating the questions they ask during intake interviews, such as how long it will take to get relief or what various legal terms mean in plain English. Or put yourself in their positions and imagine what they might type into a search engine and plan posts accordingly.

For example, a potential client who is considering divorce might want to know if Wisconsin courts award alimony. In Wisconsin, alimony is referred to as "maintenance," and you could write an entire blog post about the meaning of the term and when a court will order that maintenance be paid.

Next, think about regularly occurring events around which you could plan posts. You could write about something you learned during a continuing legal education presentation at the State Bar of Wisconsin's Annual Meeting & Conference, reminisce about law school graduation, blog about the annual data released by a governmental agency, highlight your firm's annual contribution to a worthy nonprofit organization, or wax poetic about Major League Baseball's antitrust exemption as the playoffs begin. Focus on events that will resonate with your ideal clients or have a strong connection with a practice area you want to highlight.

If you already have a robust website or blog, review your analytics to find out which pages or posts are performing the best. This is a good indication of the information people are looking to you for. If your top content is not geared toward your ideal clients, you should prioritize creating new pieces that will appeal to them.

Now, take the list of potential topics you have generated and plug in some potential publication dates. Match topics to specific months when doing so makes sense. If you want to write about tax law, post in the months when people are doing their tax planning. Plan to write about marital property agreements? You need to get that up before wedding season (but keep in mind that people get married year-round).

Case 2:23-cv-01697   Filed 12/19/23   Page 31 of 65   Document 1-4

Consider external publications (that is, ones not affiliated with your law firm or organization) that might be interested in publishing your work as well. If you want to write an article for *Wisconsin Lawyer*, talk to the editorial staff about the publication timeline when you make your pitch. If your article is published, you can then republish it on your website with proper attribution.

Also consider your firm's workflow. If there is a month each year that is always slow, consider writing about topics that could bring in more work at that time. Or you might want to allot some of that time for writing blog posts and then publish them throughout the year.

If there are gaps in your content calendar, be prepared to look for relevant cases, news clips, or other hot topics to blog about. Share information that will highlight your ability to solve the problems your preferred clients are facing.

## Firm But Flexible

Although it is possible to plan everything you want to write for an entire year, it is okay to adjust the plan as the year unfolds. The best-laid plans are often thwarted by courts and policymakers when they modify laws or take actions that bring new topics to the forefront.

You should adjust the content calendar if content is not bringing in clients. Regardless of website or social media analytics, if content is not leading to more clients, something is amiss. Consider adjusting your tone or the topics you write about until you find something that works.

## Plan Your Work, Work Your Plan

A well-considered content calendar is an important tool for lawyers who hope to convert website visitors into clients. Being more thoughtful about what you are going to post can help you comply with attorney advertising rules and make it easier to generate posts and consistently get them up on your website.

Over time, you should be able to track the results of your effort by looking at your website and social media traffic and mapping that on to data gathered during client intake interviews.

You probably won't end up with as many readers as *Sports Illustrated*, *Vogue*, or *Time*, but you will have something in common with these publishing giants.

## Also of interest: State Bar Offers Marketing Services at Discounted Rates

Being a member of the State Bar of Wisconsin offers access to a range of marketing services at discounted rates. Save up to 40% on Constant Contact's email communication tools and benefit from special discounts and pricing on law firm marketing services through partnership programs with NOMOS Marketing, Omnizant, and Gavel Marketing. Whether you're looking to expand your marketing reach with email campaigns, create new marketing videos for your office, improve your website with powerful SEO terms, or launch a new website or marketing campaign for your firm, these discounts and programs can help you succeed.

Click here to learn more

## Endnotes

1 *How Results Are Automatically Generated*, www.google.com/search/howsearchworks/how-search-works/ranking-results/ (last visited Apr. 11, 2023).

2 *How Bing Delivers Search Results*, https://support.microsoft.com/en-au/topic/how-bing-delivers-search-results-d18fc815-ac37-4723-bc67-9229ce3eb6a3 (last visited Apr. 11, 2023).

3 SCR 20:3.5, SCR 20:4.2, SCR 20:4.3.

4 SCR 20:7.1, SCR 20:7.4.

**» Cite this article:** *96 Wis. Law. 41-43 (May 2023).*

---

Comments (0)

SHARE THIS:



Log In here





Search the site

NOVEMBER
2023
VOLUME
96
NUMBER
10

# Lawyer

Exhibit 71

NOVEMBER 09, 2023

Marketing
How to Measure Your Digital Marketing & Set Some Goals

You can't make informed choices about your marketing efforts unless you have data to support your decision-making. Here are tips to collect meaningful data.

EMILY STEVER KELCHEN

Comments (0)

SHARE THIS:



The most followed page on Facebook (other than Facebook's official page, which is very Meta) is that of Portuguese soccer player Cristiano Ronaldo.[1] He has more than 162 million followers, and every post he shares garners hundreds of thousands of comments and likes within a few hours.[2]

The most-liked social media post of all time[3] is an Instagram post made by soccer player Lionel Messi, a native of Argentina, celebrating his team's victory in the 2022 FIFA World Cup.[4] 75 million people have shared in his joy by liking the post.

Over on YouTube, the most popular video of all time is an instructional video on how to become a world-famous soccer player. Just kidding! It's the "Baby Shark Dance" video every toddler you know has watched at least 1,000 times.[5] And those views are adding up. It's been watched 13 billion times over the past seven years.[6]

These statistics give you a sense of the scope and power of social media, but they can also give you unrealistic expectations about the attention you can attract by beefing up your firm's online marketing. It is unlikely that a few social media posts will make your firm go viral or that your website will immediately become your firm's primary source of new business – even if you have a robust content calendar that helps you consistently crank out quality information of interest to your ideal clients.[7]

So, what does a successful attempt at online marketing look like, and how do you know if the time and money you are putting into your online marketing is paying off? Read on for some tactics you can use to answer these questions.

## How are Potential Clients Finding You?

The most important measures of your firm's marketing tactics are the number and quality of the leads you are getting.

 **Emily Kelchen**, *U.W. 2011, is the chair of the State Bar of Wisconsin's* Communications Committee *and a member of the* Nonresident Lawyers Division *board. She is the owner of* Kelchen Consulting, *a government affairs and legal marketing firm.*

As part of your firm's intake process you should be asking every potential client who contacts you how they heard about you. Figuring out a way to capture, aggregate, and pull insights from this information is the best way to measure marketing. This may be as simple as adding a question to your standard intake forms or having your administrative assistant track in Excel the responses callers give. Do whatever works for your firm.

There is no better way to know if your marketing is working than to ask the people who responded to your marketing. You will no longer have to wonder if anyone is seeing your social media posts or noticed the ad you ran in the local paper or met you at a Chamber of Commerce event, because they will tell you how they found out about you.

Look at the data you have collected every few weeks to see if you notice any patterns. Over time, you can compare your results on a month-to-month basis or track your year-over-year growth. This can help you figure out which marketing efforts are paying off.

After a few months of collecting this information, you can also start to look at what sort of clients specific marketing campaigns are drawing in. Tailoring your marketing so you are attracting your ideal clients is key. If you can identify how your ideal clients are learning about you, you can focus more of your time and energy on those tactics. You can also spend less time and money advertising in ways that attract the attention of potential clients you would rather not represent.

You might be surprised to discover how many clients are referred to you by others. Whether you decide this means you need to adjust your marketing to appeal directly to clients, or spend more time and money cultivating these referral sources, is up to you.

The key takeaway here is that you can't make informed choices about your marketing efforts unless you have data to support your decision-making. The ways potential clients learn about you should match up with the time and money you put into various client-generation tactics.

## Key Takeaway

To determine if your firm's marketing is working, you should track the following:

- The number of potential clients who contact you

- The percentage of those potential clients who are ideal clients

- How those potential clients heard about you.

This will take some work, but it is essential to understanding the effectiveness of your marketing campaigns.

## Search Engine Success

In a world where the majority of all potential clients will use a search engine like Google or Bing to find a veterinarian, a roofer, or an attorney (or any other service provider), climbing the results page is crucial.[8] Search engine optimization (SEO) is how you do it.

SEO is exactly what it sounds like: creating an online presence that appeals to search engine algorithms.[9] There are all kinds of tips and tricks marketing gurus swear they can employ on your behalf to help you find a shortcut to good search results, but the search engines themselves say the best thing

to do is to consistently post information people will find helpful.[10] Doing this on your website by incorporating a blog, and on various social media accounts, is the long-term path to search engine success.

It is a good idea to check every few months where you rank when someone in your area searches various keywords you want to be known for. If you are holding steady or rising in the results, what you are doing is working. If your firm is falling down the results page, it is time to switch tactics.

## Google Analytics

Over 50% of all websites have the free tool Google Analytics built into them.[11] Your website's creator probably installed Google Analytics when they were setting up your site. If they didn't, you can have them do so now.

In Google Analytics, you can see:

- How many people are visiting your website;

- The most popular content on your website;

- How visitors to your site are finding it; and

- What search terms are leading visitors to your website.

You can use this data to figure out if the practice areas you want to highlight are getting hits and identify which pages you need to update, or blogs you need to write, to attract more of the attention you want.

You can also map the paths potential clients are taking when they visit your site to determine if your online materials are helping reel them in. Each page of your website should lead visitors to take the next step toward becoming a client. That could be reading additional information they can use to evaluate your experience, clicking on your contact information, or checking out your online biography. Google Analytics can show you the flow of visitors, which can help you identify pages people are visiting and then leaving without taking that vital next step toward becoming a client.

## Social Media Analytics

In their quest to dominate the market and capture advertising dollars, social media companies are giving business users robust tools for tracking their followers and measuring the effects of any ad buys.

If you plan to spend a large portion of your advertising budget on social media, you should take advantage of the training modules each of the major platforms offer to businesses so you know you are getting the most bang for your buck.

Below are three things to do to monitor the effects of your marketing if you are doing social on a shoestring budget or outsourcing the work to someone but want to keep oversight of what they are doing for you.

As discussed above, the number one indication of success is an uptick in the number of potential clients who mention during their intake that they checked out your firm online. Followers, likes, and comments are great, but they don't mean anything if those connections aren't becoming clients.

Search engine rankings are the second area to look for your social media impact. Posting on social media can boost your firm's online presence and help search engines find and share your content.

Third, look at the number of followers you have and how engaged those people are with your content. Followers and engagement are important, but online popularity is just an illusion of success if it doesn't translate into contacts from potential clients.

## Benchmarking

Most marketing tactics will not result in meteoric growth. Looking at your intake data each time you

attend an event or post something witty on Facebook will disappoint you. Reputation building and client cultivation take time and are best seen by looking back over a longer period. This means engaging in benchmarking.[12]

Take a deep dive into whatever marketing data you have now and keep it as a snapshot of this moment in time. Collect the same data (and whatever new data you have) in a few weeks, a few months, and a year from now. Give yourself a pat on the back if things are going well. Figure out changes you can make if things are not moving in the right direction.

If you want to dig a little deeper, make a note of the publicly available information about your closest competitors. How well do they rank on various search engines? How many followers do they have on different social media accounts? Do their social media posts get good engagement? Make a note of this information each time you look at your own so you can compare yourself to them.

## Kick Your Marketing Up a Notch

Every client-generation tactic can be tracked, counted, and analyzed. Discovering what marketing data you already have, and making an effort to collect more, will ensure you are spending your firm's resources wisely.

## Endnotes

1 List of most-followed Facebook pages, https://en.wikipedia.org/wiki/List_of_most-followed_Facebook_pages#:~:text=The most-followed person is,with over 122 million followers. All web pages in these notes were last visited on Aug. 14, 2023.

2 https://www.facebook.com/Cristiano/.

3 Lionel Messi's Instagram post is the most liked thing on social media – ever. https://mashable.com/article/lionel-messi-instagram-record-egg. (Here is the egg whose record Messi broke: https://www.instagram.com/world_record_egg/.)

4 https://www.instagram.com/p/CmUv48DLvxd/.

5 https://en.wikipedia.org/wiki/List_of_most-viewed_YouTube_videos.

6 https://www.youtube.com/watch?v=XqZsoesa55w.

7 Emily Kelchen, *What Your Firm Should Have in Common with Sports Illustrated*, 96 Wis. Law. 41 (May 2023), https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?ArticleID=29790&Issue=5&Volume=96.

8 According to an article published in 2015, 96% of people seeking legal advice use a search engine. *Legal Marketing Stats Lawyers Need to Know*, Nat'l L. Rev. (Oct. 1, 2015), https://www.natlawreview.com/article/legal-marketing-stats-lawyers-need-to-know.

9 Christopher Cody Shattuck & Spencer X. Smith, *SEO 101: How to Drive Website Traffic*, 93. Wis. Law. 53 (Dec. 2020), https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=93&Issue=11&ArticleID=28098.

10 https://www.google.com/search/howsearchworks/;https://tinyurl.com/5x8kypj9.

11 W3Techs, *Usage Statistics of Traffic Analysis Tools for Websites*, https://w3techs.com/technologies/overview/traffic_analysis.

12 David Stauffer, *BestPractices for Benchmarking*, Harvard Bus. Sch. Working Knowledge (Oct. 27, 2003), https://hbswk.hbs.edu/archive/best-practices-for-benchmarking.

» Cite this article: *96 Wis. Law. 41-43 (November 2023).*

Comments (0)

SHARE THIS:

The Wayback Machine - https://web.archive.org/web/20231213052351/https://www.wisbar.org/formembers/wislap/pages/health.aspx



Log In here

 

Search the site

# Health and Wellness



## Mental Health

Managing your general health and wellness is integral in helping you function at your peak performance in all aspects of life. This includes being aware of your health and well-being, understanding how to take care of yourself emotionally, physically, and psychologically, and learning how to make good lifestyle choices.

Stress | ADHD | Depression | Anxiety | Suicide | Eating Disorder | Wellness Resources | Related Links

Use the Personal Assessment:

8 Dimensions of Wellness Tool

Personal
Assessment

## Stress

WisLAP recognizes that legal professionals work within a culture of stress. Heavy caseloads and dockets, high demands with limited resources, long hours and struggling to find time for family or interpersonal relationships can result in a decrease in overall health and well-being.



Unlike everyday stress, chronic stress is the response to emotional pressure suffered for a prolonged period of time during which the individual perceives he or she has little or no control.  This is associated with many physical symptoms such as:

- Low energy
- Headaches
- Insomnia
- Upset stomach
- Diabetes, hypertension, and heart disease

**Are you stressed out? Take these Stress Assessments:**

- How Well Are You Handling Stress?
- Workplace Stress
- Life Stress

**Additional Resources:**

- For an interactive guide to Stress Management, click here: Managing Stress
- For Mental Health Screening Tools, Click here
- Self-Assessment Screens

<span style="color:red">Exhibit 72</span>

BACK TO TOP ↑

## ADHD

Are you experiencing challenges with concentration, impulsivity, restlessness, and organization throughout your life? Have you ever wondered whether you might have attention-deficit/hyperactivity disorder (ADHD)? Although ADHD is well known as a condition that affects children, many adults also experience it. ADHD can be harmful to an individual's social relationships and work and school performance, but effective treatments are available to manage the symptoms of ADHD

According to the National Institute of Mental Health, ADHD is a developmental disorder associated with an ongoing pattern of inattention, hyperactivity, and/or impulsivity. The symptoms of ADHD can interfere significantly with an individual's daily activities and relationships. ADHD begins in childhood and can continue into the teen years and adulthood

**Additional Resources:**

- Neurodiversity in the Practice of Law
- How can I help myself?
- Improving Wellbeing of Lawyers with ADHD
- Article and Podcast Resources
- Workplace Concerns
- CDC ADHD
- Adult ADHD

BACK TO TOP ↑

## Depression

Research shows attorneys and judges have a higher rate of depression than the general population.

**Take this Depression Self Test**

According to the National Institute of Mental Health, depression is an illness that involves the body, emotions, and thoughts. It can affect appetite and sleep, the way one feels about oneself, and the way one thinks about things. A depressive disorder is not the same as a passing blue mood. It is not a sign of personal weakness or a condition that can be willed or wished away. People with a depressive illness cannot merely "pull themselves together" and get better. Depression can result in thoughts of suicide or dying which indicate an imbalance within the brain and the need for evaluation and treatment.



DEPRESSION

Don't ignore depression symptoms or hope they'll go away on their own. Without treatment, symptoms can last for weeks, months, or years. Appropriate treatment can help most people who suffer from depression. Talk to a health care professional.

**Symptoms include:**

- Decreased productivity
- Decreased interest in activities
- Sleep disturbances
- Eating and weight changes
- Fatigue/loss of energy

**Additional Resources:**

- Depression Basics from the National Institute of Mental Health
- Men and Depression
- Lawyers Depression Project
- Depression in Women
- For Mental Health Screening Tools, Click here
- Self-Assessment Screens

Case 2:23-cv-01697   Filed 12/19/23   Page 41 of 65   Document 1-4

## Anxiety

According to the [National Institute of Mental Health](#), anxiety disorders affect more than 40 million people in the U.S. each year, making them the most commonly diagnosed mental illness.  They are not merely brief, relatively mild episodes of anxiety caused by a stressful situation, they develop from a complex set of risk factors, including genetics, brain chemistry, personality, and life events.



These disorders include generalized anxiety disorder, panic disorder, post-traumatic stress disorder, obsessive-compulsive disorder, and social phobia. Left untreated, anxiety disorders can dramatically reduce productivity and significantly diminish the person's quality of life.  However, anxiety disorders respond well to treatment with medication and psychotherapy.  Many individuals with anxiety disorders are high achievers.

**Symptoms include:**

- Restlessness
- Fatigue
- Sleep problems
- Difficulty concentrating
- Worrying

**Additional Resources:**

- [Lawyer Anxiety](#)
- Feeling anxious? Take this [Anxiety Screening Test](#)
- [Social Anxiety Disorder](#)
- [Generalized Anxiety Disorder](#)
- [Obsessive Compulsive Disorder](#)
- [Post-Traumatic Stress Disorder](#)
- For Mental Health Screening Tools, Click [here](#)
- [Self-Assessment Screens](#)

BACK TO TOP ↑

## Suicide

If you are thinking about harming yourself or attempting suicide, tell someone who can help right away:

- Call the [Suicide Prevention Lifeline](#) at (800) 273-TALK [8255] to be connected to a trained counselor at a suicide crisis center nearest you.
- Text START to 741741 for the Crisis Text Line
- Call 911 for Emergency services.
- Go to the nearest hospital emergency room.

A correlation exists between suicide, depression, and other mental health issues, including substance abuse.  Statistics suggest that many who commit suicide were under the influence at the time of death.  In one study, approximately one third of those who committed suicide were positive for alcohol at the time of death and approximately 1 and 5 had evidence of opiates.

[Statistically lawyers rank fourth in suicides](#) by profession behind only dentists, pharmacists and physicians.

Is this due to the "lawyer personality"? The high stress business model?  The adversarial nature of the profession? Long hours and isolation?  The ongoing stigma against getting help and/or the fear of exposing that vulnerability?

**Warning signs** that may indicate someone is contemplating suicide:

- Verbal threats or comments such as "You'd be better off without me" or "Maybe I won't be around." Direct threats to do harm to self such as "I will just kill myself."
- Expressions of hopelessness and/or helplessness
- Previous suicide attempts

Case 2:23-cv-01697   Filed 12/19/23   Page 42 of 65   Document 1-4

- Daring or risk-taking behavior
- Personality change (withdrawal, aggression, moodiness)
- Depression
- Giving away prized possessions, getting one's life in order
- Lack of interest in the future

**Additional Resources:**

- Suicide Prevention Resource Center
- Bar Exam Suicides Are Disturbingly Common Among Recent Law School Graduates
- Why Are Lawyers Killing Themselves
- Suicide in America- FAQ

BACK TO TOP ↑

## Eating Disorders

Eating disorders include multiple conditions that involve an obsession with food, weight, and/or physical appearance to the degree that a person's health, relationships and daily activities are negatively affected. Eating disorders affect people of all ages, genders, races, ethnicities, and socioeconomic groups.



The same personality factors that can make a successful lawyer also overlap and increase the risk in developing and eating disorder. Some examples are, perfectionism (high expectations of self), the need to over-achieve (low self-esteem), and black and white thinking (seeing everything as a success of failure).

**Some symptoms include:**

- Low self-esteem
- Depression
- Anxiety
- A need to control
- Shame and guilt issues
- Obsessive thinking and/or worrying

**Additional Resources:**

- Screening Tool I National Eating Disorders Association
- Eating Disorder During Law School
- Eating Disorders

BACK TO TOP ↑

## Wellness Resources

Meditation                                                                    DOWNLOAD (344 KB)

Mindful Eating                                                                DOWNLOAD (743 KB)

Self Care                                                                       DOWNLOAD (322 KB)

Coronavirus mental health resources_CoLAP              DOWNLOAD (30 KB)

Lifestyle and Fitness Discounts

Walking Benefits

Enjoying Nature May lessen Need for Some Medications

4

BACK TO TOP ↑

RELATED LINKS

[Wisconsin Crisis List by County](#)

[WisHope - Local Resources in Wisconsin](#)

[Bipolar Disorder](#)

[Attention-Deficit/Hyperactivity Disorder (ADHD)](#)

[Lawyers with ADHD Podcast](#)

[Understanding ADHD in Lawyers](#)

[ADHD Resources for Lawyers with ADHD](#)

[Mental Health First Aid for the Workplace](#)

## Personality Assessments

[Are you a workaholic?](#) | [Attachment Styles](#) | [Personality Questionaires](#)

## Domestic Violence

["Dynamics of Abuse"](#) | ["Signs of an Abusive Partner"](#) | ["Tool for Attorneys to Screen for Domestic Violence"](#)

## Women's Health Websites

[MedlinePlus: Women's Health Issues](#) | [Women's Health - National Institutes of Health,/font>](#)

## Men's Health Websites

[MedlinePlus: Men's Health Issues](#) | [Men's Health - National Institutes of Health](#)

Disclaimer: These screening tests and associated information do not provide a diagnosis. They are meant as a tool to help assess and be used as a guide. You may contact WisLAP to talk confidentially and answer any questions or concerns you may have.

BACK TO TOP ↑

FOR MEMBERS

## LAWYER ASSISTANCE PROGRAM (WISLAP)

Health / Mental Health

Substance Use Disorder

Support Groups

Volunteer

Newsletters

Articles

Task Force on Wisconsin Lawyer Well-Being

CLASSIFIEDS / SERVICES

Place a Classified Ad

Career Opportunities

For Sale or Rent

Case 2:23-cv-01697   Filed 12/19/23   Page 44 of 65   Document 1-4

Member Discounts

Professional Services & Experts

Court Reporters

Attorney Referrals

ADVERTISE WITH US



Follow us:

HELP FOR MEMBERS

Ethics Hotline

WisLAP

Practice411

Mentoring Program

YOUR MEMBERSHIP

FAQs

Your Benefits

Maintaining Your Membership

## CONNECT WITH US

Customer Service

Social Media

Staff Directory

Find Us

## AUDIENCES

For New Lawyers

For Public

For Law Students

For Paralegals

For Media

For Educators

## DIRECTORIES

Lawyer Search

Court Directory

Circuit Court Rules

Lawyer-to-Lawyer Directory

State Bar Leadership

Professional Services & Experts

Law-Related Organizations and Agencies

## GET INVOLVED

Advocate

Volunteer

→ Pro Bono

→ Write/Speak

→ Leadership and Committees

→ ABA Delegates

Join LRIS Panel

Sections/Divisions

Committees

## DIVERSITY & INCLUSION

Diversity Clerkship Program

Diversity and Inclusion Oversight Committee

What We Are Doing

## WORK FOR US

Open Positions

Application Process

Benefits

## CLASSIFIEDS | ADVERTISE

View Classifieds

Place a Classified Ad

Advertise With Us

## WISCONSIN LAW FOUNDATION

Donate

## HELP FOR THE PUBLIC

Lawyer Referral and Information Service

Apply for Grants                                          Common Legal Questions

Awards and Scholarships                                   Resources for the Public

For Fellows

LEGAL REPORTS AND HISTORY

Legal Reports

→ Reports

→ Resarch & Reports

Legal History

---

Advertise With Us        Legal        Privacy

©2023 State Bar of Wisconsin. All rights reserved.

Live 2







## Breathe and relax

Find a place to get comfortable, preferably while sitting or lying down. Complete the following steps in one breath cycle. Repeat as needed.

1. Exhale completely through your mouth. Try to empty your lungs as much as possible.

2. Close your lips, inhale silently through your nose, and count to four.

3. Using the same rhythm, hold your breath and count to seven.

4. Exhale through your mouth and count to eight in the same rhythm.

From well-being.net

2

LAP61-B    9/22

# Mindful Eating

The art of paying attention to what you consume and fully experiencing it without judgment.

 Don't eat straight from the packaging

 Drink more water

 Take small bites

 Eat without gadgets

 Always sit down at a table to eat

 Savor your food

 Don't hurry

## WisLAP
### Wisconsin Lawyers Assistance Program

Here to help you thrive. Contact WisLAP for confidential guidance and well-being support.

**wisbar.org/wislap • (800) 543-2625**


STATE BAR OF WISCONSIN

## Exhibit 74

## Ingredients:

- 1 pound chicken breasts boneless, skinless, cut into thin strips
- 2 teaspoons olive oil
- 1 large yellow onion, finely chopped
- 1 medium green pepper, finely chopped
- 1 medium red pepper, finely chopped
- 3 cloves garlic, mashed
- 1/3 cup no-salt-added tomato sauce
- 1/3 cup low-sodium chicken broth
- 1/3 cup fresh lemon juice
- 1/3 cup water
- 1/4 teaspoon ground cumin
- 2 bay leaves
- 1/4 cup golden raisins
- 1 tablespoon capers, drained
- 2 tablespoons green olives chopped

# Chicken Picadillo



1. Heat olive oil in a large sauté pan over medium heat. Add the onion, bell peppers, and garlic; sauté until vegetables are soft, about 5 minutes.

2. Add the chicken, and stir-fry for another 5–10 minutes until chicken is no longer pink inside.

3. Add the tomato sauce, chicken broth, lemon juice, cumin, bay leaves, water, and raisins to the vegetables and chicken.

4. Cover the pan, and reduce the heat. Simmer for 10 minutes.

5. Remove the bay leaves and garnish with fresh cilantro, capers, and green olives; serve.

**Yield** 6 servings, **Serving Size** 3 /4 cup, **Calories** 162, **Total Fat** 5g, **Saturated Fat** 1g, **Cholesterol** 46mg, **Sodium** 133mg, **Total Fiber** 2g, **Protein** 18g, **Carbohydrates** 13g, **Potassium** 380mg

Source: Deliciously Healthy Dinners; National Heart, Lung, and Blood Institute; National Institutes of Health;
U.S. Department of Health and Human Services.

2

Case 2:23-cv-01697    Filed 12/19/23    Page 51 of 65    Document 1-4

  S T A T E  B A R
OF WISCONSIN

Log In here





Search the site

## Lifestyle & Fitness



**FITNESS & WELLNESS**

TRANSFORMATION CENTER
*Fitness ⟷ Wellness ⟷ Community*

LIVE virtual or in-person fitness program at exclusive discounted rates. 45-minute live workouts from home. Try a free session today!

**LEARN MORE**



**800Flowers**

1-800 flowers.com

Send a bouquet or basket to celebrate important milestones! Eligable NPP members can save at 1-800-FLOWERS and Harry & David. Enroll today!

**LEARN MORE**



**NEW!** **OMAHA STEAKS**

OMAHA STEAKS SINCE 1917

Enjoy quality hand-cut steaks, food gifts, seafood, wine and great side dishes. Enroll with NPP to save on the entire Omaha Steaks online catalog and receive free shipping on select offers.

**LEARN MORE**



**ASPCA PET HEALTH INSURANCE**

ASPCA PET HEALTH INSURANCE

Save 10% with your member discount – plus an additional 10% when enrolling multiple pets.

**LEARN MORE**

*Exhibit 75*



**BONUSDRIVE AUTO REBATES**

Get up to $500 cash back when you purchase or lease a select new vehicle

LEARN MORE



**UPS SHIPPING SERVICES**

Take advantage of 50% off air, 30% off ground, and free UPS Smart Pickup service

LEARN MORE



NEW!

**CHERYL'S COOKIES**

Enroll with NPP today and register for 20% OFF Cheryl's Cookies fresh-baked gourmet cookies, brownies, cakes, and desserts.

LEARN MORE



NEW!

**HARRY & DAVID**

Enroll with NPP today and register for 20% OFF Harry & David gift baskets, fruit and gourmet food delivery. Perfect for holidays, anniversaries, work events and other special occasions. Check out their famous buttercream frosting and a wide array of gift options.

LEARN MORE

Case 2:23-cv-01697   Filed 12/19/23   Page 53 of 65   Document 1-4



**NEW!**

SIMPLY CHOCOLATE

simply CHOCOLATE

Enroll with NPP today and register for **20% OFF** Simply Chocolate. Chocolate bars, truffles, deluxe baskets and more from chocolate makers like Ghirardelli, Godiva, Fannie May, Harry & David and Neuhaus.

**LEARN MORE**

ABOUT US

# MEMBERSHIP

### Member Benefits

### myStateBar

### FAQs

### E-lists

### Admission to Practice

### Certificates of Good Standing

---

**CLASSIFIEDS / SERVICES**

Place a Classified Ad

Career Opportunities

For Sale or Rent

Member Discounts

Professional Services & Experts

Court Reporters

Attorney Referrals

**ADVERTISE WITH US**



Follow us:

HELP FOR MEMBERS

Ethics Hotline
WisLAP
Practice411
Mentoring Program

YOUR MEMBERSHIP

FAQs
Your Benefits
Maintaining Your Membership

CONNECT WITH US

Customer Service
Social Media
Staff Directory
Find Us

AUDIENCES

For New Lawyers
For Public
For Law Students
For Paralegals
For Media
For Educators

DIRECTORIES

Lawyer Search
Court Directory
Circuit Court Rules
Lawyer-to-Lawyer Directory
State Bar Leadership
Professional Services & Experts
Law-Related Organizations and Agencies

GET INVOLVED

Advocate
Volunteer

Case 2:23-cv-01697   Filed 12/19/23   Page 55 of 65   Document 1-4

→ Pro Bono

→ Write/Speak

→ Leadership and Committees

→ ABA Delegates

Join LRIS Panel

Sections/Divisions

Committees

## DIVERSITY & INCLUSION

Diversity Clerkship Program

Diversity and Inclusion Oversight Committee

What We Are Doing

## CLASSIFIEDS | ADVERTISE

View Classifieds

Place a Classified Ad

Advertise With Us

## WISCONSIN LAW FOUNDATION

Donate

Apply for Grants

Awards and Scholarships

For Fellows

## LEGAL REPORTS AND HISTORY

Legal Reports

→ Reports

→ Resarch & Reports

Legal History

## WORK FOR US

Open Positions

Application Process

Benefits

## HELP FOR THE PUBLIC

Lawyer Referral and Information Service

Common Legal Questions

Resources for the Public

Advertise With Us      Legal      Privacy

©2023 State Bar of Wisconsin. All rights reserved.

Live 2

The Wayback Machine - https://web.archive.org/web/20231213053751/https://www.wisbar.org/aboutus/membership/membershipandbenefits/P...

 **STATE BAR** OF WISCONSIN

Log In here





Search the site

## Security



**SECURITY**

Exclusive offers for State Bar of Wisconsin members: Receive 10% discount on all three cybersecurity bundles.

**LEARN MORE**



**NEW!** **HOME SECURITY SYSTEMS**

Save up to 15% on initial installation and 10% on monthly VIP monitoring and concierge services. Discounts are available to new, takeovers, or resale customers.

**LEARN MORE**



**CYBERSECURITY SUITE**

Cybersecurity solutions for solo, small and midsize firms.

**LEARN MORE**



**ENCRYPTED EMAIL**

Ensures total security and control over your sensitive email communications, both outbound and recipients' responses.

**LEARN MORE**

Exhibit 76





**HSB**
**TOTAL CYBER™**

**HSB.**™
A Munich Re company

Fast, affordable and customizable cyber
insurance and access to tools that can help
prevent cyber attacks before they occur.

**LEARN MORE**

ABOUT US

## MEMBERSHIP

Member Benefits

myStateBar

FAQs

E-lists

Admission to Practice

Certificates of Good Standing

---

CLASSIFIEDS / SERVICES

Place a Classified Ad

Career Opportunities

For Sale or Rent

Member Discounts

Professional Services & Experts

Court Reporters

Attorney Referrals

**ADVERTISE WITH US**



Follow us:

---

HELP FOR MEMBERS

Ethics Hotline

WisLAP

Practice411

Mentoring Program

YOUR MEMBERSHIP

FAQs

Your Benefits

Maintaining Your Membership

CONNECT WITH US

Customer Service

Social Media

Staff Directory

Find Us

---

AUDIENCES

For New Lawyers

For Public

For Law Students

For Paralegals

For Media

For Educators

DIRECTORIES

Lawyer Search

Court Directory

Circuit Court Rules

Lawyer-to-Lawyer Directory

State Bar Leadership

Professional Services & Experts

Law-Related Organizations and Agencies

## GET INVOLVED

Advocate

Volunteer

→ Pro Bono

→ Write/Speak

→ Leadership and Committees

→ ABA Delegates

Join LRIS Panel

Sections/Divisions

Committees

---

## DIVERSITY & INCLUSION

Diversity Clerkship Program

Diversity and Inclusion Oversight Committee

What We Are Doing

## CLASSIFIEDS | ADVERTISE

View Classifieds

Place a Classified Ad

Advertise With Us

## WORK FOR US

Open Positions

Application Process

Benefits

---

## WISCONSIN LAW FOUNDATION

Donate

Apply for Grants

Awards and Scholarships

For Fellows

## HELP FOR THE PUBLIC

Lawyer Referral and Information Service

Common Legal Questions

Resources for the Public

## LEGAL REPORTS AND HISTORY

Legal Reports

→ Reports

→ Resarch & Reports

Legal History

---

Advertise With Us        Legal        Privacy

©2023 State Bar of Wisconsin. All rights reserved.

Live 2

The Wayback Machine - https://web.archive.org/web/20231213054000/https://www.wisbar.org/aboutus/membership/membershipandbenefits/P…

 **STATE BAR** OF WISCONSIN

Log In here

   

Search the site

## Insurance Discounts



### ASPCA PET HEALTH INSURANCE

Save 10% with your member discount – plus an additional 10% when enrolling multiple pets.

**LEARN MORE**



### Group Health Plan for Law Firms

Obtain affordable insurance coverage and rates for your Wisconsin law firm of two or more

**LEARN MORE**



### AUTO AND HOME INSURANCE

Discover a variety of personal insurance coverages with special features and discounts

**LEARN MORE**



### DENTAL INSURANCE

State Bar members and their families can join a group Delta Dental plan

**LEARN MORE**

<span style="color:red">Exhibit 77</span>

## LIFE INSURANCE



Personal assistance in evaluating your options for term or permanent coverage.

**LEARN MORE**

## GROUP TERM LIFE INSURANCE



Ensure your family is financially cared for

**LEARN MORE**

## LONG-TERM CARE INSURANCE



Offset costs if you or a loved one face a chronic illness or long-term disability

**LEARN MORE**

## LONG-TERM DISABILITY INSURANCE



Offers active members (60 and under) the advantage of individual disability insurance at group coverage prices

**LEARN MORE**



**PROFESSIONAL LIABILITY INSURANCE**

Protect your firm with coverage from the Wisconsin Lawyers Mutual Insurance Company (WILMIC)

**LEARN MORE**



**GROUP ACCIDENTAL DEATH & DISMEMBERMENT INSURANCE**

Worldwide, 24-hour protection that pays in addition to other insurance. Available to you and your employees.

**LEARN MORE**



**PROPERTY & CASUALTY INSURANCE FOR FIRMS**

Property and casualty insurance – and auto and worker's comp programs – tailored to fit your firm's needs.

**LEARN MORE**



**EYEMED**

Get access to a national network of providers through this beneficial vision plan

**LEARN MORE**



**HSB
TOTAL CYBER™**

# HSB.

A Munich Re company

Fast, affordable and customizable cyber
insurance and access to tools that can help
prevent cyber attacks before they occur.

**LEARN MORE**

ABOUT US

## CLASSIFIEDS / SERVICES

Place a Classified Ad

Career Opportunities

For Sale or Rent

Member Discounts

Professional Services & Experts

Court Reporters

Attorney Referrals

**ADVERTISE WITH US**



Follow us:

## HELP FOR MEMBERS

Ethics Hotline

WisLAP

Practice411

Mentoring Program

## CONNECT WITH US

Customer Service

Social Media

Staff Directory

Find Us

## YOUR MEMBERSHIP

FAQs

Your Benefits

Maintaining Your Membership

## AUDIENCES

For New Lawyers

For Public

For Law Students

For Paralegals

For Media

For Educators

## DIRECTORIES

Lawyer Search

Court Directory

Circuit Court Rules

Lawyer-to-Lawyer Directory

State Bar Leadership

Professional Services & Experts

Law-Related Organizations and Agencies

## GET INVOLVED

Advocate

Volunteer

→ Pro Bono

→ Write/Speak

→ Leadership and Committees

→ ABA Delegates

Join LRIS Panel

Sections/Divisions

Committees

## DIVERSITY & INCLUSION

Diversity Clerkship Program

Diversity and Inclusion Oversight Committee

## WORK FOR US

Open Positions

Application Process

Case 2:23-cv-01697   Filed 12/19/23   Page 65 of 65   Document 1-4