UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL SUHR,

        Plaintiff,

    v.

DEAN R. DIETRICH, JANE DOE, MARGARET
WRENN HICKEY, FRANCES COYER MUNOZ,
DEANNE M. KOLL, JOSEPH M. CARDAMONE
III, AND LARRY MARTIN, in their official
capacities as officers of the State Bar of Wisconsin,

        Defendants.

## VERIFIED AMENDED COMPLAINT

Plaintiff states his Verified Amended Complaint against Defendants as follows.

## INTRODUCTION

1. The State Bar of Wisconsin, a state agency created by the Wisconsin Supreme Court, administers and promotes a "Leadership Development Summit" and a "Leadership Academy," which together have doled out training to hundreds of attorneys. These programs confer a credential, offer a privileged path to coveted leadership positions, and grant unique access to prominent figures, such as former Governor Jim Doyle and Wisconsin Supreme Court Justice Jill J. Karofsky.

Suppl. Exs. 1:1;[1] 2:1.[2] Additionally, the Bar runs a "Ready.Set.Practice. Lawyer to Lawyer Mentoring Program," which purportedly matches new attorneys with experienced mentors.

2.      Whether an attorney is granted one of these credentials and placed on a privileged path to leadership is not decided on merit alone. Rather, the selection processes discriminate between attorneys based on various protected traits, primarily race. In a video posted on YouTube by the Bar, Jill M. Kastner, a past president of the Bar, bragged that "of the . . . [B]ar's six highest office holders, four are women and three are people of color. . . . [That] happened because of intentional and deliberate choices that the Bar has made to promote diversity," including "the Leadership Development Summit and . . . [Leadership] Academy." Suppl. Ex. 3.[3]

3.      The nomination form for the Leadership Development Summit, for example, states that "[t]his event is designed to attract a variety of legal professionals with diverse . . . ethnic[] [and] gender . . . backgrounds. Please tell us what is unique,

---

[1] https://web.archive.org/web/20240425162400/https://www.wisbar.org/NewsPublications/Pages/General-Article.aspx?ArticleID=10664.

Exhibits include several webpages and responses to public records requests. Exhibits may be viewed in the appendix to the original verified complaint, the supplemental appendix to this Verified Amended Complaint, or by clicking the permalink in the first footnote citing the exhibit. YouTube videos and certain social media posts cannot be easily permalinked; accordingly, the standard address is provided for such links. Exhibits in the appendix to the original verified complaint are cited as "Ex.," and exhibits in supplemental appendix are cited as "Suppl. Ex." Some public record exhibits were sent by the agency with redactions. Plaintiff has additionally redacted law student names and what he believes are student ID numbers.

[2] https://www.instagram.com/p/C6HhYOeKiIF/?short_redirect=1&img_index=3.

[3] https://www.youtube.com/watch?v=r8hd_rZBP_s&t=56s.

special, distinctive[,] and/or impressive about your nominee." Suppl. Ex. 4.[4] The form asks only one other question.

4.  Similarly, the application form for the Leadership Academy begins with the following question: "Please provide information about yourself for the Selection Committee to consider. . . . Factors to incorporate in your comments below may include, but are not limited to, your race, ethnicity and national origin, . . . [and] gender . . . ." Suppl. Ex. 5:1.[5]

5.  The Mentoring Program requires would-be mentees and mentors to explain on the application form how they support so-called diversity, equity, and inclusion. Suppl. Exs. 6:2;[6] 7:2.[7]

6.  Additionally, the Mentor Handbook states that "[i]f the new lawyer specifically requests a mentor who has a similar identity, such as race or gender, this will be taken into consideration during the matching process . . . ." Suppl. Ex. 8:11.[8]

---

[4] https://web.archive.org/web/20240424201025/https://www.wisbar.org/aboutus/leadership/Documents/2024_LS_Leader_Nomination_Form_due_12.15.23.pdf.

[5] https://web.archive.org/web/20240424202622/https://www.wisbar.org/aboutus/leadership/Documents/2023-24_Application.pdf.

[6] https://web.archive.org/web/20240424205844/https://www.wisbar.org/formembers/membershipandbenefits/Pages/Ready-Set-Practice-Mentor-Signup.aspx.

[7] https://web.archive.org/web/20240425163224/https://www.wisbar.org/formembers/membershipandbenefits/Pages/Ready-Set-Practice-Mentee-Signup.aspx.

[8] https://web.archive.org/web/20240425163529/https://www.wisbar.org/formembers/membershipandbenefits/Documents/Ready%20Set%20Practice/FY2023/UPDATED%20-%20Ready-Set-Practice-Mentoring-Handbook-2023.pdf.

7.      The programs are illegal. The Fourteenth Amendment to the United States Constitution mandates that educational opportunities "must be made available to all on equal terms" and "shall be the same for the black as for the white . . . ." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 202, 204 (2023) (quoted sources omitted). Affirmative action for attorneys is just as unconstitutional as affirmative action for student admissions. The programs also implicate various civil rights statutes.

8.      Upon information and belief, the Bar requires its members to fund at least two of these unconstitutional programs, the Leadership Development Summit and the Mentoring Program—the Bar does not charge attorneys money to participate. For the third, the Leadership Academy, the Bar charges a fee to attend but still relies on general Bar infrastructure, resources, and staffing that are provided by general dues funds.

9.      Plaintiff Daniel Suhr, an accomplished attorney and member, objects. Plaintiff is required to join the Bar and pay it hundreds of dollars each year to maintain his membership. *See* Wis. Sup. Ct. R. (SCR) 10.01(1); SCR 10.03(5). If he does not pay, the Bar will suspend him, and an attorney cannot practice law while suspended. *See* SCR 10.03(6); SCR 20:8.4(f); Ex. 4:2.[9]

10.      Defendants are violating Plaintiff's First Amendment right to free speech under *Keller v. State Bar of California*, in which the United States Supreme

---

[9] https://web.archive.org/web/20231003164903/https://www.wisbar.org/formembers/groups/Pages/State-Bar-Bylaws.aspx#1.

Court held that an association like the Bar cannot compel an objecting member to fund activities that are not "germane" to a constitutionally permissible justification for mandatory membership. 496 U.S. 1, 13–14 (1990). The Court identified only two permissible justifications: "regulating the legal profession and improving the quality of legal services." *Id.* at 13. The Bar offers objecting members a so-called *Keller* "dues reduction" instead of abstaining from non-germane activities. Ex. 5:1.[10] The Bar classifies its various activities as either chargeable or non-chargeable to the mandatory portion of dues through an opaque procedure, ultimately determining a reduction amount. *Id.* Plaintiff took a reduction for this fiscal year, but because the Bar incorrectly classified the Leadership Development Summit and Mentoring Program as chargeable (and potentially also the Leadership Academy), he has been forced to fund the programs.

11.     The programs should not exist, but, at a minimum, under *Keller*, the Bar should have classified them as non-chargeable. The Bar, via these programs, violates the equal protection rights of attorneys. *See Students for Fair Admissions*, 600 U.S. at 213. It also advocates for supplanting equal opportunity with equal outcome and violates the free speech rights of attorneys by discriminating against those who will not profess a commitment to this ideology. *See Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). A program that violates the Constitution cannot be germane to a constitutionally permissible justification. Therefore, under

---

[10] https://web.archive.org/web/20231003173910/https://www.wisbar.org/formembers/membershipandbenefits/Documents/2024%20Keller%20Dues%20Insert.pdf.

*Keller*, the Bar is violating Plaintiff's right to free speech. For similar reasons, the Bar is also violating Plaintiff's First Amendment right to free association by forcing him to be a member of an association engaged in illegal activity. *See Janus v. Am. Fed. of State Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 897–98 (2018).

12. The Bar also engages in several other non-germane activities to which Plaintiff objects. *See Boudreaux v. La. State Bar Ass'n*, 86 F.4th 620 (5th Cir. 2023). Like the programs, some of these activities include divisive rhetoric. For example, the Bar lambasts police on its website, claiming that "[b]lack Americans suffer from police brutality . . . caused by systemic racism . . . that is ingrained in our legal system . . . . This is unacceptable. Black Lives Matter." Ex. 7:1.[11] Plaintiff does not want to subsidize or be associated with this speech.

13. Additionally, the Bar uses constitutionally inadequate dues-collecting procedures, thereby violating Plaintiff's right to free speech. Among other issues, the Bar is required to provide "potential objectors" with "sufficient information to gauge" whether it has correctly calculated the amount it requires members to pay for chargeable activities. *See Chi. Tchrs. Union, Loc. No. 1 v. Hudson*, 475 U.S. 292, 306 (1996). The Bar obscures its funding decisions in large, generic categories that inhibit objector's ability to identify non-germane activities. *See Janus*, 585 U.S. at 922–23.

14. Plaintiff requests that this Court declare that Defendants have violated Plaintiff's rights to free speech and free association, enjoin Defendants from

---

[11] https://web.archive.org/web/20231207175523/https://www.wisbar.org/aboutus/diversity/Pages/Racial-Equity.aspx.

permitting the Bar to spend money received from Plaintiff's dues on the programs and other activities discussed herein, enjoin Defendants from administering or promoting these programs in an unconstitutional manner, enjoin Defendants from using constitutionally inadequate dues-collecting procedures, and award Plaintiff damages, costs, attorney fees, and such other relief as this Court may deem appropriate.

## PARTIES

15.     Plaintiff is a constitutional conservative who has dedicated his legal practice to public-interest litigation. He believes in equality under the law for all. Plaintiff has been a member of the Bar and paid it dues yearly since his law school graduation in May 2008. Each year, Plaintiff takes a *Keller* dues reduction. In fact, in 2009, he called the Bar when his Bar dues form included a typo with $0.00 for the *Keller* dues reduction amount, which prompted the Bar to send him a stuffed cow wearing a Bar t-shirt as a token of appreciation for finding the error. As already noted, Plaintiff took a *Keller* dues reduction for fiscal year 2024. He intends to do so again for the upcoming fiscal year. Plaintiff resides and works in Ozaukee County, Wisconsin.

16.     Defendant Dean R. Dietrich is the President of the Bar; as such, he is the Bar's "chief executive officer" and a member-at-large of the Bar Board of Governors, which "manage[s] and direct[s]" the "affairs" of the Bar. SCR 10.04(2)(a); SCR 10.05(1). Defendant Dietrich resides in Wausau, Wisconsin.

17.    Defendant Jane Doe is a placeholder for the President-elect of the Bar, which is used because the office is vacant; as such, she is an officer of the Bar and a member-at-large of the Bar Board of Governors. SCR 10.04(1), (2)(b).

18.    Defendant Margaret Wrenn Hickey is the Past-president of the Bar; as such, she is an officer of the Bar and a member-at-large of the Bar Board of Governors. SCR 10.04(1), (2)(b). Defendant Hickey resides in Milwaukee, Wisconsin.

19.    Defendant Frances Coyer Munoz is the Secretary of the Bar; as such, she is an officer of the Bar and a member-at-large of the Bar Board of Governors. SCR 10.04(1), (2)(d). Defendant Munoz resides in Milwaukee, Wisconsin.

20.    Defendant Deanne M. Koll is the Treasurer of the Bar; as such, she is an officer of the Bar and a member-at-large of the Bar Board of Governors. SCR 10.04(1), (2)(e). Defendant Koll resides in New Richmond, Wisconsin.

21.    Defendant Joseph M. Cardamone III is the Chairperson of the Bar Board of Governors; as such, he is an officer of the Bar and a member-at-large of the Board. SCR 10.04(1), (2)(c). Defendant Cardamone resides in Kenosha, Wisconsin.

22.    Defendant Martin is the Executive Director of the Bar; as such, he is the "chief executive officer of the administrative staff" of the Bar. SCR 10.11. He is responsible for certifying to the Clerk of the Wisconsin Supreme Court all members who are suspended for the nonpayment of dues. Ex. 4:2. Upon information and belief, Defendant Martin resides in Dane County, Wisconsin.

23.    Each Defendant is sued only in his or her official capacity.

## JURISDICTION AND VENUE

24.     This action arises under the First and Fourteenth Amendments and is brought pursuant to 42 U.S.C. § 1983. Accordingly, this Court has subject matter jurisdiction to hear and decide this action under 28 U.S.C. § 1331.

25.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) & (2) because Plaintiff resides in this district, at least one Defendant resides in this district, all Defendants reside in Wisconsin, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## BACKGROUND

### The programs discriminate
### based on protected traits and viewpoint.

26.     The programs are the most troubling of the Bar's many non-germane activities—because they are illegal.

27.     For context, the purpose of the Leadership Development Summit is "to identify future leaders," which the Bar claims is necessary to keep it "strong and vital." Suppl. Ex. 9:2.[12]

28.     The Bar began the Leadership Development Summit in 2012 as "part of the . . . Bar's deliberate and intentional step to increase the diversity of [B]ar leadership by training and providing opportunities to lawyers from diverse

---

[12] https://web.archive.org/web/20240425164545/https://www.wisbar.org/aboutus/leadership/Pages/Leadership-Summit.aspx.

backgrounds." Suppl. Ex. 10:10.[13] It "focuses on inclusivity," and "[o]ver the years, 40 to 60 percent of participants were members of diverse groups." *Id.* at 11.

29.     Notably, the Bar defines diversity largely by the presence or absence of immutable characteristics: "The term 'diversity' has a dynamic meaning that evolves as the demographics in the state change. It . . . encompasses . . . race, ethnicity, national origin, religion, gender, gender identity, age, sexual orientation[,] and disability." Suppl. Ex. 11:2.[14]

30.     The Leadership Development Summit is "a three-hour program and luncheon that brings together . . . Bar leaders, past and present, and provides the next generation of leaders the chance to explore . . . Bar involvement opportunities, gain insight from experienced . . . Bar leaders, and help[] new attorneys find their niche." Suppl. Ex. 9:2.

31.     Attorneys who desire to participate in the program must be "nominated" by a "Bar leader." *Id.*

32.     From those nominated, a Bar sub-committee selects no more than 24 attorneys to attend the program. *Id.*

33.     The nomination form asks only two questions, one of which is the following: "This event is designed to attract a variety of legal professionals with

---

[13] https://web.archive.org/web/20240425164924/https://www.wisbar.org/SiteCollectio nDocuments/News/Racial%20Justice%20Task%20Force%20Report-Approved.pdf.

[14] https://web.archive.org/web/20240425165123/https://www.wisbar.org/aboutus/dive rsity/Pages/Diversity.aspx.

diverse . . . ethnic[] [and] gender . . . backgrounds. Tell us what is unique, special, distinctive[,] and/or impressive about your nominee." Suppl. Ex. 4.

34.     By ethnicity and gender, the Bar means not white men—white men must point to something other than race or gender to be considered "diverse."

35.     Indeed, at the last Leadership Development Summit, held on April 20, 2024, only five of 24 participants were white men. Suppl. Ex. 12:1.[15]

36.     Eighteen of the 24 (75%) were women. *Id.*

37.     These numbers do not reflect the state's demographics even though the Bar claims that diversity is tied to such demographics: About 87% of Wisconsinites are white and about 50% are men. Suppl. Ex. 13:1.[16]

38.     Attorneys who attend the Leadership Development Summit and commit to taking on a Bar leadership role are eligible to receive a "tuition scholarship" to attend the Bar's Annual Meeting & Conference—a $389 value. Suppl. Exs. 9:3; 10:11; 14:4.[17] These scholarships are funded by the Wisconsin Law Foundation, Inc., the self-described charitable arm of the Bar.

39.     The Leadership Academy is a similar program.

40.     The Bar established the Leadership Academy in 2015 "to empower participants from diverse backgrounds . . . to become effective leaders in their

----

[15] https://www.instagram.com/p/C6HhYOeKiIF/?short_redirect=1&img_index=1.

[16] https://web.archive.org/web/20240425165701/https://www.census.gov/quickfacts/fact/table/WI/BZA115221.

[17] https://web.archive.org/web/20240425220002/https://www.wisbar.org/AMC/2024/Pages/Home.aspx.

careers, communities, local and state bar associations, and the profession itself." Suppl. Ex. 10:9.

41.     The Bar describes the Leadership Academy as "a comprehensive leadership development-training program created by the . . . Bar's Leadership Development Committee." Suppl. Ex. 15:2.[18]

42.     The Leadership Academy provides instruction at three weekend sessions over the course of several months, at which "presenters" include "highly regarded national and regional" leaders. *Id.*

43.     The application form for the program begins with the following question: "Please provide information about yourself for the Selection Committee to consider. . . . Factors to incorporate in your comments below may include, but are not limited to, your race, ethnicity and national origin, . . . [and] gender . . . ." Suppl. Ex. 5:1.

44.     Both the Leadership Development Summit and the Leadership Academy are specifically advertised to racial minorities, with one report noting, "[p]romotional recruitment information is provided to leadership of the affinity bars including the Wisconsin Hispanic Lawyers Association, Wisconsin African American Lawyers Association, Wisconsin Association of LGBT Lawyers, Wisconsin Asian American Bar Association, and the Indian Law Section." Suppl. Ex. 10:29.

---

[18] https://web.archive.org/web/20240425174055/https://www.wisbar.org/aboutus/leadership/pages/leadership-academy.aspx.

45.     Upon information and belief, similar information has not been provided to affinity bars that promote traditional values, such as the Christian Law Association, Christian Legal Society, or St. Thomas More Legal Society even though the Bar claims that its definition of diversity includes religious diversity.

46.     The Leadership Development Summit and the Leadership Academy, according to the Bar, are paths to coveted positions.

47.      For example, Kristen D. Hardy, a former Chairperson of the Bar Board of Governors and graduate of the Leadership Academy, explained in a YouTube video posted by the Bar that the Leadership Academy served as a springboard to her position as chairperson. Suppl. Ex. 16.[19]

48.     The Mentoring Program purportedly matches new attorneys with an experienced mentor.

49.     As advertised, the Mentoring Program is intended to provide structure to a mentee-mentor relationship, and if certain requirements are satisfied over a roughly-year-long period, a certificate of completion is issued. Suppl. Ex. 17.[20]

50.     Potential mentees and mentors must answer the following question when applying: "The . . . Bar . . . is committed to Diversity and Inclusion by striving for understanding and commitment to diversity . . . . Please share how you have been

---

[19] https://www.youtube.com/watch?v=AJhpSzR4NXg.

[20] https://web.archive.org/web/20240425221555/https://www.wisbar.org/formembers/membershipandbenefits/Documents/Ready%20Set%20Practice/Pre-FY2019/Ready-Set-Practice-Certificate%20of%20Completion.pdf.

affected by diversity; contributed to diversity; and/or hope to contribute to diversity and inclusion in the future." Suppl. Exs. 6:2; 7:2.

51.     In the application process, mentees can express a desire to be mentored by an attorney of their own race or gender, which the Bar prioritizes in matching. Suppl. Ex. 8:11.

<b>The programs are illegal.</b>

52.     The programs discriminate against attorneys based on unlawful classifications, thereby violating attorneys' rights secured by the Equal Protection Clause of the Fourteenth Amendment. Plaintiff cannot be compelled to support unconstitutional programs.

53.     The selection processes for both the Leadership Development Summit and the Leadership Academy ask about immutable characteristics.

54.     Indeed, the nomination form for the Leadership Development Summit says that the program is intended to attract attorneys with certain ethnic and gender backgrounds, and in the very next sentence, instructs the nominator to explain how the nominee is "unique, special, distinctive[,] and/or impressive." Suppl. Ex. 4.

55.     The application form for the Leadership Academy is just as nefarious, instructing applications to "provide information about yourself"—the very first question—and then noting, "[f]actors to incorporate in your comments below may include, but are not limited to, your race, ethnicity and national origin, . . . [and] gender . . . ." Suppl. Ex. 5:1.

56. An attorney's race and gender have nothing to do with the attorney's leadership potential.

57. Stated differently, an attorney is not "unique, special, distinctive, or impressive" because of his or her race or gender, and the Bar's contrary belief is immoral.

58. Accordingly, the programs violate the Equal Protection Clause's "twin commands": the programs use race as a "stereotype" and as a "negative." *Students for Fair Admissions*, 600 U.S. at 218.

59. For similar reasons, the programs' other classifications based on protected traits, including gender, are also unconstitutional. *See United States v. Virginia*, 518 U.S. 515, 532–33 (1996).

60. Specifically, the programs presume that the absence or presence of immutable characteristics is indicative of leadership potential—a stereotype—and then use that stereotype as a reason to deny some attorneys a place in their ranks—a negative.

61. To the extent that the Bar believes its members would prefer to be led by attorneys of a certain race or gender, it is further stereotyping and assigning negative traits to its members.

62. Additionally, the selection process for the Leadership Development Summit prevents some attorneys from competing on equal footing for scholarships because of their race. Even if the Wisconsin Law Foundation is the ultimate rights violator, the Bar still aids and abets the Foundation's conduct.

63. "[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoted source omitted); *see also id.* at 752 (Thomas, J., concurring) ("[A]s a general rule, all race-based government decisionmaking—regardless of context—is unconstitutional.").

64. "[Racial] classifications . . . 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' . . . They threaten to stigmatize individuals by reason of their membership in the racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoted source omitted).

65. Therefore, the Bar must demonstrate that its racial classifications satisfy strict scrutiny. *See Johnson v. California*, 543 U.S. 499, 505 (2005).

66. Accordingly, the Bar must establish that the program's classifications are narrowly tailored to further a compelling governmental interest. *See id.*

67. The Bar appears to believe that diversity is such an interest, but a 2023 decision from the United States Supreme Court made clear that diversity is not a compelling interest. *Students for Fair Admissions*, 600 U.S. at 214.

68. The programs cannot be justified on a remedial ground, either.

69. To justify the programs on a remedial ground, the Bar needed a "strong" evidentiary basis "to conclude that remedial action was *necessary*, '*before* it embark[ed] on an affirmative-action program.'" *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 404 (2022) (per curiam) (quoted source omitted). *See generally*

*Reno*, 509 U.S. at 643 ("[E]ven in the pursuit of remedial objectives, an explicit policy of assignment by race may serve to stimulate our society's latent race consciousness, suggesting the utility and propriety of basing decisions on a factor that ideally bears no relationship to an individuals' worth or needs." (quoted source omitted)).

70.     Specifically, the Bar needed evidence of past instances of intentional racial discrimination in which the Bar participated. *See Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (holding that to establish a compelling interest, the government must show that it is remedying a specific instance of intentional discrimination that it had a hand in); *see also Parents Involved*, 551 U.S. at 720, 731–32 (majority opinion).

71.     The Bar needed to be able to describe these instances "with some specificity." *See Shaw v. Hunt*, 517 U.S. 899, 909 (1996) (quoted source omitted)).

72.     "A generalized assertion of past discrimination in a particular industry or region is not adequate . . . ." *Id.*

73.     The Bar has never had evidence of this nature; accordingly, it lacks a compelling interest.

74.     Even if the Bar could prove a compelling interest, the programs are not narrowly tailored.

75.     Among other issues, these programs' racial classifications are "arbitrary," "imprecise," "undefined," "underinclusive," and "overbroad." *Students for Fair Admissions*, 600 U.S. at 216.

76.     Even if the programs could have been justified on a remedial ground at some point in the past, narrow tailoring requires a "logical end point." *Id.* at 221.

77.     The programs are several years old, and the Bar now brags about the "diversity" of its leaders, and just a few years ago, half of the Bar's six highest officers were minorities, and more than half were women. Suppl. Ex. 3.

78.     Furthermore, at least the Mentoring Program discriminates against attorneys based on viewpoint.

79.     "When the government targets . . . particular views taken by speakers on a subject," the First Amendment is "blatant[ly]" violated. *Rosenberger*, 515 U.S. at 829.

80.     Therefore, the Bar must "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

81.     The Bar penalizes certain attorneys for their viewpoint (or encourages them to censor themselves) by requiring them to write a personal statement in which they profess a commitment to diversity, which the Bar defines as largely a matter of protected traits.

82.     Attorneys who believe that people should be judged on their "merit and essential qualities," rather than immutable characteristics, cannot express their true beliefs in a personal statement and hope to gain admission to the Mentoring Program. *See Students for Fair Admissions*, 600 U.S. at 220 (quoted source omitted).

83.     Upon information and belief, these attorneys also could not say that "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial . . . [or] sexual . . . class" and hope to gain admission to the program—despite being correct. *See id.* at 223 (quoted source omitted).

84.     At bottom, the programs advocates for a race-centric worldview and in favor of "[t]he badge of inequality and stigmatization conferred by . . . discrimination . . . ." *See Moore v. U.S. Dep't of Argric.*, 993 F.2d 1222, 1224 (5th Cir. 1993).

85.     The programs are, therefore, illegal.

**The Bar incorrectly classified at least two of the programs as chargeable to membership dues.**

86.     The Bar spends substantial sums of money administering and promoting each program.

87.     Indeed, multiple Bar employees have dedicated time to facilitating the programs.

88.     Upon information and belief, five to six Bar employees were present at the last Leadership Development Summit, which took place on a Saturday.

89.     The Bar also provided a free lunch at the Leadership Development Summit.

90.     The Bar also promotes the programs through various means, including videos on the Bar's YouTube channel.

91.     The Bar does not charge money for the Leadership Development Summit or the Mentoring Program, and while it charges $350 for the Leadership Academy, upon information and belief, this charge does not cover the full cost of the program.

92.     Upon information and belief, in calculating the *Keller* dues reduction amount, the Bar incorrectly classified at least the Leadership Development Summit and the Mentoring Program as chargeable to membership dues (and potentially also the Leadership Academy).

93.     Upon information and belief, the Bar considers most—if not all—of its diversity, equity, and inclusion initiatives chargeable to membership dues.

**Plaintiff objects to his dues being used to fund the programs.**

94.     Plaintiff objects to the programs, but the Bar is still using money received from his dues to fund them.

95.     Dues for fiscal year 2024 were over $300; however, dues for an attorney who objected to the Bar's "political or ideological activities" were reduced by $15.50—the *Keller* dues reduction. Ex. 5:1.

96.     Plaintiff took a *Keller* dues reduction for fiscal year 2024; however, the Bar did not increase the amount of the reduction to account for the programs—even though they are "political or ideological" activities.

97.     Plaintiff objects to the programs as a violation of his values and as illegal.

98. Plaintiff is especially concerned about the Bar facilitating leadership opportunities based on immutable characteristics, having written before on the importance of maintaining integrity in those chosen for public honors and recognition. *See* Daniel R. Suhr, *Lessons for Law School Deans Regarding* Catholics in Political Life, 8 Geo. J.L. & Pub. Pol'y 395 (2010).

99. Plaintiff believes—correctly—that he is being forced to support programs that violate the rights of attorneys, which he considers a breach of the oath he took when he became an attorney. *See* SCR 40.15. He believes that it is the responsibility of attorneys and legal institutions to model and exemplify respect for the Constitution and the rule of law and that the legal profession bears a special responsibility to ensure its activities are legally compliant.

100. If Plaintiff were not required to be a member of the Bar and pay it dues, he would not support the programs financially or otherwise.

101. Plaintiff believes that such activities should not exist and, at a minimum, should be funded through private contributions.

102. Regardless of how the programs are funded, Plaintiff also objects to being forced to associate himself with an entity that engages in such conduct.

### Plaintiff objects to other non-germane Bar activities.

103. Plaintiff also objects to other non-germane Bar activities.

104. Upon information and belief, some of these other activities are funded using membership dues.

105.     Even if these other activities were classified as non-chargeable, Plaintiff objects to being forced to associate with the Bar as long as it engages in them.

106.     Several of these other non-germane activities advance the same race-centric worldview as the programs.

107.     For example, the Bar has a Diversity, Equity, and Inclusion Plan Committee. Suppl. Ex. 17A:1.[21]

108.     Upon information and belief, the committee's most recent "action plan" is from fiscal year 2023. *Id.*

109.     According to that action plan, the committee is trying to "create more minority training programs" for law students. *Id.* at 5.

110.     The committee also wants the Bar to "[a]dopt a Wisconsin Scholar [P]rogram as a [B]ar preparation program for underrepresented groups." *Id.* The committee says the point of this new program would be to help craft a different "racial and ethnic" make up for the Bar. *Id.*

111.     Additionally, the committee is looking into "[e]stablish[ing] coordinated pathways to admission with students who attend . . . [Historically Black Colleges & Universities] and underrepresented students who attend Wisconsin (UW system) institutions and organizations that serve significant numbers of potential law school applicants from underrepresented racial and ethnic groups." *Id.*

---

[21] Plaintiff was unable to locate a hyperlink for this exhibit, but the plan is provided in the supplemental appendix.

112. The committee is also exploring "the feasibility of a loan repayment program for underrepresented groups that gain [B]ar admissions through the Wisconsin Scholars Program and practice law in the state for one year." *Id.*

113. The Bar also supports the development of a "Center for Black Excellence and Culture" in Madison, Wisconsin. Suppl. Ex. 18.[22]

114. The Bar says that the center will "sit on 3.5 acres of land" and "include an art gallery, two theatres, a recording studio, meeting space, and a fitness room." *Id.* at 1.

115. The Bar complained that the center was necessary because "only 2% of the [B]ar" in Dane County, Wisconsin identifies as black, and the center will create a "place where [b]lack talent can find community." *Id.* at 1–2.

116. As of February 2024, the Bar said an additional $3 million was necessary "to break ground on the center," and it asked its members to donate to the cause. *Id.* at 2.

117. The Bar also had a spokesperson for the project promote it in a YouTube video, which the Bar posted. Suppl. Ex. 19.[23]

118. The spokesperson said that attorneys should support the center "because, especially now, where so many firms specifically, but companies, schools, etc., are looking to increase the diversity of their staff . . . ." *Id.*

---

[22] https://web.archive.org/web/20240430124350/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.aspx?Volume=16&Issue=3&ArticleID=30258.

[23] https://www.youtube.com/watch?v=cdABIiY9g04&t=4s.

119.    The Bar operates a "Diversity Counsel Program" for attorneys, which promotes the same disconcerting race-centric worldview as many of the Bar's other programs. Ex. 66.[24]

120.    At a recent event as a part of the Diversity Counsel Program, one speaker, a state circuit court judge, gave a speech. *Id.* at 4.

121.    This judge complained that while walking to her chambers, she had to "look[] down" a hallway that had "a row of white men that goes from one end to the other." *Id.*

122.    This "row of white men" is a series of portraits of previous judges. *Id.*

123.    Another speaker advised that employers ask themselves: "How many board members of color do we have? How many board members who identify as LGTBQIA+ do we have?" *Id.* at 5.

124.    Another speaker called "the notion of a colorblind constitution, propounded by Justice John Harlan in *Plessy v. Ferguson*, 163 U.S. 537 (1896), . . . a non-sequitur . . . ." *Id.* at 3.

125.    The Bar also recently promoted a "DEI Hackathon Pitch Contest," which was aimed at changing the racial makeup of the "Milwaukee legal community" to make it more "diverse." Ex. 67:2.[25]

---

[24] https://web.archive.org/web/20231213035937/https://www.wisbar.org/NewsPublications/Pages/General-Article.aspx?ArticleID=30151.

[25] https://web.archive.org/web/20231213050219/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.aspx?Volume=15&Issue=21&ArticleID=30110.

126.    The Bar operates or at least helps facilitate other race-based programs, benefits, and policies, such as the Litigation Section's "diversity" scholarship, which the Bar helps advertise. Suppl. Ex. 18A:9.[26]

127.    Notably, the Bar has promoted the same race-centric worldview for years.

128.    For example, in 2020, the Bar used its resources to attack the character of police and promote the Black Lives Matter movement.

129.    As explained on the official website for Black Lives Matter, the movement's goals include "convict[ing] and bann[ing] [former President Donald] Trump from future political office," "[p]ermanently ban[ning] [President] Trump from all digital media platforms," "[e]xpel[ling] Republican members of Congress who attempted to overturn the election and incited a white supremacist attack," and "[d]efund[ing] the police." Ex. 58:1.[27]

130.    In a 2020 statement, the President of the Bar claimed that "[t]he plain truth is that there are racial disparities in our legal system and that many Wisconsin residents, particularly those of color, lack access to justice." Ex. 60:1.[28]

---

[26] https://web.archive.org/web/20240426154021/https://www.wisbar.org/aboutus/leadership/Documents/State%20Bar%20Executive%20Director%20Report%20April%202023.pdf.

[27]    https://web.archive.org/web/20231207220410/https://blacklivesmatter.com/blm-demands/.

[28] https://web.archive.org/web/20231213033320/https://www.wisbar.org/NewsPublications/Pages/General-Article.aspx?ArticleID=27782.

131.    A few weeks later, the Bar posted on Twitter (a social media site now known as X) that "[b]lack Americans suffer from police brutality and crippling fear caused by systemic racism . . . that is ingrained our legal system [sic], law enforcement institutions, and countless other facets of American life. This is unacceptable. Black Lives Matter." Ex. 61.[29]

132.    The Twitter post is also still publicly visible on the Bar's account.

133.    Around this time, Bar leaders issued a collective official statement, praising the "Black Lives Matter" movement as "historic" and purporting that "[m]any of us cannot fathom the pain that the [b]lack community experiences daily." Ex. 62:2.[30]

134.    This statement is still publicly visible on the Bar's website.

135.    The Bar leaders further emphasized their race-centric worldview, noting that "[m]any of us don't know the agony of losing a father, a mother, a sister or brother, a son, or daughter to police violence. Many of us don't know what it's like to live in fear for our lives due to the color of our skin." *Id.*

136.    Also in 2020, following a police-involved shooting in Kenosha, Wisconsin, as summarized in one Bar publication, "Bar leaders wondered what message might be conveyed by having a [Bar] meeting in . . . [Kenosha]." Ex. 63:4. [31]

---

[29] https://twitter.com/statebarofwi/status/1273263903795970048.

[30] https://web.archive.org/web/20231213034222/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.aspx?Volume=12&Issue=11&ArticleID=27820.

[31] https://web.archive.org/web/20231213034723/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=95&Issue=6&ArticleID=29154.

137. Rather than have a meeting, the Bar partnered with various groups to "hold an expungement clinic" in Kenosha. *Id.*

138. In one Bar publication, the author laments about how "the legal profession" has "been complicit in perpetuating racial injustice," making it responsible for the "Black Lives Matter movement." Ex. 64:7–8.[32]

139. As evidence of this complicity, the author relies on a study that he describes as showing that "[b]lacks" and "[l]atinx" are underrepresented in "the legal technology industry." *Id.* at 8.

140. The Bar also posted on Twitter a quote from an attorney that read: "Become friends with [b]lack people. Consistently surround yourself with [b]lack people in and out of the office." Ex. 65.[33]

141. The Bar has published numerous articles in its magazine, the *Wisconsin Lawyer*, and on its website promoting its race-centric worldview.

142. In one such article, an attorney lamented about how he "practiced estate planning and long-term care planning for close to three decades" but had "not consistently ask[ed] questions about a client's racial or ethnic background." Ex. 68:3.[34]

---

[32] https://web.archive.org/web/20231213035123/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=94&Issue=3&ArticleID=28271.

[33] https://twitter.com/StateBarofWI/status/1294665425171644416?s=20.

[34] https://web.archive.org/web/20231213051326/https://www.wisbar.org/NewsPublications/Pages/General-Article.aspx?ArticleID=29945.

143.    The Bar also publishes other articles in the *Wisconsin Lawyer*, which are not germane to regulating the legal profession or improving the practice of law.

144.    Among other things, these articles take stances on controversial issues and give advice about the business of law—rather than its practice.

145.    Titles of such articles include "Qualified Immunity: A Dubious Doctrine and a 21st Century Wisconsin Solution," "What Your Firm Should Have in Common with Sports Illustrated," and "How to Measure Your Digital Marketing & Set Some Goals." Exs. 69;[35] 70;[36] 71.[37]

146.    The Bar also promotes "health and wellness" through the "Wisconsin Lawyers Assistance Program" (WisLAP). Ex. 72:1.[38]

147.    The Bar's webpage promoting WisLAP encourages attorneys to consider whether they are experiencing "attention-deficit/hyperactivity disorder" and to self-administer a test to determine if they have "depression." *Id.* at 2.

---

[35]    https://web.archive.org/web/20231213051629/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=96&Issue=10&ArticleID=30088.

[36]    https://web.archive.org/web/20231213051831/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=96&Issue=5&ArticleID=29790.

[37]    https://web.archive.org/web/20231213052032/https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=96&Issue=10&ArticleID=30096.

[38]    https://web.archive.org/web/20231213052351/https://www.wisbar.org/formembers/wislap/pages/health.aspx.

148. The Bar on this webpage recommends "breathe and relax" exercises and "mindful eating." Exs. 73:2;[39] 74:1.[40]

149. The Bar's webpage has a link titled "Lifestyle and Fitness Discounts." Ex. 72:4.

150. This link takes the browser to another Bar webpage that advertises several member benefits unrelated to a healthy lifestyle.

151. For example, the webpage advertises brands that cannot be fairly characterized as healthy, such as "Cheryl's Cookies," "Simply Chocolate," and "Omaha Steaks." Ex. 75:1–3.[41]

152. The webpage also advertises for "800Flowers," "Pet Health Insurance," "Auto Rebates," and "Shipping Services." *Id.* at 1–2.

153. The Bar also promotes several other so-called "benefits of membership," which are not germane to a constitutionally permissible justification for mandatory membership in the Bar.

154. To name just a few more, the Bar promotes "Home Security Systems," "Auto and Home Insurance," "Life Insurance," various financial services, discounts on Dell computing products, discounts on Verizon products or services, and "Travel

---

[39] https://web.archive.org/web/20231213052648/https://www.wisbar.org/formembers/wislap/Documents/Meditation.pdf.

[40] https://web.archive.org/web/20231213052923/https://www.wisbar.org/formembers/wislap/Documents/Mindful%20Eating.pdf.

[41] https://web.archive.org/web/20231213053134/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Lifestyle-Discounts.aspx.

and Entertainment Discounts." Exs. 76:1;[42] 77:1–2; [43] 78;[44] 79:1;[45] 80:1;[46] 81:1.[47] *See generally Romero v. Colegio de Abogados de Puerto Rico*, 204 F.3d 291, 302–03 (1st Cir. 2000) (explaining the record did not establish that life insurance was germane to a constitutionally permissible justification for mandatory membership in an association like the Bar).

155. The Bar also promotes various "Marketing Resources" to help attorneys advertise their services. Ex. 82:1.[48]

156. For example, the Bar partnered with the Wisconsin Newspaper Association to help attorneys place columns in newspapers as a way for attorneys to "[b]oost" their "brand." Ex. 83.[49]

---

[42] https://web.archive.org/web/20231213053751/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Security.aspx.

[43] https://web.archive.org/web/20231213054000/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Insurance-Discounts.aspx.

[44] https://web.archive.org/web/20231213054327/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Financial-Discounts.aspx.

[45] https://web.archive.org/web/20231213054707/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Computers-and-Technology-Discounts.aspx.

[46] https://web.archive.org/web/20231213055114/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Office-Discounts.aspx.

[47] https://web.archive.org/web/20231213055348/https://www.wisbar.org/aboutus/membership/membershipandbenefits/Pages/Travel-Discounts.aspx.

[48] https://web.archive.org/web/20231213055618/https://marketplace.wisbar.org/Practice-Management/Marketing-Resources.

[49] https://twitter.com/StateBarofWI/status/1733541008988586281.

157.    The Bar says that "[i]n 2024 we'll amplify these stories through a new branded campaign on . . . Bar social media channels." Ex. 84:3.[50]

158.    The Bar has posted all of the following on social media: "Unhappy at your job? Don't hesitate or overthink. Why and how to take action now to create a career you love," "Save up to 30% on Lenovo laptops, tablets, desktops, and accessories for your home or office @Lenovo," "Looking for the best deal on wireless service? State Bar members can save 22% off monthly access fees and up to 35% off smartphones, tablets, and accessories from Verizon. @Verizon," generic Thanksgiving messages, a generic Happy Halloween post, and a "LoveYourLawyerDay" post. Exs. 85;[51] 86;[52] 87;[53] 88;[54] 89;[55] 90;[56] 91.[57]

159.    The Bar has taken formal stances on controversial legal issues and legislation.

160.    On social media, the Bar liked a post thanking two legislators for sponsoring a bill "strengthening the criminal code . . . ." Ex. 92:2.[58]

---

[50] https://web.archive.org/web/20231213060221/https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.aspx?Volume=15&Issue=22&ArticleID=30126.

[51] https://twitter.com/StateBarofWI/status/1730366992232702145.

[52] https://twitter.com/StateBarofWI/status/1729515590434373759.

[53] https://twitter.com/StateBarofWI/status/1729153294184902745.

[54] https://twitter.com/StateBarofWI/status/1728134921703555173?s=20.

[55] https://twitter.com/StateBarofWI/status/1727440083278499841?s=20.

[56] https://twitter.com/StateBarofWI/status/1719422740929605803.

[57] https://twitter.com/StateBarofWI/status/1720592541920215464.

[58] https://twitter.com/StateBarofWI/likes.

161.    The Bar also liked a post thanking legislators for sponsoring a bill that "clarifi[ed] the responsible party for costs incurred by utility relocation delays." *Id.* at 3.

162.    In one publication, under the heading "Your Voice Matters," the Bar explained that its "Advocacy and Access Justice Team" worked on "Expungement Reform" and "Returning 17-year-olds to Juvenile Jurisdiction Courts." Ex. 93:11.[59]

163.    The Bar effectively claims to speak on behalf of all members as if it were a voluntary association—but it is not.

### Plaintiff objects to the Bar's dues collecting procedures.

164.    Plaintiff is also frustrated by the lack of procedures to protect his free speech and free association rights.

165.    The Bar's dues collecting procedure is problematic in numerous ways.

166.    First, the Bar uses a so-called "opt-out" procedure, by which it assumes that each member wants to fund activities that are not germane to a constitutionally permissible justification for mandatory membership in the Bar unless a member takes affirmative and specific steps to inform the Bar otherwise.

167.    These steps must be taken during a specific period each year.

---

[59] https://web.archive.org/web/20231213063710/https://www.wisbar.org/aboutus/leadership/Documents/ExDReports/Executive%20Director%27s%20Report%20-%202023%20-%20Dec.pdf.

168.     Second, although the Bar provides members with a notice of its activities that it has classified as non-chargeable, the notice does not summarize activities that it has deemed chargeable. Ex. 5:2.

169.     Below is a screenshot from the fiscal year 2024 notice, which lists the "Cost of Nonchargeable Activities."

| Activity | Cost of Nonchargeable Activity | Portion Funded by Dues |
|---|---|---|
| Board of Governors | $42,214 | $42,214 |
| Legislative Activities | 62,552 | 62,552 |
| Annual Meeting & Conference | 30,612 | 30,612 |
| ABA Delegates | 1,596 | 1,596 |
| ABA Lobby Day | 1,346 | 1,346 |
| Division ABA | 3,703 | 3,703 |
| Government Lawyers Division | 2,852 | 2,852 |
| Non-Resident Lawyers Division | 4,633 | 4,633 |
| WI Lawyer Magazine | 13,738 | 13,738 |
| Legislative Oversight Committee | 5,291 | 5,291 |
| Executive Committee | 758 | 758 |
| Board of Governors Policy Committee | 3,368 | 3,368 |
| InsideTrack | 521 | 521 |
| Grassroots & Rotunda Report | 59,264 | 59,264 |
| Sections | 61,829 | 61,829 |
| Young Lawyers Division | 2,417 | 2,417 |
| Senior Lawyers Division | 7,968 | 7,968 |
| Social Media/WisLaw Now | 0 | 0 |
| Legal Assistance Committee | 0 | 0 |
| **Total Cost of Nonchargeable Activities** | **$304,662** | |
| **Total Dues Devoted to Nonchargeable Activities** | | **$304,662** |

170.   No similar chart is provided in the notice for activities that the Bar classified as chargeable.

171.    Effectively, the Bar presumes that members are aware of all activities that the Bar classifies as chargeable and places the onus on members to object to its classification of these activities.

172.    Indeed, from the chart, Plaintiff cannot be entirely sure whether many of the activities herein discussed were actually deemed chargeable to membership dues.

173.    For example, zero dollars of "nonchargeable activity" for "social media" makes zero sense unless the Bar is saying that none of its social media activities are non-germane, which would be an extraordinary claim for the Bar to make.

174.    Third, the Bar maintains that it is not subject to public records requests.

175.    Attorneys should not have to work hard to understand how the money they are required to pay is being spent.

### First Claim for Relief: Violation of 42 U.S.C. § 1983 (Compelled Speech)

176.    Plaintiff repeats and realleges the preceding allegations.

177.    By carrying out the program and other activities as alleged herein, Defendants act under color of state law.

178.    The Bar is an association created by the Wisconsin Supreme Court. SCR 10.01(1).

179.    The Wisconsin Supreme Court has promulgated rules that authorize the Bar to, among other things, charge dues, which the Bar does. *See* SCR 10.03(5).

- 35 -

180.    Acting under color of these and other state laws, Defendants have violated Plaintiff's right to free speech.

181.    Plaintiff did not surrender his free speech rights when he became an attorney. *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002).

182.    To the contrary, an attorney's speech may be entitled to "the strongest protection our Constitution has to offer." *See id.*; *see also Keller*, 496 U.S. at 10–12 (rejecting a government speech argument and explaining "the very specialized character of the . . . the Bar . . . serve[s] to distinguish it from the role of the typical government official or agency."); *cf. Sup. Ct. of N.H. v. Piper*, 470 U.S. 274, 281 (1985) (explaining a minimally component person has a "fundamental right" to "practice law," which is protected by the Privileges and Immunities Clause of Article IV of the Constitution).

183.    Plaintiff's free speech rights include the right to "refrain" from speaking. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

184.    As a corollary, the First Amendment prohibits the Bar from forcing Plaintiff to subsidize activities that are not "germane" to a constitutionally permissible justification for mandatory membership in the Bar. *Keller*, 496 U.S. at 13–14.

185.    To be "germane," an activity must "necessarily or reasonably" serve a justification. *Id.* at 14; *see also U.S. Dep't of Argic. v. United Foods, Inc.*, 533 U.S. 405, 415 (2001) (instructing lower courts not to render the germaneness requirement from *Keller* "empty of meaning and significance").

186. In *Keller*, the United States Supreme Court identified only two constitutionally permissible justifications for mandatory membership in an association like the Bar: "regulating the legal profession and improving the quality of legal services." 496 U.S. at 13.

187. For example, under *Keller*, "activities connected with disciplining members of the Bar or proposing ethical codes for the profession" are germane. *Id.* at 16.

188. In contrast, the Bar cannot spend money received from dues to lobby for gun control. *Id.*; *see also Pomeroy v. Utah State Bar*, 598 F. Supp. 3d 1250, 1260 (D. Utah 2022) (explaining a Utah attorney plausibly identified articles in the *Utah Bar Journal* that "could be non-germane" because "[i]nvoking the concept of implicit bias, discussing the importance of equity as a distinct concept from equality, and reviewing a book which advocates punishing people who protect an institution where a sexual assault occurred" are "topics" that may "stray from the goals of regulating the legal profession and improving the quality of legal services"); *Romero*, 204 F.3d at 302–03 (explaining the record did not establish that life insurance was germane to a constitutionally permissible justification for mandatory membership in an association like the Bar).

189. Notably, "Plaintiff[] . . . do[es] not bear the burden of proving non-germaneness. Challengers bear only the burden of making their objections known; the Bar must prove that the expenditures were germane and chargeable." *Popejoy v.*

*N.M. Bd. of Bar Comm'rs*, 887 F. Supp. 1422, 1432 (D.N.M. 1995) (citing *Hudson*, 475 U.S. at 306).

190.   Accordingly, any doubt is to be resolved in Plaintiff's favor.

191.   The Bar cannot meet its burden.

192.   As a preliminary matter, in Wisconsin, the Bar is not primarily responsible for either regulating the legal profession or improving the quality of legal services. *See generally In re the State Bar of Wis.*, 485 N.W. 2d 225, 231 (1992) (Abrahamson, J., dissenting) ("In 1976, the [Wisconsin Supreme C]ourt explicitly removed these responsibilities from the Bar and placed them under the court's supervision to assure the public that lawyer discipline, bar admission, and regulating competence through continuing legal education would be conducted for the benefit of the public, independent of elected bar officials.").

193.   The Board of Bar Examiners, a separate entity from the Bar, deals with attorney licensing issues, such as administering continuing legal education requirements.

194.   The Office of Lawyer Regulation, also a separate entity, investigates and prosecutes attorney misconduct.

195.   The Bar does not even issue Certificates of Good Standing—the Clerk of the Wisconsin Supreme Court performs that activity.

196.   Even assuming that the Bar engages in some activities germane to the constitutionally permissible justifications, the programs and other activities discussed herein are not germane.

197. The Bar is forcing Plaintiff to support discrimination by spending his dues to fund the programs, and discrimination cannot be germane to any constitutionally permissible justification for mandatory membership in the Bar. *See Keller*, 496 U.S. at 13–14.

198. More generally, the Bar's ideologically charged messages, advertisements, and other activities discussed herein are not germane to regulating or improving the legal profession.[60]

199. The Bar is "demeaning" Plaintiff because "free and independent individuals" cannot be "[f]orc[ed] . . . to endorse ideas they find objectionable . . . ." *Janus*, 585 U.S. at 893.

200. Additionally, the Bar must implement procedures that safeguard the rights of its members to free speech. *Keller*, 496 U.S. at 17.

201. The United States Supreme Court has long analogized procedures that an association like the Bar must follow to procedures that unions were required to follow—when unions could compel support. *Id.* at 12.

202. Years ago, "opt-out . . . schemes," like the Bar's, were declared insufficient in the union context. *Knox v. Servs. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 312 (2012).

---

[60] Defendants may rely on *Kingstad v. State Bar of Wisconsin*, 622 F.3d 708, 721 (7th Cir. 2010), in which the court held that a "public image campaign" by the Bar was germane. *Kingstad* is distinguishable and, in any event, should be overruled. Defendants may also rely on *File v. Martin*, 33 F.4th 385, 388 (7th Cir. 2022); however, *File* was a facial challenge.

203. "Courts 'do not presume acquiescence in the loss of fundamental rights.' " *Id.* (quoted source omitted).

204. An opt-out scheme "creates a risk" that dues will be used for an activity that is not germane without an objector's knowledge—let alone approval. *Id.*

205. Accordingly, quoting the same decision relied on in *Keller*, the United States Supreme Court held that unions must minimize this risk. *Id.* (quoting *Hudson*, 475 U.S. at 305).

206. The Bar's opt-out scheme does not do so. *See id.* at 317, 321.

207. Worse still, the Bar's notice about *Keller* dues reductions does not give "potential objectors . . . sufficient information to gauge the propriety" of the Bar's dues. *Hudson*, 475 U.S. at 306.

208. The notice does not tell members about "the source of the figure" they are required to pay (the post-*Keller* dues reduction amount)—rather, it tells members about how the *Keller* dues reduction amount was calculated (and not very well). *Id.*; *see also id.* at 306–07 ("In this case, the original information given to the nonunion employees was inadequate. Instead of identifying the expenditures for collective bargaining and contract administration [i.e., the germane expenses] that had been provided for the benefit of nonmembers as well as members—and for which nonmembers as well as members may be fairly charged a fee—the Union identified the amount that it admittedly had expended for purposes that did not benefit dissenting members.").

209. The Bar also does not permit members to access records that are reasonably necessary for those members to understand whether activities have been incorrectly classified as chargeable. *See Janus*, 585 U.S. at 922–24 (indicating members should not have to litigate to gain access to such records).

210. Simply put, the First Amendment "requires that [B]ar members be able to challenge expenditures as non-germane," and the "inability to identify non-germane expenditures" in an easy manner is a standalone injury to Plaintiff's free speech right. *Boundreaux v. La. State Bar Ass'n*, 3 F.4th 748, 760 (5th Cir. 2021); *see also Janus*, 585 U.S. at 923 (explaining that determining whether an activity is properly chargeable should not be "a laborious and difficult task" or require litigation).

211. Plaintiff suffered this injury because the Bar makes understanding its finances far too difficult.

212. In summary, the Bar is violating Plaintiff's right to free speech.

## Second Claim for Relief: Violation of 42 U.S.C. § 1983
### (Compelled Association)

213. Plaintiff repeats and realleges the preceding allegations.

214. The First Amendment also protects the freedom of association.

215. "Freedom of association . . . plainly presupposes a freedom not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

216. Individuals have a right to "eschew association for expressive purposes . . . ." *Janus*, 585 U.S. at 892.

217. For as long as the Bar is engaged in activities that are political, ideological, or not germane to either regulating the legal profession or improving the quality of legal services, compelled membership is unconstitutional.

218. The State lacks a compelling interest in forcing attorneys to associate with and pay dues to an association engaged in such activities.

219. The State especially lacks any interest in forcing attorneys to support an association engaged in illegal activities.

220. Nineteen states license and regulate attorneys directly without compelling them to join an association like the Bar, and no evidence indicates they have any serious issues with the legal profession. Other states, such as California, require membership in the bar only for regulatory purposes, while membership in the trade-association aspects of the bar is optional.

221. Defendants have no justification for their continued violation of Plaintiff's right to free association.

## REQUEST FOR RELIEF

For these reasons, Plaintiff requests that this Court:

A.      Enter a judgment declaring that Defendants have violated Plaintiff's free speech and free association rights;

B.      Enjoin Defendants from permitting the Bar to spend money received from his dues on the programs and other activities discussed herein;

C.      Enjoin Defendants from implementing the programs in a manner that violates the rights of attorneys;

D.     Enjoin Defendants from using constitutionally inadequate dues-collecting procedures;

E.     Award Plaintiff damages under 42 U.S.C. § 1983, including nominal, compensatory, and punitive damages;

F.     Award Plaintiff costs and attorney fees; and

G.     Award Plaintiff such other relief as this Court may deem appropriate.

Respectfully submitted April 30th, 2024

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

s/ Skylar Croy

Rick Esenberg (WI Bar No. 1005622)
Daniel P. Lennington (WI Bar No. 1088694)
Skylar Croy (WI Bar No. 1117831)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Dan@will-law.org
Skylar@will-law.org

*Attorneys for Plaintiff*

## VERIFICATION

1.       I am the plaintiff in this action.

2.       I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint. If called upon to testify, I would competently testify as to the matters relevant to me and my claim.

3.       I have also reviewed all the materials in the attached exhibits and declare that they are true and accurate representations of websites and public records.

4.       I verify under the penalty of perjury under the laws of the United States that the factual statements in this Verified Complaint concerning myself, my activities, and my intentions, are true and correct.

Dated: __April 30, 2024__          Signature: _____

Printed Name: _____Daniel R. Suhr_____