**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

---

DANIEL SUHR,

      Plaintiff,

    v.                                         Civil Action No. 2:23-cv-01697

DEAN R. DIETRICH, et al.,

      Defendants.

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

---

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................1

LEGAL STANDARD .................................................................................................3

ARGUMENT ..............................................................................................................5

    I.   Based on the Verified Amended Complaint alone, this Court cannot conclude that a threshold issue will prevent it from considering the claims raised in this action. ............5

        A.  This action is timely—the claims are not time-barred by the statute of limitations. ..............................................................................................6

        B.  The claims in this action are ripe. .................................................................9

    II.  Mr. Suhr has stated a free speech claim by alleging that the Bar has engaged in various non-germane activities that were improperly accounted for when the Bar determined a *Keller* dues reduction amount. ..................................................12

        A.  The Bar's illegal activities are non-germane. .............................................13

        B.  The Bar's diversity, equity, and inclusion initiatives are non-germane. ...................16

        C.  The Bar's various business ventures are non-germane. ...............................18

        D.  The Bar's Wisconsin Lawyer Assistance Program (WisLAP) is non-germane. .........19

        E.  The Bar's social media activities are non-germane. ...................................20

        F.  The Bar's Wisconsin Lawyers articles are non-germane. ...........................22

    III.  Mr. Suhr has also stated a free speech claim by alleging that the Bar's dues-collecting procedures are constitutionally inadequate. .....................................23

    IV.  One instance of non-germane activity is sufficient to state a free association claim; however, even if more is required, Mr. Suhr has alleged plenty. .....................................26

    V.  Forcing Mr. Suhr to subsidize and associate himself with the Bar is inconsistent with the history of the First Amendment. ........................................................29

    VI.  The Bar mistakenly treats all non-germane activities as either relevant to both the free speech and free association claims or neither. ...........................................30

CONCLUSION...........................................................................................................30

CERTIFICATE OF SERVICE ..................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ........................................................... 16

*Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461 (2004) ................................................. 9

*Bennett v. Schmidt*, 153 F.3d 516 (7th Cir. 1998) .................................................................. 3, 4

*Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748 (5th Cir. 2021) .................................................. 25

*Boudreaux v. La. State Bar Ass'n*, 86 F.4th 620 (5th Cir. 2023) .......................................... passim

*Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656 (7th Cir. 2022) ..................................................... 3, 4

*Brosterhous v. State Bar of Cal.*, No. 95AS03901, slip op. (Cal. Super. Ct. Aug. 17, 1999) ............................................................................................................... 13, 17, 22

*Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732 (7th Cir. 2014) ....................................... 4

*Chapman v. Yellow Cab Coop.*, 875 F.3d 846 (7th Cir. 2017) ..................................................... 4

*Chi. Tchrs. Union, Loc. No. 1 v. Hudson*, 475 U.S. 292 (1986) ............................................ passim

*Clark v. Law Off. of Terrence Kennedy, Jr.*, 709 F. App'x 826 (7th Cir. 2017) ........................... 4

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999) .......... 24

*Crowe v. Oregon State Bar*, 989 F.3d 714 (9th Cir. 2021) .................................................... 6, 27

*File v. Martin*, 33 F.4th 385 (7th Cir. 2022), *cert. denied sub nom.*, *File v. Hickey*, 143 S. Ct. 745 (2023) ...................................................................................................... 28

*Freeman v. Metro. Water Reclamation Dist. of Greater Chi.*, 927 F.3d 961 (7th Cir. 2019) ............................................................................................................................. 3

*Gomez v. Toledo*, 446 U.S. 635 (1980) .................................................................................... 5

*Gonzales v. N. Twp. of Lake Cnty.*, 800 F. Supp. 676 (N.D. Ill. 1992), *rev'd on other grounds*, 4 F.3d 1412 (7th Cir. 1993) ................................................................................ 7

*Griffin v. Rogers*, 308 F.3d 647 (6th Cir. 2002) ....................................................................... 8

*Harris v. Quinn*, 573 U.S. 616 (2014) .................................................................................... 13

*Heard v. Sheahan*, 253 F.3d 316 (7th Cir. 2001) ..................................................................... 8

*Huber v. Anderson*, 909 F.3d 201 (7th Cir. 2018) .................................................................... 6

*In Integration of the Bar*, 5 Wis. 2d 618 (1958) .................................................................... 29

*In re Diversity, Equity, Inclusion, & Access Training for Continuing Legal Educ.*, No. 22-01 (Wis. July 13, 2023) ............................................................................................... 17

*In re the State Bar of Wis.*, 485 N.W.2d 225 (1992) ............................................................... 29

*Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000) .......................................................... 6

*Janus v. AFSCME, Council 31*, 585 U.S. 878 (2018) ........................................................... passim

*Keller v. State Bar of Cal.*, 496 U.S. 1 (1990) ..................................................................... passim

- ii -

*Kingstad v. State Bar of Wis.*, 622 F.3d 708 (7th Cir. 2010) ........................................ 4, 12, 13, 18

*Knox v. SEIU, Loc. 1000*, 567 U.S. 298 (2012) ..................................................... passim

*McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021) .................................................. 26, 27

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ....................................... 29

*Nuziard v. MBDA*, __ F. Supp. 3d __, 2024 WL 965299 (N.D. Tex. Mar. 5, 2024) ................... 16

*Pitts v. City of Kankakee*, 267 F.3d 592 (2001) ....................................................... 7, 8

*Pittsfield Dev., LLC v. City of Chicago*, 2024 WL 579715 (N.D. Ill. Feb. 13, 2024) ................... 5

*Plessy v. Ferguson*, 163 U.S. 537 (1896), *overruled by Brown v. Bd. of Educ.*, 347
    U.S. 483 (1954) .......................................................................... 17

*Pomeroy v. Utah State Bar*, 2024 WL 1810229 (D. Utah Apr. 25, 2024) .......................... 27

*Pomeroy v. Utah State Bar*, 598 F. Supp. 3d 1250 (D. Utah 2022) ......................... 22, 27

*Preston v. Wis. Health Fund*, 397 F.3d 539 (7th Cir. 2005) ....................................... 16

*Ray v. Clements*, 700 F.3d 993 (7th Cir. 2012) ..................................................... 8, 9

*Reed v. Palmer*, 906 F.3d 540 (7th Cir. 2018) ......................................................... 6

*Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759 (7th Cir. 2010) .................................. 3

*Rice v. Cayetano*, 528 U.S. 495 (2000) ................................................................ 16

*Richards v. Mitcheff*, 696 F.3d 635 (7th Cir. 2012) ................................................. 5, 6

*Romero v. Colegio de Abogados de P.R.*, 204 F.3d 291 (1st Cir. 2000) ......................... 18

*Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712 (7th Cir. 2005) ................................. 15

*Schell v. Chief Just. & Justs. of the Okla. Sup. Ct.*, 11 F.4th 1178 (10th Cir. 2021) ................... 27

*Schneider v. Colegio de Abogados de P.R.*, 917 F.2d 620 (1st Cir. 1990) ........................ 22

*Shipley v. Chi Bd. of Election Comm'nrs*, 947 F.3d 1056 (7th Cir. 2020) ........................ 26

*Southworth v. Grebe*, 151 F.3d 717 (7th Cir. 1998), *rev'd sub nom. on other grounds*, *Bd.*
    *of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217 (2000) ....................... 13, 18

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181
    (2023) ............................................................................... 15, 16, 17

*Taylor v. Buchanan*, 4 F.4th 406 (6th Cir. 2021) ..................................................... 30

*Thiel v. State Bar of Wis.*, 94 F.3d 399 (7th Cir. 1996), *overruled on other grounds by*
    *Kingstad v. State Bar of Wis.*, 622 F.3d 708 (7th Cir. 2010) .................................... 4, 6, 20

*Thomas v. Walmart Inc.*, __ F. Supp. 3d __, 2024 WL 1050179 (N.D. Ill. Mar. 11, 2024) ........... 4

*Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409 (7th Cir. 2019) ................................... 26

*United States v. Stevens*, 559 U.S. 460 (2010) ....................................................... 29

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) ......................................... 18

*Wallace v. Kato*, 549 U.S. 384 (2007) .................................................................. 6

- iii -

**Statutes**

42 U.S.C. § 1983 ........................................................................................................ 6

Wis. Stat. § 893.53 ................................................................................................... 6

**Other Authorities**

*A Memorial and Remonstrance Against Religious Assessments* (1785), *reprinted in* 2 *The Writings of James Madison* 183 (G. Hunt ed. 1901) ......................................... 1

Cal. Bar, *Test for Chargeability* (Feb. 5, 2000),
https://www.calbar.ca.gov/portals/0/documents/bog/minutes_00-02-05_4010_chargeabilty.pdf ............................................................................... 16

*Keller* Dues Reduction Notice FY2025,
https://www.wisbar.org/formembers/membershipandbenefits/Documents/Keller%20Dues%20Insert.pdf ........................................................................................ 11

Leslie C. Levin, *The End of Mandatory State Bars?*, 109 Geo. L.J. Online 1 (2020) ................. 29

Thomas Jefferson, *A Bill for Establishing Religious Freedom* (1777), *reprinted in* 2 *Papers of Thomas Jefferson* 545 (J. Boyd ed. 1950) ...................................... 11

**Rules**

FRCP 12 .............................................................................................................. 3, 23

FRCP 8 .................................................................................................................. 3

# INTRODUCTION

In 2018, the United States Supreme Court explained in *Janus v. AFSCME, Council 31* that "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning . . . ." 585 U.S. 878, 893 (2018). Similarly, one founding father said that an individual cannot be forced to contribute even "three pence" to a cause to which he or she objects. James Madison, *A Memorial and Remonstrance Against Religious Assessments* (1785), *reprinted in* 2 *The Writings of James Madison* 183, 186 (G. Hunt ed. 1901).

The Wisconsin State Bar disagrees. It moves to dismiss a complaint for failure to state a claim, asserting that it can compel attorneys to subsidize all sorts of reasonably objectionable activities—and associate themselves with said activities no less.

The claims raised are firmly based in precedent, and the complaint raises serious allegations; at a minimum, discovery is warranted. This Court should deny the motion.[1]

# BACKGROUND

Daniel Suhr is a member of the Bar. ECF 44:4. He is also an "accomplished attorney." *Id.* He must pay the Bar hundreds of dollars annually and maintain his membership to work in his chosen profession. *Id.*

The Bar engages in activities that Mr. Suhr believes are ideologically objectionable or immoral and that he does not desire to fund, so each year, he takes a "*Keller* dues reduction." *Id.* at 7. This name comes from the United States Supreme Court's decision in *Keller v. State Bar of California*, in which the Court held that an association like the Bar cannot compel an objecting member to subsidize activities that are not "germane" to either "improving the quality of legal

---

[1] The Bar asks that three of its seven officers be dismissed, and Mr. Suhr does not oppose that part of the motion insofar as the Bar concedes that they are not necessary parties.

- 1 -

services" or "regulating the legal profession"—the only constitutional justifications for such a mandatory association to exist.[2] 496 U.S. 1, 13–14 (1990). The Bar offers this reduction instead of abstaining from non-germane activities. ECF 44:5. It classifies its activities as either chargeable or non-chargeable to the mandatory portion of dues through an opaque procedure to determine a reduction amount. *Id.* When the Bar incorrectly classifies an activity as germane or undervalues the cost of a non-germane activity, an objecting member is functionally funding it—violating that member's right to free speech.

On December 19, 2023, Mr. Suhr filed a Verified Complaint, alleging that the Bar engages in various non-germane activities and that the Bar's dues-collecting procedures are unconstitutional. Among other things, he asserted that some of these activities were improperly classified as germane when the Bar calculated the *Keller* dues reduction amount. In particular, the Bar has various programs that discriminate based on race, sex, and viewpoint. Accordingly, Mr. Suhr made a free speech claim. Even assuming all activities were correctly classified and valued, Mr. Suhr is coerced to be a member. So, he also made a free association claim based on the Bar's choice to engage in at least some non-germane activities.

The parties reached a partial settlement. ECF 41-1. The Bar agreed to change its Diversity Clerkship Program—which helps law students find internships—so that the Bar could not consider immutable characteristics in selecting interns. *Id.* at 1–2. In exchange, Mr. Suhr agreed to file an amended complaint that would not challenge that program. *Id.* at 2.

---

[2] These justifications should be read narrowly. The California Supreme Court had used broader language, holding the State Bar of California could "aid in all matters pertaining to the advancement of the science of jurisprudence or the improvement of the administration of justice." *Keller*, 496 U.S. at 15 (quoted source omitted). The United States Supreme Court disagreed. *Id.*

- 2 -

Mr. Suhr filed a Verified Amended Complaint. He continued to allege that various activities are non-germane, noting multiple annual leadership programs that use immutable characteristics in selecting applicants and nominees. ECF 44:1–4. More details on his allegations are provided below.

## LEGAL STANDARD

The Bar filed a motion to dismiss the Verified Amended Complaint for failure to state a claim under FRCP 12(b)(6). Under FRCP 8(a)(2), a complaint need only contain "a short and plain statement of . . . [a] claim showing that the pleader is entitled to relief." This standard is not difficult to satisfy.

As the Seventh Circuit has instructed, this Court should determine whether the Verified Amended Complaint provides "enough detail" to give the Bar "fair notice," i.e., to facilitate the Bar's response. *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 664 (7th Cir. 2022) (quoting *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)). Second, it should consider whether the allegations "plausibl[y]" suggest that Mr. Suhr has a right to relief, i.e., the allegations must rise above the "speculative" level. *Id.* (quoting *Reger*, 592 F.3d at 764).

To clear these hurdles, the Verified Amended Complaint need not include evidence or describe the factual basis for the claims in detail. *See Freeman v. Metro. Water Reclamation Dist. of Greater Chi.*, 927 F.3d 961, 965 (7th Cir. 2019) (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)) (noting the statement "I was turned down for a job because of my race" would be sufficient to state a claim). In the words of the Seventh Circuit, a plaintiff, like Mr. Suhr, is "entitled to discovery before being put to . . . [his] proof, [because] treating the allegations of the complaint as a statement of the party's proof leads to windy complaints and defeats the function of . . . [FRCP] 8." *Clark v. Law Off. of Terrence Kennedy, Jr.*, 709 F. App'x 826, 829 (7th

- 3 -

Cir. 2017) (quoting *Bennett*, 153 F.3d at 519) ([because] alteration in original). Additionally, because Mr. Suhr has not had an opportunity for discovery yet, he should "receive[] the benefit of the imagination, so long as the hypotheses are consistent with the complaint." *Brant*, 43 F.4th at 664 (quoting *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017)). Similarly, the complaint need not "state all possible legal theories" on which Mr. Suhr might rely after discovery. *Thomas v. Walmart Inc.*, __ F. Supp. 3d __, 2024 WL 1050179, at *3 (N.D. Ill. Mar. 11, 2024) (citing *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)).

The Bar's arguments about the supposed structural problems with the Verified Amended Complaint are inconsistent. On the one hand, it insinuates that Mr. Suhr "file[d] a generally phrased complaint." ECF 46:21 (quoted source omitted). On the other hand, the Bar suggests that the complaint is too detailed because Mr. Suhr "identifie[d] more than 30 separate activities." *Id.* at 13. Also, the Bar says that Mr. Suhr must allege a sufficient "quantity, substance, or prominence" of "non-germane activities" to succeed on the free association claim. ECF 46:20 (quoted source omitted). This theory is misguided, but regardless, the Bar cannot complain about Mr. Suhr referencing many activities while advocating that he must establish that the proportion of non-germane activities to germane activities has reached an unidentified ratio.

In reality, Mr. Suhr has done more than give a short and plain statement of the facts upon information and belief. He has given a detailed accounting of the Bar's activities based on public information derived largely from the Bar's own website. Indeed, the Bar has had no problem determining what Mr. Suhr is upset about.

In any event, the proper approach is laid out in *Thiel v. State Bar of Wisconsin*, 94 F.3d 399, 405 (7th Cir. 1996), *overruled on other grounds by Kingstad v. State Bar of Wisconsin*, 622 F.3d 708 (7th Cir. 2010). The Seventh Circuit (while ultimately siding with the Bar on summary

- 4 -

judgment, not a motion to dismiss) explained that it "examined each expenditure"—it did not dispose of them *en masse*. *Id.*

The Bar also raises affirmative defenses; however, a plaintiff, like Mr. Suhr, "need not anticipate defenses and attempt to defeat them" in a complaint. *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)). Only when a plaintiff has (presumably inadvertently) pleaded "an airtight defense" on which a defendant may rely has the plaintiff "pleaded himself [or herself] out of court," and, even then, a district court cannot dismiss the action unless the defendant by "proper motion" seeks judgment on the pleadings—rather than moves to dismiss. *Id.* at 637–38. For example, the Seventh Circuit held that a plaintiff injured over an "extended period[]" need not have addressed the statute of limitations in his complaint—because its purported applicability is a defense—and that the plaintiff's allegations did not give the defendant an "impenetrable defense," making judgment on the pleadings inappropriate.[3] *See id.*

## ARGUMENT

I.  **Based on the Verified Amended Complaint alone, this Court cannot conclude that a threshold issue will prevent it from considering the claims raised in this action.**

This Court will be able to reach the merits of the claims in this action. The Bar raises two affirmative defenses: a statute of limitations and ripeness. *See id.* at 637; *Pittsfield Dev., LLC v. City of Chicago*, 2024 WL 579715, at *12 (N.D. Ill. Feb. 13, 2024) (explaining ripeness is an "affirmative defense"). Notably, these defenses were not raised by "proper motion"—the Bar has

---

[3] The Bar goes on about the "burden" Mr. Suhr has, but his burden is minimal. *Chi. Tchrs. Union, Loc. No. 1 v. Hudson*, 475 U.S. 292, 306 n.16 (1986) ("The nonmember's 'burden' is simply the obligation to make his objection known.").

- 5 -

not sought judgment on the pleadings. *See Richards*, 696 F.3d at 637–38. Even putting aside that procedural problem, these defenses still fail.[4]

A.      ***This action is timely—the claims are not time-barred by the statute of limitations.***

The statute of limitations for a claim under 42 U.S.C. § 1983 is the statute of limitations for personal injuries supplied by the state where the claim arose. *Huber v. Anderson*, 909 F.3d 201, 207 (7th Cir. 2018) (citing *Wallace v. Kato*, 549 U.S. 384, 487 (2007)). Accordingly, Wis. Stat. § 893.53 is in play, which says that an action "shall be commenced within 3 years after the cause of action accrues . . . ."

This action commenced on December 19, 2023, and the claims are based on activities that took place within the preceding three years, as required by Wis. Stat. § 893.53. While some of these activities started outside of this period, all continued into this period. For example, in 2020, the Bar endorsed the Black Lives Matter Movement, but it has not stopped. ECF 44:6, 25–26. Figure 1 is a screenshot of one statement. The statement lacks a publication date and is written in the present tense: "We must insist on real change," etc. ECF 35-1:34. The copyright (at the bottom of the website and not included in the screenshot for space) even says 2023. *Id.* at 37. All activities that the Bar claims should not be considered given § 893.53 are like Figure 1. The Bar cannot compel Mr. Suhr to subsidize the infrastructure for this ongoing activity, and it cannot force Mr. Suhr to associate with this activity either.

---

[4] The Bar also raises sovereign immunity. Little changes even if the Bar has immunity—Mr. Suhr can seek declaratory and injunctive relief, as the Bar concedes—just not damages. *See* ECF 46:17–18. If this defense is properly before this Court, this Court may need to accept it because of *Thiel*; however, *Thiel* is inconsistent with *Crowe v. Oregon State Bar*, 989 F.3d 714, 731 (9th Cir. 2021). *See generally Reed v. Palmer*, 906 F.3d 540, 549 (7th Cir. 2018) (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring in part & concurring in the judgment)) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal."). Mr. Suhr may seek to have *Thiel* overruled on appeal.

- 6 -

Figure 1: The Bar Endorsing the Black Lives Matter Movement



The Seventh Circuit examined a similar fact pattern in *Pitts v. City of Kankakee*, 267 F.3d 592 (2001). As it noted, plaintiffs in one action argued that "the maintenance of a religious monument" that was erected 27 years before their complaint was filed violated the Establishment Clause. *Id.* at 595 (citing *Gonzales v. N. Twp. of Lake Cnty.*, 800 F. Supp. 676 (N.D. Ill. 1992), *rev'd on other grounds*, 4 F.3d 1412 (7th Cir. 1993)). The Seventh Circuit, summarizing the procedural history, explained that "[t]he district court decided that the case was not time-barred, because the claim accrued every day the monument remained on display." *Id.* The Seventh Circuit then explained that it had "implicitly recognized" the correctness of the district court's decision. *Id.* at 596. The Seventh Circuit added that an Establishment Clause cause of action does not "expire simply because a monument has been comfortably unchallenged for . . . a hundred years. Each day . . . brings a new duty on the government's part[] and a corresponding new right to seek vindication of the constitutional right in question." *Id.* The Seventh Circuit contrasted a claim of

- 7 -

that nature with a retaliatory defamation claim, which it held accrues when a defamatory statement is published. *Id.* at 596–97. The effects of the retaliatory act may linger, but the act occurs at a discrete moment. *Id.*; *see also Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) ("Every day that . . . [prison officials] prolonged . . . [a prisoner's] agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew.").

Like the monument fact pattern, each day, the Bar continues to endorse the Black Lives Matter Movement—each day, it has a new duty to stop. Mr. Suhr emphasized in the Verified Amended Complaint that these statements are "still publicly visible" on the Bar's social media or website. ECF 44:26. The Bar maintains these statements in cyberspace like how a municipality might maintain a monument outside of a courthouse or town hall. Even if the statements were to come down, forcing Mr. Suhr to associate with an entity that has a history of this nature is different only in degree—not in quality—from forcing him to associate with an entity with a more nefarious past.

Contrarily, the Bar says that Mr. Suhr's claims, as they relate to these statements, are time-barred; however, the Bar does not address that it continues to endorse the Black Lives Matter Movement. Additionally, the Bar also argues, in a different section of its brief, that Mr. Suhr's free speech claim does not accrue until the Bar uses the activities in calculating a *Keller* dues reduction amount. ECF 46:27. Assuming the Bar is correct, Mr. Suhr's claim regarding these statements did not accrue in 2020: it accrued at some later—and unidentified—date.

Ultimately, the Bar has the burden of proof to show that "the statute has run," and Mr. Suhr had no duty to address the issue in the Verified Amended Complaint. *See Ray v. Clements*, 700 F.3d 993, 1007 (7th Cir. 2012) (quoting *Griffin v. Rogers*, 308 F.3d 647, 753 (6th Cir. 2002)). The

- 8 -

Bar should bear the burden because it is in the "best position" to explain the nature of the statements and when it considered or at least should have considered the statements in calculating a *Keller* dues reduction amount. *See id.* at 1008 (citing *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 494 n.17 (2004)).

### B. The claims in this action are ripe.

The claims in this action are ripe—despite the Bar's contrary affirmative defense, which notably contradicts its statute of limitations defense. All claims relate to activities that have already occurred and that should have been accounted for in the Bar's most recent audit (the document in which it determines which of its activities are non-germane). Under United States Supreme Court precedent, the Bar has a "responsibility to provide procedures that minimize . . . [an impingement on First Amendment rights] and that facilitate a . . . [member's] ability to protect his [or her] rights." *Hudson*, 475 U.S. at 307 n.20.

The Bar says it "has not yet audited any of its activities occurring after June 30, 2023, for germaneness, which means it has not yet concluded which activities from that date are fundable with mandatory dues." ECF 46:24–25. These activities relate to social media and various Bar publications. *Id.* at 25. The Bar also says that it used an audit of activities from two years ago— fiscal year 2023—in calculating dues for fiscal year 2025. *Id.* at 24.

Problematically for the Bar, United States Supreme Court precedent is not so permissive. The Bar primarily relies on two decisions, both of which ruled against a public-sector union that wanted to collect mandatory dues. In *Chicago Teachers Union, Local No. 1 v. Hudson*, a teachers union determined that nonmembers would have to pay 95 percent of union dues for the 1982–83 school year. 475 U.S. at 295. As summarized by the Court, "[u]nion officials computed the 95% fee on the basis of the [u]nion's financial records for the fiscal year ending on June 30, 1982. They identified expenditures unrelated to collective bargaining and contract administration . . . ." *Id.* The

- 9 -

Court then held that the "advance reduction of dues" was "inadequate because it provided nonmembers with inadequate information about the basis for the proportionate share." *Id.* at 306. In passing, the Court noted that the union was not wrong to use "its expenses during the preceding year" in calculating the fee. *Id.* at 307 n.20.

In the second decision, *Knox v. SEIU, Local 1000*, the United States Supreme Court again ruled against a public-sector union while noting in passing that a union might be able to rely on an audit "in the most recent year" assuming a lack of "significant fluctuation[] in the chargeable and non-chargeable proportions of a union's spending." 567 U.S. 298, 318 n.7 (2012). It explained this assumption was at work in *Hudson*. *Id.* The Court then held that "[t]he First Amendment does not permit a . . . union to adopt procedures that have the effect of requiring objecting nonmembers to lend the union money to be used for political, ideological, and other purposes," although it noted that unions had been allowed "[i]n the interest of administrative convenience" to calculate dues "on the basis of . . . [their] expenses in the preceding year." *Id.* at 303 (quoting *Hudson*, 475 U.S. at 307 n.18).

The Bar, unlike the union in *Hudson*, uses old data in calculating dues. Specifically, it uses the most recent year "for which audited financial statements are available"—e.g., it used fiscal year 2023 activities to set dues for fiscal year 2025. ECF 46:23–24. The Bar admits that activities occurring as far back as October 2023 were not considered in calculating dues for fiscal year 2025, but the Bar has not explained why it cannot perform an audit based on much more recent activity—*Hudson*, on which it relies, involved such an audit.

The difference between the Bar's procedures and the union's in *Hudson* is substantial. First, the *Keller* dues reduction amount varies significantly from year to year, so the assumption mentioned in *Knox* does not apply. For fiscal year 2024, the amount was $15.50, but for fiscal year

- 10 -

2025, the amount is $11.00—a decrease of 30 percent. *Compare* ECF 44:20, *with Keller* Dues

Reduction                                  Notice                                  FY2025,

https://www.wisbar.org/formembers/membershipandbenefits/Documents/Keller%20Dues%20Ins

ert.pdf.[5] Indeed, for 2024, the Bar claims in its dues notice that (in whatever period it considered),

it spent $0 on social media, but it anticipates spending $5080 on such activities in 2025.

      Second, the Bar is saying that an attorney who objects to his fiscal year 2024 dues being

misused must wait until almost fiscal year 2026 to state a claim. This lengthy waiting period cannot

be squared with the United States Supreme Court's strong language in *Hudson*. *See* 475 U.S. at 305

("[W]hatever the amount, the quality of . . . [the] interest in not being compelled to subsidize the

propagation of political or ideological views that . . . [one] oppose[s] is clear. . . . [We have]

emphasized this point by quoting the comments of Thomas Jefferson and James Madison about

the tyrannical character of forcing an individual to contribute even 'three pence' for the

'propagation of opinions which he disbelieves.' "). Similarly, in *Janus*, the Court twice said that

compelling a person to subsidize speech with which he or she disagrees is "sinful and tyrannical."

585 U.S. at 893, 905 (quoting Thomas Jefferson, *A Bill for Establishing Religious Freedom* (1777),

*reprinted in* 2 *Papers of Thomas Jefferson* 545, 545 (J. Boyd ed. 1950)). The Court has not allowed

bars or unions to set dues based only on activities that occurred a full year earlier, and if such a

rule would create a lengthy waiting period, the rule would seem, in and of itself, sinful and

tyrannical—it would functionally require Mr. Suhr to give the Bar an interest-free loan to finance

speech he does not support. *See Knox*, 567 U.S. at 302–03.

---

[5] Given this action's procedural posture, whether this Court can rely on this notice is questionable. The Bar references this notice in its brief, and Mr. Suhr cites it only in response. ECF 46:27.

At most, the Bar raises a factual dispute for which discovery is needed. This Court should have access to evidence about the degree of fluctuation in the *Keller* dues reduction amount so that it can decide the extent to which the Bar may be relying on outdated information.

**II.     Mr. Suhr has stated a free speech claim by alleging that the Bar has engaged in various non-germane activities that were improperly accounted for when the Bar determined a *Keller* dues reduction amount.**

Mr. Suhr has stated a free speech claim. Specifically, he alleged that the Bar has engaged in non-germane activities that were improperly accounted for by the Bar when it determined a *Keller* dues reduction amount. *See Keller*, 496 U.S. at 13–14.

For context, in *Kingstad*, the Seventh Circuit explained that an activity is non-germane if it is not "reasonably related" to a constitutionally permissible purpose of the Bar, i.e., improving the quality of legal services or regulating the legal profession. 622 F.3d at 716. An activity, it said, can be non-germane even if the activity is not inherently "ideological" or "political;" however, the ideological or political nature of the activity is a "factor[] . . . [in] the ultimate analysis." *Id.* The Seventh Circuit then held that a "public relations campaign" by the Bar was germane because it was aimed at fostering "better attorney-client relationships;" however, the Seventh Circuit acknowledged that this theory was not "beyond debate."[6] *Id.* at 719. Notably, *Kingstad* was not about ideological or political activity, so the Seventh Circuit did not have to apply that "factor." *Id.* at 716; *see also Southworth v. Grebe*, 151 F.3d 717, 724 (7th Cir. 1998) (explaining " 'germaneness' cannot be read so broadly as to justify the compelled funding of private organizations which engage in political and ideological advocacy, activities[,] and speech" and

---

[6] *Kingstad* was wrongly decided, but it is binding on this Court (although, the Seventh Circuit correctly held an activity need not be ideological or political in nature to be non-germane). Mr. Suhr reserves the right to argue that it should be overruled.

discussing *Keller*), *rev'd sub nom. on other grounds*, *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217 (2000).

After *Kingstad*, the United States Supreme Court clarified in *Knox* that the "definition of germaneness" had to be sufficiently narrow so as not to "effectively eviscerate the limitation on the use of compulsory fees to support . . . controversial political activities." *Knox*, 567 U.S. at 320. The Court indicated that germaneness requires a direct and simple, rather than attenuated, connection between an activity and a constitutionally permissible justification for compelled union support—especially if the activity is ideological or political in nature—a point noted by some lower courts even before *Knox*. *See id.* For example, "[l]obbying for an increase in judicial salaries" is non-germane because "[a]ny impact on the quality of legal service[s] may only be discerned by engaging in . . . protracted analysis . . . ." *Brosterhous v. State Bar of Cal.*, No. 95AS03901, slip op. at 30 (Cal. Super. Ct. Aug. 17, 1999); *see also id.* at 13 ("[G]ermaneness requires a simple, direct connection . . . ."). In another post-*Kingstad* decision, the Court indicated *Keller* significantly restricts associations like the Bar, suggesting most activities other than "proposing ethical codes and disciplining bar members" are non-germane. *Harris v. Quinn*, 573 U.S. 616, 655–56 (2014) (citing *Keller*, 567 U.S. at 14).

Applying *Kingstad*, in light of subsequent decisions, the Bar engages in many non-germane activities.

### A.     *The Bar's illegal activities are non-germane*.

Much of this action concerns activities that Mr. Suhr alleges are not just non-germane— but illegal. Illegal activity cannot be "reasonably related" to a constitutionally permissible justification for the Bar's existence. *Kingstad*, 622 F.3d at 716.

Mr. Suhr provided detailed allegations regarding the Bar's discriminatory conduct, even attaching various application materials for the annual leadership programs that asked about race,

- 13 -

sex, and viewpoint. Indeed, one form begins with the following question: "Please provide information about yourself for the Selection Committee to consider. . . . Factors to incorporate in your comments below may include, but are not limited to, your race, ethnicity[,] . . . national origin, . . . [and] gender . . . ." ECF 44-1:9. Mr. Suhr also discussed a plethora of other evidence, including (1) materials prepared by the Bar bragging that "[o]ver the years, 40 to 60 percent of participants were members of diverse groups," *id.* at 50; (2) the Bar's definition of "diversity," which includes "race," *id.* at 70; (3) recent demographic information showing that the number of minority participants in one program was disproportionately high relative to Wisconsin's population, *id.* at 74; (4) a report noting that the Bar advertises these programs to minorities and that the programs "focus on ethnic diversity," *id.* at 68; and (5) a YouTube video in which a Bar Past-president said that the leaders of the Bar were now "people of color" and "women" because of the Bar's "intentional and deliberate choices," including its efforts to support these programs, *id.* at 7.

The Bar claims that Mr. Suhr "misquotes and mischaracterizes" the application materials; however, it acknowledges that "these application questions clearly show that characteristics such as race, ethnicity, and gender are but a few suggested factors among many that can be presented to display the candidate's unique perspectives and experiences."[7] ECF 46:31. The Bar does not address Mr. Suhr's other evidence of discriminatory conduct, and, more importantly, the Bar appears to be admitting liability. In *SFFA v. President & Fellows of Harvard College*, the United States Supreme Court held that similar consideration of race in college admissions violates "the twin commands of the Equal Protection Clause": "race may never be used as a 'negative[,]

---

[7] Mr. Suhr also alleged that the Bar has engaged in viewpoint discrimination (especially with regards to its mentoring program), a point not discussed by the Bar. *See* ECF 44:3, 5, 18.

- 14 -

and . . . it may not operate as a stereotype." 600 U.S. 181, 218 (2023). It went on to emphasize that in a "zero-sum" situation, like college admissions, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218–19. Therefore, any consideration of race is necessarily negative. *Id.* It also explained that a person's background cannot be assumed based on race—stereotyping made the admissions policies unconstitutional. *Id.* at 219.

The Bar acknowledges that "race, ethnicity, and gender" are "factors" that it used to determine whether an applicant or nominee for the annual leadership programs has the right "perspectives and experiences." ECF 46:31. The Bar's argument sounds much more like the dissent in *SFFA* than the majority. *See* 600 U.S. at 347 (Sotomayor, J., dissenting) (declaring race should be a permissible consideration so long as it is "one factor of many in the context of [a] holistic review"). The holding of *SFFA*, however, is not in the dissent: at least in a zero-sum situation, consideration of immutable characteristics is illegal. *Id.* at 218–19 (majority opinion). These programs are zero-sum. ECF 44:10. Accordingly, any benefit to even one applicant or nominee based on race is necessarily negative because someone of another race cannot claim the same advantage. Additionally, the benefit is provided based on a stereotype: people with certain skin colors have "perspectives and experiences" that are more valuable. A person's skin color does not make him or her a better leader, and the Bar's apparent assumption otherwise is patently offensive. *Id.* at 15, 21 (noting Mr. Suhr's concern about doling out "public honors and recognition" inappropriately); *see also Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 722–23 (7th Cir. 2005) (concluding "administrative pressure" to hire diverse candidates, including by expanding an interview pool to include minorities, could form a "strong basis for drawing an inference of intentional discrimination"); *Preston v. Wis. Health Fund*, 397 F.3d 539, 542 (7th Cir.

- 15 -

2005) (explaining courts are not "surprised" when "pressure from . . . corporate superiors imbued with belief in 'diversity' " causes discrimination).

The Bar purports that *SFFA* is limited only to the college admissions context—it is wrong. ECF 46:29–30. The United States Supreme Court emphasized that "[e]liminating racial discrimination means eliminating all of it. . . . [T]he Equal Protection Clause . . . is 'universal in [its] application.' " *SFFA*, 600 U.S. at 206 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)) ([its] alteration in original). The Court relied on precedent from other contexts, including government contracting and voting. *Id.* (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)); *id.* at 208 (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). Multiple courts have applied *SFFA* in contexts other than college admissions. *See, e.g.*, *Nuziard v. MBDA*, __ F. Supp. 3d __, 2024 WL 965299, at *36 (N.D. Tex. Mar. 5, 2024) ("[N]othing in the [*SFFA*] decision indicates the Court's holding should be constrained to that context.").

### B.    The Bar's diversity, equity, and inclusion initiatives are non-germane.

Even assuming that the annual leadership programs are not illegal, similar programs have been declared non-germane, as have diversity efforts more generally. As summarized by the State Bar of California, after *Keller*, one court ruled that the following were non-germane: "[a]ctivities . . . directed at helping ethnic minority or women attorneys [] 'achieve personal success in []the practice of law;' " "[m]entoring programs designed for use by law firms;" "[a] survey of women lawyers in the state[];" and "[a] statewide Minority Attorneys Conference with topics such as 'client development for minority law firms,' 'building a solo practice,' 'how to become a judge,' and 'how to become a partner in a majority law firm.' " Cal. Bar, *Test for Chargeability*,                     at               1–2               (Feb.               5,               2000), https://www.calbar.ca.gov/portals/0/documents/bog/minutes_00-02-05_4010_chargeabilty.pdf. That court reasoned, "laudable intentions" aside, efforts to combat "problems which are firmly

- 16 -

entrenched in society itself" (e.g., racial disparities) are non-germane because an association like the Bar does not exist "to participate in the general government of the State" but rather to provide "specialized professional advice." *Brosterhous*, No. 95AS03901, at 11, 19. It also noted, "any issue" involving immutable characteristics is "clear[ly] ideological, if not political," in nature. *Id.* at 20.

Diversity, equity, and inclusion initiatives are, if nothing else, "controversial"—which is important under *Knox*. *See* 567 U.S. at 320. Such efforts are as controversial today as "gun control or nuclear weapons freeze initiatives" were when *Keller* was decided—and the United States Supreme Court held associations like the Bar have no business being involved in those two things because they are too "ideological" or "political." 496 U.S. at 15–16; *see also In re Diversity, Equity, Inclusion, & Access Training for Continuing Legal Educ.*, No. 22-01, at 2 (Wis. July 13, 2023) (Rebecca Bradley, J., concurring) (calling such initiatives "a smoke screen for a divisive political agenda that perniciously reduces people to racial categories and strips them of their unique individuality").

Additionally, such initiatives are inconsistent with the "color-blind Constitution," so they cannot be said to either improve the quality of legal services or regulate the legal profession. The United States Supreme Court held in *SFFA* that "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens." 600 U.S. at 230 (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting), *overruled by Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)). Mr. Suhr alleged that contrary to the color-blind Constitution, many of the Bar's activities promote a "race-centric worldview." ECF 44:19. He should not be compelled to subsidize activities that are at odds with the spirit of *SFFA* under the guise that these activities will somehow make the legal profession better—and as a condition to him practicing law, no less.

- 17 -

### C. The Bar's various business ventures are non-germane.

Mr. Suhr also took issue with the Bar's various business ventures. For example, the Bar advertises cookies as part of a healthy lifestyle. ECF 44:29. Selling cookies is not "reasonably related" to either improving the quality of legal services or regulating the legal profession. *See Kingstad*, 622 F.3d at 716. Indeed, contrary to the Bar's claimed intent, a cookie-based diet does not promote fitness. *See* ECF 44:29. Regardless, to quote the Fifth Circuit, the Bar is not an "all-encompassing wellness service." *Boudreaux (Boudreaux II) v. La. State Bar Ass'n*, 86 F.4th 620, 632 (5th Cir. 2023). It does not get to comment on "every facet of lawyers' health and fitness." *Id.* The Bar also cannot argue that raising money for itself is germane—by that logic, collecting any dues would be germane. *United States v. United Foods, Inc.*, 533 U.S. 405, 415 (2001) (explaining the germaneness requirement set forth in *Keller* must not be rendered "empty of meaning and significance"); *Romero v. Colegio de Abogados de P.R.*, 204 F.3d 291, 300–03 (1st Cir. 2000) (explaining the germaneness requirement has "teeth" and holding the record did not establish that mandatory life insurance was germane).

The Bar's argument regarding these activities reads more like a motion for summary judgment. The Bar appears to raise a factual dispute by claiming that these activities "are not funded by dues at all." ECF 46:20. If the Bar is saying that no staff time was spent on these business ventures or that all staff time was funded entirely from bank accounts that do not include membership dues, Mr. Suhr is entitled to discovery before a decision is rendered. More fundamentally, because money is fungible, Mr. Suhr needs to be credited for all non-germane activities, even if the Bar is keeping separate bank accounts. The Seventh Circuit has held that— because money is "fungible"—an association like the Bar cannot escape a germaneness requirement through "bookkeeping." *Southworth*, 151 F.3d at 732. Accordingly, the Bar must account for the cost of all non-germane activities—even those that cover direct costs or earn a

- 18 -

profit—when calculating a *Keller* dues reduction amount. Notably, the Bar claims in one document that "[a]ny revenue generated by . . . [a non-germane] activity . . . or other income earmarked for the activity . . . [are] deducted from the total cost before the amount of dues devoted to the activity . . . [is] calculated." ECF 35-1:30. The Bar does not explain why it should be able to consider "revenue" or "other income" in this manner. That theory is unsupported by precedent. The First Amendment does not permit the Bar to make Mr. Suhr a compelled investor in a business venture that he does not support. Perhaps if a donor said to the Bar, "I will give you $100,000 for non-germane activity *x*," and the Bar accounted for all staff time, etc., in spending the money, subject to strict accounting practices, it would not need to account for *x* in calculating a *Keller* dues reduction amount, but if even a dollar from a bank account containing dues were spent on *x*, that dollar would need to be credited, and it cannot be offset by the $100,000. To give an extreme hypothetical, if the Bar became a drug dealer, it might make a lot of money, but it could not compel Mr. Suhr to subsidize its initial payment to the cartel.

### D. The Bar's Wisconsin Lawyer Assistance Program (WisLAP) is non-germane.

For similar reasons, the Bar's WisLAP is also non-germane. The Bar purports that this program promotes "health and wellness." ECF 44:28. Among other things, WisLAP encourages attorneys to consider whether they have "attention-deficient/hyperactivity disorder" or "depression." *Id.* It also recommends "breathe and relax" exercises and "mindful eating." *Id.* at 29. Assuming, for the sake of argument, that healthier attorneys are more effective, WisLAP is still non-germane. Again, an association like the Bar is not an "all-encompassing wellness service." *Boudreaux II*, 86 F.4th at 632. The Bar lacks "expertise" in such matters. *Id.*; *see also Keller*, 496 U.S. at 13 ("The State Bar of California was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession."). This sort of activity lacks a reasonable relation to either

- 19 -

improving the quality of legal services or regulating the legal profession; instead, it is advice on a "personal matter" that might affect an attorney's competence "indirectly." *Boudreaux II*, 86 F.4th at 633. Accordingly, it is non-germane, and an opposite conclusion stretches the germaneness requirement awfully thin. *See id.*

The Bar's contrary argument is wanting, raising another factual dispute. The Bar says WisLAP is just a new name for the "Lawyers Concerned for Lawyers" program, which was declared germane in *Thiel* (with almost no analysis). ECF 46:35 & n.11. This Court has no way of knowing whether the Bar is right. The Seventh Circuit in *Thiel* said little about the program, merely noting that "Lawyers Concerned for Lawyers assists alcoholic lawyers." 94 F.3d at 405. WisLAP does much more than help alcoholic attorneys—it is a general health and wellness program. ECF 44:28. Helping specific attorneys who have a substance abuse disorder may be germane to improving the legal profession; however, "generic advice to attorneys about health and fitness" is not. *See Boudreaux II*, 86 F.4th at 633. No one seriously thinks, for example, that the Bar could use dues to open an Anytime Fitness franchise under the guise of helping some attorneys get in shape or on the idea that exercise reduces stress and encourages mindfulness. The Bar makes no other arguments about WisLAP—it merely alleges that it is the same program discussed in *Thiel*. It does not, for example, argue that a general health and wellness program is, in fact, germane. Accordingly, this Court should merely note that the Bar has raised a factual dispute in disposing of the Bar's argument.

### E.    *The Bar's social media activities are non-germane.*

The Bar's social media activities discussed in the Verified Amended Complaint are non-germane. For example, the Bar has posted a generic "Happy Halloween" message on one social media site. ECF 1-5:35. The Fifth Circuit held that similar activity (a social media post about Halloween) by the Louisiana Bar was non-germane because it does not "involve" that bar's

- 20 -

"character as a legal organization." *Boudreaux II*, 86 F.4th at 633–34. As the Fifth Circuit explained, such activity lacks a "direct relation" to legal practice. *Id.* at 634. This Court should reach the same conclusion.

The Bar's arguments, once again, miss the mark. The Bar argues that it correctly classified "social media" as a non-chargeable activity. ECF 46:27. Figure 2 is a chart from the Bar's fiscal year 2024 dues notice, which was included in the Verified Amended Complaint. ECF 44:34.

Figure 2: The Non-Germane Activities Chart

| Activity | Cost of Nonchargeable Activity | Portion Funded by Dues |
|---|---|---|
| Board of Governors | $42,214 | $42,214 |
| Legislative Activities | 62,552 | 62,552 |
| Annual Meeting & Conference | 30,612 | 30,612 |
| ABA Delegates | 1,596 | 1,596 |
| ABA Lobby Day | 1,346 | 1,346 |
| Division ABA | 3,703 | 3,703 |
| Government Lawyers Division | 2,852 | 2,852 |
| Non-Resident Lawyers Division | 4,633 | 4,633 |
| WI Lawyer Magazine | 13,738 | 13,738 |
| Legislative Oversight Committee | 5,291 | 5,291 |
| Executive Committee | 758 | 758 |
| Board of Governors Policy Committee | 3,368 | 3,368 |
| InsideTrack | 521 | 521 |
| Grassroots & Rotunda Report | 59,264 | 59,264 |
| Sections | 61,829 | 61,829 |
| Young Lawyers Division | 2,417 | 2,417 |
| Senior Lawyers Division | 7,968 | 7,968 |
| Social Media/WisLaw Now | 0 | 0 |
| Legal Assistance Committee | 0 | 0 |
| Total Cost of Nonchargeable Activities | $304,662 | |
| Total Dues Devoted to Nonchargeable Activities | | $304,662 |

Mr. Suhr acknowledged that "Social Media" was listed in the chart but alleged that "zero dollars of 'nonchargeable activity' for 'social media' makes zero sense . . . ." *Id.* at 35. The Bar does not respond to this concern. At most, the Bar has raised another factual dispute for which discovery is warranted.

- 21 -

### F.    The Bar's *Wisconsin Lawyers* articles are non-germane.

Even the Bar appears to concede that some articles it published in the *Wisconsin Lawyer* are non-germane. ECF 46:19–20; *see Pomeroy v. Utah State Bar*, 598 F. Supp. 3d 1250, 1260 (D. Utah 2022) (explaining an attorney plausibly identified articles in the *Utah Bar Journal* that "could be non-germane" because "[i]nvoking the concept of implicit bias, discussing the importance of equity as a distinct concept from equality, and reviewing a book which advocates punishing people who protect an institution where a sexual assault occurred" are "topics" that could "plausibly stray from the goals of regulating the legal profession and improving the quality of legal services by taking ideological positions").

The Bar, however, raises three arguments. First, it suggests the activity in question is the publication of a magazine, not individual articles. ECF 46:33. Accordingly, it says that this Court should look at the whole magazine. Mr. Suhr disagrees; however, if the Bar is right, assessing the whole magazine will take discovery and further arguments. The First Circuit explained that if a "chaplain" opens a two-hour annual meeting with a "long prayer" that creates a "partisan" atmosphere, the whole meeting can be deemed non-germane because the "permissible and impermissible are intertwined beyond separation." *Schneider v. Colegio de Abogrados de P.R.*, 917 F.2d 620, 633–34 (1st Cir. 1990); *see also Brosterhous*, No. 95A03901, at 26–27 ("Where impermissible and permissible are intertwined beyond separation, the objector should be entitled to a full rebate . . . ."). Applying this standard, the First Circuit suggested factual disputes may exist when an association like the Bar publishes a magazine that contains both "educational articles about the legal profession" and "markedly political and ideological material." *Schneider*, 917 F.3d at 634. At most, the Bar raises another factual dispute about the nature of the *Wisconsin Lawyer*.

Second, the Bar claims that one specific article was germane, saying that Mr. Suhr "cherry-pick[ed]" a sentence from it to insinuate that it promotes a race-centric worldview. ECF 46:33. That article, however, contains an entire section called "Diversity Demanded Action." ECF 1-4:1–2. The author went on about the death of George Floyd, a black man who died in a police-related incident and also referenced similar incidents: "In 2020, their names, tragically, became iconic: George Floyd, Breonna Taylor, Ahmaud Arbery. Floyd's desperate final pleas, 'I can't breathe,' became a haunting symbol of our nation's legacy of racial injustice and the slogan of the Black Lives Matter movement."[8] *Id.* at 1.

## III. Mr. Suhr has also stated a free speech claim by alleging that the Bar's dues-collecting procedures are constitutionally inadequate.

Mr. Suhr has stated a free speech claim for a second reason. Under *Keller*, the Bar must implement procedures that safeguard free speech—i.e., that limit the chance that a member inadvertently subsidizes non-germane activities that he or she does not want to fund. 496 U.S. at 17; *Knox*, 567 U.S. at 313 (explaining *Hudson* made "clear" that these procedures "must satisfy a high standard"). In the Verified Amended Complaint, Mr. Suhr painstakingly explained how the Bar's dues-collecting procedures are constitutionally inadequate.

---

[8] The Bar also attaches to its motion pages from the print edition of the *Wisconsin Lawyer*, which the Bar refers to as Exhibit A; the pages should be excluded so as not to complicate the legal standard. The Bar appears to ask that this Court take judicial notice of the pages to which Mr. Suhr objects. It claims that the pages say that "[s]tatements or expressions of opinions here are those of the authors and not necessarily those of the State Bar or editors." ECF 46:33–34. Under FRCP 12(d), if the pages are not excluded, the Bar's motion must be treated as a motion for summary judgment. Mr. Suhr has not had an opportunity for discovery and could—if it were procedurally appropriate—rebut the inference that the Bar would have this Court draw. The Bar purports that it can attach the pages because Mr. Suhr cited the print edition of the *Wisconsin Lawyer* "numerous" times in the Verified Amended Complaint. *Id.* at 34 n.10. The Bar is wrong. He cited the online edition, which is not the same—the disclaimer language is not found in the articles that Mr. Suhr attached to the Verified Amended Complaint. Whether it can be found anywhere online is unclear. Even assuming the speech in these articles is not attributable to the Bar, it makes little difference. Mr. Suhr cannot be compelled to subsidize the speech of a few attorneys who wrote articles that the Bar published any more than he can be compelled to subsidize the Bar's own speech.

Mr. Suhr alleged that the Bar's procedures have three defects. First, the Bar uses a so-called "opt-out . . . scheme"—the Bar presumes that members want to fund non-germane activities and makes them take steps to "opt out." *See Knox*, 567 U.S. at 312. These steps must be taken during a specific period each year. ECF 44:32. The United States Supreme Court declared such schemes inadequate (or at least highly suspect) in *Knox*, noting "[c]ourts 'do not presume acquiescence in the loss of fundamental rights' " and that such schemes "create[] a risk" that mandatory dues will be used for non-germane activities without an objector's knowledge—let alone approval. 567 U.S. at 312 (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999)).

Second, the Bar gives members inadequate notice about the "source of the figure" they are required to pay such that "potential objectors" lack "sufficient information to gauge the propriety" of the *Keller* dues reduction amount. *See Hudson*, 475 U.S. at 306. In *Hudson*, the United States Supreme Court held that a notice was "inadequate" because "[i]nstead of identifying the expenditures for . . . [germane activities,] the [u]nion identified the amount that it admittedly had expended for purposes that did not benefit dissenting members." *Id.* at 306–07. More specifically, the union erred because the notice explained why nonmembers would get a five percent reduction rather than why "they were required to pay" 95 percent of what members had to pay. *Id.* at 307.

The dues notice that the Bar uses each year is like the notice in *Hudson*. Figure 2, above, is a chart from the Bar's fiscal year 2024 dues notice. ECF 44:34. It lists activities that the Bar classified as non-germane. In the notice, the Bar did not provide a similar chart for activities that the Bar classified as germane or otherwise explain the source of the figure that members are required to pay. *Id.* Instead, the Bar said that the *Keller* dues reduction amount was calculated by summing up the cost of activities that the Bar deemed non-germane—and even these activities

- 24 -

were referenced only at a high level of generality. *Id.* at 6 (citing *Janus*, 585 U.S. at 922–23) ("The Bar obscures its funding decisions in large, generic categories . . . ."). As noted in the Verified Amended Complaint, "[e]ffectively, the Bar presumes that members are aware of all activities that the Bar classifies as chargeable and places the onus on members to object to its classification of these activities." *Id.* at 35. Indeed, Mr. Suhr acknowledged that "from the chart" alone, he could not be "entirely sure" whether some activities discussed in the complaint were actually deemed chargeable to membership dues. *Id.*

Lastly, the Bar does not permit members to access records that are reasonably necessary for those members to understand whether activities have been incorrectly classified as chargeable. *See Janus*, 585 U.S. at 922–24 (indicating members should not have to litigate to gain access to such records).

Even if one of these defects does not render the Bar's dues-collecting procedures constitutionally inadequate, in the aggregate, they violate Mr. Suhr's free speech right. The First Amendment "requires that [B]ar members be able to challenge expenditures as non-germane," and the "inability to identify non-germane expenditures" in a straightforward manner is a standalone injury to Mr. Suhr's free speech right. *Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748, 760 (5th Cir. 2021); *see also Janus*, 585 U.S. at 923 (explaining determining whether an activity is classified correctly should not be "a laborious and difficult task"). These concerns are even more serious if the Bar is correct that it can rely on potentially outdated information when calculating a *Keller* dues reduction amount.

The Bar's response to this detailed argument is only six sentences long. ECF 46:36. It relies on two Seventh Circuit decisions rejecting different arguments but in which the court passingly indicated the Bar's procedures comply with *Keller*. The decisions on which the Bar relies did not

address claims anything like Mr. Suhr's. The Bar's theory is "underdeveloped" and should not be addressed by this Court at this time. *See Shipley v. Chi Bd. of Election Comm'nrs*, 947 F.3d 1056, 1063 (7th Cir. 2020) (citing *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 419 n.2 (7th Cir. 2019)).

**IV.    One instance of non-germane activity is sufficient to state a free association claim; however, even if more is required, Mr. Suhr has alleged plenty.**

Mr. Suhr has identified plenty of non-germane activities—and all he needs is one to state a free association claim. The Fifth Circuit, in addressing this issue, stated: "[W]e decline to recognize a *de minimis* exception . . . . *Keller* . . . categorically state[s] that [mandatory] bar associations cannot engage in non-germane speech . . . . 'Compelled membership in a bar association that engages in non-germane activities . . . fails exacting scrutiny.' " *Boudreaux II*, 86 F.4th at 636–38 (quoting *McDonald v. Longley*, 4 F.4th 229, 246 (5th Cir. 2021)) (ellipsis in original). Additionally, it noted, "a *de minimis* standard is unworkable . . . . It would put judges in the position of deciding whether speech is objectionable *enough* . . . ." *Id.* at 637.

The Bar launches a broad two-step assault on the Verified Amended Complaint. First, it claims that the United States Supreme Court in *Keller* foreclosed any—or at least some—free association claims. ECF 46:19. Second, it says that if a free association claim may proceed, Mr. Suhr must point to a sufficient quantum of non-germane activities, and it believes he has not done so. *Id.* at 20.

*Keller* does not foreclose a free association claim like the one brought in this action. In the second to last paragraph, the United States Supreme Court made clear that it was declining to address a "freedom of association claim" that attorneys "cannot be compelled to associate with an organization that engages in political or ideological activities," at least when those activities are non-germane. *Keller*, 496 U.S. at 17. The Court then stated that this claim was different—and

- 26 -

"much broader"—than anything addressed in its precedent to date, i.e., the Court considered the question open. *Id.* The Court remanded for a lower court to consider it in the "first instance." *Id.*

At least the Fifth and the Ninth Circuits have rejected the Bar's reading of *Keller*. *Boudreaux II*, 86 F.4th at 624; *Crowe*, 989 F.3d at 728 ("*Keller* and . . . [a prior decision] thus speak for themselves: the [United States] Supreme Court has never resolved this broader free association claim based on compelled bar membership."); *see also McDonald*, 4 F.4th at 244 (noting *Keller* and a prior decision "did not decide whether lawyers may be constitutionally mandated to join a bar association that engages in other, non-germane activities").

The Bar's reading of *Keller* is based on dicta in a Tenth Circuit opinion. The Bar asks this Court to adopt a novel "quantity, substance, or prominence" test. ECF 46:20. The language comes from a footnote of that opinion, but the footnote makes clear that the court was holding open an issue, not deciding one: "A potential open issue is to what degree, in quantity, substance, or prominence, a bar association must engage in non-germane activities in order to support a freedom-of-association claim . . . . [B]ecause this issue was not adequately argued before us, we do not address it now." *Schell v. Chief Just. & Justs. of the Okla. Sup. Ct.*, 11 F.4th 1178, 1195 n.11 (10th Cir. 2021). When the Bar says that this test is a "better standard" that was "used by the Tenth Circuit" for evaluating a free association claim, the Bar is mistaken. ECF 46:13.

The one district court opinion, *Pomeroy v. Utah State Bar*, that supports the Bar's preferred test was decided on a summary judgment motion after protracted litigation—not a motion to dismiss. 2024 WL 1810229 (D. Utah Apr. 25, 2024). Indeed, at the motion to dismiss stage, the attorney in *Pomeroy* won. *See Pomeroy*, 598 F. Supp. 3d at 1260. At a minimum, if this Court desires to apply a "quantity, substance, or prominence" test, Mr. Suhr is entitled to a similar opportunity to engage in discovery. His claims are much broader and more serious than those

- 27 -

considered by the district court in *Pomeroy*—the Utah Bar was not alleged to have engaged in discriminatory conduct.

The Bar, in suggesting Seventh Circuit precedent forecloses Mr. Suhr's free association claim, is wrong. The Bar relies on *File v. Martin*, 33 F.4th 385 (7th Cir. 2022), *cert. denied sub nom.*, *File v. Hickey*, 143 S. Ct. 745 (2023). In *File*, an attorney argued that mandatory membership in the Bar was facially unconstitutional, and that argument was rejected; however, the Seventh Circuit emphasized that the attorney had not brought an as-applied claim. *Id.* at 388, 391 n.1 ("[The plaintiff] sought a declaration that the mandatory bar is facially incompatible with the First Amendment . . . . [He] has not raised a *Keller* 'germaneness' challenge . . . ."). Mr. Suhr brings the kind of claim that attorneys post-*File* were practically invited to bring. The Bar's contrary reading of *File* is nonsensical. The Bar says that "the requirement for dues reduction procedures presupposes that a mandatory bar might engage in non-germane activities and provides a mechanism for ensuring that such activities do not violate an objector's constitutional rights." ECF 46:19. This presupposition itself presupposes that as-applied free association claims were presented and rejected in these prior actions. Not so.

At bottom, the Bar may be concerned that the outcome Mr. Suhr seeks is overly troublesome for the Bar bureaucracy; however, such concerns are irrelevant. *See Keller*, 496 U.S. at 16–17 (quoted source omitted) (noting "additional burden[s]" on bar associations are "hardly sufficient" reasons to "justify contravention of the constitutional mandate"). Also, the rule is more flexible than the rule for public-sector unions. They cannot even compel a nonmember to fund collective bargaining anymore. *Janus*, 585 U.S. at 884. Notably, Mr. Suhr has no nonmember option.

- 28 -

## V. Forcing Mr. Suhr to subsidize and associate himself with the Bar is inconsistent with the history of the First Amendment.

Mr. Suhr's claims are also supported by the history of the First Amendment—the Bar makes no effort to argue otherwise. *Id.* at 904 ("The [u]nion . . . failed to show that . . . the First Amendment was originally understood to allow forced subsidies like those at issue here."); *see N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24–25 (2022) (citing *United States v. Stevens*, 559 U.S. 460, 468–71 (2010)) (explaining "the government must generally point to *historical* evidence about the reach of the First Amendment protections").

Associations like the Bar did not exist until over a century after the First Amendment was ratified. Leslie C. Levin, *The End of Mandatory State Bars?*, 109 Geo. L.J. Online 1, 3–5 (2020). Wisconsin had nothing like it until 1956. *In re Integration of the Bar*, 5 Wis. 2d 618 (1958) (per curiam). The Bar also changed over time, and today, it resembles more of a social club or trade association that engages in advocacy than a regulatory body. As then-Justice Shirley Abrahamson explained, "[i]n 1976, the [Wisconsin Supreme C]ourt explicitly removed" several "responsibilities from the Bar and placed them under the court's supervision to assure the public that lawyer discipline, bar admission, and regulating competence . . . would be conducted for the benefit of the public, independent of elected bar officials." *In re State Bar of Wis.*, 485 N.W.2d 225, 231 (1992) (Abrahamson, J., dissenting). As she continued, while "[t]he bench and the bar should . . . strive for amicable relations," the court wanted an "independent bar and an independent judiciary." *Id.* at 233. Notably, Justice Abrahamson was dissenting from a court order reinstating mandatory Bar membership, and she concluded, "I would not reinstitute a unified bar because . . . regulating the legal profession and improving the quality of legal services[] are performed primarily by the . . . court, not the Bar." *Id.* at 231. She worried that *Keller* would prevent the Bar from "engaging in law reform." *Id.* at 234.

- 29 -

The Bar has not cited any historical evidence that it can compel Mr. Suhr to subsidize activities unrelated to either improving the quality of legal services or regulating the legal profession or even engage in such activities given that Mr. Suhr is forced to associate with the Bar. At least for as long as membership in the Bar is mandatory, history does not indicate that the Bar may engage in such activities.

## VI. The Bar mistakenly treats all non-germane activities as either relevant to both the free speech and free association claims or neither.

Lastly, the Bar mistakenly treats all non-germane activities discussed in the Verified Amended Complaint as either relevant to both claims or neither. Even if this Court were to conclude that the *Keller* dues reduction amount was calculated perfectly, that conclusion would not defeat the free association claim. *Taylor v. Buchanan*, 4 F.4th 406, 410–11 (6th Cir. 2021) (Thapar, J., concurring). Additionally, the Bar's ripeness argument, at most, defeats some of Mr. Suhr's allegations as those allegations relate to the free speech claim. The Bar cannot defeat the free association claim merely by saying it has yet to account for post-June 30, 2023, activities in calculating a *Keller* dues reduction amount. In fact, assuming the Bar's ripeness argument is correct, Mr. Suhr's free association claim is more potent: without such a claim, he must front money to the Bar, wait a year or so, and then hope the Bar accounts for that activity in calculating a *Keller* dues reduction amount.

## CONCLUSION

This Court should deny the motion for the preceding reasons, and discovery should commence immediately.

Dated this 28th day of June, 2024.

- 30 -

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*Electronically signed by Skylar Croy*

Richard Esenberg (WI Bar No. 1005622)
Daniel P. Lennington (WI Bar No. 1088694)
Skylar Croy (WI Bar No. 1117831)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Dan@will-law.org
Skylar@will-law.org

*Attorneys for Plaintiff*

- 31 -

**CERTIFICATE OF SERVICE**

I hereby certify that on June 28th, 2024, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice to all attorneys of record.

Dated this 28th day of June, 2024.

s/ *Skylar Croy*
_____
Skylar Croy
